## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VENETEC INTERNATIONAL, INC.     )
    )
        Plaintiff,     )
    )
    v.     )
    )   Case No.: 07-CV-0057 ***
NEXUS MEDICAL, LLC     )
    )
        Defendant.     )
    )
_____)

### DECLARATION OF SCOTT R. BROWN IN SUPPORT OF
### NEXUS MEDICAL LLC'S MOTION TO STAY ALL PROCEEDINGS
### PENDING REEXAMINATION OF U.S. PATENT NO. 6,447,485 BY
### THE UNITED STATES PATENT AND TRADEMARK OFFICE

I, Scott R. Brown, declare:

1.     I am a member in good standing of the bar of the state of Missouri and am a partner in the law firm Hovey Williams LLP, responsible for representation of Nexus Medical, LLC ("Nexus") in this matter. I have personal knowledge of the statements made herein.

2.     This Declaration accompanies Nexus Medical, LLC's Motion to Stay All Proceedings Pending Reexamination of U.S. Patent No. 6,447,485 by the United States Patent and Trademark Office.

3.     Attached hereto as Exhibit A is a copy of Nexus Medical, LLC's Request for Reexamination of U.S. Patent No. 6,447,485.

4.     Attached hereto as Exhibit B is a copy of *Alloc, Inc. v. Unilin Decor N.V.*, No. Civ.A. 03-253-GMS, 2003 WL 21640372 (D. Del. July 11, 2003).

5.     Attached hereto as Exhibit C is a copy of *Broadcast Innovation, LLC v. Charter Communications, Inc.*, 2006 WL 1897165 (D. Colo. 2006).

6.     Attached hereto as Exhibit D is a copy of *Pegasus Development Corp., L.L.C. v. DirecTV, Inc.*, No. Civ.A. 00-1020-GMS, 2003 WL 21105073 (D. Del. May 14, 2003).

7.    Attached hereto as Exhibit E is a copy of *Gioello Enterprises LTD. v. Mattel, Inc.,* No. C.A. 99-375 GMS, 2001 WL 125340 (D. Del. Jan. 29, 2001).

8.    Attached hereto as Exhibit F is a copy of *Abbott Diabetes Care, Inc. v. Dexcom, Inc.,* C.A. No. 05-590 GMS, 2006 WL 2375035 (D. Del. 2006).

9.    Attached hereto as Exhibit G is a copy of *Kla-Tencor Corp. v. Nanometrics, Inc.,* 2006 WL 708661 (N.D. Cal. 2006).

10.    Attached hereto as Exhibit H is a copy of U.S. Patent No. 6,447,485.

11.    Attached hereto as Exhibit I is a copy of U.S. Patent No. 6,213,979.

12.    Attached hereto as Exhibit J is a copy of *Medicis Pharm. Corp. v. Upsher-Smith Labs, Inc.,* _____ F.Supp.2d _____, 2007 WL 1446617 (D. Az. 2007)

13.    Attached hereto as Exhibit K is a copy of *Werre v. Battenfeld Techs., Inc.,* 2004 WL 2554568 (D. Or. 2004).

14.    Attached hereto as Exhibit L is a copy of *Methode Elecs., Inc. v. Infineon Techs. Corp.,* 2000 WL 35357130 (N.D. Cal. 2000).

15.    Attached hereto as Exhibit M is a copy of *Hewlett-Packard Co. v. Acuson Corp.,* 1993 WL 149994 (N.D. Cal. 1993).

16.    Attached hereto as Exhibit N is a copy of *Robert H. Harris Co. v. Metal Mfg. Co.,* 1991 WL 217666 (E.D. Ark. 1991).

17.    Attached hereto as Exhibit O is a copy of *Middleton, Inc. v. Minnesota Mining and Mfg. Co.,* 2004 WL 1968669 (S.D. Iowa 2004).

18.    Attached hereto as Exhibit P is a copy of the U.S. Patent Office's Performance and Accountability Report: Fiscal Year 2006, Tables 13A and 13B.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:  June 25, 2007

Scott R. Brown

# Exhibit A

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In the Reexamination of: | |
| Bierman, Steven F. | Examiner: To Be Assigned |
| Patent No.: 6,447,485 | |
| Issue Date: September 10, 2002 | |
| Assignee: Venetec International, Inc. | |
| Title: MEDICAL LINE ANCHORING SYSTEM | |

Mail Stop *Inter Partes* Reexamination
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## REQUEST FOR *INTER PARTES* REEXAMINATION UNDER 37 C.F.R. § 1.913

On behalf of Nexus Medical LLC ("Nexus") and in accordance with 37 C.F.R. § 1.913, *inter partes* reexamination is respectfully requested for claims 1-3, 5-8, 11-13, 15-18, and 21-22 of U.S. Patent No. 6,447,485 ("the '485 patent") to Bierman, entitled "Medical Line Anchoring System," filed on March 1, 2002, as U.S. Patent Application No. 09/979,341, and issued September 10, 2002. The '485 patent is a division of U.S. Application No. 08/865,231, filed on May 29, 1997, and now U.S. Patent No. 6,213,979 ("the '979 patent"). The '485 patent is assigned on its face to Venetec International, Inc. ("Venetec"), and upon information and belief, Venetec is the present assignee of the patent.

*Inter partes* reexamination of the '485 patent is requested in view of the following references:

> Bierman, WO 96/10435;
> Sorbonne, U.S. Patent No. 4,517,971;
> Gordon, U.S. Patent No. 4,397,647; and
> Gordon, U.S. Patent No. 4,250,880.

Pursuant to 35 U.S.C. §§ 311 and 312, Requester submits that the above-listed prior art references raise substantial new questions of patentability for claims 1-3, 5-8, 11-13, 15-18, and 21-22 of the '485 patent. As required by 37 C.F.R. § 1.915(b)(3), a statement pointing out each substantial new question of patentability is provided below for each claim for which reexamination is requested. Furthermore, a detailed explanation of the pertinence and manner of applying the cited patents and publications to each identified claim is provided pursuant to 37 C.F.R. § 1.915(b)(3). As required by 37 C.F.R. §§ 1.915(b)(4) and 1.915(b)(5), copies of prior art references raising a substantial new question of patentability and a copy of the '485 patent, including the front face, drawings, and specification/claims in double column format, as applicable, are included with this Request. The fee of $8,800.00 for requesting reexamination under 37 C.F.R. § 1.20(c)(2), and an Information Disclosure Statement on form PTO/SB/08 citing the four prior art references supporting the present Request also accompanies this Request.

## I.      RELATED LITIGATION

### A.      Request for Special Dispatch

The '485 patent is presently the subject of a patent infringement lawsuit brought by the assignee, Venetec, against Nexus in the District of Delaware and captioned *Venetec International, Inc. v. Nexus Medical LLC*, USDC District of Delaware, Case No.: 1:07-cv-00057-*** (hereinafter "the Litigation"). Therefore, Requester respectfully requests that the present reexamination proceeding be conducted with special dispatch as having priority over all other cases, pursuant to 35 U.S.C. § 314(c) and MPEP § 2661.

### B.    Description of the Litigation

On January 29, 2007, Venetec filed suit against Nexus seeking a finding of infringement of the '485 and '979 patents in view of Nexus's "The BONE®" site securement product for a medical line.   On March 22, 2007, Nexus filed an Answer and Counterclaims in reply to Venetec's Complaint and sought declaratory judgment of non-infringement and invalidity of the '485 and '979 patents.   Nexus is concurrently filing with this Request a Motion to Stay the pending Litigation in the District of Delaware in view of the present Request for Reexamination.

## II.    DESCRIPTION OF THE ALLEGED INVENTION OF THE '485 PATENT

The '485 patent is directed to an anchoring system for a medical line, such as a catheter tube, and a method of use.   The '485 patent discloses an anchoring system 8 comprising a retainer 10 configured to retain a catheter 15 via a fitting 11.   (Col. 4, ll. 20-26; Fig. 1A).   The retainer 10 includes a base 14 attached to an anchor pad 16.   (Col. 4, ll. 37-34).   The anchor pad 16 includes an adhesive layer for securing to a patient's skin.   (Col. 4, ll. 36-39).   A cover 22 is flexibly coupled to the base 14 via a leash 24.   (Col. 6, ll. 9-11; Fig. 1A).   At least one post 20 extends upwardly from the base 14.   (Col. 5, ll. 30-33; Fig. 1A).

The fitting 11 comprises a box clamp 12 and a wing clamp 13.   *Id*.   The box clamp 12 includes a groove 62 formed on the underside of an elongate body 60 and sized to receive an elongate body 70 formed on the wing clamp 13.   (Col. 8, ll. 31-34 and ll. 51-53; Col. 9, ll. 25-30).   The elongate body 70 of the wing clamp 13 receives internally therein a portion of the catheter 15.   (Col. 8, ll. 56-64).   In operation, the box clamp 12 is secured to the wing clamp 13 to form the fitting 11.   (Col. 9, ll. 33-37).

Each of the cover 22, box clamp 12, and wing clamp 13 includes holes or openings formed therein. (Col. 7, ll. 4-7; Col. 8, ll. 48-50; Col. 8, l. 66 – Col. 9, l. 1). These holes interact with the posts 20 to secure the catheter 15 to the retainer 10. In particular, the posts 20 interact with the openings 67 and 77 of the respective box clamp 12 and wing clamp 13 to mount the fitting 11 on the base 14. (Col. 9, ll. 50-51). The posts 20 also interact with the openings 32 on the cover 22 to form a latching mechanism. (Col. 7, l. 37-39). In operation, the fitting 11 comprising the box clamp 12 and wing clamp 13 is secured to the base 14, and the cover is latched to the base 14 by aligning the openings 32 of the cover 22 with the posts 20 of the base 13 and passing the posts 20 through the openings 32. (Col. 10, ll. 44-48; Figs. 2-3).

Because independent claim 22 of the '485 patent recites means plus function limitations, such recitation is limited to the structure disclosed in the specification or equivalents. Therefore, for claim 22 and the recitation of a "means for releasably latching," the structure is disclosed in the specification as the posts 20 and the openings 32 on the cover 22 that "form the latching mechanism that releasably secures the cover 22 to the base 14." (Col. 7, ll. 37-39). The structure corresponding to the "means for limiting longitudinal movement of the medical line relative to the retainer" is disclosed in the specification as "[t]he interaction between the posts 20 and the openings 67,77 of the fitting 11." (Col. 9, ll. 51-57). This "interacting structure between the retainer 10 and the fitting 11 inhibits movement of the catheter 15 relative to the retainer 11 in at least the longitudinal and lateral directions." *Id*.

4

III.  **STATEMENT POINTING OUT EACH SUBSTANTIAL NEW QUESTION OF PATENTABILITY FOR CLAIMS 1-3, 5-8, 11-13, 15-18, and 21-22 UNDER 37 C.F.R. § 1.915(b)(3)**

A.  **Claim 1**

Claim 1 is directed to a method of securing a medical device to the body of a patient and recites providing a retainer that includes a base defining a receiving area, a cover, a latching mechanism, and interacting structure; positioning the retainer on a body; attaching the retainer to the body; securing the medical device to the receiving area of the base; moving the cover over the base; and securing the cover to the base using the latching mechanism.

*1.  Anticipated by U.S. Patent No. 4,517,971 to Sorbonne*

Sorbonne is prior art to the '485 patent under 35 U.S.C. § § 102(a) and 102(b), was not of record during prosecution of the '485 patent, and was never relied upon in any rejection of the claims.  Sorbonne anticipates claim 1 of the '485 patent by disclosing a method for securing a medical line using a "venipuncture site guard and non-occluding catheter and intravenous tubing retainer." (Col. 1, ll. 62-64).

Sorbonne discloses a method of securing a medical device, e.g., a catheter tube, to a patient using a retainer or device 10 including a base 16, an openable cover or lid 20, and adhesive strips 23 and 24. (Col. 3, ll. 56-58).  The base 16 comprises a substantially planar shape-retaining part for receiving the catheter tube.  (Col. 3, ll. 64-65; Figs. 3-4).  The cover 20 of the device 10 is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68).  The cover is movable between a closed position that at least partially extends over the shape-retaining part, and an open position in which the shape-retaining part is at least partially open. (Col. 6, ll. 18-21; Fig. 5).

5

The device 10 disclosed in Sorbonne further includes a latching mechanism that releasably latches the cover to the base. In particular, the base 16 includes two integral hollow spools or annular cylindrical anchors 42,44. (Col. 4, ll. 25-28). Each spool extends generally upwards from the base. (See Figs. 4-5). The cover includes opposing projecting cylindrical studs or posts 90 that are "sized and located so as to be in alignment with the . . . annularly hollow spools 42 and 44." (Col. 5, ll. 34-39). "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42).

Sorbonne's device 10 further includes interacting structure adapted to engage the catheter tube in a non-occlusive manner. In particular, the interacting structure comprises the cylindrical posts 42,44 secured to the base 16. (Col. 6, ll. 10-13; Fig. 4). The tubing is threaded around the posts, as illustrated in Fig. 4. *Id.* "This . . . prevent[s] crimping or occlusion of the tubing 102." (Col. 6, ll. 15-16).

The device 10 is operable to be positioned on the body of a patient using the adhesive strips 23,24, as illustrated in Fig. 1. (Col. 6, ll. 5-10). The catheter tubing can then be secured in the device by threading the tubing around the posts 42,44. (Col. 6, ll. 10-13). The cover 20 is then moved over the base 16 and secured by pressing the cylindrical hubs or posts 90 into the hollow interiors 46 of the spools 42,44. (Col. 6, ll. 18-21).

Because Sorbonne teaches all of the elements recited in claim 1 of the '485 patent, Sorbonne anticipates claim 1 of the '485 patent and thus, raises a substantial new question of patentability.

2. **_Obvious in View of WO 96/10435 to Bierman Combined with Sorbonne_**

International application WO 96/10435 to Bierman ("the '435 application") was published under the Patent Cooperation Treaty on April 11, 1996, more than one year prior to the '485 patent's earliest priority date of May 29, 1997. As such, the '435 application is prior art to the '485 patent under 35 U.S.C. § § 102(a) and 102(b). The inventor of the '435 application and the '485 patent are the same. The '435 application was of record during prosecution of the '485 patent but was not considered by the U.S. Patent and Trademark Office as a basis for rejection of any claim of the '485 patent.

Bierman combined with Sorbonne renders obvious claim 1 of the '485 patent. Bierman discloses every element of claim 1 except for the cover being permanently coupled to the base. Sorbonne, as discussed below, discloses this element.

Bierman discloses a method for securing a medical line using an anchoring system 10 that includes an anchor base or retainer 20. (P. 4, ll. 24-25). The retainer 20 defines a receiving area to "provide releasable retention for the catheter 12." (P. 6, ll. 9-10). Bierman further discloses a cover comprising an "overlying box clamp 14 . . . [that] overlies and engages a soft wing clamp 18 which surrounds a portion of the catheter 12." (Page 4, ll. 22-24). The box clamp 14 is movable between a closed position wherein it overlies the wing clamp 18 and it extends over at least a portion of the receiving area of the retainer 20, and an open position in which the receiving area is open. (See Figs. 8-9; Page 4, ll. 24-25).

The anchoring system 10 also includes a latching mechanism for releasably latching the box clamp 18 to the base or retainer 20. The latching mechanism comprises posts 17 secured to the base or retainer 20 (see Fig. 9) and holes or openings 42 formed in wings of both the box clamp 14 and

7

wing clamp 18. (P. 7, ll. 6-13). "The posts 17 of the box clamp 14 are [] aligned with the slotted openings 42 on the top surface of the retainer 20 such that the tip 44 of each post 17 passes through the corresponding large diameter hole 42a of the retainer 20." (P. 7, ll. 9-11). Engagement of the posts 17 and the openings 42 "serves to retain the box clamp combination secured in place within the retainer 20." (P. 7, ll. 19-20).

The '435 application further discloses interacting structure that is adapted to engage the medical device in a non-occlusive manner so as to limit longitudinal movement of the device. In particular, the soft wing clamp 18 is configured to receive a catheter within a central elongate body 32. (P. 5, ll. 17-18). "Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place." (P. 5, ll. 20-21). The elongate body 32 is then sized to be received within a longitudinal groove 28 formed in the box clamp 14. (P. 5, ll. 30-31). The combined box clamp 14 and wing clamp 18 can be secured to the retainer via holes 42 in the lateral wings of both the box and wing clamps. As illustrated in Fig. 9, the holes 42 are aligned with the posts 17 so that the catheter 12 is retained in place by the engagement of the posts 17 with the holes 42. (P. 6, l. 36 – P.7, l. 3).

Claim 1 of the '485 patent recites that the medical device, e.g., the catheter, is held in a non-occlusive manner. During prosecution of the parent application of the '485 patent, the '979 patent, the applicant amended the claims to recite that the medical line was secured to the retainer in a "non-occlusive" manner to overcome an anticipation rejection in view of U.S. Patent No. 4,193,174 to Stephens. In particular, the applicant argued that the structure disclosed in the '979 patent application, which is of course the same structure disclosed in the '485 patent, does not "press the

8

walls of the medical line inwardly toward each other in an occlusive manner[1]." (Exhibit A, Amendment Dated August 25, 2000, P. 3). Thus, the box and wing clamps do not apply pressure against the medical line. Because the '485 patent is a division of the '979 patent, prosecution history estoppel regarding arguments made during prosecution of the '979 patent applies equally to the '485 patent. *Biovail Corp. Int'l v. Andrx Pharmaceuticals, Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) (stating that the prosecution history for one related patent applies with "equal force to subsequently issued patents that contain the same claim limitation"). Therefore, the manner of limiting longitudinal movement disclosed in the '485 patent is limited to non-occlusive.

The structure disclosed in the '485 patent for securing the medical line to the base is almost identical to the structure disclosed in the '435 application. More notably, the '485 patent's interacting structure for securing the medical device in a non-occlusive manner is identical to the '435 application's interacting structure. The box and wing clamp combination disclosed in the '435 application does not press the medical line inwardly and as such, holds the medical line in a non-occlusive manner. Therefore, the '435 application discloses the interacting structure claimed in the '485 patent.

The Bierman '435 application's base or retainer 20 is operable to be positioned on the body of a patient by attaching the base or retainer 20 to the patient via an adhesive layer. (P. 7, ll. 4-6). The medical device is then secured in the receiving area of the base. (P. 7, ll. 6-20). The cover comprising the box clamp 14 is secured over the base or retainer 20, such that the box clamp 14

---

[1]    Requester notes that the embodiment illustrated in Figs. 4 and 5 of Stephens does not disclose pressing on the catheter walls to a visually discernable degree but instead discloses that the clamping arms 11,12 "contact" the catheter walls. (Stephens, Col. 3, ll. 66-68). It necessarily follows that Venetec considers the embodiment of Figs. 4 and 5 of Stephens to be securement in an occlusive manner.

covers at least a portion of the posts 17 and wing clamp 18.  (P. 7, ll. 6-14; Fig. 9).  The box clamp 14 is secured to the retainer 20 by inserting the posts 17 through the openings 42 on the wings of the clamp 14.  (P. 7, ll. 15-20).

Bierman does not disclose that the box clamp that operates as a cover for the base 20 is permanently coupled to the base.  Sorbonne, however, discloses a cover 20 that is permanently secured to the base 16 and hinged at site 18.  (Col. 3, ll. 56-57; Col. 4, ll. 67-68).  One of ordinary skill in the art would have been motivated to permanently secure the box clamp, as disclosed in Sorbonne, to the base of Bierman so as to provide a device that is an integral unit with fewer separated parts.  Additionally, the improvement of the '485 patent over Bierman, namely the addition of a cover, is a predictable use of prior art elements according to their established functions.  Finally, the teachings of Bierman and Sorbonne are sufficiently interrelated such that one of ordinary skill in the art would have looked to Sorbonne in designing a securement device for a catheter.

Because the combination of the Bierman and Sorbonne references discloses all of the elements recited in claim 1 of the '485 patent, Bierman and Sorbonne render obvious claim 1 of the '485 patent and thus, raise a substantial new question of patentability.

### 3.    *Obvious in View of U.S. Patent No. 4,397,647 to Gordon and U.S. Patent No. 4,250,880 to Gordon*

U.S. Patent No. 4,397,647 to Gordon ("the Gordon '647 patent") and U.S. Patent No. 4,250,880 to Gordon ("the Gordon '880 patent") are prior art to the '485 patent under 35 U.S.C. § § 102(a) and 102(b) and were of record during prosecution of the '485 patent.  The Gordon '647 patent was never relied upon for any rejection of the claims; the Gordon '880 patent was relied upon for a rejection of the claims of the related '979 patent.  Although the Gordon '880 patent was the

10

subject of a rejection in the related '979 patent, the combination of the teachings of the primary reference, the Gordon '647 patent, with the Gordon '880 patent raises a substantial new question of patentability. In particular, the combination of the Gordon references renders obvious claim 1 of the '485 patent by disclosing a method for securing a medical line, such as a catheter tube, to the body of a patient using a stabilizing fitting. (Abstract; Col. 1, ll. 23-27).

The Gordon '647 patent discloses two distinct embodiments, each of which will be discussed separately below. Each embodiment discloses all of the claimed elements except for limiting longitudinal movement of the medical line in a non-occlusive manner. The Gordon '880 patent, when combined with the Gordon '647 patent discloses such.

### a.    First Embodiment Disclosed in the Gordon '647 Patent

The first embodiment disclosed in the Gordon '647 patent includes a catheter-stabilizer 10 having a base member 11 on which is supported a support member 14. (Col. 3, ll. 42 and 56-59). The support member 14 is a retainer integrally formed with a cradle 16. (See alternative structure wherein the support member 14 is eliminated and the cradle is secured directly to the base 11 (Col. 6, ll. 1-4)). The cradle 16 is a base for the catheter-stabilizer 10 and defines a receiving area (inside of cradle) for the catheter tube. (Col. 3, ll. 63-65 and Col. 5, l. 63 – Col. 6, l. 6). A cover member 25 is permanently coupled to the cradle 16 and is movable between open and closed positions, wherein in a closed position the cover extends over a portion of the cradle 16 (see Fig. 3), and in an open position, the cradle 16 is at least partially open (see Fig. 3). (Col. 4, ll. 16-26).

The catheter-stabilizer 10 further includes a latch mechanism comprising vertically spaced longitudinally extending ribs 30,31,32 that are positioned to provide resilient engagement with

projection 29. (Fig. 3, Col. 4, ll. 43-53). The projection 29 engages any one of the ribs to releasably latch the cover 25 closed. (Col. 5, ll. 2-6).

The stabilizer 10 further includes interacting structure adapted to engage the medical device and limit longitudinal movement of the medical device through the cradle 16 when the medical device is received within the cradle 16. In particular, the interacting structure comprises ribs 21,28 positioned within the cradle. (Col. 5, ll. 9-12). These ribs receive and hold the catheter within the cradle 16 upon closing of the cover 25. (See Fig. 5). The vertical spacing or height of the ribs "provide[s] a firm grip against longitudinal displacement of the tubing within the stabilizer." (Col. 5, ll. 23-26).

The Gordon '647 patent does not disclose that the catheter's longitudinal movement is limited in a non-occlusive manner. However, the Gordon '880 patent discloses structure for limiting the longitudinal movement in the recited non-occlusive manner. In particular, the Gordon '880 patent discloses a similar cradle 12 comprising a plurality of internal, longitudinal ridges 28 (see Fig. 7). (Col. 3, ll. 18-24). The cradle is dimensioned to receive a standard catheter hub 36. (Col. 4, ll. 24-26). "[P]ositive longitudinal location of the hub is obtained by the hub boss [36a] fitting in the wall openings 30." (Col. 3, ll. 29-31; Fig. 15). Therefore, the hub boss 36a limits longitudinal movement of the catheter by providing a surface that cannot be forcibly moved past ribs 60, as illustrated in Fig. 15.

One of ordinary skill in the art would have been motivated to combine the Gordon '880 patent with the Gordon '647 patent to "provide complete security against unwanted longitudinal movement of the catheter in spite of extensive movements by the patient." (Gordon '647 Patent, Col. 2, ll. 7-9).

The Gordon '647 patent further discloses positioning the support member 14 on the body of a patient and attaching the member 14 to the body using an adhesive material 12. (Col. 3, ll. 49-56 and Col. 5, ll. 27-33). The catheter tube is then secured within the cradle 16 of the stabilizer 10, and the cover 25 is pivoted closed and secured so that the projection 29 engages the ribs 30,31, or 32. (Col. 4, l. 65 – Col. 5, l. 4). Once the cover is in its closed position, it is located over at least a portion of the interacting structure comprising the ribs 21,28. (See Fig. 3).

Because the combination of the Gordon references discloses all of the elements recited in claim 1 of the '485 patent, the Gordon '647 patent and the Gordon '880 patent render obvious claim 1 of the '485 patent and thus, raise a substantial new question of patentability.

### a.    Second Embodiment Disclosed in the Gordon '647 Patent

The second embodiment discussed in the Gordon '647 patent begins at column 6, line 15 and discloses a catheter-stabilizer 40 having a base member 41 serving as a retainer, the underside of which is coated with an adhesive material. (Col. 6, ll. 17-28; Figs. 6-9). The base member 41 includes a base portion 43 to which is secured a plurality of upstanding walls 44,45 defining a base. (Col. 6, ll. 28-34). Recesses 47,48 are formed within the walls 44,45 and define a receiving area for a catheter tube. *Id.* The recesses 47,48 receive the catheter tube in a neck portion of the recess. (Col. 6, ll. 51-52).

The catheter-stabilizer 40 also includes a cover member 46 comprising a flexible strap hinged and permanently coupled to the upstanding walls 44,45. (Col. 6, l. 64 – Col. 7, l. 3). When the cover 46 is in a closed position, at least a portion of the cover extends over the receiving area for the catheter tube. (See Fig. 7). When the cover 46 is in an open position, the receiving area is at least partially open. *Id.*

13

The stabilizer 40 further includes a latching mechanism comprising a projecting latch member 53 formed on the base and a through hole 52 formed in the cover 46. (Col. 7, ll. 3-7). The cover 46 is releasably secured to the base by mating the through hole 52 through the latch member 53. The latch member 53, as illustrated in Fig. 6, is a post extending from the base and operable to be mated with an opening or hole in the cover 46.

The stabilizer is operable to limit longitudinal movement of the catheter using interacting structure comprising the recesses 47,48, which, in an alternative arrangement, are sized slightly smaller than the diameter of the catheter tube so as to firmly engage the tube when retained in the stabilizer. (Col. 6, ll. 58-63). Although the interacting structure comprising the recesses 47,48 disclosed in the second embodiment of the Gordon '647 patent limits the longitudinal movement of the catheter, such interacting structure does not limit the longitudinal movement in a non-occlusive manner, as recited in claim 1 of the '485 patent. However, as noted above for the first embodiment disclosed in the Gordon '647 patent, the Gordon '880 patent discloses structure for limiting the longitudinal movement in the recited non-occlusive manner. The Gordon '880 patent's cradle 12 comprises a plurality of internal, longitudinal ridges 28 (see Fig. 7). (Col. 3, ll. 18-24). The cradle is dimensioned to receive a standard catheter hub 36. (Col. 4, ll. 24-26). "[P]ositive longitudinal location of the hub is obtained by the hub boss [36a] fitting in the wall openings 30." (Col. 3, ll. 29-31; Fig. 15). Therefore, the hub boss 36a limits longitudinal movement of the catheter by providing a surface that cannot be forcibly moved past ribs 60, as illustrated in Fig. 15.

One of ordinary skill in the art would have been motivated to combine the Gordon '880 patent with the Gordon '647 patent to "provide complete security against unwanted longitudinal

movement of the catheter in spite of extensive movements by the patient." (Gordon '647 Patent, Col. 2, ll. 7-9).

The second embodiment disclosed in the Gordon '647 patent further teaches positioning and attaching the base member 41 serving as the retainer on the body of a patient by attaching the adhesive material. (Col. 6, ll. 19-28). The catheter tube is then secured in the recesses 47,48 of the side walls 44,45. (Col. 6, ll. 44-47 and 59-63). The cover 46 is then moved over and secured to the base using the snap-fit latch member 53 and through hole 52 latching mechanism. (Col. 7, ll. 3-12; Fig. 7).

Because the combination of the Gordon references discloses all of the elements recited in claim 1 of the '485 patent, the Gordon '647 patent and the Gordon '880 patent render obvious claim 1 of the '485 patent and thus, raise a substantial new question of patentability.

### B.     Claim 2

Claim 2 directly depends from claim 1 and recites that the retainer include a channel that lies between the base and the cover when the cover is in the closed position.

#### 1.     *Anticipated by Sorbonne*

Sorbonne discloses a channel (see Fig. 4) through which the medical device, i.e., the catheter tube, is threaded. The channel is formed on the retainer 10 and lies between the base 16 and the cover 20 when the cover is in the closed position. (See Fig. 5). Because Sorbonne teaches the element recited in claim 2, Sorbonne raises a substantial new question of patentability.

#### 2.     *Obvious in View of Sorbonne and Bierman*

Bierman discloses a channel 28 in which the wing clamp 18 lies. The channel 28 lies between the base 20 and the cover 14 when the cover is secured to the base 20 and thus in the closed

15

position. Because Bierman teaches the element recited in claim 2, Bierman raises a substantial new question of patentability.

C.    **Claim 3 – Anticipated by Sorbonne**

Claim 3 depends directly from claim 2 and recites that the interacting structure of the retainer comprises a post that extends at least partially into the channel of the retainer. Sorbonne discloses that the both posts 42,44 extend into the channel. (See Fig. 4). Requester submits that it is unclear and ambiguous the structure that claim 3 is referring to in the '485 patent specification. In particular, it is unclear how the posts 20 extend into the channel disclosed in Fig. 10A of the '485 patent. Nonetheless, because Sorbonne teaches the element recited in claim 3, Sorbonne raises a substantial new question of patentability.

D.    **Claim 5 – Anticipated by Sorbonne**

Claim 5 depends directly from claim 2 and recites that the channel has a variable cross-section along its length. Sorbonne discloses that the channel gradually narrows towards its left-hand side as viewed in Figure 4. Thus, Sorbonne discloses a channel having a variable cross-section along its length. Because Sorbonne teaches the element recited in claim 5, Sorbonne raises a substantial new question of patentability.

E.    **Claim 6**

Claim 6 depends directly from claim 2 and recites that the medical device is secured to the body of a patient by placing a portion of the medical device within the channel of the retainer.

1.    *Anticipated by Sorbonne*

Sorbonne discloses that the catheter tube is threaded around the posts 42,44 and through the channel (See Fig. 4) so as to secure the medical device to the body of the patient. (Col. 6, ll. 11-13).

16

Because Sorbonne teaches the element recited in claim 6, Sorbonne raises a substantial new question of patentability.

### 2.    *Obvious in View of Sorbonne and Bierman*

Bierman discloses that the medical device comprising the catheter tube 12 is secured within the soft wing clamp 18, which is then secured within the channel 28. (See Figs. 2 and 9; P. 4, ll. 33-35). Therefore, a portion of the medical device 12 is placed within the channel 28. Because Bierman teaches the element recited in claim 6, Bierman raises a substantial new question of patentability.

### F.    Claim 7 – Anticipated by Sorbonne

Claim 7 depends directly from claim 2 and recites that the cross-section of the channel tapers along its length. Sorbonne discloses that the channel gradually narrows towards its left-hand side as viewed in Figure 4. Thus, Sorbonne discloses a channel that tapers along its length. Because Sorbonne teaches the element recited in claim 7, Sorbonne raises a substantial new question of patentability.

### G.    Claim 8 – Anticipated by Sorbonne

Claim 8 depends directly from claim 1 and recites that the cover of the retainer is coupled to the base of the retainer by a flexible hinge. Sorbonne discloses that the cover 20 is flexibly hinged at line 18 and may be "manually opened and closed by a pivotal or hinged action." (Col. 4, ll. 67-68; Col 3, ll. 56-58; Fig. 5). Because Sorbonne teaches the element recited in claim 8, Sorbonne raises a substantial new question of patentability.

17

H.    **Claim 11 – Anticipated by Sorbonne**

Claim 11 depends directly from claim 8 and recites that the base, cover, and hinge are integrally formed. Sorbonne discloses such, as illustrated in Figure 5, and as discussed at col. 3, ll. 49-51. Because Sorbonne teaches the element recited in claim 11, Sorbonne raises a substantial new question of patentability.

I.    **Claim 12**

Claim 12 is directed to a method of securing a medical line, such as a catheter tube, to the body of a patient and recites providing a retainer that includes a base, a cover, a latching mechanism, a channel, and an adhesive layer; positioning the retainer on a body; attaching the adhesive layer to the body; placing a portion of the medical line into the channel; moving the cover over the base; and securing the cover to the base using the latching mechanism.

1.    *Anticipated by Sorbonne*

Sorbonne anticipates claim 1 of the '485 patent by disclosing a method for securing a medical line using a "venipuncture site guard and non-occluding catheter and intravenous tubing retainer." (Col. 1, ll. 62-64). Sorbonne discloses a method of securing a medical device, e.g., a catheter tube, to a patient using a retainer or device 10 including a base 16, a cover or lid 20 permanently coupled to the base, and adhesive strips 23 and 24. (Col. 3, ll. 56-58). The base 16 comprises a substantially planar shape-retaining part for receiving the catheter tube. (Col. 3, ll. 64-65; Figs. 3-4). The cover 20 of the device 10 is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68). The cover is movable between a closed position that at least partially extends over the shape-retaining part, and an open position in which the shape-retaining part is at least partially open. (Col. 6, ll. 18-21; Fig. 5).

18

The device 10 disclosed in Sorbonne further includes a latching mechanism that releasably latches the cover to the base. In particular, the base 16 includes two integral hollow spools or annular cylindrical anchors 42,44. (Col. 4, ll. 25-28). Each spool extends generally upwards from the base. (See Figs. 4-5). The cover includes opposing projecting cylindrical studs or posts 90 that are "sized and located so as to be in alignment with the . . . annularly hollow spools 42 and 44." (Col. 5, ll. 34-39). "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42).

Sorbonne's device 10 further includes a channel (see right-hand side of Fig. 4) disposed between the base 16 and the cover 20 when the cover is in the closed position (see Fig. 5). The catheter tube can be threaded around the posts 42,44 and through the channel so as to retain the catheter tube between the base 16 and cover 20 when the cover 20 is in the closed position. (Col. 6, ll. 11-13). The channel and post arrangement further inhibits movement of the catheter tube in a direction generally parallel to the tube's longitudinal axis. (Col. 6, ll. 13-17; 22-25).

The device 10 is operable to be positioned on the body of a patient by attaching the adhesive strips 23,24 to the body, as illustrated in Fig. 1. (Col. 6, ll. 5-10). The catheter tubing can then be placed in the device by threading the tubing through the channel and around the posts 42,44. (Col. 6, ll. 10-13; Fig. 4). The cover 20 is then moved over the base 16 and secured by pressing the cylindrical hubs or posts 90 into the hollow interiors 46 of the spools 42,44, which retains the catheter tubing within the channel. (Col. 6, ll. 18-21).

19

Because Sorbonne teaches or suggests all of the elements recited in claim 12 of the '485 patent, Sorbonne anticipates claim 12 of the '485 patent and thus, raises a substantial new question of patentability.

### 2.    *Obvious in View of Bierman and Sorbonne*

Bierman combined with Sorbonne renders obvious claim 12 of the '485 patent. Bierman discloses every element of claim 12 except for the cover being permanently coupled to the base. Sorbonne, as discussed below, discloses this element.

Bierman discloses a method for securing a medical line to the body of a patient using an anchoring system 10. (Abstract). The anchoring system 10 includes a retainer 20 that is attachable to a medical line. (P. 4, ll. 14-15 and 24-25). The retainer includes a base. (See Fig. 2 and top surface of retainer 20). Adhesive is secured to the underside of the retainer: "The retainer 20 in turn is mounted on an anchor pad 22 which is attached directly to the skin 24 of the patient by means of a self-adhesive backing (not shown)." (P. 4, ll. 25-26).

The system 10 includes a cover comprising an "overlying box clamp 14 . . . [that] overlies and engages a soft wing clamp 18 which surrounds a portion of the catheter 12." (Page 4, ll. 22-24). The box clamp 14 is movable between a closed position wherein it overlies the wing clamp 18 and it extends over at least a portion of the receiving area of the retainer 20, and an open position in which the receiving area is open. (See Figs. 8-9; Page 4, ll. 24-25).

Bierman does not disclose that the box clamp 14 is permanently coupled to the base. Sorbonne, however, discloses a cover 20 that is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68). One of ordinary skill in the art would have been motivated to permanently secure the box clamp, as disclosed in Sorbonne, to the base of Bierman

so as to provide a device that is an integral unit with fewer separated parts. Additionally, the improvement of the '485 patent over Bierman, namely the addition of a cover, is a predictable use of prior art elements according to their established functions. The teachings of Bierman and Sorbonne are sufficiently interrelated such that one of ordinary skill in the art would have looked to Sorbonne in designing a securement device for a catheter.

The anchoring system 10 also includes a latching mechanism for releasably latching the box clamp 18 to the base or retainer 20. The latching mechanism comprises posts 17 secured to the base or retainer 20 (see Fig. 9) and holes or openings 42 formed in wings of both the box clamp 14 and wing clamp 18. (P. 7, ll. 6-13). "The posts 17 of the box clamp 14 are [] aligned with the slotted openings 42 on the top surface of the retainer 20 such that the tip 44 of each post 17 passes through the corresponding large diameter hole 42a of the retainer 20." (P. 7, ll. 9-11).

The box clamp 14 includes a channel 28 comprising a longitudinal groove sized to receive portions of the wing clamp 18. When the box clamp 14 is secured to the base 20 so as to cover the base, the channel 28 is disposed between the base 20 and the box clamp 14. (See Figs. 1 and 8). The channel is shaped to receive the soft wing clamp 18, which is configured to receive a catheter within a central elongate body 32. (P. 5, ll. 17-18). "Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place." (P. 5, ll. 20-21). The elongate body 32 is then sized to be received within the channel 28 formed in the box clamp 14 so as to inhibit movement of the catheter in a direction generally parallel to the catheter's longitudinal axis. (P. 5, ll. 20-21 and 30-32).

The base or retainer 20 is operable to be positioned on the body of a patient by attaching the base or retainer 20 to the patient via an adhesive layer. (P. 7, ll. 4-6). The soft wing clamp 18

21

including the catheter 12 is then secured into the channel 28 of the box clamp 14. (P. 7, ll. 6-8). The cover comprising the box clamp 14 is secured over the base or retainer 20, such that the catheter 12 is retained within the channel 28. (P. 7, ll. 6-14; Figs. 8 and 9). The box clamp 14 is secured to the retainer 20 by inserting posts 17 through openings 42 on the wings of the clamp 14. (P. 7, ll. 15-20).

Because the combination of Bierman and Sorbonne discloses all of the elements recited in claim 12 of the '485 patent, Bierman and Sorbonne render obvious claim 12 of the '485 patent and thus, raise a substantial new question of patentability.

### 3.     *Anticipated by the Gordon '647 Patent*

The Gordon '647 patent anticipates claim 12 of the '485 patent by disclosing a method for securing a medical line, such as a catheter tube, to the body of a patient using a stabilizing fitting. (Abstract; Col. 1, ll. 23-27). The Gordon '647 patent discloses two distinct embodiments, each of which will be discussed separately.

### a.     **First Embodiment Disclosed in the Gordon '647 Patent**

The first embodiment disclosed in the Gordon '647 patent includes a catheter-stabilizer 10 having a base member 11 on which is supported a support member 14. (Col. 3, ll. 42 and 56-59). The support member 14 is a retainer integrally formed with a cradle 16. (See alternative structure wherein the support member 14 is eliminated and the cradle is secured directly to the base 11 (Col. 6, ll. 1-4)). The cradle 16 is a base for the catheter-stabilizer 10. (Col. 3, ll. 63-65 and Col. 5, l. 63 – Col. 6, l. 6). An adhesive layer 12 is provided on the underside of the base member 11 so as to secure the support member 14 and cradle 16 to the body of a patient. (Col. 3, ll. 49-53 and Col. 5, ll. 27-33). A cover member 25 is permanently coupled to the cradle 16 and is movable between open and closed positions. (Col. 4, ll. 16-26; Fig. 3).

The cover member 25 is secured to the cradle via a latch mechanism comprising vertically spaced longitudinally extending ribs 30,31,32 that are positioned to provide resilient engagement with projection 29. (Fig. 3, Col. 4, ll. 43-53). The projection 29 engages any one of the ribs to releasably latch the cover 25 closed. (Col. 5, ll. 2-6).

The support member 14 defining the cradle 16 further includes a channel formed in the cradle (see Fig. 3). The channel is disposed between the cradle 16 and the cover member 25 when the cover is in the closed position. (See Fig. 4). The channel is shaped to retain the catheter tube between the cradle 16 and the cover member 25, when the cover member 25 is in the closed position, so as to inhibit movement of the catheter tube in a direction generally parallel to the tube's longitudinal axis. (Col. 5, ll. 9-33; Fig. 5). In particular, in addition to the channel formed in the cradle 16, the cradle 16 includes ribs 21,28 positioned within the cradle. (Col. 5, ll. 9-12). These ribs receive and hold the catheter within the cradle 16 upon closing of the cover 25. (See Fig. 5). The vertical spacing or height of the ribs "provide[s] a firm grip against longitudinal displacement of the tubing within the stabilizer." (Col. 5, ll. 23-26).

The Gordon '647 patent further discloses positioning the support member 14 on the body of a patient and attaching the member 14 to the body using an adhesive material 12. (Col. 3, ll. 49-56 and Col. 5, ll. 27-33). The catheter tube is then secured within the channel of the cradle 16 (see Fig. 5), and the cover 25 is pivoted closed and secured so that the projection 29 engages the ribs 30,31, or 32. (Col. 4, l. 65 – Col. 5, l. 4). Once the cover is in its closed position, it is located over at least a portion of the channel and catheter tube. (See Fig. 3).

23

Because the first embodiment of the Gordon '647 patent discloses all of the elements recited in claim 12 of the '485 patent, the Gordon '647 patent anticipates claim 12 of the '485 patent and thus, raise a substantial new question of patentability.

### a.    Second Embodiment Disclosed in the Gordon '647 Patent

The second embodiment discussed in the Gordon '647 patent begins at column 6, line 15 and discloses a catheter-stabilizer 40 having a base member 41 serving as a retainer, the underside of which is coated with an adhesive material. (Col. 6, ll. 17-28; Figs. 6-9). The base member 41 includes a base portion 43 to which is secured a plurality of upstanding walls 44,45 defining a base. (Col. 6, ll. 28-34). Recesses 47,48 are formed within the walls 44,45 and define a channel for receiving the catheter tube. *Id.* The recesses 47,48 receive the catheter tube in a neck portion of the recess. (Col. 6, ll. 51-52).

The catheter-stabilizer 40 also includes a cover member 46 operable to be moved between open and closed positions and comprising a flexible strap hinged and permanently coupled to the upstanding walls 44,45. (Col. 6, l. 64 – Col. 7, l. 3). When the cover 46 is in a closed position, at least a portion of the cover extends over the channel, such that the channel is disposed between the walls 44,45 and the cover 46. (See Fig. 7).

The stabilizer 40 further includes a latching mechanism comprising a projecting latch member 53 formed on the base and a through hole 52 formed in the cover 46. (Col. 7, ll. 3-7). The cover 46 is releasably secured to the base by mating the through hole 52 through the latch member 53. The latch member 53, as illustrated in Fig. 6, is a post extending from the base and operable to be mated with an opening or hole in the cover 46.

24

In an alternative arrangement, the stabilizer is operable to limit longitudinal movement of the catheter using the recesses 47,48 that form the channel, such that when the catheter tube is retained in the channel, the channel inhibits longitudinal movement of the tube in a direction generally parallel to the tube's longitudinal axis. (Col. 6, ll. 58-63). In particular, the recesses 47,48 are sized slightly smaller than the diameter of the catheter tube so as to firmly engage the tube when retained in the channel, thus inhibiting longitudinal movement. *Id.*

The second embodiment disclosed in the Gordon '647 patent further teaches positioning and attaching the base member 41 serving as the retainer on the body of a patient by attaching the adhesive material. (Col. 6, ll. 19-28). The catheter tube is then secured in the channel formed by the recesses 47,48 of the side walls 44,45. (Col. 6, ll. 44-47 and 59-63). The cover 46 is then moved over and secured to the base using the snap-fit latch member 53 and through hole 52 latching mechanism. (Col. 7, ll. 3-12; Fig. 7).

Because the second embodiment of the Gordon '647 patent discloses all of the elements recited in claim 12 of the '485 patent, the Gordon '647 patent anticipates claim 12 of the '485 patent and thus, raise a substantial new question of patentability.

**J.    Claim 13 – Anticipated by Sorbonne**

Claim 13 depends directly from claim 12 and recites that the retainer comprises a post that extends at least partially into the channel of the retainer. Sorbonne discloses that both posts 42,44 extend into the channel. (See Fig. 4). Requester submits that it is unclear and ambiguous the structure that claim 13 is referring to in the '485 patent specification. In particular, it is unclear how the posts 20 extend at least partially into the channel disclosed in Fig. 10A of the '485 patent.

25

Nonetheless, because Sorbonne teaches the element recited in claim 13, Sorbonne raises a substantial new question of patentability.

### K.    Claim 15 – Anticipated by Sorbonne

Claim 15 depends directly from claim 12 and recites that the channel has a variable cross-section along its length.  Sorbonne discloses that the channel gradually narrows towards its left-hand side as viewed in Figure 4.  Thus, Sorbonne discloses a channel having a variable cross-section along its length.  Because Sorbonne teaches the element recited in claim 15, Sorbonne raises a substantial new question of patentability.

### L.    Claim 16

Claim 16 depends directly from claim 12 and recites that the medical device is secured to the body of a patient by placing a portion of the medical device within the channel of the retainer.

#### 1.    *Anticipated by Sorbonne*

Sorbonne discloses that the catheter tube is threaded around the posts 42,44 and through the channel (see Fig. 4) so as to secure the medical device to the body of the patient.  (Col. 6, ll. 11-13). Because Sorbonne teaches the element recited in claim 16, Sorbonne raises a substantial new question of patentability.

#### 2.    *Obvious in View of Bierman and Sorbonne*

Bierman discloses that the medical device comprising the catheter tube 12 is secured within the soft wing clamp 18, which is then secured within the channel 28.  (See Figs. 2 and 9; P. 4, ll. 33-35).  Therefore, a portion of the medical device 12 is placed within the channel 28.  Because Bierman teaches the element recited in claim 16, Bierman raises a substantial new question of patentability.

### M.     Claim 17 – Anticipated by Sorbonne

Claim 17 depends directly from claim 12 and recites that the cross-section of the channel tapers along its length. Sorbonne discloses that the channel gradually narrows towards its left-hand side as viewed in Figure 4. Thus, Sorbonne discloses a channel that tapers along its length. Because Sorbonne teaches the element recited in claim 17, Sorbonne raises a substantial new question of patentability.

### N.     Claim 18 – Anticipated by Sorbonne

Claim 18 depends directly from claim 12 and recites that the cover of the retainer is coupled to the base of the retainer by a flexible hinge. Sorbonne discloses that the cover 20 is flexibly hinged at line 18 and may be "manually opened and closed by a pivotal or hinged action." (Col. 4, ll. 67-68; Col 3, ll. 56-58; Fig. 5). Because Sorbonne teaches the element recited in claim 18, Sorbonne raises a substantial new question of patentability.

### O.     Claim 21 – Anticipated by Sorbonne

Claim 21 depends directly from claim 18 and recites that the base, cover, and hinge are integrally formed. Sorbonne discloses such, as illustrated in Fig. 5, and as discussed at col. 3, ll. 49-51. Because Sorbonne teaches the element recited in claim 21, Sorbonne raises a substantial new question of patentability.

### P.     Claim 22

Claim 22 is directed to a method of securing a medical line, such as a catheter tube, to the body of a patient and recites providing a retainer that includes a base defining a receiving area, a cover coupled to the base, means for releasably latching the cover to the base, and means for limiting longitudinal movement of the medical line relative to the retainer; positioning the retainer on a body;

27

attaching the adhesive layer to the body; placing a portion of the medical line into the receiving area; moving the cover over the base; and securing the cover in position upon the base using the latching mechanism.

Claim 22 includes two means plus function limitations under 35 U.S.C. § 112, ¶ 6, namely the means for releasably latching the cover to the base and the means for limiting longitudinal movement. As means plus function limitations, the scope of the claims is restricted to the structure disclosed in the '485 patent for performing the function and equivalent structures. The corresponding structure disclosed in the '485 patent for each limitation, and how such is anticipated or obvious in view of the prior art, is discussed below.

### 1.    *Anticipated by Bierman*

Bierman discloses a method for securing a medical line using an anchoring system 10 that includes an anchor base or retainer 20. (P. 4, ll. 24-25). The retainer 20 defines a receiving area to "provide releasable retention for the catheter 12." (P. 6, ll. 9-10). Bierman further discloses a cover comprising an "overlying box clamp 14 . . . [that] overlies and engages a soft wing clamp 18 which surrounds a portion of the catheter 12." (Page 4, ll. 22-24). The box clamp 14 is coupled to the cover upon securement to the retainer 20 via the means for releasably latching discussed below.

The anchoring system 10 also includes means for releasably latching the cover comprising the box clamp 14 to the base or retainer 20. This latching mechanism comprises posts 17 secured to the base or retainer 20 (see Fig. 9) and holes or openings 42 formed in wings of both the box clamp 14 and wing clamp 18. (P. 7, ll. 6-13). "The posts 17 of the box clamp 14 are [] aligned with the slotted openings 42 on the top surface of the retainer 20 such that the tip 44 of each post 17 passes through the corresponding large diameter hole 42a of the retainer 20." (P. 7, ll. 9-11).

28

Engagement of the posts 17 and the openings 42 "serves to retain the box clamp combination secured in place within the retainer 20." (P. 7, ll. 19-20).

The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is identical or equivalent to Bierman's disclosure of holes or openings formed in the box clamp 14 interengaging with the posts 17 formed on the base 20.

Bierman also discloses means for limiting the longitudinal movement of the medical line. In particular, the soft wing clamp 18 is configured to receive a catheter within a central elongate body 32. (P. 5, ll. 17-18). "Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place." (P. 5, ll. 20-21). The elongate body 32 is then sized to be received within a longitudinal groove 28 formed in the box clamp 14. (P. 5, ll. 30-31). The combined box clamp 14 and wing clamp 18 can be secured to the retainer via holes 42 in the lateral wings of both the box and wing clamps. As illustrated in Fig. 9, the holes 42 are aligned with the posts 17 so that the catheter 12 is retained in place by the engagement of the posts 17 with the holes 42. (P. 6, l. 36 – P.7, l. 3).

The means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises the interaction of the holes or openings formed in the fitting 11 (comprising a box and wing clamp) and the posts 20 formed on the base. ('485 Patent, Col. 9, ll. 55-59). This structure is identical or equivalent to Bierman's disclosure of holes or openings formed in the box and wing clamp combination interacting with the posts 17 formed on the base 20.

Bierman's base or retainer 20 is operable to be positioned on the body of a patient by attaching the base or retainer 20 to the patient via an adhesive layer. (P. 6, ll. 19-33 and P. 7, ll. 4-6). The medical device is then placed in the receiving area of the base. (P. 7, ll. 6-20). The cover comprising the box clamp 14 is secured over the base or retainer 20, such that the box clamp 14 covers at least a portion of the posts 17 and wing clamp 18. (P. 7, ll. 6-14; Fig. 9). The box clamp 14 is secured to the retainer 20 by inserting the posts 17 through the openings 42 on the wings of the clamp 14. (P. 7, ll. 15-20).

Because Bierman teaches or suggests all of the elements recited in claim 22 of the '485 patent, Bierman anticipates claim 22 of the '485 patent and thus, raises a substantial new question of patentability.

### 2.    *Anticipated by Sorbonne*

Sorbonne anticipates claim 1 of the '485 patent by disclosing a method for securing a medical line using a "venipuncture site guard and non-occluding catheter and intravenous tubing retainer." (Col. 1, ll. 62-64). Sorbonne discloses a method of securing a medical device, e.g., a catheter tube, to a patient using a retainer or device 10 including a base 16, a cover or lid 20 permanently coupled to the base, and adhesive strips 23 and 24. (Col. 3, ll. 56-58). The base 16 comprises a substantially planar shape-retaining part for receiving the catheter tube. (Col. 3, ll. 64-65; Figs. 3-4). The cover 20 of the device 10 is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68). The cover is movable between a closed position that at least partially extends over the shape-retaining part, and an open position in which the shape-retaining part is at least partially open. (Col. 6, ll. 18-21; Fig. 5).

Sorbonne discloses that the device 10 further includes a means for releasably latching the cover to the base. In particular, the base 16 includes two integral hollow spools or annular cylindrical anchors 42,44. (Col. 4, ll. 25-28). Each spool extends generally upwards from the base. (See Figs. 4-5). The cover includes opposing projecting cylindrical studs or posts 90 that are "sized and located so as to be in alignment with the . . . annularly hollow spools 42 and 44." (Col. 5, ll. 34-39). "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42).

The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is equivalent to or obvious in view of Sorbonne's disclosure of hollow spools 42,44 interengaging with cylindrical studs or posts 90.

Sorbonne also discloses means for limiting longitudinal movement of the medical line comprising a channel formed through the cylindrical posts 42,44 secured to the base 16. The catheter tube can be threaded around the posts 42,44 and through the channel so as to retain the catheter tube between the base 16 and cover 20 when the cover 20 is in the closed position. (Col. 6, ll. 11-13; Fig. 4). The channel and post arrangement further inhibits movement of the catheter tube in a direction generally parallel to the tube's longitudinal axis. (Col. 6, ll. 13-17; 22-25). One of the means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises a channel defined by a mounting structure 140, as illustrated in Fig. 10A. The mounting structure 140 comprises two inner faces that inhibit longitudinal movement of the adaptor engaged with the medical line. (See '485 Patent, Col. 17, ll. 33-66). This structure is equivalent to or obvious in view of Sorbonne's disclosure of threading the tubing within a channel.

31

The device 10 is operable to be positioned on the body of a patient by attaching the adhesive strips 23,24 to the body, as illustrated in Fig. 1. (Col. 6, ll. 5-10). The catheter tubing can then be placed in the device by threading the tubing through the channel and around the posts 42,44. (Col. 6, ll. 10-13; Fig. 4). The cover 20 is then moved over the base 16 and secured by pressing the cylindrical hubs or posts 90 into the hollow interiors 46 of the spools 42,44, which retains the catheter tubing within the channel. (Col. 6, ll. 18-21).

Because Sorbonne teaches or suggests all of the elements recited in claim 22 of the '485 patent, Sorbonne anticipates claim 22 of the '485 patent and thus, raises a substantial new question of patentability.

### 3.    *Obvious in View of Sorbonne and Bierman*

Sorbonne combined with Bierman renders obvious claim 22 of the '485 patent. Sorbonne discloses a method for securing a medical line using a "venipuncture site guard and non-occluding catheter and intravenous tubing retainer." (Col. 1, ll. 62-64). Sorbonne discloses a method of securing a medical device, e.g., a catheter tube, to a patient using a retainer or device 10 including a base 16, a cover or lid 20 permanently coupled to the base, and adhesive strips 23 and 24. (Col. 3, ll. 56-58). The base 16 comprises a substantially planar shape-retaining part for receiving the catheter tube. (Col. 3, ll. 64-65; Figs. 3-4). The cover 20 of the device 10 is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68). The cover is movable between a closed position that at least partially extends over the shape-retaining part, and an open position in which the shape-retaining part is at least partially open. (Col. 6, ll. 18-21; Fig. 5).

Sorbonne discloses that the device 10 further includes a means for releasably latching the cover to the base. In particular, the base 16 includes two integral hollow spools or annular

32

cylindrical anchors 42,44. (Col. 4, ll. 25-28). Each spool extends generally upwards from the base. (See Figs. 4-5). The cover includes opposing projecting cylindrical studs or posts 90 that are "sized and located so as to be in alignment with the . . . annularly hollow spools 42 and 44." (Col. 5, ll. 34-39). "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42).

The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is equivalent to or obvious in view of Sorbonne's disclosure of hollow spools 42,44 interengaging with cylindrical studs or posts 90.

Bierman discloses interacting structure that is adapted to engage the medical line so as to limit longitudinal movement of the line. In particular, the soft wing clamp 18 is configured to receive a catheter within a central elongate body 32. (P. 5, ll. 17-18). "Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place." (P. 5, ll. 20-21). The elongate body 32 is then sized to be received within a longitudinal groove 28 formed in the box clamp 14. (P. 5, ll. 30-31). The combined box clamp 14 and wing clamp 18 can be secured to the retainer via holes 42 in the lateral wings of both the box and wing clamps. As illustrated in Fig. 9, the holes 42 are aligned with the posts 17 so that the catheter 12 is retained in place by the engagement of the posts 17 with the holes 42. (P. 6, l. 36 – P.7, l. 3).

One of the means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises the interaction of the holes or openings formed in the fitting 11 (comprising a box and wing clamp) and the posts 20 formed on the base. ('485 Patent, Col. 9, ll. 55-61). This

33

structure is identical or equivalent to Bierman's disclosure of holes or openings formed in the box and wing clamp combination interacting with the posts 17 formed on the base 20.

One of ordinary skill in the art would have been motivated to combine the means for limiting longitudinal movement disclosed in Bierman with the tubing retainer of Sorbonne so as to provide a device that "reliably and inexpensively guards a venipuncture site and retains the catheter in its subcutaneous condition without occlusion thereof." (Sorbonne, Col. 1, ll. 40-43).

Sorbonne further discloses that the device 10 is operable to be positioned on the body of a patient by attaching the adhesive strips 23,24 to the body, as illustrated in Fig. 1. (Col. 6, ll. 5-10). The catheter tubing can then be placed in the device by threading the tubing through the channel and around the posts 42,44. (Col. 6, ll. 10-13; Fig. 4). The cover 20 is then moved over the base 16 and secured by pressing the cylindrical hubs or posts 90 into the hollow interiors 46 of the spools 42,44, which retains the catheter tubing within the channel. (Col. 6, ll. 18-21).

Because the combination of the Sorbonne and Bierman references discloses all of the elements recited in claim 22 of the '485 patent, Sorbonne and Bierman render obvious claim 22 of the '485 patent and thus, raise a substantial new question of patentability.

### 4.    *Anticipated by the Gordon '647 Patent*

The Gordon '647 patent anticipates claim 22 of the '485 patent by disclosing a method for securing a medical line, such as a catheter tube, to the body of a patient using a stabilizing fitting. (Abstract; Col. 1, ll. 23-27). Although the Gordon '647 patent discloses two distinct embodiments, Requester's arguments for claim 22 will only be with respect to the second embodiment.

The second embodiment discussed in the Gordon '647 patent begins at column 6, line 15 and discloses a catheter-stabilizer 40 having a base member 41 serving as a retainer, the underside of

which is coated with an adhesive material. (Col. 6, ll. 17-28; Figs. 6-9). The base member 41 includes a base portion 43 to which is secured a plurality of upstanding walls 44,45 defining a base. (Col. 6, ll. 28-34). Recesses 47,48 are formed within the walls 44,45 and define a receiving area for receipt of a portion of the catheter tube. *Id.* The recesses 47,48 receive the catheter tube in a neck portion of the recess. (Col. 6, ll. 51-52).

The catheter-stabilizer 40 also includes a cover member 46 operable to be moved between open and closed positions and comprising a flexible strap hinged and permanently coupled to the upstanding walls 44,45. (Col. 6, l. 64 – Col. 7, l. 3). When the cover 46 is in a closed position, at least a portion of the cover extends over the receiving area. (See Fig. 7).

The stabilizer 40 further includes a means for releasably latching the cover to the walls 44,45 comprising the base, the means including a latching mechanism comprising a projecting latch member 53 formed on the base and a through hole 52 formed in the cover 46. (Col. 7, ll. 3-7). The cover 46 is releasably secured to the base by mating the through hole 52 through the latch member 53. The latch member 53, as illustrated in Fig. 6, is a post extending from the base and operable to be mated with an opening or hole in the cover 46.

The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is identical or equivalent to Gordon's disclosure of a hole 52 formed in the cover 46 that interengages with a post 53 formed on the base 44,45.

The Gordon '647 patent discloses a means for limiting longitudinal movement of the catheter tube relative to the base member 41 comprising the cover 46, the through hole 52 formed in the cover 46, the latch member 53, and a projection 55 extending from the underside of the cover 46.

35

(Col. 7, ll. 33-42; Figs. 6 and 9). When the cover 46 is moved over the catheter tube and secured to the walls 44,45 by mating the through hole 52 with the latch member 53, which is equivalent to a post, then the projection 55 is allowed to interengage with the catheter tube: "The gripping projection extends sufficiently far down into the space between the side walls 44 and 45 to engage and slightly crimp the catheter tube 50 (as best illustrated in FIG. 9), forcing the catheter tube slightly downward into the central opening 4 at the center of the annular base portion 43." (Col. 7, ll. 36-42). Thus, via the interacting structure of the hole 52 and post 53, the projection 55 contacts the catheter tube and presses slightly downward to crimp the catheter tube, inhibiting longitudinal movement of the tube. (Fig. 9).

One of the means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises the interaction of the holes or openings formed in the fitting 11 (comprising a box and wing clamp) and the posts 20 formed on the base. ('485 Patent, Col. 9, ll. 51-56). In particular, the box clamp 12 receives the catheter tube positioned within the soft wing clamp 18. ('485 Patent, Col. 8, ll. 31-34 and ll. 51-53; Col. 9, ll. 25-30). This box and wing clamp combination is then positioned on the retainer, identical to the positioning of the catheter tube in the Gordon '647 patent on the recesses of the walls. In the '485 patent, the cover is then latched over the fitting and secured by mating holes in the cover with the posts on the fitting. ('485 Patent, Col. 7, ll. 40-45). This is identical to latching the cover of the Gordon '647 patent over the catheter tube and securing by mating the hole in the cover with an extending post.

In the prosecution history of the '979 patent, the parent of the '485 patent, the applicant argued that the means for limiting longitudinal movement is in a non-occlusive manner. (See Section III(A)(2), *supra*). Arguably, the means for limiting longitudinal movement disclosed in the

36

Gordon '647 patent is occlusive because it presses downwardly and slightly crimps the catheter tube. However, the broadest application of "means for limiting longitudinal movement," notwithstanding the prosecution history of the '979 patent, is that movement can be limited in either an occlusive or non-occlusive manner.

The second embodiment disclosed in the Gordon '647 patent further teaches positioning and attaching the base member 41 serving as the retainer on the body of a patient by attaching the adhesive material. (Col. 6, ll. 19-28). The catheter tube is then secured in the receiving area formed by the recesses 47,48 of the side walls 44,45. (Col. 6, ll. 44-47 and 59-63). The cover 46 is then moved over and secured to the base using the snap-fit latch member 53 and through hole 52 latching mechanism. (Col. 7, ll. 3-12; Fig. 7). When in the closed position, the cover lies at least partially over the projection 55. (Fig. 9).

Because the second embodiment of the Gordon '647 patent discloses all of the elements recited in claim 22 of the '485 patent, the Gordon '647 patent anticipates claim 22 of the '485 patent and thus, raises a substantial new question of patentability.

5.    *Obvious in View of the Gordon '647 Patent and Bierman*

The Gordon '647 patent combined with Bierman renders obvious claim 22 of the '485 patent. Gordon discloses a method for securing a medical line, such as a catheter tube, to the body of a patient using a stabilizing fitting. (Abstract; Col. 1, ll. 23-27).

The second embodiment discussed in the Gordon '647 patent discloses a catheter-stabilizer 40 having a base member 41 serving as a retainer, the underside of which is coated with an adhesive material. (Col. 6, ll. 17-28; Figs. 6-9). The base member 41 includes a base portion 43 to which is secured a plurality of upstanding walls 44,45 defining a base. (Col. 6, ll. 28-34). Recesses 47,48

37

are formed within the walls 44,45 and define a receiving area for receipt of a portion of the catheter tube. *Id.* The recesses 47,48 receive the catheter tube in a neck portion of the recess. (Col. 6, ll. 51-52).

The catheter-stabilizer 40 also includes a cover member 46 operable to be moved between open and closed positions and comprising a flexible strap hinged and permanently coupled to the upstanding walls 44,45. (Col. 6, l. 64 – Col. 7, l. 3). When the cover 46 is in a closed position, at least a portion of the cover extends over the receiving area. (See Fig. 7).

The stabilizer 40 further includes a means for releasably latching the cover to the walls 44,45 comprising the base, the means including a latching mechanism comprising a projecting latch member 53 formed on the base and a through hole 52 formed in the cover 46. (Col. 7, ll. 3-7). The cover 46 is releasably secured to the base by mating the through hole 52 through the latch member 53. The latch member 53, as illustrated in Fig. 6, is a post extending from the base and operable to be mated with an opening or hole in the cover 46.

The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is identical or equivalent to Gordon's disclosure of a hole 52 formed in the cover 46 that interengages with a post 53 formed on the base 44,45.

Bierman combined with the Gordon '647 patent discloses a means for limiting longitudinal movement of the catheter tube relative to the base member 41 comprising the cover 46, the through hole 52 formed in the cover 46, the latch member 53, and a projection 55 extending from the underside of the cover 46. (Col. 7, ll. 33-42; Figs. 6 and 9). Additionally, Bierman teaches a wing clamp that surrounds a portion of a catheter tube. (Bierman, P. 4, ll. 34-35; Fig. 2). The wing clamp

38

containing the catheter, which is a conventional product, can be fitted within the walls 44,45 of the base member 41. Because the wing clamp is constructed from a "soft, pliable or flexible material such as, for example, Latex or the like," the wing clamp can be easily fitted within the open channel and diameter of the walls 44,45. (Bierman, P. 5, ll. 16-17). When the cover 46 is moved over the catheter tube and secured to the walls 44,45 by mating the through hole 52 with the latch member 53, which is equivalent to a post, then the projection 55 is allowed to interengage with the catheter tube: "The gripping projection extends sufficiently far down into the space between the side walls 44 and 45 to engage and slightly crimp the catheter tube 50 (as best illustrated in FIG. 9), forcing the catheter tube slightly downward into the central opening 4 at the center of the annular base portion 43." (Col. 7, ll. 36-42). Thus, via the interacting structure of the hole 52 and post 53, the projection 55 contacts the wing clamp containing the catheter tube and presses slightly downward to crimp the wing clamp, inhibiting longitudinal movement of the tube. (Fig. 9). One of ordinary skill in the art would have been motivated to combine Bierman with Gordon so as to use the common wing clamp design with the "important advantage" provided by the post and slotted hole arrangement taught by Bierman and Gordon. (Bierman, P. 2, ll. 6-7).

The second embodiment disclosed in the Gordon '647 patent further teaches positioning and attaching the base member 41 serving as the retainer on the body of a patient by attaching the adhesive material. (Col. 6, ll. 19-28). The catheter tube is then secured in the receiving area formed by the recesses 47,48 of the side walls 44,45. (Col. 6, ll. 44-47 and 59-63). The cover 46 is then moved over and secured to the base using the snap-fit latch member 53 and through hole 52 latching mechanism. (Col. 7, ll. 3-12; Fig. 7). When in the closed position, the cover lies at least partially over the projection 55. (Fig. 9).

Because the combination of the second embodiment of the Gordon '647 patent and Bierman discloses all of the elements recited in claim 22 of the '485 patent, the combination renders obvious claim 22 of the '485 patent and thus, raises a substantial new question of patentability.

## IV.    LEGAL STANDARDS

### A.    Claim Interpretation During a Reexamination

When reexamining patent claims, "the PTO must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in the specification." *In re Bass*, 314 F.3d 575, 577 (Fed. Cir. 2002) (citing *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984). "In a reexamination, claims should be given the broadest reasonable interpretation, as is done in an original or reissue examination, rather than the more charitable interpretation appropriate in an infringement suit. In a reexamination, the patent owner has the opportunity to amend the claims." *In re Yamamoto*, 740 F.2d at 1571. "Although claims of <u>issued</u> patents are interpreted in light of the specification, prosecution history, prior art and other claims, this is not the mode of claim interpretation to be applied during examination. During examination, the claims must be interpreted as broadly as their terms reasonably allow." MPEP § 2111.01 (emphasis in original), *citing In re American Academy of Science Tech Center*, 367 F.3d 1359, 1369, 70 USPQ2d 1827, 1834 (Fed. Cir. 2004) ("The USPTO uses a different standard for construing claims than that used by district courts; during examination the USPTO must give claims their broadest reasonable interpretation in light of the specification.").

During any examination, including reexamination, the claims must be interpreted as broadly as their terms reasonably allow, including giving the words of the claim their plain meaning unless applicant has provided a clear definition in the specification. *In re Zletz*, 893 F.2d 319, 321, 13

U.S.P.Q.2d 1320, 1322 (Fed. Cir. 1989). The broadest reasonable interpretation of the claims must also be consistent with the interpretation that those skilled in the art would reach. *In re Cortright*, 165 F.3d 1353, 1359, 49 U.S.P.Q.2d 1464, 1468 (Fed. Cir. 1999).

**B.    Laws on Anticipation**

To anticipate a claim under 35 U.S.C. § 102(a), 102(b), or 102(e), a single reference must disclose every limitation of the claim, either explicitly or inherently. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001); *In re Crish*, 393 F.3d 1253, 1256 (Fed. Cir. 2004). For a prior art reference to anticipate a claim, the disclosure must be sufficient to enable one of ordinary skill in the art to practice the claimed invention. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1342 (Fed. Cir. 2005). "[T]here is no requirement that an anticipating reference must provide specific examples; rather, the reference need only 'be enabling and describe the [patentee's] claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention.'" *Arthrocare Corp. v. Smith & Nephew*, 406 F.3d 1365, 1371-72 (Fed. Cir. 2005). Anticipatory disclosure may also be contained in the drawings of a patent. *See, e.g., Prima Tek II, L.L.C. v. Polypap, S.a.R.L.*, 412 F.3d 1284, 1289-90 (Fed. Cir. 2005) (finding anticipation based on necessary operation of product disclosed in reference drawings).

"Anticipation of a patent claim requires a finding that the claim at issue 'reads on' a prior art reference." The claim is to be tested in terms of whether it would "allow the patentee to exclude the public from practicing the prior art" disclosed in the reference; if so, the claim is anticipated. *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999). Hence, "it is axiomatic that that which would literally infringe it later anticipates if earlier." *Bristol-Myers Squibb*, 246 F.3d at 1378.

41

When a reference does not expressly disclose a claim limitation, it may nevertheless anticipate if the limitation is nonetheless inherent in the reference. *Atlas*, 190 F.3d at 1347. "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *MEHL/Biophile International Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).

The principle of inherency is part of the policy of ensuring that the prior art remains available for public use:

> The public remains free to make, use, or sell prior art compositions or processes, regardless of whether or not they understand their complete makeup or the underlying scientific principles which allow them to operate. The doctrine of anticipation by inherency, among other doctrines enforces that basic principle.

*Atlas*, 190 F.3d at 1348.

"An inherent structure, composition or function is not necessarily known. . . . Insufficient prior understanding of the inherent properties of a known composition does not defeat a finding of anticipation." *Atlas*, 190 F.3d at 1949. "Inherent anticipation does not require an appreciation of the inherent limitation by those of skill in the art before the critical date of the patents in issue." *Prima Tek*, 412 F.3d at 1289-90. "Inherency is not necessarily coterminous with the knowledge of those of ordinary skill in the art. Artisans of ordinary skill may not recognize the inherent characteristics or function of the prior art." *MEHL/Biophile*, 198 F.3d at 1365. Moreover, "the discovery of a previously unappreciated property of a prior art composition, *or of a scientific explanation for the prior art's functioning*, does not render the old composition patentably new to the discoverer." *Atlas*, 190 F.3d at 1347 (emphasis added).

On the other hand, it is equally well-established that evidence of what a reference would have taught a skilled artisan is highly relevant to anticipation. Although anticipation requires that all limitations of the claim must be disclosed in a single reference, extrinsic evidence may be used in order to establish what a reference discloses, inherently and explicitly, to one skilled in the art. Thus, extrinsic evidence such as other prior art documents and testimony from skilled artisans "may be considered when it is used to explain, but not expand, the meaning of a reference." *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991).

> We note that recourse to extrinsic evidence is proper to determine whether a feature, while not explicitly discussed, is necessarily present in a reference. . . . The evidence must make clear that the missing feature is necessarily present, and that it would be so recognized by persons of ordinary skill in the relevant art.

*Telemac*, 247 F.3d at 1328 (citations omitted).

### C.   Laws on Obviousness

"To determine whether an adequate reason exists to combine known elements, [the Patent Office] consider[s] (1) interrelated teachings of multiple patents; (2) the effects of demands known to the design community or present in the marketplace; and (3) the background knowledge possessed by a person having ordinary skill in the art. [The Patent Office] need not, however, 'seek out precise teachings directed to the specific [claimed] subject matter' as [it] can account for 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" *Ex Parte Teng and Remahl*, No. 2007-0954, at 10 (BAPI May 10, 2007), *quoting KSR Int'l v. Teleflex Inc.*, 127 S.Ct. 1727, 1741 (2007). Thus, as the Supreme Court recently commented in *KSR Int'l*, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 1739. When an improvement on the prior art is nothing more than a

"predictable use of prior art elements according to their established functions," the improvement is not sufficiently non-obvious to warrant patent protection. *Id*. at 1740.

## V.    DETAILED EXPLANATION UNDER 37 C.F.R. § 1.510(b)

### A.    Claim 1 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102(b) as Being Anticipated by Sorbonne

As detailed in the following claim chart, Sorbonne discloses each of the elements recited in claim 1 of the '485 patent.

| Claim 1 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| A method of securing a medical device to the body of a patient, the method comprising the steps of: | Sorbonne discloses a method of securing a medical device, e.g., a catheter tube, to a patient using a retainer or device 10 including a base 16, an openable cover or lid 20, and adhesive strips 23 and 24. (Col. 3, ll. 56-58). |
| providing a retainer including a base that defines a receiving area for receiving a portion of the medical device, | The base 16 comprises a substantially planar shape-retaining part for receiving the catheter tube. (Col. 3, ll. 64-65; Figs. 3-4). |
| a cover permanently coupled to the base, | The cover 20 of the device 10 is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68). |
| the cover being movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, | The cover is movable between a closed position that at least partially extends over the shape-retaining part, and an open position in which the shape-retaining part is at least partially open. (Col. 6, ll. 18-21; Fig. 5). |
| a latching mechanism operating between the base and the cover to releasably latch the cover to the base with the cover in the closed position, | Sorbonne's device 10 further includes a latching mechanism that releasably latches the cover to the base. The base 16 includes two integral hollow spools or annular cylindrical anchors 42,44. (Col. 4, ll. 25-28). Each spool extends generally upwards from the base. (See Figs. 4-5). The cover includes opposing projecting cylindrical studs or posts 90 that are "sized and located so as to be in |

| | alignment with the . . . annularly hollow spools 42 and 44." (Col. 5, ll. 34-39). "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42). |
|---|---|
| and interacting structure which is adapted to engage the medical device in a non-occlusive manner and to limit longitudinal movement of the medical device through the retainer when the medical device is placed within the receiving area; | Sorbonne's device 10 further includes interacting structure adapted to engage the catheter tube in a non-occlusive manner. The interacting structure comprises the cylindrical posts 42,44 secured to the base 16. (Col. 6, ll. 10-13; Fig. 4). The tubing is threaded around the posts, as illustrated in Fig. 4. *Id.* "This . . . prevent[s] crimping or occlusion of the tubing 102." (Col. 6, ll. 15-16). |
| positioning the retainer on the body of the patient; attaching the retainer to the body of the patient with an adhesive layer; | The device 10 is operable to be positioned on the body of a patient using the adhesive strips 23,24, as illustrated in Fig. 1. (Col. 6, ll. 5-10). |
| securing a portion of the medical device in the receiving area of the base; | The catheter tubing can be secured in the device by threading the tubing around the posts 42,44. (Col. 6, ll. 10-13). |
| moving the cover over the base so that the cover is located over at least a portion of the interacting structure; and securing the cover in position upon the base using the latching mechanism. | The cover 20 is moved over the base 16 and secured by pressing the cylindrical hubs or posts 90 into the hollow interiors 46 of the spools 42,44. (Col. 6, ll. 18-21). |

**B.    Claim 1 of the '485 Patent is Unpatentable Under 35 U.S.C. § 103 as Being Obvious in View of Bierman Combined with Sorbonne**

As detailed in the following claim chart, the combination of Bierman and Sorbonne discloses each of the elements recited in claim 1 of the '485 patent.

45

| Claim 1 of the '485 Patent | Obvious in View of Bierman Combined with Sorbonne |
|---|---|
| A method of securing a medical device to the body of a patient, the method comprising the steps of: | **Bierman** <br> Bierman discloses a method for securing a medical line using an anchoring system 10 that includes an anchor base or retainer 20. (P. 4, ll. 24-25). |
| providing a retainer including a base that defines a receiving area for receiving a portion of the medical device, | **Bierman** <br> The retainer 20 defines a receiving area to "provide releasable retention for the catheter 12." (P. 6, ll. 9-10). |
| a cover permanently coupled to the base, | **Bierman** <br> Bierman further discloses a cover comprising an "overlying box clamp 14 . . . [that] overlies and engages a soft wing clamp 18 which surrounds a portion of the catheter 12." (Page 4, ll. 22-24). <br><br> **Sorbonne** <br> Sorbonne discloses a cover 20 that is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68). <br><br> One of ordinary skill in the art would have been motivated to permanently secure the box clamp, as disclosed in Sorbonne, to the base of Bierman so as to provide a device that is an integral unit with fewer separated parts. Additionally, the improvement of the '485 patent over Bierman, namely the addition of a cover, is a predictable use of prior art elements according to their established functions. The teachings of Bierman and Sorbonne are sufficiently interrelated such that one of ordinary skill in the art would have looked to Sorbonne in designing a securement device for a catheter. |
| the cover being movable between a closed position, in which at least a portion of the | **Bierman** <br> The box clamp 14 is movable between a |

| | |
|---|---|
| cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, | closed position wherein it overlies the wing clamp 18 and it extends over at least a portion of the receiving area of the retainer 20, and an open position in which the receiving area is open.  (See Figs. 8-9; Page 4, ll. 24-25). |
| a latching mechanism operating between the base and the cover to releasably latch the cover to the base with the cover in the closed position, | Bierman<br>The anchoring system 10 also includes a latching mechanism for releasably latching the box clamp 18 to the base or retainer 20. The latching mechanism comprises posts 17 secured to the base or retainer 20 (see Fig. 9) and holes or openings 42 formed in wings of both the box clamp 14 and wing clamp 18. (P. 7, ll. 6-13).  "The posts 17 of the box clamp 14 are [] aligned with the slotted openings 42 on the top surface of the retainer 20 such that the tip 44 of each post 17 passes through the corresponding large diameter hole 42a of the retainer 20."  (P. 7, ll. 9-11). Engagement of the posts 17 and the openings 42 "serves to retain the box clamp combination secured in place within the retainer 20."  (P. 7, ll. 19-20). |
| and interacting structure which is adapted to engage the medical device in a non-occlusive manner and to limit longitudinal movement of the medical device through the retainer when the medical device is placed within the receiving area; | Bierman<br>The interacting structure comprises a soft wing clamp 18 configured to receive a catheter within a central elongate body 32. (P. 5, ll. 17-18).  "Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place."  (P. 5, ll. 20-21).  The elongate body 32 is then sized to be received within a longitudinal groove 28 formed in the box clamp 14.  (P. 5, ll. 30-31). The combined box clamp 14 and wing clamp 18 can be secured to the retainer via holes 42 in the lateral wings of both the box and wing clamps.  As illustrated in Fig. 9, the holes 42 are aligned with the posts 17 so that the catheter 12 is retained in place by the engagement of the posts 17 with the holes 42. |

| | (P. 6, l. 36 – P.7, l. 3). |
|---|---|
| positioning the retainer on the body of the patient; attaching the retainer to the body of the patient with an adhesive layer; | <u>Bierman</u><br>The base or retainer 20 is operable to be positioned on the body of a patient by attaching the base or retainer 20 to the patient via an adhesive layer. (P. 7, ll. 4-6). |
| securing a portion of the medical device in the receiving area of the base; | <u>Bierman</u><br>The medical device is then secured in the receiving area of the base. (P. 7, ll. 6-20). |
| moving the cover over the base so that the cover is located over at least a portion of the interacting structure; and | <u>Bierman</u><br>The cover comprising the box clamp 14 is secured over the base or retainer 20, such that the box clamp 14 covers at least a portion of the posts 17 and wing clamp 18. (P. 7, ll. 6-14; Fig. 9). |
| securing the cover in position upon the base using the latching mechanism. | <u>Bierman</u><br>The box clamp 14 is secured to the retainer 20 by inserting the posts 17 through the openings 42 on the wings of the clamp 14. (P. 7, ll. 15-20). |

**C.    Claim 1 of the '485 Patent is Unpatentable Under 35 U.S.C. § 103 as Being Obvious in View of the Gordon '647 Patent and the Gordon '880 Patent**

As detailed in the following two claim charts, the combination of the Gordon '647 patent and the Gordon '880 patent discloses each of the elements recited in claim 1 of the '485 patent.

*1.    First Embodiment Disclosed in the Gordon '647 Patent*

| **Claim 1 of the '485 Patent** | **Obvious in View of the Gordon '647 Patent and Gordon '880 Patent** |
|---|---|
| A method of securing a medical device to the body of a patient, the method comprising the steps of: | <u>Gordon '647</u><br>The first embodiment disclosed in the Gordon '647 patent includes a catheter-stabilizer 10 having a base member 11 on which is supported a support member 14. (Col. 3, ll. 42 and 56-59). The support member 14 is a |

48

| | retainer integrally formed with a cradle 16. (See alternative structure wherein the support member 14 is eliminated and the cradle is secured directly to the base 11 (Col. 6, ll. 1-4)). |
|---|---|
| providing a retainer including a base that defines a receiving area for receiving a portion of the medical device, . | Gordon '647<br>The cradle 16 is a base for the catheter-stabilizer 10 and defines a receiving area (inside of cradle) for the catheter tube. (Col. 3, ll. 63-65 and Col. 5, l. 63 – Col. 6, l. 6). |
| a cover permanently coupled to the base, the cover being movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, | Gordon '647<br>A cover member 25 is permanently coupled to the cradle 16 and is movable between open and closed positions, wherein in a closed position the cover extends over a portion of the cradle 16 (see Fig. 3), and in an open position, the cradle 16 is at least partially open (see Fig. 3). (Col. 4, ll. 16-26). |
| a latching mechanism operating between the base and the cover to releasably latch the cover to the base with the cover in the closed position, | Gordon '647<br>A latch mechanism comprises vertically spaced longitudinally extending ribs 30,31,32 that are positioned to provide resilient engagement with projection 29. (Fig. 3, Col. 4, ll. 43-53). The projection 29 engages any one of the ribs to releasably latch the cover 25 closed. (Col. 5, ll. 2-6). |
| and interacting structure which is adapted to engage the medical device in a non-occlusive manner and to limit longitudinal movement of the medical device through the retainer when the medical device is placed within the receiving area; | Gordon '647<br>Interacting structure comprises ribs 21, 28 positioned within the cradle. (Col. 5, ll. 9-12). These ribs receive and hold the catheter within the cradle 16 upon closing of the cover 25. (See Fig. 5). The vertical spacing or height of the ribs "provide[s] a firm grip against longitudinal displacement of the tubing within the stabilizer." (Col. 5, ll. 23-26).<br><br>Gordon '880<br>The Gordon '647 patent does not disclose that |

| | the catheter's longitudinal movement is limited in a non-occlusive manner. However, the Gordon '880 patent discloses structure for limiting the longitudinal movement in the recited non-occlusive manner. In particular, the Gordon '880 patent discloses a similar cradle 12 comprising a plurality of internal, longitudinal ridges 28 (see Fig. 7). (Col. 3, ll. 18-24). The cradle is dimensioned to receive a standard catheter hub 36. (Col. 4, ll. 24-26). "[P]ositive longitudinal location of the hub is obtained by the hub boss [36a] fitting in the wall openings 30." (Col. 3, ll. 29-31; Fig. 15). Therefore, the hub boss 36a limits longitudinal movement of the catheter by providing a surface that cannot be forcibly moved past ribs 60, as illustrated in Fig. 15.<br><br>One of ordinary skill in the art would have been motivated to combine the Gordon '880 patent with the Gordon '647 patent to "provide complete security against unwanted longitudinal movement of the catheter in spite of extensive movements by the patient." (Gordon '647 Patent, Col. 2, ll. 7-9). |
| --- | --- |
| positioning the retainer on the body of the patient; attaching the retainer to the body of the patient with an adhesive layer; securing a portion of the medical device in the receiving area of the base; | Gordon '647<br>The support member 14 is positioned on the body of a patient and attached to the body using an adhesive material 12. (Col. 3, ll. 49-56 and Col. 5, ll. 27-33). |
| moving the cover over the base so that the cover is located over at least a portion of the interacting structure; and securing the cover in position upon the base using the latching mechanism. | Gordon '647<br>The catheter tube is then secured within the cradle 16 of the stabilizer 10, and the cover 25 is pivoted closed and secured so that the projection 29 engages the ribs 30,31, or 32. (Col. 4, l. 65 – Col. 5, l. 4). Once the cover is in its closed position, it is located over at least a portion of the interacting structure comprising the ribs 21,28. (See Fig. 3). |

2.    *Second Embodiment Disclosed in the Gordon '647 Patent*

| Claim 1 of the '485 Patent | Obvious in View of the Gordon '647 Patent and Gordon '880 Patent |
|---|---|
| A method of securing a medical device to the body of a patient, the method comprising the steps of: | Gordon '647<br>The second embodiment discussed in the Gordon '647 patent discloses a catheter-stabilizer 40 having a base member 41 serving as a retainer, the underside of which is coated with an adhesive material. (Col. 6, ll. 17-28; Figs. 6-9). |
| providing a retainer including a base that defines a receiving area for receiving a portion of the medical device, | Gordon '647<br>The base member 41 includes a base portion 43 to which is secured a plurality of upstanding walls 44,45 defining a base. (Col. 6, ll. 28-34). Recesses 47,48 are formed within the walls 44,45 and define a receiving area for a catheter tube. *Id.* The recesses 47,48 receive the catheter tube in a neck portion of the recess. (Col. 6, ll. 51-52). |
| a cover permanently coupled to the base, the cover being movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, | Gordon '647<br>A cover member 46 comprises a flexible strap hinged and permanently coupled to the upstanding walls 44,45. (Col. 6, l. 64 – Col. 7, l. 3). When the cover 46 is in a closed position, at least a portion of the cover extends over the receiving area for the catheter tube. (See Fig. 7). When the cover 46 is in an open position, the receiving area is at least partially open. *Id.* |
| a latching mechanism operating between the base and the cover to releasably latch the cover to the base with the cover in the closed position, | Gordon '647<br>A latching mechanism comprises a projecting latch member 53 formed on the base and a through hole 52 formed in the cover 46. (Col. 7, ll. 3-7). The cover 46 is releasably secured to the base by mating the through hole 52 through the latch member 53. The latch member 53, as illustrated in Fig. 6, is a post extending from the base and operable to be mated with an opening or hole in the cover |

| | 46. |
|---|---|
| and interacting structure which is adapted to engage the medical device in a non-occlusive manner and to limit longitudinal movement of the medical device through the retainer when the medical device is placed within the receiving area;<br><br>. | Gordon '647<br>Recesses 47,48 limit longitudinal movement of the catheter.  The recesses 47,48 are sized slightly smaller than the diameter of the catheter tube so as to firmly engage the tube when retained in the stabilizer.  (Col. 6, ll. 58-63).<br><br>Gordon '880<br>Although the interacting structure comprising the recesses 47,48 disclosed in the second embodiment of the Gordon '647 patent limits the longitudinal movement of the catheter, such interacting structure does not limit the longitudinal movement in a non-occlusive manner. The Gordon '880 patent discloses structure for limiting the longitudinal movement in the recited non-occlusive manner.  The Gordon '880 patent's cradle 12 comprises a plurality of internal, longitudinal ridges 28 (see Fig. 7). (Col. 3, ll. 18-24).  The cradle is dimensioned to receive a standard catheter hub 36.  (Col. 4, ll. 24-26).  "[P]ositive longitudinal location of the hub is obtained by the hub boss [36a] fitting in the wall openings 30." (Col. 3, ll. 29-31; Fig. 15).  Therefore, the hub boss 36a limits longitudinal movement of the catheter by providing a surface that cannot be forcibly moved past ribs 60, as illustrated in Fig. 15.<br><br>One of ordinary skill in the art would have been motivated to combine the Gordon '880 patent with the Gordon '647 patent to "provide complete security against unwanted longitudinal movement of the catheter in spite of extensive movements by the patient." (Gordon '647 Patent, Col. 2, ll. 7-9). |
| positioning the retainer on the body of the patient; attaching the retainer to the body of the patient with an adhesive layer; securing a | Gordon '647<br>The second embodiment disclosed in the Gordon '647 patent further teaches |

52

| portion of the medical device in the receiving area of the base; | positioning and attaching the base member 41 serving as the retainer on the body of a patient by attaching the adhesive material. (Col. 6, ll. 19-28). The catheter tube is then secured in the recesses 47,48 of the side walls 44,45, (Col. 6, ll. 44-47 and 59-63). |
| moving the cover over the base so that the cover is located over at least a portion of the interacting structure; and securing the cover in position upon the base using the latching mechanism. | Gordon '647<br>The cover 46 is then moved over and secured to the base using the snap-fit latch member 53 and through hole 52 latching mechanism. (Col. 7, ll. 3-12; Fig. 7). |

**D.    Claim 2 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne and Under 35 U.S.C. § 103 as Being Obvious in View of Sorbonne and Bierman**

     *1.    Sorbonne as Anticipatory*

| Claim 2 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 1 | Sorbonne discloses all the elements recited in claim 1, as detailed in Section III(A)(1), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer having a channel which lies between the base and the cover of the retainer when the cover is in the closed position. | Sorbonne discloses a channel (See Fig. 4) through which the medical device, i.e., the catheter tube, is threaded. The channel is formed on the retainer 10 and lies between the base 16 and the cover 20 when the cover is in the closed position (See Fig. 5). |

     *2.    Sorbonne and Bierman as Obvious*

| Claim 2 of the '485 Patent | Obvious in View of Sorbonne and Bierman |
|---|---|
| The method of claim 1 | Sorbonne discloses all the elements recited in claim 1, as detailed in Section III(A)(1), *supra*. |
| wherein the step of providing a retainer | Bierman |

53

| further comprises providing a retainer having a channel which lies between the base and the cover of the retainer when the cover is in the closed position. | Bierman discloses a channel 28 in which the wing clamp 18 lies. The channel 28 lies between the base 20 and the cover 14 when the cover is secured to the base 20 and thus in the closed position. |

### E.    Claim 3 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne

| Claim 3 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 2 | Sorbonne discloses all the elements recited in claim 1, as detailed in Section III(A)(1), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer having the interacting structure of the retainer comprise a post which extends at least partially into the channel of the retainer. | Sorbonne discloses that the both posts 42,44 extend into the channel (See Fig. 4). |

### F.    Claim 5 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne

| Claim 5 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 2 | Sorbonne discloses all the elements recited in claim 2, as detailed in Section III(B)(1), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer having a channel that has a variable cross section along its length. | Sorbonne discloses that the channel gradually narrows towards its left-hand side as viewed in Figure 4. Thus, Sorbonne discloses a channel having a variable cross-section along its length. |

G.    **Claim 6 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne and Under 35 U.S.C. § 103 as Being Obvious in View of Sorbonne and Bierman**

1.    *Sorbonne as Anticipatory*

| Claim 6 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 2 | Sorbonne discloses all the elements recited in claim 2, as detailed in Section III(B)(1), *supra*. |
| wherein the step of securing a portion of the medical device comprises placing a portion of the medical device within the channel of the retainer. | The catheter tube is threaded around the posts 42,44 and through the channel (See Fig. 4) so as to secure the medical device to the body of the patient.  (Col. 6, ll. 11-13). |

2.    *Sorbonne and Bierman as Obvious*

| Claim 6 of the '485 Patent | Obvious in View of Sorbonne and Bierman |
|---|---|
| The method of claim 2 | Sorbonne discloses all the elements recited in claim 2, as detailed in Section III(B)(1), *supra*. |
| wherein the step of securing a portion of the medical device comprises placing a portion of the medical device within the channel of the retainer. | Bierman<br>Bierman discloses that the medical device comprising the catheter tube 12 is secured within the soft wing clamp 18, which is then secured within the channel 28.  (See Figs. 2 and 9; P. 4, ll. 33-35).  Therefore, a portion of the medical device 12 is placed within the channel 28. |

**H.**  **Claim 7 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne**

| Claim 7 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 2 | Sorbonne discloses all the elements recited in claim 2, as detailed in Section III(B)(1), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer in which the cross section of the channel tapers along its length. | The channel gradually narrows towards its left-hand side as viewed in Figure 4. Thus, Sorbonne discloses a channel that tapers along its length. |

**I.**  **Claim 8 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne**

| Claim 8 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 1 | Sorbonne discloses all the elements recited in claim 1, as detailed in Section III(A)(1), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer having the cover of the retainer coupled to the base of the retainer by a flexible hinge. | The cover 20 is flexibly hinged at line 18 and may be "manually opened and closed by a pivotal or hinged action." (Col. 4, ll. 67-68; Col 3, ll. 56-58; Fig. 5). |

**J.**  **Claim 11 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne**

| Claim 11 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 8 | Sorbonne discloses all the elements recited in claim 8, as detailed in Section III(G), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer in which the base, cover and hinge are integrally formed. | Sorbonne discloses an integrally formed base, cover, and hinge, as illustrated in Fig. 5. (See also Col. 3, ll. 49-51). |

**K.    Claim 12 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne**

As detailed in the following claim chart, Sorbonne discloses each of the elements recited in claim 12 of the '485 patent.

| Claim 12 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | Sorbonne discloses a method for securing a medical line using a "venipuncture site guard and non-occluding catheter and intravenous tubing retainer." (Col. 1, ll. 62-64). |
| providing a retainer attachable to a medical line, including a base, | Sorbonne discloses a retainer or device 10 including a base 16, a cover or lid 20 permanently coupled to the base, and adhesive strips 23 and 24. (Col. 3, ll. 56-58). The base 16 comprises a substantially planar shape-retaining part for receiving the catheter tube. (Col. 3, ll. 64-65; Figs. 3-4). |
| a cover permanently coupled to the base, | The cover 20 of the device 10 is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68). |
| a latching mechanism, | A latching mechanism comprises the base 16, which includes two integral hollow spools or annular cylindrical anchors 42,44. (Col. 4, ll. 25-28). Each spool extends generally upwards from the base. (See Figs. 4-5). The cover includes opposing projecting cylindrical studs or posts 90 that are "sized and located so as to be in alignment with the . . . annularly hollow spools 42 and 44." (Col. 5, ll. 34-39). "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42). |
| a channel, | Sorbonne's device 10 includes a channel (see right-hand side of Fig. 4). |

| Claim 12 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| and an adhesive layer attached to the retainer, | Sorbonne's device 10 includes adhesive strips 23 and 24 . (Col. 3, ll. 56-58). The strips are located for securing the retainer to the skin of a patient. (Col. 5, ll. 47-61; Fig. 1). |
| the cover being movable between an open position and a closed position, | The cover is movable between a closed position that at least partially extends over the shape-retaining part, and an open position in which the shape-retaining part is at least partially open. (Col. 6, ll. 18-21; Fig. 5). |
| the latching mechanism releasably latching the cover to the base in the closed position, | "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42). |
| the channel being disposed between the base and the cover when the cover is in the closed position, | The channel is disposed between the base 16 and the cover 20 when the cover is in the closed position (see Fig. 5). |
| the channel being shaped to retain the medical line between the cover and the base with the cover in the closed position in order to inhibit movement of the medical line in a direction generally parallel to the medical line's longitudinal axis; | The catheter tube can be threaded around the posts 42,44 and through the channel so as to retain the catheter tube between the base 16 and cover 20 when the cover 20 is in the closed position. (Col. 6, ll. 11-13). The channel and post arrangement further inhibits movement of the catheter tube in a direction generally parallel to the tube's longitudinal axis. (Col. 6, ll. 13-17; 22-25). |
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | The device 10 is operable to be positioned on the body of a patient by attaching the adhesive strips 23,24 to the body, as illustrated in Fig. 1. (Col. 6, ll. 5-10). |
| placing a portion of the medical line into the channel; | The catheter tubing can then be placed in the device by threading the tubing through the channel and around the posts 42,44. (Col. 6, ll. 10-13; Fig. 4). |

| Claim 12 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| moving the cover over the base so that the medical line is retained within the channel; and securing the cover in position upon the base using the latching mechanism. | The cover 20 is then moved over the base 16 and secured by pressing the cylindrical hubs or posts 90 into the hollow interiors 46 of the spools 42,44, which retains the catheter tubing within the channel. (Col. 6, ll. 18-21). |

- **L.    Claim 12 of the '485 Patent is Unpatentable Under 35 U.S.C. § 103 as Being Obvious in View of Bierman Combined with Sorbonne**

As detailed in the following claim chart, the combination of Bierman and Sorbonne discloses each of the elements recited in claim 12 of the '485 patent.

| Claim 12 of the '485 Patent | Obvious in View of Bierman Combined with Sorbonne |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | Bierman<br>Bierman discloses a method for securing a medical line to the body of a patient using an anchoring system 10. (Abstract). |
| providing a retainer attachable to a medical line, | Bierman<br>The anchoring system 10 includes a retainer 20 to that is attachable to a medical line. (P. 4, ll. 14-15 and 24-25). |
| including a base, | Bierman<br>The retainer includes a base. (See Fig. 2 and top surface of retainer 20). |

| Claim 12 of the '485 Patent | Obvious in View of Bierman Combined with Sorbonne |
|---|---|
| a cover permanently coupled to the base, | Bierman<br><br>The system 10 includes a cover comprising an "overlying box clamp 14 . . . [that] overlies and engages a soft wing clamp 18 which surrounds a portion of the catheter 12." (Page 4, ll. 22-24).<br><br>Sorbonne<br><br>Bierman does not disclose that the box clamp 14 that operates as a cover for the base 20 is permanently coupled to the base. Sorbonne, however, discloses a cover 20 that is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68).<br><br>One of ordinary skill in the art would have been motivated to permanently secure the box clamp, as disclosed in Sorbonne, to the base of Bierman so as to provide a device that is an integral unit with fewer separated parts. Additionally, the improvement of the '485 patent over Bierman, namely the addition of a cover, is a predictable use of prior art elements according to their established functions. The teachings of Bierman and Sorbonne are sufficiently interrelated such that one of ordinary skill in the art would have looked to Sorbonne in designing a securement device for a catheter. |

| Claim 12 of the '485 Patent | Obvious in View of Bierman Combined with Sorbonne |
|---|---|
| a latching mechanism, | **Bierman**<br><br>The anchoring system 10 also includes a latching mechanism for releasably latching the box clamp 18 to the base or retainer 20. The latching mechanism comprises posts 17 secured to the base or retainer 20 (see Fig. 9) and holes or openings 42 formed in wings of both the box clamp 14 and wing clamp 18. (P. 7, ll. 6-13). "The posts 17 of the box clamp 14 are [] aligned with the slotted openings 42 on the top surface of the retainer 20 such that the tip 44 of each post 17 passes through the corresponding large diameter hole 42a of the retainer 20." (P. 7, ll. 9-11). |
| a channel, | **Bierman**<br><br>The box clamp 14 includes a channel 28. (See Fig. 9). |
| and an adhesive layer attached to the retainer, | **Bierman**<br><br>"The retainer 20 in turn is mounted on an anchor pad 22 which is attached directly to the skin 24 of the patient by means of a self-adhesive backing (not shown)." (P. 4, ll. 25-26). |
| the cover being movable between an open position and a closed position, | **Bierman**<br><br>The box clamp 14 is movable between a closed position wherein it overlies the wing clamp 18 and it extends over at least a portion of the receiving area of the retainer 20, and an open position in which the receiving area is open. (See Figs. 8-9; P. 4, ll. 24-25). |

| Claim 12 of the '485 Patent | Obvious in View of Bierman Combined with Sorbonne |
|---|---|
| the latching mechanism releasably latching the cover to the base in the closed position, | **Bierman**<br><br>Engagement of the posts 17 and the openings 42 "serves to retain the box clamp combination secured in place within the retainer 20. When removal becomes necessary, the box clamp 14 is slid . . . so that the tips 44 of the posts 17 are once again aligned . . . whereupon the box clamp combination can be easily removed vertically from the retainer 20." (P. 7, ll. 19-23). |
| the channel being disposed between the base and the cover when the cover is in the closed position, | **Bierman**<br><br>The channel 28 of the box clamp 14 comprises a longitudinal groove sized to receive portions of the wing clamp 18. When the box clamp 14 is secured to the base 20 so as to cover the base, the channel 28 is disposed between the base 20 and the box clamp 14. (See Figs. 1 and 8). |
| the channel being shaped to retain the medical line between the cover and the base with the cover in the closed position in order to inhibit movement of the medical line in a direction generally parallel to the medical line's longitudinal axis; | **Bierman**<br><br>The channel is shaped to receive the soft wing clamp 18, which is configured to receive a catheter within a central elongate body 32. (P. 5, ll. 17-18). "Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place." (P. 5, ll. 20-21). The elongate body 32 is then sized to be received within the channel 28 formed in the box clamp 14 so as to inhibit movement of the catheter in a direction generally parallel to the catheter's longitudinal axis. (P. 5, ll. 20-21 and 30-32). |

| Claim 12 of the '485 Patent | Obvious in View of Bierman Combined with Sorbonne |
|---|---|
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | **Bierman**<br><br>The base or retainer 20 is operable to be positioned on the body of a patient by attaching the base or retainer 20 to the patient via an adhesive layer. (P. 7, ll. 4-6). |
| placing a portion of the medical line into the channel; | **Bierman**<br><br>The soft wing clamp 18 including the catheter 12 is then secured into the channel 28 of the box clamp 14. (P. 7, ll. 6-8). |
| moving the cover over the base so that the medical line is retained within the channel; | **Bierman**<br><br>The cover comprising the box clamp 14 is secured over the base or retainer 20, such that the catheter 12 is retained within the channel 28. (P. 7, ll. 6-14; Figs. 8 and 9). |
| and securing the cover in position upon the base using the latching mechanism. | **Bierman**<br><br>The box clamp 14 is secured to the retainer 20 by inserting posts 17 through openings 42 on the wings of the clamp 14. (P. 7, ll. 15-20). |

**M.    Claim 12 of the '485 Patent is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by the Gordon '647 Patent**

As detailed in the following two claim charts, the Gordon '647 patent discloses each of the elements recited in claim 12 of the '485 patent. The Gordon '647 patent discloses two distinct embodiments, each of which is discussed in a separate claim chart.

### 1.    *First Embodiment Disclosed in the Gordon '647 Patent*

| Claim 12 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | The Gordon '647 patent discloses a method for securing a medical line, such as a catheter tube, to the body of a patient using a stabilizing fitting.  (Abstract; Col. 1, ll. 23-27). |
| providing a retainer attachable to a medical line, | The patent discloses a catheter-stabilizer 10 having a base member 11 on which is supported a support member 14.  (Col. 3, ll. 42 and 56-59).  The support member 14 is a retainer integrally formed with a cradle 16.  (See alternative structure wherein the support member 14 is eliminated and the cradle is secured directly to the base 11 (Col. 6, ll. 1-4)). |
| including a base, | The cradle 16 is a base for the catheter-stabilizer 10.  (Col. 3, ll. 63-65 and Col. 5, l. 63 – Col. 6, l. 6). |
| a cover permanently coupled to the base, | A cover member 25 is permanently coupled to the cradle 16.  (Col. 4, ll. 16-26; Fig. 3). |
| a latching mechanism, | The cover member 25 is secured to the cradle via a latch mechanism comprising vertically spaced longitudinally extending ribs 30,31,32 that are positioned to provide resilient engagement with projection 29.  (Fig. 3, Col. 4, ll. 43-53). |
| a channel, | The support member 14 defining the cradle 16 further includes a channel formed in the cradle (see Fig. 3). |
| and an adhesive layer attached to the retainer, | An adhesive layer 12 is provided on the underside of the base member 11 so as to secure the support member 14 and cradle 16 to the body of a patient.  (Col. 3, ll. 49-53 and Col. 5, ll. 27-33). |

| Claim 12 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| the cover being movable between an open position and a closed position, | The cover member 25 is movable between open and closed positions. (Col. 4, ll. 16-26; Fig. 3). |
| the latching mechanism releasably latching the cover to the base in the closed position, | The projection 29 engages any one of the ribs to releasably latch the cover 25 closed. (Col. 5, ll. 2-6). |
| the channel being disposed between the base and the cover when the cover is in the closed position, | The channel is disposed between the cradle 16 and the cover member 25 when the cover is in the closed position. (See Fig. 4). |
| the channel being shaped to retain the medical line between the cover and the base with the cover in the closed position in order to inhibit movement of the medical line in a direction generally parallel to the medical line's longitudinal axis; | The channel is shaped to retain the catheter tube between the cradle 16 and the cover member 25, when the cover member 25 is in the closed position, so as to inhibit movement of the catheter tube in a direction generally parallel to the tube's longitudinal axis. (Col. 5, ll. 9-33; Fig. 5). In particular, in addition to the channel formed in the cradle 16, the cradle 16 includes ribs 21, 28 positioned within the cradle. (Col. 5, ll. 9-12). These ribs receive and hold the catheter within the cradle 16 upon closing of the cover 25. (See Fig. 5). The vertical spacing or height of the ribs "provide[s] a firm grip against longitudinal displacement of the tubing within the stabilizer." (Col. 5, ll. 23-26). |
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | The support member 14 is positioned on the body of a patient and attached to the body using an adhesive material 12. (Col. 3, ll. 49-56 and Col. 5, ll. 27-33). |
| placing a portion of the medical line into the channel; moving the cover over the base so that the medical line is retained within the channel; and securing the cover in position upon the base using the latching mechanism. | The catheter tube is then secured within the channel of the cradle 16 (see Fig. 5), and the cover 25 is pivoted closed and secured so that the projection 29 engages the ribs 30,31, or 32. (Col. 4, l. 65 – Col. 5, l. 4). Once the cover is in its closed position, it is located over at least a portion of the channel and catheter tube. (See Fig. 3). |

## 2. *Second Embodiment Disclosed in the Gordon '647 Patent*

| Claim 12 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | The Gordon '647 patent discloses a method for securing a medical line, such as a catheter tube, to the body of a patient using a stabilizing fitting. (Abstract; Col. 1, ll. 23-27). |
| providing a retainer attachable to a medical line, | The second embodiment discussed in the Gordon '647 patent discloses a catheter-stabilizer 40 having a base member 41 serving as a retainer. (Col. 6, ll. 17-28; Figs. 6-9). |
| including a base, | The base member 41 includes a base portion 43 to which is secured a plurality of upstanding walls 44,45 defining a base. (Col. 6, ll. 28-34). |
| a cover permanently coupled to the base, | A cover 46 comprising a flexible strap hinged and permanently coupled to the upstanding walls 44,45 is releasably secured to the base by mating the through hole 52 through the latch member 53. |
| a latching mechanism, | The stabilizer 40 further includes a latching mechanism comprising a projecting latch member 53 formed on the base and a through hole 52 formed in the cover 46. (Col. 7, ll. 3-7). |
| a channel, | Recesses 47,48 are formed within the walls 44,45 and define a channel for receiving the catheter tube. *Id.* The recesses 47,48 receive the catheter tube in a neck portion of the recess. (Col. 6, ll. 51-52). |
| and an adhesive layer attached to the retainer, | The underside of the base member is coated with an adhesive material. (Col. 6, ll. 25-28; Fig. 6). |

| Claim 12 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| the cover being movable between an open position and a closed position, | The cover member 46 is operable to be moved between open and closed positions. (Col. 6, l. 64 – Col. 7, l. 3). |
| the latching mechanism releasably latching the cover to the base in the closed position, | The latch member 53, as illustrated in Fig. 6, is operable to releasably latch the cover to the base: "The latch member 53 projects radially outward somewhat from side wall 44 and is configured to permit the latching hole 52 of the strap 46 to be stretched over projection 53 so that the projection extends through the hole and latches the cover in place." (See Figs. 7 and 8; Col. 7, ll. 7-11). |
| the channel being disposed between the base and the cover when the cover is in the closed position, | When the cover 46 is in a closed position, at least a portion of the cover extends over the channel, such that the channel is disposed between the walls 44,45 and the cover 46. (See Fig. 7). |
| the channel being shaped to retain the medical line between the cover and the base with the cover in the closed position in order to inhibit movement of the medical line in a direction generally parallel to the medical line's longitudinal axis; | In an alternative arrangement, the stabilizer is operable to limit longitudinal movement of the catheter using the recesses 47,48 that form the channel, such that when the catheter tube is retained in the channel, the channel inhibits longitudinal movement of the tube in a direction generally parallel to the tube's longitudinal axis. (Col. 6, ll. 58-63). In particular, the recesses 47,48 are sized slightly smaller than the diameter of the catheter tube so as to firmly engage the tube when retained in the channel, thus inhibiting longitudinal movement. *Id.* |
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | The base member 41 is positioned and attached to the body of a patient by attaching the adhesive material to the body. (Col. 6, ll. 19-28). |
| placing a portion of the medical line into the channel; | The catheter tube is then secured in the channel formed by the recesses 47,48 of the side walls 44,45. (Col. 6, ll. 44-47 and 59-63). |

67

| Claim 12 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| moving the cover over the base so that the medical line is retained within the channel; and securing the cover in position upon the base using the latching mechanism. | The cover 46 is then moved over and secured to the base using the snap-fit latch member 53 and through hole 52 latching mechanism. (Col. 7, ll. 3-12; Fig. 7). |

### N.    Claim 13 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne

| Claim 13 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 12 | Sorbonne discloses all the elements recited in claim 12, as detailed in Section III(I)(1), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer having a post which extends at least partially into the channel of the retainer. | Sorbonne discloses that both posts 42,44 extend into the channel.  (See Fig. 4). |

### O.    Claim 15 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne

| Claim 15 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 12 | Sorbonne discloses all the elements recited in claim 12, as detailed in Section III(I)(1), *supra*. |
| wherein the step the step of providing a retainer further comprises providing a retainer in which the channel has a variable cross section along its length. | Sorbonne discloses that the channel gradually narrows towards its left-hand side as viewed in Figure 4.  Thus, Sorbonne discloses a channel having a variable cross-section along its length. |

**P.    Claim 16 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne and Under 35 U.S.C. § 103 as Being Obvious in View of the Combination of Sorbonne and Bierman**

### 1.    Sorbonne as Anticipatory

| Claim 16 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 12 | Sorbonne discloses all the elements recited in claim 12, as detailed in Section III(I)(1), *supra*. |
| wherein the step of securing a portion of the medical device comprises placing a portion of the medical device within the channel of the retainer. | Sorbonne discloses that the catheter tube is threaded around the posts 42,44 and through the channel (see Fig. 4) so as to secure the medical device to the body of the patient. (Col. 6, ll. 11-13). |

### 2.    Sorbonne and Bierman as Obvious

| Claim 16 of the '485 Patent | Obvious in View of Sorbonne and Bierman |
|---|---|
| The method of claim 12 | Sorbonne discloses all the elements recited in claim 12, as detailed in Section III(I)(1), *supra*. |
| wherein the step of securing a portion of the medical device comprises placing a portion of the medical device within the channel of the retainer. | Bierman<br><br>Bierman discloses that the medical device comprising the catheter tube 12 is secured within the soft wing clamp 18, which is then secured within the channel 28. (See Figs. 2 and 9; P. 4, ll. 33-35). |

**Q.** **Claim 17 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne**

| Claim 17 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 12 | Sorbonne discloses all the elements recited in claim 12, as detailed in Section III(I)(1), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer in which the cross section of the channel tapers along its length. | Sorbonne discloses that the channel gradually narrows towards its left-hand side as viewed in Figure 4. Thus, Sorbonne discloses a channel that tapers along its length. |

**R.** **Claim 18 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne**

| Claim 18 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 12 | Sorbonne discloses all the elements recited in claim 12, as detailed in Section III(I)(1), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer in which the cover of the retainer is coupled to the base of the retainer by a flexible hinge. | Sorbonne discloses that the cover 20 is flexibly hinged at line 18 and may be "manually opened and closed by a pivotal or hinged action." (Col. 4, ll. 67-68; Col 3, ll. 56-58; Fig. 5). |

**S.** **Claim 21 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne**

| Claim 21 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| The method of claim 18 | Sorbonne discloses all the elements recited in claim 18, as detailed in Section III(N), *supra*. |
| wherein the step of providing a retainer further comprises providing a retainer in which the base, cover and hinge are integrally formed. | Sorbonne discloses an integrally formed base, cover, and hinge, as illustrated in Fig. 5. (See also Col. 3, ll. 49-51). |

T.    **Claim 22 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Bierman**

As detailed in the following claim chart, Bierman discloses each of the elements recited in claim 22 of the '485 patent.

| Claim 22 of the '485 Patent | Anticipated by Bierman |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | Bierman discloses a method for securing a medical line to the body of a patient using an anchoring system 10 that includes an anchor base or retainer 20. (P. 4, ll. 4-5 and 24-25). |
| providing a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and | Bierman discloses an anchor base or retainer 20. (P. 4, ll. 24-25). The retainer 20 defines a receiving area to "provide releasable retention for the catheter 12." (P. 6, ll. 9-10). |
| a cover coupled to the base, | Bierman further discloses a cover comprising an "overlying box clamp 14 . . . [that] overlies and engages a soft wing clamp 18 which surrounds a portion of the catheter 12." (P. 4, ll. 22-24). The box clamp 14 is coupled to the cover upon securement to the retainer 20 via the means for releasably latching discussed below. |

| Claim 22 of the '485 Patent | Anticipated by Bierman |
|---|---|
| means for releasably latching the cover to the base, | The Bierman anchoring system 10 also includes a latching mechanism for releasably latching the box clamp 14 to the base or retainer 20.  The latching mechanism comprises posts 17 secured to the base or retainer 20 (see Fig. 9) and holes or openings 42 formed in wings of both the box clamp 14 and wing clamp 18.  (P. 7, ll. 6-13).  "The posts 17 of the box clamp 14 are [] aligned with the slotted openings 42 on the top surface of the retainer 20 such that the tip 44 of each post 17 passes through the corresponding large diameter hole 42a of the retainer 20."  (P. 7, ll. 9-11).  Engagement of the posts 17 and the openings 42 "serves to retain the box clamp combination secured in place within the retainer 20."  (P. 7, ll. 19-20).<br><br>The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base.  ('485 Patent, Col. 7, ll. 40-45).  This structure is identical or equivalent to Bierman's disclosure of holes or openings formed in the box clamp 14 interengaging with the posts 17 formed on the base 20. |

| Claim 22 of the '485 Patent | Anticipated by Bierman |
|---|---|
| and means for limiting longitudinal movement of the medical line relative to the retainer; | Bierman discloses interacting structure that is adapted to engage the medical line so as to limit longitudinal movement of the line. In particular, the soft wing clamp 18 is configured to receive a catheter within a central elongate body 32. (P. 5, ll. 17-18). "Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place." (P. 5, ll. 20-21). The elongate body 32 is then sized to be received within a longitudinal groove 28 formed in the box clamp 14. (P. 5, ll. 30-31). The combined box clamp 14 and wing clamp 18 can be secured to the retainer via holes 42 in the lateral wings of both the box and wing clamps. As illustrated in Fig. 9, the holes 42 are aligned with the posts 17 so that the catheter 12 is retained in place by the engagement of the posts 17 with the holes 42. (P. 6, l. 36 – P.7, l. 3).

The means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises the interaction of the holes or openings formed in the fitting 11 (comprising a box and wing clamp) and the posts 20 formed on the base. ('485 Patent, Col. 9, ll. 55-61). This structure is identical or equivalent to Bierman's disclosure of holes or openings formed in the box and wing clamp combination interacting with the posts 17 formed on the base 20. |
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | The base or retainer 20 is operable to be positioned on the body of a patient by attaching the base or retainer 20 to the patient via an adhesive layer. (P. 7, ll. 4-6). |

| Claim 22 of the '485 Patent | Anticipated by Bierman |
|---|---|
| placing a portion of the medical line into the receiving area; | Bierman discloses securing the medical device in the receiving area of the base.  (P. 7, ll. 6-20). |
| moving the cover over the base so that the cover lies at least partially over the movement limiting means; | The cover comprising the box clamp 14 is secured over the base or retainer 20, such that the box clamp 14 covers at least a portion of the posts 17 and wing clamp 18.  (P. 7, ll. 6-14; Fig. 9). |
| and securing the cover in position upon the base using the latching mechanism. | The box clamp 14 is secured to the retainer 20 by inserting the posts 17 through the openings 42 on the wings of the clamp 14.  (P. 7, ll. 15-20). |

## U.    Claim 22 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by Sorbonne

As detailed in the following claim chart, Sorbonne discloses each of the elements recited in claim 22 of the '485 patent.

| Claim 22 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | Sorbonne discloses a method for securing a medical line using a "venipuncture site guard and non-occluding catheter and intravenous tubing retainer." (Col. 1, ll. 62-64). |
| providing a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and | Sorbonne discloses a method of securing a medical device, e.g., a catheter tube, to a patient using a retainer or device 10 including a base 16 and adhesive strips 23 and 24. (Col. 3, ll. 56-58).  The base 16 comprises a substantially planar shape-retaining part for receiving the catheter tube. (Col. 3, ll. 64-65; Figs. 3-4). |

| Claim 22 of the '485 Patent | Anticipated by Sorbonne |
| --- | --- |
| a cover coupled to the base, | Sorbonne's device 10 includes a cover or lid 20 permanently coupled to the base 16 and hinged at site 18. (Col. 3, ll. 56-58; Col. 4, ll. 67-68). The cover is movable between a closed position that at least partially extends over the shape-retaining part, and an open position in which the shape-retaining part is at least partially open. (Col. 6, ll. 18-21; Fig. 5). |
| means for releasably latching the cover to the base, | Sorbonne discloses that the device 10 further includes a means for releasably latching the cover to the base. In particular, the base 16 includes two integral hollow spools or annular cylindrical anchors 42,44. (Col. 4, ll. 25-28). Each spool extends generally upwards from the base. (See Figs. 4-5). The cover includes opposing projecting cylindrical studs or posts 90 that are "sized and located so as to be in alignment with the . . . annularly hollow spools 42 and 44." (Col. 5, ll. 34-39). "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42).

The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is equivalent to or obvious in view of Sorbonne's disclosure of hollow spools 42,44 interengaging with cylindrical studs or posts 90. |

| Claim 22 of the '485 Patent | Anticipated by Sorbonne |
|---|---|
| and means for limiting longitudinal movement of the medical line relative to the retainer; | Sorbonne also discloses means for limiting longitudinal movement of the medical line comprising a channel formed through the cylindrical posts 42,44 secured to the base 16. The catheter tube can be threaded around the posts 42,44 and through the channel so as to retain the catheter tube between the base 16 and cover 20 when the cover 20 is in the closed position. (Col. 6, ll. 11-13; Fig. 4). The channel and post arrangement further inhibits movement of the catheter tube in a direction generally parallel to the tube's longitudinal axis. (Col. 6, ll. 13-17; 22-25).<br><br>One of the means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises a channel defined by a mounting structure 140, as illustrated in Fig. 10A. The mounting structure 140 comprises two inner faces that inhibit longitudinal movement of the adaptor engaged with the medical line. (See '485 Patent, Col. 17, ll. 33-66). This structure is equivalent to or obvious in view of Sorbonne's disclosure of threading the tubing within a channel. |
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | The device 10 is operable to be positioned on the body of a patient by attaching the adhesive strips 23,24 to the body, as illustrated in Fig. 1. (Col. 6, ll. 5-10). |
| placing a portion of the medical line into the receiving area; | The catheter tubing can then be placed in the device by threading the tubing through the channel and around the posts 42,44. (Col. 6, ll. 10-13; Fig. 4). |
| moving the cover over the base so that the cover lies at least partially over the movement limiting means; and securing the cover in position upon the base using the latching mechanism. | The cover 20 is then moved over the base 16 and secured by pressing the cylindrical hubs or posts 90 into the hollow interiors 46 of the spools 42,44, which retains the catheter tubing within the channel. (Col. 6, ll. 18-21). |

V.    Claim 22 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 103 as Being Obvious in View of the Combination of Sorbonne and Bierman

As detailed in the following claim chart, the combination of Sorbonne and Bierman discloses each of the elements recited in claim 22 of the '485 patent.

| Claim 22 of the '485 Patent | Obvious in View of Sorbonne and Bierman |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | Sorbonne<br><br>Sorbonne discloses a method for securing a medical line using a "venipuncture site guard and non-occluding catheter and intravenous tubing retainer." (Col. 1, ll. 62-64). |
| providing a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and | Sorbonne<br><br>Sorbonne discloses a retainer or device 10 including a base 16 and an openable cover or lid 20. (Col. 3, ll. 56-58). The base 16 comprises a substantially planar shape-retaining part for receiving the catheter tube. (Col. 3, ll. 64-65; Figs. 3-4). |
| a cover coupled to the base, | Sorbonne<br><br>Sorbonne discloses an openable cover or lid 20. (Col. 3, ll. 56-58). The cover 20 of the device 10 is permanently secured to the base 16 and hinged at site 18. (Col. 3, ll. 56-57; Col. 4, ll. 67-68). |
| means for releasably latching the cover to the base, | Sorbonne<br><br>Sorbonne discloses that the device 10 further includes a latching mechanism that releasably latches the cover to the base. In particular, the base 16 includes two integral hollow spools or annular cylindrical anchors 42,44. (Col. 4, ll. 25-28). Each spool extends generally upwards from the base. (See Figs. 4-5). The cover includes opposing projecting cylindrical studs or posts 90 that are "sized and located so as to be in alignment with the . . . annularly hollow spools 42 and 44." (Col. |

77

| Claim 22 of the '485 Patent | Obvious in View of Sorbonne and Bierman |
|---|---|
| | 5, ll. 34-39). "[T]he studs 90 fit within the hollow interior 46 in snug tight-fitting though releasable relation when the cover is in a closed position to form a snap or friction latch." (Col. 5, ll. 39-42).<br><br>The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is equivalent to or obvious in view of Sorbonne's disclosure of hollow spools 42,44 interengaging with cylindrical studs or posts 90. |
| and means for limiting longitudinal movement of the medical line relative to the retainer; | <u>Sorbonne</u><br>The means for limiting longitudinal movement disclosed in Sorbonne comprises cylindrical posts 42,44 secured to the base 16. (Col. 6, ll. 10-13; Fig. 4).<br><br>One of the means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises a channel defined by a mounting structure 140, as illustrated in Fig. 10A. The mounting structure 140 comprises two inner faces that inhibit longitudinal movement of the adaptor engaged with the medical line. (See '485 Patent, Col. 17, ll. 33-66). This structure is equivalent to or obvious in view of Sorbonne's disclosure of threading the tubing within a channel.<br><br><u>Bierman</u><br>The means for limiting longitudinal movement disclosed in Bierman comprises a soft wing clamp 18 configured to receive a catheter within a central elongate body 32. |

| Claim 22 of the '485 Patent | Obvious in View of Sorbonne and Bierman |
|---|---|
| | (P. 5, ll. 17-18).  "Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place." (P. 5, ll. 20-21).  The elongate body 32 is then sized to be received within a longitudinal groove 28 formed in the box clamp 14.  (P. 5, ll. 30-31).  The combined box clamp 14 and wing clamp 18 can be secured to the retainer via holes 42 in the lateral wings of both the box and wing clamps.  As illustrated in Fig. 9, the holes 42 are aligned with the posts 17 so that the catheter 12 is retained in place by the engagement of the posts 17 with the holes 42.  (P. 6, l. 36 – P.7, l. 3). |
| | One of the means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises the interaction of the holes or openings formed in the fitting 11 (comprising a box and wing clamp) and the posts 20 formed on the base.  ('485 Patent, Col. 9, ll. 55-61).  This structure is identical or equivalent to Bierman's disclosure of holes or openings formed in the box and wing clamp combination interacting with the posts 17 formed on the base 20. |
| | One of ordinary skill in the art would have been motivated to combine the means for limiting longitudinal movement disclosed in Bierman with the tubing retainer of Sorbonne so as to provide a device that "reliably and inexpensively guards a venipuncture site and retains the catheter in its subcutaneous condition without occlusion thereof." (Sorbonne, Col. 1, ll. 40-43). |

79

| Claim 22 of the '485 Patent | Obvious in View of Sorbonne and Bierman |
|---|---|
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | Sorbonne<br>The device 10 is operable to be positioned on the body of a patient using the adhesive strips 23,24, as illustrated in Fig. 1. (Col. 6, ll. 5-10). |
| placing a portion of the medical line into the receiving area; | Sorbonne<br>The catheter tubing is secured in the device by threading the tubing around the posts 42,44. (Col. 6, ll. 10-13). |
| moving the cover over the base so that the cover lies at least partially over the movement limiting means; and securing the cover in position upon the base using the latching mechanism. | Sorbonne<br>The cover 20 is moved over the base 16 and secured by pressing the cylindrical hubs or posts 90 into the hollow interiors 46 of the spools 42,44. (Col. 6, ll. 18-21). |

**W.    Claim 22 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 102 as Being Anticipated by the Gordon '647 Patent**

As detailed in the following claim chart, the second embodiment of the Gordon '647 patent discloses each of the elements recited in claim 22 of the '485 patent.

| Claim 22 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | The Gordon '647 patent discloses a method for securing a medical line, such as a catheter tube, to the body of a patient using a stabilizing fitting. (Abstract; Col. 1, ll. 23-27). |

| Claim 22 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| providing a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and | The second embodiment discussed in the Gordon '647 patent discloses a catheter-stabilizer 40 having a base member 41 serving as a retainer, the underside of which is coated with an adhesive material. (Col. 6, ll. 17-28; Figs. 6-9).  The base member 41 includes a base portion 43 to which is secured a plurality of upstanding walls 44,45 defining a base.  (Col. 6, ll. 28-34).  Recesses 47,48 are formed within the walls 44,45 and define a receiving area for receipt of a portion of the catheter tube.  *Id.*  The recesses 47,48 receive the catheter tube in a neck portion of the recess.  (Col. 6, ll. 51-52). |
| a cover coupled to the base, | The catheter-stabilizer 40 also includes a cover member 46 operable to be moved between open and closed positions and comprising a flexible strap hinged and permanently coupled to the upstanding walls 44,45.  (Col. 6, l. 64 – Col. 7, l. 3).   When the cover 46 is in a closed position, at least a portion of the cover extends over the receiving area.  (See Fig. 7). |

| Claim 22 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| means for releasably latching the cover to the base, | The stabilizer 40 further includes a means for releasably latching the cover to the walls 44,45 comprising the base, the means including a latching mechanism comprising a projecting latch member 53 formed on the base and a through hole 52 formed in the cover 46. (Col. 7, ll. 3-7).  The cover 46 is releasably secured to the base by mating the through hole 52 through the latch member 53. The latch member 53, as illustrated in Fig. 6, is a post extending from the base and operable to be mated with an opening or hole in the cover 46.<br><br>The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is identical or equivalent to Gordon's disclosure of a hole 52 formed in the cover 46 that interengages with a post 53 formed on the base 44,45. |
| and means for limiting longitudinal movement of the medical line relative to the retainer; | The Gordon '647 patent discloses a means for limiting longitudinal movement of the catheter tube relative to the base member 41 comprising the cover 46, the through hole 52 formed in the cover 46, the latch member 53, and a projection 55 extending from the underside of the cover 46. (Col. 7, ll. 33-42; Figs. 6 and 9).  When the cover 46 is moved over the catheter tube and secured to the walls 44,45 by mating the through hole 52 with the latch member 53, which is equivalent to a post, then the projection 55 is allowed to interengage with the catheter tube: "The gripping projection extends sufficiently far down into the space between the side walls 44 and 45 to engage and slightly crimp the catheter tube 50 (as best illustrated in FIG. 9), |

| Claim 22 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| | forcing the catheter tube slightly downward into the central opening 4 at the center of the annular base portion 43." (Col. 7, ll. 36-42). Thus, via the interacting structure of the hole 52 and post 53, the projection 55 contacts the catheter tube and presses slightly downward to crimp the catheter tube, inhibiting longitudinal movement of the tube. (Fig. 9).<br><br>One of the means for limiting longitudinal movement of the medical line disclosed in the '485 patent comprises the interaction of the holes or openings formed in the fitting 11 (comprising a box and wing clamp) and the posts 20 formed on the base. ('485 Patent, Col. 9, ll. 51-56). In particular, the box clamp 12 receives the catheter tube positioned within the soft wing clamp 18. ('485 Patent, Col. 8, ll. 31-34 and ll. 51-53; Col. 9, ll. 25-30). This box and wing clamp combination is then positioned on the retainer, identical to the positioning of the catheter tube in the Gordon '647 patent on the recesses of the walls. In the '485 patent, the cover is then latched over the fitting and secured by mating holes in the cover with the posts on the fitting. ('485 Patent, Col. 7, ll. 40-45). This is identical to latching the cover of the Gordon '647 patent over the catheter tube and securing by mating the hole in the cover with an extending post. |
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | The second embodiment disclosed in the Gordon '647 patent further teaches positioning and attaching the base member 41 serving as the retainer on the body of a patient by attaching the adhesive material. (Col. 6, ll. 19-28). |
| placing a portion of the medical line into the receiving area; | The catheter tube is then secured in the receiving area formed by the recesses 47,48 of the side walls 44,45. (Col. 6, ll. 44-47 and 59-63). |

| Claim 22 of the '485 Patent | Anticipated by the Gordon '647 Patent |
|---|---|
| moving the cover over the base so that the cover lies at least partially over the movement limiting means; and securing the cover in position upon the base using the latching mechanism. | The cover 46 is then moved over and secured to the base using the snap-fit latch member 53 and through hole 52 latching mechanism. (Col. 7, ll. 3-12; Fig. 7). When in the closed position, the cover lies at least partially over the projection 55. (Fig. 9). |

## X.  Claim 22 of the '485 Patent Is Unpatentable Under 35 U.S.C. § 103 as Being Obvious in View of the Combination of the Gordon '647 Patent and Bierman

As detailed in the following claim chart, the combination of the Gordon '647 Patent and

Bierman discloses each of the elements recited in claim 22 of the '485 patent.

| Claim 22 of the '485 Patent | Obvious in View of the Gordon '647 Patent and Bierman |
|---|---|
| A method of securing a medical line to the body of a patient, the method comprising the steps of: | Gordon<br><br>Gordon discloses a method for securing a medical line, such as a catheter tube, to the body of a patient using a stabilizing fitting. (Abstract; Col. 1, ll. 23-27). |
| providing a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and | Gordon<br><br>The second embodiment discussed in the Gordon '647 patent discloses a catheter-stabilizer 40 having a base member 41 serving as a retainer, the underside of which is coated with an adhesive material. (Col. 6, ll. 17-28; Figs. 6-9). The base member 41 includes a base portion 43 to which is secured a plurality of upstanding walls 44,45 defining a base. (Col. 6, ll. 28-34). Recesses 47,48 are formed within the walls 44,45 and define a receiving area for receipt of a portion of the catheter tube. *Id.* The recesses 47,48 receive the catheter tube in a neck portion of the recess. (Col. 6, ll. 51-52). |

| Claim 22 of the '485 Patent | Obvious in View of the Gordon '647 Patent and Bierman |
|---|---|
| a cover coupled to the base, | Gordon<br><br>The catheter-stabilizer 40 also includes a cover member 46 operable to be moved between open and closed positions and comprising a flexible strap hinged and permanently coupled to the upstanding walls 44,45. (Col. 6, l. 64 – Col. 7, l. 3). When the cover 46 is in a closed position, at least a portion of the cover extends over the receiving area. (See Fig. 7). |
| means for releasably latching the cover to the base, | Gordon<br><br>The stabilizer 40 further includes a means for releasably latching the cover to the walls 44,45 comprising the base, the means including a latching mechanism comprising a projecting latch member 53 formed on the base and a through hole 52 formed in the cover 46. (Col. 7, ll. 3-7). The cover 46 is releasably secured to the base by mating the through hole 52 through the latch member 53. The latch member 53, as illustrated in Fig. 6, is a post extending from the base and operable to be mated with an opening or hole in the cover 46.<br><br>The means for releasably latching the cover to the base disclosed in the '485 patent comprises holes or openings formed in the cover that interengage with the posts formed on the base. ('485 Patent, Col. 7, ll. 40-45). This structure is identical or equivalent to Gordon's disclosure of a hole 52 formed in the cover 46 that interengages with a post 53 formed on the base 44,45. |
| and means for limiting longitudinal movement of the medical line relative to the retainer; | Bierman<br><br>Bierman combined with the Gordon '647 patent discloses a means for limiting |

| Claim 22 of the '485 Patent | Obvious in View of the Gordon '647 Patent and Bierman |
| --- | --- |
| | longitudinal movement of the catheter tube relative to the base member 41 comprising the cover 46, the through hole 52 formed in the cover 46, the latch member 53, and a projection 55 extending from the underside of the cover 46. (Col. 7, ll. 33-42; Figs. 6 and 9). Additionally, Bierman teaches a wing clamp that surrounds a portion of a catheter tube. (Bierman, P. 4, ll. 34-35; Fig. 2). The wing clamp containing the catheter, which is a conventional product, can be fitted within the walls 44,45 of the base member 41. Because the wing clamp is constructed from a "soft, pliable or flexible material such as, for example, Latex or the like," the wing clamp can be easily fitted within the open channel and diameter of the walls 44,45. (Bierman, P. 5, ll. 16-17). When the cover 46 is moved over the catheter tube and secured to the walls 44,45 by mating the through hole 52 with the latch member 53, which is equivalent to a post, then the projection 55 is allowed to interengage with the catheter tube: "The gripping projection extends sufficiently far down into the space between the side walls 44 and 45 to engage and slightly crimp the catheter tube 50 (as best illustrated in FIG. 9), forcing the catheter tube slightly downward into the central opening 4 at the center of the annular base portion 43." (Col. 7, ll. 36-42). Thus, via the interacting structure of the hole 52 and post 53, the projection 55 contacts the wing clamp containing the catheter tube and presses slightly downward to crimp the wing clamp, inhibiting longitudinal movement of the tube. (Fig. 9). One of ordinary skill in the art would have been motivated to combine Bierman with |

86

| Claim 22 of the '485 Patent | Obvious in View of the Gordon '647 Patent and Bierman |
|---|---|
| | Gordon so as to use the common wing clamp design with the "important advantage" provided by the post and slotted hole arrangement taught by Bierman and Gordon. (Bierman, P. 2, ll. 6-7) |
| positioning the retainer on the body of the patient; attaching the adhesive layer to the body of the patient; | Gordon<br><br>The second embodiment disclosed in the Gordon '647 patent further teaches positioning and attaching the base member 41 serving as the retainer on the body of a patient by attaching the adhesive material. (Col. 6, ll. 19-28). |
| placing a portion of the medical line into the receiving area; | Gordon<br><br>The catheter tube is then secured in the receiving area formed by the recesses 47,48 of the side walls 44,45. (Col. 6, ll. 44-47 and 59-63). |
| moving the cover over the base so that the cover lies at least partially over the movement limiting means; and securing the cover in position upon the base using the latching mechanism. | Gordon<br><br>The cover 46 is then moved over and secured to the base using the snap-fit latch member 53 and through hole 52 latching mechanism. (Col. 7, ll. 3-12; Fig. 7). When in the closed position, the cover lies at least partially over the projection 55. (Fig. 9). |

## VI.    CONCLUSION

For the forgoing reasons, reexamination of claims 1-3, 5-8, 11-13, 15-18, and 21-22 of U.S.

Patent No. 6,447,485 is respectfully requested. Any additional fee which might be due in connection

with this Request for Reexamination should be applied against our Deposit Account No. 19-0522.

Respectfully submitted,

HOVEY WILLIAMS LLP

BY: _____

Scott R. Brown, Reg. No. 40,535

Jennifer C. Bailey, Reg. No. 52,583

2405 Grand Blvd., Suite 400

Kansas City, Missouri 64108

(816) 474-9050

*ATTORNEYS FOR REQUESTER*

# Exhibit B

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2003 WL 21640372 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Alloc, Inc. v. Unilin Decor N.V.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ALLOC, INC., a Delaware corporation, et al.,
Plaintiffs,
v.
UNILIN DECOR N.V., a Belgian company, et al.,
Defendants.
No. Civ.A. 03-253-GMS.

July 11, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.

I. INTRODUCTION

*1 On March 5, 2003, Alloc, Inc. ("Alloc"), Berry Finance N.V. ("Berry"), and Valinge Aluminum AB, ("Valinge") (collectively "the plaintiffs") filed a complaint against Unilin Decor, N.V. ("Unilin") and Quick-Step Flooring, Inc. ("Quick-Step") (collectively "the defendants") alleging infringement of U.S. Patent No. 6,516,579 ("the '579 patent"). The '579 patent is the latest in a series of continuation patents that include U.S. Patent Nos. 5,706,621 ("the '621 patent"), 5,860,267 ("the '267 patent"), 6,023,907 ("the '907 patent"), and 6,182,410 ("the '410 patent").

The '621 patent is currently undergoing reexamination in the United States Patent and Trademark Office ("PTO"). Additionally, the Federal Circuit is considering infringement issues with regard to the '267, '907, and '410 patents after the International Trade Commission ("ITC") rendered a non-infringement decision in favor of Unilin and against the plaintiffs.

Presently before the court is the defendant's motion to stay litigation of the '579 patent pending the completion of both the '621 reexamination proceedings and the Federal Circuit's decision on the '267, '907, and '410 patents. After consideration of each of the factors involved, and for the reasons detailed below, the court will grant the motion to stay.

II. BACKGROUND

The parties involved in the present action have attempted to resolve their patent infringement issues in many different forums, both in the United States and in Europe. Specifically, in July 2000, Pergo Inc. ("Pergo"), Unilin's licensee, brought a declaratory action in the District of Columbia with regard to the '267, '907, and '621 patents in response to the plaintiffs' threats of infringement litigation. Pergo additionally filed a request for reexamination of the '621 patent in the PTO. This reexamination is currently ongoing. The plaintiffs subsequently filed a complaint in the Eastern District of Wisconsin asserting that Pergo and Unilin infringed the '267 and '907 patents. In response, Unilin filed its own declaratory judgment action in the District of Columbia, alleging that its product did not infringe the '267, '907, and '621 patents.

In December 2000, the plaintiffs initiated a proceeding in the ITC asserting that Unilin infringed the '267, '907, and '410 patents. Upon the filing of the ITC action, all of the district court actions between the two parties concerning the alleged infringement of the '267, '907, and '410 patents were stayed pursuant to 28 U.S.C. § 1659. In November 2001, an ITC Administrative Law Judge ("ALJ") issued a decision finding that Unilin did not infringe the '267, '907, or '410 patents. The ITC affirmed the ALJ's decision in April 2002. The plaintiffs then appealed to the Federal Circuit, which heard oral argument on that case in March 2003. No decision has yet issued.

In the present case, the '579 patent is the only patent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21640372 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

in dispute. However, as the court noted above, it is the latest of the continuation patents that stem from the original '621 patent. The '579 patent has never been reviewed by the PTO, the ITC, or any other court.

## III. DISCUSSION

**\*2** The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985) . This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) (noting that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted); *see also Emhart Indus. v. Sankyo Seiki Mfg.,* 3 U.S.P.Q .2d 1889, 1890 (N.D.Ill.1987) (recognizing that, "in passing legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion. "); *Gould v. Control Laser Corp.,* 705 F .2d 1340, 1342 (Fed.Cir.1983) (citing legislative history of reexamination statute).

In determining whether a stay is appropriate, courts are directed to consider the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3 Comm Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

In opposition to the defendants' motion to stay, the plaintiffs first argue that, since the '579 patent itself is not at issue in the reexamination proceedings, or in the Federal Circuit appeal, there is no need to stay the case before this court. *See* D.I. 21 at 7. The court must disagree because the plaintiffs cannot credibly argue that the patents are not alike in

subject matter, as well as in many of their claims. This is so because, in general, "a continuing application is one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application." *Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 555 (Fed.Cir.1994). Thus, a continuation application "claims the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed." *Id.* Indeed, the plaintiffs themselves admit that the patents in question do have some terms in common. *See* D.I. 21 at 10. Therefore, even though the '579 patent does not contain precisely the same claims of the other patents that are under review or reexamination, there is a sufficient correlation among all of the patents for the court to conclude that a stay is appropriate.

Additionally, with regard to the issue of efficiency, it is beyond dispute that the court would benefit from a narrowing of the numerous complex issues relating to claims, which, if clearly defined, would streamline discovery and subsequent litigation. To this end, the reexamination of the '621 patent will greatly serve the purpose of defining the issues in this case. For example, the court will gain the benefit of the PTO's particular expertise in evaluating the prior art. *See Pegasus Development Corp. v. DirecTV, Inc.,* 2003 WL 21105073, \*2 (D.Del. May 14, 2003) (citations omitted). Likewise, the court will also benefit from the reexamination process in that (1) many discovery issues relating to prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; and (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court. *Id.* (citations omitted). Such a refinement of the issues will benefit both parties by reducing litigation costs. *See id.* This approach will also best conserve the court's scarce resources. *See id.* Similar benefits will likewise flow from the Federal Circuit's analysis of the '267, '907, and '410 patents.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 21640372 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*3 The plaintiffs alternatively contend that the motion is premature because the two proceedings that have a potential impact on this case may be decided well before this case reaches the claim interpretation stage. *See* D.I. 21 at 5. However, if the decisions of the PTO and Federal Circuit are imminent, as the plaintiffs suggest, a stay at this time would not unduly burden their case as the stay would then be of short duration.

Finally, the court notes that discovery in this case has not yet begun, nor has a discovery schedule been entered at this time. Likewise, the court has not yet set a trial date. Therefore, the stay will be entered before any party incurs substantial litigation-related expenses.

### IV. CONCLUSION

In light of the above considerations, the court concludes that a stay at this point in the case would not unduly prejudice the plaintiffs or create for them a clear tactical disadvantage. Indeed, a stay will allow the issues before the court to be further simplified and defined to the benefit of the parties, as well as the court.

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. The Defendants' Motion to Stay Pending the Reexamination by the U.S. Patent and Trademark Office and Ruling by the United States Court of Appeals for the Federal Circuit (D.I.15) is GRANTED.
2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '621 patent and any decision that results from the Federal Circuit's consideration of the '267, '907, and '410 patents within thirty (30) days of the date of each decision.
3. The Plaintiffs' Motion to Strike Portions of the Answer and Complaint (D.I.11) is DISMISSED, without prejudice, and with leave to re-file should it become necessary following the stay.

D.Del.,2003.
Alloc, Inc. v. Unilin Decor N.V.

Not Reported in F.Supp.2d, 2003 WL 21640372 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
(Cite as: Not Reported in F.Supp.2d)

**H**
**Broadcast Innovation**, L.L.C. v. Charter
Communication, Inc.
D.Colo.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Colorado.
BROADCAST INNOVATION, L.L.C., and IO
Research Pty, Ltd., Plaintiffs and
Counter-Defendants,
v.
CHARTER COMMUNICATIONS, INC.,
Defendant and Counter-Plaintiff.
Civil Action No. 03-CV-2223-ABJ-BNB.

July 11, 2006.

Barry Alan Schwartz, Kamlet, Shepherd, &
Reichert, LLP, Denver, CO, Corby R. Vowell,
Edward W. Goldstein, Goldstein & Faucett, LLP,
Houston, TX, Edward R. Nelson, III, Jonathan Tad
Suder, Friedman, Suder & Cooke, Fort Worth, TX,
for Plaintiffs and Counter-Defendants.
David C. Doyle, Jose L. Patino, Morrison &
Foerster, LLP, San Diego, CA, J. Eric Elliff,
Morrison & Foerster, LLP, Denver, CO, Robert M.
Harkins, Morrison & Foerster, San Francisco, CA,
for Defendant and Counter-Plaintiff.

**ORDER GRANTING DEFENDANT'S
MOTION FOR STAY PENDING
REEXAMINATION OF U.S. PATENT 6,076,094
BY UNITED STATES PATENT AND
TRADEMARK OFFICE**
ALAN B. JOHNSON, District Judge.
*1 The above-captioned matter comes before the
Court on Defendant Charter Communications, Inc.'s
Motion to Stay Pending Reexamination of the U.S.
Patent 6,076,094 By United States Patent and
Trademark Office. Plaintiffs Broadcast Innovation,
LLC and IO Research Pty, Ltd. have resisted this
motion, timely filing a response on June 29, 2006.
After careful consideration of the motion, briefs and
governing authorities, and being otherwise fully

advised in the premises, the Court **FINDS** and
**ORDERS** as follows:

**Background**

**I. Procedural History**

In this patent infringement and validity action,
Plaintiffs Broadcast Innovation, LLC and IO
Research Pty, Ltd. (hereinafter "Plaintiffs") allege
that Charter Communications, Inc. (hereinafter "
Charter") infringed directly or indirectly claims 8,
15, 22, 29 of United States Patent No. 6,076,094
(hereinafter " 094 patent"), a patent Charter claims
is invalid for numerous reasons, not the least of
which being anticipation and obviousness based on
prior art.[FN1] The 094 patent claims a complex
distributed database system with applicability to
data broadcasting and data casting communications
media.[FN2]

> FN1. The Court also notes that Charter has
> joined in and adopted a host of pleadings
> filed both in the present action and in the
> case of *Broadcast Innovation, L.L. C. v.
> Echostar Communication Corp.,*
> 01-cv-2201-ABJ-BNB (D.Colo), a case
> also involving the 094 patent which has
> been stayed pending final resolution of the
> present case.

> FN2. The Court eschews an exhaustive
> recitation of the adjudicative facts
> surrounding the merits of this case,
> focusing instead on the posture of the
> present motion and response.

On June 8, 2006, Charter requested that the United
States Patent and Trademark Office (PTO)
reexamine the 094 patent to determine whether the
four asserted claims in the present case-claims 8,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

15, 22 and 29-are invalid. The information provided to the PTO as a basis for reexamination includes, among other materials, three prior art references that form the basis of Charter's summary judgment motion before this Court: (1) the 1989 World System Teletext and Data Broadcasting Technical Specification; (2) a 1986 article entitled *"BBC Datacast-A New Generation of Data Transmission Networks Using Broadcast Video"*; and (3) a 1988 article authored by John Lilley entitled *"Can Data Broadcasting Actually Sell Itself?"* It is undisputed that this art was not before the PTO during its original examination of the application that eventually issued the 094 patent. Unsurprisingly, Charter asks this Court to stay the case awaiting the fully-informed, expert view of the PTO.

## II. Patent Reexamination

### A. Overview

Reexamination is a procedure by which any person can request that the PTO reexamine or reevaluate the patentability of an unexpired U.S. patent. 35 U.S.C. § 302. A request for patent reexamination must be based upon prior art patents or publications which raise "a substantial new question of patentability." *Id.* § 303(a). Typically, the cited prior art patents or printed publications upon which such a request is based were not considered by the patent examiner during the processing of the patent application that resulted in the patent-in-suit. Once a reexamination request is granted, a patent examiner who is familiar with the technology involved with the patent conducts the reexamination. The examiner is obligated to do so " with special dispatch." 35 U.S.C. § 305; 37 C.F.R. § 1.550(a).

**\*2** Within approximately three months of the filing of the reexamination petition, the PTO will determine whether the request raises a "substantial new question of patentability" affecting any claim or claims of the patent. *Kaufman Co. v. Lantech Inc.,* 807 F.2d 970, 976 (Fed.Cir.1986). The examiner, utilizing his expertise, determines if such a "new question" exists by comparing the prior art

of record in the original patent application with the prior art cited in the request for reexamination (although the examiner is not limited to that information). 35 U.S.C. § 303(a). If the prior art patents and/or printed publications are "material" to the reexamination of at least one claim of the patent, a substantial new question of patentability exists. [FN3] Thereafter, the parties are given the opportunity to provide position statements to the PTO, and the PTO reexamines the patent claims in *ex parte* fashion. If the Commissioner decides *not* to institute a reexamination proceeding, the decision is final and nonappealable.

> FN3. The materiality standard is fairly deferential to the PTO. Prior art is " material" to the examination of a claim of the patent if "there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication *important* in deciding whether or not the claim is patentable." United States Patent and Trademark Office, *Manual of Patent Examination Procedure* § 2294 (8th ed., rev.1, October 2005) (emphasis added).

Importantly, a decision by the Patent Office that the reexamined claims of an issued patent are canceled as unpatentable renders the claims unenforceable in the pending litigation and in any future disputes. 35 U.S.C. § 307(a). Cancellation through reexamination, however, is available only when the claims at issue are unpatentable over prior art patents and publications. 35 U.S.C. §§ 301-02. Although not binding, a decision by the PTO upholding the validity of reexamined patent claims is strong evidence that a district court must consider in assessing whether the party asserting invalidity has met its burden of clear and convincing evidence. *Custom Accessories, Inc. v. Jeffery-Allan Indus., Inc.,* 807 F.2d 955, 961 (Fed.Cir.1986). After a decision sustaining the validity of the claims, this burden becomes more difficult to satisfy. *Id.*[FN4]

> FN4. Relevant are the Federal Circuit's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 3

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

comments in *American Hoist v. Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350 (Fed.Cir.1984):

[I]t is clearly appropriate that the jury be instructed that because the PTO has now held the claims in suit patentable in light of the additional art discovered by Sowa, its burden of proof of unpatentability has become *more difficult* to sustain-a fact likewise to be taken into account by the trial judge.
*Id.* at 1354.

During the course of a stay, the court retains jurisdiction to respond to changing factual circumstances with appropriate orders. Thus, if a stay is granted prior to the decision from the Patent Office as to whether a substantial new question of patentability exists, the court can issue an order lifting the stay upon a negative determination, thereafter deciding all pending motions and, if necessary, proceeding to trial. *See, e.g., Grayling Indus. v. GPAC Inc.,* 19 U.S.P.Q.2d 1872, 1874 (N.D.Ga.1991); *Brown v. Shimano American Corp.,* 18 U.S.P.Q.2d 1496, 1496 (C.D.Cal.1991). Similarly, the court may dissolve the stay when preliminary reports from the Patent Office reveal that some of the claims at issue will survive reexamination. The court would then await the PTO's decision for guidance on pending motions and, if necessary, trial. *See, e.g ., Purolite Int'l, Ltd. v. Rohm and Haas Co.,* 24 U.S.P.Q.2d 1857, 1860 (E.D.Pa.1992); *Rohm and Haas Co. v. Brotech Corp.,* 24 U.S.P .Q.2d 1369, 1372 (D.Del.1992). If no claims survive, neither does the court's work.

### B. Scope and Purpose: Expertise

*\*3* "Congress instituted the reexamination process to shift the burden or reexamination of patent validity from the courts to the PTO. Patent validity is a commonly asserted defense in litigation and courts are cognizant of Congress's intention of utilizing the PTO's specialized expertise to reduce costly and timely litigation." *Canady v. Erbe Elektromedizin GmbH,* 271 F.Supp.2d 64, 78 (D.D.C.2002) (citing H.R. Rep. No. 1307, 96th Cong., 2d Sess., pt. 7 at 4 (1980), *reprinted in* 1980

U.S.C.C.A.N. 6460)); *see also* Wayne O. Stacy, *Reexamination Reality: How Courts Should Approach A Motion to Stay Litigation Pending the Outcome of Reexamination,* 66 Geo. Wash. L.Rev. 172, 172 (1997) ("Congress decided that the often-asserted validity issue, which can involve intricate technological questions, deserved special treatment. Thus, Congress established a patent reexamination procedure that allows the Patent and Trademark Office, instead of a district court, to consider validity issues that the PTO overlooked during the initial examination.").

Shifting the patent validity issue to the PTO has many advantages, including:
1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.
2. Many discovery problems relating to prior art can be alleviated by the PTO examination.
3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.
4. The outcome of the reexamination many encourage a settlement without the further use of the Court.
5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation.
6. Issues, defenses, and evidence will be more easily limited in final pretrial conferences after a reexamination.
7. The cost will likely be reduced both for the parties and the Court.

*Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987).

Early drafts of the reexamination statute expressly provided for a stay of court proceedings during all reexamination proceedings. *See* S. Rep. 1679, 96th Cong., 1st Sess. § 310 (1979); H.R. Rep. 5075, 96th Cong., 1 st Sess. § 310 (1979); S. Rep. 2446, 96th Cong., 2d Sess. § 310 (1980). However, an express provision was ultimately deemed unnecessary because courts already had the power to stay civil actions "to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure." *Gould v. Control Laser Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.), *cert. denied,* 464 U.S.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

935 (1983).[FN5] "When a district court stays patent validity proceedings before it until completion of a reexamination proceeding, that stay must be accepted if the purpose of the reexamination statute is to be preserved." *Id.* To no surprise, courts frequently note that "[t]he legislative history surrounding the establishment of the reexamination proceeding evinces congressional approval of district courts liberally granting stays." *Robert H. Harris Co. v. Metal Mfg. Co.,* 19 U.S.P.Q.2d 1786, 1788 (E.D.Ark.1991).

> FN5. The pertinent House report explained as follows:
> The bill [35 U.S.C. §§ 301-07] does not provide for a stay of court proceedings. It is believed by the committee that stay provisions are unnecessary in that such power already resides with the Court to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure. It is anticipated that these measures provide a useful and necessary alternative for challengers and for patent owners to test the validity of United States patents in an efficient and relatively inexpensive manner.
> H.R. Rep. No. 1307 Part I, 96th Cong., 2d Sess. 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460-6463).

**C. Relevant Factors Weighing For Or Against A Stay**

*4 "A motion to stay an action pending the resolution of a reexamination proceeding in the United States Patent and Trademark Office is directed to the sound discretion of the court." *Braintree Laboratories, Inc. v. Nephro-Tech, Inc.,* 1997 WL 94237 (D.Kan.1997); *see also Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). As mentioned above, there exists a "liberal policy in favor of granting motions to stay proceedings pending the outcome of reexamination

proceedings." *Whatley v. Nike,* 54 U.S .P.Q.2d 1124, 1125 (D.Or.2000); *see also In re Laughlin Products, Inc.,* 265 F.Supp.2d 525, 530 (E.D.Pa.2003) (same).

"In deciding whether to grant a stay, the court must weight the benefits of the stay against the costs." *Motson v. Franklin Covey Co.,* 2005 WL 3465664, *1 (D.N.J.2005). Courts consider a number of factors in determining whether to stay litigation pending PTO reexamination, including: (1) whether a stay will simplify the issues in question and streamline the trial; (2) whether discovery is complete and whether a trial date has been set; (3) whether a stay would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and (4) "whether a stay will reduce the burden of litigation on the parties and on the court ." *Tap Pharm. Prods. Inc. v. Atrix Labs., Inc.,* 70 U.S.P.Q.2d 1319, 1320 (N.D.Ill.2004); *Nexmed Holdings, Inc. v. Block Inv., Inc.,* 2006 WL 149044, *1 (D.Utah Jan. 19, 2006) (citing *In re Laughlin Prods.,* 265 F.Supp.2d at 530); *Brown,* 18 U.S.P.Q.2d at 1496 (detailing the expertise factor).[FN6] No one factor is controlling-the totality of the circumstances governs.

> FN6. While the *Tap Pharmaceuticals* court created a fourth category examining the "burden of litigation on the parties and on the court," see 70 U.S.P.Q.2d at 1320, most courts merge this inquiry with the " simplification of issues" factor. *Accord Xerox Corp. v. 3Com Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (collecting cases); *Versa Corp. v. Ag-Bag Intern. Ltd.,* 2001 WL 34046241, *1 (D.Or.2001) (describing this factor as "the orderly course of justice measured in terms of the *simplifying or complicating of issues,* proof, and questions of law which could be expected to result from a stay") (emphasis added).

**Analysis**

**I. Will A Stay Simplify the Issues Before the Court?**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

Courts routinely consider the expertise of the Patent Office, under which claim validity will be rigorously reevaluated, as an important factor in determining whether to stay its proceedings. *Accord Gould,* 705 F.3d at 1342; *Middleton, Inc. v. Minn. Mining & Mfg. Co.,* 2004 WL 198669, at *3 (S.D.Iowa 2004); *GPAC Inc. v. D. W.W.Enter. Inc.,* 23· U.S.P.Q.2d 1129, 1134 (D.N.J.1992); *see also Bausch & Lomb Inc. v. Alcon Labs., Inc.,* 914 F.Supp. 951, 953 (W.D.N.Y.1996) ("Because the PTO is considered to have expertise in deciding issues of patentability[,] many courts have preferred to postpone making final decisions on infringement until the PTO rules on issues before it."). The technical nature of the patent claims in question increases the utility of PTO expertise, which is further amplified by the need to examine prior art and publications not before the PTO during its original patent examination. *See Brown,* 18 U.S.P.Q.2d at 1496 ("[R]eexamination by the PTO when issues relevant to prior art are involved is especially helpful given the PTO's expertise."). In turn, patent cases *not* hinging upon the consequences of prior art references have less of a need for the PTO's expertise. *See Emhart Indus., Inc.,* 3 U.S.P.Q.2d at 1892 n. 3 (distinguishing the matter before it on such grounds, explaining that if " the issue of prior art was involved, the PTO's opinion [would] be invaluable.") (quotation omitted).

*5 Confronted with a motion to stay pending PTO reexamination after significant discovery, pretrial conference and trial dates set, a neighboring district court concluded as follows:
The technical expertise provided by the reexamination proceeding ... will be extremely helpful to this Court should further consideration of this matter be necessary. Indeed, the Court invites a final determination by the PTO as to the validity of plaintiff's patent claims. The reexamination procedure has the potential to eliminate trial on the issue of patent infringement, should all of the patent's claims be cancelled. It is equally possible for all of the claims in plaintiff's patent to be upheld, or to be narrowed in some degree. In any event, the expert view of the Patent Office examiner will certainly benefit this Court. Thus, the Court is of the opinion that a stay of the trial of this matter

should be granted to allow the PTO to complete the reexamination proceeding.

*Loffland Bros. Co. v. Mid-Western Energy Corp.,* 225 U.S.P.Q. 886, 887 (W.D.Okla.1985) (staying trial pending conclusion of the reexamination proceedings).[FN7]

> FN7. Also interesting to note is that the patent at issue in *Loffland* appears quite simple when compared to the 094 patent presently before the Court-the technology in *Loffland* consisted of patent covering an elevating catwalk used on drilling rigs. *See Loffland Bros.,* 225 U.S.P.Q. at 886.

Indeed, some courts consider this factor of primary importance. *See, e.g., Dresser Indus., Inc. v. Ford Motor Co.,* 530 F.Supp. 309, 316 (N.D.Tex.1981) (" The major benefit of staying litigation pending reconsideration of a patent under [reexamination] is that it affords the Court the assistance of the Patent Office's specialized expertise on technical questions of validity."); *cf. Pegasus Development Corp. v. Directv, Inc.,* 2003 WL 21105073, *2 (D.Del.2003) (deciding that by staying a highly technical case involving computer programming communication systems, "the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency").

The *Loffland Bros.* court also understood the PTO's expertise to have benefits beyond educating the court. That is, simplification may occur by the very nature of the reexamination procedure itself, as claims, arguments and defenses can be narrowed or entirely disposed of, preserving the resources of the parties and the court. The Federal Circuit has explained that a major "purpose of the reexamination procedure is to eliminate trial of that issue (when the claim is canceled) or facilitate trial of that issue by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceedings)." *Gould,* 705 F.2d at 1342 (Markey, C.J.); *see also Canady,* 271 F.Supp.2d at 68 ("[C]ourts often stay proceedings, such as in the instant case, to wait for reexamination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
(Cite as: Not Reported in F.Supp.2d)

results that will simplify litigation by eliminating, clarifying, or limiting the claims."). "If not found invalid, the reexamination will at least likely result in a narrowing and simplifying of the issues before the Court." *Middleton, Inc.,* 2004 WL 1968669 at *3. "This is because the scope of the patent claims, which the PTO may narrow or otherwise limit, controls the outcome of any subsequent infringement analysis." *Id.; see also, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1344 (Fed.Cir.2002).

*6 Combining these benefits, countless courts have touted the value of streamlining voluminous and complicated patent cases. For example, the court in *Motson* found that the benefits derived from the PTO's reexamination outweighed the fact that much effort had already been expended by the parties:
[E]ntry of a stay, pending reexamination by the PTO, may simplify or even eliminate the need for trial on the remaining validity challenge in this matter. The reexamination procedure has the potential to either uphold or narrow the claims in the plaintiff's patent. In any event, the technical expertise of the PTO examiner may be helpful to the Court should further consideration of the matter be necessary after reexamination.... Although discovery and briefing expenses have already been incurred, a trial at this point on the sole remaining issue in the case may compound those costs unnecessarily if the PTO reexamination eliminates the need for a trial or creates a need to relitigate other issues.

*Motson,* 2005 WL 3465664 at *1-2.

Despite being less than two-and-a-half months from trial and despite the substantial monetary expenditures by each party, the court in *Gioello Enterprises* provided a similar explanation for granting a stay:
Presently, this case is scheduled for trial on April 13, 2001. According to the PTO's order granting the request for reexamination, it is possible that submission of statements will not be complete until April 12, 2001. Additionally, the outstanding motions for summary judgment by Mattel claim invalidity and non-infringement-two issues the PTO's decision could render moot. Since the court

must decide the summary judgment motions well in advance of trial, it would have to address the arguments raised before the PTO. Such a situation raises resource questions.

*Gioello Enterprises, Ltd.,* 2001 WL 125340 at *1.

This question of "resources" was detailed by the Southern District of New York in *Softview Computer Products Corp. and Ergo View Technologies Corp. v. Haworth, Inc.,* 56 U.S.P.Q.2d 1633 (S.D.N.Y.2000), a case bearing many resemblances to the matter *sub judice.* There, the court addressed a stay pending PTO reexamination of allegedly relevant prior art. While the motion was brought by the *plaintiff* in that case, the instructiveness of the court's language applies equally to the present matter:
Although [defendant] correctly notes that plaintiffs have not acted with dispatch in seeking reexamination and that plaintiffs have pursued an extremely burdensome discovery program, the cost to [defendant] of the litigation to date will not be affected by the grant or denial of a stay; denying the stay will not, without more, entitle [defendant] to recover fees it has already spent litigating this case. In addition, if the parties continue to litigate the validity of the claims in this Court, and the PTO subsequently finds that some or all of the claims in issue here are invalid, the Court will have wasted time and the parties will have spent additional funds addressing an invalid claim or claims. Thus, although the denial of a stay can have no effect whatsoever on past events, the grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims.
*7 Second, although there has been a great deal of activity in this litigation to date, much remains to be done before the case is ready for trial. Discovery is not yet completed, extremely voluminous summary judgment motions have been served ... and the Pretrial Order has not yet been prepared. I[t] would be a serious waste of both the parties' and the Court's resources if the ... summary judgment proceedings went forward and the claims were subsequently declared invalid or were amended as a result of the reexamination proceeding.
Third, a stay will necessarily simplify the issues. If

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

the reexamination proceeding invalidates or narrows a claim or claims, the issues at trial will be simplified. Similarly, if the reexamination proceeding reaffirms all the claims as issued, the Court will then have the benefit of the PTO's expert analysis of the prior art that allegedly invalidates or limits the claims.

*Softview Computer Prods. Corp.,* 56 U.S.P.Q.2d at 1636; *see also Bausch & Lomb Inc.,* 914 F.Supp. at 953 ("If this Court were to deny the stay and proceed to trial, it is possible that the time, resources, and significant efforts of all those involved in such a trial would be wasted. Because a finding by this Court that the 607 patent is not invalid would not bind the PTO, the PTO could reach the opposite conclusion at any time thereafter. Not only would such a scenario cause Alcon significant harm[,] but it also would be a tremendous waste of the time and resources of all those involved in a trial before me. Such an outcome is unacceptable. Because the reexamination is to be conducted "with special dispatch" (35 U.S.C. § 305), I find that a stay of the proceedings before me will not greatly prejudice any party and will serve to promote judicial economy.").

In the present matter, Charter argues that a stay " will simplify the issues, avoid inconsistent rulings and conserve the resources of the Court and the parties." *Defendant's Motion,* at 7. Broadcast and IO Research, on the other hand, summarily state that the possibility of simplification is "equivocal." *Plaintiff's Response,* at 3. For the reasons detailed above as well as those to follow, the Court finds that this factor weighs heavily in favor of granting a stay.

The heart of this complicated patent case involves the impact of several prior art references-an issue the PTO is far better suited to address given the technology at issue in this case. *Ethicon, Inc.,* 849 F.2d at 1427. Moreover, because this prior art was not before the PTO during its original patent examination, the Court would benefit immensely from the PTO analysis of it. *Accord Softview Computer Prods. Corp.,* 56 U.S.P.Q.2d at 1636; *Emhart Indus., Inc.,* 3 U.S.P.Q.2d at 1890, 1892 n.

3; *Indust Wireless Spectrum Techs., Inc. v. Motorola Corp.,* 57 U.S.P.Q.2d 1662, 1663 (N.D.Ill.2001); *Brown,* 18 U.S.P.Q.2d at 1496 (noting that "[t]he PTO is in a better position than the Court to evaluate the validity of the patent [at issue] in view of the prior art references.").

**\*8** Judged solely by this factor, a stay would further the interests of judicial economy and the conservation of the parties' resources, as well as that of the court. Charter's pending reexamination petition involves the same issues currently before this Court. If the PTO, utilizing its unique expertise, determines that all or some of the 094 claims are invalid, that determination will either dispose of this litigation entirely or at least aid the Court in adjudicating this case. *See In re Cygnus Telecomms. Tech., LLC, Patent Litig.,* 385 F.Supp.2d 1022, 1023 (N.D.Cal.2005) ("A stay is particularly justified where the outcome of the reexamination would be likely to assist the court in determining patent validity and, if the claims were canceled in the reexamination, would eliminate the need to try the infringement issue."). Moreover, "[s]ince the PTO cannot stay the reexamination once a request has been granted, the court's issuance of a stay is the only way to avoid the potential for conflict." *Gioello Enterprises, Ltd.,* 2001 WL 125340 at \*2; *see also Bayer AG v. Novartis Crop Prot. Inc .,* 55 U.S.P.Q.2d 1509, 1511 (M.D.La.2000) (holding that simultaneous litigation of patent issues "would create an economic hardship on the parties and also result in the ineffective administration of justice"); *Hewlett-Packard Co. v. Acuson Corp.,* 1993 WL 149994, \*2 (N.D.Cal.1993) ("Ordinarily, courts need not expend unnecessary judicial resources by attempting to resolve claims which may be amended, eliminated, or lucidly narrowed by the patent reexamination process and the expertise of its officers."); *Childers Foods, Inc. v. Rockingham Poultry Mktg. Co-op., Inc.,* 203 F.Supp. 794, 796 (D.Va.1962) (noting that simultaneous proceedings in federal district court and the PTO are "wasteful and extravagant" where issues to be decided are very similar). The Court, unlike the PTO, can exercise its direction to avoid this conflict and potential for waste.[FN8]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

FN8. The Court is also cognizant of the fact that the PTO grants more than nine of every ten petitions for reexamination. *See* United States Patent and Trademark Office, *Ex Parte Reexamination Filing Data,* at 1, ¶ 5 (Sept. 30, 2005) (noting 91% acceptance out of 7,510 requests). If and when the PTO grants Charter's petition, history also teaches that there is a 74% likelihood that the PTO will eliminate, amend or otherwise limit the claims at issue, which will significantly alter the nature and amount of work for the attorneys, the court and the jury. *See id.* at 2, ¶ 9; *Tap Pharm. Prods. Inc.,* 70 U.S.P.Q.2d at 1320.

## II. Time and Timing

Broadcast and IO Research argue that this factor "is decidedly pro-Plaintiffs," as "[t]rial is less than three months away. *Plaintiffs' Response,* at 5.[FN9] Charter acknowledges the trial setting, but insists that the proximity of trial, standing alone, is not a reason to blindly deny an otherwise appropriate stay.

FN9. Indeed, Plaintiffs' entire argument regarding this factor consists of that single statement.

This factor, at first glance, likely weighs in favor of the Plaintiffs and thus against a stay. Although discovery is not complete, *see Stipulation Regarding Additional Discovery* at 2, a trial date has been set for September 11, 2006. If these two litigation aspects were all that courts considered when assessing this factor, it might lean towards Broadcast and IO Research. However, courts considering this factor do not stop at discovery and trial settings, but rather, routinely inquire as to the occurrence summary judgment arguments, rulings on summary judgment, and the status of the final pretrial order, among other elements. *See, e.g., Gioello Enterprises, Ltd.,* 2001 WL 125340 at *1 (noting trial was set, but expressing concern for pending summary judgment motions); *Softview Computer Prods. Corp.,* 56 U.S.P.Q.2d at 1636 (same concern as to "extremely voluminous

summary judgment motions" and unfinished final pretrial order); *Bausch & Lomb Inc.,* 914 F.Supp. at 953 (same); *Middleton, Inc.,* 2004 WL 198669 at *4 (same).

*9 In sum, the proximity of the trial date does not preclude entry of a stay. "Courts have granted stays even where discovery has been completed, and even when a trial date has been scheduled or is forthcoming." *Ralph Gonnocci Revocable Living Trust v. Three M Tool & Mach. Inc.,* 68 U.S.P.Q.2d 1755, 1757 (E.D.Mich.2003); *see also Perricone v. Unimed Nutritional Services, Inc.,* 2002 WL 31075868, *3 (D.Conn.2002) (noting that courts " have granted stays pending re-examination proceedings notwithstanding the well-developed posture of the litigation"). For every court that yields to completed discovery and a looming trial date, another court finds these dates outweighed by other factors-be it the complexity of the suit, the value of PTO expertise, simplification of the issues, lack of hardship to the nonmovant, or the overall burden of duplicitous litigation on the parties and on the court. Put simply, trial time doesn't always tell the tale. *See, e.g., Gould,* 705 F.2d at 1342 (order granting motion to stay proceedings five years into litigation and twenty days before scheduled trial date); *Middleton, Inc.,* 2004 WL 198669 at *10 (granting motion to stay proceedings eight years after start of litigation and less than two months before trial); *Loffland Bros.,* 225 U.S.P.Q. at 887 (order granting motion to stay proceedings after significant discovery, rulings on dispositive motions, pretrial conference and setting of initial trial date); *see also Softview Computer Prods. Corp.,* 56 U.S.P.Q.2d at 1636 (granting stay; noting that "although there has been a great deal of activity in this litigation to date, much remains to be done before the case is ready for trial. Discovery is not yet completed, extremely voluminous summary judgment motions have been served ... and the Pretrial Order has not yet been prepared."); *Robert H. Harris Co.,* 19 U.S.P.Q.2d at 1789 (granting stay despite the fact that case was set for trial in less than a month); *Motson,* 2005 WL 3465664 at *2 (granting stay despite discovery being complete and summary judgment decided).[FN10]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

> FN10. A more detailed balancing process was explained by the court in *Ralph Gonnocci Revocable Living Trust,* who ultimately ruled in favor of a stay:
> Undoubtably the parties have spent considerable time and resources thus far-substantial discovery has been conducted and the parties have submitted witness lists and three lengthy summary judgment motions. Yet far more time and resources remain to be spent before this matter is concluded. Two responses to motions for summary judgment must be submitted, the Court has not begun to review those motions, and much remains to be done by the parties and the Court to prepare this case for trial.
> *Id.* at 1758.

In the present case, although trial is set for mid-September, significant work remains for the parties and the Court. First, numerous voluminous dispositive motions are pending, including, but not limited to, Broadcast and IO Research's motion for summary judgment of infringement, Charter's motion for summary judgment of non-infringement and Charter's motion for summary judgment of invalidity. Furthermore, the parties have recently stipulated to additional discovery, including supplemental document production, supplemental responses to written discovery, supplemental expert reports, rebuttal expert reports, and expert depositions related to those supplemental expert reports. *Stipulation Regarding Discovery And Expert Report Supplementation,* at 2 (filed June 22, 2006). According to this stipulation, the parties hope to conclude this work in late August. *Id.*[FN11] In addition to preparing their final pretrial memorandums and other trial presentations, numerous pretrial filings remain for both parties, including submission of deposition designations, oppositions to more than forty motions *in limine* (according to Charter, and not disputed by Broadcast or IO Research), as well as proposed jury instructions and special verdict forms. Charter argues that

> FN11. To this end, the Court fails to see

the significance of Plaintiffs' argument that *Charter* acted as the initiator of the stipulation, for the fact remains that *both* parties stipulated to additional discovery.

**\*10** Neither the Court nor the parties should expend additional resources when it is uncertain which, if any, of the four asserted claims will survive the reexamination process. The reexamination proceedings before the PTO may well [alter], moot or resolve the issues set for trial in less than three months, and staying the trial pending conclusion of the PTO's review will eliminate the ... additional expense of trial preparation [and the] risk of inconsistent rulings.
*Defendant's Motion,* at 13.

The Court agrees. *See Tap Pharm. Prods. Inc.,* 70 U.S.P.Q.2d at 1320 (noting similarly, i.e., "There is a significant chance that the PTO will either invalidate this patent or drastically decrease its scope. This creates a very real possibility that the parties will waste their resources litigating over issues that will ultimately be rendered moot by the PTO's findings. Simplification of the issues will allow both parties to conserve time and resources." ). A more detailed glance at the timing factor reveals, beyond any peradventure of doubt, that a stay is appropriate in this case.

### III. Will A Stay Unduly Prejudice the Nonmoving Party or Present a Clear Tactical Advantage for the Moving Party?

This factor is best summarized by one question: *do the Plaintiffs have an adequate remedy at law?* Because they do, this factor weighs heavily in favor or staying the case. The Plaintiffs seek *only* monetary damages and for that reason, have an adequate remedy at law should they prevail on the merits. *See, e.g., Robert H. Harris Co.,* 19 U.S.P.Q.2d at 1788.

Plaintiffs make the vague argument that a delay in trial is unfair. However, this argument fails to address the crucial question of the prejudice factor-i.e., will a stay unduly prejudice the legal remedy sought by the nonmovants? *Softview*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 10

*Computer Prods. Corp.,* 56 U.S.P.Q.2d at 1636; *Ingro v. Tyco Indus., Inc.,* 227 U.S.P.Q. 69, 70 (N.D.Ill.1985). Clearly it will not. If the PTO does not invalidate or otherwise alter the claims of the 094 patent, the Plaintiffs' legal remedy remains unaffected, and they will have over a decade to exploit the 094 patent. Moreover, if the claims are narrowed, *both* sets of parties will have benefitted by avoiding the needless waste of resources before this Court, and again, the Plaintiffs will be able to pursue their claim for money damages at trial. Finally, if the claims are strengthened, the Plaintiffs' position will be as well, and their likelihood of monetary damages will increase. *See, e.g., Motson,* 2005 WL 3465664 at *1 ("[I]f the PTO upholds the validity of plaintiff's patent, 'the plaintiff's rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain.' ") (quoting *Pegasus Dev. Corp.,* 2003 WL 21105073 at *2). Indeed, the only possibility of irreparable harm to Broadcast and IO Research would exist if the Court chose *not* to stay the case. That is, if the Court finds that the 094 patent is valid and that Charter has infringed it, and orders Charter to pay damages to Broadcast and IO Research, then Broadcast and IO Research "would have no ability to recover those damages if at a later date the PTO determine[s] that the ['094] patent is invalid." *Bausch & Lomb Inc.,* 914 F.Supp. at 952. The Court finds such a possibility unacceptable.

*11 In sum, this factor weighs in favor staying the case because monetary relief-the only relief Plaintiffs seek-is fully capable of restoring Plaintiffs to the *status quo ante. Accord Brown,* 18 U.S.P.Q.2d at 1496 ("While the Court recognizes that the reexamination could cause significant delay in the proceedings, the complexity of the case and the fact that Mr. Brown can be fully compensated should he prevail at the reexamination and trial support staying this action.").[FN12]

    FN12. Moreover, a stay would not affect the issue of damages accruing during the pendency of the reexamination period should Plaintiffs ultimately prevail at trial. The Federal Circuit has considered the impact of a completed reexamination upon

the viability of infringement claims relating to the reexamined patent. *See, e.g., Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1346 (Fed .Cir.1998). The general rule is that the owner of a reexamined patent "is entitled to infringement damages, *inter alia,* for the period between the date of issuance of the original claims and the date of issuance of the reexamined claims if the original and reexamined claims are 'identical.' " *Id.* (citing 35 U.S.C. §§ 252 and 307(b); *Tennant Co. v. Hako Minuteman, Inc.,* 878 F.2d 1413, 1417, (Fed.Cir.1989)).

**IV. Conclusion**

A future trial date, standing alone, does not obviate otherwise unassailable reasons to stay these proceedings. At the very least, awaiting outcome of reexamination will facilitate motion disposition and trial, as valuable efficiencies will be gained by awaiting the input of the PTO on the scope of the claims in light of the prior art that will be considered during the reexamination proceedings.

The Court's decision mirrors, in many respects, that made in *Middleton* by the Honorable James E. Gritzner of the United States District Court for the Southern District of Iowa. By the time Judge Gritzner ruled on the defendant's motion to stay, the "long and convoluted" case before him was eight years old-"proceeding from the United States District Court for the Northern District of Illinois to the Federal Circuit and back multiple times." *Middleton, Inc.,* 2004 WL 1968669 at * 1. Like this Court, Judge Gritzner was faced with the choice of ruling on numerous motions for summary judgment-in fact, three motions presenting legal questions nearly identical to the motions presently before this Court-or staying the case pending PTO reexamination. *Id.* The case was set for trial in less than two months. *Id.* The plaintiff in *Middleton* -much like Broadcast and IO Research-resisted the motion to stay "based primarily on the short time left before trial and the delay in seeking reconsideration." *Id.* Judge Gritzner's thorough and thoughtful explanation warrants repeating:
In the present case, the litigation has been ongoing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

for over eight years. The trial date is set and is scheduled for the week of October 12, 2004 [i.e., less than two months away]. In addition, several motions for summary judgment remain pending that may be dispositive of some or all of the issues remaining in the case. Discovery is completed, and the parties are most likely well into their trial preparation. Thus, the parties have already spent a considerable amount of time and money on the pending litigation. On its face, these facts seem to weigh against granting a stay.

However, these facts should be weighed against the benefits of issuing a stay. As argued by [the defendant], the following factors weigh in favor of issuing a stay: (1) a stay will be the most efficient use of judicial resources by preventing duplication of effort; (2) the reexamination may simplify and narrow the issues in the case; and (3) the Court will be able to benefit from the expertise of the PTO. Moreover, a stay issued pending reexamination "is not for such a protracted or indefinite period" as reexamination proceedings are to " 'be conducted with special dispatch." ' *Gould*, 705 F.2d at 1341 (quoting 35 U.S.C. § 305). Thus, while some courts have denied a stay based on the end of discovery and the proximity of trial, *see Toro Co. [v. L.R. Nelson Corp.]*, 223 U.S.P.Q. [636,] 638 [ (C.D.Ill.1984) ]; the ultimate determination is within the Court's discretion based on a weighing of the benefits of issuing a stay versus any added expenses resulting from the stay.

*12 In the present action, the Court finds the element of judicial economy does in fact weigh in favor of granting the motion to stay. First, a stay would preserve the costs of a trial on the merits that may be obviated by the results of the reexamination. Second, even if a trial is ultimately required, the Court can have all issues heard in one trial on the proper scope of the patent claims. In addition to limiting the issues at trial, the reexamination decision may also limit the issues in the currently pending dispositive motions. Finally, the Court will be able to use the expertise of the PTO in making further determinations as related to the proper patent claims. In that regard, the Court is influenced by the breadth of the reexamination and the number of prior art references under active review.

The Court acknowledges the considerable expense already endured by the parties in the present action

but notes that these costs will not be recouped by denying a stay and proceeding to a trial. This may actually compound the parties' expenses if some or all of the issues need to be retried later as a result of the reexamination. In addition, the Court disagrees with [Plaintiff's] contention that only incremental resources will be expended if the action proceeds to trial. It is simply not efficient to rule on three motions for summary judgment, complete pretrial, and hold a full jury trial if all or part have to be redone. The apparent scope of the reexamination, the technical expertise of the PTO, and the relationship to the issues in this case suggest to the Court a great likelihood that the continuing work of this Court would be impacted by the reexamination. The judicial efforts that a stay would preserve outweigh any additional cost in staying the proceedings even at this late juncture.

*Id.* at *5-6.

This Court finishes where the Southern District of Iowa did two short years ago.

Accordingly, and for the foregoing reasons, it is hereby

**ORDERED** that Defendant Charter Communications, Inc.'s Motion to Stay Pending Reexamination of the U.S. Patent 6,076,094 By United States Patent and Trademark Office shall be, and now is, **GRANTED**. It is further

**ORDERED** that the proceedings in the above-captioned case are **STAYED** from the date of this Order until further notice. It is further

**ORDERED** that the parties shall immediately advise the Court of the PTO's decision to grant or deny Defendant's petition for reexamination of the 094 patent, this Court continuing or lifting the present stay pending that initial determination. It is further

**ORDERED** that the parties shall advise the Court of any final decision that results from the PTO's reexamination of the 094 patent.

D.Colo.,2006.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**


Broadcast   Innovation,   L.L.C.   v.   Charter
Communication, Inc.
Not Reported in F.Supp.2d, 2006 WL 1897165
(D.Colo.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

.

# Exhibit D

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Pegasus Development Corp. v. Directv, Inc.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PEGASUS DEVELOPMENT CORPORATION
and Personalized Media Communications, L.L.C.,
Plaintiffs
v.
DIRECTV, INC., Hughes Electronics Corporation,
Thompson Consumer Electronics, Inc., and Philips
Electronics North America Corporation, Defendants.
**No. Civ.A. 00-1020-GMS.**

May 14, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.
***1** AND RELATED COUNTERCLAIMS

I. INTRODUCTION

On December 4, 2000, Pegasus Development Corporation ("Pegasus") and Personalized Media Communications, L.L.C. ("PMC") filed a complaint against several defendants, alleging infringement of six patents, including U.S. Patent Nos. 4,965,825 (" the '825 patent") and 5,335,277 ("the '277 patent"). Since that time, the original scheduling order has been revised several times. Currently, fact discovery is scheduled to close on August 22, 2003, and a trial is scheduled for February of 2004.

On February 4, 2003 and March 14, 2003, respectively, the defendant Thomson Consumer Electronics, Inc. ("Thomson") filed with the Patent and Trademark Office ("PTO") a request for *ex parte* reexaminations of the '825 and '277 patents. The request for reexamination of the '825 patent was granted on April 10, 2003.[FN1] Presently before the court is a joint motion by the defendants to stay the litigation pending the completion of the

patent reexaminations (D.I.459). After careful consideration of the parties' submissions, and for the reasons detailed below, the court will grant the motion.

> FN1. The court is not yet aware of a
> decision by the PTO regarding
> reexamination of the '277 patent.

II. DISCUSSION

The decision to stay a case is firmly within the discretion of the court. *Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985). This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citation omitted); *see also Emhart Indus. v. Sankyo Seiki Mfg.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987) ("[I]n passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion."); *Gould v. Control Laser Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.1983) (citing legislative history of reexamination statute). In determining whether a stay is appropriate, the court is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp v. 3 Comm Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

In this case, there are two plaintiffs, four defendants, and several counter claimants, as well

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

as six patents comprising dozens of claims. In addition, the written submissions in this case have been particularly voluminous; the briefing on claim construction alone, for example, constitutes 576 pages. *See* Report and Recommendation of Special Master Regarding Claim Construction at 2 (citing " copious briefing"). In these ways, the present suit is quite complex, although, perhaps, not extraordinarily so. The greater context of this suit is extraordinary, however: the plaintiffs have filed more than 300 related patent applications based upon an original patent application filed in 1981 and supplemented in 1987. Together, these applications contain an estimated 10,000 claims. Furthermore, as observed by the Special Master appointed in this case, the 1987 application alone constitutes over 300 columns of patent text and "is, by any measure, an extremely complex document." *Id.* at 2. These related applications may become relevant to the present case in respect to several issues including claim construction, enablement, adequacy of written description, indefiniteness, and inequitable conduct. *See id.* at 21. Thus, in this case, more than many, the court would benefit from a narrowing of the issues.

**\*2** The reexamination process will serve this purpose. For example, the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency. *See Braintree Laboratories, Inc. v. Nephron-Tech, Inc.,* 1997 WL 94237, at \*9 (D.Kan.1997); *Hamilton Indus., Inc. v. Midwest Folding Products Mfg.,* 1990 WL 37642, at \*1-2 (N.D.Ill.1990). Other potential efficiencies resulting from the reexamination process are numerous: (1) many discovery problems relating to the prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial, reducing the complexity and length of the litigation; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court; and (5) if the patent is declared invalid, the suit likely will be dismissed as to that patent. *Id.* These efficiencies will result in a reduced cost of litigation for the parties and more effective utilization of the limited

resources of the court. *Id.*

Thus, a stay may result in a simplification or reduction of issues for the court's consideration, or it may dispense with the litigation entirely. These are considerable economies indeed, particularly in this case. Given the involved prosecution history of the various patents-in-suit and hundreds of related patents, the number of claim terms at issue, the inordinate amount of prior art references, and the PTO's conclusion that all of the challenged claims warrant reexamination, the court finds particular merit in permitting an additional layer of review by the PTO before expending further judicial resources. *See Digital Magnetic Systems, Inc. v. Ainsley,* 213 U.S.P.Q. 290, 290 (W.D.Okla.1982) (" Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts."); *Softview Computer Products Corp. v. Haworth, Inc.,* 2000 WL 1134471, at \*3 (S.D.N.Y.2000) ("[T]he grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims."). Furthermore, the court notes that discovery is not complete, and the trial, although scheduled, is some nine months in the future. In light of all these factors, and considering that the reexamination process will proceed "with special dispatch," 35 U.S.C. 305, the court concludes that a stay is the most compelling alternative.

The court recognizes that a stay will cause further delay in a case that has suffered several delays already, as well as considerable distress to the plaintiffs. The court is sensitive to the plaintiffs' right to have their day in court. Nonetheless, for the reasons already mentioned, the court is convinced that a stay is appropriate in this particular case. In addition, the court reminds the plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard now to complain of the rights afforded others by that same statutory framework. Thomson is legally entitled to invoke the reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that. Moreover, the court notes that if, after reexamination, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

plaintiffs' patents are again upheld, the plaintiffs' rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 961 (Fed.Cir.1986) (holding that upon reissue, the burden of proving invalidity is 'made heavier') (quoting *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985)). In this light, and given the particular circumstances of this case, the court cannot find that the prejudice to the plaintiffs is undue.

*3 Objecting to a stay, the plaintiffs also have complained of dilatory conduct by the defendants, who, in turn, have accused the plaintiffs of "burying " the PTO in claims and prior art references. *See, e.g.,* Mem. of Plaintiffs in Opp. to Defs.' Joint Motion to Stay (D.I.488) at 5-22 (detailing ways in which the defendants allegedly "have repeatedly acted to complicate and delay the resolution of this litigation"); Defs.' Joint Brief in Support of Motion to Stay (D.I.460) at 4 ("Many of the Harvey patents had vast numbers of cited prior art references of record, effectively burying the most relevant ones.") and 7 ("[I]t appears that PMC sought to 'overwhelm ' the PTO and the Courts.").

As a brief response to the accusation of dilatory conduct, the court notes that Thomson's request for reexamination of the '825 patent comprised 2,610 pages; its request regarding the '277 patent totaled 4,736 pages. It is presumed that such an effort requires an enormous expenditure of time and other resources; thus, the timing of Thomson's reexamination requests does not, necessarily, reflect undue delay. Furthermore, as noted above, Thomson was legally entitled to invoke the reexamination procedure when it did. As to the defendants' repeated complaint that the plaintiffs overwhelmed the PTO with prior art references during prosecution of the patents-in-suit, the implications of such alleged conduct will be explored at another time in the litigation, if necessary. At this stage in the process, the court is satisfied that the PTO has found "substantial new questions of patentability" raised by each of the cited references, and has determined that all of the challenged claims of the '825 patent necessitate a

reexamination. *See* PTO's Decision Granting Reexamination, Supp. Appendix to Defs.' Joint Brief in Support of Motion to Stay (D.I.467) at 138. Although the court regrets a further delay in the present case, it is confident that the advantages of a stay outweigh the costs.

### III. CONCLUSION

Because the PTO's reexamination of one or more of the patents-in-suit may materially affect the issues in this case, the court will grant the defendants' motion to stay. The case is stayed pending a disposition of the PTO's reexamination of patent '825, and will be stayed pending reexamination of the '277 patent, if applicable. All pending motions will be denied without prejudice; the parties may refile them following the stay and upon the entry of a new scheduling order, if applicable.

Thus, for the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Stay Pending Reexamination by the U .S. Patent and Trademark Office (D.I.459) is GRANTED. The proceedings are stayed from the date of this order until further notice.
2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '825 patent, and any other decision of the PTO regarding reexamination of any of the other patents-in-suit.
*4 3. The plaintiffs' Motion for Leave to Assert Claim 15 of U.S. Patent 4,965,825 (D.I.399) is DENIED without prejudice.
4. Thomson's Motion to Dismiss or in the Alternative for Summary Judgment (D.I.376) is DENIED without prejudice.
5. Phillips' Motion to Dismiss for Lack of Standing (D.I.396) is DENIED without prejudice.

D.Del.,2003.
Pegasus Development Corp. v. Directv, Inc.
Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

Westlaw.

Not Reported in F.Supp.2d                                      Page 1

Not Reported in F.Supp.2d, 2001 WL 125340 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**C**
Gioello Enterprises Ltd. v. Mattel, Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
**GIOELLO** ENTERPRISES LTD., Plaintiff,
v.
**MATTEL**, INC., Defendant.
No. C.A. 99-375 GMS.

Jan. 29, 2001.

Philip A. Royner, Potter, Anderson & Corroon LLP, Wilmington, DE, James G. Goggin, Verrill & Dana LLP, Portland, Maine, for Plaintiff, of counsel. Robert W. Whetzel, Chad M. Shandler, Richards, Layton & Finger, Wilmington, DE, Peter E. Heuser, David A. Fanning, Charles H. DeVoe, Kolisch, Hartwell, Dickinson, McCormick, & Heuser, Portland, Oregon, for Defendants, of counsel.

*ORDER*
SLEET, J.
*1 On June 11, 1999, the plaintiff, Gioello Enterprises Ltd. ("Gioello"), filed a complaint against Mattel, Inc. ("Mattel") claiming infringement of U.S. Patent 4,546,434 (the " '434 patent"). Mattel answered and filed a counterclaim which Gioello, in turn, answered. Both parties filed motions which are currently pending. Mattel filed a request with the U.S. Patent and Trademark Office (the "PTO") on November 9, 2000 for an reexamination of claims 1-3 of the '434 patent. The PTO granted Mattel's request on December 21, 2000, and issued a schedule for statements from the parties (D.I.104). Currently before the court is Mattel's motion to stay proceedings pending reexamination (D.I.84).[FN1] Upon consideration of the parties' submissions, the court will grant Mattel's motion and stay the proceedings until further notice.

FN1. Although Mattel filed its motion

before the PTO granted its request, the court will consider the PTO's actions.

In deciding whether to stay the proceedings, the court's discretion is guided by the following factors: (1) whether a stay would unduly prejudice Gioello or present a clear tactical advantage for Mattel, (2) whether a stay will simplify the issues, and (3) whether discovery is complete and whether a trial date has been set. *See Xerox Corp v. 3Comm Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

The PTO's recent decision to reexamine the '434 patent will simplify the issues in this case and focus the litigation. Numerous courts have cited a number of advantages of granting a stay pending PTO reexamination: (1) all prior art presented to the court at trial will have been first considered by the PTO with its particular expertise, (2) many discovery problems relating to the prior art can be alleviated, (3) if patent is declared invalid, the suit will likely be dismissed, (4) the outcome of the reexamination may encourage a settlement without further involvement of the court, (5) the record of the reexamination would probably be entered at trial, reducing the complexity and the length of the litigation, (6) issues, defenses, and evidence will be more easily limited in pre-trial conferences and (7) the cost will likely be reduced both for the parties and the court. *See, e.g., Braintree Laboratories, Inc.,* Civ. A. No. 96-2459-JWL, 1997 WL 94237, at * 9 (D.Kan. Feb. 26, 1997); *Hamilton Indus. v. Midwest Folding Products Mfg.,* Civ. A. No. 89-C-8689, 1990 WL 37642, at *1- *2 (N.D.Ill. March 20, 1990) (citing cases). All of these potential advantages are present, to some degree, if the court imposes a stay of the proceedings pending the outcome of the PTO's reexamination.

Not staying the proceedings runs the risk of inconsistent adjudications or issuance of advisory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 125340 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

opinions. Presently, this case is scheduled for trial on April 13, 2001. According to the PTO's order granting the request for reexamination, it is possible that submission of statements will not be complete until April 12, 2001.[FN2] Additionally, the outstanding motions for summary judgment by Mattel claim invalidity and non-infringement-two issues the PTO's decision could render moot. Since the court must decide the summary judgment motions well in advance of trial, it would have to address the arguments raised before the PTO. Such a situation raises resource questions. As one court noted:

> FN2. The PTO's order of December 21, 2000 states that Gioello has up to two months to submit an optional response. If Gioello submits a response, Mattel has up to two months to submit a reply. Since no extensions will be granted, the court believes April 12, 2001-16 weeks from the date of the order is the maximum time allowable for written submissions to the PTO.

**\*2** ... if the parties continue to litigate the validity of the claims in this Court [sic], and the PTO subsequently finds that some or all of the claims in issue here are invalid, the Court [sic] will have wasted time and the parties will have spend additional funds addressing an invalid claim or claims. Thus, although the denial of a stay can have no effect whatsoever on past events, the grant of a stay will maximize the likelihood that neither the Court [sic] nor the parties expend their assets addressing invalid claims. *Softview Computer Products Corp. and Ergo View Technologies Corp. v. Haworth, Inc.,* No. 97 Civ. 8815 KMW HBP, 2000 WL 1134471, at *3 (S.D.N.Y. Aug. 10, 2000). Since the PTO cannot stay the reexamination once a request has been granted, the court's issuance of a stay is the only way to avoid the potential for conflict. *See Hamilton,* 1990 WL 37642, at *2 (citing *Ethicon, Inc. v. Quigg,* 849 F.2d 1422 (Fed.Cir.1988).

The court finds the prejudice to Gioello is slight, if any. Gioello claims it is prejudiced both by Mattel's

dilatory tactics in not requesting an examination earlier and by it spending money on discovery that is nearly complete. Leaving aside timing arguments, the court finds no merit in this position. First, Gioello is not selling or actively licensing goods or services related to the '434 patent; money damages is an adequate remedy for any delay in redress. Second, both Mattel and Gioello have spent money on discovery. Third, Mattel is entitled by law to request a reexamination. *See* 35 U.S.C. §§ 302-307; 37 C.F.R. § 1.525. The fact that the request was granted means the PTO deems the '434 patent worthy of reexamination. It is not for the court to second guess the PTO's decision to reassess the prior art.

Given the possibility that the PTO's reexamination could materially affect the issues in this case, the court will deny Mattel's motions for summary judgment and Gioello's motion to strike without prejudice.[FN3] Although the could will hold a status conference in late April or early May, 2001, the parties should advise the court of any earlier developments in the PTO's reexamination.

> FN3. Upon the entry of a new scheduling order, the parties are free to re-file their motions.

Therefore, IT IS HEREBY ORDERED that:
1. Mattel's motion to stay the proceeding pending reexamination (D.I.84) is GRANTED. The proceedings are stayed from the date of this order until further notice.
2. Mattel's motion for summary judgment on invalidity (D.I.87) is DENIED without prejudice.
3. Mattel's motion for summary judgement on noninfringement (D.I.89) is DENIED without prejudice.
4. Gioello's motion to strike (D.I.91) is DENIED without prejudice.
5. The parties shall advise the court of any decision that results from the PTO's reexamination of the '434 patent.

D.Del.,2001.
Gioello Enterprises Ltd. v. Mattel, Inc.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2001 WL 125340 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


Not Reported in F.Supp.2d, 2001 WL 125340
(D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit F

Westlaw.

Slip Copy

Page 1

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

**C**
Abbott Diabetes Care, Inc. v. DexCom, Inc.
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ABBOTT DIABETES CARE, INC., Plaintiff,
v.
DEXCOM, INC., Defendants.
**C.A. No. 05-590 GMS.**

Aug. 16, 2006.

Mary B. Graham, James Walter Parrett, Jr., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, James F. Hurst, Stephanie S. McCallum, Pro Hac Vice, for Plaintiff.
John W. Shaw, Melanie K. Sharp, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Brian M. Kramer, David C. Doyle, M. Andrew Woodmansee, Morgan S. Adessa, Pro Hac Vice, for Defendants.

*MEMORANDUM*
GREGORY M. SLEET, District Judge.

**I. INTRODUCTION**

*1 On August 11, 2005, Abbott Diabetes Care, Inc. ( "Abbott") brought this declaratory judgment (Count I) and patent infringement (Count II) action against DexCom, Inc. ("DexCom"). Presently before the court are the following motions: (1) DexCom's Motion to Dismiss Abbott's Complaint (D.I.5); (2) DexCom's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I.61); and (3) DexCom's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I.25). For the reasons that follow, the court will grant in part and deny in part DexCom's motion to dismiss. The court will grant the motion to dismiss Abbott's declaratory judgment count and will deny the motion to dismiss the infringement count. Additionally, the court will

grant DexCom's motion to strike the "amended complaint," deny the renewed motion to dismiss the complaint as moot, and grant the motion to stay pending reexamination of Abbott's patents.

**II. BACKGROUND**

Abbott owns U.S. Patent Nos. 6,175,752 (the " 752 patent"), 6,284,478 (the " 478 patent"), 6,329,161 (the " 161 patent"), and 6,565,509 (the " 509 patent") (collectively, the "patents-in-suit"). The patents-in-suit are directed to methods, systems, and devices for continuously monitoring glucose levels in humans. (Compl.¶ 7.) The patented technology at issue offers an alternative monitoring system for diabetics, who currently monitor their glucose levels by pricking their fingers to draw blood several times a day. (D.I. 32, at 3; see 752 patent, Col. 1, ll. 21-26; 509 patent Col. 1, ll. 21-26.) According to the background of the invention sections of the 752 and 509 patents, the pricking technique does not permit the continuous monitoring of glucose, is painful and inconvenient, and results in inconsistencies in monitoring among individuals with diabetes. (See 752 patent, Col. 1, ll. 26-38; 509 patent, Col. 1. ll. 26-38.) Therefore, the technology described in the patents-in-suit was invented to address the need for a small and comfortable device that could continuously monitor glucose levels for days at a time, while permitting a patient to engage in normal activities. ( 752 patent, Col. 2, ll. 1-4; 509 patent, Col 2., ll. 5-8.) Each of the patents-in-suit relate to an aspect of the continuous glucose monitor, which involves implanting a glucose sensor in a patient and monitoring signals over the life of the sensor.[FN1] (D.I. 32, at 3.) The monitoring device provides patients with feedback regarding their glucose levels, and may even include an alarm to warn patients of dangerous glucose levels. (*Id.* at 3-4.)

    FN1. The 752 and 509 patents relate to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 2

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

glucose monitoring devices and their methods of use, while the 478 and 161 patents relate to subcutaneous glucose sensors.

Abbott alleges that DexCom intends to market its STS ™ Continuous Glucose Monitoring System, which will infringe one or more claims of the patents-in-suit. The complaint states that DexCom filed a premarket approval application with the Food and Drug Administration (the "FDA") in March 2005, seeking approval to sell its product. (Compl.¶ 12.) The complaint further states that DexCom expects FDA approval by the second quarter of 2006.[FN2] (*Id.* ¶ 15.) In Count I, Abbott seeks declaratory relief in the form of a judicial declaration that DexCom's product will infringe one or more claims of each of the patents-in-suit. (*Id.* ¶ 25.)

> FN2. As previously mentioned, Abbott filed its complaint on August 11, 2005. The FDA subsequently approved DexCom's glucose monitoring product, in March 2006.

**\*2** Further, Abbott alleges that, prior to filing its premarket approval application with the FDA, DexCom attended two "trade shows" where it publicized and displayed its glucose monitoring product. (Compl.¶ 16.) The complaint alleges that the products DexCom displayed at the trade shows were manufactured for the purpose of showcasing rather than for gathering information for submission to the FDA. (*Id.* ¶ 17.) Abbott alleges that DexCom's manufacture and display of its product constitutes an act of patent infringement. (*Id.* ¶ 28.)

On August 31, 2005, DexCom filed a motion to dismiss Abbott's complaint for lack of subject matter jurisdiction and failure to state a claim. Additionally, on February 22, 2006, DexCom filed a motion to stay the litigation pending reexamination of the patents-in-suit. On June 27, 2006, Abbott filed an amended complaint, which alleges further infringing acts on the part of DexCom and adds several patents to the suit. On July 12, 2006, DexCom filed a motion to strike the "

amended complaint" and renewed motion to dismiss.

### III. DISCUSSION

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Dexcom first contends that the court should dismiss Abbott's declaratory judgment claim because there is currently no "accused device" to compare against the claims of the patents-in-suit and, therefore, Abbott's claim is premature. In other words, DexCom contends the court lacks subject matter jurisdiction over Count I of Abbott's Complaint.

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure contests the jurisdiction of the Court to address the merits of a plaintiff's complaint. Such a challenge may present either a facial or a factual contest to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would be insufficient to establish the Court's jurisdiction. *Gould Elecs. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). The present motion presents a facial challenge to the complaint because the jurisdictional facts are not in dispute. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiff's favor. *See id.* Additionally, the court must test the existence of jurisdiction as of the time the complaint was filed. *Lang v. Pacific Marine and Supply Co.,* 895 F.2d 761, 764 (Fed.Cir.1990).

The Declaratory Judgment Act (the "Act") provides that "[i]n a case of actual controversy ... [a court of competent jurisdiction] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Thus, before a court may exercise jurisdiction over a declaratory judgment action, the Act requires an " actual controversy between the parties ." *Medimmune, Inc. v. Centocor, Inc.,* 409 F.3d 1376,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 3

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

1378-79 (Fed.Cir.2005) (citing *Teva Pharms. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1331 (Fed.Cir.2005)). "If the controversy requirement is met by a sufficient allegation of immediacy and reality ... a patentee [is able] to seek a declaration of infringement against a future infringer ... [just as] a future infringer is able to maintain a declaratory judgment action of noninfringement under the same circumstances." *Telectronics Pacing Sys., Inc v. Ventritrex, Inc.,* 982 F.2d 1520, 1526 (Fed.Cir.1992) (citing *Lang,* 895 F.2d at 764).

*3 However, a district court does not have jurisdiction to hear the action when there is no actual controversy. *Spectronics Corp. v. H .B. Fuller Co.,* 940 F.2d 631, 634 (Fed.Cir.1991), *cert. denied,* 112 S.Ct. 658 (1991). Moreover, "even assuming [the existence of] an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary." *Telectronics,* 982 F.2d at 1526 (citations omitted).

Two elements must be present in order to meet the controversy requirement in a declaratory judgment action brought by a patentee against an alleged future infringer: (1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under 35 U.S.C. § 271(a), or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming. *Lang,* 895 F.2d at 764. In addition, the declaratory judgment plaintiff bears the burden of proving the existence of facts underlying its allegations of the existence of an actual controversy. *Jervis B. Webb Co. v. S. Sys., Inc.,* 742 F.2d 1388, 1399 (Fed.Cir.1984).

Applying the above-discussed elements to the present case, it is clear to the court from the record before it that Abbott's complaint did not present an actual controversy under the Act at the time it was filed. That is, Abbott has not demonstrated that DexCom produced or has prepared to produce a product that would be subject to an infringement charge under 35 U.S.C. § 271. At the time Abbott

filed its complaint, the FDA had not approved DexCom's product and could not predict when, or if, the FDA would approve the product. Indeed, Abbott states as much in its complaint, alleging that "DexCom ... *expects* FDA approval for marketing by the second quarter of 2006...." (Compl.¶ 15) (emphasis added).[FN3] Additionally, Abbott did not, and could not, allege with any certainty that "the device when approved would be the same device that began clinical trials[,]" as " product changes during testing are contemplated by statute, 21 U.S.C. § 360j(g)(2)(C)(iii) (1988)." *Telectronics,* 982 F.2d at 1527. Most important, Abbott did not allege nor does it now contend that DexCom has distributed sales literature, prepared to solicit orders, or engaged in any sales or marketing activity with regard to its glucose monitoring product. *See Lang,* 895 F.2d at 765; *Benitec Australia Ltd. v. Nucleonics, Inc.,* Civil Action No. 04-0174 JJF, 2005 U.S. Dist. LEXIS 22008, at *9 (D.Del. Sept. 29, 2005); *Interdigital Tech. Corp. v. OKI Am., Inc.,* 845 F.Supp. 276, 284 (E.D.Pa.1994) ("Activity directed towards advertising or marketing the accused device is particularly important to a finding of a justiciable controversy.") Therefore, the court concludes that no controversy of sufficient immediacy and reality existed, at the time Abbott filed its complaint, to support declaratory judgment jurisdiction in the present case. As such, the court will dismiss Count I of Abbott's complaint.

> FN3. The court agrees with the argument Abbott makes in its answering brief, namely that FDA approval is not the standard by which it should evaluate whether an actual controversy existed at the time the complaint was filed. However, the court finds that the absence of FDA approval is evidence that the dispute between the parties is neither real nor immediate.

**B. Motion to Strike Abbott's "Amended Complaint"**

*4 DexCom next argues that the court should strike the "Amended Complaint" because Abbott failed to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 4

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

seek leave of court to file what correctly should be termed a "supplemental pleading." Conversely, Abbott asserts that it properly amended its complaint under Federal Rule of Civil Procedure 15(a) to allege additional acts of infringement that occurred prior to and after it filed the initial complaint. The court is unpersuaded by Abbott's argument and will, therefore, strike its "Amended Complaint."

As Abbott points out in its briefing, "[a]n amended pleading generally is a modification to incorporate events that were unknown but occurred *prior* to the filing of the original pleading." (D .I. 66, at 7) (emphasis added) (citing 3 James Wm. Moore et al., Moore's Federal Practice § 15.02 (3d ed.1999)). On the other hand, "a supplemental pleading refers to additions to include transactions or occurrences that take place after the filing of the original pleading." (D.I. 66, at 7.) By Abbott's own words, it amended its complaint "to allege additional acts of infringement that occurred prior to and *after* " its initial complaint. (*Id* .) Because Abbott's "Amended Complaint" contains allegations regarding events that occurred after August 11, 2005-the filing date of the original complaint-it is governed by Federal Rule of Civil Procedure 15(d). Pursuant to Rule 15(d), "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Fed.R.Civ.P. 15(d); *see GAF Bldg. Materials Corp. v. Elk Corp. of Dallas,* 90 F.3d 479, 483 (Fed.Cir.1996) (holding that district court did not abuse its discretion when " adhering to the motion requirement of Rule 15"); *Bronson v. Horn,* Civil Action No. 02-663, 2006 U.S. Dist. LEXIS 38791, at *5 (W.D. Pa. June 12, 2006) (dismissing supplemental complaint because it was not filed pursuant to a motion). Accordingly, because Abbott did not file a motion to supplement its complaint in the present case, the court will strike it from the docket for failure to comply with Rule 15(d).

**C. Motion to Dismiss for Failure to State a Claim**

Finally, with respect to dismissal, DexCom contends that Count II of Abbott's complaint fails to state a claim for which relief can be granted. According to DexCom, its display of glucose monitoring products at two scientific conferences is exempt under 35 U.S.C. § 271(e)(1).[FN4] Therefore, DexCom argues that Abbott has failed to state a claim for patent infringement.

> FN4. Section 271(e)(1) states, in pertinent part:
> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.
> 35 U.S.C. 271(e)(1).

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, in deciding a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery,* 117 F .3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer. " *Colburn v. Upper Darby Twp.,* 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss ." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir.1997). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Thus, in order to prevail, a moving party must show "beyond doubt that the plaintiff can prove no set of facts in support of his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5

Slip Copy, 2006 WL 2375035 (D.Del.)
(Cite as: Slip Copy)

**\*5** After having reviewed Abbott's complaint, the parties' submissions and relevant case law, the court concludes that DexCom cannot show that "beyond doubt" there exists "no set of facts" in support of Abbott's patent infringement claim. The language of section 271(e)(1) exempts potentially infringing activities "if performed solely for uses reasonably related to the development of information for FDA approval." *Telectronics,* 982 F.2d at 1523. Here, Abbott's complaint alleges that "[u]pon information and belief, the [DexCom] products displayed at the [two] trade shows were manufactured for the purpose of showcasing at the trade shows rather than for the purpose of gathering information." (Compl.¶ 17.) Abbott's complaint, therefore, alleges that DexCom's manufacture and display of products at scientific conferences or trade shows falls outside the safe harbor of section 271(e)(1). Based upon this allegation, and viewing the complaint in the light most favorable to Abbott, the court is unwilling to conclude at this juncture that no relief could be granted under any set of facts that Abbott could prove consistent with its patent infringement allegations.[FN5] Therefore, the court will deny DexCom's motion to dismiss Count II of the complaint.

> FN5. DexCom contends that the facts of the present case are on "all fours" with the facts of *Telectronics.* The court, however, finds that DexCom's reliance is misplaced because, in *Telectronics,* the Federal Circuit reviewed a district court's grant of summary judgment for the defendant, while here the court must decide a motion to dismiss. As DexCom well knows, the standard for granting a motion to dismiss is markedly different from the summary judgment standard. When deciding a Rule 56 motion, the court reviews "the pleadings, *depositions, answers to interrogatories,* and *admissions on file,* together with [any] affidavits," to determine whether "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added). In contrast, when deciding a motion to dismiss, the scope of the court's review is limited to the complaint. *See Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002) ("As a general rule, the court may only consider the pleading that is attacked by an FRCP 12(b)(6) motion in determining its sufficiency.") Therefore, *Telectronics* is distinguishable in that the court made its determination after reviewing a more complete record than that which the court is permitted to review here. That is not to say that DexCom could not successfully attack Abbott's claim at a later stage of these proceedings. For example if, through discovery, DexCom adduces facts indicating that its conduct at the scientific conferences or trade shows falls within the section 271(e)(1) safe harbor, the court will likely entertain a motion for summary judgment at the appropriate time.

### D. Motion to Stay

DexCom has also filed a motion to stay the litigation pending reexamination of the patents-in-suit by the Patent and Trademark Office (the "PTO"). The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985). This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) (noting that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). In determining whether a stay is appropriate, the court's discretion is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2375035 (D.Del.)
(Cite as: Slip Copy)

Page 6

*Com Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

In opposing DexCom's motion, Abbott maintains that a stay would prevent it from seeking a preliminary injunction and enforcing its patent rights, thereby unduly prejudicing it and presenting it with a clear tactical disadvantage in the marketplace. The court is not persuaded. First, Abbott's argument is premised on its filing of a motion for preliminary injunction. Abbott, however, did not, and has not, filed any such motion, even though the FDA has recently approved DexCom's glucose monitoring product for marketing. Because Abbott has not filed a motion for preliminary injunction, its arguments relating to the court's rendering of an opinion on such a motion are moot. As such, the only other argument Abbott asserts with respect to undue prejudice is that it will be unable to enforce its patents while in reexamination. Abbott's position, however, assumes that the PTO will leave all of the more than 200 claims of the four patents-in-suit unaltered after reexamination. *See Applera Corp. v. Thermo Electron Corp.,* No. C.A. 04-1230 GMS, (D.Del. Dec. 28, 2005) (04-1230 D.I. 81 ¶ 6). Further, while Abbott may suffer some prejudice from a stay, the court is not persuaded that a stay would *unduly* prejudice Abbott, or present any clear tactical disadvantage. Accordingly, the first factor militates in favor of granting the requested stay.

*6 With respect to the second factor, Abbott argues that a stay will not simplify the issues, but prolong the litigation. According to Abbott, the only way to avoid prolonging the litigation would be if the reexamination resulted in the PTO invalidating all of the asserted claims of all of the patents-in-suit. The court cannot agree. Contrary to Abbott's position, the court finds that granting the stay will simplify the issues and focus the litigation. For example, if the PTO determines that some or all of the claims of the of the four patents undergoing reexamination are invalid, then many of the issues in the litigation will become moot. Additionally, it is beyond dispute that the court, as well as the

parties, would benefit from a narrowing of the variety of complex issues relating to the numerous claims at issue, which, if clearly defined, would streamline the discovery process and the remainder of the litigation. A stay, therefore, will conserve the resources of the parties and the court, thereby promoting efficiency. Moreover, the court would not run the risk of inconsistent rulings or issuing advisory opinions. *See Gioello Enters. Ltd. v. Mattel, Inc.,* No. C.A. 99-375 GMS, 2001 WL 125340, at *1 (D.Del. Jan. 29, 2001). The second factor, therefore, weighs in favor of granting the motion to stay.

Finally, the court finds that the third factor it must consider in its determination, i.e. whether discovery is complete and whether a trial date has been set, weighs in favor of granting the motion. In the present case, fact discovery is not scheduled to close until January 31, 2007 and, although already set, the trial is not scheduled to begin until October 9, 2007. [FN6] Thus, given its findings with respect to the first two factors, the court concludes that the balance of harms weighs in favor of granting a stay of this action. Accordingly, the court will grant DexCom's motion to stay.

FN6. See Amended Scheduling Order, D.I. 71 ¶¶ 2, 8.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss Abbott's Complaint (D.I.5) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Count I of Abbott's complaint and DENIED with respect to Count II of Abbott's complaint.

2. The court shall dismiss Count I of Abbott's complaint without prejudice.

3. The plaintiff's Motion For Limited Jurisdictional Discovery and for a Corresponding Extension of the Briefing Schedule on DexCom's Motion to Dismiss

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 7

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**


(D.I.9) is DENIED as moot.

4. The defendant's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I.61) is GRANTED in part and DENIED in part. The motion to strike the " amended complaint" is GRANTED and the renewed motion to dismiss is DENIED as moot.

5. The plaintiff's Amended Complaint (D.I.55) shall be stricken from the court's docket.

6. The defendant's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I.25) is GRANTED.

D.Del.,2006.
Abbott Diabetes Care, Inc. v. DexCom, Inc.
Slip Copy, 2006 WL 2375035 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit G

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 708661 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

▷
KLA-Tencor Corp. v. Nanometrics, Inc.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
**KLA-TENCOR CORPORATION, a Delaware
corporation, Plaintiff,**
v.
**NANOMETRICS, INC., a California corporation,
Defendant.**
**No. C 05-03116 JSW.**

March 16, 2006.

Michael N. Edelman, Michael H. Kalkstein, Ben S.
Bedi, Daniel T. McCloskey, Dechert, LLP, Palo
Alto, CA, for Plaintiff.
Peter H. Kang, Matthew Laurence McCarthy,
Teague I. Donahey, Sidley Austin LLP, San
Francisco, CA, for Defendant.

ORDER GRANTING DEFENDANT'S MOTION
TO STAY ALL PROCEEDINGS PENDING
REEXAMINATION OF PATENTS-IN-SUIT
JEFFREY S. WHITE, J.
**\*1** Now before the Court is Defendant Nanometrics,
Inc.'s ("Nanometrics") Motion to Stay Proceedings
Pending Reexamination of Patents-in-Suit. Having
considered the parties' pleadings, relevant legal
authority, and the parties' arguments at the hearing
on this matter, the Court HEREBY GRANTS
Defendant's motion and STAYS ALL
PROCEEDINGS with respect to all patents-in-suit.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff KLA-Tencor Corporation ("KLA-Tencor"
), the assignee of United States Patents Nos.
6,483,580 ("the '580 patent") and 6,590,656 ("the
'656 patent"), brought this action claiming that
Nanometrics had infringed these patents by
manufacturing, offering for sale and/or selling six

devices, including but not limited to the Atlas
metrology system and/or other metrology systems.
(Declaration of Michael N. Edelman in Support of
KLA-Tencor's Opposition to Stay ("Edelman Decl."
), Ex. A at 2-3; Declaration of Edward V. Anderson
in Support of Motion to Stay Pending
Reexamination ("Anderson Decl. 1"), Ex. A at 1.)
KLA-Tencor then filed a first amended complaint
adding a cause of action for infringement of United
States Patent No. 6,611,330 ("the '330 patent").
(Edelman Decl., Ex. H.)

This litigation is in the early stages. Both parties
have propounded, and one has responded to, their
first set of requests for production of documents. (
*See* Declaration of Edward V. Anderson in Support
of Motion to Stay and *Ex Parte* Motion to Shorten
Time ("Anderson Decl. 2"), Ex. 4; *see also*
Edelman Decl., Exs. L-N.) The tutorial has been set
for August 22, 2006, but no trial date has yet been
set. Magistrate Judge Spero has established a
schedule for an exchange of discovery plans and a
date and time for a discovery conference. Neither
claim construction briefing nor discovery has
occurred on the '330 patent infringement cause of
action that KLA-Tencor has recently added.

On December 21, 2005, the United States Patent &
Trademark Office ("PTO") granted Nanometrics's
requests for reexamination of the '580 patent and
the '656 patent. (Anderson Decl. 2, Exs. 1, 2.) On
February 21, 2006, Nanometrics filed a request for
reexamination of the '330 patent with the PTO.
(Nanometrics's Notice of New Authorities, Ex. A.)

On January 6, 2006, Nanometrics filed the instant
motion. Nanometrics moves the Court for a stay of
all proceedings, including the litigation as to the
'330 patent infringement cause of action, pending
the reexamination of the '580 and '656 patents.
(Mot. at 2.) KLA-Tencor urges this Court to deny
Nanometrics's motion on the following grounds: (1)
a stay should not be entered where the
reexamination does not implicate all patents-in-suit;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 708661 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

(2) considerations of judicial efficiency militate in favor of permitting discovery on the infringement of all patents-in-suit; (3) a stay would substantially prejudice KLA-Tencor and unnecessarily delay the action given the slow pace of PTO reexamination proceedings; and (4) a stay would put KLA-Tencor at a clear tactical disadvantage.

ANALYSIS

A. Legal Standards Applicable to a Motion to Stay Proceedings Pending Reexamination.

**\*2** The patent reexamination statute provides in pertinent part that "[a]ny person at any time may file a request for reexamination by the [PTO] of any claim of a patent on the basis of any prior art cited under the provisions of section 301." 35 U.S.C. § 302. The PTO must "determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request...." 35 U.S.C. § 303(a). The reexamination statute further provides that "[a]ll reexamination proceedings ... including any appeal to the Board of Patent Appeals and Interferences, will be conducted with special dispatch." 35 U.S.C. § 305.

The determination of whether to grant a stay pending the outcome of the PTO's reexamination is soundly within the Court's discretion. *See Tap Pharm. Prods. Inc. v. Atrix Labs. Inc.,* 70 U.S.P.Q.2d 1319, 1320 (N.D.Ill.2004) (citing *Gould v. Control Laser Corp.,* 705 F.2d 1340, 1341 (Fed.Cir.1983)). When ruling on such a stay, courts consider several factors: (1) the stage of the litigation, including whether discovery is or will be almost completed and whether the matter has been marked for trial; (2) whether a stay will unduly prejudice or tactically disadvantage the nonmoving party; and (3) whether a stay will simplify the issues in question and streamline the trial, thereby reducing the burden of litigation on the parties and on the court. *Id.; Methode Elecs., Inc. v. Infineon Techs. Corp.,* No. 99-21142, 2000 U.S. Dist. LEXIS 20689, at \*5-6 (N.D.Cal. Aug. 7, 2000). There is a "liberal policy in favor of granting motions to stay proceedings pending the outcome of

USPTO reexamination or reissuance proceedings." *ASCII Corp. v. STD Entertainment,* 844 F.Supp. 1378, 1381 (N.D.Cal.1994).

B. The Early Stage of the Litigation Weighs in Favor of Granting a Stay.

The early stage of a litigation weighs in favor of granting a stay pending reexamination. *See Target Therapeutics, Inc. v. SciMed Life Sys., Inc.,* 33 U.S.P.Q.2d 2022, 2023 (N.D.Cal.1995) (holding that the absence of "significant discovery" or " substantial expense and time ... invested" in the litigation weighed in favor of staying the litigation); *see also ASCII Corp.,* 844 F.Supp. at 1381 (granting stay where parties had undertaken little or no discovery and the case had not yet been set for trial). Here, discovery has just begun. Nanometrics and KLA-Tencor have each propounded their first set of requests for the production of documents, and Nanometrics has responded to KLA-Tencor's first set of requests. (*See* Anderson Decl. 2, Ex. 4; Edelman Decl., Exs. L-N.) Magistrate Judge Spero just recently laid out a schedule for an exchange of discovery plans. Neither party has conducted any discovery with respect to the '330 patent-in-suit. The tutorial has been set for August 22, 2006, but no trial date has been set. Therefore, the fact that this case is still in the early stages and the parties have not yet conducted "significant discovery" or invested "substantial expense" into the litigation weighs in favor of granting a stay. *See Target Therapeutics,* 33 U.S.P.Q.2d at 2023.

C. A Stay Will Not Unduly Prejudice KLA-Tencor.

**\*3** In determining whether to grant a stay, courts also consider any resulting undue prejudice on the nonmoving party. *See Methode Elecs.,* 2000 U.S. Dist. LEXIS 20689, at \*7. Granting a stay does not cause the nonmoving party undue prejudice when that party has not invested substantial expense and time in the litigation. *Id.* KLA-Tencor correctly notes that "the average time for the completion of a reexamination is approximately 18.2 months," excluding appeals. *Rohm and Haas Co. v. Brotech Corp.,* 24 U.S.P.Q.2d 1369, 1372 (D.Del.1992).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

However, parties having protection under the patent statutory framework may not "complain of the rights afforded to others by that same statutory framework." *Pegasus Dev. Corp. v. DirecTV, Inc.,* 2003 WL 21105073, at \*2 (D.Del. May 14, 2003). Nanometrics "is legally entitled to invoke the reexamination process," and the PTO has already determined to reexamine two of the three patents-in-suit. *See id.* Moreover, if after reexamination the PTO again upholds KLA-Tencor's patents, this will only strengthen KLA-Tencor's rights because Nanometrics's burden of proof becomes more onerous. *See id.* Under such circumstances, the delay inherent to the reexamination process does not constitute, by itself, undue prejudice. *See id.*

As a result, courts also consider evidence of dilatory motives or tactics, such as when a party unduly delays in seeking reexamination of a patent. *Methode Elecs.,* 2000 U.S. Dist. LEXIS 20689, at \*7. KLA-Tencor has failed to show, beyond the delay implicit in the reexamination process, how it would be unduly prejudiced or tactically disadvantaged if this Court were to grant a stay. In particular, the Court finds no evidence of dilatory tactics on Nanometrics's part in seeking reexamination at this early stage of the litigation. This is not a case where reexamination is sought on the eve of trial or after protracted discovery. *Cf. Agar Corp., Inc. v. Multi-Fluid, Inc.,* 983 F.Supp. 1126, 1128 (S.D.Tex.1997) (finding that "courts are inclined to deny a stay when the case is set for trial and the discovery phase has almost been completed" ). Rather, KLA-Tencor filed its complaint on August 1, 2005, the PTO granted Nanometrics's requests to reexamine the '580 and '656 patents on December 21, 2005, and Nanometrics filed its motion to stay proceedings on January 6, 2006. (Edelman Decl., Ex. A at 4; Anderson Decl. 2, Exs. 1, 2.) In addition, KLA-Tencor filed a stipulation and proposed order seeking to add the '330 patent on January 26, 2006, and Nanometrics filed a request for reexamination of the '330 patent on February 21, 2006. (Nanometrics, Inc.'s Notice of New Authorities, Ex. A.) This does not evince dilatory motives. Furthermore, KLA-Tencor will be fully compensated for delays if it prevails at reexamination and trial. *See Brown v. Shimano Am.*

*Corp.,* 18 U.S.P.Q.2d 1496, 1496 (C.D.Cal.1991). Thus, because a stay will not unduly prejudice KLA-Tencor, this factor also weighs in favor of granting a stay.

### D. A Stay Will Simplify the Issues, Streamline the Trial, and Reduce the Burden of Litigation on Both the Parties and the Court.

\*4 The PTO is currently reexamining two of the three patents-in-suit and reviewing Nanometrics's request for reexamination of the third patent-in-suit. (Anderson Decl. 2, Exs. 1, 2; Nanometrics's Notice of New Authorities, Ex. A.) Statistical information regarding reexamination indicates that the PTO confirms all claims in approximately 24% of the cases, cancels all claims in approximately 12% of the cases, and changes some claims in approximately 64% of the cases. *Rohm and Haas,* 24 U.S.P.Q.2d at 1372. These statistics "suggest that in a typical case there is a substantial probability a reexamination will have a major impact on the issues to be resolved in the litigation." *Id.* This is because "waiting for the outcome of the reexamination could eliminate the need for trial if the claims are cancelled or, if the claims survive, facilitate the trial by providing the court with the opinion of the PTO and clarifying the scope of the claims." *Target Therapeutics,* 33 U.S.P.Q.2d at 2023; *see also Pegasus,* 2003 WL 21105073, at \* 1-2 (noting the benefits of granting a stay pending reexamination include potentially narrowing the issues, reducing the complexity and length of trial, alleviating discovery problems relating to prior art, and encouraging settlement or even dismissal if the patent is declared invalid).

When there are overlapping issues between the reexamined patents and other patents in suit, courts have found staying the entire case to be warranted. In *Methode,* for example, the court stayed the litigation of both the reexamined and non-reexamined patents because the issues regarding the non-reexamined patent "may be narrowed or amended as a result of the PTO's decision." *Id.* Moreover, the *Methode* court stayed the litigation of both the reexamined and non-reexamined patents because "it appears that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2006 WL 708661 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

there are overlapping issues" in the infringement action of the two patents. *Id.* If the court stayed the litigation with respect to the reexamined patents-in-suit only, duplicative discovery could have resulted because there were likely to be common documents and witnesses in the infringement litigation of the two patents. *Id.*

Similarly, here, even though the PTO has not determined yet whether it will reexamine the '330 patent, a stay of the entire suit is warranted because the reexamination of the '580 and '656 patents may significantly affect the litigation of the '330 patent. First, at the hearing on the instant motion, KLA-Tencor conceded that it accuses the same Nanometrics products of infringement of all three patents-in-suit. Second, Nanometrics argued at the hearing on this matter, and KLA-Tencor did not dispute, that the only real difference in discovery would involve the deposition of the different inventor of the '330 patent. Otherwise, as Nanometrics argued, the engineering and sales personnel deposed would be the same for all three patents-in-suit. Third, KLA-Tencor conceded at the hearing that there are overlapping issues between all three patents-in-suit. For example, the "first optics focusing a polarized sample beam of broadband radiation onto the surface of the sample" language of claim 28 of the '330 patent overlaps with the " optics providing a sampling beam of polarized broadband radiation and directing the beam towards the structure at an oblique angle" language of claim 111 of the '580 patent. Therefore, a stay will simplify the issues and streamline the trial, thereby reducing the burden on, and preserving the resources of both the parties and the Court.

*5 Finally, in determining whether to grant a stay of an entire case, courts consider whether there would remain, after the PTO reexamination, issues " completely unrelated to patent infringement" for which a stay would not reduce the burden of litigation on both the parties and the court. *Imax Corp. v. In-Three, Inc.,* 385 F.Supp.2d 1030, 1033 (C.D.Cal.2005). If such matters "would continue to be an issue ... a stay would not preserve many resources." *Id.* at 6.

Here, the only claims in the case are for patent

infringement. Therefore, the Court finds that there are no issues in the case unrelated to patent infringement for which the PTO's expertise resulting from the reexamination process would not be helpful. Accordingly, the Court finds that a stay of the entire case pending reexamination of the '580 and '656 is warranted.

Therefore, having considered the factors relevant in determining whether to grant a stay pending reexamination, the Court hereby GRANTS Nanometrics's motion to stay all proceedings pending reexamination of the '580 and '656 patents.

CONCLUSION

For the foregoing reasons, the Court GRANTS Nanometrics's motion to stay pending reexamination of the '580 and '656 patents. The proceedings are stayed from the date of this Order until further notice. The Court HEREBY ORDERS the parties to submit a joint status report regarding the status of the reexamination proceedings every 120 days, or sooner if the PTO issues a final decision with respect to any of the patents-in-suit, until the stay in this case is lifted.

If the PTO grants Nanometric's application to reexamine the '330 patent and the reexamination proceedings for the '330 patent extend beyond those for the '580 and '656 patents, the Court will entertain a motion extend the stay at that time.

IT IS SO ORDERED.

N.D.Cal.,2006.
KLA-Tencor Corp. v. Nanometrics, Inc.
Not Reported in F.Supp.2d, 2006 WL 708661 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit H



US006447485B2

(12) **United States Patent**            (10) **Patent No.:**     **US 6,447,485 B2**

Bierman                                  (45) **Date of Patent:**     **Sep. 10, 2002**

(54) **MEDICAL LINE ANCHORING SYSTEM**

(75) Inventor: **Steven F. Bierman**, Del Mar, CA (US)

(73) Assignee: **Venetec International, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/797,341**

(22) Filed: **Mar. 1, 2001**

**Related U.S. Application Data**

(62) Division of application No. 08/865,231, filed on May 29, 1997, now Pat. No. 6,213,979.

(51) Int. Cl.[7] ................................................. A61M 5/32

(52) U.S. Cl. ...................... 604/174; 604/177; 604/180; 128/DIG. 26

(58) Field of Search ................................. 604/174, 175, 604/177, 176, 180, 179; 128/DIG. 26

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 2,525,398 | A | 10/1950 | Collins |
| 2,533,961 | A | 12/1950 | Rouseau et al. |
| 2,707,953 | A | 5/1955 | Ryan |
| 3,059,645 | A | 10/1962 | Hasbrouck et al. |
| 3,064,648 | A | 11/1962 | Bujan |
| 3,167,072 | A | 1/1965 | Stone et al. |
| 3,482,569 | A | 12/1969 | Raffaelli |
| 3,529,597 | A | 9/1970 | Fuzak |
| 3,602,227 | A | 8/1971 | Andrew |
| 3,630,195 | A | 12/1971 | Santomieri |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| DE | 2341297 | | 4/1975 |
| EP | 0064284 | A2 | 4/1982 |
| EP | 0247590 | A2 | 12/1987 |
| EP | 356683 | A | 7/1989 |
| FR | 1184139 | | 7/1959 |
| FR | 2381529 | | 9/1978 |
| GB | 2063679 | | 6/1981 |
| GB | 2086466 | A | 5/1982 |
| WO | WO 80/01458 | | 7/1980 |
| WO | WO 85/02774 | | 7/1985 |
| WO | WO 91/16939 | | 11/1991 |
| WO | WO 92/19309 | | 11/1992 |
| WO | WO 96/10435 | | 4/1996 |

OTHER PUBLICATIONS

Multiple–Lumen Central Venous Catheerization Product with Arrow+gård™ Antiseptic Surface (Arrow International brochure) (Apr. 1994).

Photographs (4) of Catheter Clamp and Rigid Fastener sold by Arrow International, Inc.

*Primary Examiner*—Manuel Mendez

(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear, LLP

(57)                **ABSTRACT**

An anchoring system includes a simply-structured device which permits a portion of a catheter tube or similar medical article to be easily anchored to a patient, desirably without the use of tape or needles and suturing. A unitary retainer desirably includes a base connected to a cover by way of a flexible hinge. The retainer is attached to a flexible anchor pad including an adhesive bottom surface, which can be attached to the patient's skin. A catheter is secured to a fitting, which in turn mounts to the retainer. Mounting the fitting to the retainer can be accomplished by inserting posts of the retainer through holes of the fitting, or by mounting the fitting within a channel defined by mounting structures integral to the retainer. The cover is then positioned over the base, by bending the flexible hinge, and latched to the base. Several embodiments of the latching mechanism are disclosed. In one form, the latching mechanism includes one or more posts on the base which can be releasably locked into corresponding slotted holes in the cover.

**22 Claims, 6 Drawing Sheets**



# US 6,447,485 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,677,250 A | 7/1972 | Thomas |
| 3,766,915 A | 10/1973 | Rychlik |
| 3,834,380 A | 9/1974 | Boyd |
| 3,847,370 A | 11/1974 | Engelsher |
| 3,856,020 A | 12/1974 | Kovac |
| 3,896,527 A | 7/1975 | Miller, et al. |
| 3,900,026 A | 8/1975 | Wagner |
| 3,906,946 A | 9/1975 | Nordstrom |
| 3,942,228 A | 3/1976 | Buckman et al. |
| 3,973,565 A | 8/1976 | Steer |
| 4,020,835 A | 5/1977 | Nordstrom et al. |
| 4,057,066 A | 11/1977 | Taylor |
| 4,059,105 A | 11/1977 | Cutruzzula et al. |
| 4,082,094 A | 4/1978 | Dailey |
| 4,114,618 A | 9/1978 | Vargas |
| 4,129,128 A | 12/1978 | McFarlane |
| 4,133,307 A | 1/1979 | Ness |
| 4,142,527 A | 3/1979 | Garcia |
| 4,161,177 A | 7/1979 | Fuchs |
| 4,193,174 A | 3/1980 | Stephens |
| 4,224,937 A | 9/1980 | Gordon |
| 4,248,229 A | 2/1981 | Miller |
| 4,250,880 A | 2/1981 | Gordon |
| 4,316,461 A | 2/1982 | Marais et al. |
| 4,324,236 A | 4/1982 | Gordon et al. |
| 4,326,519 A | 4/1982 | D'Alo et al. |
| 4,362,156 A | 12/1982 | Feller, Jr. et al. |
| 4,392,853 A | 7/1983 | Muto |
| 4,397,647 A | 8/1983 | Gordon |
| 4,449,975 A | 5/1984 | Perry |
| 4,453,933 A | 6/1984 | Speaker |
| 4,474,559 A | 10/1984 | Steiger |
| 4,480,639 A | 11/1984 | Peterson et al. |
| 4,516,968 A | 5/1985 | Marshall et al. |
| 4,563,177 A | 1/1986 | Kamen |
| 4,633,863 A | 1/1987 | Filips et al. |
| 4,650,473 A | 3/1987 | Bartholomew et al. |
| 4,660,555 A | 4/1987 | Payton |
| 4,711,636 A | 12/1987 | Bierman |
| 4,742,824 A | 5/1988 | Payton et al. |
| 4,808,162 A | 2/1989 | Oliver |
| 4,823,789 A | 4/1989 | Beisang III |
| 4,826,486 A | 5/1989 | Palsrok et al. |
| 4,852,844 A | 8/1989 | Villaveces |
| 4,857,058 A | 8/1989 | Payton |
| 4,863,432 A | 9/1989 | Kvalo |
| 4,880,412 A | 11/1989 | Weiss |
| 4,896,465 A | 1/1990 | Rhodes et al. |
| 4,897,082 A | 1/1990 | Erskine |
| 4,898,587 A | 2/1990 | Mera |
| 4,919,654 A | 4/1990 | Kalt |
| 4,932,943 A | 6/1990 | Nowak |
| 4,955,864 A | 9/1990 | Hajduch |
| 4,976,700 A | 12/1990 | Tollini |
| 4,997,421 A | 3/1991 | Palsrok et al. |
| 5,000,741 A | 3/1991 | Kalt |
| 5,037,397 A | 8/1991 | Kalt et al. |
| 5,073,170 A | 12/1991 | Schneider |
| 5,084,026 A | 1/1992 | Shapiro |
| 5,098,399 A | 3/1992 | Tollini |
| 5,147,322 A | 9/1992 | Bowen et al. |
| 5,156,641 A | 10/1992 | White |
| 5,192,273 A | 3/1993 | Bierman et al. |
| 5,192,274 A | 3/1993 | Bierman |
| 5,195,981 A | 3/1993 | Johnson |
| 5,266,401 A | 11/1993 | Tollini |
| 5,267,967 A | 12/1993 | Schneider |
| 5,282,463 A | 2/1994 | Hammersley |
| 5,292,312 A | 3/1994 | Delk et al. |
| 5,304,146 A | 4/1994 | Johnson et al. |
| 5,306,243 A | 4/1994 | Bonaldo |
| 5,314,411 A | 5/1994 | Bierman |
| 5,322,514 A | 6/1994 | Steube et al. |
| 5,330,438 A | 7/1994 | Gollobin et al. |
| 5,338,308 A | 8/1994 | Wilk |
| 5,342,317 A | 8/1994 | Claywell |
| 5,344,406 A | 9/1994 | Spooner |
| 5,344,414 A | 9/1994 | Lopez et al. |
| 5,346,479 A | 9/1994 | Schneider |
| 5,352,211 A | 10/1994 | Merskelly |
| 5,354,282 A | 10/1994 | Bierman |
| 5,354,283 A | 10/1994 | Bark et al. |
| 5,380,293 A | 1/1995 | Grant |
| 5,380,294 A | 1/1995 | Persson |
| 5,380,301 A | 1/1995 | Prichard et al. |
| 5,382,239 A | 1/1995 | Orr et al. |
| 5,382,240 A | 1/1995 | Lam |
| 5,389,082 A | 2/1995 | Baugues, et al. |
| 5,395,344 A | 3/1995 | Beisang, III et al. |
| 5,403,285 A | 4/1995 | Roberts |
| 5,413,562 A | 5/1995 | Swauger |
| 5,443,460 A | 8/1995 | Mitusek |
| 5,449,349 A | 9/1995 | Sallee et al. |
| 5,456,671 A | 10/1995 | Bierman |
| 5,468,228 A | 11/1995 | Gebert |
| 5,468,230 A | 11/1995 | Corn |
| 5,468,231 A | 11/1995 | Newman et al. |
| 5,470,321 A | 11/1995 | Forster et al. |
| D364,922 S | 12/1995 | Bierman |
| 5,484,420 A | 1/1996 | Russo |
| 5,496,282 A | 3/1996 | Militzer et al. |
| 5,496,283 A | 3/1996 | Alexander |
| 5,499,976 A | 3/1996 | Dalton |
| 5,520,656 A | 5/1996 | Byrd |
| 5,522,803 A | 6/1996 | Teissen-Simony |
| 5,527,293 A | 6/1996 | Zamierowski |
| D375,355 S | 11/1996 | Bierman |

U.S. Patent     Sep. 10, 2002     Sheet 1 of 6     US 6,447,485 B2



U.S. Patent     Sep. 10, 2002     Sheet 2 of 6     US 6,447,485 B2



*FIG.3*



*FIG.2*

longitudinal

transverse

lateral







FIG.10A

FIG.10B



FIG. 12

FIG. 11

US 6,447,485 B2

1

# MEDICAL LINE ANCHORING SYSTEM

## RELATED CASES

The present application is a divisional of application Ser. No. 08/865,231, filed on May 29, 1997 now U.S. Pat. No. 6,213,979.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to anchoring systems for anchoring medical lines to patients.

### 2. Description of Related Art

It is very common in the treatment of patients to utilize intravenous (IV) catheters to introduce fluids and medications directly into the bloodstream. In many cases, and particularly with respect to cardiac therapy, the IV catheter is introduced into a central or larger vein located close to the patient's heart. A typical catheter utilized in connection with a central vein is referred to as a "central venous catheter" ("CVC"). A venous catheter peripherally inserted into the central circulation through a vein in the arm is commonly referred to as a "peripherally inserted central catheter" ("PICC").

In these cases, long-term IV infusion typically requires that the catheter remain in place for many days. In order to secure such an IV catheter in position at the insertion site, the catheter often is provided with an integrated or a movable flexible clamp with winged extensions which are sutured to the patient's skin. In other applications, the flexible clamp is covered by a rigid box clamp, which receives the catheter/clamp combination in a friction-fit manner. The rigid box clamp and the flexible clamp have lateral, aligned holes in them, which allow the combination to be sutured to the patient's skin. Although this technique securely attaches the central venous catheter to the patient, it obviously is painful and uncomfortable for the patient. This prior retention procedure is also time consuming and inconvenient, poses the risk of needle-stick to the health care provider, and risks suture-site infection to the patient. In addition, suture material tends to exhibit poor gripping on medical tubes and can cut through the winged extension of the flexible clamp.

## SUMMARY OF THE INVENTION

A need therefore exists for a simply-structured anchoring system that affixes a medical line in a fixed position, but releases the medical line for dressing changes or other servicing.

On aspect of the present invention thus involves an anchoring system for securing a medical line to the body of a patient. The system comprises a retainer including a base that defines a receiving area for receiving a portion of the medical line. A cover is permanently coupled to the base. The cover is movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open. A latching mechanism operates between the base and the cover to releasably latch the cover to the base with the cover in the closed position. Interacting structure is located generally beneath the cover with the cover in the closed position. The interacting structure is adapted to limit movement of the medical line through to the retainer when the catheter is placed within the receiving area.

Another aspect of the present invention involves an anchoring system for securing a medical line to the body of

2

a patient. The system includes a fitting adapted to engage with the medical line and having at least one opening. A retainer comprises a base including a platform and at least one post extending from the platform and arranged to interact with the hole of the fitting. A cover is movably coupled to the base so as to be moved between an open position and a closed position. A latching mechanism operates between the cover and the base to releasably latch the cover to the base in the closed position.

In accordance with an additional aspect of the present invention, an anchoring system for securing a medical line to the body of a patient is provided. The anchoring system comprises an adaptor having an adaptor body with a longitudinal axis defined between first and second ends. A first connector is located at the first end of the adaptor for connection to a first medical line, and a second connector is located at the second end for connection to a second medical line. A retainer includes a base and a cover permanently coupled to the base. The cover is movable between an open position and a closed position. A latching mechanism releasably latches the cover to the base in the closed position. And a channel is arranged to lie between the base and the cover in the closed position. The channel is shaped to retain the adaptor between the cover and the base with the cover in the closed position to inhibit movement of the adapter in a direction generally parallel to the adapter's longitudinal axis. An adhesive layer is attached to the retainer and is adapted to adhesively secure the retainer to the body of a patient.

A preferred method of anchoring a medical line to a patient involves providing a retainer including a base having a plurality of posts, and a cover attached to the base by a flexible leash. The provided cover also includes a corresponding plurality of openings with each opening comprising a slot. The retainer is coupled to an adhesive layer. The anchoring system is positioned on the body of the patient, and the adhesive layer is attached to the body of the patient. A medical device is arranged between the posts of the base. The cover is positioned over the base to bring the openings of the cover in proximity with the posts of the base. The cover is shifted relative to the base to engage the posts with the slots of the openings.

Further aspects, features, and advantages of the present invention will become apparent from the detailed description of the preferred embodiments that follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above-mentioned and other features of the invention will now be described with reference to the drawings of several preferred embodiments of the present anchoring system. The illustrated embodiments of the anchoring system are intended to illustrate, but not to limit the invention. The drawings contain the following figures:

FIG. 1A is a perspective view of an anchoring system in accordance with a preferred embodiment of the present invention and illustrates a retainer of the anchoring system in an open position together with an exemplary catheter wing clamp fitting (the components of which are illustrated as exploded above the retainer);

FIG. 1B is a bottom plan view of a cover of the retainer of FIG. 1A;

FIG. 2 is a perspective view of the anchoring system of FIG. 1A with the cover of the retainer shown in a partially closed position;

FIG. 3 is a cross-sectional view of the anchoring system of FIG. 2, with the retainer shown in a completely closed

US 6,447,485 B2

3

position and the catheter wing clamp fitting assembled and anchored therein;

FIG. 4A is a perspective view of a retainer in accordance with another preferred embodiment of the present invention, shown in an open position;

FIG. 4B is a bottom plan view of a cover portion of the retainer of FIG. 4A;

FIG. 5 is a perspective view of the retainer of FIG. 4A, shown in a partially closed position;

FIG. 6 is a perspective view of a retainer in accordance with another preferred embodiment of the present invention, shown in an open position;

FIG. 7 is a perspective view of the retainer of FIG. 6, shown in a closed position;

FIG. 8 is a cross-sectional view of the retainer of FIG. 7, taken along the line 8—8;

FIG. 9 is a cross-sectional view of the retainer according to FIG. 8, but with a tang shown in a release position;

FIG. 10A is a prospective view of an anchoring system in accordance with an additional preferred embodiment of the present invention and illustrates a retainer of the anchoring system in an open position and together with an exemplary catheter adaptor;

FIG. 10B is a bottom plan view of a cover portion of the retainer of FIG. 10A;

FIG. 11 is a prospective view of the retainer of FIG. 10A, shown in a partially closed position with the cover interacting with the catheter adapter; and

FIG. 12 is a cross-sectional view of the retainer according to FIG. 11, shown in a completely closed position, with the catheter adaptor anchored therein.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

The present embodiments of the medical line anchoring system are disclosed in the context of an exemplary central line catheter. The principles of the present invention, however, are not limited to PICCs or CVCs. Instead, it will be understood by one of skill in this art, in light of the present disclosure, that the anchoring systems and retainers disclosed herein also can be successfully utilized in connection with other types of medical lines, including tubes for fluid communication and electrical wires. For example, but without limitation, the retainers disclosed herein can retain CVCs, PICCs, Foley catheters, and hemodialysis catheters, surgical drainage tubes, feeding tubes, chest tubes, nasogastric tubes, scopes, as well as with electrical wires or cables connected to external or implanted electronic devices or sensors. One skilled in the art may also find additional applications for the devices and systems disclosed herein. Thus, the illustration and description of the anchoring system 8 in connection with a catheter is mainly exemplary of one possible application of the system.

Each of the embodiments described herein employ the same basic concepts characteristic of the improved anchoring system, namely releasable attachment of a medical line to a patient. The anchoring systems also all include interacting structure that operates between a retainer of the anchoring system and a fitting which in some applications is releasably attached to the medical line and in other applications is integrally formed with the medical line. The interacting structure between the retainer and the fitting generally inhibits relative movement between the medical line and the anchoring system in at least one degree of freedom.

4

To assist in the description of the components of the anchoring systems and retainers disclosed herein, the following coordinate terms are used. A longitudinal axis is generally parallel to a section of the medical line to be retained by the anchoring system, generally in the plane of a retainer base (discussed below). A lateral axis is generally perpendicular to the longitudinal axis within the plane of the base. A transverse axis extends transverse to both the longitudinal and lateral axes. A number of the figures illustrate this coordinate system to the side of the anchoring system. In addition, as used herein, the "longitudinal direction" refers to a direction substantially parallel to the longitudinal axis. "The lateral direction" refers to a direction substantially parallel to the lateral axis. And, "the transverse direction" refer to a direction substantially parallel to the transverse axis. These coordinates are used to describe structures and movement of the anchoring system of each embodiment. A detailed description of each embodiment, and its associated method of use, now follows.

FIGS. 1 to 3 illustrate an anchoring system 8 constructed in accordance with a preferred embodiment of the present invention. The system 8 includes a retainer 10 which is configured to retain a catheter, either directly or by way of a fitting 11. In the illustrated embodiment, the fitting 11 comprises a catheter box clamp 12 and a soft wing clamp 13 for use with a central line catheter 15.

The retainer 10 includes a base 14. The base 14 of the retainer 10 is attached to an anchor pad 16, which forms a part of the anchoring system 8. The base 14 desirably is secured to the anchor pad 16 by a solvent bond adhesive, such as cyanoacrylate or other bonding material. One such adhesive is available commercially as Part No. 4693 from the Minnesota Mining and Manufacturing Company (3M).

The anchor pad 16 comprises a flexible structural layer for securing the retainer 10 to a patient's skin. The pad desirably comprises a laminate structure with an upper cellulose foam layer (e.g., closed-cell polyethylene foam), and a bottom adhesive layer. The adhesive desirably is a medical-grade adhesive and can be either diaphoretic or nondiaphoretic, depending upon the particular application. Such foam with an adhesive layer is available commercially from New Dimensions in Medicine of Columbus, Ohio. Although not illustrated, it will be understood that the retainer and/or anchor pad can include suture holes in addition to the adhesive layer to further secure the anchor pad to the patient's skin.

An upper surface of the foam layer is roughened by corona-treating the foam with a low electric charge. The roughened or porous upper surface of the anchor pad 16 improves the quality of the adhesive joint formed by the cyanoacrylate (or by another type of adhesive or bonding material) between the base 14 to the anchor pad 16. In the alternative, the flexible anchor pad 16 can comprise a medical-grade adhesive bottom layer, an inner cellulose foam layer and an upper paper or other woven or non-woven cloth layer.

A removable paper or plastic backing 17 desirably covers the bottom adhesive surface before use. The backing 17 preferably resists tearing and is divided into a plurality of pieces to ease attachment of the pad to a patient's skin. Desirably, the backing 17 is split along a center line 18 of the flexible anchor pad 16 in order to expose only half of the adhesive bottom surface at one time. The backing 17 also advantageously extends beyond at least one edge of the anchor pad 16, as illustrated, to facilitate removal of the backing 17 from the adhesive layer.

US 6,447,485 B2

5

In the illustrated embodiment, the anchor pad 16 also desirably includes a pair of opposing concave sections that narrows the center of the anchor pad proximate to the base 14. As a result, the peripheral ends of the anchor pad 16 have more contact area to provide greater stability and adhesion to a patient's skin, while allowing the retainer 10, which is located at center section of the anchor pad 16, to be placed adjacent to an insertion site of the catheter 15.

Although the anchor pad 16 has not been shown in the other drawings that illustrates this embodiment, nor in some of the drawings illustrating the other embodiments, it will be understood that a similar flexible anchor pad is included to secure the retainer to the patient's skin with each embodiment.

The base 14 and the catheter 15 desirably include interacting structure to couple the catheter 15 to the base 14. As will be clear from the disclosure below, the interacting structure mounts the medical line either directly or by way of a fitting (e.g., the box clamp 12 and soft wing clamp 13) to the base 14. In the latter case, a portion of the interacting structure desirable is formed on the fitting and another portion of the interacting structure is formed on the retainer. The term "mount," when used with reference to the relation between the catheter or fitting and the retainer, does not necessarily imply that the catheter 15 or fitting 11 are immobilized or fixed. Rather, this term is meant to describe the condition in which the interacting structure inhibits movement of the catheter 15 relative to the retainer 10 in at least one degree of freedom (e.g., rotational, lateral, longitudinal or transverse). In the illustrated embodiment, as well as in those later described, the interacting structure inhibits movement of the catheter 15 at least in the longitudinal direction.

In the illustrated embodiment, a portion of the interacting structure on the base 14 comprises at least one post 20 which extends upwardly from a relatively rigid platform 21. The base 14 desirably includes a pair of posts 20. The base can also include additional posts to suit a specific application. For example, where the retainer is designed to secure a relatively large fitting, the base can include four posts arranged at the corners of a rectangle, for greater stability. And, three posts can be used to firmly anchor a Y-site fitting.

Each post 20 includes a shank or shaft 25, attached to and extending upwardly from the platform 21. The posts 20 can have a variety of lengths and a variety of distances between them, depending upon the particular application and the particular fitting 11 with which they are to interact to mount the catheter 11. For anchoring catheters and medical tubing, each post 20 desirably has a length of about 4 mm to 20 mm, and more particularly a length of about 6 mm; however, longer or shorter lengths also are possible. The posts 20 are laterally spaced at least wide enough to accommodate the medical line to be anchored, and in the illustrated embodiments, the posts 20 are spaced to accommodate the fitting 11 which secures the medical line. Desirably, the posts 20 are spaced apart by a distance between 5 mm and 40 mm, and more particularly by a distance equal to about 15 mm. The shaft 25 of each post 20 has a diameter sufficient to perform its structural function, as described in more detail below, and depends upon the material chosen for the base 14 and shafts 25. The illustrated posts 20 comprise a polymer plastic material, with a diameter between 0.5 mm and 3 mm and particularly about 1.7 mm.

At least one protrusion extends radially from the shaft. In the illustrated embodiment, the protrusion comprises an enlarged tip or head 26 at the end distal from the platform

6

21. As seen in FIG. 1, at least a portion of the head 26 of each post 20 is larger than the diameter of the shaft 25, desirably having a maximum diameter of 1.1 to 1.5 times the diameter of the shaft 25. In the illustrated embodiment, the head 26 has a generally hemispherical shape with a smooth surface and a maximum diameter at an overhanging lower surface or underside 30. It will be understood, however, that the head 26 can take a variety of other shapes, such as for example, solid or hollow conicals, arrowheads, barbs, spheres, mushroom heads, and other types of radially projecting structures. A relatively blunt end of the head 26 is preferred to avoid snagging on materials such as a health care provider's latex gloves or sheets on the patient's bed.

A cover 22 is flexibly coupled to the base 14 by way of a flexible coupling. In the illustrated embodiment, the coupling comprises a flexible leash 24. The leash 24 can take any number of forms to mechanically connect the cover 22 to the cover 22 while permitting movement of the cover 22 relative to the base 14 so as to enable engagement or disengagement of these parts, as described below. In the illustrated embodiment, the leash 24 comprises a band of flexible material. The leash 24 desirably is integrally molded with the base 14 and the cover 22. The illustrated leash 24 has a longitudinal width of about 0.5 mm to 5 mm, desirably about 1 mm, and a similar depth or transverse dimension. The length of the leash 24 depends in part upon the height of the post 20. Desirably, the leash 24 is longer than the height of the post 20, to allow some leeway in engaging or disengaging the base 14 with the cover 22, as will be understood by one of skill in the art in light of the disclosure herein. While the leash 24 desirably is generally oblong in cross-section, as illustrated, and fixes an orientation of the cover 22 relative to the base 14, it will be understood that the leash can also have a string-like (e.g., rounded) configuration and allow rotation about the lateral axis.

The cover 22 comprises an elongate member which can be formed of the same polymer or plastic material as the base 14, and desirably is integrally molded with the base 14. The cover 22 desirably has a shape that is generally coextensive with the platform 21 of the base 14. The cover 22 can be smaller; however, the cover should have a length in the lateral direction at least large enough to extend over the space between the posts 20 and a width in the longitudinal direction that is wider than the posts 20. The width of the cover 22 desirably is sufficient to stabilize a section of the catheter 15 within the retainer 10. In particular, the width of the cover 22 preferably generally matches the longitudinal length of the fitting 11. The corners of the cover are also desirably rounded to avoid snagging on materials such as the latex gloves worn by the health care provider, bed sheets, etc. In the illustrated embodiment, the cover 22 generally has an elliptical shape for this purpose.

As shown in FIG. 2, the illustrated cover 22 also desirably includes a textured portion 48, such as that formed by longitudinal ridges 50 in the cover surface at an end of cover 22 opposite the leash 24. It will be understood that any well known form of texturing such as, for example, a roughened surface can be used in place of ridges. The textured portion 48 improves the health care provider's grip on the cover 22.

The base 14 and cover 22 are further releasably connected by a latching mechanism. The latching mechanism permits the cover 22 to be engage with the base 14 in a closed position, as illustrated in FIG. 3. The cover 22 also can be disengaged from the base 14 and moved to an open position, as shown in FIG. 1A.

The latching mechanism includes interengaging structures formed on the base 14 and on the cover 22. In the

US 6,447,485 B2

7

illustrated embodiment, the portion of the latching mechanism on the base 14 is formed by at least one of the posts 20 with it enlarged head 26. Desirably, the latching mechanism involves the posts 20 that lie on opposite sides of the catheter 15 when the catheter 15 is properly positioned on the retainer 10.

A cover portion of the latching mechanism includes at least one opening 32 formed in the cover 22, and desirably includes the same number of openings 32 as there are posts 20 on the base 14. The illustrated cover 22 thus includes two openings 32 with corresponding points of the openings 32 being spaced by approximately the same distance as the two posts 20 on the base 14, desirably by between about 5 mm and 40 mm, and particularly about 15 mm. Each opening 32 is arranged in the cover 22 to cooperate with the corresponding post 20. It will be understood that, in other arrangements of the latching mechanism are possible where the posts are on the cover, the openings are formed in the base, as described in more detail below.

Each opening 32 shown in FIGS. 1–3 is defined by a central hole 34 with at least one slot 36 extending to one side, desirably laterally adjacent to and intersecting with the central hole 34 at a narrow waist opening 37. The central hole 34 is sized and shaped to accommodate the largest diameter of the post head 26. The illustrated slot 36 extends in the lateral direction from the central hole 34 with the lateral axis of the slot 36 being substantially collinear with a center line of the cover 22 extending in the lateral direction. It will be understood that the slots 36 on the cover 22 can extend from the central hole 34 in any direction, though both slots 36 desirably extend in the same general direction. In other arrangements, more than one slot can extend from each central hole.

The width of the illustrated slot 36 in the longitudinal direction is smaller than the central hole 34 and is smaller than the largest diameter of the head 26. The slot width desirably ranges from slightly smaller to slightly larger than the diameter of the shaft 25.

The interengagement between the posts 20 and the openings 32 on the cover 22 thus form the latching mechanism that releasably secures the cover 22 to the base 14. When the post shaft 25 is positioned in the slot 36, the cover 22 can not be lifted from the retainer base 14 in the transverse direction, as described in more detail below.

As best seen from the plan view of FIG. 1B, the cover 22 desirably includes a post retention mechanism to inhibit unintentional retraction of a post 20 from the slot 36. In the embodiment of FIGS. 2–3, the retention mechanism includes a lip 38 of cover material that forms a depression 40 (FIG. 3). The depression 40 is sized slightly smaller than the lower surface 30 of the post head 26. The retention mechanism of the illustrated slotted hole 36 further comprises the waist opening 37 (FIG. 1B), which has a slightly smaller diameter than the shaft 25. The longitudinal dimension of the slot 36 widens to slightly larger than the diameter of the shaft 25 between the lip 38 of the cover 22. While not illustrated, the retention mechanism can also be formed by arranging the slots at a slight deviation from parallel to one another to increase the friction between the cover 22 and the posts 20.

The retainer 10 also desirably includes a locator device to locate the cover 22 at a desired distance from the platform 21. In the illustrated embodiment, each post 20 includes an annular ring 28 positioned between the platform 21 and the head 26 for this purpose; however, other types of protuberances (e.g., small bumps or ribs) can also serve this purpose.

8

The annular ring 28 is spaced below the head 26 along the shaft 25 by a distance sufficient to accommodate the thickness of the cover 22 when latched together. The ring 28 desirably is located between about1 mm and 4 mm below the lower surface 30 of the head 26. Like the head 26, the annular ring 28 is larger in diameter than the shaft 25, desirably 1.1 to 2.0 times the diameter of the shaft 25. Most desirably, the ring 28 is slightly larger than the maximum diameter of the head 26.

As mentioned above, the base 22, leash 24 and cover 22 desirably are integrally formed to make a unitary retainer 10. This can be accomplished in any of a variety of ways well known to one of skill in the art. For instance, the entire retainer can be injection molded, in order to reduce fabrication costs. Additionally, features such as the leash 24 are desirably flexible. Suitable plastics which account for these considerations include polypropylene, polyethylene, and the like. Desirably, the illustrated retainer 10 comprises injection molded polyethylene or polypropylene.

The anchoring system 8 can also include the fitting 11 for mounting a medical line (e.g., catheter) to the retainer 10. In the exemplary application illustrated in FIGS. 1–3, the fitting 11 takes the form of the box clamp 12 and the soft wing clamp 13. Mounting of the fitting 11 (or catheter directly) to the retainer 10 is achieved by way of the interacting structures, a portion of which comprises surfaces or structures of the retainer 10 and another portion of which comprises surfaces or structures of the fitting 11 (or catheter, if directly coupled).

The box clamp 12, best seen from the view of FIG. 1, is a relatively rigid, wing-shaped device having a configuration similar to that of conventional box clamps in common usage today in suturing attachment systems. The box clamp 12 includes a central elongate body 60 having a longitudinal groove 62 formed on the underside and a box-shaped upper surface 64. The longitudinal groove 62 is generally U-shaped and is sized to receive the body of a catheter and/or associated fluid line, and more desirably is sized to receive the wing clamp 13. At least one end, and preferably at both ends of the longitudinal groove 62, the body 60 of the box clamp 12 narrows the opening of the longitudinal groove 62. That is, the longitudinal groove 62 at the end extends through an arc which is greater than 180E about an axis of the longitudinal groove 62. The groove also can have a uniform cross section along its length so that the wall of the entire groove extends through an arc greater than 180E. The box clamp 12 desirably is formed of a relatively rigid material, such as polycarbonate.

A pair of lateral wings 66 extend roughly perpendicularly from the body 60 of the box clamp 12, each including a hole 67 therethrough. Each hole 67 is sized and shaped to receive the head 26 and the collar 28 of one of the posts 20.

The soft wing clamp 13 has a configuration similar to that of the box clamp 14, including a central elongate body 70 defining an inner cavity 72 and an outer surface 74. The inner cavity 72 is sized to surround a portion of a catheter. The wing clamp 13 is constructed from a soft, pliable or flexible material such as, for example, latex or the like. The central elongate body 70 includes a longitudinal slit 75 along its underside. The slit 75 can be expanded due to the pliable nature of the wing clamp 13. Thus, the wing clamp 13 is capable of being placed on and surrounding and longitudinally contacting in a frictional manner a portion of the catheter. This frictional contact between the soft wing claim 13 and the catheter generally prevents relative movement between these articles.

US 6,447,485 B2

9

Lateral wings 76 extend roughly perpendicularly from the body 70 of the soft wing clamp 13, each including a through-hole 77. Each hole 77 is sized and shaped to receive the head 26 of one of the posts 20. As the material surrounding the wing hole 67 is pliable in the illustrated embodiment, the hole 67 can be smaller than the corresponding box clamp hole 67 and even smaller than the post head 26, yet still be stretched to receive the post head 26; the through-hole, 77, however, desirably is larger than the post head 26 and generally equal in size to the corresponding hole 67 in the box clamp 12.

The illustrated box clamp 12 and soft wing clamp 13 are commercially available from Arrow® for use with its CVC. Other clamps with suture wing extensions are currently in commercial use with Quinton® Hemodialysis catheters, Cook® PICC's, Baxter® CVCs and B. Braun CVCs. The skilled artisan will find application for the present invention with any of these and many other clamp configurations. As will be clear from a discussion of the embodiment of FIGS. 10–12, the fitting 11 (box clamp/soft wing clamp combination) can also be replaced with an inter-line connector or adaptor, such as those used to connect the catheter to a supply, delivery or drainage line.

FIG. 3 illustrates the interengagement of the components of the anchoring system 8, in accordance with the present embodiment. The box clamp 12 and soft wing claim 13 are shown engaged with the posts 20 and retained between the base 14 and cover 22 of the retainer 10.

As noted, the groove 62 of the box clamp 12 is configured to receive the soft wing clamp 13. In particular, the groove 62 is sized and shaped to receive the outer surface 74 of the elongate body 74 on the soft wing clamp 13. The wings 66 of the box clamp 12 have approximately the same size and shape as the wings 76 of the soft wing clamp 13. When the wings 66, 76 are aligned, the box clamp holes 67 are correspondingly aligned with the soft wing clamp holes 77.

Together, the box clamp 12 and the soft wing clamp 13 form the fitting 11 for mounting in the retainer 10. In the illustrated embodiment, the retainer 10 has been sized for retention of the conventional box clamp 12 and soft wing clamp 13. Accordingly, the holes 67, 77 of the fitting 11 are spaced by approximately the same distance as the posts 20 on the retainer base 14. The box-like upper surface 64 of the box clamp 12 is sized and shaped to fit between the posts 20. Accordingly, a lateral dimension of the elongate body 60 is smaller than the spacing between the posts 20 (i.e., the elongate body 60 is located between and spaced from holes 67 on the box clamp wings 66), while the height of the fitting 11 (formed by the height of the box clamp 12 plus the thickness of the soft wing clamp wings 76) is smaller than the height of the posts. Desirably, the height of the fitting is smaller than the height of the shaft 25 up to the underside 30 of the post head.

The interaction between the posts 20 and the openings 67, 77 of the fitting 11 mount the fitting 11 on the base 14. Accordingly, this interacting structure between the retainer 10 and the fitting 11 inhibits movement of the catheter 15 relative to the retainer 11 in at least the longitudinal and lateral directions. It is understood that the posts need not to extend entire through the holes for this purpose, though.

As noted above, the spacing between the posts 20 on the base 14 also dictates the spacing between the openings 32 in the cover 22. Desirably, the slots 36 each extend from the same side, and desirably laterally, from the central holes 34. Thus, the spacing between the central holes 34 is approximately equal to the spacing between the slots 36, which is

10

in turn approximately equal to the spacing between the posts 20 on the base.

As also noted above, the leash 24 flexibly connects the platform 21 of the base 14 to the cover 22. Desirably, the leash 24 connects lateral ends of the base 14 and cover 22, so as not to interfere with the mounting of the fitting 11 and catheter along the longitudinal axis. The leash 24 is long enough to permit a desired parallel spacing of the base 14 from the cover 22 when the retainer is in a closed position, as illustrated.

In operation, a catheter (or other medical tube or wire) is inserted into the patient, and the fitting 11 is secured to the catheter. The fitting 11 is then retained within the retainer 10, and the retainer 10 is then secured to the patient. These steps are described in more detail below. While this sequence is advantageous, it will be understood that, in other arrangements, the fitting can be secured to a catheter before or after securing the fitting to the retainer, depending upon the form of the fitting. Similarly, and especially for reapplication of a catheter to the retainer 10, the catheter and fitting 11 can be mounted to the retainer 10 after the retainer 10 has already been secured to the patient.

In the illustrated embodiment, desirably after catheter insertion, the wing clamp 13 is stretched open at the slit 75 and fit over the catheter, as in standard practice. The groove 62 of the box clamp 12 is fitted over the elongate body 70 of the soft wing clamp 13, providing a tight "snap fit." Some flexibility in the wing clamp body 70 facilitates this fitting. The relatively more rigid box clamp body 60, however, exerts relatively more inward pressure on the catheter than the relatively more flexible wing clamp 13, such that a better frictional grip holds the catheter within the fitting 11. It will be understood by one of skill in this art, however, that the fitting 11 of the present embodiment can comprise the soft wing clamp 13 alone.

As shown in FIG. 2, the catheter and fitting 11 are then removably mounted to the retainer 10. In the illustrated embodiment, the holes 77, 67 are fitted over the posts 20 of the retainer base 14. Desirably, each slightly smaller wing clamp hole 77 stretches to accommodate the larger diameter head 26 and ring 28 of the post 20. Each box clamp hole 67, on the other hand, desirably is large enough to receive the head 26 and ring 28 without interference. The fitting 11 is thereby fitted onto the base 14 with the posts 20 extending through the fitting holes 67, 77 and the bottom surface of the soft wing clamp 13 resting on the platform 21.

As illustrated in FIGS. 2 and 3, the cover 22 is latched to the base 14, with the fitting 11 interposed between the cover and the base. FIG. 2 shows the cover 22 in a partially closed position, with the flexible leash 24 bent to position the cover 22 over the base 14. The openings 32 of the cover 22 are aligned with the posts 20 of the base 14 and the cover 22 is then moved toward the base such that the head 26 of each post passes through the central hole 34 of one of the openings 32. The size and spacing of the openings 32 and the posts 22 should result in an easy engagement so that only a light downward force is necessary, thereby avoiding pain or discomfort to the patient. In this position, the portion of the cover 22 between the posts 20 can firmly contact a portion of the fitting 11 in some applications.

The rings 28 can also support, at least in part, the cover 22, or at least limit the travel of the cover 22 over the posts 20 so as to properly position the cover 22 on the posts 22 generally beneath the flared heads 26. Once the heads 26 of the posts 20 have cleared the central holes 34 in the cover 22, the cover 22 contacts the ring 28.

US 6,447,485 B2

11

The cover 22 is then slid laterally (to the right, in the views of FIGS. 2 and 3) so that the shaft 25 of each post 20 slides past the narrow waist opening 37 into the corresponding slot 36. The cover material at the waist 37 and/or the shaft 25 slightly compresses as the cover 22 is shifted under force provided by the health care provider. Desirably, the retainer is arranged such that, when the posts 20 are engaged with the slots 36, the cover 22 is centered with respect to the base.

The resulting engagement, shown in FIG. 3, serves to retain the fitting 11 securely in place within the retainer 10. As the waist openings 37 are desirably slightly more narrow than the post shafts 25, the slots 36 provide a friction or snap fit engagement with the posts 20. The slots 36 are longitudinally more narrow than the post heads 26, such that the cover 22 cannot be transversely lifted away from the base 14 in this position. Surfaces of the post 20 abut against surfaces of the cover 22 formed by the lip 38 and walls 46 of the opening 32. The posts 20 of the base 14 and the slotted holes 67, 77 of the cover 22 thereby form a latching structure. The latching structure allows the posts 20 to be easily inserted into the openings 32 in one position but inhibits unintentional retraction of the posts 20 from the openings 32 in a second position.

Additionally, the underside 30 of the post head 26 seats against the cover 22 with the periphery of the head 26 at the edge of the depression 40, as shown. A slight deformation of the head 26 and/or edge of the depression 40 creates increased interference between the cover 22 and the post heads 26 which aids in maintaining the cover 22 in place, relative to the posts 20.

It will be understood that, in other arrangements, the openings can instead be formed in the base, rather than the cover, and the posts formed on the cover. In such a case, each opening would comprise a partial central hole in the base, below which a hollow space is formed for receiving the heads of downward extending posts of the cover. The space would also accommodate the lateral movement of the cover (and consequent lateral movement of the posts) in order to provide engagement between the shaft of each post and a narrow slot extending from the opening. In this manner, the head of one of the posts would be captured within the hollow space below each slot. The post could not be pulled out of the hollow space because the rear side of the post head would contact the portions of the base which define the slot. Such a latching mechanism is disclosed in copending application Ser. No. 08/587,092, entitled "Catheter Anchoring System", filed on Jan. 15, 1996, in the name of Steven F. Bierman and assigned to the assignee hereof, which stands allowed as of the filing date of this application and which is hereby incorporated by reference.

In initial application, the illustrated retainer 10, with the fitting 11 and the catheter retained in it as described above, is secured to the patient by way of the self-adhesive anchor pad 16. The health care provider selects a skin site on which the retainer 10 will be attached. For use with CVCs and PICCs, the retainer 10 desirably is applied to the skin of the patient in the vicinity of the catheter insertion site. The health care provider then cleanses and prepares the anticipated dressing site according to well known methods, usually swabbing with alcohol and allowing the site to dry thoroughly. The health care provider peels away half of the backing layer 17 from the adhesive surface of the anchor pad 16, properly locates the pad 16 on the patient, and presses the exposed adhesive against the patient's skin to secure the anchor pad 16 to the patient. The second half of the backing layer 17 is then removed, and the second half of the anchor

12

pad 17 adhered to the patient's skin. The anchor pad 16 should be mounted on the patient so that catheter overlies the retainer 10 along the retainer's longitudinal axis.

When removal of the catheter becomes necessary, the cover 22 simply is slid horizontally in the opposite direction, desirably with force sufficient to compress cover material at the waists 37, so that the heads 26 of the posts 20 are once again aligned with the central holes 34. The cover 22 can then be easily lifted transversely from the base 14. With the retainer 10 thus unlatched, the fitting 11 can also be removed. The catheter secured by the fitting 11 can then be changed or cleaned and replaced in the retainer 10, without requiring a new retainer.

It should be noted that a deliberate effort is generally required to disengage the post shafts 25 from the slots 36, due to the retention mechanism formed by the narrow neck 37 and/or depression 40. The retainer 10 thus releasably mounts a catheter (or other medical line) and can be reused without requiring reattachment to the patient, while at the same time inhibiting accidental release of the catheter.

Significantly, the removed cover 22 remains leashed to the retainer base 14, which remains attached to the patient. Thus, the health care provider need not take care to place the cover 22 in a safe hygienic place, nor keep track of its whereabouts. The cover 22 can simply hang from the base 14 by the leash 24, where it is easily found and relatched to the base 14 when a new catheter is engaged. Furthermore, each time the cover is relatched, the cover 22 is automatically correctly oriented, such that the health care provider need not take care to ensure that the depression 40 is facing the correct direction, nor to ensure that the slots 36 are on the correct side.

Of course, if the medical treatment is completed and there is no need to reuse the retainer 10, the health care provider can release the cover from the base in the manner described above. The medical article then can be lifted from the base. To remove the anchor pad 16, the health care provider lifts an edge of the pad 16 and gently strokes the undersurface with an alcohol swab while slowly but continuously lifting the edge. The anchor pad 16 can be peeled from the patient's skin in this manner. The health care provider then cleanses and prepares skin using well known hospital or agency protocols.

A retainer 10a in accordance with another embodiment of the invention is illustrated in FIGS. 4A to 5, with FIG. 4A showing a completely open position of the retainer 10a and FIG. 5 showing the partially closed position, similar to FIGS. 1–2 above. Though not illustrated, this retainer 10a also desirably includes a flexible anchor pad, as illustrated in FIG. 1, for adhesive attachment to the body of a patient. Only the cover 22a of this embodiment differs from the above-described embodiment. Accordingly, the above description applies equally to the embodiment of FIGS. 4–5, unless otherwise indicated. In addition, like reference numerals are used to indicate like features of the two embodiments, with the letter "a" added as a suffix to refer to features of the present embodiment.

The cover 22a of this retention mechanism 14a includes a pair of openings 32a. In contrast to the embodiment discussed above, each opening 32a comprises a single slot 80 extending from a longitudinal outer edge 82 of the cover 22a to a terminus 84. The pair of slots 80 can extend from either of the two outer edges 82, but both slots 80 desirably extend from the same edge.

The slots 80 advantageously extend obliquely from the outer edge 82 of the cover 22a to the slot terminus 84, such

US 6,447,485 B2

13

that one side of each slot 80 defines an obtuse angle a (FIG. 4B) with the outer edge 82 from which the slot extends, as shown in FIG. 4B. The termini 84 of the slots 80 desirably are centered on or close to a lateral line that bisects the cover 22a into longitudinal halves. Thus, the length of each slot 80 depends upon the obtuse angle a between the outer edge 82 and the slot 80. The angle α should be small enough and the slot 80 short enough that the structural integrity of the cover 22a is not compromised. While illustrated as parallel, the slots 80 can also be arranged at a slight angle to one another. The width of each slot 80 desirably is slightly larger than the diameter of the post shaft 25a, and smaller than the largest dimension of the post head 26a.

As best seen from the plan view of FIG. 4B, the opening 32a desirably includes a retention mechanism, such as to inhibit retraction of the post 20a from the slot 80. As visible from the views of FIGS. 4B and 5, each slot 80 is partially defined at the terminus 84 by a lip 38a of cover material, forming a depression 40a in the cover 22a, similar to the lip 38 and depression 40 shown in FIGS. 1–3. The depression 40a is sized slightly smaller than the lower surface 30a of the post head 26a.

In the illustrated embodiment, the retention mechanism further comprises one or more protuberances 86 extending at certain positions from interior walls of the slot 80. As illustrated, the protuberances 86 desirably are positioned within the slot 80 just outside the depression 40a. At the protuberances 86, the slot 36a most desirably has a slightly smaller diameter than the shaft 25a, while widening to slightly larger than the shaft 25a at the lip 38a. These protuberances 86 define the waist 37a of the opening 32a for the present embodiment.

FIG. 5 illustrates the retainer 10a in a partially closed position. The flexible leash 24a has been bent to swing the cover 22a counterclockwise (in the view of FIG. 5), bringing the openings 32a in proximity to the posts 20a. The cover 22a continues in a downward arc from the position of FIG. 5 and is shifted slightly out of alignment with the base 14a until the edge openings of the openings 32a at the longitudinal edge 82 are adjacent to the section of the posts 20a between the head 26a and the ring 28a.

While not illustrated in FIGS. 4A to 5, a catheter fitting can first be mounted to the retainer 10a prior to latching. For example, the fitting 11a illustrated in FIGS. 1–3 can be first secured to the retainer. For such a case, the posts 20a serve as a portion of an interacting structure and the holes 67a, 77a of the fitting 11a serve as another portion of the interacting structure. The interacting structure thus mounts the fitting to the retainer to inhibit at least one degree of movement of the fitting relative to the retainer. Alternatively, a portion of the interacting structure can directly mount a catheter, without the intermediate fitting.

The shaft 25a of each post 20a (between the head 26a and the ring 28a) can be easily inserted into the edge opening of the openings 32a at the outer edge 82. The cover 22a is then shifted obliquely such that the shafts 25a slide along the slots 80. The shafts 25a and/or the protuberances 86 are compressed or the protuberances are deflected as the shafts 25a slide past the protuberances 86. After the shafts 25a have passed the protuberances 86, the shafts and/or the protuberances can regain their original shape such that the shafts snap into the position adjacent to the protuberances 86 and engage with the terminus 84 of the slots 80. When the head 26a is seated at the edge of the depression 40a, the surfaces of the cover 22a formed by the lip 38a and the protuberances 86 of the slot 80 abut against the shaft 25a of the post 20a. The cover 22a is thus latched in a closed position.

14

In order to remove the cover 22a from the base 14a, the sliding motion of the cover 22a over at the posts 20a is simply reversed until the post shafts 25a exit the openings 32a at the outer edge 82 of the cover 22a. Note that some deliberate force is generally required to overcome the retention mechanism. Namely, the cover 22a is slightly depressed to disengage the underside of the head 26a from the edge of the depression 40a, and the cover 22a is slid with sufficient force to deflect or compress the protuberances 86. Any fitting secured therein can then be disengaged from the opened retainer 10a.

Where the slots are arranged at a slight angle to one another, the friction fit of the posts within the slots will improve, relative to an exactly parallel arrangement. It will be understood that, in other arrangements, a similar slot can extend perpendicularly from the longitudinal edge. Alternatively, slots of each opening can extend from opposite longitudinal edges of the cover. In the latter arrangement, the cover would be aligned longitudinally between the posts and the cover twisted to a lateral alignment, such that the posts each engage the slots on each side. As will be understood by one of skill in this art, such slots would desirably extend along the circumference of a circle centered between the termini.

In either of the above illustrated embodiments, or in inverted arrangements with the posts on the cover, the posts serve both as an interacting structure (for mounting a medical line or fitting) and as a part of the latching structure (for latching the cover to the base). It will be understood, however, from the description of the following two embodiments, that the posts can serve only as part of the latching structure, or only as part of the interacting structure. It will further be understood by one of ordinary skill in this art that the posts can be absent altogether in other arrangements.

FIGS. 6–9 illustrate a retainer 10b in accordance with another embodiment of the present invention. The retainer 10b is shown in an open position in FIG. 6 and in a fully closed and latched position in FIG. 7. Other components of the anchoring system 8b (e.g., anchor pad, catheter adapter) can be the same as described above with respect to FIGS. 1–3. Accordingly, the above description applies equally to the embodiment of FIGS. 6–9, unless otherwise indicated. In addition, like reference numerals are used to indicate like features among the embodiments, with the letter "b" added as a suffix to refer to features of the present embodiment.

The base 14b includes a pair of posts 20b; however, the base can include more or less posts depending upon the application of the anchoring system. Each post 20b has a relatively smooth, continuous surface up to a tip 90 which need not protrude radially from the post 20b, unlike the head 26, 26a of the previously described embodiments. The tip 90 of the post 20b can be a flat surface or can taper into a hemispherical shape (as shown), a conical shape or other well known shapes. In the illustrated embodiment, the posts 20b each consist only of a simple shaft tapered hemispherically at the tip 90. The posts 20b otherwise desirably have the same diameter, spacing, and height of the posts 20, 20a of the previous embodiments. The posts 20b are illustrated as connected to a platform 21b of the base 14a, although it will be appreciated by those skilled in the art, in light of the above disclosure, that the posts could be connected to the cover 22b.

The flexible hinge 24b of this embodiment comprises a relatively rigid support arm 92 that is integrally joined to the platform 21b at a base end 94. As shown in FIG. 6, the

US 6,447,485 B2

15

support arm 92 extends upwardly from the base end 94 to join with the cover 22b at a thin bridge 96 of cover material. The bridge 96 is formed along a common exterior surface 98 (see FIG. 7) of the cover 22b and the support arm 92. The bridge 96 is defined along the apex of a notch

in the material that forms the cover 22b and support arm 92. The notch 100 can be thought of as the structure formed by a beveled edge sloping away from an interior surface 102 of the cover 22b, conjoined at the bridge 96 with a beveled edge sloping away from an inside surface 104 of the support arm 92.

The hinge 24b flexibly connecting the base 14b to the cover 22b thus comprises the support arm 92, the bridge 96, and the surfaces forming the notch 100. In other arrangements, however, the hinge of an embodiment resembling that of FIGS. 6–9 can comprise a structure similar to a conventional hinge pin-bracket arrangement.

Desirably, the support arm 92, which terminates at an upper end at the bridge 96, has the same height as the posts 20b. It will be understood, however, that the support arm 92 can be higher than the posts 20b in other arrangements.

The thickness of the bridge 96 depends upon the material chosen, and is thick enough to provide the desired strength to connect the support arm 92 to the cover 22b, but thin enough to provide flexibility for opening and closing the retainer 10b. Desirably, the retainer 10b is integrally injection molded of a resilient polymer material, such as polypropylene or polyethylene. For such materials, the bridge 96 has a thickness between about 0.5 mm and 2.5 mm, and desirably about 1.5 mm.

The flexibility of the hinge 24b also depends in part upon the angle formed by surfaces of the notch 100 when the retainer 10b is in the open position shown in FIG. 6. Desirably, the notch 100 defines an angle of at least about 90E, and particularly about 115E. Such an arrangement allows the cover 22b to lie parallel to the platform 21b when the retainer 10b is in the closed position shown in FIG. 7. It will be understood, however, that in other arrangements the closed cover need not lie parallel to the platform 14b (and may take a curvilinear path as described below).

As seen in FIG. 7A, the latching mechanism 110b of the illustrated retainer 10b comprising a fastening pin 112 and a latch having a receptacle 114. The receptacle 114 is configured to receive the fastening pin 112. As shown in FIGS. 6–9, the illustrated fastening pin 112 is integrally connected to the cover 22b and the receptacle 114 is integrally connected to the base 14b. It will be understood, however, that the pin can instead be positioned on the base, while the receptacle is positioned on the cover.

The fastening pin 112 includes a bar 116 extending from the cover 22b (or the base 14b, depending on the position of the element). At the end distal from the connection to the cover 22b, the bar 116 connects to an expanded portion or barb 118 which tapers to a terminus 120 of the pin 112. Like the post head 26, 26a of the previous embodiments, the barb 118 of the fastening pin 112 can be formed in any of a variety of shapes such as an arrowhead (as shown), hemispherical, conical or flexible ribs extending outward from the bar 116. Desirably, the terminus 120 of the fastening pin 112 is relatively blunt and smooth to prevent it from puncturing the gloves of a health care provider or catching on other materials. The barb 118 also desirably includes a sloping or curved surface 121 leading from the terminus 120 to the maximum diameter of the barb 118. At least one shoulder is formed behind the barb 118. In the illustrated embodiment, shoulders are defined on either side of the bar 116.

16

The receptacle 114 of the latch 110b comprises a pair of opposing tangs 122 that extend to a stem 124 connected to the base 14b (or cover 22b, depending on the position of this element of the latch). Each tang 122 extends outwardly to a lug 126 that can be depressed by finger pressure. Desirably, each tang 122 includes an inner beveled surface 127. These beveled surfaces define an aperture 128 therebetween which tapers from a wider dimension at the top to a narrower dimension at the bottom, where it communicates with a slot 130 located between the opposing stems 124. Each tang defines a downward facing shoulder that cooperates with one of the shoulders of the fastening pin barb 118, as described below.

In operation, a fitting, such as the fitting 11 of FIGS. 1–3, can be first engaged with the posts 20b while the retainer 10b is open (see FIG. 6). Accordingly, the posts 20b of the illustrated embodiment form a portion of the interacting structure for inhibiting movement of a medical line fitting relative to the retainer 10b.

The cover 22b can then swing to a closed position as shown in FIG. 7. The relatively thin strip of material forming the bridge 96 allows the hinge 24b to bend when finger pressure is exerted on the cover 22b to lower it. The angle of the notch 100 further allows the cover 22 to be closed without compressing material between the interior surface 102 of the cover and the inner surface of the support arm 92. While the rigid support arm 92 and the thin bridge 96 permit only rotational and not lateral movement of the cover 22b relative to the base 14b, such lateral movement is not necessary for the illustrated latching mechanism.

The fastening pin 112 can be inserted into the receptacle 114 by positioning the pin 112 into the aperture 128 and pressing on the cover 22b. The sloped surfaces 121 of the fastening pin 112 slide over the beveled inner surfaces 127 of the tangs 122. The interaction of these sloped and beveled surfaces tends to distend the tangs 122 slightly, thereby allowing the barb 118 to enter the slot 130. The tangs 122 then snap back into their original position and engage with the barb 118 of the pin 112 with the corresponding shoulders abutting, thereby releasably securing the cover 22b to the base 14b. FIG. 8 illustrates the closed latch 110b.

When the latch 110b is closed, as shown in FIG. 7, the inner surface 102 of the cover 22b sits atop the tip 90 of the posts 20b, since the posts of the illustrated retainer 10b have the same height as the support arm 92. It will be understood that, in arrangements where the posts are attached to the cover, the tips would abut the base when the cover is in the closed position and latched. Where such contact takes place, a fitting secured between the cover 22b and the base 14b could not slip off the posts 20b when the retainer 10b is closed and latched. Furthermore, the posts 20b provide added support for the cover 22b in the closed position to prevent over-extension of the hinge 24b.

To release the cover 22b from the base 14b, the health care provider can press down on the lugs 126, thereby gaining access to the fitting and/or catheter secured therein. When a lug 126 is depressed, the attached stem 124 bends outward slightly, causing the tang 122 to moved outwardly and the slot 128 to expand, as shown in FIG. 9. To provide friction between the health care provider's finger and the top of the lug 124, ridges or other types of roughened surface can be included.

When only a single lug 124 is depressed, however, the attached tang 122 is elevated until it contacts the surface of the element (e.g., the cover) to which the fastening pin 112 is connected. This degree of elevation of a single tang 122

US 6,447,485 B2

17

does not expand the aperture 128 sufficiently to release the barb 118 of the fastening pin 112. In contrast, when both lugs 124 are depressed (not shown), the aperture 128 is sufficiently widened to allow the fastening pin 112 to be readily extracted from the receptacle 114. This design prevents inadvertent release of the fastening pin 112 (e.g., when a lug is bumped), but permits easy opening of the retainer 10*b* when a health care provider seeks to move the catheter or other fitting held within the retainer 10*b*.

FIGS. 10–12 illustrate an anchoring system 8*c* in accordance with another embodiment of the present invention. Like the anchoring systems described above, the illustrated embodiment includes a retainer 10*c*, a fitting or adaptor 11*c* and an anchor pad 16*c*. The anchor pad 16*c* desirably is similar to the anchor pad 16 described with respect to FIG. 1. The retainer 10*c* and the fitting 11*c* differ somewhat from the above-described embodiments, though certain features are the same. Accordingly, the above description applies equally to the embodiment of FIGS. 10–12, unless otherwise indicated. In addition, like reference numerals are used for like features among the embodiments, with the letter "c" added as a suffix to refer to features of the present embodiment.

The illustrated posts 20*c* do not include a locator ring of material below the head 26*c*. The illustrated base 14*c*, including dimensions of the posts 20*c*, is otherwise identical to the base 14 described with respect to FIGS. 1–3. Unlike the openings 32, 32*a* of the previous embodiments, the illustrated opening 32*c* is shown without a lip or depression in the slot 36*c*. It will be understood, however, that the slot can also include a depression over which the post head would seat without departing from the principles of the present embodiment.

Like the previous embodiments, the present embodiment includes interengaging structure to mount the medical line to the retainer 10*c*. In the illustrated embodiment, the interacting structure comprises a channel defined by a mounting structure 140. The channel is sized and shaped to mount a medical line, such as a catheter, either directly or indirectly by way of a fitting. Desirably, the channel defined by the mounting structure 140 is configured to mate with and mount the adaptor 11*c* which, in turn, engages with the medical line. In the illustrated embodiment, the mounting structure 140 is integrally formed with the cover 22*c*, such as by injection molding. It will be understood, however, that the mounting structure 140 can equally well be formed as part of the base 14*c* without materially affecting the function of the retainer 10*c*.

The illustrated mounting structure 140 comprises two substantially rectangular box-like extensions 141 that extends from the cover 22*c* between the two openings 32*c*. The extensions 141 are spaced by a distance sufficient to receive the adaptor 11*c* and include inner faces 142 configured to mate with surfaces of the adaptor 11*c*. The inner faces 142 are more particularly shaped to inhibit at least one degree of freedom, desirably to inhibit longitudinal movement of the adaptor 11*c* when the adaptor is mounted within the channel (see FIG. 11). The illustrated inner faces 142 are convex in shape. The channel defined between the extensions 141, thus, has a minimal width at a central point and widens toward either longitudinal end. In other arrangements, the skilled artisan will recognize that a maximum channel width at a central point will inhibit longitudinal movement of a different fitting. Where, as illustrated, the mounting structure 140 is integral with the cover 22*c*, the extensions 141 desirably are spaced closely enough to provide a snug or slight interference fit for the adaptor 11*c* within the channel.

18

The mounting structure 140 (and the channel defined by it) has a height less than or equal to the height of the post shafts 25*c* of the base 14*c*. In the illustrated embodiment, the structure 140 is equal to the height of the shafts 25*c*, less the thickness of the cover 22*c*. An outer surface 144 (FIG. 10) of each of the illustrated extensions 141 is accordingly configured to mate with the platform 21*c* of the base 14*c*, and is flat in this case.

The cover 22*c* is illustrated with a slight hourglass shape, such as to provide a slight indentation 146 along an edge 148 of the cover 22*c*. Desirably, the indentation 146 comprises transverse ridges 150. This shape facilitates an interengagement between the fitting 11*c* and the mounting structure 140 to inhibit movement of the adaptor 11*c* at least in the longitudinal direction, as described below.

The fitting 11*c* of the present embodiment is an in-line adaptor 11*c*. This adaptor 11*c* comprises an elongate structure defining a fluid pathway, and means for connecting the adaptor to lines at either end. The illustrated adaptor 11*c* comprises a medical connector such as those commonly used to connect a supply line to a catheter.

Desirably, the adaptor 11*c* is of a type similar to that disclosed with respect to FIGS. 11 and 12 of U.S. Pat. No. 5,306,243 ("the '243 patent"), the disclosure of which is hereby incorporated herein by reference. The adaptor 11*c* includes a male connector 160 for connection to a catheter and a female connector 162 for connection to a medical supply or delivery tube (e.g., leading to an IV drip or a suction pump). The illustrated male connector 160 includes a Luer-type fitting 164 with internal threads and a tapered nose extending outwardly, with an internal passageway for fluid communication with a catheter.

The female connector 162 comprises external threads 166 and a membrane 168 for sealing the internal passageway. The membrane 168 can comprise a closed septum, through which a sharp needle is inserted to provide communication between the supply or delivery tube and the internal passageway. The membrane 168 can also comprise a pre-slit membrane, through which a blunt needle provides communication between the supply or delivery tube and the internal passageway. Desirably, however, the female connector 162 of the adaptor 11*c* comprises an internal needle integral with the internal passageway, as disclosed in the '243 patent. The membrane 168 comprises a resilient, self-sealing material which is outwardly biased.

An adaptor body 170, between the male connector 160 and the female connector 162, comprises mounting surfaces 172 which form a portion of the interacting structure of the anchoring system 8*c*. The illustrated mounting surfaces 172 comprise opposed concave surfaces, desirably including ridges (not shown) to facilitate finger gripping during connection of the adaptor 11*c* to catheters or other medical tubes. In this manner, the adaptor body 170 has a minimal width at a central point and widens toward both the female connector 162 and the male connector 160. In particular, the widest points of the illustrated adaptor 11*c* are wider than the most narrow portion of the channel between the extensions 141 of the retainer 10*c*.

The mounting surfaces 172 are joined by a top surface 174 and a bottom surface (not shown). The top and bottom surfaces desirably are flat to mate with the illustrated cover 22*c* and platform 21*c* of the retainer 10*c*, such that these surfaces also form a portion of the interacting structure.

In operation, the adaptor 11*c* can first be connected to medical tubes. For example, a catheter can be fitted with a female connector with external threading, similar to the

US 6,447,485 B2

19

female connector 162 of the adaptor 11c. Such a connector can be quickly and easily threaded into the male connector 160 of the adaptor without any external needles, thus reducing the likelihood of needle sticks to the health care provider. While the female connector is threaded into the Luer-type fitting of the male connector 160, the nose of the male connector 160 forces the membrane 168 backwards over the internal needle, thus providing fluid communication between the catheter and the internal passage of the adaptor 11c. Similarly, a medical delivery/supply line can be fitted with a male connector similar to the male connector 160 of the adaptor 11c. Such a connector would then connect with the female connector 162 of the adaptor 11c, thereby completing fluid communication through the adaptor 11c between the delivery/supply line and the catheter.

The adaptor 11c then mounts within the channel defined by the mounting structure 140 of the retainer 10c. In the illustrated embodiment, wherein the mounting structure 140 is formed integrally with the cover 22c, the inner faces 142 of the extensions 141 desirably snugly receive and grip the mounting surfaces 172 of the adaptor 11c.

It will be understood by one of skill in the art, however, that the fit need not be tight enough to inhibit transverse movement of the fitting or adaptor, particularly where the mounting structure is integral to the base, rather than integral to the cover. Desirably, however, the interaction between the mounting structure inner faces 142 and the adaptor mounting surfaces 172 is such as to inhibit significant longitudinal movement (e.g., more than 1–2 mm) of the adaptor 11c. In the illustrated embodiment, the minimal width of the channel is more narrow than the widest portions on either end of the adaptor body 170.

With the adaptor 11c thus mounted to the retainer 10c, the retainer 10c is then be closed and latched, as described with respect to the previous embodiments. Where, as illustrated, the mounting structure 140 is located on the cover 22c, if the mounting structure 140 is not configured for firm engagement, the health care provider can hold the adaptor 11c within the channel until the retainer 10c is latched. FIG. 11 illustrates the retainer 10c in a partially closed condition.

FIG. 12 illustrates the retainer 10c latched closed with the adaptor 11c retained therein. As will be understood by one of skill in the art, the cover 22c and the base 14c interposed the adaptor 11c between them, preventing transverse movement of the adaptor 11c relative to the retainer 14c. The channel defined by the mounting structure 140 inhibits lateral or longitudinal movement of the adaptor 11c relative to the retainer 14c by the cooperating shape of the channel and the adaptor 11c (which form the interengaging structure in this embodiment). Accordingly, the adaptor 11c is sufficiently restrained to secure a catheter extending therefrom to the patient. If the catheter had not been secured to the adaptor prior to engagement of the adaptor to the retainer, the catheter can be secured after engagement.

The skilled artisan will appreciate that the retainers disclosed herein demonstrate versatility in securing a great variety of medical articles to a patient. Retainers similar to those of FIGS. 1–9 can be utilized to secure any device which is provided with holes spaced apart to engage with the posts. The cover is secured to the base to interpose the device between them. Many medical devices are already provided with suture holes which can be fitted over the retainer posts disclosed herein. Other devices can be modified to include such holes. Other arrangements to secure a medical article to the posts, either between the posts or adjacent to a single post, will be readily apparent to those skilled in the art in light of the disclosure herein.

20

Medical devices can be also be provided with surfaces similar to the mounting surfaces 172 of the illustrated adaptor 11c, for mounting within the integral channel of the retainer 10c illustrated in FIGS. 10–12. Y-joint adapters, for example, can be adapted to mount within the channel of the retainer 10c shown in FIGS. 10–12.

Alternatively, one of skill in the art will readily appreciate that the disclosed retainers can be modified, without departing from the spirit of the invention, to mount and retain existing medical devices. For example, the integral mounting structure illustrated in FIGS. 10–12 can be adapted to clamp existing Y-joint adapters, or to directly mount a catheter or other medical line without the need for an intermediate fitting. In addition, the channel can have a semi-tubular shape and include at least one lateral slot that receives a radially extending member of the adaptor (e.g., an annular collar). Desirably, any such modified mounting structure would inhibit longitudinal and lateral movement of the device or medical line. Transverse movement is inhibited by closure of the retainer with the device or line sandwiched between the base and the cover.

Furthermore, the skilled artisan will recognize the interchangeability of various features from different embodiments. For example, the integral mounting structure 140 of FIGS. 10–12 can be adapted for mounting an adaptor in a retainer having the latch 70 of FIGS. 6–9, thus requiring no posts. Similarly, the various posts, slotted holes, hinges, anchor pads and fittings disclosed herein, as well as other known equivalents for each such feature, can be mixed and matched by one of ordinary skill in this art to construct anchoring systems in accordance with principles of the present invention.

Although not illustrated, each of the illustrated retainers can be adapted for use in an anchoring system which includes a safety loop. An anchor pad larger than the pad 16 illustrated in FIG. 1 can mount both a retainer, in accordance with one of the preferred embodiments, and a separate tube clip. The medical line mounted by the retainer can also be secured less tightly to the tube clip, with an adequate amount of slack in the line between the retainer and the clip. The clip and the resultant slack are desirably located between the retainer and the catheter insertion site, for example.

If movement by the patient causes a sudden pull upon catheter, the catheter slips within the tube clip and the slack length or "safety loop" of the tube is pulled through the clip. Friction between the clip and the sliding tube absorbs some of the force and some of the force causes a slight pull on the adhesive pad, functioning as a warning to the patient to cease the undesirable movement.

Similarly, the retainer itself can be arranged to only slightly inhibit longitudinal movement of a catheter, such as to allow some amount of slip in response to large forces. For example, the fitting of FIGS. 1–3 can comprise a soft wing clamp without the box clamp. In any of these arrangements, a jerk upon the medical line can be largely absorbed by allowing some slip, without either disconnecting the line from the fitting or painfully pulling the anchor pad from the patient's skin.

Using a retainer in accordance with the above disclosure, no painful, invasive or time-consuming sutures or other extensive procedures involving medical sharps (e.g., suture needles) are necessary to anchor an elongate medical article to a patient's skin. In addition, the flexible anchor pad absorbs much of the force incurred in the installation or removal of the retainer and the medical device, thereby providing greater comfort for the patient.

US 6,447,485 B2

21

As common to each of the above-described retainers and anchoring systems, the present invention provides a sterile, tight-gripping, needle-free way to anchor medical articles to a patient. The retainers thus eliminate accidental needle sticks, suture wound site infections and scarring because sutures are not required. In addition, the retainers can be used with any of a wide variety of catheters, tubes, wires, and other medical articles to provide universal securement using one style of retainer. Also, patient comfort is enhanced and application time is decreased with the use of the present retainer.

The releasable engagement of the cover and the base allow the same retainer to be used more than once on the same patient at the application location. That is, a first medical device can be mounted in the retainer. When the function of the first medical device is accomplished, the retainer can be unlatched, the first device removed, and a second medical device can be retained in the same retainer. Furthermore, the leash or hinge connecting the cover to the base ensures that the cover will not be lost or misplaced during a catheter change. The health care provider wastes no time in searching for a cover, nor in orienting the cover prior to latching.

Although this invention has been described in terms of certain preferred embodiments and suggested possible modifications thereto, other embodiments and modifications apparent to those of ordinary skill in the art are also within the scope of this invention. Accordingly, the scope of the invention is intended to be defined only by the claims which follow.

What is claimed is:

1. A method of securing a medical device to the body of a patient, the method comprising the steps of:

providing a retainer including a base that defines a receiving area for receiving a portion of the medical device, a cover permanently coupled to the base, the cover being movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, a latching mechanism operating between the base and the cover to releasably latch the cover to the base with the cover in the closed position, and interacting structure which is adapted to engage the medical device in a non-occlusive manner and to limit longitudinal movement of the medical device through the retainer when the medical device is placed within the receiving area;

positioning the retainer on the body of the patient;

attaching the retainer to the body of the patient with an adhesive layer;

securing a portion of the medical device in the receiving area of the base;

moving the cover over the base so that the cover is located over at least a portion of the interacting structure; and

securing the cover in position upon the base using the latching mechanism.

2. The method of claim 1 wherein the step of providing a retainer further comprises providing a retainer having a channel which lies between the base and the cover of the retainer when the cover is in the closed position.

3. The method of claim 2 wherein the step of providing a retainer further comprises providing a retainer having the interacting structure comprise a post which extends at least partially into the channel of the retainer.

4. The method of claim 3 wherein the step of securing a portion of the medical device comprises inserting the post of the retainer through a hole in the medical device.

22

5. The method of claim 2 wherein the step of providing a retainer further comprises providing a retainer having a channel that has a variable cross section along its length.

6. The method of claim 2 wherein the step of providing a portion of the medical device comprises placing a portion of the medical device within the channel of the retainer.

7. The method of claim 2 wherein the step of providing a retainer further comprises providing a retainer in which the cross section of the channel tapers along its length.

8. The method of claim 1 wherein the step of providing a retainer further comprises providing a retainer having the cover of the retainer coupled to the base of the retainer by a flexible hinge.

9. The method of claim 8 wherein the step of providing a retainer further comprises providing a retainer having the flexible hinge comprise an elongate leash extending between the cover and the base.

10. The method of claim 8 wherein the step of providing a retainer further comprises providing a retainer having the flexible hinge comprise a rigid support arm fixed to the base and a flexible bridge extending between the support arm and the cover.

11. The method of claim 8 wherein the step of providing a retainer further comprises providing a retainer in which the base, cover and hinge are integrally formed.

12. A method of securing a medical line to the body of a patient, the method comprising the steps of:

providing a retainer attachable to a medical line, including a base, a cover permanently coupled to the base, a latching mechanism, a channel, and an adhesive layer attached to the retainer, the cover being movable between an open position and a closed position, the latching mechanism releasably latching the cover to the base in the closed position, the channel being disposed between the base and the cover when the cover is in the closed position, the channel being shaped to retain the medical line between the cover and the base with the cover in the closed position in order to inhibit movement of the medical line in a direction generally parallel to the medical line's longitudinal axis;

positioning the retainer on the body of the patient;

attaching the adhesive layer to the body of the patient;

placing a portion of the medical line into the channel;

moving the cover over the base so that the medical line is retained within the channel; and

securing the cover in position upon the base using the latching mechanism.

13. The method of claim 12 wherein the step of providing a retainer further comprises providing a retainer having a post which extends at least partially into the channel of the retainer.

14. The method of claim 13 wherein the step of securing a portion of the medical device comprises inserting the post of the retainer through a hole in the medical device.

15. the method of claim 12 wherein the step the step of providing a retainer further comprises providing a retainer in which the channel has a variable cross section along its length.

16. The method of claim 12 wherein the step of securing a portion of the medical device comprises placing a portion of the medical device within the channel of the retainer.

17. The method of claim 12 wherein the step of providing a retainer further comprises providing a retainer in which the cross section of the channel tapers along its length.

18. The method of claim 12 wherein the step of providing a retainer further comprises providing a retainer in which the

US 6,447,485 B2

23

cover of the retainer is coupled to the base of the retainer by a flexible hinge.

19. The method of claim 18 wherein the step of providing a retainer further comprises providing a retainer in which the flexible hinge comprises an elongate leash extending between the cover and the base.

20. The method of claim 18 wherein the step of providing a retainer further comprises providing a retainer having a flexible hinge that comprises a rigid support arm fixed to the base and a flexible bridge extending between the support arm and the cover.

21. The method of claim 18 wherein the step of providing a retainer further comprises providing a retainer in which the base, cover and hinge are integrally formed.

22. A method of securing a medical line to the body of a patient, the method comprising the steps of:

24

providing a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and a cover coupled to the base, means for releasably latching the cover to the base, and means for limiting longitudinal movement of the medical line relative to the retainer;

positioning the retainer on the body of the patient;

attaching the adhesive layer to the body of the patient;

placing a portion of the medical line into the receiving area;

moving the cover over the base so that the cover lies at least partially over the movement limiting means; and

securing the cover in position upon the base using the latching mechanism.

* * * * *

# Exhibit I

US006213979B1

## (12) United States Patent
### Bierman

(10) Patent No.: **US 6,213,979 B1**
(45) Date of Patent: \*Apr. 10, 2001

(54) **MEDICAL LINE ANCHORING SYSTEM**

(75) Inventor: **Steven F. Bierman**, Del Mar, CA (US)

(73) Assignee: **Venetec International, Inc.**, San Diego, CA (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/865,231**

(22) Filed: **May 29, 1997**

(51) Int. Cl.⁷ ..................................... A61M 5/00

(52) U.S. Cl. .......................... 604/174; 604/177; 604/180; 128/DIG. 26

(58) Field of Search ..................................... 604/174, 177, 604/180; 128/DIG. 26

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D. 364,922 | 12/1995 | Bierman . |
| D. 375,355 | 11/1996 | Bierman . |
| 2,525,398 | * 10/1950 | Collins . |
| 2,533,961 | * 12/1950 | Rouseau et al. . |
| 2,707,953 | * 5/1955 | Ryan . |
| 3,059,645 | * 10/1962 | Hasbrouck et al. . |
| 3,064,648 | * 11/1962 | Bujan . |
| 3,167,072 | * 1/1965 | Stone et al. . |
| 3,482,569 | * 12/1969 | Raffaelli . |
| 3,529,597 | * 9/1970 | Fuzak . |
| 3,602,227 | * 8/1971 | Andrew . |
| 3,630,195 | * 12/1971 | Santomieri . |
| 3,677,250 | * 7/1972 | Thomas . |
| 3,766,915 | * 10/1973 | Rychlik . |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2341297 | 8/1973 | (DE) . |
| 0247590 A2 | 12/1987 | (EP) . |
| 356683 | 7/1989 | (EP) . |
| 2063679 | 6/1981 | (GB) . |
| 2086466 | 5/1982 | (GB) . |
| WO 80/01458 | 7/1980 | (WO) . |
| WO 85/02774 | 7/1985 | (WO) . |
| WO 91/16939 | 11/1991 | (WO) . |
| WO 92/19309 | 11/1992 | (WO) . |
| WO 96/10435 | 4/1996 | (WO) . |

#### OTHER PUBLICATIONS

Multiple–Lumen Central Venous Catheerization Product with ARROW+gard™ Antiseptic Surface (Arrow International brochure) (4/94).

Photographs (4) of Catheter Clamp and Rigid Fastener sold by Arrow International, Inc.

*Primary Examiner*—John D. Yasuo

(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

An anchoring system includes a simply-structured device which permits a portion of a catheter tube or similar medical article to be easily anchored to a patient, desirably without the use of tape or needles and suturing. A unitary retainer desirably includes a base connected to a cover by way of a flexible hinge. The retainer is attached to a flexible anchor pad including an adhesive bottom surface, which can be attached to the patient's skin. A catheter is secured to a fitting, which in turn mounts to the retainer. Mounting the fitting to the retainer can be accomplished by inserting posts of the retainer through holes of the fitting, or by mounting the fitting within a channel defined by mounting structures integral to the retainer. The cover is then positioned over the base, by bending the flexible hinge, and latched to the base. Several embodiments of the latching mechanism are disclosed. In one form, the latching mechanism includes one or more posts on the base which can be releasably locked into corresponding slotted holes in the cover.

**74 Claims, 6 Drawing Sheets**



# US 6,213,979 B1
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,834,380 | | 9/1974 | Boyd . |
| 3,847,370 | * | 11/1974 | Engelsher . |
| 3,856,020 | * | 12/1974 | Kovac . |
| 3,900,026 | | 8/1975 | Wagner . |
| 3,906,946 | * | 9/1975 | Nordstrom . |
| 3,942,228 | * | 3/1976 | Buckman et al. . |
| 3,973,565 | * | 8/1976 | Steer . |
| 4,020,835 | * | 5/1977 | Norstrom et al. . |
| 4,057,066 | * | 11/1977 | Taylor . |
| 4,059,105 | * | 11/1977 | Cutruzzula et al. . |
| 4,082,094 | * | 4/1978 | Dailey . |
| 4,114,618 | * | 9/1978 | Vargas . |
| 4,129,128 | * | 12/1978 | McFarlane . |
| 4,133,307 | * | 1/1979 | Ness . |
| 4,142,527 | * | 3/1979 | Garcia . |
| 4,161,177 | * | 7/1979 | Fuchs . |
| 4,193,174 | | 3/1980 | Stephens . |
| 4,224,937 | * | 9/1980 | Gordon . |
| 4,248,229 | * | 2/1981 | Miller . |
| 4,250,880 | * | 2/1981 | Gordon . |
| 4,316,461 | * | 2/1982 | Marais et al. . |
| 4,324,236 | * | 4/1982 | Gordon et al. . |
| 4,326,519 | * | 4/1982 | D'Alo et al. . |
| 4,362,156 | * | 12/1982 | Feller, Jr. et al. . |
| 4,392,853 | * | 7/1983 | Muto . |
| 4,397,647 | | 8/1983 | Gordon . |
| 4,449,975 | * | 5/1984 | Perry . |
| 4,453,933 | * | 6/1984 | Speaker . |
| 4,474,559 | * | 10/1984 | Steiger . |
| 4,480,639 | * | 11/1984 | Peterson et al. . |
| 4,516,968 | * | 5/1985 | Marshall et al. . |
| 4,563,177 | * | 1/1986 | Kamen . |
| 4,633,863 | * | 1/1987 | Filips et al. . |
| 4,650,473 | * | 3/1987 | Bartholomew et al. . |
| 4,660,555 | * | 4/1987 | Payton . |
| 4,711,636 | * | 12/1987 | Bierman . |
| 4,742,824 | * | 5/1988 | Payton et al. . |
| 4,808,162 | * | 2/1989 | Oliver . |
| 4,823,789 | * | 4/1989 | Besiang, III . |
| 4,826,486 | * | 5/1989 | Palsrok et al. . |
| 4,852,844 | * | 8/1989 | Villaveces . |
| 4,857,058 | * | 8/1989 | Payton . |
| 4,863,432 | * | 9/1989 | Kvalo . |
| 4,880,412 | * | 11/1989 | Weiss . |
| 4,896,465 | | 1/1990 | Rhodes et al. . |
| 4,897,082 | * | 1/1990 | Erskine . |
| 4,898,587 | * | 2/1990 | Mera . |
| 4,919,654 | * | 4/1990 | Kalt . |
| 4,932,943 | * | 6/1990 | Nowak . |
| 4,955,864 | * | 9/1990 | Hajduch . |
| 4,976,700 | * | 12/1990 | Tollini . |
| 4,997,421 | * | 3/1991 | Palsrok et al. . |
| 5,000,741 | * | 3/1991 | Kalt . |
| 5,037,397 | * | 8/1991 | Kalt et al. . |
| 5,073,170 | * | 12/1991 | Schneider . |
| 5,084,026 | * | 1/1992 | Shapiro . |
| 5,098,399 | * | 3/1992 | Tollini . |
| 5,147,322 | * | 9/1992 | Bowen et al. . |
| 5,156,641 | | 10/1992 | White . |
| 5,192,273 | | 3/1993 | Bierman et al. . |
| 5,192,274 | | 3/1993 | Bierman . |
| 5,195,981 | | 3/1993 | Johnson . |
| 5,266,401 | | 11/1993 | Tollini . |
| 5,267,967 | | 12/1993 | Schneider . |
| 5,282,463 | | 2/1994 | Hammersley . |
| 5,292,312 | | 3/1994 | Delk et al. . |
| 5,304,146 | | 4/1994 | Johnson et al. . |
| 5,306,243 | | 4/1994 | Bonaldo . |
| 5,314,411 | | 5/1994 | Bierman . |
| 5,322,514 | | 6/1994 | Steube et al. . |
| 5,330,438 | | 7/1994 | Gollobin et al. . |
| 5,338,308 | | 8/1994 | Wilk . |
| 5,342,317 | | 8/1994 | Claywell . |
| 5,344,406 | | 9/1994 | Spooner . |
| 5,344,414 | | 9/1994 | Lopez et al. . |
| 5,346,479 | | 9/1994 | Schneider . |
| 5,352,211 | | 10/1994 | Merskelly . |
| 5,354,282 | | 10/1994 | Bierman . |
| 5,354,283 | | 10/1994 | Bark et al. . |
| 5,380,293 | | 1/1995 | Grant . |
| 5,380,294 | | 1/1995 | Persson . |
| 5,380,301 | | 1/1995 | Prichard et al. . |
| 5,382,239 | | 1/1995 | Orr et al. . |
| 5,382,240 | | 1/1995 | Lam . |
| 5,395,344 | | 3/1995 | Beisang, III et al. . |
| 5,403,285 | | 4/1995 | Roberts . |
| 5,413,562 | | 5/1995 | Swauger . |
| 5,443,460 | | 8/1995 | Milusek . |
| 5,449,349 | | 9/1995 | Sallee et al. . |
| 5,456,671 | | 10/1995 | Bierman . |
| 5,468,228 | | 11/1995 | Gebert . |
| 5,468,230 | | 11/1995 | Corn . |
| 5,468,231 | | 11/1995 | Newman et al. . |
| 5,470,321 | | 11/1995 | Forster et al. . |
| 5,484,420 | | 1/1996 | Russo . |
| 5,496,282 | | 3/1996 | Militzer et al. . |
| 5,496,283 | | 3/1996 | Alexander . |
| 5,499,976 | | 3/1996 | Dalton . |
| 5,520,656 | | 5/1996 | Byrd . |
| 5,522,803 | | 6/1996 | Teissen-Simony . |
| 5,527,293 | | 6/1996 | Zamierowski . |
| B1 5,147,322 | * | 1/1996 | Bowen et al. . |

\* cited by examiner













*FIG. 10A*

*FIG. 10B*



US 6,213,979 B1

| 1 | 2 |

# MEDICAL LINE ANCHORING SYSTEM

## Background of the Invention

### 1. Field of the Invention

The present invention relates to anchoring systems for anchoring medical lines to patients.

### 2. Description of Related Art

It is very common in the treatment of patients to utilize intravenous (IV) catheters to introduce fluids and medications directly into the bloodstream. In many cases, and particularly with respect to cardiac therapy, the IV catheter is introduced into a central or larger vein located close to the patient's heart. A typical catheter utilized in connection with a central vein is referred to as a "central venous catheter" ("CVC"). A venous catheter peripherally inserted into the central circulation through a vein in the arm is commonly referred to as a "peripherally inserted central catheter" ("PICC").

In these cases, long-term IV infusion typically requires that the catheter remain in place for many days. In order to secure such an IV catheter in position at the insertion site, the catheter often is provided with an integrated or a movable flexible clamp with winged extensions which are sutured to the patient's skin. In other applications, the flexible clamp is covered by a rigid box clamp, which receives the catheter/clamp combination in a friction-fit manner. The rigid box clamp and the flexible clamp have lateral, aligned holes in them, which allow the combination to be sutured to the patient's skin. Although this technique securely attaches the central venous catheter to the patient, it obviously is painful and uncomfortable for the patient. This prior retention procedure is also time consuming and inconvenient, poses the risk of needle-stick to the health care provider, and risks suture-site infection to the patient. In addition, suture material tends to exhibit poor gripping on medical tubes and can cut through the winged extension of the flexible clamp.

## SUMMARY OF THE INVENTION

A need therefore exists for a simply-structured anchoring system that affixes a medical line in a fixed position, but releases the medical line for dressing changes or other servicing.

On aspect of the present invention thus involves an anchoring system for securing a medical line to the body of a patient. The system comprises a retainer including a base that defines a receiving area for receiving a portion of the medical line. A cover is permanently coupled to the base. The cover is movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open. A latching mechanism operates between the base and the cover to releasably latch the cover to the base with the cover in the closed position. Interacting structure is located generally beneath the cover with the cover in the closed position. The interacting structure is adapted to limit movement of the medical line through to the retainer when the catheter is placed within the receiving area.

Another aspect of the present invention involves an anchoring system for securing a medical line to the body of a patient. The system includes a fitting adapted to engage with the medical line and having at least one opening. A retainer comprises a base including a platform and at least one post extending from the platform and arranged to interact with the hole of the fitting. A cover is movably coupled to the base so as to be moved between an open position and a closed position. A latching mechanism operates between the cover and the base to releasably latch the cover to the base in the closed position.

In accordance with an additional aspect of the present invention, an anchoring system for securing a medical line to the body of a patient is provided. The anchoring system comprises an adaptor having an adaptor body with a longitudinal axis defined between first and second ends. A first connector is located at the first end of the adaptor for connection to a first medical line, and a second connector is located at the second end for connection to a second medical line. A retainer includes a base and a cover permanently coupled to the base. The cover is movable between an open position and a closed position. A latching mechanism releasably latches the cover to the base in the closed position. And a channel is arranged to lie between the base and the cover in the closed position. The channel is shaped to retain the adaptor between the cover and the base with the cover in the closed position to inhibit movement of the adapter in a direction generally parallel to the adapter's longitudinal axis. An adhesive layer is attached to the retainer and is adapted to adhesively secure the retainer to the body of a patient.

A preferred method of anchoring a medical line to a patient involves providing a retainer including a base having a plurality of posts, and a cover attached to the base by a flexible leash. The provided cover also includes a corresponding plurality of openings with each opening comprising a slot. The retainer is coupled to an adhesive layer. The anchoring system is positioned on the body of the patient, and the adhesive layer is attached to the body of the patient. A medical device is arranged between the posts of the base. The cover is positioned over the base to bring the openings of the cover in proximity with the posts of the base. The cover is shifted relative to the base to engage the posts with the slots of the openings.

Further aspects, features, and advantages of the present invention will become apparent from the detailed description of the preferred embodiments that follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above-mentioned and other features of the invention will now be described with reference to the drawings of several preferred embodiments of the present anchoring system. The illustrated embodiments of the anchoring system are intended to illustrate, but not to limit the invention. The drawings contain the following figures:

FIG. 1A is a perspective view of an anchoring system in accordance with a preferred embodiment of the present invention and illustrates a retainer of the anchoring system in an open position together with an exemplary catheter wing clamp fitting (the components of which are illustrated as exploded above the retainer);

FIG. 1B is a bottom plan view of a cover of the retainer of FIG. 1A;

FIG. 2 is a perspective view of the anchoring system of FIG. 1A with the cover of the retainer shown in a partially closed position;

FIG. 3 is a cross-sectional view of the anchoring system of FIG. 2, with the retainer shown in a completely closed position and the catheter wing clamp fitting assembled and anchored therein;

FIG. 4A is a perspective view of a retainer in accordance with another preferred embodiment of the present invention, shown in an open position;

US 6,213,979 B1

3

FIG. 4B is a bottom plan view of a cover portion of the retainer of FIG. 4A;

FIG. 5 is a perspective view of the retainer of FIG. 4A, shown in a partially closed position;

FIG. 6 is a perspective view of a retainer in accordance with another preferred embodiment of the present invention, shown in an open position;

FIG. 7 is a perspective view of the retainer of FIG. 6, shown in a closed position;

FIG. 8 is a cross-sectional view of the retainer of FIG. 7, taken along the line 8—8;

FIG. 9 is a cross-sectional view of the retainer according to FIG. 8, but with a tang shown in a release position;

FIG. 10A is a prospective view of an anchoring system in accordance with an additional preferred embodiment of the present invention and illustrates a retainer of the anchoring system in an open position and together with an exemplary catheter adaptor;

FIG. 10B is a bottom plan view of a cover portion of the retainer of FIG. 10A;

FIG. 11 is a prospective view of the retainer of FIG. 10A, shown in a partially closed position with the cover interacting with the catheter adapter; and

FIG. 12 is a cross-sectional view of the retainer according to FIG. 11, shown in a completely closed position, with the catheter adaptor anchored therein.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present embodiments of the medical line anchoring system are disclosed in the context of an exemplary central line catheter. The principles of the present invention, however, are not limited to PICCs or CVCs. Instead, it will be understood by one of skill in this art, in light of the present disclosure, that the anchoring systems and retainers disclosed herein also can be successfully utilized in connection with other types of medical lines, including tubes for fluid communication and electrical wires. For example, but without limitation, the retainers disclosed herein can retain CVCs, PICCs, Foley catheters, and hemodialysis catheters, surgical drainage tubes, feeding tubes, chest tubes, nasogastric tubes, scopes, as well as with electrical wires or cables connected to external or implanted electronic devices or sensors. One skilled in the art may also find additional applications for the devices and systems disclosed herein. Thus, the illustration and description of the anchoring system 8 in connection with a catheter is mainly exemplary of one possible application of the system.

Each of the embodiments described herein employ the same basic concepts characteristic of the improved anchoring system, namely releasable attachment of a medical line to a patient. The anchoring systems also all include interacting structure that operates between a retainer of the anchoring system and a fitting which in some applications is releasably attached to the medical line and in other applications is integrally formed with the medical line. The interacting structure between the retainer and the fitting generally inhibits relative movement between the medical line and the anchoring system in at least one degree of freedom.

To assist in the description of the components of the anchoring systems and retainers disclosed herein, the following coordinate terms are used. A longitudinal axis is generally parallel to a section of the medical line to be retained by the anchoring system, generally in the plane of

4

a retainer base (discussed below). A lateral axis is generally perpendicular to the longitudinal axis within the plane of the base. A transverse axis extends transverse to both the longitudinal and lateral axes. A number of the figures illustrate this coordinate system to the side of the anchoring system. In addition, as used herein, the "longitudinal direction" refers to a direction substantially parallel to the longitudinal axis. "The lateral direction" refers to a direction substantially parallel to the lateral axis. And, "the transverse direction" refer to a direction substantially parallel to the transverse axis. These coordinates are used to describe structures and movement of the anchoring system of each embodiment. A detailed description of each embodiment, and its associated method of use, now follows.

FIGS. 1 to 3 illustrate an anchoring system 8 constructed in accordance with a preferred embodiment of the present invention. The system 8 includes a retainer 10 which is configured to retain a catheter, either directly or by way of a fitting 11. In the illustrated embodiment, the fitting 11 comprises a catheter box clamp 12 and a soft wing clamp 13 for use with a central line catheter 15.

The retainer 10 includes a base 14. The base 14 of the retainer 10 is attached to an anchor pad 16, which forms a part of the anchoring system 8. The base 14 desirably is secured to the anchor pad 16 by a solvent bond adhesive, such as cyanoacrylate or other bonding material. One such adhesive is available commercially as Part No. 4693 from the Minnesota Mining and Manufacturing Company (3M).

The anchor pad 16 comprises a flexible structural layer for securing the retainer 10 to a patient's skin. The pad desirably comprises a laminate structure with an upper cellulose foam layer (e.g., closed-cell polyethylene foam), and a bottom adhesive layer. The adhesive desirably is a medical-grade adhesive and can be either diaphoretic or nondiaphoretic, depending upon the particular application. Such foam with an adhesive layer is available commercially from New Dimensions in Medicine of Columbus, Ohio. Although not illustrated, it will be understood that the retainer and/or anchor pad can include suture holes in addition to the adhesive layer to further secure the anchor pad to the patient's skin.

An upper surface of the foam layer is roughened by corona-treating the foam with a low electric charge. The roughened or porous upper surface of the anchor pad 16 improves the quality of the adhesive joint formed by the cyanoacrylate (or by another type of adhesive or bonding material) between the base 14 to the anchor pad 16. In the alternative, the flexible anchor pad 16 can comprise a medical-grade adhesive bottom layer, an inner cellulose foam layer and an upper paper or other woven or nonwoven cloth layer.

A removable paper or plastic backing 17 desirably covers the bottom adhesive surface before use. The backing 17 preferably resists tearing and is divided into a plurality of pieces to ease attachment of the pad to a patient's skin. Desirably, the backing 17 is split along a center line 18 of the flexible anchor pad 16 in order to expose only half of the adhesive bottom surface at one time. The backing 17 also advantageously extends beyond at least one edge of the anchor pad 16, as illustrated, to facilitate removal of the backing 17 from the adhesive layer.

In the illustrated embodiment, the anchor pad 16 also desirably includes a pair of opposing concave sections that narrows the center of the anchor pad proximate to the base 14. As a result, the peripheral ends of the anchor pad 16 have more contact area to provide greater stability and adhesion

5                                                                                          6

to a patient's skin, while allowing the retainer 10, which is located at center section of the anchor pad 16, to be placed adjacent to an insertion site of the catheter 15.

Although the anchor pad 16 has not been shown in the other drawings that illustrates this embodiment, nor in some of the drawings illustrating the other embodiments, it will be understood that a similar flexible anchor pad is included to secure the retainer to the patent's skin with each embodiment.

The base 14 and the catheter 15 desirably include interacting structure to couple the catheter 15 to the base 14. As will be clear from the disclosure below, the interacting structure mounts the medical line either directly or by way of a fitting (e.g., the box clamp 12 and soft wing clamp 13) to the base 14. In the latter case, a portion of the interacting structure desirable is formed on the fitting and another portion of the interacting structure is formed on the retainer. The term "mount," when used with reference to the relation between the catheter or fitting and the retainer, does not necessarily imply that the catheter 15 or fitting 11 are immobilized or fixed. Rather, this term is meant to describe the condition in which the interacting structure inhibits movement of the catheter 15 relative to the retainer 10 in at least one degree of freedom (e.g., rotational, lateral, longitudinal or transverse). In the illustrated embodiment, as well as in those later described, the interacting structure inhibits movement of the catheter 15 at least in the longitudinal direction.

In the illustrated embodiment, a portion of the interacting structure on the base 14 comprises at least one post 20 which extends upwardly from a relatively rigid platform 21. The base 14 desirably includes a pair of posts 20. The base can also include additional posts to suit a specific application. For example, where the retainer is designed to secure a relatively large fitting, the base can include four posts arranged at the corners of a rectangle, for greater stability. And, three posts can be used to firmly anchor a Y-site fitting.

Each post 20 includes a shank or shaft 25, attached to and extending upwardly from the platform 21. The posts 20 can have a variety of lengths and a variety of distances between them, depending upon the particular application and the particular fitting 11 with which they are to interact to mount the catheter 11. For anchoring catheters and medical tubing, each post 20 desirably has a length of about 4 mm to 20 mm, and more particularly a length of about 6 mm; however, longer or shorter lengths also are possible. The posts 20 are laterally spaced at least wide enough to accommodate the medical line to be anchored, and in the illustrated embodiments, the posts 20 are spaced to accommodate the fitting 11 which secures the medical line. Desirably, the posts 20 are spaced apart by a distance between 5 mm and 40 mm, and more particularly by a distance equal to about 15 mm. The shaft 25 of each post 20 has a diameter sufficient to perform its structural function, as described in more detail below, and depends upon the material chosen for the base 14 and shafts 25. The illustrated posts 20 comprise a polymer plastic material, with a diameter between 0.5 mm and 3 mm and particularly about 1.7 mm.

At least one protrusion extends radially from the shaft. In the illustrated embodiment, the protrusion comprises an enlarged tip or head 26 at the end distal from the platform 21. As seen in FIG. 1, at least a portion of the head 26 of each post 20 is larger than the diameter of the shaft 25, desirably having a maximum diameter of 1.1 to 1.5 times the diameter of the shaft 25. In the illustrated embodiment, the head 26 has a generally hemispherical shape with a smooth surface

and a maximum diameter at an overhanging lower surface or underside 30. It will be understood, however, that the head 26 can take a variety of other shapes, such as for example, solid or hollow conicals, arrowheads, barbs, spheres, mushroom heads, and other types of radially projecting structures. A relatively blunt end of the head 26 is preferred to avoid snagging on materials such as a health care provider's latex gloves or sheets on the patient's bed.

A cover 22 is flexibly coupled to the base 14 by way of a flexible coupling. In the illustrated embodiment, the coupling comprises a flexible leash 24. The leash 24 can take any number of forms to mechanically connect the base 14 to the cover 22 while permitting movement of the cover 22 relative to the base 14 so as to enable engagement or disengagement of these parts, as described below. In the illustrated embodiment, the leash 24 comprises a band of flexible material. The leash 24 desirably is integrally molded with the base 14 and the cover 22. The illustrated leash 24 has a longitudinal width of about 0.5 mm to 5 mm, desirably about 1 mm, and a similar depth or transverse dimension. The length of the leash 24 depends in part upon the height of the post 20. Desirably, the leash 24 is longer than the height of the post 20, to allow some leeway in engaging or disengaging the base 14 with the cover 22, as will be understood by one of skill in the art in light of the disclosure herein. While the leash 24 desirably is generally oblong in cross-section, as illustrated, and fixes an orientation of the cover 22 relative to the base 14, it will be understood that the leash can also have a string-like (e.g., rounded) configuration and allow rotation about the lateral axis.

The cover 22 comprises an elongate member which can be formed of the same polymer or plastic material as the base 14, and desirably is integrally molded with the base 14. The cover 22 desirably has a shape that is generally coextensive with the platform 21 of the base 14. The cover 22 can be smaller; however, the cover should have a length in the lateral direction at least large enough to extend over the space between the posts 20 and a width in the longitudinal direction that is wider than the posts 20. The width of the cover 22 desirably is sufficient to stabilize a section of the catheter 15 within the retainer 10. In particular, the width of the cover 22 preferably generally matches the longitudinal length of the fitting 11. The corners of the cover are also desirably rounded to avoid snagging on materials such as the latex gloves worn by the health care provider, bed sheets, etc. In the illustrated embodiment, the cover 22 generally has an elliptical shape for this purpose.

As shown in FIG. 2, the illustrated cover 22 also desirably includes a textured portion 48, such as that formed by longitudinal ridges 50 in the cover surface at an end of cover 22 opposite of the leach 24. It will be understood that any well known form of texturing such as, for example, a roughened surface can be used in place of ridges. The textured portion 48 improves the health care provider's grip on the cover 22.

The base 14 and cover 22 are further releasably connected by a latching mechanism. The latching mechanism permits the cover 22 to be engage with the base 14 in a closed position, as illustrated in FIG. 3. The cover 22 also can be disengaged from the base 14 and moved to an open position, as shown in FIG. 1A.

The latching mechanism includes interengaging structures formed on the base 14 and on the cover 22. In the illustrated embodiment, the portion of the latching mechanism on the base 14 is formed by at least one of the posts 20 with it enlarged head 26. Desirably, the latching mechanism

US 6,213,979 B1

7

8

involves the posts 20 that lie on opposite sides of the catheter 15 when the catheter 15 is properly positioned on the retainer 10.

A cover portion of the latching mechanism includes at least one opening 32 formed in the cover 22, and desirably includes the same number of openings 32 as there are posts 20 on the base 14. The illustrated cover 22 thus includes two openings 32 with corresponding points of the openings 32 being spaced by approximately the same distance as the two posts 20 on the base 14, desirably by between about 5 mm and 40 mm, and particularly about 15 mm. Each opening 32 is arranged in the cover 22 to cooperate with the corresponding post 20. It will be understood that, in other arrangements of the latching mechanism are possible where the posts are on the cover, the openings are formed in the base, as described in more detail below.

Each opening 32 shown in FIGS. 1–3 is defined by a central hole 34 with at least one slot 36 extending to one side, desirably laterally adjacent to and intersecting with the central hole 34 at a narrow waist opening 37. The central hole 34 is sized and shaped to accommodate the largest diameter of the post head 26. The illustrated slot 36 extends in the lateral direction from the central hole 34 with the lateral axis of the slot 36 being substantially collinear with a center line of the cover 22 extending in the lateral direction. It will be understood that the slots 36 on the cover 22 can extend from the central hole 34 in any direction, though both slots 36 desirably extend in the same general direction. In other arrangements, more than one slot can extend from each central hole.

The width of the illustrated slot 36 in the longitudinal direction is smaller than the central hole 34 and is smaller than the largest diameter of the head 26. The slot width desirably ranges from slightly smaller to slightly larger than the diameter of the shaft 25.

The interengagement between the posts 20 and the openings 32 on the cover 22 thus form the latching mechanism that releasably secures the cover 22 to the base 14. When the post shaft 25 is positioned in the slot 36, the cover 22 can not be lifted from the retainer base 14 in the transverse direction, as described in more detail below.

As best seen from the plan view of FIG. 1B, the cover 22 desirably includes a post retention mechanism to inhibit unintentional retraction of a post 20 from the slot 36. In the embodiment of FIGS. 2–3, the retention mechanism includes a lip 38 of cover material that forms a depression 40 (FIG. 3). The depression 40 is sized slightly smaller than the lower surface 30 of the post head 26. The retention mechanism of the illustrated slotted hole 36 further comprises the waist opening 37 (FIG. 18), which has a slightly smaller diameter than the shaft 25. The longitudinal dimension of the slot 36 widens to slightly larger than the diameter of the shaft 25 between the lip 38 of the cover 22. While not illustrated, the retention mechanism can also be formed by arranging the slots at a slight deviation from parallel to one another to increase the friction between the cover 22 and the posts 20.

The retainer 10 also desirably includes a locator device to locate the cover 22 at a desired distance from the platform 21. In the illustrated embodiment, each post 20 includes an annular ring 28 positioned between the platform 21 and the head 26 for this purpose; however, other types of protuberances (e.g., small bumps or ribs) can also serve this purpose. The annular ring 28 is spaced below the head 26 along the shaft 25 by a distance sufficient to accommodate the thickness of the cover 22 when latched together. The ring 28

desirably is located between about 1 mm and 4 mm below the lower surface 30 of the head 26. Like the head 26, the annual ring 28 is larger in diameter than the shaft 25, desirably 1.1 to 2.0 times the diameter of the shaft 25. Most desirably, the ring 28 is slightly larger than the maximum diameter of the head 26.

As mentioned above, the base 14, leash 24 and cover 22 desirably are integrally formed to make a unitary retainer 10. This can be accomplished in any of a variety of ways well known to one of skill in the art. For instance, the entire retainer can be injection molded, in order to reduce fabrication costs. Additionally, features such as the leash 24 are desirably flexible. Suitable plastics which account for these considerations include polypropylene, polyethylene, and the like. Desirably, the illustrated retainer 10 comprises injection molded polyethylene or polypropylene.

The anchoring system 8 can also include the fitting 11 for mounting a medical line (e.g., catheter) to the retainer 10. In the exemplary application illustrated in FIGS. 1–3, the fitting 11 takes the form of the box clamp 12 and the soft wing clamp 13. Mounting of the fitting 11 (or catheter directly) to the retainer 10 is achieved by way of the interacting structures, a portion of which comprises surfaces or structures of the retainer 10 and another portion of which comprises surfaces or structures of the fitting 11 (or catheter, if directly coupled).

The box clamp 12, best seen from the view of FIG. 1, is a relatively small, rigid wing-shaped device having a configuration similar to that of conventional box clamps in common usage today in suturing attachment systems. The box clamp 12 includes a central elongate body 60 having a longitudinal groove 62 formed on the underside and a box-shaped upper surface 64. The longitudinal groove 62 is generally U-shaped and is sized to receive the body of a catheter and/or associated fluid line, and more desirably is sized to receive the wing clamp 13. At least one end, and preferably at both ends of the longitudinal groove 62, the body 60 of the box clamp 12 narrows the opening of the longitudinal groove 62. That is, the longitudinal groove 62 at either end extends through an arc which is greater than 180° about an axis of the longitudinal groove 62. The groove also can have a uniform cross section along its length so that the wall of the entire groove extends through an arc greater than 180°. The box clamp 12 desirably is formed of a relatively rigid material, such as polycarbonate.

A pair of lateral wings 66 extend roughly perpendicularly from the body 60 of the box clamp 12, each including a hole 67 therethrough. Each hole 67 is sized and shaped to receive the head 26 and the collar 28 of one of the posts 20.

The soft wing clamp 13 has a configuration similar to that of the box clamp 14, including a central elongate body 70 defining an inner cavity 72 and an outer surface 74. The inner cavity 72 is sized to surround a portion of a catheter. The wing clamp 13 is constructed from a soft, pliable or flexible material such as, for example, latex or the like. The central elongate body 70 includes a longitudinal slit 75 along its underside. The slit 75 can be expanded due to the pliable nature of the wing clamp 13. Thus, the wing clamp 13 is capable of being placed on and surrounding and longitudinally contacting in a frictional manner a portion of the catheter. This frictional contact between the soft wing claim 13 and the catheter generally prevents relative movement between these articles.

Lateral wings 76 extend roughly perpendicularly from the body 70 of the soft wing clamp 13, each including a through-hole 77. Each hole 77 is sized and shaped to receive

9                                                                10

the head 26 of one of the posts 20. As the material surrounding the wing hole 67 is pliable in the illustrated embodiment, the hole 67 can be smaller than the corresponding box clamp hole 67 and even smaller than the post head 26, yet still be stretched to receive the post head 26; the through-hole 77, however, desirably is larger than the post head 26 and generally equal in size to the corresponding hole 67 in the box clamp 12.

The illustrated box clamp 12 and soft wing clamp 13 are commercially available from Arrow® for use with its CVC. Other clamps with suture wing extensions are currently in commercial use with Quinton® Hemodialysis catheters, Cook® PICC's, Baxter® CVCs and B. Braun CVCs. The skilled artisan will find application for the present invention with any of these and many other clamp configurations. As will be clear from a discussion of the embodiment of FIGS. 10–12, the fitting 11 (box clamp/soft wing clamp combination) can also be replaced with an inter-line connector or adaptor, such as those used to connect the catheter to a supply, delivery or drainage line.

FIG. 3 illustrates the interengagement of the components of the anchoring system 8, in accordance with the present embodiment. The box clamp 12 and soft wing claim 13 are shown engaged with the posts 20 and retained between the base 14 and cover 22 of the retainer 10.

As noted, the groove 62 of the box clamp 12 is configured to receive the soft wing clamp 13. In particular, the groove 62 is sized and shaped to receive the outer surface 74 of the elongate body 70 on the soft wing clamp 13. The wings 66 of the box clamp 12 have approximately the same size and shape as the wings 76 of the soft wing clamp 13. When the wings 66, 76 are aligned, the box clamp holes 67 are correspondingly aligned with the soft wing clamp holes 77.

Together, the box clamp 12 and the soft wing clamp 13 form the fitting 11 for mounting in the retainer 10. In the illustrated embodiment, the retainer 10 has been sized for retention of the conventional box clamp 12 and soft wing clamp 13. Accordingly, the holes 67, 77 of the fitting 11 are spaced by approximately the same distance as the posts 20 on the retainer base 14. The box-like upper surface 64 of the box clamp 12 is sized and shaped to fit between the posts 20. Accordingly, a lateral dimension of the elongate body 60 is smaller than the spacing between the posts 20 (i.e., the elongate body 60 is located between and spaced from holes 67 on the box clamp wings 66), while the height of the fitting 11 (formed by the height of the box clamp 12 plus the thickness of the soft wing clamp wings 76) is smaller than the height of the fitting. Desirably, the height of the fitting is smaller than the height of the shaft 25 up to the underside 30 of the post head.

The interaction between the posts 20 and the openings 67, 77 of the fitting 11 mount the fitting 11 on the base 14. Accordingly, this interacting structure between the retainer 10 and the fitting 11 inhibits movement of the catheter 15 relative to the retainer 11 in at least the longitudinal and lateral directions. It is understood that the posts need not to extend entire through the holes for this purpose, though.

As noted above, the spacing between the posts 20 on the base 14 also dictates the spacing between the openings 32 in the cover 22. Desirably, the slots 36 each extend from the same side, and desirably laterally, from the central holes 34. Thus, the spacing between the central holes 34 is approximately equal to the spacing between the slots 36, which is in turn approximately equal to the spacing between the posts 20 on the base.

As also noted above, the leash 24 flexibly connects the platform 21 of the base 14 to the cover 22. Desirably, the

leash 24 connects lateral ends of the base 14 and cover 22, so as not to interfere with the mounting of the fitting 11 and catheter along the longitudinal axis. The leash 24 is long enough to permit a desired parallel spacing of the base 14 from the cover 22 when the retainer is in a closed position, as illustrated.

In operation, a catheter (or other medical tube or wire) is inserted into the patient, and the fitting 11 is secured to the catheter. The fitting 11 is then retained within the retainer 10, and the retainer 10 is then secured to the patient. These steps are described in more detail below. While this sequence is advantageous, it will be understood that, in other arrangements, the fitting can be secured to a catheter before or after securing the fitting to the retainer, depending upon the form of the fitting. Similarly, and especially for reapplication of a catheter to the retainer 10, the catheter and fitting 11 can be mounted to the retainer 10 after the retainer 10 has already been secured to the patient.

In the illustrated embodiment, desirably after catheter insertion, the wing clamp 13 is stretched open at the slit 75 and fit over the catheter, as in standard practice. The groove 62 of the box clamp 12 is fitted over the elongate body 70 of the soft wing clamp 13, providing a tight "snap fit." Some flexibility in the wing clamp body 70 facilitates this fitting. The relatively more rigid box clamp body 60, however, exerts relatively more inward pressure on the catheter than the relatively more flexible wing clamp 13, such that a better frictional grip holds the catheter within the fitting 11. It will be understood by one of skill in this art, however, that the fitting 11 of the present embodiment can comprise the soft wing clamp 13 alone.

As shown in FIG. 2, the catheter and fitting 11 are then removably mounted to the retainer 10. In the illustrated embodiment, the holes 77, 67 are fitted over the posts 20 of the retainer base 14. Desirably, each slightly smaller wing clamp hole 77 stretches to accommodate the larger diameter head 26 and ring 28 of the post 20. Each box clamp hole 67, on the other hand, desirably is large enough to receive the head 26 and ring 28 without interference. The fitting 11 is thereby fitted onto the base 14 with the posts 20 extending through the fitting holes 67, 77 and the bottom surface of the soft wing clamp 13 resting on the platform 21.

As illustrated in FIGS. 2 and 3, the cover 22 is latched to the base 14, with the fitting 11 interposed between the cover and the base. FIG. 2 shows the cover 22 in a partially closed position, with the flexible leash 24 bent to position the cover 22 over the base 14. The openings 32 of the cover 22 are aligned with the posts 20 of the base 14 and the cover 22 is then moved toward the base such that the head 26 of each post passes through the central hole 34 of one of the openings 32. The size and spacing of the openings 32 and the posts 22 should result in an easy engagement so that only a light downward force is necessary, thereby avoiding pain or discomfort to the patient. In this position, the portion of the cover 22 between the holes 34 can firmly contact a portion of the fitting 11 in some applications.

The rings 28 can also support, at least in part, the cover 22, or at least limit the travel of the cover 22 over the posts 20 so as to properly position the cover 22 on the posts 22 generally beneath the flared heads 26. Once the heads 26 of the posts 20 have cleared the central holes 34 in the cover 22, the cover 22 contacts the ring 28.

The cover 22 is then slid laterally (to the right, in the views of FIGS. 2 and 3) so that the shaft 25 of each post 20 slides past the narrow waist opening 37 into the corresponding slot 36. The cover material at the waist 37 and/or the

US 6,213,979 B1

11                                                          12

shaft 25 slightly compresses as the cover 22 is shifted under force provided by the health care provider. Desirably, the retainer is arranged such that, when the posts 20 are engaged with the slots 36, the cover 22 is centered with respect to the base.

The resulting engagement, shown in FIG. 3, serves to retain the fitting 11 securely in place within the retainer 10. As the waist openings 37 are desirably slightly more narrow than the post shafts 25, the slots 36 provide a friction or snap fit engagement with the posts 20. The slots 36 are longitudinally more narrow than the post heads 26, such that the cover 22 cannot be transversely lifted away from the base 14 in this position. Surfaces of the post 20 abut against surfaces of the cover 22 formed by the lip 38 and walls 46 of the opening 32. The posts 20 of the base 14 and the slotted holes 67, 77 of the cover 22 thereby form a latching structure. The latching structure allows the posts 20 to be easily inserted into the openings 32 in one position but inhibits unintentional retraction of the posts 20 from the openings 32 in a second position.

Additionally, the underside 30 of the post head 26 seats against the cover 22 with the periphery of the head 26 at the edge of the depression 40, as shown. A slight deformation of the head 26 and/or edge of the depression 40 creates increased interference between the cover 22 and the post heads 26 which aids in maintaining the cover 22 in place, relative to the posts 20.

It will be understood that, in other arrangements, the openings can instead be formed in the base, rather than the cover, and the posts formed on the cover. In such a case, each opening would comprise a partial central hole in the base, below which a hollow space is formed for receiving the heads of downward extending posts of the cover. The space would also accommodate the lateral movement of the cover (and consequent lateral movement of the posts) in order to provide engagement between the shaft of each post and a narrow slot extending from the opening. In this manner, the head of one of the posts would be captured within the hollow space below each slot. The post could not be pulled out of the hollow space because the rear side of the post head would contact the portions of the base which define the slot. Such a latching mechanism is disclosed in copending application. Ser. No. 08/587,092, entitled "Catheter Anchoring System", filed on Jan. 15, 1996, in the name of Steven F. Bierman and assigned to the assignee hereof, which stands allowed as of the filing date of this application and which is hereby incorporated by reference.

In initial application, the illustrated retainer 10, with the fitting 11 and the catheter retained in it as described above, is secured to the patient by way of the self-adhesive anchor pad 16. The health care provider selects a skin site on which the retainer 10 will be attached. For use with CVCs and PICCs, the retainer 10 desirably is applied to the skin of the patient in the vicinity of the catheter insertion site. The health care provider then cleanses and prepares the anticipated dressing site according to well known methods, usually swabbing with alcohol and allowing the site to dry thoroughly. The health care provider peels away half of the backing layer 17 from the adhesive surface of the anchor pad 16, properly locates the pad 16 on the patient, and presses the exposed adhesive against the patient's skin to secure the anchor pad 16 to the patient. The second half of the backing layer 17 is then removed, and the second half of the anchor pad 17 adhered to the patient's skin. The anchor pad 16 should be mounted on the patient so that catheter overlies the retainer 10 along the retainer's longitudinal axis.

When removal of the catheter becomes necessary, the cover 22 simply is slid horizontally in the opposite direction,

desirably with force sufficient to compress cover material at the waists 37, so that the heads 26 of the posts 20 are once again aligned with the central holes 34. The cover 22 can then be easily lifted transversely from the base 14. With the retainer 10 thus unlatched, the fitting 11 can also be removed. The catheter secured by the fitting 11 can then be changed or cleaned and replaced in the retainer 10, without requiring a new retainer.

It should be noted that a deliberate effort is generally required to disengage the post shafts 25 from the slots 36, due to the retention mechanism formed by the narrow neck 37 and/or depression 40. The retainer 10 thus releasably mounts a catheter (or other medical line) and can be reused without requiring reattachment to the patient, while at the same time inhibiting accidental release of the catheter.

Significantly, the removed cover 22 remains leashed to the retainer base 14, which remains attached to the patient. Thus, the health care provider need not take care to place the cover 22 in a safe hygienic place, nor keep track of its whereabouts. The cover 22 can simply hang from the base 14 by the leash 24, where it is easily found and relatched to the base 14 when a new catheter is engaged. Furthermore, each time the cover is relatched, the cover 22 is automatically correctly oriented, such that the health care provider need not take care to ensure that the depression 40 is facing the correct direction, nor to ensure that the slots 36 are on the correct side.

Of course, if the medical treatment is completed and there is no need to reuse the retainer 10, the health care provider can release the cover from the base in the manner described above. The medical article then can be lifted from the base. To remove the anchor pad 16, the health care provider lifts an edge of the pad 16 and gently strokes the undersurface with an alcohol swab while slowly but continuously lifting the edge. The anchor pad 16 can be peeled from the patient's skin in this manner. The health care provider then cleanses and prepares skin using well known hospital or agency protocols.

A retainer 10a in accordance with another embodiment of the invention is illustrated in FIGS. 4A to 5, with FIG. 4A showing a completely open position of the retainer 10a and FIG. 5 showing the partially closed position, similar to FIGS. 1–2 above. Though not illustrated, this retainer 10a also desirably includes a flexible anchor pad, as illustrated in FIG. 1, for adhesive attachment to the body of a patient. Only the cover 22a of this embodiment differs from the above-described embodiment. Accordingly, the above description applies equally to the embodiment of FIGS. 4–5, unless otherwise indicated. In addition, like reference numerals are used to indicate like features of the two embodiments, with the letter "a" added as a suffix to refer to features of the present embodiment.

The cover 22a of this retention mechanism 14a includes a pair of openings 32a. In contrast to the embodiment discussed above, each opening 32a comprises a single slot 80 extending from a longitudinal outer edge 82 of the cover 22a to a terminus 84. The pair of slots 80 can extend from either of the two outer edges 82, but both slots 80 desirably extend from the same edge.

The slots 80 advantageously extend obliquely from the outer edge 82 of the cover 22a to the slot terminus 84, such that one side of each slot 80 defines an obtuse angle α (FIG. 4B) with the outer edge 82 from which the slot extends, as shown in FIG. 4B. The termini 84 of the slots 80 desirably are centered on or close to a lateral line that bisects the cover 22a into longitudinal halves. Thus, the length of each slot 80

US 6,213,979 B1

13

depends upon the obtuse angle cc between the outer edge 82 and the slot 80. The angle cc should be small enough and the slot 80 short enough that the structural integrity of the cover 22a is not compromised. While illustrated as parallel, the slots 80 can also be arranged at a slight angle to one another. The width of each slot 80 desirably is slightly larger than the diameter of the post shaft 25a, and smaller than the largest dimension of the post head 26a.

As best seen from the plan view of FIG. 4B, the opening 32a desirably includes a retention mechanism, such as to inhibit retraction of the post 20a from the slot 80. As visible from the views of FIGS. 4B and 5, each slot 80 is partially defined at the terminus 84 by a lip 38a of cover material, forming a depression 40a in the cover 22a, similar to the lip 38 and depression 40 shown in FIGS. 1–3. The depression 40a is sized slightly smaller than the lower surface 30a of the post head 26a.

In the illustrated embodiment, the retention mechanism further comprises one or more protuberances 86 extending at certain positions from interior walls of the slot 80. As illustrated, the protuberances 86 desirably are positioned within the slot 80 just outside the depression 40a. At the protuberances 86, the slot 36a most desirably has a slightly smaller diameter than the shaft 25a, while widening to slightly larger than the shaft 25a at the lip 38a. These protuberances 86 define the waist 37a of the opening 32a for the present embodiment.

FIG. 5 illustrates the retainer 10a in a partially closed position. The flexible leash 24a has been bent to swing the cover 22a counterclockwise (in the view of FIG. 5), bringing the openings 32a in proximity to the posts 20a. The cover 22a continues in a downward arc from the position of FIG. 5 and is shifted slightly out of alignment with the base 14a until the edge openings of the openings 32a at the longitudinal edge 82 are adjacent to the underside of the posts 20a between the head 26a and the ring 28a.

While not illustrated in FIGS. 4A to 5, a catheter fitting can first be mounted to the retainer 10a prior to latching. For example, the fitting 11a illustrated in FIGS. 1–3 can be first secured to the retainer. For such a case, the posts 20a serve as a portion of an interacting structure and the holes 67a, 77a of the fitting 11a serve as another portion of the interacting structure. The interacting structure thus mounts the fitting to the retainer to inhibit at least one degree of movement of the fitting relative to the retainer. Alternatively, a portion of the interacting structure can directly mount a catheter, without the intermediate fitting.

The shaft 25a of each post 20a (between the head 26a and the ring 28a) can be easily inserted into the edge opening of the openings 32a at the outer edge 82. The cover 22a is then shifted obliquely such that the shafts 25a slide along the slots 80. The shafts 25a and/or the protuberances 86 are compressed or the protuberances are deflected as the shafts 25a slide past the protuberances 86. After the shafts 25a have passed the protuberances 86, the shafts and/or the protuberances can regain their original shape such that the shafts snap into the position adjacent to the protuberances 86 and engage with the terminus 84 of the slots 80. When the head 26a is seated at the edge of the depression 40a, the surfaces of the cover 22a formed by the lip 38a and the protuberances 86 of the slot 80 abut against the shaft 25a of the post 20a. The cover 22a is thus latched in a closed position.

In order to remove the cover 22a from the base 14a, the sliding motion of the cover 22a over the posts 20a is simply reversed until the post shafts 25a exit the openings 32a at the

14

outer edge 82 of the cover 22a. Note that some deliberate force is generally required to overcome the retention mechanism. Namely, the cover 22a is slightly depressed to disengage the underside of the head 26a from the edge of the depression 40a, and the cover 22a is slid with sufficient force to deflect or compress the protuberances 86. Any fitting secured therein can then be disengaged from the opened retainer 10a.

Where the slots are arranged at a slight angle to one another, the friction fit of the posts within the slots will improve, relative to an exactly parallel arrangement. It will be understood that, in other arrangements, a similar slot can extend perpendicularly from the longitudinal edge. Alternatively, slots of each opening can extend from opposite longitudinal edges of the cover. In the latter arrangement, the cover would be aligned longitudinally between the posts and the cover twisted to a lateral alignment, such that the posts each engage the slots on each side. As will be understood by one of skill in this art, such slots would desirably extend along the circumference of a circle centered between the termini.

In either of the above illustrated embodiments, or in inverted arrangements with the posts on the cover, the posts serve both as an interacting structure (for mounting a medical line or fitting) and as a part of the latching structure (for latching the cover to the base). It will be understood, however, from the description of the following two embodiments, that the posts can serve only as part of the latching structure, or only as part of the interacting structure. It will further be understood by one of ordinary skill in this art that the posts can be absent altogether in other arrangements.

FIGS. 6–9 illustrate a retainer 10b in accordance with another embodiment of the present invention. The retainer 10b is shown in an open position in FIG. 6 and in a fully closed and latched position in FIG. 7. Other components of the anchoring system 8b (e.g., anchor pad, catheter adapter) can be the same as described above with respect to FIGS. 1–3. Accordingly, the above description applies equally to the embodiment of FIGS. 6–9, unless otherwise indicated. In addition, like reference numerals are used to indicate like features among the embodiments, with the letter "b" added as a suffix to refer to features of the present embodiment.

The base 14b includes a pair of posts 20b; however, the base can include more or less posts depending upon the application of the anchoring system. Each post 20b has a relatively smooth, continuous surface up to a tip 90 which need not protrude radially from the post 20b, unlike the head 26, 26a of the previously described embodiments. The tip 90 of the post 20b can be a flat surface or can taper into a hemispherical shape (as shown), a conical shape or other well known shapes. In the illustrated embodiment, the posts 20b each consist only of a simple shaft tapered hemispherically at the tip 90. The posts 20b otherwise desirably have the same diameter, spacing, and height of the posts 20, 20a of the previous embodiments. The posts 20b are illustrated as connected to a platform 21b of the base 14a, although it will be appreciated by those skilled in the art, in light of the above disclosure, that the posts could be connected to the cover 22b.

The flexible hinge 24b of this embodiment comprises a relatively rigid support arm 92 that is integrally joined to the platform 21b at a base end 94. As shown in FIG. 6, the support arm 92 extends upwardly from the base end 94 to join with the cover 22b at a thin bridge 96 of cover material. The bridge 96 is formed along a common exterior surface 98

US 6,213,979 B1

15

(see FIG. 7) of the cover 22*b* and the support arm 92. The bridge 96 is defined along the apex of a notch 100 in the material that forms the cover 22*b* and support arm 92. The notch 100 can be thought of as the structure formed by a bevelled edge sloping away from an interior surface 102 of the cover 22*b*, conjoined at the bridge 96 with a bevelled edge sloping away from an inside surface 104 of the support arm 92. The hinge 24*b* flexibly connecting the base 14*b* to the cover 22*b* thus comprises the support arm 92, the bridge 96, and the surfaces forming the notch 100. In other arrangements, however, the hinge of an embodiment resembling that of FIGS. 6–9 can comprise a structure similar to a conventional hinge pin-bracket arrangement.

Desirably, the support arm 92, which terminates at an upper end at the bridge 96, has the same height as the posts 20*b*. It will be understood, however, that the support arm 92 can be higher than the posts 20*b* in other arrangements.

The thickness of the bridge 96 depends upon the material chosen, and is thick enough to provide the desired strength to connect the support arm 92 to the cover 22*b*, but thin enough to provide flexibility for opening and closing the retainer 10*b*. Desirably, the retainer 10*b* is integrally injection molded of a resilient polymer material, such as polypropylene or polyethylene. For such materials, the bridge 96 has a thickness between about 0.5 mm and 2.5 mm, and desirably about 1.5 mm.

The flexibility of the hinge 24*b* also depends in part upon the angle formed by surfaces of the notch 100 when the retainer 10*b* is in the open position shown in FIG. 6. Desirably, the notch 100 defines an angle of at least about 90°, and particularly about 115°. Such an arrangement allows the cover 22*b* to lie parallel to the platform 21*b* when the retainer 10*b* is in the closed position shown in FIG. 7. It will be understood, however, that in other arrangements the closed cover need not lie parallel to the platform 14*b* (and may take a curvilinear path as described below).

As seen in FIG. 7A, the latching mechanism 110*b* of the illustrated retainer 10*b* comprising a fastening pin 112 and a latch having a receptacle 114. The receptacle 114 is configured to receive the fastening pin 112. As shown in FIGS. 6–9, the illustrated fastening pin 112 is integrally connected to the cover 22*b* and the receptacle 114 is integrally connected to the base 14*b*. It will be understood, however, that the pin can instead be positioned on the base, while the receptacle is positioned on the cover.

The fastening pin 112 includes a bar 116 extending from the cover 22*b* (or the base 14*b*, depending on the position of the element). At the end distal from the connection to the cover 22*b*, the bar 116 connects to an expanded portion or barb 118 which tapers to a terminus 120 of the pin 112. Like the post head 26, 26*a* of the previous embodiments, the barb 118 of the fastening pin 112 can be formed in any of a variety of shapes such as an arrowhead (as shown), hemispherical, conical or flexible ribs extending outward from the bar 116. Desirably, the terminus 120 of the fastening pin 112 is relatively blunt and smooth to prevent it from puncturing the gloves of a health care provider or catching on other materials. The barb 118 also desirably includes a sloping or curved surface 121 leading from the terminus 120 to the maximum diameter of the barb 118. At least one shoulder is formed behind the barb 118. In the illustrated embodiment, shoulders are formed on either side of the bar 116.

The receptacle 114 of the latch 110*b* comprises a pair of opposing tangs 122 that extend to a stem 124 connected to the base 14*b* (or cover 22*b*, depending on the position of this element of the latch). Each tang 122 extends outwardly to a

16

lug 126 that can be depressed by finger pressure. Desirably, each tang 122 includes an inner bevelled surface 127. These bevelled surfaces define an aperture 128 therebetween which tapers from a wider dimension at the top to a narrower dimension at the bottom, where it communicates with a slot 130 located between the opposing stems 124. Each tang defines a downward facing shoulder that cooperates with one of the shoulders of the fastening pin barb 118, as described below.

In operation, a fitting, such as the fitting 11 of FIGS. 1–3, can be first engaged with the posts 20*b* while the retainer 10*b* is open (see FIG. 6). Accordingly, the posts 20*b* of the illustrated embodiment form a portion of the interacting structure for inhibiting movement of a medical line fitting relative to the retainer 10*b*.

The cover 22*b* can then swing to a closed position as shown in FIG. 7. The relatively thin strip of material forming the bridge 96 allows the hinge 24*b* to bend when finger pressure is exerted on the cover 22*b* to lower it. The angle of the notch 100 further allows the cover 22 to be closed without compressing material between the interior surface 102 of the cover and the inner surface of the support arm 92. While the rigid support arm 92 and the thin bridge 96 permit only rotational and not lateral movement of the cover 22*b* relative to the base 14*b*, such lateral movement is not necessary for the illustrated latching mechanism.

The fastening pin 112 can be inserted into the receptacle 114 by positioning the pin 112 into the aperture 128 and pressing on the cover 22*b*. The sloped surfaces 121 of the fastening pin 112 slide over the bevelled inner surfaces 127 of the tangs 122. The interaction of these sloped and bevelled surfaces tends to distend the tangs 122 slightly, thereby allowing the barb 118 to enter the slot 130. The tangs 122 then snap back into their original position and engage with the barb 118 of the pin 112 with the corresponding shoulders abutting, thereby releasably securing the cover 22*b* to the base 14*b*. FIG. 8 illustrates the closed latch 110*b*.

When the latch 110*b* is closed, as shown in FIG. 7, the inner surface 102 of the cover 22*b* sits atop the tip 90 of the posts 20*b*, since the posts of the illustrated retainer 10*b* have the same height as the support arm 92. It will be understood that, in arrangements where the posts are attached to the cover, the tips would abut the base when the cover is in the closed position and latched. Where such contact takes place, a fitting secured between the cover 22*b* and the base 14*b* could not slip off the posts 20*b* when the retainer 10*b* is closed and latched. Furthermore, the posts 20*b* provide added support for the cover 22*b* in the closed position to prevent overextension of the hinge 24*b*.

To release the cover 22*b* from the base 14*b*, the health care provider can press down on the lugs 126, thereby gaining access to the fitting and/or catheter secured therein. When a lug 126 is depressed, the attached stem 124 bends outward slightly, causing the tang 122 to moved outwardly and the slot 128 to expand, as shown in FIG. 9. To provide friction between the health care provider's finger and the top of the lug 124, ridges or other types of roughened surface can be included.

When only a single lug 124 is depressed, however, the attached tang 122 is elevated until it contacts the surface of the element (e.g., the cover) to which the fastening pin 112 is connected. This degree of elevation of a single tang 122 does not expand the aperture 128 sufficiently to release the barb 118 of the fastening pin 112. In contrast, when both lugs 124 are depressed (not shown), the aperture 128 is sufficiently widened to allow the fastening pin 112 to be readily

US 6,213,979 B1

17

extracted from the receptacle 114. This design prevents inadvertent release of the fastening pin 112 (e.g., when a lug is bumped), but permits easy opening of the retainer 10b when a health care provider seeks to move the catheter or other fitting held within the retainer 10b.

FIGS. 10–12 illustrate an anchoring system 8c in accordance with another embodiment of the present invention. Like the anchoring systems described above, the illustrated embodiment includes a retainer 10c, a fitting or adaptor 11c and an anchor pad 16c. The anchor pad 16c desirably is similar to the anchor pad 16 described with respect to FIG. 1. The retainer 10c and the fitting 11c differ somewhat from the above-described embodiments, though certain features are the same. Accordingly, the above description applies equally to the embodiment of FIGS. 10–12, unless otherwise indicated. In addition, like reference numerals are used for like features among the embodiments, with the letter "c" added as a suffix to refer to features of the present embodiment.

The illustrated posts 20c do not include a locator ring of material below the head 26c. The illustrated base 14c, including dimensions of the posts 20c, is otherwise identical to the base 14 described with respect to FIGS. 1–3. Unlike the openings 32, 32a of the previous embodiments, the illustrated opening 32c is shown without a lip or depression in the slot 36c. It will be understood, however, that the slot can also include a depression over which the post head would seat without departing from the principles of the present embodiment.

Like the previous embodiments, the present embodiment includes interengaging structure to mount the medical line to the retainer 10c. In the illustrated embodiment, the interacting structure comprises a channel defined by a mounting structure 140. The channel is sized and shaped to mount a medical line, such as a catheter, either directly or indirectly by way of a fitting. Desirably, the channel defined by the mounting structure 140 is configured to mate with and mount the adaptor 11c which, in turn, engages with the medical line. In the illustrated embodiment, the mounting structure 140 is integrally formed with the cover 22c, such as by injection molding. It will be understood, however, that the mounting structure 140 can equally well be formed as part of the base 14c without materially affecting the function of the retainer 10c.

The illustrated mounting structure 140 comprises two substantially rectangular box-like extensions 141 that extends from the cover 22c between the two openings 32c. The extensions 141 are spaced by a distance sufficient to receive the adaptor 11c and include inner faces 142 configured to mate with surfaces of the adaptor 11c. The inner faces 142 are more particularly shaped to inhibit at least one degree of freedom, desirably to inhibit longitudinal movement of the adaptor 11c when the adaptor is mounted within the channel (see FIG. 11). The illustrated inner faces 142 are convex in shape. The channel defined between the extensions 141, thus, has a minimal width at a central point and widens toward either longitudinal end. In other arrangements, the skilled artisan will recognize that a maximum channel width at a central point will inhibit longitudinal movement of a different fitting. Where, as illustrated, the mounting structure 140 is integral with the cover 22c, the extensions 141 desirably are spaced closely enough to provide a snug or slight interference fit for the adaptor 11c within the channel.

The mounting structure 140 (and the channel defined by it) has a height less than or equal to the height of the post

18

shafts 25c of the base 14c. In the illustrated embodiment, the structure 140 is equal to the height of the shafts 25c, less the thickness of the cover 22c. An outer surface 144 (FIG. 10) of each of the illustrated extensions 141 is accordingly configured to mate with the platform 21c of the base 14c, and is flat in this case.

The cover 22c is illustrated with a slight hourglass shape, such as to provide a slight indentation 146 along an edge 148 of the cover 22c. Desirably, the indentation 146 comprises transverse ridges 150. This shape facilitates an interengagement between the fitting 11c and the mounting structure 140 to inhibit movement of the adaptor 11c at least in the longitudinal direction, as described below.

The fitting 11c of the present embodiment is an in-line adaptor 11c. This adaptor 11c comprises an elongate structure defining a fluid pathway, and means for connecting the adaptor to lines at either end. The illustrated adaptor 11c comprises a medical connector such as those commonly used to connect a supply line to a catheter.

Desirably, the adaptor 11c is of a type similar to that disclosed with respect to FIGS. 11 and 12 of U.S. Pat. No. 5,306,243 ("the '243 patent"), the disclosure of which is hereby incorporated herein by reference. The adaptor 11c includes a male connector 160 for connection to a catheter and a female connector 162 for connection to a medical supply or delivery tube (e.g., leading to an IV drip or a suction pump). The illustrated male connector 160 includes a Luer-type fitting 164 with internal threads and a tapered nose extending outwardly, with an internal passageway for fluid communication with a catheter.

The female connector 162 comprises external threads 166 and a membrane 168 for sealing the internal passageway. The membrane 168 can comprise a closed septum, through which a sharp needle is inserted to provide communication between the supply or delivery tube and the internal passageway. The membrane 168 can also comprise a pre-slit membrane, through which a blunt needle provides communication between the supply or delivery tube and the internal passageway. Desirably, however, the female connector 162 of the adaptor 11c comprises an internal needle integral with the internal passageway, as disclosed in the '243 patent. The membrane 168 comprises a resilient, self-sealing material which is outwardly biased.

An adaptor body 170, between the male connector 160 and the female connector 162, comprises mounting surfaces 172 which form a portion of the interacting structure of the anchoring system 8c. The illustrated mounting surfaces 172 comprise opposed concave surfaces, desirably including ridges (not shown) to facilitate finger gripping during connection of the adaptor 11c to catheters or other medical tubes. In this manner, the adaptor body 170 has a minimal width at a central point and widens toward both the female connector 162 and the male connector 160. In particular, the widest points of the illustrated adaptor 11c are wider than the most narrow portion of the channel between the extensions 141 of the retainer 10c.

The mounting surfaces 172 are joined by a top surface 174 and a bottom surface (not shown). The top and bottom surfaces desirably are flat to mate with the illustrated cover 22c and platform 21c of the retainer 10c, such that these surfaces also form a portion of the interacting structure.

In operation, the adaptor 11c can first be connected to medical tubes. For example, a catheter can be fitted with a female connector with external threading, similar to the female connector 162 of the adaptor 11c. Such a connector can be quickly and easily threaded into the male connector

US 6,213,979 B1

19                                                                20

160 of the adaptor without any external needles, thus reducing the likelihood of needle sticks to the health care provider. While the female connector is threaded into the Luer-type fitting of the male connector 160, the nose of the male connector 160 forces the membrane 168 backwards over the internal needle, thus providing fluid communication between the catheter and the internal passage of the adaptor 11c. Similarly, a medical delivery/supply line can be fitted with a male connector similar to the male connector 160 of the adaptor 11c. Such a connector would then connect with the female connector 162 of the adaptor 11c, thereby completing fluid communication through the adaptor 11c between the delivery/supply line and the catheter.

The adaptor 11c then mounts within the channel defined by the mounting structure 140 of the retainer 10c. In the illustrated embodiment, wherein the mounting structure 140 is formed integrally with the cover 22c, the inner faces 142 of the extensions 141 desirably snugly receive and grip the mounting surfaces 172 of the adaptor 11c.

It will be understood by one of skill in the art, however, that the fit need not be tight enough to inhibit transverse movement of the fitting or adaptor, particularly where the mounting structure is integral to the base, rather than integral to the cover. Desirably, however, the interaction between the mounting structure inner faces 142 and the adaptor mounting surfaces 172 is such as to inhibit significant longitudinal movement (e.g., more than 1–2 mm) of the adaptor 11c. In the illustrated embodiment, the minimal width of the channel is more narrow than the widest portions on either end of the adaptor body 170.

With the adaptor 11c thus mounted to the retainer 10c, the retainer 10c is then be closed and latched, as described with respect to the previous embodiments. Where, as illustrated, the mounting structure 140 is located on the cover 22c, if the mounting structure 140 is not configured for firm engagement, the health care provider can hold the adaptor 11c within the channel until the retainer 10c is latched. FIG. 11 illustrates the retainer 10c in a partially closed condition.

FIG. 12 illustrates the retainer 10c latched closed with the adaptor 11c retained therein. As will be understood by one of skill in the art, the cover 22c and the base 14c interposed the adaptor 11c between them, preventing transverse movement of the adaptor 11c relative to the retainer 14c. The channel defined by the mounting structure 140 inhibits lateral or longitudinal movement of the adaptor 11c relative to the retainer 14c by the cooperating shape of the channel and the adaptor 11c (which form the interengaging structure in this embodiment). Accordingly, the adaptor 11c is sufficiently restrained to secure a catheter extending therefrom to the patient. If the catheter had not been secured to the adaptor prior to engagement of the adaptor to the retainer, the catheter can be secured after engagement.

The skilled artisan will appreciate that the retainers disclosed herein demonstrate versatility in securing a great variety of medical articles to a patient. Retainers similar to those of FIGS. 1–9 can be utilized to secure any device which is provided with holes spaced apart to engage with the posts. The cover is secured to the base to interpose the device between them. Many medical devices are already provided with suture holes which can be fitted over the retainer posts disclosed herein. Other devices can be modified to include such holes. Other arrangements to secure a medical article to the posts, either between the posts or adjacent to a single post, will be readily apparent to those skilled in the art in light of the disclosure herein.

Medical devices can be also be provided with surfaces similar to the mounting surfaces 172 of the illustrated adaptor 11c, for mounting within the integral channel of the retainer 10c illustrated in FIGS. 10–12. Y-joint adapters, for example, can be adapted to mount within the channel of the retainer 10c shown in FIGS. 10–12.

Alternatively, one of skill in the art will readily appreciate that the disclosed retainers can be modified, without departing from the spirit of the invention, to mount and retain existing medical devices. For example, the integral mounting structure illustrated in FIGS. 10–12 can be adapted to clamp existing Y-joint adapters, or to directly mount a catheter or other medical line without the need for an intermediate fitting. In addition, the channel can have a semi-tubular shape and include at least one lateral slot that receives a laterally extending member of the device (e.g., an annular collar). Desirably, any such modified mounting structure would inhibit longitudinal and lateral movement of the device or medical line. Transverse movement is inhibited by closure of the retainer with the device or line sandwiched between the base and the cover.

Furthermore, the skilled artisan will recognize the interchangeability of various features from different embodiments. For example, the integral mounting structure 140 of FIGS. 10–12 can be adapted for mounting an adaptor in a retainer having the latch 70 of FIGS. 6–9, thus requiring no posts. Similarly, the various posts, slotted holes, hinges, anchor pads and fittings disclosed herein, as well as other known equivalents for each such feature, can be mixed and matched by one of ordinary skill in this art to construct anchoring systems in accordance with principles of the present invention.

Although not illustrated, each of the illustrated retainers can be adapted for use in an anchoring system which includes a safety loop. An anchor pad larger than the pad 16 illustrated in FIG. 1 can mount both a retainer, in accordance with one of the preferred embodiments, and a separate tube clip. The medical line mounted by the retainer can also be secured less tightly to the tube clip, with an adequate amount of slack in the line between the retainer and the clip. The clip and the resultant slack are desirably located between the retainer and the catheter insertion site, for example.

If movement by the patient causes a sudden pull upon catheter, the catheter slips within the tube clip and the slack length or "safety loop" of the tube is pulled through the clip. Friction between the clip and the sliding tube absorbs some of the force and some of the force causes a slight pull on the adhesive pad, functioning as a warning to the patient to cease the undesirable movement.

Similarly, the retainer itself can be arranged to only slightly inhibit longitudinal movement of a catheter, such as to allow some amount of slip in response to large forces. For example, the fitting of FIGS. 1–3 can comprise a soft wing clamp without the box clamp. In any of these arrangements, a jerk upon the medical line can be largely absorbed by allowing some slip, without either disconnecting the line from the fitting or painfully pulling the anchor pad from the patient's skin.

Using a retainer in accordance with the above disclosure, no painful, invasive or time-consuming sutures or other extensive procedures involving medical sharps (e.g., suture needles) are necessary to anchor an elongate medical article to a patient's skin. In addition, the flexible anchor pad absorbs much of the force incurred in the installation or removal of the retainer and the medical device, thereby providing greater comfort for the patient.

As common to each of the above-described retainers and anchoring systems, the present invention provides a sterile,

21

22

tight-gripping, needle-free way to anchor medical articles to a patient. The retainers thus eliminate accidental needle sticks, suture wound site infections and scarring because sutures are not required. In addition, the retainers can be used with any of a wide variety of catheters, tubes, wires, and other medical articles to provide universal securement using one style of retainer. Also, patient comfort is enhanced and application time is decreased with the use of the present retainer.

The releasable engagement of the cover and the base allow the same retainer to be used more than once on the same patient at the application location. That is, a first medical device can be mounted in the retainer. When the function of the first medical device is accomplished, the retainer can be unlatched, the first device removed, and a second medical device can be retained in the same retainer. Furthermore, the leash or hinge connecting the cover to the base ensures that the cover will not be lost or misplaced during a catheter change. The health care provider wastes no time in searching for a cover, nor in orienting the cover prior to latching.

Although this invention has been described in terms of certain preferred embodiments and suggested possible modifications thereto, other embodiments and modifications apparent to those of ordinary skill in the art are also within the scope of this invention. Accordingly, the scope of the invention is intended to be defined only by the claims which follow.

What is claimed is:

1. An anchoring system for securing a medical line to the body of a patient, comprising a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line, a cover permanently coupled to the base, the cover being movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, a latching mechanism operating between the base and the cover to releasably latch the cover to the base with the cover in the closed position, and interacting structure which is adapted to engage the medical line in a non-occlusive manner and to limit longitudinal movement of the medical line through the retainer when the medical line is placed within the receiving area, the interacting structure being located at least partially beneath the cover with the cover in the closed position.

2. The anchoring system of claim 1, wherein the cover is coupled to the base by a flexible hinge.

3. The anchoring system of claim 2, wherein the flexible hinge comprises an elongate leash extending between and permanently connected to the cover and the base.

4. The anchoring system of claim 2, wherein the flexible hinge comprises a rigid support arm fixed to the base and a flexible bridge extending between the support arm and the cover.

5. The anchoring system of claim 2, wherein the base, cover and hinge are integrally formed.

6. The anchoring system of claim 1, wherein the latching mechanism comprises barb member and a latch having a receptacle that releasably receives the barb member.

7. The anchoring system of claim 6, wherein said barb member comprises a shank and a barbed end, and said latch includes at least one tang that projects into the receptacle and cooperates with the barbed end to inhibit unintentional retraction of the barb member from the receptacle.

8. The anchoring system as in claim 7, wherein said tang is formed as a flexible stem.

9. The anchoring system of claim 1, wherein the latching mechanism comprises at least one post extending between

the base and the cover and at least one opening sized to receive a portion of the post with the cover in the closed position, and the post includes at least one radial extension.

10. The anchoring system of claim 9, wherein the opening comprises a central hole with a more narrow slot extending from the central hole.

11. The anchoring system of claim 9, wherein the opening comprises a slot extending into either the base or the cover from a respective edge.

12. The anchoring system of claim 9, additionally comprising a keeper mechanism operating between the post and the opening to inhibit movement of the post within the opening with the cover in the closed position.

13. The anchoring system of claim 9, wherein the post extends from the base and the opening is formed in the cover.

14. The anchoring system of claim 13, wherein post comprises a shaft and the radial extension comprises a flared head atop the shaft, the flared head engaging with a cover surface in the closed position.

15. The anchoring system of claim 14 additionally comprising a locator extending radially from the post and spaced along the post from the flared head.

16. The anchoring system of claim 14, wherein the cover comprises a keeper mechanism operating between the post and the cover to inhibit unintentional disengagement of the post from the opening.

17. The anchoring system of claim 16, wherein the keeper mechanism comprises a narrowing waist at a juncture between a slot and a remaining portion of the opening.

18. The anchoring system of claim 16, wherein the keeper mechanism comprises a lip forming a depression within the cover surface and next to a portion of the opening, the depression having a dimension slightly more narrow than the flared head.

19. The anchoring system of claim 1 additionally comprising a fitting adapted to attach to the medical line, the interacting structure being formed between the fitting and the retainer.

20. The anchoring system of claim 19, wherein the fitting comprises a rigid box clamp engaged with a wing clamp, and the interacting structure comprises at least one hole that extends through corresponding wings of the box clamp and the wing clamp.

21. The anchoring system of claim 19, wherein the fitting comprises an adaptor including an adaptor body, a first connector at a distal end for connection to a first medical line, and a second connector at a proximal end for connection to a second medical line.

22. The anchoring system of claim 21, wherein the interacting structure comprises a channel formed on the retainer and arranged to lie between the base and the cover with the cover in the closed position, the channel being configured to receive a portion of this adapter.

23. The anchoring system of claim 22, wherein the channel has a shape that generally corresponds to the shape of the portion of the fitting to be received.

24. The anchoring system of claim 19, wherein the interacting structure comprises at least one post extending at least partially between the cover and the base with the cover in the closed position.

25. The anchoring system of claim 23, wherein the post is integrally formed with the base.

26. The anchoring system of claim 23, wherein the latching mechanism comprises the post and at least one opening sized to receive at least a portion of the post with the cover in the closed position, and the post includes at least one radial extension.

US 6,213,979 B1

23

27. The anchoring system of claim 26, wherein the post comprises a shaft, and the radial extension comprises a flared head atop the shaft.

28. The anchoring system of claim 27 additionally comprising a locator ring defining the maximum radial dimension of the post, and the fitting comprises a hole that is larger than the locator ring.

29. The anchoring system of claim 1, wherein at least a portion of the latching mechanism is integrated with the interacting structure.

30. The anchoring system of claim 29, wherein the latching mechanism comprises a post shank supporting a projection that extends in a direction radial to an axis of the post shank, and the post shank is arranged to form at least a portion of the interacting structure.

31. The anchoring system of claim 1 additionally comprising an adhesive layer coupled to the retainer and adapted to adhesively secure the retainer to the body of a patient.

32. The anchoring system of claim 31 additionally comprising a flexible anchor pad interposed between the retainer and the adhesive layer.

33. The anchoring system of claim 32, wherein the base of the retainer is bonded to the adhesive pad.

34. An anchoring system for securing a medical line to the body of a patient, said anchoring system comprising a fitting adapted to engage with the medical line, the fitting having at least one hole, and a retainer releasably receiving the fitting and comprising a base having a platform and at least one post extending from the platform and arranged to interact with the hole of the fitting, a cover movably coupled to the base so as to be moved between an open position and a closed position, and a latching mechanism operating between the cover and the base to releasably latch the cover to the base in the closed position.

35. The anchoring system of claim 34, wherein the fitting includes a plurality of holes and the base includes a plurality of posts.

36. The anchoring system as in claim 34, wherein the latching mechanism is formed at least between the post and a hole on the retainer.

37. The anchoring system of claim 36, wherein the hole is formed on the cover and includes a central aperture and a slot, the aperture being sized and shaped to receive the protrusion of the post, and the slot extending from the central aperture.

38. The anchoring system of claim 36, wherein the hole is formed on the cover and includes an edge hole at an edge of the cover and a slot extending into the cover from the edge hole.

39. The anchoring system of claim 36, wherein each hole further comprises a retention mechanism to inhibit movement of the post through the hole.

40. The anchoring system of claim 36, wherein the post includes a radial protrusion.

41. An anchoring system for securing a medical line to the body of a patient, comprising:

an adaptor having an adaptor body with a longitudinal axis defined between first and second ends, a first connector at the first end for connection to a first medical line, and a second connector at the second end for connection to a second medical line;

a retainer attachable to the adaptor, including a base, a cover permanently coupled to the base, the cover movable between an open position and a closed position, a latching mechanism for releasably latching the cover to the base in the closed position, and a channel arranged to lie between the base and the cover

24

in the closed position, the channel shaped to retain the adaptor between the cover and the base with the cover in the closed position to inhibit movement of the adapter in a direction generally parallel to the adapter's longitudinal axis; and

an adhesive layer attached to the retainer and adapted to adhesively secure the retainer to the body of a patient.

42. The anchor system of claim 41, wherein the latching mechanism comprises a plurality of posts extending from the base and a corresponding plurality of openings in the cover.

43. The anchor system of claim 41, wherein the channel is defined by opposed inner faces of a pair of extensions positioned between the base and the cover with the cover in the closed position.

44. The anchor system of claim 43, wherein the extensions extend from the cover.

45. The anchor system of claim 43, wherein the inner faces are each convex.

46. The anchoring system of claim 41, wherein the cover is permanently attached to the base.

47. The anchoring system of claim 46, wherein a flexible leash couples the cover to the base.

48. The anchoring system of claim 46, wherein a flexible hinge couples the cover to the base, and the flexible hinge comprises a rigid support area fixed to the base and a flexible bridge that extends between the support arm and the cover.

49. An anchoring system for securing a medical line to the body of a patient, comprising a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and a cover coupled to the base, means for releasably latching the cover to the base, and means for limiting longitudinal movement of the medical line relative to the retainer, said movement limiting means located at least partially beneath the cover when the cover is latched to the base.

50. An anchoring system as in claim 49 additionally comprising an flexible anchor pad having an adhesive layer on one side, and the retainer is attached to the flexible anchor pad on an opposite side.

51. An anchoring system as in claim 49, wherein the retainer comprises a movable clamp.

52. An anchoring system as in claim 49, wherein the retainer comprises an in-line adapter.

53. An anchoring system as in claim 49, wherein the cover is permanently linked to the base.

54. An anchoring system as in claim 53, wherein the cover and the base are integrally formed such that the retainer has a unitary construction.

55. The anchoring system of claim 1, wherein the cover is smaller than the base.

56. The anchoring system of claim 1, wherein the interacting structure is a pair of posts arranged on the base.

57. The anchoring system of claim 56, wherein the cover has length in a lateral direction sufficient to extend between the pair of posts arranged on the base.

58. The anchoring system of claim 1, wherein the cover has width in a longitudinal direction that is wider than a width of a post formed on the base.

59. The anchoring system of claim 58, wherein the cover has a width sufficient to stabilize a section of the medical line located within the retainer.

60. The anchoring system of claim 41, wherein the cover is permanently coupled to the base.

61. The anchoring system of claim 41, additionally comprising an adhesive layer coupled to the retainer and adapted to adhesively secure the retainer to the body of a patient.

US 6,213,979 B1

25

**62**. The anchoring system of claim **61**, additionally comprising a flexible anchor pad interposed between the anchor pad and the adhesive layer.

**63**. The anchoring system of claim **61**, wherein the base of the retainer is bonded to the adhesive pad.

**64**. An anchoring system for securing a fitting, having at least one opening, on a medical line to a body of a patient, the anchoring system comprising a base having a platform and at least one post extending from the platform and arranged to interact with the opening of the fitting, a cover movably coupled to the base so as to be moved between an open position and a closed position, and a latching mechanism operating between the cover and the base to releasably latch the cover to the base in the closed position, the post being disposed at least partially beneath the cover with the cover in the closed position.

**65**. The anchoring system of claim **64**, wherein the cover is coupled to the base by a flexible hinge.

**66**. The anchoring system of claim **65**, wherein the flexible hinge comprises an elongate leash extending between and permanently connected to the cover and the base.

**67**. The anchoring system of claim **65**, wherein the flexible hinge comprises a rigid support arm fixed to the base and a flexible bridge extending between the support arm and the cover.

26

**68**. The anchoring system of claim **65**, wherein the base, cover and hinge are integrally formed.

**69**. The anchoring system of claim **64**, wherein the latching mechanism comprises a barb member and a latch having a receptacle that releasably receives the barb member.

**70**. The anchoring system of claim **69**, wherein said barb member comprises a shank and a barbed end, and said latch includes at least one tang that projects into the receptacle and cooperates with the barbed end to inhibit unintentional retraction of the barb member from the receptacle.

**71**. The anchoring system as in claim **70**, wherein said tang is formed as a flexible stem.

**72**. The anchoring system of claim **64** additionally comprising an adhesive layer coupled to the base and adapted to adhesively secure the base to the body of a patient.

**73**. The anchoring system of claim **72** additionally comprising a flexible anchor pad interposed between the base and the adhesive layer.

**74**. The anchoring system of claim **73**, wherein the base is bonded to the adhesive pad.

\*  \*  \*  \*  \*

# Exhibit J

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1446617 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

**Medicis** Pharmaceutical Corp. v. **Upsher**-Smith Laboratories, Inc.
D.Ariz.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Arizona.
**MEDICIS** PHARMACEUTICAL
CORPORATION, Plaintiff,
v.
**UPSHER**-SMITH LABORATORIES, INC.;
Prasco, LLC (d/b/a Prasco Laboratories), Group,
Inc., Defendants.
**No. CV-05-3458-PHX-SMM.**

Feb. 5, 2007.

**Background:** Patent holder brought action against competitor alleging infringement of patent on formula for treatment of skin conditions including rosacea and acne. Patent holder brought motion for stay pending reexamination.

**Holdings:** The District Court, McNamee, J., held that:

(1) stay was warranted;

(2) unsealing order that denied patent holder's motion for preliminary injunction, and requiring patent holder to provide it to Patent and Trademark Office (PTO) as condition of entering stay pending reexamination, was not warranted;

(3) patent holder did not have to be precluded from asserting infringement of patent during stay; and

(4) court's jurisdiction over issued protective order remained in effect during stay pending patent reexamination.

Motion granted.

**[1] Patents 291 ⊷314(1)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k314 Hearing
        291k314(1) k. In General. Most Cited Cases
When determining whether to stay a case pending patent reexamination, a court must consider the following factors: (1) whether a stay will simplify the issues in question and trial of the case; (2) whether discovery is complete and whether a trial date has been set; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party.

**[2] Patents 291 ⊷314(1)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k314 Hearing
        291k314(1) k. In General. Most Cited Cases
Stay of patent infringement lawsuit pending reexamination of patent was warranted, which was sought by patent holder, after court denied patent holder's motion for preliminary injunction, based on all of prior art references cited by competitor at hearing, since any review of prior art that court subsequently might conduct would be enhanced by PTO's expert opinion, denying stay could have resulted in substantial expense and wasted resources, reexamination was not sought on eve of trial, after protracted discovery, or at critical juncture in the case, and competitor did not make any showing of dilatory motive or tactics by patent holder in requesting reexamination.

**[3] Patents 291 ⊷314(1)**

291 Patents
  291XII Infringement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 2

--- F.Supp.2d ----, 2007 WL 1446617 (D.Ariz.)
(Cite as: --- F.Supp.2d ----)

291XII(C) Suits in Equity
   291k314 Hearing
      291k314(1) k. In General. Most Cited Cases
Unsealing order that denied patent holder's motion for preliminary injunction, and requiring patent holder to provide it to Patent and Trademark Office (PTO) as condition of entering stay pending reexamination, was not warranted, since to have done so would have required court to improperly involve itself in necessarily ex parte process of PTO's reexamination.

**[4] Patents 291 ☞314(1)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
            291k314(1) k. In General. Most Cited Cases
Patent owner was not required to refrain from suing alleged infringers pending reexamination.

**[5] Patents 291 ☞314(1)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
            291k314(1) k. In General. Most Cited Cases
Patent holder did not have to be precluded from asserting infringement of patent during stay of patent infringement lawsuit, as condition to entry of stay pending reexamination, since condition was not necessary to avoid undue prejudice to competitor; although reexamination would postpone activity in infringement lawsuit for period of time, reexamination likely would clarify and potentially narrow the issues, resulting in more efficient resolution of lawsuit.

**[6] Patents 291 ☞314(1)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing

      291k314(1) k. In General. Most Cited Cases
Court's jurisdiction over protective order issued in patent infringement lawsuit remained in effect during stay pending reexamination.

**Patents 291 ☞328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases
6,905,675. Cited.

Brian J. Foster, Snell & Wilmer LLP, Phoenix, AZ, John P. Bovich, Morgan W. Tovey, Reed Smith LLP, San Francisco, CA, Maryellen Feehery, William J. McNichol, Jr, Reed Smith LLP, Philadelphia, PA, for Plaintiff.
Jake M. Holdreith, Ronald J. Schutz, Trevor J. Foster, Robins Kaplan Miller & Ciresi LLP, Minneapolis, MN, Richard A. Halloran, Lewis & Roca LLP, C. Mark Kittredge, Christopher Stuart Coleman, Perkins Coie Brown & Bain PA, Phoenix, AZ, Alice L. Riechers, Deanne M. Mazzochi, Paul J. Molino, William A. Rakoczy, Rakoczy Molino Mazzochi Siwik LLP, Chicago, IL, for Defendants.

**ORDER**
McNAMEE, District Judge.
*1 Pending before the Court is the Application of defense counsel Misti Okerlund to Withdraw as Counsel of Record for Defendant Upsher-Smith Laboratories, Inc. (Dkt.119.) For good cause shown,

**IT IS HEREBY ORDERED GRANTING** the Application of defense counsel Misti Okerlund to Withdraw as Counsel of Record for Defendant Upsher-Smith Laboratories, Inc. (Dkt.119.)

**IT IS FURTHER ORDERED** that Misti Okerlund is hereby withdrawn as counsel of record for Defendant Upsher-Smith Laboratories.

**ORDER**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ---- Page 3

--- F.Supp.2d ----, 2007 WL 1446617 (D.Ariz.)
(Cite as: --- F.Supp.2d ----)

Pending before the Court is Plaintiff Medicis Pharmaceutical Corporation's ("Medicis") Motion to Stay Proceedings (the "Motion to Stay"). (Dkt.114.) Defendant Upsher-Smith Laboratories, Inc. ("Upsher") has filed an Opposition to Medicis's Motion to Stay (dkt.115), in which Prasco, LLC (" Prasco" and, collectively with Upsher, "Defendants" ) has joined (dkt.116). Medicis has replied to Defendants' Opposition. (Dkt.117.) After considering the arguments raised in the parties' briefs, the Court issues the following Order.

## BACKGROUND

On June 14, 2005, Medicis was awarded U.S. Patent No. 6,905,675 (the "675 Patent") for a product called Plexion Cleanser ("Plexion"). Medicis contends Claim 1 of the 675 Patent claims an innovative formula of sulfur and sodium sulfacetamide in a dermatological composition for the treatment of skin conditions including rosacea and acne. Medicis further claims that Prasco and Upsher are selling competing products, Prascion and Clenia, respectively, that infringe Claim 1 of the 675 Patent.

On October 27, 2005, Medicis filed a Complaint against Defendants. (Dkt.1.) One week later, Medicis filed a Motion for Preliminary Injunction (Dkt.10), requesting that Defendants be preliminarily enjoined from "making, using, offering for sale, and/or selling infringing products, including but not limited to Clenia and Prascion, and from otherwise infringing, contributing to the infringement of, or actively inducing infringement of, the 675 Patent." (Dkt. 1 at 5.)

On April 28, 2006, after a two-day hearing held on March 8 and 9, 2006, the Court denied Medicis's Motion for a Preliminary Injunction on a number of grounds. (Dkt.113.) Among other reasons, the Court found that Defendants presented evidence that prior art references anticipated and/or made obvious the 675 Patent because "the term cleanser as used in Claim 1 of the 675 Patent does not require that a composition be rinsed off." (Id. at 4, 6, 9.)

On June 16, 2006, Medicis filed a Request for Reexamination of the 675 Patent with the Patent and Trademark Office (the "PTO"). (Dkt. 114, Foster Decl. at ¶ 4.) Any person may request reexamination by the PTO of any claim of a patent on the basis of "any prior art." 35 U.S.C. § 302. If the Director finds that the prior art raises a " substantial new question of patentability affecting any claim of a patent," the PTO will reexamine the patent in light of the prior art. Id. §§ 303-304. If reexamination is ordered, "[t]he patent owner will be given a reasonable period ... within which he may file a statement on such question, including any amendment to his patent and new claim or claims he may wish to propose, for consideration in the reexamination." Id. § 304. When the entire reexamination process is complete (and appeal time expired or appeals exhausted), the PTO will issue a certificate "canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent any proposed amended or new claim determined to be patentable." Id. § 307(a).

*2 In the present case, Medicis's reexamination request is "based on all of the prior art references cited by Defendants [during the preliminary injunction hearing] and not previously considered during the original prosecution." (Dkt. 114 at 5.) In its reexamination request, Medicis disclosed the instant case and "noted that patent infringement and validity are issues in this litigation." (Id.) On August 1, 2006, the PTO granted Medicis's request by ordering a reexamination of the 675 Patent. (Id.)

## DISCUSSION

Medicis requests the Court issue an order staying the instant case pending the final outcome of the PTO's reexamination of the 675 Patent because the reexamination request "could result in amendment or even cancellation of the asserted claims, thereby significantly altering the issues" in the present case. See Dkt. 114 at 2, 4-9. Defendants do not fundamentally disagree with Medicis's contention that a stay of the instant litigation is warranted, but instead argue that three conditions should be imposed if a stay is granted: (i) the Order denying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 4

--- F.Supp.2d ----, 2007 WL 1446617 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

Medicis's Motion for Preliminary Injunction should be unsealed so that Medicis can provide the Order to the PTO; (ii) Medicis should be precluded from asserting infringement of any patents related to sulfur and/or sodium sulfacetamide products during the stay; and (iii) the Court should retain jurisdiction over any potential disputes regarding the protective order in the present case (dkt.61). *See* Dkt. 115 at 1-7.

### A. *The Instant Proceeding Will Be Stayed*

[1] As the Federal Circuit has noted, courts have inherent power to stay their proceedings pending the reexamination of a patent. *Gould v. Control Laser Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.1983); *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988). Indeed, district courts within this Circuit have noted that "there is a liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO reexamination ... proceedings." *ASCII Corp. v. STD Entertainment USA, Inc.,* 844 F.Supp. 1378, 1381 (N.D.Cal.1994); *Guthy-Renker Fitness L.L.C. v. Icon Health and Fitness Inc.,* 48 U.S.P.Q.2d 1058, 1060 (C.D.Cal.1998) (citation omitted). In determining whether to stay a case pending reexamination, a court must consider the following factors: (1) whether a stay will simplify the issues in question and trial of the case; (2) whether discovery is complete and whether a trial date has been set; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party. *In re Cygnus Telecomms. Tech., LLC,* 385 F.Supp.2d 1022, 1023 (N.D.Cal.2005). Here, all three factors weigh in favor of granting Medicis's request for a stay.

[2] First, the Court finds that staying the proceedings will simplify the issues and focus the litigation in the present case. As Medicis notes, "the reexamination could result in claim amendments or even cancellation," thereby simplifying and focusing the issues in the case. By granting a stay at this juncture, the parties will save the expense of litigating issues that the PTO's experts may render moot. Moreover, the PTO has ordered reexamination of the 675 Patent, following

Medicis's request based on "all of the prior art references cited by Defendants [during the preliminary injunction hearing] that were not previously considered during the original prosecution." (Dkt. 114 at 5.) Thus, any review of prior art that the Court may conduct will be enhanced by the PTO's expert opinion. *See In re Etter,* 756 F.2d 852, 857 (Fed.Cir.1985) ("When the patent is concurrently involved in litigation, an auxiliary function [of reexamination] is to free the court from any need to consider prior art without the benefit of the PTO's initial consideration."); *Brown v. Shimano American Corp.,* 18 U.S.P.Q.2d 1496 (C.D.Cal.1991) ( "[R]eexamination by the PTO when issues relevant to prior art are involved is especially helpful given the PTO's expertise.").

*3 Second, the early stage of the instant litigation weighs in favor of granting a stay. *See Target Therapeutics, Inc.v. SciMed Life Sys., Inc.,* 33 U.S.P.Q.2d 2022, 2023 (N.D.Cal.1995) (holding that the absence of "significant discovery" or " substantial expense and time ... invested" in the litigation weighed in favor of staying the litigation); *see also ASCII Corp.,* 844 F.Supp. at 1381 (granting stay where parties had undertaken little or no discovery and the case had not yet been set for trial). The parties here have engaged in limited discovery pertinent only to the issues addressed at the hearing on Medicis's request for a preliminary injunction. Dkt. 114 at 9. Moreover, no trial date has been scheduled. *Id.* The fact that this case is still in the early stages and the parties have not yet conducted "significant discovery" or invested " substantial expense" into the litigation weighs in favor of granting a stay. *See Target Therapeutics,* 33 U.S.P.Q.2d at 2023.

Finally, the Court finds that a stay would not unduly prejudice or present a clear tactical disadvantage to Defendants. The present case was filed only fourteen months ago, the Court issued its Order denying the preliminary injunction less than six months ago, and the litigation is still in the early stages. Therefore, this is clearly not a case where reexamination is sought on the eve of trial, after protracted discovery, or at a critical juncture in the case. *See E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,* 711 F.Supp. 1205, 1208 n. 9

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 5

--- F.Supp.2d ----, 2007 WL 1446617 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

(D.Del.1989) (denying stay where litigation had advanced through trial, appeal, and remand when stay requested); *cf. Agar Corp. Inc. v. Multi-Fluid, Inc.,* 983 F.Supp. 1126, 1128 (S.D.Tex.1997) (finding that "courts are inclined to deny a stay when ... the case has been set for trial and the discovery phase has almost been completed"). Indeed, denying the stay could result in substantial expense and wasted resources if the PTO and the Court were to issue inconsistent rulings. *See Bausch & Lomb Inc. v. Alcon Labs., Inc.,* 914 F.Supp. 951, 952-53 (W.D.N.Y.1996) (because courts and the PTO apply different standards and can consider different evidence, courts' findings on patent validity are not binding on PTO and vice versa). Moreover, Defendants have made no showing of dilatory motive or tactics by Medicis in requesting reexamination.

**B. *The Imposition of Defendants' Proposed Conditions Is Not Necessary***

[3] As previously stated, Defendants have requested the Court to place three conditions upon its issuance of a stay: (i) unseal the Court's Order denying Medicis's Motion for Preliminary Injunction "so that Medicis may freely disclose the Court's Order and claim construction to the PTO"; (ii) preclude Medicis from asserting "infringement of any patents related to sulfur and/or sodium sulfacetamide products during the stay"; and (iii) "retain jurisdiction over any potential disputes regarding the Protective Order in this case" (dkt.61). *See* Dkt. 115 at 1-7.

*4    Defendants contend the first proposed condition-unsealing the Court's Order denying the Preliminary Injunction so that Medicis is provided the opportunity to submit it to the PTO-is necessary in order to apprise the PTO that "Medicis originally defined 'cleanser' as 'a composition that incorporates a surface agent ... [i.e.,] a compound that reduces surface tension at the external boundary of a liquid.' " (Dkt. 115 at 4.) Defendants further argue that, if the Order is not unsealed, Medicis will later be able to claim that it was excused from providing the PTO with "information highly material to patentability, and complying with

its duty of candor to the PTO." (*Id.* at 4-5.)

The Court will not unseal the Order and require Medicis to provide it to the PTO because to do so would require the Court to improperly involve itself in the necessarily *ex parte* process of the PTO's reexamination. As the Federal Circuit has found, " [a] party's choice of what, if anything, to file with the patent office in a reexamination proceeding should remain undisturbed by the courts." *Emerson Elec. Co. v. Davoil, Inc.,* 88 F.3d 1051, 1054 (Fed.Cir.1996) (internal quotations omitted) (holding that district court exceeded its authority when it required patentee, as condition of stay of patent infringement suit, to file alleged infringer's documents together with its own responses to reexamination request). While noting the importance of candor and good faith during reexamination, the Court will refrain from involving itself in the reexamination proceeding by implying that Medicis should submit the Court's Order to the PTO. The Court notes, however, that if Medicis elects to provide the Order to the PTO, the Court will unseal the Order upon the filing of a request by Medicis.

[4] For two reasons, the Court rejects Defendants' second proposed condition-preclude Medicis from asserting "infringement of any patents related to sulfur and/or sodium sulfacetamide products during the stay." (Dkt. 115 at 1-2.) First, nothing in the patent statute or case law requires a patent owner to refrain from suing alleged infringers pending reexamination. *Micron Technology, Inc. v. Rambus Inc.,* 189 F.Supp.2d 201 (D.Del.2002), and *In re Laughlin Products, Inc.,* 265 F.Supp.2d 525 (E.D.Pa.2003), cited by Defendants, are distinguishable from the present case. *Micron Technology* involved an agreement by the patent holder not to assert patent rights during a stay of litigation pending appeal, not pending reexamination by the PTO. *See* 189 F.Supp.2d at 211-13. Although the Court in *In re Laughlin Products* granted a stay pending reexamination on the condition that the patentee not file suit on the same patent against new defendants, the Court permitted the patentee to obtain tolling agreements from potential defendants and allowed new lawsuits if such agreements were not obtained. 265

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 6

--- F.Supp.2d ----, 2007 WL 1446617 (D.Ariz.)
(Cite as: --- F.Supp.2d ----)

F.Supp.2d at 536-38.

[5] Second, Defendants have failed to show that the second proposed condition is necessary to avoid undue prejudice to them. Although reexamination will postpone activity in the present a case for period of time, it will likely clarify and potentially narrow the issues, resulting in a more efficient resolution of the suit-for all three parties-following the conclusion of the reexamination process. The parties may agree among themselves that no new infringement suits will be filed while this proceeding is stayed, but it is both unnecessary and inappropriate for the Court to condition the issuance of a stay on Defendants' vague and overbroad request. *See* dkt. 115 at 1-2 ("any patents related to sulfur and/or sodium sulfacetamide products").

*5 [6] As Medicis notes, Defendants' third proposed condition-the retention of jurisdiction over disputes regarding the Protective Order (dkt. 61)-is not necessarily a "condition" because the Court's jurisdiction over protective order issues remains in effect during the stay. For the sake of clarity, however, the Court will acknowledge its retention of jurisdiction on this issue in the order staying the case.

In sum, the Motion to Stay will be granted, conditioned only on Medicis's duty to (i) continue prosecuting the reexamination proceeding as expeditiously as possible; and (ii) promptly report the outcome of the reexamination proceeding to this Court and Defendants.

**IT IS HEREBY ORDERED GRANTING** Medicis's Motion to Stay This Proceeding. (Dkt. 114.)

**IT IS FURTHER ORDERED** that this case shall be stayed pending the final outcome of the PTO's reexamination of the 675 Patent.

**IT IS FURTHER ORDERED** that Medicis shall continue to prosecute the reexamination proceeding as expeditiously as possible.

**IT IS FURTHER ORDERED** that, within five (5) days of receiving notice of the outcome of the

reexamination proceeding, Medicis shall file and serve a notice of the outcome on this Court and both Defendants.

**IT IS FURTHER ORDERED** that, during the pendency of this stay, the Court explicitly acknowledges its retention of jurisdiction over disputes regarding the Protective Order in this case (dkt. 61).

**IT IS FURTHER ORDERED** that, if disputes regarding the Protective Order arise, the parties shall meet and confer and attempt to resolve such disputes without Court action. If the parties' efforts fail, the complaining party may request a telephonic hearing to resolve any Protective Order disputes.

D.Ariz.,2007.
Medicis Pharmaceutical Corp. v. Upsher-Smith Laboratories, Inc.
--- F.Supp.2d ----, 2007 WL 1446617 (D.Ariz.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit K

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1

Not Reported in F.Supp.2d, 2004 WL 2554568 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Werre v. Battenfeld Technologies, Inc.
D.Or.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
John **WERRE**, Plaintiff,
v.
**BATTENFELD TECHNOLOGIES, INC.**, a
Missouri corporation, Midway Arms, Inc., a
Missouri corporation, Does 1-100 and Does, Inc.
1-100, Defendants.
**No. Civ.03-1471-AA.**

Nov. 9, 2004.

Bert P. Krages II, Attorney at Law, Leonard D.
Duboff, Duboff Dorband Cushing & King PLLC,
Portland, OR, for Plaintiff.
David W. Harlan, Senniger Powers Leavitt &
Roedel, St. Louis, MO, Paul T. Fortino, Scott D.
Eads, Christopher L. Garrett, Perkins Coie, LLP,
Portland, OR, for Defendants.

### ORDER
AIKEN, J.
*1 Defendants' motion to stay litigation pending
reexamination of '131 Patent by the United States
Patent and Trademark Office (PTO) is granted.

Plaintiff contends that defendants have infringed
claims 1 and 2 of plaintiff's U.S. Patent No.
5,813,131 (the '131' Patent). Plaintiff commenced
this action on October 24, 2003. On July 2, 2004,
defendant Midway Arms, Inc. (Midway) requested
that the PTO "reexamine" claims 1 through 4 of the
'131 Patent in light of relevant "prior art" that was
not considered by the PTO during the original
prosecution of the '131 Patent. On August 31, 2004,
the PTO granted Midway's request, finding that the
new prior art raises a "substantial new question of
patentability" as to claims 1 through 4 of the '131
Patent.

The decision to stay litigation is within the sound
discretion of this court. *Ethicon, Inc. v. Quigg,* 849
F.2d 1422, 1426-27 (Fed.Cir.1988) ("Courts have
inherent power to manage their dockets and stay
proceedings, including the authority to order a stay
pending conclusion of a PTO reexamination.")
(internal citations omitted). Further, the court
recognizes that there exists a "liberal policy in favor
of granting motions to stay proceedings pending the
outcome of reexamination proceedings." *Whatley v.
Nike Inc.,* 54 U.S.P.Q.2d 1124, 1125 (D.Or.2000).

Case law sets forth the relevant considerations when
courts are considering staying patent litigation during
the reexamination of a patent by the PTO. Those
are: (1) whether a stay would unduly prejudice or
present a clear tactical disadvantage for the
non-moving party; (2) whether a stay will simplify
the issues in question and trial of the case; and (3)
whether discovery is complete and whether a trial
date has been set. *Shatley,* 54 U.S.P.Q.2d at 1125. I
find that all three factors favor a stay in this case.

First, I find no undue prejudice that will occur to
the plaintiff if the stay is granted. Discovery is not
scheduled to close in this case until February 2005.
Each party has served and responded to only a
single set of written discovery requests. No
depositions have been noticed or taken. No expert
reports have been exchanged. A *Markman* claim
construction hearing has not been held, or even
scheduled, nor have any summary judgment
motions been filed. Moreover, I note the PTO's
obligation to handle the reexamination proceeding "
with special dispatch." 35 U.S.C. § 305.

As to the second factor, simplification of issues, this
also weighs in favor of granting the stay. The '131
Patent is the only patent at issue; further, defendants
are accused of infringing only two claims of that
patent, both of which are now being reexamined by
the PTO. A determination of invalidity by the PTO
would entirely dispose of the case before this court.
Further, even if the PTO cancels just some of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 2

Not Reported in F.Supp.2d, 2004 WL 2554568 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

claims 1 through 4, that may very well narrow the
issues before this court.

Finally, the third factor-whether discovery is
complete and a trial date has been set-also favors
entering the stay. As stated earlier, discovery is in
the beginning stages. There have been no
depositions, expert discovery, claim construction, or
dispositive motions filed. No trial date has been set.


                        *CONCLUSION*

**\*2** Defendant's motion to stay this litigation pending
reexamination of '131 Patent by the U.S. Patent &
Trademark Office (doc. 29) is granted. The parties
are ordered to notify the court when the PTO has
concluded its reexamination proceeding and
reached a conclusion.

IT IS SO ORDERED.

D.Or.,2004.
Werre v. Battenfeld Technologies, Inc.
Not Reported in F.Supp.2d, 2004 WL 2554568
(D.Or.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit L

Westlaw.

Slip Copy                                                                                               Page 1

Slip Copy, 2000 WL 35357130 (N.D.Cal.)
**(Cite as: Slip Copy)**

**H**
Methode Elec., Inc. v. Infineon Technologies Corp.
N.D.Cal.,2000.
Only the Westlaw citation is currently
available.NOT FOR CITATION
United States District Court, N.D. California,
San Jose Division.
**METHODE** ELECTRONICS, INC., Plaintiff,
v.
**INFINEON** TECHNOLOGIES CORP. and Optical
Communication Products, Inc., Defendants.
**No. C 99-21142 JW.**

Aug. 7, 2000.

ORDER GRANTING DEFENDANT INFINEON
TECHNOLOGIES CORP. AND DEFENDANT
OPTICAL COMMUNICATION PRODUCTS,
INC.'S JOINT MOTION TO STAY
PROCEEDINGS PENDING REEXAMINATION
OF THE '408 PATENT
JAMES WARE, J.

[Docket No. 50]

*I. INTRODUCTION*

*1 Defendant Infineon Technologies Corporation
now brings a motion to stay all proceedings as to
the '408 and '468 patents pending reexamination of
the '408 patent. A hearing was held on July 10,
2000. Defendant Optical Communication Products,
Inc. joined in and incorporated by reference
Infineon's motion. Based on all papers filed to date
and the oral argument of counsel, and for the
reasons set forth below, the Court grants the
Defendants' motion to stay the action as to the '408
and '468 patents pending reexamination of the '408
patent.

*II. BACKGROUND*

This case involves an action for patent infringement
by Plaintiff Methode Electronics, Inc. ("Methode")
against Defendants Infineon Technologies
Corporation ("Infineon") and Optical
Communication Products, Inc. ("OCP"). Methode
alleges infringement of five patents pertaining to
optoelectronic transceiver devices used in computer
networks for the conversion of light pulses to
electrical pulses and back to light pulses. Methode
alleges that Infineon has infringed U.S. Patent
5,528,408 (" '408 patent") and U.S. Patent
5,864,468 (" '468 patent"). Methode alleges that
OCP has infringed the '408 and '468 patents, as well
as three additional patents: U.S. Patent 5,717,533 ("
'533 patent"); U.S. Patent 5,734,558 (" '558 patent")
; and U.S. Patent 5,879,173 (" '173 patent").

The accused devices at issue in this infringement
action are "1x9" optoelectronic transceivers,
produced by both Infineon and OCP. The "1x9"
optoelectronic transceivers are alleged to infringe
both the '408 and '468 patents. Infineon also
produces a Small Form Factor ("SFF") transceiver
which is alleged to infringe only the '468 patent.
Both Defendants deny infringement and allege that
the patents are invalid.

The '408 patent issued on June 18, 1996. On June
16, 1998, Methode filed a Request For
Reexamination of the '408 patent on the ground that
the Examiner failed to consider nine prior art
references during the original prosecution.
Methode's request for reexamination was granted
and assigned to the original '408 Examiner.

On February 5, 1999, the Patent and Trademark
Office issued a First Office Action, rejecting all
claims (1-16) as obvious under 35 U.S.C. § 103(a).
Methode added additional claims 17-25. In a
Second Office Action, issued on September 2,
1999, the PTO rejected claims 1-25. Methode then
initiated this action against Infineon and OCP on
October 15, 1999. Subsequently, Methode filed
another amendment to its request for reexamination.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2

Slip Copy, 2000 WL 35357130 (N.D.Cal.)
**(Cite as: Slip Copy)**

On March 2, 2000, in a Third Office Action, the PTO rejected claims 1-16 for the third time and claims 17-25 for the second time on the ground that the claims are obvious in view of the previously undisclosed prior art references. Methode's response to the Third Office Action was due on June 2, 2000.

Defendants now move for a stay of litigation and all discovery as to the '408 and '468 patents pending the PTO's reexamination of the '408 patent. [FN1]

> FN1. OCP's joinder covers the same issues stated in Infineon's motion to stay. The Court finds that OCP's joinder is neither untimely nor unfair. Methode's *ex parte* motion to strike OCP's joinder is hereby denied.

### III. STANDARDS

**\*2** After a patent issues, 35 U.S.C. § 302 authorizes any person at any time to file a request with the PTO for reexamination of any claim of the patent on the basis of prior art patents and publications. Upon receipt of a request for reexamination, the PTO determines whether the cited prior art raises "a substantial new question of patentability." 35 U.S.C. § 303. If it is determined that a substantial new question of patentability is raised, then a reexamination is granted and the claim or claims in question are examined in the same manner as the claims of a patent application.

The district court has the inherent authority to order a stay pending the outcome of reexamination by the PTO. *See Ethicon v. Quigg,* 849 F.2d 1422, 1426 (Fed.Cir.1988). The Court, however, must weigh the competing interests presented by a specific set of facts. *See Gladish v. Tyco Toys,* 29 U.S.P.Q.2d 1718, 1719 (E .D. Cal.1993). "[T]he court has the inherent ability to grant a stay of proceedings provided that it does not cause undue prejudice or present a clear tactical disadvantage to the non-moving part[ies] ." *ASCII Corp. v. STD Entertainment USA, Inc.,* 844 F.Supp. 1378, 1380 (N.D.Cal.1994) (internal quotations and citations omitted). Other factors considered include the stage

of the litigation, whether discovery is or will be almost completed, and whether the matter has been marked for trial. *See id.* In determining whether to grant a motion to stay, the district court has considerable latitude. *See Gould v. Control Laser Corp.,* 705 F.2d 1340, 1341 (Fed.Cir.1983). "There is a liberal policy in favor of granting motions to stay proceedings pending the outcome of reexamination proceedings." *See ASCII Corp.,* 844 F.Supp. at 1381.

### IV. DISCUSSION

#### A. Staying litigation of the '408 patent

In this case, the relevant factors weigh heavily in favor of staying the proceedings as to the '408 patent pending the PTO's reexamination of the '408 patent . First, this case is in its incipient stages. Methode's complaint was filed less than eight months ago, no depositions have been taken, and no trial date has been set. Second, a stay will allow the parties and the Court to take advantage of the PTO's conclusions regarding prior art. A stay will also further the goal of judicial economy: a PTO determination that some of the claims of the '408 patent are unpatentable may narrow the scope of this litigation. Third, if the PTO ultimately makes a determination that Methode's claims are unpatentable with respect to the '408 patent, a stay will have eliminated the need for discovery and trial of those issues that pertain solely to the '408 patent. Finally, regardless of the outcome of the reexamination, the PTO's expert opinion will help the Court focus on the pertinent issues.

Granting a stay would not cause undue prejudice. Although "[s]ubstantial expense and time ... invested in th[e] litigation ... would militate against a further delay of disposition," *GPAC Inc .,* 23 U.S.P.Q.2d at 1133, Methode concedes that its " expenditure of fees to this point have been minimal." Plaintiff's Opposition, p. 5. Methode's argument that a stay of the '408 patent solely with respect to Infineon would be prejudicial is rendered moot since OCP has joined in and incorporated by reference Infineon's motion. A stay of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2000 WL 35357130 (N.D.Cal.)
**(Cite as: Slip Copy)**

proceedings with respect to the '408 patent would apply to both Defendants Infineon and OCP.

**\*3** Furthermore, the Court finds that Defendants did not unduly delay in bringing the present motion, and that there is no reason to believe that Defendants are utilizing any dilatory tactics by requesting the stay. *See Guthy-Renker L.L.C. v. Icon Health and Fitness Inc.,* 48 U.S.P.Q.2d 1058, 1061 (C.D.Cal.1998).

Therefore, the Court hereby stays all proceedings as to the '408 patent pending the PTO reexamination.

### *B. Staying litigation of the '468 patent*

The Court agrees with both parties that granting a stay with respect to only the '408 patent would be problematic since the '468 patent involves the same accused device. Duplicative discovery may result if only the '408 patent is stayed since there are likely to be common documents and witnesses regarding the infringement litigation of the '408 and '468 patents . For example, staying the '408 patent but not the '468 patent may result in two separate tutorials and two claim construction hearings after the reexamination proceedings.

Finally, although discovery will still take place regarding the same accused product regardless of the reexamination results, the Court finds that the issues regarding the '468 patent may be narrowed or amended as a result of the PTO's decision. Furthermore, it appears that there are overlapping issues in the '408 and '468 infringement actions. Methode noted at the July 10 hearing that all elements in the '408 patent claims are contained in the '468 patent. The Court also finds that Methode will not be unduly prejudiced by staying the '468 litigation proceedings.

Methode's argument that staying proceedings as to the '468 patent would waste the patent's limited lifetime has no merit. Methode has failed to explain why money damages would not be adequate if it prevails at trial. *See Guthy-Renker,* 48 U.S.P.Q.2d at 1061.

Therefore, the Court hereby grants Defendants' motion to stay proceedings regarding the '468 patent pending the PTO's reexamination of the '408 patent as well.

### *V. CONCLUSION*

Based on the reasons set forth above, the Court grants Defendants' joint motion to stay proceedings as to both the '408 and '468 patents pending reexamination of the '408 patent by the PTO. The Court orders the parties to submit a joint statement by September 11, 2000 informing the Court of the status of the case.

At the July 10 hearing, counsel for OCP requested a stay of proceedings as to the '533, '558, and '173 patents as well. OCP has not submitted papers requesting a stay as to those patents. Therefore, OCP's request is denied without prejudice.

N.D.Cal.,2000.
Methode Elec., Inc. v. Infineon Technologies Corp.
Slip Copy, 2000 WL 35357130 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit M

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 149994 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

C
Hewlett-Packard Co. v. Acuson Corp.
N.D.Cal.,1993.
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
**HEWLETT-PACKARD** COMPANY, Plaintiff,
v.
**ACUSON CORPORATION, Defendant.**
**No. C-93-0808 MHP.**

May 5, 1993.

MEMORANDUM AND ORDER
PATEL, District Judge.
**\*1** Plaintiff Hewlett-Packard Company ("HP")
brought this action on March 8, 1993 against
defendant Acuson Corporation ("Acuson") for
allegedly infringing upon United States patent No.
4,140,022 (" '022"). Prior to this action, Acuson
submitted to the United States Patent and
Trademark Office ("PTO") a petition for
reexamination of the '022 patent pursuant to 35
U.S.C. §§ 301-07. The matter is presently before
the court on Acuson's motion to stay litigation
pending the reexamination.

Having considered the submissions and arguments
of the parties, and for the following reasons, the
court GRANTS Acuson's motion to stay litigation
pending reexamination.

BACKGROUND

While working for HP, Samuel H. Maslak ("Maslak
") discovered an ultrasonic imaging invention.
Pursuant to an employment agreement, Maslak (1)
assigned to HP all of his right, title and interest in
and to his invention, (2) expressly authorized HP to
apply for and obtain a patent for the invention and
(3) agreed to assist in obtaining such patent. Opp.
to Mot. for Stay, Ex. 3.

On December 20, 1977 HP filed a United States
patent application covering Maslak's invention,
identifying Maslak as the inventor and HP as the
assignee. McElhinny Dec., Ex. B at 1. A formal
Notice of Allowance for the '022 patent issued on
August 31, 1978, Opp. to Mot. for Stay, Ex. 7, and
the patent issued on February 20, 1979.
McElhinny Dec., Ex. B at 1. Maslak gave notice
of his resignation from HP on November 20, 1978.
Opp. to Mot. for Stay, Ex. 8.

In September 1981, Maslak co-founded Acuson and
has been President, Chief Executive Officer and a
director since that date. Oakley Dec., Ex. 2 at 30.
Acuson introduced its first medical diagnostic
imaging system in 1983. *Id.* ¶ 3.

By letter dated June 1, 1990, HP contacted Acuson
regarding possible infringement of its '022 patent.
*Id.* ¶ 2. Acuson filed a Request for
Reexamination of the '022 patent with the PTO on
March 3, 1993. McElhinny Dec., Ex. D. Grounds
for reexamination raised by Acuson include
anticipation, double patenting and obviousness. *Id.,*
Ex. D at 2-3. Acuson claims that the references
cited to in its Request for Reexamination were not
cited to or considered by the PTO during the
original '022 patent proceedings. *Id.,* Ex. D at 4.
On March 8, 1993 HP filed this action alleging that
Acuson's medical diagnostic systems infringe upon
the '022 patent. Acuson now moves for a motion
staying the litigation pending reexamination by the
PTO.

*LEGAL STANDARD*

This circuit has held that the district court has the
authority to stay actions in order to:
control the disposition of the cases on its docket in a
manner which will promote economy of time and
effort for itself, for counsel, and for litigants. The
exertion of this power calls for the exercise of a
sound discretion. Where it is proposed that a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 2

Not Reported in F.Supp., 1993 WL 149994 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among these competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

*2 *Filtrol Corp. v. Kelleher,* 467 F.2d 242, 244 (9th Cir.1972), *cert. denied,* 409 U.S. 1110 (1973) (citations omitted). Ordinarily, courts need not expend unnecessary judicial resources by attempting to resolve claims which may be amended, eliminated, or lucidly narrowed by the patent reexamination process and the expertise of its officers. *See Gould v. Control Laser Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.), *cert. denied,* 464 U.S. 935 (1983). [FN1] The purpose of the reexamination procedure is to eliminate the need for a trial if the claim is canceled or to provide the district court with the expert view of the Patent Office if the claim survives the reexamination. *Id.* Additionally, there is clear congressional intent to maximize efficiency and reduce cost in this regard; thus, district courts often stay patent proceedings pending reexamination. *See, e.g., Ingro v. Tyco Industries, Inc.,* 227 U.S.P.Q. (BNA) 69, 71 (N.D.Ill.1985) ("legislative history indicates Congress ... approved of courts liberally granting stays within their discretion."); *Digital Magnetic Systems, Inc., v. Ansley,* 213 U.S.P.Q. (BNA) 290 (W.D.Okla.1982) ("Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts.").[FN2]

## DISCUSSION

During oral argument, HP admitted that it was on notice that Acuson might be infringing its '022 patent as early as 1983. While the court applauds HP's efforts to settle its dispute with Acuson through means other than litigation, HP's ten year delay in seeking to protect its patented interests

weighs heavily against denying Acuson's motion for stay.[FN3] Indeed, the first record of correspondence with Acuson concerning patent infringement is dated June 1, 1990. Oakley Dec. ¶ 2. The record also shows that HP did not seek to enforce its patent until after Acuson had filed its Request for Reexamination of the '022 patent. The court finds that these combined factors compel a grant of Acuson's request for a stay pending the PTO proceedings.

Moreover, the court is not persuaded by HP's assignor estoppel argument opposing Acuson's motion for stay. Acuson alleges that reexamination of patent '022 will result in an amendment or cancellation of the patent, thus streamlining the current litigation. Specifically, Acuson argues that HP failed to disclose to the PTO, during the original '022 patent proceedings, evidence of a patent previously issued to HP,[FN4] which would bear upon the patentability of the '022 patent.[FN5] Acuson urges that the technical nature of both the prior art and the '022 patent dictate that this court issue a stay so that the PTO's expertise can be brought to bear in assessing this question and in determining whether or not the '022 may be narrowed, amended or invalidated.

HP, on the other hand, opposes a stay of the present litigation. HP argues that Acuson is barred under the doctrine of assignor estoppel, as a matter of law, from alleging patent invalidity or unenforceability as a defense to the underlying infringement action. In support of this proposition, HP cites *Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220, 1224 (Fed.Cir.), *cert. dismissed,* 487 U.S. 1265 (1988): *3 Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity. The estoppel also operates to bar other parties in privity with the assignor, such as a corporation founded by the assignor.[FN6]

*Diamond,* 848 F.2d at 1224. Therefore, HP urges, Acuson's motion for stay pending reexamination for invalidity or unenforceability is without merit.

Although HP's argument may apply as a litigation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1993 WL 149994 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

strategy in the underlying infringement action, is not entirely persuasive on the motion for stay. [FN7] In fact, for the following reasons, this court finds that a stay in this action will "promote economy of time and effort for itself, for counsel, and for [the] litigants." *Filtrol,* 467 F.2d at 244.

First, *Diamond* indicates that the doctrine of assignor estoppel is not an all or nothing bar to an assignor's invalidity defense in an infringement proceeding. 848 F.2d at 1226. *Diamond* recognizes an "accommodation" to the assignor estoppel doctrine which may frustrate the use of estoppel to bar a defense of invalidity in a patent infringement case. The "accommodation" was carved out by *Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.,* 266 U.S. 342, 350-53 (1924).
"To the extent that [the party claiming infringement] may have broadened the claims in the patent applications (after the assignments) beyond what could be validly claimed in light of the prior art, *Westinghouse* may allow appellants to introduce evidence of prior art to narrow the scope of the claims of the patents, which may bring their accused devices outside the scope of the claims of the patents in suit."

*Diamond,* 848 F.2d at 1226 (citing *Westinghouse,* 266 U.S. at 350). Thus, the reexamination of '022 will, more likely than not, simplify the issues, proof, and questions of law relating to this " accommodation," *see Filtrol,* 467 F.2d at 244, and expedite the infringement litigation by clarifying whether HP's claim to assignor estoppel may prevail in the infringement litigation, or will be frustrated by the "accommodation".

Second, as Acuson correctly points out, assignor estoppel is an equitable doctrine. "[T]he primary consideration in [ ] applying the doctrine is the measure of unfairness and injustice that would be suffered by the assignee if the assignor were allowed to raise defenses of patent invalidity. Our analysis must be concerned mainly with the balance of equities between the parties." *Diamond,* 848 F.2d at 1225; *accord, Carroll Touch v. Electro Mechanical Systems, Inc.,* 779 F.Supp. 101, 103 (C.D.Ill.1991) (*Diamond* did not create a

mechanical checklist for application of assignor estoppel, the court must still consider the equities involved in applying the doctrine). Therefore, Acuson's claim that HP's conduct before the PTO was inequitable and fraudulent in reference to the original '022 patent proceeding may very will bar HP from relying on the doctrine of assignor estoppel during the infringement litigation. *See Shamrock Technologies v. Medical Sterilization, Inc.,* 903 F.2d 789, 795 (Fed.Cir.1990) ("in a proper case general principles of equity may preclude use of assignor estoppel to bar a viable equitable defense arising from post-assignment events"); *accord, Buckingham Prods. Co. v. McAleer Mfg. Co.,* 108 F.2d 192, 195 (6th Cir.1939) ; *see also, Medical Designs, Inc. v. Medical Technology, Inc.,* 786 F.Supp. 614, 618 (N.D.Tex.1992) (application of assignor estoppel barred when party seeking patent proceeded without calling to the attention of the PTO material prior art).

\*4 This second factor weighs heavily in favor of staying the litigation pending the PTO's reexamination of the '022 patent. In the event that a trial court should bar HP from using assignor estoppel after weighing the equities, the reexamination process, having possibly narrowed or eliminated some of the infringement claims, could greatly increase the efficiency of the litigation process. *See Gould,* 705 F.2d at 1342.

Therefore, this court finds that the possible hardship to HP, including delay of injunctive relief, is outweighed by the orderly cause of justice measured in terms of the simplification of issues, proof, and questions of law which are expected to result from the stay.[FN8] *Filtrol,* 467 F.2d at 244; *see also Gould,* 705 F.2d at 1342.

## CONCLUSION

For all the foregoing reasons, Defendant's motion for a stay of litigation pending the later of (1) the decision by the United States Patent and Trademark Office on Defendant's request for reexamination of U.S. Letter Patent N. 4,140,022 ('022), or (2) the conclusion of the reexamination proceedings is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1993 WL 149994 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

GRANTED.

IT IS SO ORDERED.

> FN1. *See also, Grayling Industries v. GPAC, Inc.,* 19 U.S.P.Q.2d (BNA) 1872, 1873 (N.D.Ga.1991); *Brown v. Simano American Corp.,* 18 U.S.P.Q.2d (BNA) 1496 (C.D.Cal.1991).

> FN2. For more detailed information in support of a stay of patent proceedings pending reexamination, *see Teradyne, Inc. v. Hewlett-Packard Company,* Civil Action No. C-91-0344 MHP (Memorandum and Order, Jan. 7, 1993), at 16-20.

> FN3. The present action is brought with only three years remaining in the life of the patent.

> FN4. Acuson alleges that the '229 is also owned by HP and was prosecuted by the same attorney as the '022.

> FN5. Acuson bolsters this claim by arguing that during the prosecution of the German equivalent of '022, Siemans Corporation cited the '229 against the '022. Acuson states that HP amended and narrowed claim 1 of the '022 patent as a result.

> FN6. In *Lear, Inc. v. Adkins,* 395 U.S. 653, 668-71 (1969), the Supreme Court abolished as inconsistent with federal patent and antitrust policy the doctrine that a licensee was estopped from contesting the validity of a patent. However, the doctrine that an assignor was estopped from contesting the validity of a patent was not addressed by the Court. As a result, it remained unclear whether the rule of *Lear* should also be applied to assignor estoppel. As late as 1972, the rule of this circuit was that the *Lear* rule should be applied. *See Coastal Dynamics Corp. v.*

*Symbolic Displays, Inc.,* 469 F.2d 79 (9th Cir.1972) (*Lear* dictates abolition of assignor estoppel). However, the passage of 29 U.S.C. § 1295 gave exclusive jurisdiction to the Federal Circuit on appeals from district court decisions involving patent law under 28 U.S.C. § 1338. And, in 1988, the Federal Circuit found that the rule of *Lear* did not apply to assignor estoppel, distinguishing assignor estoppel from licensee estoppel. *See Diamond,* 848 F.2d at 1224 (assignor estoppel available to bar invalidity defense in infringement proceedings).

> FN7. Whether HP has met all of the equitable requirements to use assignor estoppel to bar a defense of invalidity by Acuson in the infringement action is not before the court. Rather, the court, at this juncture, is concerned only with Acuson's motion for stay. While HP's intended use of assignor estoppel may bear upon the court's determination of stay, it is not dispositive.

> FN8. HP claims no other substantial hardship other than the delay in obtaining injunctive relief based on a finding that Acuson has infringed the '022 patent. The court finds that the stay involved is not of such a protracted or indefinite period as to render its issuance an undue hardship. The fact that the life of the patent may expire before the stay is up is of no moment; other remedies besides injunctive relief still remain available to HP.

N.D.Cal.,1993.
Hewlett-Packard Co. v. Acuson Corp.
Not Reported in F.Supp., 1993 WL 149994 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit N

Westlaw.

Not Reported in F.Supp.    Page 1

Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786
**(Cite as: Not Reported in F.Supp.)**

▷
Robert H. Harris Co., Inc. v. Metal Mfg. Co., Inc.
E.D.Ark.,1991.

United States District Court, E.D. Arkansas,
Jonesboro Division.
**ROBERT H. HARRIS** COMPANY, INC.,
Plaintiff,
v.
**METAL** MANUFACTURING CO., INC.,
Defendant.
**Civ. No. J-C-90-179.**

June 21, 1991.

J. Frank Lady, Jr., Lady & Houston, P.A.,
Jonesboro, Ark., for plaintiff.
Glenn Lovett, Jr., Snellgrove, Laser, Langley &
Lovett, Jonesboro, Ark., for defendant.

*ORDER*
GEORGE HOWARD, Jr., District Judge.
**\*1** Plaintiff brings this action alleging that
defendant manufactures and sells a product which
infringes plaintiff's patent. Defendant has filed a
motion to dismiss for lack of personal jurisdiction
and for improper venue. In the alternative,
defendant asks that the Court transfer this action
pursuant to 28 U.S.C. § 1404(a). Defendant has
also filed a motion for stay pending re-examination.

*Motion to Dismiss or to Transfer*

To determine whether the Court can exercise
personal jurisdiction over defendant, the Court must
find that jurisdiction is proper under the Arkansas
long-arm statute and that the exercise of personal
jurisdiction is consistent with due process.
*Mountaire Feeds, Inc. v. Agro Impex, S.A.,* 677
F.2d 651, 653 (8th Cir.1982).

The Arkansas long-arm statute provides that a court

may exercise personal jurisdiction over a
non-resident for a cause of action arising from the
defendant's transacting any business in this state.
A.C.A. § 16-4-101(C)(1)(a). The Arkansas
Supreme Court has held that the term "transacting
business" is more inclusive than the previous
statutory provision of "doing business" and that the
legislative intent is to expand jurisdiction to the
limits permitted by the due process clause of the
United States Constitution. *Dudley v. Dittmer,* 795
F.2d 669, 672 (8th Cir.1986).

Defendant states that its contacts with the state are
too "attenuated" to comport with due process.
Defendant also asserts that the Court cannot
exercise personal jurisdiction over it unless plaintiff
demonstrates that defendant has shipped the
allegedly infringing product into Arkansas.

The Court disagrees. Defendant has purposefully
availed itself of the privilege of conducting business
in Arkansas. *See Burger King Corp. v. Rudzewicz,*
105 S.Ct. 2174 (1985). Defendant has derived
significant revenues from the sale of its products in
Arkansas. It solicits business in Arkansas
(including the sale of the allegedly infringing
product) through the mailing of catalogs, magazine
advertisements, and telephone contacts. The
documentation provided by plaintiff demonstrates
sufficient "minimum contacts" between the
non-resident defendant and the forum state so that
the exercise of personal jurisdiction over defendant
is consistent with traditional notions of fair play and
substantial justice. *International Shoe Co. v.
Washington,* 326 U.S. 310 (1945).

Defendant also argues that venue is inappropriate in
this district. Defendant relies on the language of
the patent venue statute, 28 U.S.C. § 1400(b) which
provides that an action for patent infringement may
be brought in the judicial district where the
defendant resides, or where defendant has
committed acts of infringements and has a regular
and established place of business.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 2

Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786
(Cite as: Not Reported in F.Supp.)

The question of the meaning of the patent venue statute in light of the recent changes to the general venue statute, 28 U.S.C. § 1391(c) was addressed in a recent decision. *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574 (Fed.Cir.1990). The court held that the definition of "reside" in § 1391(c) applies to § 1400(b).

**\*2** By order dated December 12, 1990, the Court stayed a decision on the motion to dismiss because of improper venue pending action by the United States Supreme Court on the petition for certiorari filed in *VE Holding Corp.* Certiorari in that case has recently been denied. 111 S.Ct. 1315 (1991).

As the Court noted in its December 12th order, the holding in *VE Holding Corp.* is dispositive of the venue issue. As defendant is subject to personal jurisdiction in this district, venue is proper here.

Defendant contends, in the alternative, that the Court should transfer the case to the Middle District of Florida.

Under 28 U.S.C. § 1404(a), a court may transfer an action to any district where it might have been brought "[f]or the convenience or the parties and witnesses, [and] in the interest of justice." The plaintiff's choice of forum is usually entitled to great weight and should not be disturbed unless the balance of the various factors is clearly in favor of the defendants. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947). However, "[t]his choice is deserving of less weight when none of the operative facts of the action occur in the forum selected by the plaintiff." *National Mortgage Network, Inc. v. Home Equity Centers, Inc.,* 683 F.Supp. 116, 119 (E.D.Pa.1988). In determining whether to exercise its discretion to transfer an action, the Court may consider a number of factors, including the convenience of the parties and the witnesses, the availability of judicial process to compel the attendance of unwilling witnesses, the governing law, ease of access to sources of proof such as the location of records and documents, the place where the events at issue occurred, and the place where the case could be tried more expeditiously and inexpensively. *Darchuk v. Kellwood Co.,* 47 FEP Cases 1259 (E.D.Ark.1988); *Kolko v. Holiday*

*Inns, Inc.,* 672 F.Supp. 713 (S.D.N.Y.1987).

The Court has weighed the factors and is persuaded that the balance of convenience or burden to defendants in this instance does not outweigh plaintiff's choice of forum. Both plaintiff and defendant will be somewhat burdened by having to obtain witnesses and documents from Florida. Plaintiff, however, contends that it is not financially able to prosecute its action in Florida.

In sum, the Court finds that defendant has not met its burden of demonstrating that transfer is warranted under 28 U.S.C. § 1404(a).

*Motion for Stay Pending Re-Examination*

Defendant has filed a reexamination request with the United States Patent and Trademark Office (PTO) on June 7, 1991. The reexamination process is a relatively new procedure codified at 35 U.S.C. §§ 301-307. When a petition for reexamination is filed, the PTO must decide within three months whether there is a substantial question of patentability. 35 U.S.C. § 303(a). If a substantial question of patentability is found, the patent will be reexamined, and the patent owner will be given a reasonable period to respond. 35 U.S.C. § 304. *See Freeman v. Minnesota Mining & Mfg. Co.,* 661 F.Supp. 886 (D.Del.1987).

**\*3** Only items of prior art are to be considered in the reexamination proceeding. "Typically, the cited prior art patents or printed publications upon which such a request is based are ones which were not considered by the patent examiner during the processing of the patent application which results in the patent-in-suit. Once a reexamination request is granted, a Patent Examiner who is familiar with the technology involved with the patent conducts the reexamination and is obligated to do so 'with special dispatch.' 37 C.F.R. § 1.550(a)." *Ingro v. Tyco Industries, Inc.,* 227 U.S.P.Q. 69, 70 (N.D.Ill.1985).

In this instance, defendant states that a recently discovered manual raises new questions of patentability with respect to plaintiff's patent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 3

Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786
**(Cite as: Not Reported in F.Supp.)**

Defendant therefore has requested that Claims 1-8 of the Harris patent be reexamined.

Whether the action should be stayed pending the outcome of a reexamination proceedings before the PTO resides in the discretion of the court. The legislative history surrounding the establishment of the reexamination proceeding evinces congressional approval of district courts liberally granting stays.

The bill does not provide for a stay of court proceedings. It is believed by the committee that stay provisions are unnecessary in that such power already resides with the Court to prevent costly pre-trial maneuvering which attempts to circumvent the reexamination procedure. It is anticipated that these measures provide a useful and necessary alternative for challengers and for patent owners to test the validity of the United States patents in an efficient and relatively inexpensive manner.

H.R.Rep. No. 1307 Part I, 96th Cong., 2d Sess. 4, *reprinted* in 1980 U.S.Code Cong. & Ad. News 6460, 6463.

A number of courts have recognized the advantages of staying a pending infringement action until completion of a reexamination request. In *Emhart Industries, Inc. v. Sankyo Keiki Mfg.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987), the court enumerated the following advantages in granting a stay which would shift to the PTO the validity of a patent claim:

1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.

2. Many discovery problems relating to prior art can be alleviated by the PTO examination.

3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.

4. The outcome of the reexamination may encourage a settlement without the further use of the Court.

5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation.

6. Issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination.

7. The cost will likely be reduced both for the parties and the Court.

Similarly, in *Loffland Brothers Co. v. Mid-Western Energy Corp.,* 225 U.S.P.Q. 886, 887 (W.D.Okla.1985), the court noted that "[t]he reexamination procedure has the potential to eliminate trial on the issue of patent infringement, should all of the patent's claims be cancelled. It is equally possible for all of the claims in plaintiff's patent to be upheld ... In any event, the expert view of the Patent Office examiner will certainly benefit this Court."

*4 Plaintiff objects to a stay. It argues that defendant seeks a stay solely to prolong the litigation and increase plaintiff's costs. In particular, plaintiff argues that it continues to be prejudiced by the existence of defendant in the marketplace. Plaintiff argues that the prejudice of the delay would outweigh any benefit which might result from the reexamination procedure.

The Court has weighed the costs and benefits of granting a stay. This action has been pending less than a year. Although it is set for trial next month, the Court is not persuaded that this a case which has "run an overly protracted course." *See Toro Company v. L.R. Nelson Corp.,* 223 U.S.P.Q. 636, 638 (C.D.Ill.1984). The parties appear not to have engaged in expensive discovery or extensive pretrial preparation. Furthermore, plaintiff has sued for damages and has an adequate legal remedy. *See Ingro, supra.*

The Court is not persuaded that defendant has abused the reexamination process in an attempt to delay trial proceedings. The Court notes that the decision on whether defendant's request for reexamination is granted will be forthcoming; should it be denied, the case can immediately be replaced on the trial calendar.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4

Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786
**(Cite as: Not Reported in F.Supp.)**

Should the reexamination request be granted, some
delay will result. The Court, however, is not of the
opinion that the delay will be significant and finds
that the benefits of the reexamination procedure far
outweigh the prejudice to plaintiff resulting from
the delay.

Thus, the Court grants defendant's motion for stay
of proceedings pending resolution of its request for
reexamination by the PTO. Defendant is directed
to notify the Court as soon as the PTO acts on the
request. The case will be removed from the July
29th trial calendar.

Accordingly, the motion to quash or dismiss for
lack of jurisdiction or improper venue, or in the
alternative, to transfer venue is denied. The motion
for stay of proceedings or to continue is granted.

E.D.Ark.,1991.
Robert H. Harris Co., Inc. v. Metal Mfg. Co., Inc.
Not Reported in F.Supp., 1991 WL 217666
(E.D.Ark.), 19 U.S.P.Q.2d 1786

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit O

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d)

▷
Middleton, Inc. v. Minnesota Mining and Mfg. Co.
S.D.Iowa,2004.
Only the Westlaw citation is currently available.
    United States District Court,S.D. Iowa, Central
                      Division.
            MIDDLETON, INC., Plaintiff,
                         v.
          MINNESOTA MINING AND
MANUFACTURING COMPANY, Defendant.
              No. 4:03-CV-40493.

                  Aug. 24, 2004.

Donald William Rupert, Mayer Brown Rowe &
Maw LLP, Joseph A. Grear, George C. Summerfield
, Keith A. Vogt, Stadheim & Grear, Jonathan G.
Bunge, Bunge Law Firm PC, Chicago, IL, Suzanne
J. Levitt, Des Moines, IA, for Plaintiff and
Counter-Defendant.
Daniel L. Hartnett, Crary Huff Inkster Hecht &
Sheehan PC, Soux City, IA, David M. Swinton,
Ahlers & Cooney PC, Des Moines, IA, William A.
Streff, Jr., David Kenneth Callahan, Mary E. Zaug,
Karen J. Nelson, Kirkland & Ellis LLP, Chicago,
IL, Kevin H. Rhodes, 3M Innovative Properties
Company, St. Paul, MN, for Defendant and
Counter-Claimant.

       ORDER GRANTING DEFENDANT'S MOTION
                    TO STAY
GRITZNER, J.
**1** This matter is before the Court on Defendant's
Motion to Stay (Clerk's No. 170). Defendant
brought the motion as a result of a recently granted
reexamination [FN1] of the patent-in-suit by the
Patent and Trademark Office ("PTO"). Based on
Defendant's request for expedited relief, an oral
hearing was held on Friday, August 13, 2004, via
telephone. Attorney George C. Summerfield
appeared on behalf of the Plaintiff; attorneys David
Callahan and Karen Nelson appeared on behalf of
the Defendant. Following the hearing, the Court

took the matter under advisement and finds
Defendant's motion is now fully submitted and
ready for ruling.

        FN1. While the PTO officially granted an
        *inter partes* reexamination, counsel for
        Defendant noted at the hearing that this
        was clerical error, and the PTO is in the
        process of rectifying the mistake. The
        reexamination must necessarily be *ex parte*
        due to the age of the patent at issue. This
        change has no effect on the parties'
        arguments or the Court's analysis of the
        motion to stay.

    PROCEDURAL HISTORY AND BACKGROUND
                    FACTS

The Plaintiff, Middleton, Inc. ("Middleton"),
commenced this action against the Defendant,
Minnesota Mining and Manufacturing Co. ("3M"),
in the United States District Court for the Northern
District of Illinois, Chicago Division, on October
17, 1996. After much litigation activity in that
district, the Honorable James F. Holderman of the
Northern District of Illinois transferred the action to
this Court on August 29, 2003. Jurisdiction is
proper pursuant to 28 U.S.C. § 1331, the federal
question statute, and 28 U.S.C. § 1338(a), as this
case arises under the federal patent laws, 35 U.S.C.
§§ 101 et seq.

The lawsuit alleges infringement of a patent held by
Middleton, specifically, U.S. Patent No. 4,944,514 (
"the '514 patent"), by 3M. Trial is scheduled for the
week beginning October 12, 2004. The Court also
has three summary judgment motions pending. The
first motion was filed by Middleton and pertains to
infringement. The second and third motions, filed
by 3M, pertain to validity and infringement,
respectively. 3M filed an application for
reexamination [FN2] and learned on July 26, 2004,
that the PTO had granted the request. The pending

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d)

reexamination prompted the current motion to stay, which Middleton has resited.

> FN2. Out of courtesy, 3M made the Court aware of its pending application for reexamination. While the PTO was making its decision, the present action moved forward in accordance with the scheduling order.

## ANALYSIS

3M has moved to stay this matter based on the PTO's granted reexamination of the patent-in-suit. This case has a long and convoluted history even before the present circumstances giving rise to this motion. Prior to even coming to rest before this Court, this action proceeded from the United States District Court for the Northern District of Illinois to the Federal Circuit and back multiple times. Now, the present motion comes after eight years of litigation and with just over two months remaining before trial. Middleton resists the motion based primarily on the short time left before trial and the delay in seeking reexamination. Middleton also contends 3M lacks the authority to even bring the pending motion.

Briefly, the PTO recently granted [FN3] 3M's request for reexamination of the '514 Patent based on the determination that the multiple independent prior art references identified by 3M in its application " raised substantial new questions of the patentability of claims 4-7," the patent claims at issue in the present infringement action.[FN4] Based upon this determination, 3M contends "[i]t is now highly likely that the PTO will either declare these claims of [the '514 Patent] invalid, or require Middleton to narrow the claims to avoid the prior art references." *See Tap Pharm. Prods., Inc. v. Atrix Labs., Inc.,* 2004 WL 422697, at *2 (N.D.Ill. March 4, 2004) (" There is a significant chance that the PTO will either invalidate this patent or drastically decrease its scope.").[FN5] 3M contends the result of the reexamination could end or dramatically impact the remaining issues in this case, especially considering the PTO found all 13 references cited in the reexamination patent, either alone or in

combination, relevant to patentability. Therefore, 3M requests the Court stay all proceedings in this case pending the outcome of the reexamination by the PTO. Specifically, 3M argues the stay should be granted because this will allow for the most efficient use of the Court's resources, it will simplify the issues for trial, and it will not unduly prejudice Middleton.

> FN3. The determination was mailed by the PTO on July 19, 2004, and received by 3M on July 26, 2004.

> FN4. The prior art references identified by 3M consist of the following: U.S. Patent No. 3,785,102 ("Amos"); U.S. Patent No. 4,151,319 ("Sackoff"); U.S. Patent No. 4,543,765 ("Barrett"); U.S. Patent No. 4,328,274 ("Tarbutton"); Russian Patent Publication SU 1,111,880 ("Shevchenko" ); U.S. Patent No. 3,665,543 ("Nappi"); Japanese Patent Document Sho 61-98834 ( "Shirasu"); Unexamined German Patent Application Number 1,809,794 ("Wilson" ); U.S. Patent No. 3,788,941 ("Kupits"); U.S. Patent No. 2,987,103 ("Yakubik"); U.S. Patent No. 4,221,620 ("Milne"); U.S. Patent No. 4,095,340 ("Kingsley"); and U.S. Patent No. 4,115,917 ("Charon").

> FN5. "Generally speaking, the PTO invalidates 10% of the patents it reexamines and amends the claims in 64%. " *Tap Pharm. Prods., Inc.,* 2004 WL 422697, at *2.

### A. Statutory Authority to Request a Stay

*2 Middleton first argues that 3M lacks the statutory authority to request a stay. Middleton bases this assertion on an examination of the statues governing patent reexamination. Pursuant to section 318 of the Patent Statute,

Once an order for *inter partes* reexamination of a patent has been issued under section 313, *the patent owner* may obtain a stay of any pending litigation which involves an issue of patentability of any claims of the patent which are the subject of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d)

*inter partes* reexamination order, unless the court before which such litigation is pending determines that a stay would not serve the interests of justice.

35 U.S.C. § 318 (emphasis added).

Middleton claims this section clearly limits the rights set forth to those of the patent owner. In contrast, section 311 of the Patent Statute provides that *"[a]ny person* at anytime may file a request for *inter partes* reexamination...." 35 U.S.C. § 311(a) (emphasis added). When Congress uses different terms in a statute, the presumption is that those terms have different meanings. *See Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 497, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). Therefore, according to Middleton, while "any person" may file an *inter partes* reexamination request, only "the patent owner" may seek a stay of litigation once such a request is granted.

Further, courts generally refer to Federal Rule of Civil Procedure 1 ("Rule 1"), allowing for "the just, speedy, and inexpensive determination of every action," when reciting their authority to grant a stay of proceedings. *See, e.g., W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis,* 138 F.Supp.2d 1015, 1029 (W.D.Tenn.2000). Regulations cannot, however, trump the plain language of conflicting statutes. *Ellis v. General Motors Acceptance Corp.,* 160 F.3d 703, 709 (11th Cir.1998) (quoting *Robbins v. Bentsen,* 41 F.3d 1195, 1198 (7th Cir.1994)); *see also Caldera v. J.S. Alberici Constr. Co.,* 153 F.3d 1381, 1383 n.* * (Fed.Cir.1998) (finding that " [s]tatutes trump conflicting regulations"). Because the relevant statute provides that "the patent owner" can ask for a stay in the event of an *inter partes* reexamination, Middleton contends that Rule 1 does not give the Court the broader authority to grant such a request by 3M, which is not the patent owner.

This contention is easily resolved as Middleton disregards the Court's inherent discretionary power to issue a stay. *See Softview Computer Prods. Corp. v. Haworth, Inc.,* 2000 WL 1134471, at *2 (S.D.N.Y. Aug.10, 2000) (finding "there is no question that a district court in which an infringement action has been filed has the discretion

to stay the infringement action pending the outcome of the reexamination proceeding") (citing *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988)); *see also Robert H. Harris Co. v. Metal Mfg. Co.,* 1991 WL 217666, at *3 (E.D.Ark. June 21, 1991) ("Whether the action should be stayed pending the outcome of the reexamination proceeding before the PTO resides in the discretion of the court."). The Court has this discretion even though the reexamination procedure does not expressly provide for an automatic stay of parallel district court proceedings. *Softview Computer Prods. Corp.,* 2000 WL 1134471, at *2 (citations omitted); *see also Grayling Indus., Inc. v. GPAC, Inc.,* 1991 WL 236196, at *1 (N.D.Ga. March 25, 1991) ("The decision whether to stay proceedings in district court while a reexamination by the PTO takes place, while not vested expressly in the discretion of the district court by the statute, has been recognized to be within the district court's inherent discretionary power.").

*3 As the courts have recognized, "Congress stated its approval of district courts liberally granting stays within their discretion" when the committee stated " '[i]t is believed by the committee that *stay provisions are unnecessary in that such power already resides with the Court ....*' " *Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co.,* 1987 WL 6314, at *2 (quoting H.R.Rep. No. 1307 Part I, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad. News 6460, 6463 (emphasis added)); *see also Fisher Controls Co. v. Control Components Inc.,* 443 F.Supp. 581, 581 (S.D.Iowa 1977) ("The district court's power to stay proceedings has been drawn purposefully broad and is discretionary."). Indeed, "[c]ourts have routinely stayed infringement actions pending the outcome of reexamination proceedings," *Softview Computer Prods. Corp.,* 2000 WL 1134471, at *2 (citations omitted), and Middleton has cited to no authority supporting the limitation it asserts. Accordingly, this Court finds it has the authority to issue a stay in the present matter if the circumstances weigh in favor of staying the proceedings. *See Gould v. Control Laser Corp.,* 705 F.2d 1340, 1341-42 (Fed.Cir.1983).[FN6]

FN6. In addition, as noted in footnote 1,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
**(Cite as: Not Reported in F.Supp.2d)**

this is an *ex parte* reexamination, while the statutes relied on by Middleton in raising this argument apply to *inter partes* reexaminations.

### B. Standard for Motion to Stay

Generally, courts consider the following factors in determining whether to grant a stay: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Softview Computer Prods. Corp.,* 2000 WL 1134471, at *2-3 (quoting *Xerox Corp. v. 3Com Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citations omitted)). In other words, based on these factors the Court determines whether the benefits of a stay outweigh the associated costs.

The advantages that may result from a stay of the district court proceedings pending completion of reexamination by the PTO include,
"1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.
2. Many discovery problems relating to prior art can be alleviated by the PTO examination.
3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.
4. The outcome of the reexamination may encourage a settlement without the further use of the Court.
5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation.
6. Issues, defenses, and evidence will be more easily limited in pretrial conferences after a reexamination.
7. The cost will likely be reduced both for the parties and the Court."

*Emhart Indus., Inc.,* 1987 WL 6314, at *2 (quoting *Fisher Controls Corp.,* 443 F.Supp. at 582 (S.D.Iowa 1977)).[FN7] Reexamination may result in the elimination of most, if not all, of the issues remaining in the pending litigation. *See Gould,* 705 F.2d at 1342. If not found invalid, the

reexamination will at least likely result in a narrowing and simplifying of the issues before the Court.[FN8] *See Loffland Bros. Co. v. Mid-Western Energy Corp.,* 1985 WL 1483, at *2 (W.D.Okla. Jan.3, 1985). In addition, the technical expertise provided by the reexamination proceeding will be helpful to the Court on any issues that remain. *See Gould,* 705 F.2d at 1342.

FN7. "Although not binding on the Court, the PTO's determination will be admissible and will carry a presumption of validity." *Ralph Gonnocci Revocable Living Trust v. Three M Tool & Mach. Co.,* 68 U.S.P.Q.2d 1755, 1759 (E.D.Mich.2003).

FN8. This is because the scope of the patent claims, which the PTO may narrow or otherwise limit, controls the outcome of any subsequent infringement analysis. *See Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1344 (Fed.Cir.2002) (finding "an assessment of whether an accused device infringes claims of a patent necessarily involves both an identification and interpretation of the asserted claims, and a comparison of the properly interpreted claim limitations to the elements of the accused device").

*4 Plaintiff makes three primary arguments against issuance of a stay. First, Middleton argues the issuance of a stay will not promote judicial economy. Second, Middleton urges the Court to deny the stay based on 3M's delay in filing for reexamination. Third, Middleton contends it will be prejudiced if the stay is granted. In the alternative, if the Court determines a stay is warranted, Middleton requests the Court grant a stay only as to those issues before the PTO. Each of these contentions is summarized and discussed below.

### 1. Judicial Economy

Both parties accept that one factor in determining the propriety of a stay of proceedings in the face of reexamination is the judicial economy that such stay

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d)

Page 5

would promote. Middleton contends that, contrary to 3M's assertions, a stay would not promote judicial economy at all in this case because of the amount of preparation by the parties thus far. This matter has now been pending for eight years, and that fact alone would seem to argue strongly against a stay. However, despite the lengthy pendency of this matter in the Northern District of Illinois, the validity of the '514 patent has only been explored by the parties for a little over a year, in isolation hardly an unusual period of time for development of such issues.

According to Middleton, the court in *Toro Co. v. L.R. Nelson Corp.* ruled a stay was unwarranted under similar circumstances.

This suit has been pending in litigation for almost 3 1/2 years. Before the motion for stay was filed, the court had under advisement a motion by defendant for summary judgment, which may well be dispositive of the issue of validity of asserted claims 14 and 15. Those factors militate against a stay at this stage of the proceedings.
The pendency of this suit does not necessarily preclude any further proceedings which the Patent Office may choose to pursue. It is the opinion of the court that its granting of a stay order would accomplish little, other than the delay of disposition of a suit which has, until now, run an overly protracted course.

*Toro Co. v. L.R. Nelson Corp.,* 223 U.S.P.Q. 636, 638 (C.D.Ill.1984).

Middleton contends that the factual circumstances impacting judicial economy in *Toro* and in the present case are vastly different than those involved in the cases cited by 3M. *See Tap Pharm. Prods., Inc.,* 2004 WL 422697, at *1 ("Plaintiffs have known from the start of this case three months ago that the pending reexaminations could create grounds for a stay. As of yet, this case has not progressed beyond the initial pleadings stage; the parties have not engaged in any discovery and have not filed any other substantive motions."); *Ralph Gonnocci Revocable Living Trust,* 68 U.S.P.Q.2d at 1758 ("This action has been pending for less than a year. Undoubtably the parties have spent considerable time and resources thus far-substantial

discovery has been conducted and the parties have submitted witness lists and three lengthy summary judgment motions. Yet far more time and resources remain to be spent before this matter is concluded. Two responses to motions for summary judgment must be submitted, the Court has not begun to review those motions, and much remains to be done by the parties and the Court to prepare this case for trial."); *Softview Computer Prods. Corp.,* 2000 WL 1134471, at *3 ("[A]lthough there has been a great deal of activity in this litigation to date, much remains to be done before the case is ready for trial. Discovery is not yet completed, extremely voluminous summary judgment motions have been served, the *Markman* hearing has not yet been held and the Pretrial Order has not yet been prepared."); *Robert H. Harris Co., Inc.,* 1991 WL 217666, at *4 ("[T]his action has been pending less than a year. Although it is set for trial next month, the Court is not persuaded that this a case which has 'run an overly protracted course' ... The parties appear not to have engaged in expensive discovery or extensive pretrial preparation") (citations omitted); *Emhart Indus., Inc.,* 1987 WL 6314, at *3 (noting that "substantially no trial preparations have been carried out-there is no pretrial order in place and no trial schedule has been set"). Arguably, none of these cases was at the stage of litigation that the present case indicates.

*5 In the present action. all summary judgment motions have been fully briefed, and discovery appears essentially complete. Accordingly, Middleton claims a stay at this point would do little to serve the interests of judicial economy, and would only have the effect of further delaying final resolution of this matter, which has already been pending far too long.

Additionally, Middleton contends 3M's reliance in part on *Standard Havens Products, Inc. v. Gencor Industries, Inc.* is misplaced as Middleton does not base its opposition to the present motion to stay on the proposition found to be faulty. *See Standard Havens Prods., Inc. v. Gencor Indus., Inc.,* 996 F. 32d 1236, 1993 WL 172432, at *1 (Fed.Cir. May 21, 1993) (reversing the lower court's decision denying a stay, as such decision was based upon the obviously incorrect proposition that a "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
**(Cite as: Not Reported in F.Supp.2d)**

reexamination decision can have no effect on this infringement suit even if the reexamination decision becomes final.").[FN9]

> FN9. Middleton also notes that this decision is unreported and, as such, "shall not be employed as precedent by this court, and may not be cited by counsel, except in support of a claim of res judicata, collateral estoppel, or law of the case." Fed. Cir. R. 47.8. However, the decision is relevant not as precedent but to demonstrate the final result of issues similar to those in the present case.

At least one court found the fact that discovery is complete and the case set for trial has been found to be the most compelling reason to justify denial of a motion to stay pending reexamination by the PTO. *See Enprotech Corp. v. Autotech Corp.,* 1990 WL 37217, at *1-2 (N.D.Ill. March 16, 1990) (finding these factors the most compelling and concluding the action was "too far along the road to justify halting the journey while the defendant explores an alternate route" in denying the motion to stay). Likewise, this is the most compelling argument made by Middleton in resisting the pending motion to stay.

In the present case, the litigation has been ongoing for over eight years.[FN10] The trial date is set and is scheduled for the week of October 12, 2004. In addition, several motions for summary judgment remain pending that may be dispositive of some or all of the issues remaining in the case. Discovery is completed, and the parties are most likely well into their trial preparation. Thus, the parties have already spent a considerable amount of time and money on the pending litigation. On its face, these facts seem to weigh against granting a stay.

> FN10. As indicated in the text, most of the history of this case occurred in the Northern District of Illinois and the Federal Circuit through litigation activities promoted by both parties. The issue now before the Court is of much more recent

vintage.

However, these facts should be weighed against the benefits of issuing a stay. As argued by 3M, the following factors weigh in favor of issuing a stay: (1) a stay will be the most efficient use of judicial resources by preventing duplication of effort; (2) the reexamination may simplify and narrow the issues in the case; and (3) the Court will be able to benefit from the expertise of the PTO. Moreover, a stay issued pending reexamination "is not for such a protracted or indefinite period" as reexamination proceedings are to " 'be conducted with special dispatch." ' [FN11] *Gould,* 705 F.2d at 1341 (quoting 35 U.S.C. § 305). Thus, while some courts have denied a stay based on the end of discovery and the proximity of trial, *see Toro Co.,* 223 U.S.P.Q. at 638; *Enprotech Corp.,* 1990 WL 37217, at *2, the ultimate determination is within the Court's discretion based on a weighing of the benefits of issuing a stay versus any added expenses resulting from the stay.

> FN11. One study listed the average pendency of a reexamination to be 19 months. *See* Note, "Reexamination Reality: How Courts Should Approach a Motion to Stay Litigation Pending the Outcome of Reexamination", 66 Geo. Wash. L.Rev. 172, 192 app. A (Nov.1997). This note is, however, over seven years old, and the parties were unable to indicate to the Court whether this estimate is accurate, though Defendant's counsel thought, but could not state definitively, that the average pendency has been shortened.

*6 In the present action, the Court finds the element of judicial economy does in fact weigh in favor of granting the motion to stay. First, a stay would preserve the costs of a trial on the merits that may be obviated by the results of the reexamination. Second, even if a trial is ultimately required, the Court can have all issues heard in one trial on the proper scope of the patent claims. In addition to limiting the issues at trial, the reexamination decision may also limit the issues in the currently

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d)

pending dispositive motions. Finally, the Court will be able to use the expertise of the PTO in making further determinations as related to the proper patent claims. In that regard, the Court is influenced by the breadth of the reexamination and the number of prior art references under active review.

The Court acknowledges the considerable expense already endured by the parties in the present action but notes that these costs will not be recouped by denying a stay and proceeding to a trial. This may actually compound the parties' expenses if some or all of the issues need to be retried later as a result of the reexamination. In addition, the Court disagrees with Middleton's contention that only incremental resources will be expended if the action proceeds to trial. It is simply not efficient to rule on three motions for summary judgment, complete pretrial, and hold a full jury trial if all or part have to be redone. The apparent scope of the reexamination, the technical expertise of the PTO, and the relationship to the issues in this case suggest to the Court a great likelihood that the continuing work of this Court would be impacted by the reexamination. The judicial efforts that a stay would preserve outweigh any additional cost in staying the proceedings even at this late juncture.

C. Filing for Reexamination

Middleton also argues that 3M's delay in filing reexamination warrants denying the motion. As noted above, 3M did not seek reexamination of the patent-in-suit until well after the commencement of the litigation. In addition, one of the references upon which 3M relied in seeking reexamination was one of its own patents. Under these circumstances, Middleton contends that it is an inevitable conclusion that 3M delayed unduly in seeking reexamination.[FN12]

> FN12. Middleton avers this is not the first time that 3M has used the reexamination procedure to engage in delay. For proof, Middleton cites to the decision in *Freeman v. Minnesota Mining & Mfg. Co.,* in which the court, apparently anticipating a motion

to stay from 3M, had the following to say:

> Though not before the Court, it seems worthwhile to state the Court's view on granting a stay of court proceedings pending the PTO reexamination. In *Digital Magnetic,* the court commented that ' parties should not be permitted to abuse the [reexamination] process by applying for reexamination after protracted, expensive discovery or trial preparation.' ... Discovery was concluded in this case seven months ago, and the first of the two suits was filed two and a half years ago. Moreover, 3M knew about all three of the documents on which its reexamination petition will be based no later than August 8, 1986. To allow 3M to now use the reexamination process to get this case stayed would be to allow a defendant to use the reexamination as a mere dilatory tactic.

*Freeman v. Minnesota Mining & Mfg. Co.,* 661 F.Supp. 886, 888 (D.Del.1987) (citations omitted). However, 3M's actions in another case are not relevant to the present action, especially considering the court's statement in *Freeman* was *anticipatory* and not in reaction to any actual motion to stay filed by 3M, let alone any proof that 3M was so moving for the purpose of delaying or unduly protracting the litigation. 3M's motion in the present case will be analyzed on its own merits and under the circumstances of the present action.

Courts have generally considered a delay in seeking reexamination in evaluating the propriety of a stay in light of such reexamination. Indeed, "[t]he potential for abuse inherent in granting a stay where the petition for reexamination comes very late and without explanation is apparent." *Grayling Indus., Inc.,* 1991 WL 236196, at *2. For example, in *Enprotech Corp.,* the defendant first raised the question of reexamination and an associated stay some 18 months after the commencement of litigation and four months before trial. *Enprotech Corp.,* 1990 WL 37217, at *1. That court, in denying the motion to stay, stated "[w]e are too far

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
**(Cite as: Not Reported in F.Supp.2d)**

along the road to justify halting the journey while the defendant explores an alternate route." *Id.* at *2; *see also Toro Co.,* 223 U.S .P.Q. at 638 (denying stay given three and a half year delay).

*7 Middleton asserts again that the authority cited by 3M in support of granting a stay is inapposite on this issue. In *Emhart Industries, Inc.,* the court found that although there was a delay in filing reexamination, that delay was the fault of the patentee in postponing needed discovery regarding the prior art. *Emhart Indus., Inc.,* 1987 WL 6314, at *3 ("Whatever plaintiff's reasons were for postponing these depositions, plaintiff will not now be heard to object to defendant's motion for stay on the grounds that too much time has passed since the commencement of this litigation.").

With regard to the other authority cited by 3M, in no instance was the delay between the commencement of the suit and the request for reexamination nearly as long as in this case. *See Tap Pharm. Prods., Inc.,* 2004 WL 422697, at *1 (reexamination requests were filed before the lawsuit began); *Ralph Gonnocci Revocable Living Trust,* 68 U.S.P.Q.2d at 1756 (request for reexamination filed within two months of the defendant's counsel's notice of appearance, and within eight months of commencement of suit); *Robert H. Harris Co.,* 1991 WL 217666, at *4 (request for reexamination filed within one year of commencement of suit); *Loffland Bros. Co.,* 1985 WL 1483, at *1 (request for reexamination filed within one year of commencement of suit); *Gioello Enterprises Ltd. v. Mattel, Inc.,* 2001 WL 125430, at *1 (D.Del. Jan. 29, 2001) (request for reexamination filed within 18 months of commencement of suit); *Grayling Indus., Inc.,* 1991 WL 236196, at *1 (reexamination request filed within two years of commencement of suit).[FN13]

> FN13. It is unclear in the *Softview Computer* decision, also relied upon by 3M, how much time elapsed between the commencement of suit and the reexamination request. *Softview Computer Prods. Corp.,* 2000 WL 1134471, at *1.

3M seeks to justify its delay in filing for reexamination by arguing there was a discovery stay in place as to validity that was "implicitly" lifted on March 11, 2003. Middleton counters by stating that, in the first place, the prior art upon which 3M based its request for reexamination was not the result of any discovery efforts engaged in by 3M and that 3M has not taken a single deposition on the subject prior art such art was identified. Middleton asserts that 3M could have filed for reexamination at the PTO at any time, notwithstanding any discovery stay imposed by a district court. Finally, even if 3M was somehow impeded by a discovery stay, it still took 3M over a year after the stay was "implicitly" lifted to file its reexamination request. Middleton contends that under the circumstances of the present case, a one-year delay is inexcusable, and 3M should not be allowed to benefit from its delay.

Middleton seemingly misses the point in arguing 3M's delay warrants denial of the motion to stay. More important than when the reexamination application was made was the purpose behind said application. Thus, instead of looking solely at when the application was made with regard to the pending litigation, the Court looks at whether the petition for reexamination was made with a dilatory purpose. *See Grayling Indus., Inc.,* 1991 WL 236196, at *2-3; *Emhart Indus., Inc.,* 1987 WL 6314, at *3. While the timing of the application is relevant in making this determination, the Court also looks to the proffered reasons for the delay. *See Ralph Gonnocci Revocable Living Trust,* 68 U.S.P.Q.2d at 1758 ("Plaintiff may be correct that [defendant] did not act swiftly in seeking reexamination. Nothing in the record, however, indicates when [defendant] became aware of the prior art which is the basis for his request for reexamination.... Thus the Court cannot conclude that [defendant] unnecessarily delayed seeking a reexamination or that he is doing so now to stall this litigation."); *Grayling Indus., Inc.,* 1991 WL 236196, at *3 (finding that " although it is not clear that Plaintiffs had good reason for the delay in petitioning the PTO for reexamination, neither has Defendant shown such egregiously dilatory conduct as would justify short-circuiting the reexamination procedure now that Plaintiffs have invoked it"). Moreover, if "the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d)

Page 9

Court finds that the benefits of granting a stay in the present proceedings outweigh the burdens, it need not decide whether the defendant could actually have filed its request at an earlier date." *Emhart Indus., Inc.,* 1987 WL 6314, at *3.

*8 In the present action, Middleton has presented no· evidence, beyond pointing out that one of the prior art references asserted by 3M was its own patent, that indicates 3M had knowledge of the prior art and could have made the request for reexamination much earlier. Due to the stay of discovery on issues related to the validity issue, 3M was not actively pursuing this issue. [FN14] Significantly, 3M had won a judgment of non-infringement on two different occasions in the Northern District of Illinois. Accordingly, 3M may have had little reason to pursue the issue of validity until the stay on discovery was lifted. 3M also argues that under the last decision from the Federal Circuit, the construction of the claims at issue was significantly broadened.

> FN14. Middleton argues that 3M did not have its hands tied by the Illinois court but instead put all its eggs into the infringement basket, holding in abeyance any argument on validity even though 3M has alleged validity from the beginning.

The record indicates it was not until this decision, and the subsequent course of the proceeding, that 3M began to actively pursue the validity issue. In May 2003, 3M received information pursuant to discovery that was relevant to this issue. Based on this information, 3M was able to gather additional information. Upon determining the validity of the '514 patent was an issue, 3M drafted the reexamination application, notified the Court, submitted a motion for summary judgment on validity, and, as soon as the reexamination was granted, moved for a stay. The Court finds it is not unreasonable under all of the unique circumstances of this case that it took 3M nearly a year from this time to file for reexamination, particularly in light of the numerous prior art references discovered, both domestic and foreign.

The Court finds that any delay in filing for reexamination is not cause to deny the motion to stay. While 3M may be guilty of focusing too much attention on the infringement issue, it was led on that course by the proceedings in the action. As soon as validity became a very real issue, 3M did not unduly delay in moving for reexamination. Moreover, there is no evidence that 3M has moved for a stay solely for a dilatory purpose beyond Middleton's argument to the contrary.

D. Prejudice to Middleton

Pursuant to section 318 of the Patent Statute, a court is not to issue a stay if it "would not serve the interests of justice." 35 U.S.C. § 318. Middleton contends that because of the prejudice it would incur should a stay be granted, such interests would not be served. When Middleton first filed suit against 3M, the patent in suit had more than a decade of useful life remaining, whereas now it is due to expire in less than three years. If 3M's proposed stay is granted, Middleton claims that it is likely that there will be no life remaining in the patent in suit in the event this matter is revived following reexamination; however, this fact alone is not sufficient to deny the motion to stay. *See Tap Pharm. Prods., Inc.,* 2004 WL 422697, at *1 (dismissing plaintiff's argument that patent may expire thereby depriving them of any injunctive remedy because patent may still expire before trial is completed).

*9 3M answers by stating that monetary compensation is sufficient to remedy infringement. Middleton disagrees and asserts that while it has no intention of commercializing the '514 patent, it would be deprived of its right to exclude others under the patent, stating that 3M's position would be tantamount to a compulsory license for using the patented invention. The Federal Circuit has found this to be an inadequate remedy for infringement. *See, e.g., Reebok Int'l, Ltd. v. Baker, Inc.,* 32 F.3d 1552, 1557 (Fed.Cir.1994); *Hybritech Inc. v. Abbott Lab.,* 849 F.2d 1446, 1456-57 (Fed.Cir.1988). According to Middleton, because it stands to lose its ultimate remedy for patent infringement in the event 3M's proposed stay

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 10

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d)

becomes a reality, Middleton will be severely prejudiced by such a stay, and this warrants denial of 3M's motion.

At present Middleton is not, however, selling or marketing products under its patent. Indeed, it has never done so and thus has no market to protect. Under similar circumstances, a district court found " money damages is an adequate remedy for any delay in redress" where the patentee was not " selling or actively licensing goods or services related to" the patent in suit. *Gioello Enters., Ltd.,* 2001 WL 126350, at *2; *see also Emhart Indus., Inc.,* 1987 WL 6314, at *2 (finding that " notwithstanding plaintiff's argument that monetary damage will not compensate for its losses, this *is* a suit for money damages and plaintiff has never sought preliminary injunctive relief from the Court" ).

Middleton is not currently selling products related to the patent in issue and would be entitled to any money damages if infringement is ultimately found. Ultimately, the Court finds this is sufficient to protect Middleton from suffering any undue prejudice or a clear tactical disadvantage. Should the action proceed to trial following reexamination, the Court may still order appropriate injunctive relief. In addition, Middleton would be entitled to money damages if proven, and there is no immediate danger of not being able to collect said damages from 3M.

### E. Alternatively, Granting Stay Solely on Issues Before the PTO

In the alternative, if the Court issues a stay in light of the reexamination, Middleton urges that the stay be limited to those issues pending before the PTO as part of the reexamination proceedings, i.e., anticipation and obviousness. Thus, the issues of infringement, willfulness, damages, and inequitable conduct would continue before the Court under Middleton's plan. Under this proposal, any judgment would not become final until the PTO has ruled on the reexamination and the parties' appeal rights have been exhausted unless the Court makes the judgment final as to those issues tried,[FN15]

thereby entitling the parties to appeal the judgment immediately.

FN15. *See* Fed.R.Civ.P. 54(b).

As concerns the issue of validity, 3M's request was for a reexamination proceeding pursuant to Chapter 30 of the Patent Statute. Pursuant to section 315 of the Patent Statute,
*10 A third party requester whose request for an *inter partes* reexamination results in an order under section 313 is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third party requester raised or could have raised during the *inter partes* reexamination proceeding.

35 U.S.C. § 315(c). In other words, in the event the PTO finds the subject claims patentable, 3M would be estopped from returning to court to re-argue validity of those claims. Therefore, Middleton contends that staying only those issues before the PTO would be a practical solution that would provide Middleton with more timely relief on the remaining issues.

The PTO's reexamination could, however, affect more than just the validity issues before the Court. Indeed, a PTO decision that the '514 Patent is invalid could render moot the issues of validity *and* infringement. *See Gioello Enters. Ltd.,* 2001 WL 125340, at *1 (finding the PTO's decision could render moot the issues of non-infringement and invalidity before the court in pending motions for summary judgment); *ASCII Corp. v. STD Entm't USA, Inc.,* 844 F.Supp. 1378, 1380-81 (N.D.Cal.1994) (finding stay was justified because if claims were cancelled in reexamination then the need to try the infringement issue would be eliminated); *Loffland Bros. Co.,* 1985 WL 1483, at *2 ("The reexamination procedure has the potential to eliminate trial on the issue of patent infringement, should all of the patent's claims be cancelled."). "In addition, if a final decision of unpatentability means the patent was void *ab initio*, then damages would also be precluded." *Standard Havens Prods., Inc.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11

Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)
**(Cite as: Not Reported in F.Supp.2d)**

1993 WL 172432, at *1. The issues of inequitable conduct and willfulness may not be impacted by the PTO's determination, *see Enprotech Corp.,* 1990 WL 37217, at *1 (finding reexamination would not affect the inequitable conduct claim at issue), though to only proceed on these two issues would not serve the interests of justice. Therefore, the Court finds it would not be appropriate to stay only a portion of the pending issues.

CONCLUSION

For the foregoing reasons, the Court hereby grants Defendant's Motion to Stay the Proceedings Pending Reexamination of U.S. Patent No. 4,944,514 by the Patent and Trademark Office (Clerk's No. 170). The Court finds a high likelihood that results of the PTO's reexamination would have a dramatic effect on the issues before the Court, up to and including dismissal of the entire action if the patent claims are found to be unpatentable. In any event, the Court will benefit from the PTO's expertise and determination on reexamination, and Middleton will not be unduly prejudiced by the stay. Thus, under the unique circumstances of this case the Court finds the benefits of issuing the stay outweigh the arguments made by Middleton in resistance to the motion.

**\*11** IT IS SO ORDERED.

S.D.Iowa,2004.
Middleton, Inc. v. Minnesota Mining and Mfg. Co.
Not Reported in F.Supp.2d, 2004 WL 1968669 (S.D.Iowa)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT P



**United States Patent and Trademark Office**                          ABOUT

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Reports > USPTO Annual Reports

## Performance and Accountability Report Fiscal Year 2006
### Other Accompanying Information

Table of Contents | Management | Financial | Auditor | IG | Other

### TABLE 13A: EX PARTE REEXAMINATION
### (FY 2002 - FY 2006)

| ACTIVITY | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| **Requests filed, total** | **272** | **392** | **441** | **524** | **511** |
| By patent owner | 121 | 136 | 166 | 166 | 129 |
| By third party | 140 | 239 | 268 | 358 | 382 |
| Commissioner ordered | 11 | 17 | 7 | – | – |
| | | | | | |
| **Determinations on requests, total** [1] | **272** | **381** | **419** | **535** | **453** |
| Requests granted: | | | | | |
| By examiner | 262 | 360 | 408 | 509 | 422 |
| By petition | 1 | 1 | – | 2 | 3 |
| Requests denied | 9 | 20 | 11 | 24 | 28 |
| | | | | | |
| **Requests known to have related litigation** | **52** | **109** | **138** | **176** | **229** |
| | | | | | |
| **Filings by discipline, total** | **272** | **392** | **441** | **524** | **511** |
| Chemical | 87 | 124 | 130 | 138 | 118 |
| Electrical | 78 | 118 | 156 | 188 | 228 |
| Mechanical | 107 | 150 | 155 | 198 | 165 |

Notes:

1: Past years' data have been revised from prior year reports. *(back to text)*

< Previous Page | Next Page >

*Is there a question about what the USPTO can or cannot do that you cannot find an answer for? Send questions about USPTO programs and services to the USPTO Contact Center (UCC). You can suggest USPTO webpages or material you would like featured on this section by E-mail to the webmaster@uspto.gov. While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.*

 **United States Patent and Trademark Office**                          ABOUT

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Reports > USPTO Annual Reports

## Performance and Accountability Report Fiscal Year 2006
### Other Accompanying Information

Table of Contents | Management | Financial | Auditor | IG | Other

### TABLE 13B: INTER PARTES REEXAMINATION
### (FY 2002 - FY 2006)

| ACTIVITY | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| **Requests filed, total** | 4 | 21 | 27 | 59 | 70 |
| **Determinations on requests, total** | 5 | 20 | 25 | 57 | 47 |
|     Requests granted: | 5 | 18 | 25 | 54 | 43 |
|         By examiner | – | 18 | 25 | 54 | 43 |
|         By petition | – | – | – | – | – |
|     Requests denied | – | 2 | – | 3 | 4 |
| | | | | | |
| **Requests known to have related litigation** [1] | 1 | 7 | 5 | 29 | 32 |
| | | | | | |
| **Filings by discipline, total** | 4 | 21 | 27 | 59 | 70 |
|     Chemical | 2 | 3 | 6 | 17 | 17 |
|     Electrical | – | 7 | 7 | 20 | 27 |
|     Mechanical | 2 | 11 | 14 | 22 | 26 |

**Notes:**

1: Past years' data have been revised from prior year reports. *(back to text)*

< Previous Page | Next Page >

*Is there a question about what the USPTO can or cannot do that you cannot find an answer for? Send questions about USPTO programs and services to the USPTO Contact Center (UCC). You can suggest USPTO webpages or material you would like featured on this section by E-mail to the* webmaster@uspto.gov. *While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.*

.| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Last Modified: 12/18/2006 17:27:39