**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VENETEC INTERNATIONAL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 07-CV-0057 *** |
| NEXUS MEDICAL, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**DECLARATION OF SCOTT R. BROWN IN SUPPORT OF NEXUS MEDICAL, LLC'S
REPLY TO VENETEC INTERNATIONAL, INC.'S OPPOSITION TO THE MOTION
TO STAY ALL PROCEEDINGS PENDING REEXAMINATION OF U.S. PATENT NO.
6,447,485 BY THE UNITED STATES PATENT AND TRADEMARK OFFICE**

I, Scott R. Brown, declare:

1.       I am a member in good standing of the bar of the state of Missouri and am a
partner in the law firm of Hovey Williams LLP, responsible for representation of Nexus Medical,
LLC ("Nexus") in this matter.  I have personal knowledge of the statements made herein.

2.       This Declaration accompanies Nexus Medical, LLC's Reply to Venetec
International, Inc.'s Opposition to the Motion to Stay All Proceedings Pending Reexamination of
U.S. Patent No. 6,447,485 by the United States Patent and Trademark Office.

3.       Attached hereto as Exhibit A is a copy of PCT International Application, WO
96/10435.

4.       Attached hereto as Exhibit B is a copy of U.S. Patent No. 6,447,485.

5.       Attached hereto as Exhibit C is a copy of U.S. Patent No. 4,397,647.

6.       Attached hereto as Exhibit D is a copy of *Executive Summary: Information
Disclosure Statement Notice of Proposed Rulemaking (IDS NPR)*, 71 Fed. Reg. 38808 (July 10,

1

2006); XX *Off. Gaz. Pat. Office* YY (August 1, 2006),

<http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/idsexecsummary.pdf>.

7.    Attached hereto as Exhibit E is a copy of *Inter Partes* Reexamination Filing Data – March 31, 2007.

8.    Attached hereto as Exhibit F is a copy of *Robert E. Harris Co., Inc. v. Metal Mfrg. Co., Inc.*, 19 U.S.P.Q.2d 1786, Civ. No. J-C-90-179, 1991 WL 217666 (E.D. Ark. June 21, 1991).

9.    Attached hereto as Exhibit G is a copy of *Brown v. Shimano American Corp.*, 18 U.S.P.Q.2d 1496, No. CV 88-6565 WJR (BX), 1991 WL 133586 (C.D. Cal. Jan. 29, 1991).

10.    Attached hereto as Exhibit H is a copy of *Alloc, Inc. v. Unilin Decor N.V.*, No. Civ.A. 03-253-GMS, 2003 WL 21640372 (D. Del. July 11, 2003).

11.    Attached hereto as Exhibit I is a copy of *Pegasus Development Corp. v. DirecTV, Inc.*, No. Civ.A. 00-1020-GMS, 2003 WL 21105073 (D. Del. May 14, 2004).

12.    Attached hereto as Exhibit J is a copy of *Abbott Diabetes Care, Inc. v. Dexcom, Inc.*, C.A. No. 05-590 GMS, 2006 WL 2375035 (D. Del. Aug. 16, 2006).

13.    Attached hereto as Exhibit K is a copy of U.S. Patent No. 6,213,979.

14.    Attached hereto as Exhibit L is a copy of the Amendment in the '150 Patent Application Listing the Allowed Claims.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  July 23, 2007

Scott R. Brown

# Exhibit A



**PCT**

WORLD INTELLECTUAL PROPERTY ORGANIZATION
International Bureau

INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

| (51) International Patent Classification 6 :  A61M 25/02 | A1 | (11) International Publication Number: WO 96/10435 |
| | | (43) International Publication Date:  11 April 1996 (11.04.96) |

(21) International Application Number:  PCT/US95/11996

(22) International Filing Date:  21 September 1995 (21.09.95)

(30) Priority Data:
08/316,024      30 September 1994 (30.09.94)    US

(71) Applicant:  VENETEC INTERNATIONAL, INC. [US/US]; Suite 550, 1500 Quail, Newport Beach, CA 92660 (US).

(72) Inventor: BIERMAN, Steven, F.; 143 8th Street, Del Mar, CA 92014 (US).

(74) Agent: SHREVE, William, H.; Knobbe, Martens, Olson and Bear, 16th floor, 620 Newport Center Drive, Newport Beach, CA 92660 (US).

(81) Designated States:  AU, CA, CN, JP, European patent (AT, BE, CH, DE, DK, ES, FR, GB, GR, IE, IT, LU, MC, NL, PT, SE).

Published
*With international search report.*
*With amended claims.*

(54) Title:  CATHETER ANCHORING SYSTEM

(57) Abstract

   An anchoring system for a central line catheter or other similar catheter or fluid lines provides convenient installation and release with a minimum of procedures and no pain or discomfort to the patient. The anchoring system includes a self-adhesive anchoring pad for secure mounting on the patient and an associated retainer. The retainer includes slotted openings to receive downwardly extending posts formed on the underside of lateral wings of a box clamp. The ends of the posts can be easily inserted into a large diameter central opening of the retainer holes and then slid horizontally to allow frictional or snap fit engagement and retention between the necks of the posts and the lateral slots or holes formed in the retainer. In this position, the ends of the posts are captured with a hollow within the retainer and beneath the lateral slots, and the box clamp and retainer thus are releasably locked together. The opposite sequence is followed for removal of the box clamp and catheter combination. A soft, pliable wing clamp also can be used in connection with the box clamp to retain the catheter and/or associated tubing within the box clamp.



*FOR THE PURPOSES OF INFORMATION ONLY*

Codes used to identify States party to the PCT on the front pages of pamphlets publishing international applications under the PCT.

| | | | | | |
|----|---------------------------|----|--------------------------------|----|--------------------------|
| AT | Austria | GB | United Kingdom | MR | Mauritania |
| AU | Australia | GE | Georgia | MW | Malawi |
| BB | Barbados | GN | Guinea | NE | Niger |
| BE | Belgium | GR | Greece | NL | Netherlands |
| BF | Burkina Faso | HU | Hungary | NO | Norway |
| BG | Bulgaria | IE | Ireland | NZ | New Zealand |
| BJ | Benin | IT | Italy | PL | Poland |
| BR | Brazil | JP | Japan | PT | Portugal |
| BY | Belarus | KE | Kenya | RO | Romania |
| CA | Canada | KG | Kyrgystan | RU | Russian Federation |
| CF | Central African Republic | KP | Democratic People's Republic | SD | Sudan |
| CG | Congo | | of Korea | SE | Sweden |
| CH | Switzerland | KR | Republic of Korea | SI | Slovenia |
| CI | Côte d'Ivoire | KZ | Kazakhstan | SK | Slovakia |
| CM | Cameroon | LI | Liechtenstein | SN | Senegal |
| CN | China | LK | Sri Lanka | TD | Chad |
| CS | Czechoslovakia | LU | Luxembourg | TG | Togo |
| CZ | Czech Republic | LV | Latvia | TJ | Tajikistan |
| DE | Germany | MC | Monaco | TT | Trinidad and Tobago |
| DK | Denmark | MD | Republic of Moldova | UA | Ukraine |
| ES | Spain | MG | Madagascar | US | United States of America |
| FI | Finland | ML | Mali | UZ | Uzbekistan |
| FR | France | MN | Mongolia | VN | Viet Nam |
| GA | Gabon | | | | |

-1-

## CATHETER ANCHORING SYSTEM
### Background of the Invention

Field of the Invention

    The present invention relates to a catheterization system, and more particularly to an anchoring system for

5    catheters and/or associated fluid supply or drainage lines.

Description of the Related Art

    It is very common in the treatment of patients to utilize intravenous (IV) catheters to introduce fluids and

medications directly into the bloodstream. In many cases, and particularly with respect to cardiac therapy, the IV

catheter is introduced into a central venous line or a larger vein located close to the patient's heart. For example,

10    a typical catheter utilized in connection with a central line is referred to as a "central venous catheter" ("CVC"),

while a venous catheter peripherally inserted into the heart through a vein in the arm is sometimes referred to as

a "peripherally inserted central catheter" ("PICC").

    In these cases, long-term IV infusion typically requires that the catheter remain in place for many days.

In order to secure such a central line IV catheter in position at the insertion site of the catheter, the IV tubing and/or

15    CVC is commonly surrounded by a thin, winged, flexible pad or seat, which is then sutured to the patient's skin.

In other applications, the thin, winged, flexible pad is covered by a more rigid clamp, which provides a friction fit

for the catheter/pad combination. The rigid clamp and the flexible pad have lateral, aligned holes in them which

allow the combination to be sutured to the patient's skin. Although this technique provides secure installation of

the central line catheter, it obviously is painful and uncomfortable for the patient. This prior retention procedure also

20    is time consuming and inconvenient, and poses the risk of needle-stick to the nurse or other medical professional.

    In U.S. Patent No. 5,192,274 ("the '274 patent), the present Applicant describes an anchoring system

which provides for the convenient and pain-free installation of a central line catheter. Applicant hereby incorporates

the '274 patent by reference. The anchoring system of the '274 patent includes an anchor pad which has an

adhesive bottom surface that attaches to the patient's skin. Two posts on the pad slidable receive a conventional

25    catheter seat or box clamp to secure the seat to the pad, but prevent disengagement of the seat from the pad. The

posts are snipped or cut in order to remove the catheter.

### Summary of the Invention

    In addition to incorporating the advantages of the anchoring system of the '274 patent, the anchoring

system of the present invention also provides for releasible retention of the catheter and/or associated fluid line.

30    That is, the present anchoring system releasible retains the catheter and/or fluid tubing to patient's skin in a manner

which allows for convenient release and reattachment of the catheter or fluid line to the patient.

    Thus, in accordance with one aspect of the present invention, an anchoring system for securing a

catheterization device to the body of a patient is provided. The anchoring system includes a clamp which is

configured to releasably engage a portion of the catheterization device. A retainer is connected to an adhesive layer

35    for secure attachment to the body of the patient. The clamp and retainer including corresponding coupling structure

which releasably engage to secure the clamp to the retainer.

-2-

In a preferred embodiment, the anchoring system is a multilevel system compatible with current venous catheter and retention systems. The anchoring system utilizes a soft split wing clamp, similar to one having present usage, as well as an overlying rigid box clamp. The box clamp engages the wing clamp from above and snaps on a portion of the central line catheter. However, unlike prior box clamps, the box clamp of the present invention

5    includes one or more downwardly extending posts which are insertable into corresponding slotted holes within the retainer. The downwardly extending posts, in cooperation with the slotted holes of the retainer, provide an important advantage in connection with the convenient installation and easy release of central line catheters.

The retainer having the slotted holes is in turn secured on a self-adhesive foam anchor pad which can be easily and painlessly mounted on the skin of the patient by means of the self-adhesive backing. The retainer is

10    mounted on this anchor pad by means of cyanoacrylate, or other bonding materials.

The slotted holes of the retainer correspond in number and location to the posts on the box clamp. Each post desirably includes a large diameter head or tip and a narrow neck or shank. The post tip is somewhat pointed or rounded in order to guide its insertion into the slotted holes, and the smaller diameter neck or shank mounts the tip to the underside of the box clamp. Each corresponding slotted hole in the retainer is formed by at least a larger

15    diameter central hole and smaller diameter lateral, slot or hole. The diameter of the central hole is sufficient to receive the tip of the post, while the diameter of the lateral slots or holes provides a friction or snap fit with respect to the neck or shank of the posts. Thus, the retainer provides retention for the box clamp (and, in turn for the wing clamp and catheter), by freely receiving the end of each post, and then providing friction or snap fit engagement between the neck of the post and the lateral slots or holes. With the neck of the post positioned within the lateral

20    slot or hole, the head of the post is captured within the retainer, beneath the slot, to releasable secure the box clamp to the retainer.

In use, the central line catheter is first inserted in accordance with standard procedure. The self-adhesive anchor pad is then adhered to the skin of the patient in such a manner so that its narrow neck region lies under the catheter and near the point of insertion. The soft split wing clamp is then placed over the shank of the catheter

25    so that its longitudinal split is stretched and engages the catheter. The rigid box clamp is then snapped in place over the top of the wing clamp and the catheter shank in conventional fashion, such that a longitudinal groove formed in the box clamp engages the combination of the catheter and the wing clamp in a snap fit or friction fit engagement. The box clamp combination, including the wing clamp and catheter, is then aligned downwardly over the retainer such that the posts are aligned with the central slotted holes in the top surface thereof. These holes

30    freely receive the posts as initial insertion occurs. Upon lateral movement of the box clamp, the neck of each post engages the lateral slots or holes of the retainer in a snap fit or friction fit engagement. This engagement then provides easy and convenient installation for the anchoring system.

During this installation process, the foam anchor pad serves to avoid any pain or discomfort to the patient by absorbing the downward force accompanying such installation. However, it should be noted that such force need

35    only be very slight, as there is no resistance to initial insertion of the tip of the post into the central holes in the

WO 96/10435                                                                    PCT/US95/11996

-3-

retainer. Firm force is required in only a lateral direction in order to secure the post to the lateral slots, such lateral movement being less painful for the patient.

In order to remove the catheter for replacement, cleaning, and the like, the opposite procedure is followed. The box clamp is simply moved laterally so that the neck of the post disengages the lateral hole or slot. The box
5   clamp can then be easily lifted upward and removed from the retainer so that the tip of the post exits the central hole in the retainer.

Accordingly, the present invention provides secure anchoring, as well as convenient removal.

In accordance with another aspect of the present invention, an anchoring system is provided for securing a catheterization device to the body of a patient. The anchoring system includes an anchor pad having an adhesive
10   layer for secure attachment to the body of the patient. A retainer is attached to the pad, and a clamp is configured to releasably engage a portion of the catheterization device. A coupling releasable interconnects the clamp to the retainer. The coupling includes at least one post and at least one slotted hole. The slotted hole receiving the post in a first position, and the post is movable from the first position to a second position within the hole. The coupling interconnects the retainer and clamp with the post in the second position.

15   An additional aspect of the present invention involves an anchoring system for securing a medical device to the body of a patient. The medical device includes a cylindrical portion. The anchoring system comprises a clamp configured to releasably engage the cylindrical portion of the medical device and a retainer connected to an adhesive layer. The clamp and retainer comprise corresponding first and second members which releasably interconnect to couple together the clamp and retainer. The first member is movable relative to the second member in a direction
20   generally parallel to the adhesive layer from a first position in which the first and second members are disengaged to a second position in which the first and second members are engaged.

In accordance with a preferred method of attaching a catheterization device to a body of a patient, a retainer, which is coupled to an adhesive member, is provided. The retainer is attached to the body by placing the adhesive member on the body. A clamp, which also is provided, is engaged with a portion of the catheterization
25   device. The retainer and clamp are then connected together in a releasable manner. The clamp is release from the retainer in a manner which permits the clamp to be later reconnected to the retainer.

### Brief Description of the Drawings

These and other features of the invention will now be described with reference to the drawings of a preferred embodiment which is intended to illustrate and not to limit the invention, and in which:

30   Figure 1 is a perspective view of the central line catheter anchoring system of the present invention shown in use in connection with the central line catheter;

Figure 2 is an exploded perspective view illustrating certain elements of the anchoring system of the present invention;

Figure 3 is a bottom plan view of a wing clamp utilized in connection with the present anchoring system;
35   Figure 4 is an elevational end view of the wing clamp of Figure 3;

-4-

Figure 5 is a bottom plan view of the box clamp of the present anchoring system illustrating the longitudinal groove for receiving the central line catheter and the downwardly extending posts mounted on the lateral wings of the box clamp;

Figure 6 is an elevational end view of the box clamp of Figure 5 illustrating the lateral, downwardly

5    extending mounting posts;

Figure 7 is a cross-sectional view of the retainer or anchor base of the present anchoring system illustrating the slotted holes formed in the top surface of the retainer and the relief there below to receive the posts of the box clamp;

Figure 8 is an elevational end view of the anchoring system of Figure 1; and

10   Figure 9 is an exploded perspective view of an anchoring system in accordance with another preferred embodiment of the present invention.

Detailed Description of the Preferred Embodiments

Figure 1 illustrates an anchoring system 10 which is configured in accordance with a preferred embodiment of the present invention and is used in connection with a central line catheter 12. It is understood, however, that

15   the anchoring system of the present invention also can be successfully utilized in connection with other types of catheters and catheterization devices utilized in a variety of different applications (e.g., arterial, intravenous, epidural, etc.), as well as with electrical wires or cables connected to external or implanted electronic devices or sensors. Thus, as used herein, the term "catheterization device" is meant generically to include catheters, fluid supply and drainage lines, connectors, adaptors, electrical wires and cables, and the like, all of which may be retained by the

20   present anchoring system. It therefore should be understood that the principles of the present invention are not limited to central line catheters or peripherally inserted central catheters.

Figure 1 illustrates the catheter 12 being anchored in position by an overlying box clamp 14 of the anchoring system 10. The box clamp 14 overlies and engages a soft wing clamp 18 which surrounds a portion of the catheter 12. The box clamp 14 and the wing clamp 18, which have similar configurations, engage an anchor

25   base or retainer 20 which underlies the catheter 12. The retainer 20 in turn is mounted on an anchor pad 22 which is attached directly to the skin 24 of the patient by means of a self-adhesive backing (not shown). Thus, by means of cooperation between the box clamp 14 and the retainer 20, as described below in more detail, the catheter 12 may be conveniently and painlessly anchored to and released from the patient's skin.

Figure 2 illustrates the retainer 20 and clamp components of the present anchoring system 10. The box

30   clamp 14, shown in the upper portion of Figure 2, is a relatively small, wing-shaped device having a configuration similar to that of conventional box clamps in common usage today. The box clamp 14 includes a central elongate body 26 having a longitudinal groove 28 formed therein and a pair of lateral wings 30 extending transversely from the body 26. The longitudinal groove 28 (as best seen in Figures 2, 5 and 6) is generally U-shaped and is sized to receive the body of the catheter 12 and/or the associated fluid line, and more preferably is sized to receive the wing

35   clamp 18 which surrounds a portion of the catheter 12 and/or the associated line. At least one end, and preferably at both ends of the longitudinal groove 28, the body 26 of the box clamp 14 narrows the opening of the longitudinal

-5-

groove 28. That is, the longitudinal groove 28 at either end extends through an arc, which is greater than 180 degrees about an axis of the longitudinal groove 28, so as to retain the wing clamp 18 within the body 26 of the box clamp 14. The groove 28 also can have a uniform cross section along its length so that the wall of the entire groove 28 extends through an arc greater than 180°.

5          The box clamp 14 is constructed of a substantially rigid plastic material, such as, for example, a polymer plastic material.

Figures 5 and 6 illustrate the box clamp 14 in greater detail, including the downwardly extending posts 17, shown best in Figure 6. Each post comprises a tip or head 44 and a neck or shank 46 which connects the tip 44 to the underside of the lateral wings 30 of the box clamp 14. At least a portion of the tip 44 is larger than the 10         diameter of the shank 46. In the illustrated embodiment, the tip 44 generally has a hemispherical shape; however, it is understood that other shapes, such as barbs, spheres, mushroom-shaped heads, and other types of radically projecting structures can be used as well. The tip 44 also is larger than the diameter of the lateral hole 42b. These posts 17 are aligned with the holes 36 in the wing clamp 18, although such posts can have other locations and configurations other than those shown and described herein to provide snap fit or friction fit engagement.

15         With reference to Figures 2-4, the wing clamp 18 has a configuration similar to that of the box clamp 14, including a central elongate body 32 and lateral wings 34 with holes 36 passing therethrough. The wing clamp 18 is constructed from a soft, pliable or flexible material such as, for example, Latex or the like. The body 32 generally has a tubular shape with an inner lumen 40 sized to surround a portion of the catheter body 12. The central elongate body 32 includes a slit 38 along its underside which can be expanded due to the pliable nature of the wing 20         clamp 18. Thus, the wing clamp 18 is capable of surrounding and engaging longitudinally a portion of the catheter 12 to provide a secure means for engaging and retaining the catheter 12 in place.

Figures 3 and 4 illustrate in greater detail the split or grooved wing clamp 18 used in connection with the present invention. The central elongate body 32 is shown with a groove or split 38 formed longitudinally therein to provide a central longitudinal opening 40 to receive a portion of the catheter 12. The lateral wings 34 of the 25         wing clamp 18, due to its soft, flexible construction, can be manually stretched in opposite directions to enlarge the width of the central split or groove 38 in the wing clamp, thereby providing a large enough central longitudinal opening 40 to engage a portion of the catheter 12.

As seen in Figures 1 and 8, the combination of catheter 12 and wing clamp 18 is inserted by friction fit into the longitudinal groove 28 formed in the central body 26 of the box clamp 14, as described and illustrated below 30         in more detail. The pliable nature of the wing clamp 18 allows it to be forced through the narrowed opening portions of the longitudinal groove 28. Once positioned within the groove 28, the compressed portions of the wing clamp 18 expand to form a friction fit with the wall of the groove 28.

The holes 36 in the lateral wings 34 of the wing clamp 18 desirably are aligned with the downwardly extending posts 17 on the box clamp 14. It is understood that although the anchoring system 10 of the present 35         invention is compatible with present winged retention systems which utilize two lateral, aligned suture holes in both the box clamp and the wing clamp, no particular limitation on the present invention should be intended or implied,

-6-

since its principles are equally applicable to other retention devices of other configurations which include one or more mounting posts.

Figure 2 further illustrates the retainer 20 of the anchoring system 10. The retainer 20 includes at least one and preferably a plurality of slotted holes 42 formed in the top surface thereof. These holes 42 are also in
5    alignment with the holes 36 in the lateral wings 34 of the wing clamp 18 and the downwardly extending posts 17 of the box clamp 14. Each slotted hole 42 is formed by a central circular opening 42a, with at least one lateral slot or hole 42b extending to one side. In the illustrated embodiment, each slotted hole 42 includes a central opening 42a with lateral holes 42b extending to either side. As will be explained in more detail below, these slotted holes 42 receive the downwardly extending posts 17 of the box clamp 14 to provide releasable retention for the catheter
10    12.

Figure 7 is a cross-sectional view of the retainer or anchor base 20 of the present invention and illustrates the slotted openings 42 formed on the upper surface thereof. Thus, within the retainer 20 and below each opening 42 there is found a hollow space 48 for receiving the tip 44 of the downwardly extending posts 17 of the box clamp 14. This space 48 also accommodates the lateral movement of the box clamp 14 in order to provide engagement
15    between the neck 46 of each post 17 and one of the slots or holes 42b formed laterally with respect to the upper retainer hole 42a. In this manner, the tip 44 of each post 17 is captured within the hollow space 48 below each slot 42b. The post 17 cannot be pulled out of the hole 42 because the rear side of the tip 44 contacts the portion of the retainer 20 adjacent the slot 42b.

With reference to Figures 1 and 8, the retainer 20 desirably is secured to the anchor pad 22 by means of
20    cyanoacrylate, or other bonding material. The flexible anchor pad 22 comprises a laminate structure formed by an upper paper or other woven or non-woven cloth layer, an inner cellulose foam layer, and a bottom adhesive layer. Alternatively, the flexible anchor pad 22 may comprise an adhesive bottom layer and an upper cellulose foam layer. An upper surface of the foam layer is roughened by corona treating the foam with a low electric charge, as known in the art. The roughened or porous upper surface of the anchor pad 22 improves cyanoacrylate (other types of
25    adhesive or bonding materials) adhesion when attaching the retainer 20 to the anchor pad 22.

A removable paper or plastic backing (not shown) desirably covers the bottom adhesive surface before use. The backing preferably resists tearing and is divided into a plurality of pieces to ease attachment of the pad to the patient's skin. Desirably, the backing is split along a center line of the flexible anchor pad 22 in order to expose only half of the adhesive bottom surface at one time. The backing also advantageously extends beyond at least one
30    edge of the anchor pad 22 to ease removal of the backing from the adhesive layer.

In the illustrated embodiment, the anchor pad 22 includes a pair of opposing concave sections which narrows the center of the anchor pad proximate to the retainer 22. As a result, the peripheral ends of the anchor pad 22 have more contact area to provide greater stability and adhesion to the patient's skin.

Figure 8 illustrates the complete assembly of the anchoring system 10 of the present invention, including
35    the self-adhesive foam pad 22, the retainer 20 secured to the upper foam surface of the anchor pad 22, and the catheter 12 which is retained in place by the engagement of the posts 17 of the box clamp 14 with the slotted

-7-

holes 42 of the retainer 20. The wing clamp 18, which is sandwiched between the box clamp 14 and the catheter 12, as shown in Figure 8, provides secure retention for the catheter 12 within the snap fit groove 28 of the box clamp 14.

In operation, the self-adhesive anchor pad 22 is applied to the skin 24 of the patient in the vicinity of the catheter insertion site. The anchor pad 22 should be mounted on the patient so that the retainer 20 is transverse to the catheter 12 and lies directly under it. The wing clamp 18 is then stretched and fit over the catheter 12, as in standard practice, and the downwardly extending posts 17 of the box clamp 14 are inserted through the holes 36 in the wings 34 of the wing clamp 18. The combination wing clamp/catheter is then snap fit into the longitudinal groove 28 of the box clamp 14 to form a secure engagement of those three elements. The posts 17 of the box clamp 14 are then aligned with the slotted openings 42 on the top surface of the retainer 20 such that the tip 44 of each post 17 passes through the corresponding large diameter hole 42a in the retainer 20. This engagement should be relatively easy so that downward force is not necessary, thereby avoiding pain or discomfort to the patient. Alternatively, the wing and box clamps 18, 14 may first engage the retainer 20, and subsequently the pad 22 may be affixed to the patient.

Once the tips 44 of the posts 17 have cleared the larger diameter opening 42a in the upper surface of the retainer 20 and have entered the hollow 48 there below (as shown in Figures 7 and 8), the box clamp 14 is slid laterally left or right so that the neck 46 of each post 17 slides into the lateral slots 42b of the retainer holes 42. The openings to each slots 42b desirably are sized so as to be slightly smaller than the diameter of the post necks 46, and they thereby provide a friction or snap fit engagement with the posts 17. This engagement serves to retain the box clamp combination securely in place within the retainer 20.

When removal becomes necessary, the box clamp 14 simply is slid horizontally in the opposite direction so that the tips 44 of the posts 17 are once again aligned with the larger diameter holes 42a, whereupon the box clamp combination can be easily removed vertically from the retainer 20 to allow the changing or cleaning of the catheter 12.

Thus, no painful or time-consuming sutures or other extensive removal procedures involving sharp instruments (e.g., scissors) are necessary with the anchoring system of the present invention. In addition, the anchor pad 22 absorbs any forces which are incurred in the installation or removal of the anchoring system and the catheter 12, thereby providing greater comfort for the patient.

Although this invention has been described in terms of a certain preferred embodiment, other embodiments apparent to those of ordinary skill in the art are also within the scope of this invention. For instance, as seen in Figure 9, it is appreciated that the retainer could include the post and the wings of the box clamp could define slotted holes which receive the corresponding posts. It also is understood that other types of known coupling mechanisms could be used as well to releasably secure the box clamp to the retainer. Accordingly, the scope of this invention is intended to be defined only by the claims which follow.

-8-

## WHAT IS CLAIMED IS:

    1.    An anchoring system for securing a medical device to the body of a patient, said medical device including a cylindrical portion, said anchoring system comprising a clamp configured to releasably engage the cylindrical portion of the medical device and a retainer connected to an adhesive layer, said clamp and retainer

5    comprising corresponding first and second members which releasably interconnect to couple together said clamp and retainer, said first member being movable relative to said second member in a direction generally parallel to said adhesive layer from a first position in which said first and second members are disengaged to a second position in which said first and second members are engaged.

    2.    The anchoring system of Claim 1, wherein said first member comprises a post with a flared end,

10    and second member comprises a hole which receives said post, said hole having at least one portion which is larger than said flared end of said post, and another portion which is smaller than said flared end of said post.

    3.    The anchoring system of Claim 2, wherein said retainer defines said hole and said post extends from said clamp.

    4.    The anchoring system of Claim 2, wherein said clamp defines said hole and said post extends from

15    said retainer.

    5.    The anchoring system of Claim 2, wherein said clamp is adapted to engage a fluid tube of the medical device.

    6.    The anchoring system of Claim 2, wherein said post is movable from said first position to said second position when inserted into said hole.

20    7.    The anchoring system of Claim 2, wherein said first member comprises a second post and said second member comprises a corresponding second hole which receives said second post.

    8.    An anchoring system for securing a catheterization device to the body of a patient, said anchoring system comprising a clamp configured to releasable engage a portion of the catheterization device, and a retainer connected to an adhesive layer for secure attachment to the body of the patient, said clamp and retainer including

25    corresponding coupling structure which releasable engage to secure said clamp to said retainer, said coupling structure comprising at least one hole which receives a corresponding post, said post includes a flared end which has a size larger than at least a portion of said hole said hole having a first opening which is larger than said flared end of said post, and a second opening which is smaller than said flared end of said post.

    9.    The anchoring system of Claim 8, wherein said retainer defines said hole and said post extends

30    from said clamp.

    10.    The anchoring system of Claim 9, wherein said clamp defines said hole and said post extends from said retainer.

    11.    The anchoring system of Claim 8, wherein said post includes a shank which connected to said flared end, said shank being smaller in cross section than said second opening.

35    12.    The anchoring system of Claim 8, wherein said first and second opening are placed adjacent to each other.

WO 96/10435  PCT/US95/11996

-9-

13.    The anchoring system of Claim 12, wherein said post is configured to be freely inserted into said first opening and is able to be slid from said first opening to said second opening in which position said shank extends through said second opening and said flared head is captured behind said second opening.

14.    The anchoring system of Claim 13, wherein an intermediate opening section links said first and second openings together, said intermediate opening having a size slightly smaller than said post shank such that said second opening receives said post shank in a snap fit manner.

15.    The anchoring system of Claim 8 additionally comprising a flexible anchor pad, said adhesive layer formed on one side of said anchor pad and said retainer attached to an opposite side of said anchor pad.

16.    The anchoring system of Claim 15, wherein said anchor pad has a laminate structure formed by a cellulose foam layer interposed between said adhesive layer and a layer of woven fibers.

17.    The anchoring system of Claim 8 additionally comprising an pliable wing clamp configured to surround and engage a portion of the catheterization device, said wing clamp also being configured to engage said clamp.

18.    The anchoring system of Claim 17, wherein said clamp includes a groove which receives a portion of said wing clamp.

19.    An anchoring system for securing a catheterization device to the body of a patient, said anchoring system comprising:

an anchor pad having an adhesive layer for secure attachment to the body of the patient;

a retainer attached to said pad;

a clamp configured to releasably engage a portion of the catheterization device; and

a coupling to releasably interconnect said clamp and said retainer, said coupling comprising at least one post and at least one slotted hole, said slotted hole receiving said post in a first position and said post being movable from said first position to a second position within said hole, said coupling interconnecting said retainer and clamp with said post in said second position.

20.    The anchoring system of Claim 19, wherein said coupling includes a plurality of said posts and a plurality of said slotted holes.

21.    The anchoring system of Claim 20, wherein at least one of said posts extends from said clamp and at least one of said slotted holes is defined by said retainer.

22.    The anchoring system of Claim 21, wherein at least one of said posts extends from said retainer and at least one of said slotted holes in defined by said clamp.

23.    The anchoring system of Claim 22, wherein said clamp comprises a generally rigid element which defines a longitudinal groove and a generally pliable element which is configured to surround and engage a portion of the catheterization device, said pliable element being adapted to snap into said rigid element to secure the catheter within the clamp.

24.    A method for attaching a catheterization device to a surface, comprising the steps of:

providing a retainer coupled to an adhesive member;

WO 96/10435                                                   PCT/US95/11996

-10-

providing a clamp configured to engage a portion of the catheterization device;

placing said adhesive member on a surface to secure the retainer thereon;

engaging said clamp with a portion of the catheterization device;

connecting said clamp to said retainer in a releasable manner; and

5          releasing said claim from said retainer in a manner which permits the clamp to be later reconnected to the retainer.

25.    The method of Claim 24, wherein coupling involves inserting a post with a flared end into a slotted hole at a first position and sliding said post within said slotted hole from said first position to a second position so as to capture said flared head behind a portion of said hole to prevent said post from pulling out of said slotted hole.

10         26.    The method of Claim 24, wherein said post is snapped into said second position from said first position so as to retain said post in said second position.

27.    The method of Claim 26, wherein releasing said clamp from said retainer involves sliding said post from said second position to said first position and thereafter withdrawing said post from said hole.

WO 96/10435                                              PCT/US95/11996

11

## AMENDED CLAIMS
[received by the International Bureau on 15 March 1996 (15.03.96);
original claim 24 amended; new claims 28-38 added;
remaining claims unchaged ( 2 pages )].

providing a clamp configured to engage a portion of the catheterization device; placing said adhesive member on a surface to secure the retainer thereon; engaging said clamp with a portion of the catheterization device; connecting said clamp to said retainer in a releasable manner; and

5      releasing said clamp from said retainer in a manner which permits the clamp to be later reconnected to the retainer.

25.    The method of Claim 24, wherein coupling involves inserting a post with a flared end into a slotted hole at a first position and sliding said post within said slotted hole from said first position to a second position so as to capture said flared head behind a portion of said hole to prevent said post from pulling out of
10     said slotted hole.

26.    · The method of Claim 24, wherein said post is snapped into said second position from said first position so as to retain said post in said second position.

27.    The method of Claim 26, wherein releasing said clamp from said retainer involves sliding said post from said second position to said first position and thereafter withdrawing said post from said hole.

15     28.    An anchoring system for securing a medical device to the body of a patient, the medical device having an elongated portion which defines an axis, said anchoring system comprising a clamp configured to engage the elongated portion of the medical device, and a retainer coupled to an adhesive layer which adheres to the body of the patient, said clamp and retainer having corresponding coupling structures that engage to secure said clamp to said retainer, said coupling structure comprising an aperture having a major diameter lying generally
20     perpendicular to the axis of the elongated portion engaged by the clamp, and a minor diameter lying generally parallel to the axis, said aperture being positioned to receive a corresponding post of said coupling structure, said post having a flared end of a size larger than at least a portion of said aperture.

29.    The anchoring system of Claim 28, wherein said post includes a shank connected to said flared end, said shank being smaller in cross section than said minor diameter.

25     30.    The anchoring system of Claim 29, wherein said shank of said post is configured to slide freely within said aperture along said major diameter with said flared end being captured on one side of said aperture.

31.    The anchoring system of Claim 29, wherein said aperture has a first opening which is larger than said flared end of said post, and a second opening which is smaller than said flared end of said post.

32.    The anchoring system of Claim 31, wherein said shank of said post has a smaller cross·
30     sectional width than a diameter of said second opening.

33.    The anchoring system of Claim 31, wherein said first and second openings are placed adjacent to each other.

AMENDED SHEET (ARTICLE 19)

WO 96/10435                                                    PCT/US95/11996

12

34.     The anchoring system of Claim 33, wherein said post is configured to be freely inserted into said first opening and to be slid from said first opening to said second opening in which position said shank extends through said second opening and said flared end is captured behind said second opening.

5

35.     The anchoring system of Claim 34, wherein an intermediate opening section links said first and second openings together, said intermediate opening having a size slightly smaller than the diameter of said post shank such that said second opening receives said post shank in a snap-fit manner.

36.     The anchoring system of Claim 28 additionally comprising a flexible anchor pad to which said adhesive layer is applied on one side of and said retainer is attached on an opposite side.

10

37.     The anchoring system of Claim 28 additionally comprising a pliable wing clamp configured to surround and engage a portion of the medical device, said wing clamp also being configured to engage said clamp.

38.     The anchoring system of Claim 37, wherein said clamp includes a channel which receives a portion of said wing clamp.

WO 96/10435                                                    PCT/US95/11996

1/3



*Fig. 1*

*Fig. 2*

WO 96/10435                                                    PCT/US95/11996

2/3



WO 96/10435                                        PCT/US95/11996

3/3



*Fig. 9*

# INTERNATIONAL SEARCH REPORT

| | | |
|---|---|---|
| | Inter   :al Application No | |
| | PCT/US 95/11996 | |

**A. CLASSIFICATION OF SUBJECT MATTER**

IPC 6   A61M25/02

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)

IPC 6   A61M

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category * | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | US,A,5 192 274 (BIERMAN) 9 March 1993<br>cited in the application<br>see abstract; claims 1-7; figures 1,2<br>--- | 1-27 |
| A | WO,A,92 19309 (BIERMAN) 12 November 1992<br>see abstract; claims 1-8; figures 1,2<br>----- | 1-27 |

| [ ] Further documents are listed in the continuation of box C. | [X] Patent family members are listed in annex. |
|---|---|

* Special categories of cited documents :

'A' document defining the general state of the art which is not considered to be of particular relevance

'E' earlier document but published on or after the international filing date

'L' document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

'O' document referring to an oral disclosure, use, exhibition or other means

'P' document published prior to the international filing date but later than the priority date claimed

'T' later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

'X' document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

'Y' document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

'&' document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 12 January 1996 | 18. 01. 96 |

| Name and mailing address of the ISA | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2<br>NL - 2280 HV Rijswijk<br>Tel. ( + 31-70) 340-2040, Tx. 31 651 epo nl,<br>Fax ( + 31-70) 340-3016 | Michels, N |

Form PCT/ISA/210 (second sheet) (July 1992)

# INTERNATIONAL SEARCH REPORT

...ormation on patent family members

| | Inter    ial Application No |
|---|---|
| | PCT/US 95/11996 |

| Patent document cited in search report | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|
| US-A-5192274 | 09-03-93 | AU-B- | 659174 | 11-05-95 |
| | | AU-B- | 2027692 | 21-12-92 |
| | | CA-A- | 2109333 | 09-11-92 |
| | | EP-A- | 0583388 | 23-02-94 |
| | | JP-T- | 7500976 | 02-02-95 |
| | | WO-A- | 9219309 | 12-11-92 |
| WO-A-9219309 | 12-11-92 | US-A- | 5192274 | 09-03-93 |
| | | AU-B- | 659174 | 11-05-95 |
| | | AU-B- | 2027692 | 21-12-92 |
| | | CA-A- | 2109333 | 09-11-92 |
| | | EP-A- | 0583388 | 23-02-94 |
| | | JP-T- | 7500976 | 02-02-95 |

Form PCT/ISA/210 (patent family annex) (July 1992)

# Exhibit B

US006447485B2

(12) **United States Patent**

Bierman

(10) Patent No.: **US 6,447,485 B2**

(45) Date of Patent: **Sep. 10, 2002**

(54) **MEDICAL LINE ANCHORING SYSTEM**

(75) Inventor: **Steven F. Bierman**, Del Mar, CA (US)

(73) Assignee: **Venetec International, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/797,341**

(22) Filed: **Mar. 1, 2001**

**Related U.S. Application Data**

(62) Division of application No. 08/865,231, filed on May 29, 1997, now Pat. No. 6,213,979.

(51) Int. Cl.[7] .................................................. A61M 5/32

(52) U.S. Cl. ........................ 604/174; 604/177; 604/180; 128/DIG. 26

(58) Field of Search ................................. 604/174, 175, 604/177, 176, 180, 179; 128/DIG. 26

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,525,398 | A | 10/1950 | Collins |
| 2,533,961 | A | 12/1950 | Rouseau et al. |
| 2,707,953 | A | 5/1955 | Ryan |
| 3,059,645 | A | 10/1962 | Hasbrouck et al. |
| 3,064,648 | A | 11/1962 | Bujan |
| 3,167,072 | A | 1/1965 | Stone et al. |
| 3,482,569 | A | 12/1969 | Raffaelli |
| 3,529,597 | A | 9/1970 | Fuzak |
| 3,602,227 | A | 8/1971 | Andrew |
| 3,630,195 | A | 12/1971 | Santomieri |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2341297 | 4/1975 |
| EP | 0064284 A2 | 4/1982 |
| EP | 0247590 A2 | 12/1987 |
| EP | 356683 A | 7/1989 |
| FR | 1184139 | 7/1959 |
| FR | 2381529 | 9/1978 |
| GB | 2063679 | 6/1981 |
| GB | 2086466 A | 5/1982 |
| WO | WO 80/01458 | 7/1980 |
| WO | WO 85/02774 | 7/1985 |
| WO | WO 91/16939 | 11/1991 |
| WO | WO 92/19309 | 11/1992 |
| WO | WO 96/10435 | 4/1996 |

OTHER PUBLICATIONS

Multiple–Lumen Central Venous Catheerization Product with Arrow+gård™ Antiseptic Surface (Arrow International brochure) (Apr. 1994).
Photographs (4) of Catheter Clamp and Rigid Fastener sold by Arrow International, Inc.

*Primary Examiner*—Manuel Mendez
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

An anchoring system includes a simply-structured device which permits a portion of a catheter tube or similar medical article to be easily anchored to a patient, desirably without the use of tape or needles and suturing. A unitary retainer desirably includes a base connected to a cover by way of a flexible hinge. The retainer is attached to a flexible anchor pad including an adhesive bottom surface, which can be attached to the patient's skin. A catheter is secured to a fitting, which in turn mounts to the retainer. Mounting the fitting to the retainer can be accomplished by inserting posts of the retainer through holes of the fitting, or by mounting the fitting within a channel defined by mounting structures integral to the retainer. The cover is then positioned over the base, by bending the flexible hinge, and latched to the base. Several embodiments of the latching mechanism are disclosed. In one form, the latching mechanism includes one or more posts on the base which can be releasably locked into corresponding slotted holes in the cover.

**22 Claims, 6 Drawing Sheets**



**US 6,447,485 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| 3,677,250 A | 7/1972 | Thomas | 4,976,700 A | 12/1990 | Tollini |
| 3,766,915 A | 10/1973 | Rychlik | 4,997,421 A | 3/1991 | Palsrok et al. |
| 3,834,380 A | 9/1974 | Boyd | 5,000,741 A | 3/1991 | Kalt |
| 3,847,370 A | 11/1974 | Engelsher | 5,037,397 A | 8/1991 | Kalt et al. |
| 3,856,020 A | 12/1974 | Kovac | 5,073,170 A | 12/1991 | Schneider |
| 3,896,527 A | 7/1975 | Miller, et al. | 5,084,026 A | 1/1992 | Shapiro |
| 3,900,026 A | 8/1975 | Wagner | 5,098,399 A | 3/1992 | Tollini |
| 3,906,946 A | 9/1975 | Nordstrom | 5,147,322 A | 9/1992 | Bowen et al. |
| 3,942,228 A | 3/1976 | Buckman et al. | 5,156,641 A | 10/1992 | White |
| 3,973,565 A | 8/1976 | Steer | 5,192,273 A | 3/1993 | Bierman et al. |
| 4,020,835 A | 5/1977 | Nordstrom et al. | 5,192,274 A | 3/1993 | Bierman |
| 4,057,066 A | 11/1977 | Taylor | 5,195,981 A | 3/1993 | Johnson |
| 4,059,105 A | 11/1977 | Cutruzzula et al. | 5,266,401 A | 11/1993 | Tollini |
| 4,082,094 A | 4/1978 | Dailey | 5,267,967 A | 12/1993 | Schneider |
| 4,114,618 A | 9/1978 | Vargas | 5,282,463 A | 2/1994 | Hammersley |
| 4,129,128 A | 12/1978 | McFarlane | 5,292,312 A | 3/1994 | Delk et al. |
| 4,133,307 A | 1/1979 | Ness | 5,304,146 A | 4/1994 | Johnson et al. |
| 4,142,527 A | 3/1979 | Garcia | 5,306,243 A | 4/1994 | Bonaldo |
| 4,161,177 A | 7/1979 | Fuchs | 5,314,411 A | 5/1994 | Bierman |
| 4,193,174 A | 3/1980 | Stephens | 5,322,514 A | 6/1994 | Steube et al. |
| 4,224,937 A | 9/1980 | Gordon | 5,330,438 A | 7/1994 | Gollobin et al. |
| 4,248,229 A | 2/1981 | Miller | 5,338,308 A | 8/1994 | Wilk |
| 4,250,880 A | 2/1981 | Gordon | 5,342,317 A | 8/1994 | Claywell |
| 4,316,461 A | 2/1982 | Marais et al. | 5,344,406 A | 9/1994 | Spooner |
| 4,324,236 A | 4/1982 | Gordon et al. | 5,344,414 A | 9/1994 | Lopez et al. |
| 4,326,519 A | 4/1982 | D'Alo et al. | 5,346,479 A | 9/1994 | Schneider |
| 4,362,156 A | 12/1982 | Feller, Jr. et al. | 5,352,211 A | 10/1994 | Merskelly |
| 4,392,853 A | 7/1983 | Muto | 5,354,282 A | 10/1994 | Bieman |
| 4,397,647 A | 8/1983 | Gordon | 5,354,283 A | 10/1994 | Bark et al. |
| 4,449,975 A | 5/1984 | Perry | 5,380,293 A | 1/1995 | Grant |
| 4,453,933 A | 6/1984 | Speaker | 5,380,294 A | 1/1995 | Persson |
| 4,474,559 A | 10/1984 | Steiger | 5,380,301 A | 1/1995 | Prichard et al. |
| 4,480,639 A | 11/1984 | Peterson et al. | 5,382,239 A | 1/1995 | Orr et al. |
| 4,516,968 A | 5/1985 | Marshall et al. | 5,382,240 A | 1/1995 | Lam |
| 4,563,177 A | 1/1986 | Kamen | 5,389,082 A | 2/1995 | Baugues, et al. |
| 4,633,863 A | 1/1987 | Filips et al. | 5,395,344 A | 3/1995 | Beisang, III et al. |
| 4,650,473 A | 3/1987 | Bartholomew et al. | 5,403,285 A | 4/1995 | Roberts |
| 4,660,555 A | 4/1987 | Payton | 5,413,562 A | 5/1995 | Swauger |
| 4,711,636 A | 12/1987 | Bierman | 5,443,460 A | 8/1995 | Milusek |
| 4,742,824 A | 5/1988 | Payton et al. | 5,449,349 A | 9/1995 | Sallee et al. |
| 4,808,162 A | 2/1989 | Oliver | 5,456,671 A | 10/1995 | Bierman |
| 4,823,789 A | 4/1989 | Beisang III | 5,468,228 A | 11/1995 | Gebert |
| 4,826,486 A | 5/1989 | Palsrok et al. | 5,468,230 A | 11/1995 | Corn |
| 4,852,844 A | 8/1989 | Villaveces | 5,468,231 A | 11/1995 | Newman et al. |
| 4,857,058 A | 8/1989 | Payton | 5,470,321 A | 11/1995 | Forster et al. |
| 4,863,432 A | 9/1989 | Kvalo | D364,922 S | 12/1995 | Bierman |
| 4,880,412 A | 11/1989 | Weiss | 5,484,420 A | 1/1996 | Russo |
| 4,896,465 A | 1/1990 | Rhodes et al. | 5,496,282 A | 3/1996 | Militzer et al. |
| 4,897,082 A | 1/1990 | Erskine | 5,496,283 A | 3/1996 | Alexander |
| 4,898,587 A | 2/1990 | Mera | 5,499,976 A | 3/1996 | Dalton |
| 4,919,654 A | 4/1990 | Kalt | 5,520,656 A | 5/1996 | Byrd |
| 4,932,943 A | 6/1990 | Nowak | 5,522,803 A | 6/1996 | Teissen-Simony |
| 4,955,864 A | 9/1990 | Hajduch | 5,527,293 A | 6/1996 | Zamierowski |
| | | | D375,355 S | 11/1996 | Bierman |





*FIG.3*



*FIG.2*









US 6,447,485 B2

| 1 | 2 |

# MEDICAL LINE ANCHORING SYSTEM

## RELATED CASES

The present application is a divisional of application Ser. No. 08/865,231, filed on May 29, 1997 now U.S. Pat. No. 6,213,979.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to anchoring systems for anchoring medical lines to patients.

### 2. Description of Related Art

It is very common in the treatment of patients to utilize intravenous (IV) catheters to introduce fluids and medications directly into the bloodstream. In many cases, and particularly with respect to cardiac therapy, the IV catheter is introduced into a central or larger vein located close to the patient's heart. A typical catheter utilized in connection with a central vein is referred to as a "central venous catheter" ("CVC"). A venous catheter peripherally inserted into the central circulation through a vein in the arm is commonly referred to as a "peripherally inserted central catheter" ("PICC").

In these cases, long-term IV infusion typically requires that the catheter remain in place for many days. In order to secure such an IV catheter in position at the insertion site, the catheter often is provided with an integrated or a movable flexible clamp with winged extensions which are sutured to the patient's skin. In other applications, the flexible clamp is covered by a rigid box clamp, which receives the catheter/clamp combination in a friction-fit manner. The rigid box clamp and the flexible clamp have lateral, aligned holes in them, which allow the combination to be sutured to the patient's skin. Although this technique securely attaches the central venous catheter to the patient, it obviously is painful and uncomfortable for the patient. This prior retention procedure is also time consuming and inconvenient, poses the risk of needle-stick to the health care provider, and risks suture-site infection to the patient. In addition, suture material tends to exhibit poor gripping on medical tubes and can cut through the winged extension of the flexible clamp.

## SUMMARY OF THE INVENTION

A need therefore exists for a simply-structured anchoring system that affixes a medical line in a fixed position, but releases the medical line for dressing changes or other servicing.

On aspect of the present invention thus involves an anchoring system for securing a medical line to the body of a patient. The system comprises a retainer including a base that defines a receiving area for receiving a portion of the medical line. A cover is movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open. A latching mechanism operates between the base and the cover to releasably latch the cover to the base with the cover in the closed position. Interacting structure is located generally beneath the cover with the cover in the closed position. The interacting structure is adapted to limit movement of the medical line through to the retainer when the catheter is placed within the receiving area.

Another aspect of the present invention involves an anchoring system for securing a medical line to the body of a patient. The system includes a fitting adapted to engage with the medical line and having at least one opening. A retainer comprises a base including a platform and at least one post extending from the platform and arranged to interact with the hole of the fitting. A cover is movably coupled to the base so as to be moved between an open position and a closed position. A latching mechanism operates between the cover and the base to releasably latch the cover to the base in the closed position.

In accordance with an additional aspect of the present invention, an anchoring system for securing a medical line to the body of a patient is provided. The anchoring system comprises an adaptor having an adaptor body with a longitudinal axis defined between first and second ends. A first connector is located at the first end of the adaptor for connection to a first medical line, and a second connector is located at the second end for connection to a second medical line. A retainer includes a base and a cover permanently coupled to the base. The cover is movable between an open position and a closed position. A latching mechanism releasably latches the cover to the base in the closed position. And a channel is arranged to lie between the base and the cover in the closed position. The channel is shaped to retain the adaptor between the cover and the base with the cover in the closed position to inhibit movement of the adapter in a direction generally parallel to the adapter's longitudinal axis. An adhesive layer is attached to the retainer and is adapted to adhesively secure the retainer to the body of a patient.

A preferred method of anchoring a medical line to a patient involves providing a retainer including a base having a plurality of posts, and a cover attached to the base by a flexible leash. The provided cover also includes a corresponding plurality of openings with each opening comprising a slot. The retainer is coupled to an adhesive layer. The anchoring system is positioned on the body of the patient, and the adhesive layer is attached to the body of the patient. A medical device is arranged between the posts of the base. The cover is positioned over the base to bring the openings of the cover in proximity with the posts of the base. The cover is shifted relative to the base to engage the posts with the slots of the openings.

Further aspects, features, and advantages of the present invention will become apparent from the detailed description of the preferred embodiments that follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above-mentioned and other features of the present invention will now be described with reference to the drawings of several preferred embodiments of the present anchoring system. The illustrated embodiments of the anchoring system are intended to illustrate, but not to limit the invention. The drawings contain the following figures:

FIG. 1A is a perspective view of an anchoring system in accordance with a preferred embodiment of the present invention and illustrates a retainer of the anchoring system in an open position together with an exemplary catheter wing clamp fitting (the components of which are illustrated as exploded above the retainer);

FIG. 1B is a bottom plan view of a cover of the retainer of FIG. 1A;

FIG. 2 is a perspective view of the anchoring system of FIG. 1A with the cover of the retainer shown in a partially closed position;

FIG. 3 is a cross-sectional view of the anchoring system of FIG. 2, with the retainer shown in a completely closed

US 6,447,485 B2

3

position and the catheter wing clamp fitting assembled and anchored therein;

FIG. 4A is a perspective view of a retainer in accordance with another preferred embodiment of the present invention, shown in an open position;

FIG. 4B is a bottom plan view of a cover portion of the retainer of FIG. 4A;

FIG. 5 is a perspective view of the retainer of FIG. 4A, shown in a partially closed position;

FIG. 6 is a perspective view of a retainer in accordance with another preferred embodiment of the present invention, shown in an open position;

FIG. 7 is a perspective view of the retainer of FIG. 6, shown in a closed position;

FIG. 8 is a cross-sectional view of the retainer of FIG. 7, taken along the line 8—8;

FIG. 9 is a cross-sectional view of the retainer according to FIG. 8, but with a tang shown in a release position;

FIG. 10A is a prospective view of an anchoring system in accordance with an additional preferred embodiment of the present invention and illustrates a retainer of the anchoring system in an open position and together with an exemplary catheter adaptor;

FIG. 10B is a bottom plan view of a cover portion of the retainer of FIG. 10A;

FIG. 11 is a prospective view of the retainer of FIG. 10A, shown in a partially closed position with the cover interacting with the catheter adapter; and

FIG. 12 is a cross-sectional view of the retainer according to FIG. 11, shown in a completely closed position, with the catheter adaptor anchored therein.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present embodiments of the medical line anchoring system are disclosed in the context of an exemplary central line catheter. The principles of the present invention, however, are not limited to PICCs or CVCs. Instead, it will be understood by one of skill in this art, in light of the present disclosure, that the anchoring systems and retainers disclosed herein also can be successfully utilized in connection with other types of medical lines, including tubes for fluid communication and electrical wires. For example, but without limitation, the retainers disclosed herein can retain CVCs, PICCs, Foley catheters, and hemodialysis catheters, surgical drainage tubes, feeding tubes, chest tubes, nasogastric tubes, scopes, as well as with electrical wires or cables connected to external or implanted electronic devices or sensors. One skilled in the art may also find additional applications for the devices and systems disclosed herein. Thus, the illustration and description of the anchoring system 8 in connection with a catheter is mainly exemplary of one possible application of the system.

Each of the embodiments described herein employ the same basic concepts characteristic of the improved anchoring system, namely releasable attachment of a medical line to a patient. The anchoring systems also all include interacting structure that operates between a retainer of the anchoring system and a fitting which in some applications is releasably attached to the medical line and in other applications is integrally formed with the medical line. The interacting structure between the retainer and the fitting generally inhibits relative movement between the medical line and the anchoring system in at least one degree of freedom.

4

To assist in the description of the components of the anchoring systems and retainers disclosed herein, the following coordinate terms are used. A longitudinal axis is generally parallel to a section of the medical line to be retained by the anchoring system, generally in the plane of a retainer base (discussed below). A lateral axis is generally perpendicular to the longitudinal axis within the plane of the base. A transverse axis extends transverse to both the longitudinal and lateral axes. A number of the figures illustrate this coordinate system to the side of the anchoring system. In addition, as used herein, the "longitudinal direction" refers to a direction substantially parallel to the longitudinal axis. "The lateral direction" refers to a direction substantially parallel to the lateral axis. And, "the transverse direction" refer to a direction substantially parallel to the transverse axis. These coordinates are used to describe structures and movement of the anchoring system of each embodiment. A detailed description of each embodiment, and its associated method of use, now follows.

FIGS. 1 to 3 illustrate an anchoring system 8 constructed in accordance with a preferred embodiment of the present invention. The system 8 includes a retainer 10 which is configured to retain a catheter, either directly or by way of a fitting 11. In the illustrated embodiment, the fitting 11 comprises a catheter box clamp 12 and a soft wing clamp 13 for use with a central line catheter 15.

The retainer 10 includes a base 14. The base 14 of the retainer 10 is attached to an anchor pad 16, which forms a part of the anchoring system 8. The base 14 desirably is secured to the anchor pad 16 by a solvent bond adhesive, such as cyanoacrylate or other bonding material. One such adhesive is available commercially as Part No. 4693 from the Minnesota Mining and Manufacturing Company (3M).

The anchor pad 16 comprises a flexible structural layer for securing the retainer 10 to a patient's skin. The pad desirably comprises a laminate structure with an upper cellulose foam layer (e.g., closed-cell polyethylene foam), and a bottom adhesive layer. The adhesive desirably is a medical-grade adhesive and can be either diaphoretic or nondiaphoretic, depending upon the particular application. Such foam with an adhesive layer is available commercially from New Dimensions in Medicine of Columbus, Ohio. Although not illustrated, it will be understood that the retainer and/or anchor pad can include suture holes in addition to the adhesive layer to further secure the anchor pad to the patient's skin.

An upper surface of the foam layer is roughened by corona-treating the foam with a low electric charge. The roughened or porous upper surface of the anchor pad 16 improves the quality of the adhesive joint formed by the cyanoacrylate (or by another type of adhesive or bonding material) between the base 14 to the anchor pad 16. In the alternative, the flexible anchor pad 16 can comprise a medical-grade adhesive bottom layer, an inner cellulose foam layer and an upper paper or other woven or non-woven cloth layer.

A removable paper or plastic backing 17 desirably covers the bottom adhesive surface before use. The backing 17 preferably resists tearing and is divided into a plurality of pieces to ease attachment of the pad to a patient's skin. Desirably, the backing 17 is split along a center line 18 of the flexible anchor pad 16 in order to expose only half of the adhesive bottom surface at one time. The backing 17 also advantageously extends beyond at least one edge of the anchor pad 16, as illustrated, to facilitate removal of the backing 17 from the adhesive layer.

US 6,447,485 B2

5

In the illustrated embodiment, the anchor pad 16 also desirably includes a pair of opposing concave sections that narrows the center of the anchor pad proximate to the base 14. As a result, the peripheral ends of the anchor pad 16 have more contact area to provide greater stability and adhesion to a patient's skin, while allowing the retainer 10, which is located at center section of the anchor pad 16, to be placed adjacent to an insertion site of the catheter 15.

Although the anchor pad 16 has not been shown in the other drawings that illustrates this embodiment, nor in some of the drawings illustrating the other embodiments, it will be understood that a similar flexible anchor pad is included to secure the retainer to the patent's skin with each embodiment.

The base 14 and the catheter 15 desirably include interacting structure to couple the catheter 15 to the base 14. As will be clear from the disclosure below, the interacting structure mounts the medical line either directly or by way of a fitting (e.g., the box clamp 12 and soft wing clamp 13) to the base 14. In the latter case, a portion of the interacting structure desirable is formed on the fitting and another portion of the interacting structure is formed on the retainer. The term "mount," when used with reference to the relation between the catheter or fitting and the retainer, does not necessarily imply that the catheter 15 or fitting 11 are immobilized or fixed. Rather, this term is meant to describe the condition in which the interacting structure inhibits movement of the catheter 15 relative to the retainer 10 in at least one degree of freedom (e.g., rotational, lateral, longitudinal or transverse). In the illustrated embodiment, as well as in those later described, the interacting structure inhibits movement of the catheter 15 at least in the longitudinal direction.

In the illustrated embodiment, a portion of the interacting structure on the base 14 comprises at least one post 20 which extends upwardly from a relatively rigid platform 21. The base 14 desirably includes a pair of posts 20. The base can also include additional posts to suit a specific application. For example, where the retainer is designed to secure a relatively tight fitting, the base can include four posts arranged at the corners of a rectangle, for greater stability. And, three posts can be used to firmly anchor a Y-site fitting.

Each post 20 includes a shank or shaft 25, attached to and extending upwardly from the platform 21. The posts 20 can have a variety of lengths and a variety of distances between them, depending upon the particular application and the particular fitting 11 with which they are to interact to mount the catheter 11. For anchoring catheters and medical tubing, each post 20 desirably has a length of about 4 mm to 20 mm, and more particularly a length of about 6 mm; however, longer or shorter lengths also are possible. The posts 20 are laterally spaced at least wide enough to accommodate the medical line to be anchored, and in the illustrated embodiments, the posts 20 are spaced to accommodate the fitting 11 which secures the medical line. Desirably, the posts 20 are spaced apart by a distance between 5 mm and 40 mm, and more particularly by a distance equal to about 15 mm. The shaft 25 of each post 20 has a diameter sufficient to perform its structural function, as described in more detail below, and depends upon the material chosen for the base 14 and shafts 25. The illustrated posts 20 comprise a polymer plastic material, with a diameter between 0.5 mm and 3 mm and particularly about 1.7 mm.

At least one protrusion extends radially from the shaft. In the illustrated embodiment, the protrusion comprises an enlarged tip or head 26 at the end distal from the platform

6

21. As seen in FIG. 1, at least a portion of the head 26 of each post 20 is larger than the diameter of the shaft 25, desirably having a maximum diameter of 1.1 to 1.5 times the diameter of the shaft 25. In the illustrated embodiment, the head 26 has a generally hemispherical shape with a smooth surface and a maximum diameter at an overhanging lower surface or underside 30. It will be understood, however, that the head 26 can take a variety of other shapes, such as for example, solid or hollow conicals, arrowheads, barbs, spheres, mushroom heads, and other types of radially projecting structures. A relatively blunt end of the head 26 is preferred to avoid snagging on materials such as a health care provider's latex gloves or sheets on the patient's bed.

A cover 22 is flexibly coupled to the base 14 by way of a flexible coupling. In the illustrated embodiment, the coupling comprises a flexible leash 24. The leash 24 can take any number of forms to mechanically connect the base 14 to the cover 22 while permitting movement of the cover 22 relative to the base 14 so as to enable engagement or disengagement of these parts, as described below. In the illustrated embodiment, the leash 24 comprises a band of flexible material. The leash 24 desirably is integrally molded with the base 14 and the cover 22. The illustrated leash 24 has a longitudinal width of about 0.5 mm to 5 mm, desirably about 1 mm, and a similar depth or transverse dimension. The length of the leash 24 depends in part upon the height of the post 20. Desirably, the leash 24 is longer than the height of the post 20, to allow some leeway in engaging or disengaging the base 14 with the cover 22, as will be understood by one of skill in the art in light of the disclosure herein. While the leash 24 desirably is generally oblong in cross-section, as illustrated, and fixes an orientation of the cover 22 relative to the base 14, it will be understood that the leash can also have a string-like (e.g., rounded) configuration and allow rotation about the lateral axis.

The cover 22 comprises an elongate member which can be formed of the same polymer or plastic material as the base 14, and desirably is integrally molded with the base 14. The cover 22 desirably has a shape that is generally coextensive with the platform 21 of the base 14. The cover 22 can be smaller; however, the cover should have a length in the lateral direction at least large enough to extend over the space between the posts 20 and a width in the longitudinal direction that is wider than the posts 20. The width of the cover 22 desirably is sufficient to stabilize a section of the catheter 15 within the retainer 10. In particular, the width of the cover 22 preferably generally matches the longitudinal length of the fitting 11. The corners of the cover are also desirably rounded to avoid snagging on materials such as the latex gloves worn by the health care provider, bed sheets, etc. In the illustrated embodiment, the cover 22 generally has an elliptical shape for this purpose.

As shown in FIG. 2, the illustrated cover 22 also desirably includes a textured portion 48, such as that formed by longitudinal ridges 50 in the cover surface at an end of cover 22 opposite the leach 24. It will be understood that any well known form of texturing such as, for example, a roughened surface can be used in place of ridges. The textured portion 48 improves the health care provider's grip on the cover 22.

The base 14 and cover 22 are further releasably connected by a latching mechanism. The latching mechanism permits the cover 22 to be engage with the base 14 in a closed position, as illustrated in FIG. 3. The cover 22 also can be disengaged from the base 14 and moved to an open position, as shown in FIG. 1A.

The latching mechanism includes interengaging structures formed on the base 14 and on the cover 22. In the

7

8

illustrated embodiment, the portion of the latching mechanism on the base **14** is formed by at least one of the posts **20** with it enlarged head **26**. Desirably, the latching mechanism involves the posts **20** that lie on opposite sides of the catheter **15** when the catheter **15** is properly positioned on the retainer **10**.

A cover portion of the latching mechanism includes at least one opening **32** formed in the cover **22**, and desirably includes the same number of openings **32** as there are posts **20** on the base **14**. The illustrated cover **22** thus includes two openings **32** with corresponding points of the openings **32** being spaced by approximately the same distance as the two posts **20** on the base **14**, desirably by between about 5 mm and 40 mm, and particularly about 15 mm. Each opening **32** is arranged in the cover **22** to cooperate with the corresponding post **20**. It will be understood that, in other arrangements of the latching mechanism are possible where the posts are on the cover, the openings are formed in the base, as described in more detail below.

Each opening **32** shown in FIGS. 1–3 is defined by a central hole **34** with at least one slot **36** extending to one side, desirably laterally adjacent to and intersecting with the central hole **34** at a narrow waist opening **37**. The central hole **34** is sized and shaped to accommodate the largest diameter of the post head **26**. The illustrated slot **36** extends in the lateral direction from the central hole **34** with the lateral axis of the slot **36** being substantially collinear with a center line of the cover **22** extending in the lateral direction. It will be understood that the slots **36** on the cover **22** can extend from the central hole **34** in any direction, though both slots **36** desirably extend in the same general direction. In other arrangements, more than one slot can extend from each central hole.

The width of the illustrated slot **36** in the longitudinal direction is smaller than the central hole **34** and is smaller than the largest diameter of the head **26**. The slot width desirably ranges from slightly smaller to slightly larger than the diameter of the shaft **25**.

The interengagement between the posts **20** and the openings **32** on the cover **22** thus form the latching mechanism that releasably secures the cover **22** to the base **14**. When the post shaft **25** is positioned in the slot **36**, the cover **22** can not be lifted from the retainer base **14** in the transverse direction, as described in more detail below.

As best seen from the plan view of FIG. 1B, the cover **22** desirably includes a post retention mechanism to inhibit unintentional retraction of a post **20** from the slot **36**. In the embodiment of FIGS. 2–3, the retention mechanism includes a lip **38** of cover material that forms a depression **40** (FIG. 3). The depression **40** is sized slightly smaller than the lower surface **30** of the post head **26**. The retention mechanism of the illustrated slotted hole **36** further comprises the waist opening **37** (FIG. 1B), which has a slightly smaller diameter than the shaft **25**. The longitudinal dimension of the slot **36** widens to slightly larger than the diameter of the shaft **25** between the lip **38** of the cover **22**. While not illustrated, the retention mechanism can also be formed by arranging the slots at a slight deviation from parallel to one another to increase the friction between the cover **22** and the posts **20**.

The retainer **10** also desirably includes a locator device to locate the cover **22** at a desired distance from the platform **21**. In the illustrated embodiment, each post **20** includes an annular ring **28** positioned between the platform **21** and the head **26** for this purpose; however, other types of protuberances (e.g., small bumps or ribs) can also serve this purpose.

The annular ring **28** is spaced below the head **26** along the shaft **25** by a distance sufficient to accommodate the thickness of the cover **22** when latched together. The ring **28** desirably is located between about1 mm and 4 mm below the lower surface **30** of the head **26**. Like the head **26**, the annual ring **28** is larger in diameter than the shaft **25**, desirably 1.1 to 2.0 times the diameter of the shaft **25**. Most desirably, the ring **28** is slightly larger than the maximum diameter of the head **26**.

As mentioned above, the base **22**, leash **24** and cover **22** desirably are integrally formed to make a unitary retainer **10**. This can be accomplished in any of a variety of ways well known to one of skill in the art. For instance, the entire retainer can be injection molded, in order to reduce fabrication costs. Additionally, features such as the leash **24** are desirably flexible. Suitable plastics which account for these considerations include polypropylene, polyethylene, and the like. Desirably, the illustrated retainer **10** comprises injection molded polyethylene or polypropylene.

The anchoring system **8** can also include the fitting **11** for mounting a medical line (e.g., catheter) to the retainer **10**. In the exemplary application illustrated in FIGS. 1–3, the fitting **11** takes the form of the box clamp **12** and the soft wing clamp **13**. Mounting of the fitting **11** (or catheter directly) to the retainer **10** is achieved by way of the interacting structures, a portion of which comprises surfaces or structures of the retainer **10** and another portion of which comprises surfaces or structures of the fitting **11** (or catheter, if directly coupled).

The box clamp **12**, best seen from the view of FIG. 1, is a relatively small, rigid wing-shaped device having a configuration similar to that of conventional box clamps in common usage today in suturing attachment systems. The box clamp **12** includes a central elongate body **60** having a longitudinal groove **62** formed on the underside and a box-shaped upper surface **64**. The longitudinal groove **62** is generally U-shaped and is sized to receive the body of a catheter and/or associated fluid line, and more desirably is sized to receive the wing clamp **13**. At least one end, and preferably at both ends of the longitudinal groove **62**, the body **60** of the box clamp **12** narrows the opening of the longitudinal groove **62**. That is, the longitudinal groove **62** at either end extends through an arc which is greater than 180E about an axis of the longitudinal groove **62**. The groove also can have a uniform cross section along its length so that the wall of the entire groove extends through an arc greater than 180E. The box clamp **12** desirably is formed of a relatively rigid material, such as polycarbonate.

A pair of lateral wings **66** extend roughly perpendicularly from the body **60** of the box clamp **12**, each including a hole **67** therethrough. Each hole **67** is sized and shaped to receive the head **26** and the collar **28** of one of the posts **20**.

The soft wing clamp **13** has a configuration similar to that of the box clamp **14**, including a central elongate body **70** defining an inner cavity **72** and an outer surface **74**. The inner cavity **72** is sized to surround a portion of a catheter. The wing clamp **13** is constructed from a soft, pliable or flexible material such as, for example, latex or the like. The central elongate body **70** includes a longitudinal slit **75** along its underside. The slit **75** can be expanded due to the pliable nature of the wing clamp **13**. Thus, the wing clamp **13** is capable of being placed on and surrounding and longitudinally contacting in a frictional manner a portion of the catheter. This frictional contact between the soft wing claim **13** and the catheter generally prevents relative movement between these articles.

9                                                                10

Lateral wings 76 extend roughly perpendicularly from the body 70 of the soft wing clamp 13, each including a through-hole 77. Each hole 77 is sized and shaped to receive the head 26 of one of the posts 20. As the material surrounding the wing hole 67 is pliable in the illustrated embodiment, the hole 67 can be smaller than the corresponding box clamp hole 67 and even smaller than the post head 26, yet still be stretched to receive the post head 26; the through-hole 77, however, desirably is larger than the post head 26 and generally equal in size to the corresponding hole 67 in the box clamp 12.

The illustrated box clamp 12 and soft wing clamp 13 are commercially available from Arrow® for use with its CVC. Other clamps with suture wing extensions are currently in commercial use with Quinton® Hemodialysis catheters, Cook® PICC's, Baxter® CVCs and B. Braun CVCs. The skilled artisan will find application for the present invention with any of these and many other clamp configurations. As will be clear from a discussion of the embodiment of FIGS. 10–12, the fitting 11 (box clamp/soft wing clamp combination) can also be replaced with an inter-line connector or adaptor, such as those used to connect the catheter to a supply, delivery or drainage line.

FIG. 3 illustrates the interengagement of the components of the anchoring system 8, in accordance with the present embodiment. The box clamp 12 and soft wing claim 13 are shown engaged with the posts 20 and retained between the base 14 and cover 22 of the retainer 10.

As noted, the groove 62 of the box clamp 12 is configured to receive the soft wing clamp 13. In particular, the groove 62 is sized and shaped to receive the outer surface 74 of the elongate body 74 on the soft wing clamp 13. The wings 66 of the box clamp 12 have approximately the same size and shape as the wings 76 of the soft wing clamp 13. When the wings 66, 76, are aligned, the box clamp holes 67 are correspondingly aligned with the soft wing clamp holes 77.

Together, the box clamp 12 and the soft wing clamp 13 form the fitting 11 for mounting in the retainer 10. In the illustrated embodiment, the retainer 10 has been sized for retention of the conventional box clamp 12 and soft wing clamp 13. Accordingly, the holes 67, 77 of the fitting 11 are spaced by approximately the same distance as the posts 20 on the retainer base 14. The box-like upper surface 64 of the box clamp 12 is sized and shaped to fit between the posts 20. Accordingly, a lateral dimension of the elongate body 60 is smaller than the spacing between the posts 20 (i.e., the elongate body 60 is located between and spaced from holes 67 on the box clamp wings 66), while the height of the fitting 11 (formed by the height of the box clamp 12 plus the thickness of the soft wing clamp wings 76) is smaller than the height of the posts. Desirably, the height of the fitting is smaller than the height of the shaft 25 up to the underside 30 of the post head.

The interaction between the posts 20 and the openings 67, 77 of the fitting 11 mount the fitting 11 on the base 14. Accordingly, this interacting structure between the retainer 10 and the fitting 11 inhibits movement of the catheter 15 relative to the retainer 11 in at least the longitudinal and lateral directions. It is understood that the posts need not to extend entire through the holes for this purpose, though.

As noted above, the spacing between the posts 20 on the base 14 also dictates the spacing between the openings 32 in the cover 22. Desirably, the slots 36 each extend from the same side, and desirably laterally, from the central holes 34. Thus, the spacing between the central holes 34 is approximately equal to the spacing between the slots 36, which is

in turn approximately equal to the spacing between the posts 20 on the base.

As also noted above, the leash 24 flexibly connects the platform 21 of the base 14 to the cover 22. Desirably, the leash 24 connects lateral ends of the base 14 and cover 22, so as not to interfere with the mounting of the fitting 11 and catheter along the longitudinal axis. The leash 24 is long enough to permit a desired parallel spacing of the base 14 from the cover 22 when the retainer is in a closed position, as illustrated.

In operation, a catheter (or other medical tube or wire) is inserted into the patient, and the fitting 11 is secured to the catheter. The fitting 11 is then retained within the retainer 10, and the retainer 10 is then secured to the patient. These steps are described in more detail below. While this sequence is advantageous, it will be understood that, in other arrangements, the fitting can be secured to a catheter before or after securing the fitting to the retainer, depending upon the form of the fitting. Similarly, and especially for reapplication of a catheter to the retainer 10, the catheter and fitting 11 can be mounted on the retainer 10 after the retainer 10 has already been secured to the patient.

In the illustrated embodiment, desirably after catheter insertion, the wing clamp 13 is stretched open at the slit 75 and fit over the catheter, as in standard practice. The groove 62 of the box clamp 12 is fitted over the elongate body 70 of the soft wing clamp 13, providing a tight "snap fit." Some flexibility in the wing clamp body 70 facilitates this fitting. The relatively more rigid box clamp body 60, however, exerts relatively more inward pressure on the catheter than the relatively more flexible wing clamp 13, such that a tight frictional grip holds the catheter within the fitting 11. It will be understood by one of skill in this art, however, that the fitting 11 of the present embodiment can comprise the soft wing clamp 13 alone.

As shown in FIG. 2, the catheter and fitting 11 are then removably mounted to the retainer 10. In the illustrated embodiment, the holes 77, 67 are fitted over the posts 20 of the retainer base 14. Desirably, each slightly smaller wing clamp hole 77 stretches to accommodate the larger diameter head 26 and ring 28 of the post 20. Each box clamp hole 67, on the other hand, desirably is large enough to receive the head 26 and ring 28 without interference. The fitting 11 is thereby fitted onto the base 14 with the posts 20 extending through the fitting holes 67, 77 and the bottom surface of the soft wing clamp 13 resting on the platform 21.

As illustrated in FIGS. 2 and 3, the cover 22 is latched to the base 14, with the fitting 11 interposed between the cover and the base. FIG. 2 shows the cover 22 in a partially closed position, with the flexible leash 24 bent to position the cover 22 over the base 14. The openings 32 of the cover 22 are aligned with the posts 20 of the base 14 and the cover 22 is then moved toward the base such that the head 26 of each post passes through the central hole 34 of one of the openings 32. The size and spacing of the openings 32 and the posts 22 should result in an easy engagement so that only a light downward force is necessary, thereby avoiding pain or discomfort to the patient. In this position, the portion of the cover 22 between the holes 34 can firmly contact a portion of the fitting 11 in some applications.

The rings 28 can also support, at least in part, the cover 22, or at least limit the travel of the cover 22 over the posts 20 so as to properly position the cover 22 on the posts 22 generally beneath the flared heads 26. Once the heads 26 of the posts 20 have cleared the central holes 34 in the cover 22, the cover 22 contacts the ring 28.

US 6,447,485 B2

11

12

The cover 22 is then slid laterally (to the right, in the views of FIGS. 2 and 3) so that the shaft 25 of each post 20 slides past the narrow waist opening 37 into the corresponding slot 36. The cover material at the waist 37 and/or the shaft 25 slightly compresses as the cover 22 is shifted under force provided by the health care provider. Desirably, the retainer is arranged such that, when the posts 20 are engaged with the slots 36, the cover 22 is centered with respect to the base.

The resulting engagement, shown in FIG. 3, serves to retain the fitting 11 securely in place within the retainer 10. As the waist openings 37 are desirably slightly more narrow than the post shafts 25, the slots 36 provide a friction or snap fit engagement with the posts 20. The slots 36 are longitudinally more narrow than the post heads 26, such that the cover 22 cannot be transversely lifted away from the base 14 in this position. Surfaces of the post 20 abut against surfaces of the cover 22 formed by the lip 38 and walls 46 of the opening 32. The posts 20 of the base 14 and the slotted holes 67, 77 of the cover 22 thereby form a latching structure. The latching structure allows the posts 20 to be easily inserted into the openings 32 in one position but inhibits unintentional retraction of the posts 20 from the openings 32 in a second position.

Additionally, the underside 30 of the post head 26 seats against the cover 22 with the periphery of the head 26 at the edge of the depression 40, as shown. A slight deformation of the head 26 and/or edge of the depression 40 creates increased interference between the cover 22 and the post heads 26 which aids in maintaining the cover 22 in place, relative to the posts 20.

It will be understood that, in other arrangements, the openings can instead be formed in the base, rather than the cover, and the posts formed on the cover. In such a case, each opening would comprise a partial central hole in the base, below which a hollow space is formed for receiving the heads of downward extending posts of the cover. The space would also accommodate the lateral movement of the cover (and consequent lateral movement of the posts) in order to provide engagement between the shaft of each post and a narrow slot extending from the opening. In this manner, the head of one of the posts would be captured within the hollow space below each slot. The post could not be pulled out of the hollow space because the rear side of the post head would contact the portions of the base which define the slot. Such a latching mechanism is disclosed in copending application Ser. No. 08/587,092, entitled "Catheter Anchoring System", filed on Jan. 15, 1996, in the name of Steven F. Bierman and assigned to the assignee hereof, which stands allowed as of the filing date of this application and which is hereby incorporated by reference.

In initial application, the illustrated retainer 10, with the fitting 11 and the catheter retained in it as described above, is secured to the patient by way of the self-adhesive anchor pad 16. The health care provider selects a skin site on which the retainer 10 will be attached. For use with CVCs and PICCs, the retainer 10 desirably is applied to the skin of the patient in the vicinity of the catheter insertion site. The health care provider then cleanses and prepares the anticipated dressing site according to well known methods, usually swabbing with alcohol and allowing the site to dry thoroughly. The health care provider peels away half of the backing layer 17 from the adhesive surface of the anchor pad 16, properly locates the pad 16 on the patient, and presses the exposed adhesive against the patient's skin to secure the anchor pad 16 to the patient. The second half of the backing layer 17 is then removed, and the second half of the anchor

pad 17 adhered to the patient's skin. The anchor pad 16 should be mounted on the patient so that catheter overlies the retainer 10 along the retainer's longitudinal axis.

When removal of the catheter becomes necessary, the cover 22 simply is slid horizontally in the opposite direction, desirably with force sufficient to compress cover material at the waists 37, so that the heads 26 of the posts 20 are once again aligned with the central holes 34. The cover 22 can then be easily lifted transversely from the base 14. With the retainer 10 thus unlatched, the fitting 11 can also be removed. The catheter secured by the fitting 11 can then be changed or cleaned and replaced in the retainer 10, without requiring a new retainer.

It should be noted that a deliberate effort is generally required to disengage the post shafts 25 from the slots 36, due to the retention mechanism formed by the narrow neck 37 and/or depression 40. The retainer 10 thus releasably mounts a catheter (or other medical line) and can be reused without requiring reattachment to the patient, while at the same time inhibiting accidental release of the catheter.

Significantly, the removed cover 22 remains leashed to the retainer base 14, which remains attached to the patient. Thus, the health care provider need not take care to place the cover 22 in a safe hygienic place, nor keep track of its whereabouts. The cover 22 can simply hang from the base 14 by the leash 24, where it is easily found and relatched to the base 14 when a new catheter is engaged. Furthermore, each time the cover is relatched, the cover 22 is automatically correctly oriented, such that the health care provider need not take care to ensure that the depression 40 is facing the correct direction, nor to ensure that the slots 36 are on the correct side.

Of course, if the medical treatment is completed and there is no need to reuse the retainer 10, the health care provider can release the cover from the base in the manner described above. The medical article then can be lifted from the base. To remove the anchor pad 16, the health care provider lifts an edge of the pad 16 and gently strokes the undersurface with an alcohol swab while slowly but continuously lifting the edge. The anchor pad 16 can be peeled from the patient's skin in this manner. The health care provider then cleanses and prepares skin using well known hospital or agency protocols.

A retainer 10a in accordance with another embodiment of the invention is illustrated in FIGS. 4A to 5, with FIG. 4A showing a completely open position of the retainer 10a and FIG. 5 showing the partially closed position, similar to FIGS. 1–2 above. Though not illustrated, this retainer 10a also desirably includes a flexible anchor pad, as illustrated in FIG. 1, for adhesive attachment to the body of a patient. Only the cover 22a of this embodiment differs from the above-described embodiment. Accordingly, the above description applies equally to the embodiment of FIGS. 4–5, unless otherwise indicated. In addition, like reference numerals are used to indicate like features of the two embodiments, with the letter "a" added as a suffix to refer to features of the present embodiment.

The cover 22a of this retention mechanism 14a includes a pair of openings 32a. In contrast to the embodiment discussed above, each opening 32a comprises a single slot 80 extending from a longitudinal outer edge 82 of the cover 22a to a terminus 84. The pair of slots 80 can extend from either of the two outer edges 82, but both slots 80 desirably extend from the same edge.

The slots 80 advantageously extend obliquely from the outer edge 82 of the cover 22a to the slot terminus 84, such

US 6,447,485 B2

13

that one side of each slot 80 defines an obtuse angle a (FIG. 4B) with the outer edge 82 from which the slot extends, as shown in FIG. 4B. The termini 84 of the slots 80 desirably are centered on or close to a lateral line that bisects the cover 22a into longitudinal halves. Thus, the length of each slot 80 depends upon the obtuse angle a between the outer edge 82 and the slot 80. The angle α should be small enough and the slot 80 short enough that the structural integrity of the cover 22a is not compromised. While illustrated as parallel, the slots 80 can also be arranged at a slight angle to one another. The width of each slot 80 desirably is slightly larger than the diameter of the post shaft 25a, and smaller than the largest dimension of the post head 26a.

As best seen from the plan view of FIG. 4B, the opening 32a desirably includes a retention mechanism, such as to inhibit retraction of the post 20a from the slot 80. As visible from the views of FIGS. 4B and 5, each slot 80 is partially defined at the terminus 84 by a lip 38a of cover material, forming a depression 40a in the cover 22a, similar to the lip 38 and depression 40 shown in FIGS. 1–3. The depression 40a is sized slightly smaller than the lower surface 30a of the post head 26a.

In the illustrated embodiment, the retention mechanism further comprises one or more protuberances 86 extending at certain positions from interior walls of the slot 80. As illustrated, the protuberances 86 desirably are positioned within the slot 80 just outside the depression 40a. At the protuberances 86, the slot 36a most desirably has a slightly smaller diameter than the shaft 25a, while widening to slightly larger than the shaft 25a at the lip 38a. These protuberances 86 define the waist 37a of the opening 32a for the present embodiment.

FIG. 5 illustrates the retainer 10a in a partially closed position. The flexible leash 24a has been bent to swing the cover 22a counterclockwise (in the view of FIG. 5), bringing the openings 32a in proximity to the posts 20a. The cover 22a continues in a downward arc from the position of FIG. 5 and is shifted slightly out of alignment with the base 14a until the edge openings of the openings 32a at the longitudinal edge 82 are adjacent to the section of the posts 20a between the head 26a and the ring 28a.

While not illustrated in FIGS. 4A to 5, a catheter fitting can first be mounted to the retainer 10a prior to latching. For example, the fitting 11a illustrated in FIGS. 1–3 can be first secured to the retainer. For such a case, the posts 20a serve as a portion of an interacting structure and the holes 67a, 77a of the fitting 11a serve as another portion of the interacting structure. The interacting structure thus mounts the fitting to the retainer to inhibit at least one degree of movement of the fitting relative to the retainer. Alternatively, a portion of the interacting structure can directly mount a catheter, without the intermediate fitting.

The shaft 25a of each post 20a (between the head 26a and the ring 28a) can be easily inserted into the edge opening of the openings 32a at the outer edge 82. The cover 22a is then shifted obliquely such that the shafts 25a slide along the slots 80. The shafts 25a and/or the protuberances 86 are compressed or the protuberances are deflected as the shafts 25a slide past the protuberances 86. After the shafts 25a have passed the protuberances 86, the shafts and/or the protuberances can regain their original shape such that the shafts snap into the position adjacent to the protuberances 86 and engage with the terminus 84 of the slots 80. When the head 26a is seated at the edge of the depression 40a, the surfaces of the cover 22a formed by the lip 38a and the protuberances 86 of the slot 80 abut against the shaft 25a of the post 20a. The cover 22a is thus latched in a closed position.

14

In order to remove the cover 22a from the base 14a, the sliding motion of the cover 22a over al the posts 20a is simply reversed until the post shafts 25a exit the openings 32a at the outer edge 82 of the cover 22a. Note that some deliberate force is generally required to overcome the retention mechanism. Namely, the cover 22a is slightly depressed to disengage the underside of the head 26a from the edge of the depression 40a, and the cover 22a is slid with sufficient force to deflect or compress the protuberances 86. Any fitting secured therein can then be disengaged from the opened retainer 10a.

Where the slots are arranged at a slight angle to one another, the friction fit of the posts within the slots will improve, relative to an exactly parallel arrangement. It will be understood that, in other arrangements, a similar slot can extend perpendicularly from the longitudinal edge. Alternatively, slots of each opening can extend from opposite longitudinal edges of the cover. In the latter arrangement, the cover would be aligned longitudinally between the posts and the cover twisted to a lateral alignment, such that the posts each engage the slots on each side. As will be understood by one of skill in this art, such slots would desirably extend along the circumference of a circle centered between the termini.

In either of the above illustrated embodiments, or in inverted arrangements with the posts on the cover, the posts serve both as an interacting structure (for mounting a medical line or fitting) and as a part of the latching structure (for latching the cover to the base). It will be understood, however, from the description of the following two embodiments, that the posts can serve only as part of the latching structure, or only as part of the interacting structure. It will further be understood by one of ordinary skill in this art that the posts can be absent altogether in other arrangements.

FIGS. 6–9 illustrate a retainer 10b in accordance with another embodiment of the present invention. The retainer 10b is shown in an open position in FIG. 6 and in a fully closed and latched position in FIG. 7. Other components of the anchoring system 8b (e.g., anchor pad, catheter adapter) can be the same as described above with respect to FIGS. 1–3. Accordingly, the above description applies equally to the embodiment of FIGS. 6–9, unless otherwise indicated. In addition, like reference numerals are used to indicate like features among the embodiments, with the letter "b" added as a suffix to refer to features of the present embodiment.

The base 14b includes a pair of posts 20b; however, the base can include more or less posts depending upon the application of the anchoring system. Each post 20b has a relatively smooth, continuous surface up to a tip 90 which need not protrude radially from the post 20b, unlike the head 26, 26a of the previously described embodiments. The tip 90 of the post 20b can be a flat surface or can taper into a hemispherical shape (as shown), a conical shape or other well known shapes. In the illustrated embodiment, the posts 20b each consist only of a simple shaft tapered hemispherically at the tip 90. The posts 20b otherwise desirably have the same diameter, spacing, and height of the posts 20, 20a of the previous embodiments. The posts 20b are illustrated as connected to a platform 21b of the base 14b, although it will be appreciated by those skilled in the art, in light of the above disclosure, that the posts could be connected to the cover 22b.

The flexible hinge 24b of this embodiment comprises a relatively rigid support arm 92 that is integrally joined to the platform 21b at a base end 94. As shown in FIG. 6, the

US 6,447,485 B2

15

support arm 92 extends upwardly from the base end 94 to join with the cover 22b at a thin bridge 96 of cover material. The bridge 96 is formed along a common exterior surface 98 (see FIG. 7) of the cover 22b and the support arm 92. The bridge 96 is defined along the apex of a notch

in the material that forms the cover 22b and support arm 92. The notch 100 can be thought of as the structure formed by a beveled edge sloping away from an interior surface 102 of the cover 22b, conjoined at the bridge 96 with a beveled edge sloping away from an inside surface 104 of the support arm 92.

The hinge 24b flexibly connecting the base 14b to the cover 22b thus comprises the support arm 92, the bridge 96, and the surfaces forming the notch 100. In other arrangements, however, the hinge of an embodiment resembling that of FIGS. 6–9 can comprise a structure similar to a conventional hinge pin-bracket arrangement.

Desirably, the support arm 92, which terminates at an upper end at the bridge 96, has the same height as the posts 20b. It will be understood, however, that the support arm 92 can be higher than the posts 20b in other arrangements.

The thickness of the bridge 96 depends upon the material chosen, and is thick enough to provide the desired strength to connect the support arm 92 to the cover 22b, but thin enough to provide flexibility for opening and closing the retainer 10b. Desirably, the retainer 10b is integrally injection-molded of a resilient polymer material, such as polypropylene or polyethylene. For such materials, the bridge 96 has a thickness between about 0.5 mm and 2.5 mm, and desirably about 1.5 mm.

The flexibility of the hinge 24b also depends in part upon the angle formed by surfaces of the notch 100 when the retainer 10b is in the open position shown in FIG. 6. Desirably, the notch 100 defines an angle of at least about 90E, and particularly about 115E. Such an arrangement allows the cover 22b to lie parallel to the platform 21b when the retainer 10b is in the closed position shown in FIG. 7. It will be understood, however, that in other arrangements the closed cover need not lie parallel to the platform 14b (and may take a curvilinear path as described below).

As seen in FIG. 7A, the latching mechanism 110b of the illustrated retainer 10b comprising a fastening pin 112 and a latch having a receptacle 114. The receptacle 114 is configured to receive the fastening pin 112. As shown in FIGS. 6–9, the illustrated fastening pin 112 is integrally connected to the cover 22b and the receptacle 114 is integrally connected to the base 14b. It will be understood, however, that the pin can instead be positioned on the base, while the receptacle is positioned on the cover.

The fastening pin 112 includes a bar 116 extending from the cover 22b (or the base 14b, depending on the position of the element). At the end distal from the connection to the cover 22b, the bar 116 connects to an expanded portion or barb 118 which tapers to a terminus 120 of the pin 112. Like the post head 26, 26a of the previous embodiments, the barb 118 of the fastening pin 112 can be formed in any of a variety of shapes such as an arrowhead (as shown), hemispherical, conical or flexible ribs extending outward from the bar 116. Desirably, the terminus 120 of the fastening pin 112 is relatively blunt and smooth to prevent it from puncturing the gloves of a health care provider or catching on other materials. The barb 118 also desirably includes a sloping or curved surface 121 leading from the terminus 120 to the maximum diameter of the barb 118. At least one shoulder is formed behind the barb 118. In the illustrated embodiment, shoulders are defined on either side of the bar 116.

16

The receptacle 114 of the latch 110b comprises a pair of opposing tangs 122 that extend to a stem 124 connected to the base 14b (or cover 22b, depending on the position of this element of the latch). Each tang 122 extends outwardly to a lug 126 that can be depressed by finger pressure. Desirably, each tang 122 includes an inner beveled surface 127. These beveled surfaces define an aperture 128 therebetween which tapers from a wider dimension at the top to a narrower dimension at the bottom, where it communicates with a slot 130 located between the opposing stems 124. Each tang defines a downward facing shoulder that cooperates with one of the shoulders of the fastening pin barb 118, as described below.

In operation, a fitting, such as the fitting 11 of FIGS. 1–3, can be first engaged with the posts 20b while the retainer 10b is open (see FIG. 6). Accordingly, the posts 20b of the illustrated embodiment form a portion of the interacting structure for inhibiting movement of a medical line fitting relative to the retainer 10b.

The cover 22b can then swing to a closed position as shown in FIG. 7. The relatively thin strip of material forming the bridge 96 allows the hinge 24b to bend when finger pressure is exerted on the cover 22b to lower it. The angle of the notch 100 further allows the cover 22 to be closed without compressing material between the interior surface 102 of the cover and the inner surface of the support arm 92. While the rigid support arm 92 and the thin bridge 96 permit only rotational and not lateral movement of the cover 22b relative to the base 14b, such lateral movement is not necessary for the illustrated latching mechanism.

The fastening pin 112 can be inserted into the receptacle 114 by positioning the pin 112 into the aperture 128 and pressing on the cover 22b. The sloped surfaces 121 of the fastening pin 112 slide over the beveled inner surfaces 127 of the tangs 122. The interaction of these sloped and beveled surfaces tends to distend the tangs 122 slightly, thereby allowing the barb 118 to enter the slot 130. The tangs 122 then snap back into their original position and engage with the barb 118 of the pin 112 with the corresponding shoulders abutting, thereby releasably securing the cover 22b to the base 14b. FIG. 8 illustrates the closed latch 110b.

When the latch 110b is closed, as shown in FIG. 7, the inner surface 102 of the cover 22b sits atop the tip 90 of the posts 20b, since the posts of the illustrated retainer 10b have the same height as the support arm 92. It will be understood that, in arrangements where the posts are attached to the cover, the tips would abut the base when the cover is in the closed position and latched. Where such contact takes place, a fitting secured between the cover 22b and the base 14b could not slip off the posts 20b when the retainer 10b is closed and latched. Furthermore, the posts 20b provide added support for the cover 22b in the closed position to prevent over-extension of the hinge 24b.

To release the cover 22b from the base 14b, the health care provider can press down on the lugs 126, thereby gaining access to the fitting and/or catheter secured therein. When a lug 126 is depressed, the attached stem 124 bends outward slightly, causing the tang 122 to moved outwardly and the slot 128 to expand, as shown in FIG. 9. To provide friction between the health care provider's finger and the top of the lug 124, ridges or other types of roughened surface can be included.

When only a single lug 124 is depressed, however, the attached tang 122 is elevated until it contacts the surface of the element (e.g., the cover) to which the fastening pin 112 is connected. This degree of elevation of a single tang 122

17                                                                                18

does not expand the aperture 128 sufficiently to release the barb 118 of the fastening pin 112. In contrast, when both lugs 124 are depressed (not shown), the aperture 128 is sufficiently widened to allow the fastening pin 112 to be readily extracted from the receptacle 114. This design prevents inadvertent release of the fastening pin 112 (e.g., when a lug is bumped), but permits easy opening of the retainer 10b when a health care provider seeks to move the catheter or other fitting held within the retainer 10b.

FIGS. 10–12 illustrate an anchoring system 8c in accordance with another embodiment of the present invention. Like the anchoring systems described above, the illustrated embodiment includes a retainer 10c, a fitting or adaptor 11c and an anchor pad 16c. The anchor pad 16c desirably is similar to the anchor pad 16 described with respect to FIG. 1. The retainer 10c and the fitting 11c differ somewhat from the above-described embodiments, though certain features are the same. Accordingly, the above description applies equally to the embodiment of FIGS. 10–12, unless otherwise indicated. In addition, like reference numerals are used for like features among the embodiments, with the letter "c" added as a suffix to refer to features of the present embodiment.

The illustrated posts 20c do not include a locator ring of material below the head 26c. The illustrated base 14c, including dimensions of the posts 20c, is otherwise identical to the base 14 described with respect to FIGS. 1–3. Unlike the openings 32, 32a of the previous embodiments, the illustrated opening 32c is shown without a lip or depression in the slot 36c. It will be understood, however, that the slot can also include a depression over which the post head would seat without departing from the principles of the present embodiment.

Like the previous embodiments, the present embodiment includes interengaging structure to mount the medical line to the retainer 10c. In the illustrated embodiment, the interacting structure comprises a channel defined by a mounting structure 140. The channel is sized and shaped to mount a medical line, such as a catheter, either directly or indirectly by way of a fitting. Desirably, the channel defined by the mounting structure 140 is configured to mate with and mount the adaptor 11c which, in turn, engages with the medical line. In the illustrated embodiment, the mounting structure 140 is integrally formed with the cover 22c, such as by injection molding. It will be understood, however, that the mounting structure 140 can equally be formed as part of the base 14c without materially affecting the function of the retainer 10c.

The illustrated mounting structure 140 comprises two substantially rectangular box-like extensions 141 that extends from the cover 22c between the two openings 32c. The extensions 141 are spaced by a distance sufficient to receive the adaptor 11c and include inner faces 142 configured to mate with surfaces of the adaptor 11c. The inner faces 142 are more particularly shaped to inhibit at least one degree of freedom, desirably to inhibit longitudinal movement of the adaptor 11c when the adaptor is mounted within the channel (see FIG. 11). The illustrated inner faces 142 are convex in shape. The channel defined between the extensions 141, thus, has a minimal width at a central point and widens toward either longitudinal end. In other arrangements, the skilled artisan will recognize that a maximum channel width at a central point will inhibit longitudinal movement of a different fitting. Where, as illustrated, the mounting structure 140 is integral with the cover 22c, the extensions 141 desirably are spaced closely enough to provide a snug or slight interference fit for the adaptor 11c within the channel.

The mounting structure 140 (and the channel defined by it) has a height less than or equal to the height of the post shafts 25c of the base 14c. In the illustrated embodiment, the structure 140 is equal to the height of the shafts 25c, less the thickness of the cover 22c. An outer surface 144 (FIG. 10) of each of the illustrated extensions 141 is accordingly configured to mate with the platform 21c of the base 14c, and is flat in this case.

The cover 22c is illustrated with a slight hourglass shape, such as to provide a slight indentation 146 along an edge 148 of the cover 22c. Desirably, the indentation 146 comprises transverse ridges 150. This shape facilitates an interengagement between the fitting 11c and the mounting structure 140 to inhibit movement of the adaptor 11c at least in the longitudinal direction, as described below.

The fitting 11c of the present embodiment is an in-line adaptor 11c. This adaptor 11c comprises an elongate structure defining a fluid pathway, and means for connecting the adaptor to lines at either end. The illustrated adaptor 11c comprises a medical connector such as those commonly used to connect a supply line to a catheter.

Desirably, the adaptor 11c is of a type similar to that disclosed with respect to FIGS. 11 and 12 of U.S. Pat. No. 5,306,243 ("the '243 patent"), the disclosure of which is hereby incorporated herein by reference. The adaptor 11c includes a male connector 160 for connection to a catheter and a female connector 162 for connection to a medical supply or delivery tube (e.g., leading to an IV drip or a suction pump). The illustrated male connector 160 includes a Luer-type fitting 164 with internal threads and a tapered nose extending outwardly, with an internal passageway for fluid communication with a catheter.

The female connector 162 comprises external threads 166 and a membrane 168 for sealing the internal passageway. The membrane 168 can comprise a closed septum, through which a sharp needle is inserted to provide communication between the supply or delivery tube and the internal passageway. The membrane 168 can also comprise a pre-slit membrane, through which a blunt needle provides communication between the supply or delivery tube and the internal passageway. Desirably, however, the female connector 162 of the adaptor 11c comprises an internal needle integral with the internal passageway, as disclosed in the '243 patent. The membrane 168 comprises a resilient, self-sealing material which is outwardly biased.

An adaptor body 170, between the male connector 160 and the female connector 162, comprises mounting surfaces 172 which form a portion of the interacting structure of the anchoring system 8c. The illustrated mounting surfaces 172 comprise opposed concave surfaces, desirably including ridges (not shown) to facilitate finger gripping during connection of the adaptor 11c to catheters or other medical tubes. In this manner, the adaptor body 170 has a minimal width at a central point and widens toward both the female connector 162 and the male connector 160. In particular, the widest points of the illustrated adaptor 11c are wider than the most narrow portion of the channel between the extensions 141 of the retainer 10c.

The mounting surfaces 172 are joined by a top surface 174 and a bottom surface (not shown). The top and bottom surfaces desirably are flat to mate with the illustrated cover 22c and platform 21c of the retainer 10c, such that these surfaces also form a portion of the interacting structure.

In operation, the adaptor 11c can first be connected to medical tubes. For example, a catheter can be fitted with a female connector with external threading, similar to the

US 6,447,485 B2

19

female connector 162 of the adaptor 11c. Such a connector can be quickly and easily threaded into the male connector 160 of the adaptor without any external needles, thus reducing the likelihood of needle sticks to the health care provider. While the female connector is threaded into the Luer-type fitting of the male connector 160, the nose of the male connector 160 forces the membrane 168 backwards over the internal needle, thus providing fluid communication between the catheter and the internal passage of the adaptor 11c. Similarly, a medical delivery/supply line can be fitted with a male connector similar to the male connector 160 of the adaptor 11c. Such a connector would then connect with the female connector 162 of the adaptor 11c, thereby completing fluid communication through the adaptor 11c between the delivery/supply line and the catheter.

The adaptor 11c then mounts within the channel defined by the mounting structure 140 of the retainer 10c. In the illustrated embodiment, wherein the mounting structure 140 is formed integrally with the cover 22c, the inner faces 142 of the extensions 141 desirably snugly receive and grip the mounting surfaces 172 of the adaptor 11c.

It will be understood by one of skill in the art, however, that the fit need not be tight enough to inhibit transverse movement of the fitting or adaptor, particularly where the mounting structure is integral to the base, rather than integral to the cover. Desirably, however, the interaction between the mounting structure inner faces 142 and the adaptor mounting surfaces 172 is such as to inhibit significant longitudinal movement (e.g., more than 1–2 mm) of the adaptor 11c. In the illustrated embodiment, the minimal width of the channel is more narrow than the widest portions on either end of the adaptor body 170.

With the adaptor 11c thus mounted to the retainer 10c, the retainer 10c is then be closed and latched, as described with respect to the previous embodiments. Where, as illustrated, the mounting structure 140 is located on the cover 22c, if the mounting structure 140 is not configured for firm engagement, the health care provider can hold the adaptor 11c within the channel until the retainer 10c is latched. FIG. 11 illustrates the retainer 10c in a partially closed condition.

FIG. 12 illustrates the retainer 10c latched closed with the adaptor 11c retained therein. As will be understood by one of skill in the art, the cover 22c and the base 14c interposed the adaptor 11c between them, preventing transverse movement of the adaptor 11c relative to the retainer 14c. The channel defined by the mounting structure 140 inhibits lateral or longitudinal movement of the adaptor 11c relative to the retainer 14c by the cooperating shape of the channel and the adaptor 11c (which form the interengaging structure in this embodiment). Accordingly, the adaptor 11c is sufficiently restrained to secure a catheter extending therefrom to the patient. If the catheter had not been secured to the adaptor prior to engagement of the adaptor to the retainer, the catheter can be secured after engagement.

The skilled artisan will appreciate that the retainers disclosed herein demonstrate versatility in securing a great variety of medical articles to a patient. Retainers similar to those of FIGS. 1–9 can be utilized to secure any device which is provided with holes spaced apart to engage with the posts. The cover is secured to the base to interpose the device between them. Many medical devices are already provided with suture holes which can be fitted over the retainer posts disclosed herein. Other devices can be modified to include such holes. Other arrangements to secure a medical article to the posts, either between the posts or adjacent to a single post, will be readily apparent to those skilled in the art in light of the disclosure herein.

20

Medical devices can be also be provided with surfaces similar to the mounting surfaces 172 of the illustrated adaptor 11c, for mounting within the integral channel of the retainer 10c illustrated in FIGS. 10–12. Y-joint adapters, for example, can be adapted to mount within the channel of the retainer 10c shown in FIGS. 10–12.

Alternatively, one of skill in the art will readily appreciate that the disclosed retainers can be modified, without departing from the spirit of the invention, to mount and retain existing medical devices. For example, the integral mounting structure illustrated in FIGS. 10–12 can be adapted to clamp existing Y-joint adapters, or to directly mount a catheter or other medical line without the need for an intermediate fitting. In addition, the channel can have a semi-tubular shape and include at least one lateral slot that receives a radially extending member of the adaptor (e.g., an annular collar). Desirably, any such modified mounting structure would inhibit longitudinal and lateral movement of the device or medical line. Transverse movement is inhibited by closure of the retainer with the device or line sandwiched between the base and the cover.

Furthermore, the skilled artisan will recognize the interchangeability of various features from different embodiments. For example, the integral mounting structure 140 of FIGS. 10–12 can be adapted for mounting an adaptor in a retainer having the latch 70 of FIGS. 6–9, thus requiring no posts. Similarly, the various posts, slotted holes, hinges, anchor pads and fittings disclosed herein, as well as other known equivalents for each such feature, can be mixed and matched by one of ordinary skill in this art to construct anchoring systems in accordance with principles of the present invention.

Although not illustrated, each of the illustrated retainers can be adapted for use in an anchoring system which includes a safety loop. An anchor pad larger than the pad 16 illustrated in FIG. 1 can mount both a retainer, in accordance with one of the preferred embodiments, and a separate tube clip. The medical line mounted by the retainer can also be secured less tightly to the tube clip, with an adequate amount of slack in the line between the retainer and the clip. The clip and the resultant slack are desirably located between the retainer and the catheter insertion site, for example.

If movement by the patient causes a sudden pull upon catheter, the catheter slips within the tube clip and the slack length or "safety loop" of the tube is pulled through the clip. Friction between the clip and the sliding tube absorbs some of the force and some of the force causes a slight pull on the adhesive pad, functioning as a warning to the patient to cease the undesirable movement.

Similarly, the retainer itself can be arranged to only slightly inhibit longitudinal movement of a catheter, such as to allow some amount of slip in response to large forces. For example, the fitting of FIGS. 1–3 can comprise a soft wing clamp without the box clamp. In any of these arrangements, a jerk upon the medical line can be largely absorbed by allowing some slip, without either disconnecting the line from the fitting or painfully pulling the anchor pad from the patient's skin.

Using a retainer in accordance with the above disclosure, no painful, invasive or time-consuming sutures or other extensive procedures involving medical sharps (e.g., suture needles) are necessary to anchor an elongate medical article to a patient's skin. In addition, the flexible anchor pad absorbs much of the force incurred in the installation or removal of the retainer and the medical device, thereby providing greater comfort for the patient.

US 6,447,485 B2

21

As common to each of the above-described retainers and anchoring systems, the present invention provides a sterile, tight-gripping, needle-free way to anchor medical articles to a patient. The retainers thus eliminate accidental needle sticks, suture wound site infections and scanning because sutures are not required. In addition, the retainers can be used with any of a wide variety of catheters, tubes, wires, and other medical articles to provide universal securement using one style of retainer. Also, patient comfort is enhanced and application time is decreased with the use of the present retainer.

The releasable engagement of the cover and the base allow the same retainer to be used more than once on the same patient at the application location. That is, a first medical device can be mounted in the retainer. When the function of the first medical device is accomplished, the retainer can be unlatched, the first device removed, and a second medical device can be retained in the same retainer. Furthermore, the leash or hinge connecting the cover to the base ensures that the cover will not be lost or misplaced during a catheter change. The health care provider wastes no time in searching for a cover, nor in orienting the cover prior to latching.

Although this invention has been described in terms of certain preferred embodiments and suggested possible modifications thereto, other embodiments and modifications apparent to those of ordinary skill in the art are also within the scope of this invention. Accordingly, the scope of the invention is intended to be defined only by the claims which follow.

What is claimed is:

1. A method of securing a medical device to the body of a patient, the method comprising the steps of:

providing a retainer including a base that defines a receiving area for receiving a portion of the medical device, a cover permanently coupled to the base, the cover being movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, a latching mechanism operating between the base and the cover to releasably latch the cover to the base with the cover in the closed position, and interacting structure which is adapted to engage the medical device in a non-occlusive manner and to limit longitudinal movement of the medical device through the retainer when the medical device is placed within the receiving area;

positioning the retainer on the body of the patient;

attaching the retainer to the body of the patient with an adhesive layer;

securing a portion of the medical device in the receiving area of the base;

moving the cover over the base so that the cover is located over at least a portion of the interacting structure; and

securing the cover in position upon the base using the latching mechanism.

2. The method of claim 1 wherein the step of providing a retainer further comprises providing a retainer having a channel which lies between the base and the cover of the retainer when the cover is in the closed position.

3. The method of claim 2 wherein the step of providing a retainer further comprises providing a retainer having the interacting structure of the retainer comprise a post which extends at least partially into the channel of the retainer.

4. The method of claim 3 wherein the step of securing a portion of the medical device comprises inserting the post of the retainer through a hole in the medical device.

22

5. The method of claim 2 wherein the step of providing a retainer further comprises providing a retainer having a channel that has a variable cross section along its length.

6. The method of claim 2 wherein the step of securing a portion of the medical device comprises placing a portion of the medical device within the channel of the retainer.

7. The method of claim 2 wherein the step of providing a retainer further comprises providing a retainer in which the cross section of the channel tapers along its length.

8. The method of claim 1 wherein the step of providing a retainer further comprises providing a retainer having the cover of the retainer coupled to the base of the retainer by a flexible hinge.

9. The method of claim 8 wherein the step of providing a retainer further comprises providing a retainer having the flexible hinge comprise an elongate leash extending between the cover and the base.

10. The method of claim 8 wherein the step of providing a retainer further comprises providing a retainer having the flexible hinge comprise a rigid support arm fixed to the base and a flexible bridge extending between the support arm and the cover.

11. The method of claim 8 wherein the step of providing a retainer further comprises providing a retainer in which the base, cover and hinge are integrally formed.

12. A method of securing a medical line to the body of a patient, the method comprising the steps of:

providing a retainer attachable to a medical line, including a base, a cover permanently coupled to the base, a latching mechanism, a channel, and an adhesive layer attached to the retainer, the cover being movable between an open position and a closed position, the latching mechanism releasably latching the cover to the base in the closed position, the channel being disposed between the base and the cover when the cover is in the closed position, the channel being shaped to retain the medical line between the cover and the base with the cover in the closed position in order to inhibit movement of the medical line in a direction generally parallel to the medical line's longitudinal axis;

positioning the retainer on the body of the patient;

attaching the adhesive layer to the body of the patient;

placing a portion of the medical line into the channel;

moving the cover over the base so that the medical line is retained within the channel; and

securing the cover in position upon the base using the latching mechanism.

13. The method of claim 12 wherein the step of providing a retainer further comprises providing a retainer having a post which extends at least partially into the channel of the retainer.

14. The method of claim 13 wherein the step of securing a portion of the medical device comprises inserting the post of the retainer through a hole in the medical device.

15. the method of claim 12 wherein the step the step of providing a retainer further comprises providing a retainer in which the channel has a variable cross section along its length.

16. The method of claim 12 wherein the step of securing a portion of the medical device comprises placing a portion of the medical device within the channel of the retainer.

17. The method of claim 12 wherein the step of providing a retainer further comprises providing a retainer in which the cross section of the channel tapers along its length.

18. The method of claim 12 wherein the step of providing a retainer further comprises providing a retainer in which the

US 6,447,485 B2

23

cover of the retainer is coupled to the base of the retainer by a flexible hinge.

**19**. The method of claim **18** wherein the step of providing a retainer further comprises providing a retainer in which the flexible hinge comprises an elongate leash extending between the cover and the base.

**20**. The method of claim **18** wherein the step of providing a retainer further comprises providing a retainer having a flexible hinge that comprises a rigid support arm fixed to the base and a flexible bridge extending between the support arm and the cover.

**21**. The method of claim **18** wherein the step of providing a retainer further comprises providing a retainer in which the base, cover and hinge are integrally formed.

**22**. A method of securing a medical line to the body of a patient, the method comprising the steps of:

24

providing a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and a cover coupled to the base, means for releasably latching the cover to the base, and means for limiting longitudinal movement of the medical line relative to the retainer;

positioning the retainer on the body of the patient;

attaching the adhesive layer to the body of the patient;

placing a portion of the medical line into the receiving area;

moving the cover over the base so that the cover lies at least partially over the movement limiting means; and

securing the cover in position upon the base using the latching mechanism.

* * * * *

# Exhibit C

# United States Patent [19]

**Gordon**

[11]    **4,397,647**

[45]    **Aug. 9, 1983**

[54] **CATHETER STABILIZATION FITTING HAVING A SNAP-OVER COVER**

[75] Inventor:    **Marvin Gordon,** East Windsor, N.J.

[73] Assignee:    **Whitman Medical Corporation,** Clark, N.J.

[21] Appl. No.:    **353,928**

[22] Filed:    **Mar. 2, 1982**

### Related U.S. Application Data

[63]    Continuation-in-part of Ser. No. 168,721, Jul. 14, 1980, abandoned, which is a continuation-in-part of Ser. No. 5,032, Jan. 19, 1979, Pat. No. 4,224,937, which is a continuation-in-part of Ser. No. 905,399, May 12, 1978, abandoned.

[51]    Int. Cl.³ ............................................... **A61M 5/00**
[52]    U.S. Cl. ............................. **604/180;** 128/DIG. 26
[58]    Field of Search ..................... 128/214, 133, 214.4, 128/215, 347, 348, 349, DIG. 6, DIG. 26; 604/180, 174, 178

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,525,398 | 10/1950 | Collins | 128/215 |
| 2,707,953 | 5/1955 | Ryan | 128/214 R |
| 3,059,645 | 10/1962 | Hasbrouck et al. | 128/DIG. 26 |
| 3,167,072 | 1/1965 | Stone et al. | 128/348 |
| 3,834,380 | 9/1974 | Boyd | 128/DIG. 26 |
| 3,856,020 | 12/1974 | Kovac | 128/347 |
| 4,020,835 | 5/1977 | Nordstrom et al. | 128/214.4 |
| 4,082,094 | 4/1978 | Dailey | 128/214 |
| 4,129,128 | 12/1978 | McFarlane | 128/133 |
| 4,161,171 | 7/1979 | Fuchs | 128/214.4 |

*Primary Examiner*—Stephen C. Pellegrino
*Attorney, Agent, or Firm*—Holman & Stern

[57]    **ABSTRACT**

A disposable stabilizing fitting for a catheter tube includes a laminar base member having an adhesive coated underside and a tube-retaining cradle. A snap-over cover engages the catheter tube in the cradle. Specifically, gripping members in the cradle are non-aligned with one or more gripping members in the cover such that the gripping members engage the catheter tube by bending the tube slightly without restricting flow. In one preferred embodiment, the cradle is subdivided into two longitudinal sections having respective covers which hinge in opposite directions and are latchable in a plurality of positions corresponding to various catheter tube diameters.

**19 Claims, 9 Drawing Figures**



U.S. Patent    Aug. 9, 1983    Sheet 1 of 3    4,397,647



FIG. 1

FIG. 2

FIG. 3

*FIG. 4*



*FIG. 5*





4,397,647

1

### CATHETER STABILIZATION FITTING HAVING A SNAP-OVER COVER

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation-in-Part of my copending U.S. patent application Ser. No. 168,721, filed July 14, 1980 now abandoned, and bearing the title "CATHETER STABILIZATION FITTING HAVING A SNAP-OVER COVER", which application is a Continuation-in-Part of my copending U.S. patent application Ser. No. 5,032 filed Jan. 19, 1979 now U.S. Pat. No. 4,224,937, and bearing the title "STABILIZING FITTING FOR AN INTRAVENOUS CATHETER", which application is a Continuation-in-Part application of my U.S. patent application Ser. No. 905,399, filed May 12, 1978 now abandoned. May aforesaid U.S. Patent Application Ser. No. 5,032, is expressly incorporated herein by reference.

#### TECHNICAL FIELD

The present invention relates to devices for positionally stabilizing a catheter on the body of a patient. Although described herein specifically in terms of a "fully-indwelling" catheter, the present invention encompasses stabilization of intravenous type catheters in the manner described in reference to FIGS. 16 and 17 of my aforementioned U.S. patent application Ser. No. 5,032 incorporated herein by reference.

#### BACKGROUND OF THE INVENTION

Urethral catheter stabilizing devices are required to perform two (2) primary functions. First, the device must hold the catheter tube positionally stabilized relative to the device itself. Second, the device itself must be held positionally stabilized relative to the body of the patient. Prior art urethral catheter holding devices generally fail to satisfactorily perform one or both of these functions. For example, some devices require conventional adhesive tape to be secured to the patient's skin; such tape, as a general rule, does not hold in place for any considerable period of time and is often time-consuming and bothersome to employ. Other devices utilize stretch rubber strips with VELCRO fastening devices wherein the strips encircle the patient's thigh; these are unsatisfactory because, in order to prevent the device from slipping along the thigh, the strips must be wrapped so tightly as to constrict blood circulation. Other devices hold the tube by means of some snap-fit engagement; such devices are subject to displacement of the catheter tube from the device and to movements which inadvertently remove the tube from the snap-fit. Still other devices require that the tube be tied, taped, or similarly engaged to the device; such arrangements tend to restrict the flow through the catheter tube. Finally, there are other devices which require special configurations of catheter tubes to engage the tube properly; such custom tubing requirements are clearly undesirable since it will not be useful for the majority of commercially available catheters.

#### SUMMARY OF THE INVENTION

It is therefore a primary object of the present invention to provide a stabilizing device for indwelling catheters which can be stabilized with respect to the patient's body, and which can stabilize a catheter tube with respect to the device so that the attendant disadvantages

2

described above for prior art devices are eliminated. Particularly, it is an object of the present invention to provide a disposable and inexpensive catheter stabilizing device using principles that are adaptable to both indwelling and intravenous type catheters. It is another object of the present invention to provide a catheter-stabilizing device which provides complete security against unwanted longitudinal movement of the catheter in spite of extensive movements by the patient. It is a further object of the present invention to provide a catheter-stabilizing device which is capable of performing the desired functions with catheter tubes having a variety of different diameters. Still another object of the present invention is to provide a catheter-stabilizing device with all of the attendant advantages described herein and which is waterproof so as to permit a patient to shower without the fear of dislodging the catheter.

In accordance with the present invention, a disposable catheter-stabilizing holder includes a base member having an adhesive coating on its lower surface, which coating is covered by a peel-away covering until the device is ready for use. A tube-retaining cradle is secured to the surface of the laminar base member which is not covered by adhesive. The cradle includes a body portion with one or more upstanding gripping members having aligned recesses for supporting an elongated catheter tube. A snap-over cover hinges to one side wall of the cradle and is arranged to engage a latch member on the opposite side wall so as to hold the catheter tube in the cradle and prevent both longitudinal and transverse catheter tube movement. Specifically, the cover is provided with at least one downwardly-extending gripping member which is longitudinally misaligned with the upstanding gripping members so as to slightly deform the catheter tube, when the cover is closed, without restricting flow through the tube, and thereby providing secure longitudinal stabilization of the catheter tube.

In one embodiment, the upstanding members are arcuately recessed ribs and the downwardly-extending members are similarly recessed ribs. In another embodiment, the upstanding members are side walls joining at common recesses at their opposite ends whereas the downwardly-extending member is a projection from the cover into the space between the recesses.

The latch member and cover preferably have a plurality of settings in order that the device may accommodate different diameter tubes; however, the non-aligned gripping members permit secure stabilization of catheter tubes having sizes which do not necessarily correspond to the specific positions of the latch and cover. It is also a preferred, although not necessary, part of the present invention to provide two (2) longitudinally-arranged sections wherein each section has its own snap-over cover and offset gripping member arrangements and wherein the covers pivot in opposite rotational directions. This opposite cover arrangement provides reliability, not only by means of redundancy, but also by means of the fact that any movement which might inadvertently tend to open a cover hinged in one direction while not necessarily open the cover hinged in the opposite direction. A tap grip is provided, extending from the laminar base member, on which no adhesive backing is utilized, so that the device can be readily held between the thumb and the forefinger of one hand while stripping the adhesive backing from the bottom of the

4,397,647

3

device and applying the adhesive-coated surface of the base member to the patient's skin.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and still further objects, features and advantages of the present invention will become apparent upon consideration of the following detailed description of specific embodiments thereof, especially when taken in conjunction with the accompanying drawings, wherein:

FIG. 1 is a view is perspective showing a catheter stabilizing device of the present invention secure to the inner thigh of a patient;

FIG. 2 is a top view in plan of the catheter-stabilizing device of the present invention;

FIG. 3 is a view in perspective of the catheter-stabilizing device of FIG. 1 showing the covers for the device in their open condition;

FIG. 4 is a view in perspective of the catheter-stabilizing device of FIG. 3 showing the covers of the device in their closed condition;

FIG. 5 is a view in section showing the catheter-stabilizing device of FIG. 1 engaging a catheter tube;

FIG. 6 is a view in perspective showing another catheter-stabilizing device in accordance with the present invention with the cover of the stabilizing device open and a catheter tube positioned prior to insertion into the stabilizing device cradle;

FIG. 7 is a view similar to FIG. 6 showing the catheter tube in the cradle and the stabilizing device closed;

FIG. 8 is a plan view in elevation showing the catheter-stabilizing device of FIGS. 6 and 7 in its closed position; and

FIG. 9 is a view in section taken along lines 9—9 of FIG. 8, with a catheter tube shown in phantom lines to illustrate the gripping characteristic of the stabilizing device.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring more specifically to the drawings, a catheter-stabilizer 10 includes a laminar base member 11 which is shown in the form of a circle but which may take any configuration appropriate to the area of the body of a patient to which the stabilizer is to be secured. Base member 11 may be a thin sheet of plastic material, such as polyethylene tape, or it may be a somewhat thicker but still very much flexible plastic foam material. In either case, the underside of base member 11 is coated with a pressure-sensitive adhesive material 12 which, prior to deployment of the stabilizer, is covered with a protective peel-away or strippable covering sheet 13. A support member 14 made of flexible plastic material such as polyvinylchloride or polyethylene, is heat-sealed or otherwise secured to the top surface of base member 11. Support member 14 is in the form of a strip which extends at least partially across the base member 11 and is integral with a tab grip 15 extending beyond the periphery of base member 11. Tab grip 15 is devoid of adhesive material and thereby may serve as means for holding the device when the backing 13 is removed and during the deployment of stabilizer 10.

A cradle 16, which is preferably molded integrally with support member 14, includes a front wall 17, a rear wall 18 and side walls 19 and 20. A bottom wall 22, which may be one and the same with support member 14, is surrounded by walls 17, 18, 19 and 20. Gripping members in the form of upstanding ribs 21, comprise

4

wall members extending parallel to the front wall 17 and the rear wall 18 and longitudinally spaced within cradle 16. There are four (4) such ribs 21 employed in the embodiment described herein, however, it is to be understood that the number of such ribs may vary within the scope of the present invention. The front wall 17, rear wall 18, and the ribs 21 are provided with arcuate recesses which are longitudinally aligned.

Cradle 16 is sub-divided longitudinally into two (2) sections by means of respective notches 23 and 24, defined in side walls 19 and 20. The notches extend substantially through the entire height of the side walls and terminate in a generally V-configuration, the base of which defines a transverse line across the cradle along which the cradle may be bent. The forward end of cradle 16 includes a cover 25 hinged at the top of side wall 20 and extending along the entire length of the front section of the cradle. Cover 25 has a generally C-shaped or other arcuate transverse cross-section whereby it domes upwardly from the cradle. Although the hinging mechanism between cover 25 and the top of side wall 20 may be a multipart hinge arrangement, the hinging mechanism is preferably a thinned portion 27 of the integrally molded cradle which, as is conventional, permits the integral cover to flexibly pivot about the top of side wall 20. The outer surface of cover 25 includes a longitudinally-extending handle portion 26 disposed proximate the end of the cover removed from hinged region 27. Handle 26, as the name implies, permits the user to grasp the handle to control the position of cover 25.

An interior surface of cover 25 is provided with gripping members or downwardly-extending ribs 28 which are arcuately recessed upwardly with a configuration similar but oppositely directed to recesses in ribs 21. Importantly, ribs 28 are longitudinally offset from ribs 21 and, in the particular embodiment illustrated in FIGS. 1–6, ribs 28 are disposed between the ribs 21 of the forward section of the cradle. The side of cover 25 removed from hinged portion 27 includes an inward projection 29 extending longitudinally along the entire length of cover 25.

The top of the side wall 19 in the forward half of cradle 16 includes a latch mechanism suitable for engagement with projection 29 and cover 25. Specifically, the latch mechanism includes three (3) vertically spaced longitudinally extending ribs 30, 31 and 32, the uppermost rib 30 being disposed above the normal edge of the side wall 19 whereas the lowermost rib 32 is disposed below the nominal top of side wall 19. Ribs 30, 31 and 32 are positioned to provide resilient engagement with projection 29 and cover 25 so as to provide different selective closure positions for the cover.

The rearward half of cradle 16 is provided with a cover 25'. Cover 25' is identical to cover 25 and all of its parts are designated by primed reference numerals corresponding to the reference numerals utilized to designate the parts of cover 25. The only difference between the two covers is that cover 25' is hinged atop side wall 19 and latches with the ribs disposed along the side wall 20. Therefore, the two covers pivot in opposite directions.

In use, the stabilizer can be secured to the catheter tube either before or after the catheter has been inserted into the patient. Likewise, the catheter tube can be secured in the stabilizer before or after the stabilizer has been secured to the patient's skin. In either case, the tube is secured to the stabilizer 10 by opening covers 25

4,397,647

5

and 25' and disposing the tube 35 along the longitudinally aligned recesses in ribs 21. When the tube is so positioned, the covers 25 and 25' are pivoted closed so that projections 29, 29' engage the appropriate ribs 30, 30', or 31, 31', or 32, 32', depending upon the diameter of tube 35. Preferably, the three (3) latching positions correspond to engagement of tubing diameters of 16 mm, 18 mm, and 20 mm. Of course, the stabilizer can be designed for other diameter tubing. It should be noted that when the covers 25, 25' are closed, the vertical spacing between the recessed portions of ribs 21 and 28 is slightly less than the diameter of the engaged tube 35. Since ribs 21 and 28 are offset longitudinally, this reduced spacing forces a slight crimping (as illustrated in FIG. 5) of the tube 35, thereby providing a firm engagement of the tube with the stabilizer. Importantly, this crimping is small enough to provide the desired firm engagement without restricting the flow through the tube. This feature permits the stabilizer to engage tubing having a diameter which is somewhat smaller than the three sizes for which the stabilizer is primarily designed. This feature of serving other diameter tubing, however, is secondary to the fact that the crimping feature is primarily intended to provide a firm grip against longitudinal displacement of the tubing within the stabilizer.

In applying the stabilizer to the patient's skin, the backing 13 is removed from the adhesive-coated underside of base member 11 withone hand as the other hand grips hand grip 15. The exposed adhesive coating 12 is then pressed against the desired location of the skin, again while holding hand grip 15 to facilitate positioning.

The release paper, or backing paper 13 may be slit along a transverse line parallel to and immediately below the line defined between the bottom-most portions of notches 23 and 24. This facilitates backing removal prior to use of the stabilizer since the stabilizer can be flexed along notches 23 and 24 causing the release paper to separate along the cover, thereby permitting the user to easily peel off the backing.

Although the embodiment of FIGS. 1–6 utilizes two oppositely pivoted covers 25, 25', a positive gripping arrangement provided by non-aligned recessed ribs 21, 28 in just one half of the stabilizer unit is sufficient to provide the necessary gripping of the catheter tube to prevent a longitudinal slipping. The value of the two longitudinal halves of the stabilizer resides in the fact that the covers 25, 25' are pivoted in opposite directions. This feature prevents dislodgement of the catheter tube 35 from the stabilizer in the event that one cover should open. Suppose, for example, that a patient moves and impacts an an object in such a manner that cover 25 is inadvertently opened, such an impact could likely occur on the side of the stabilizer at which hinge 27 is located (i.e., side wall 20) such that cover 25 is pushed in the direction of side wall 19 and projection 29 is slipped out of engagement with one of the ribs 30, 31, 32. Impact along the hinged side of cover 25, however, corresponds to impact along the latching side of cover 25'. Such impact on the latching side of cover 25' tends to force projection 29 into further engagement with one of the ribs 30', 31', 32'. Likewise, transverse movement of the tube 35 which would tend to inadvertently open one of the covers, would tend to further engage the latching of the other cover. Thus, the position of the two covers 25, 25' is more than merely a redundant feature.

6

Support member 14 can be eliminated entirely in which case the cradle 16 is heat-sealed directly to base member 11; under such circumstances tab member 15 would extend to cradle 16. In any event, the entire cradle 16 can readily be injection-molded in one piece; likewise, the combination of support member 14 and the cradle 16 can be injection-molded in one piece. The stabilizer is therefore inexpensive to manufacture, and can be sold as a readily disposable unit after a single use. Notwithstanding this low cost, the device still retains the advantage of providing the necessary retention of the tube in a secure positioning of the device on the patient's body while being simple and comfortable to use.

Another catheter-stabilizer embodiment of the present invention is illustrated in FIGS. 6–9 and is generally designated by the reference numeral 40. Stabilizer 40 includes a laminar base member 41 which is shown in the form of a circle, but which may take any configuration appropriate to the area of the body of a patient to which the stabilizer is to be secured. Base member 41 may be a thin sheet of plastic material, such as polyethylene tape, or it may be a somewhat thicker but still very much flexible plastic foam material. In either case, the underside of base member 41 is coated with a pressure-sensitive adhesive material which, prior to deployment of the stabilizer, is covered with a protective or peel-away or strippable covering sheet 42. An integrally formed rubber or other elastomer structure is secured to the top side of base member 41 and includes a generally circular (although the circular configuration is by no means limiting) base portion 43, a pair of upstanding arcuate side walls 44, 45 and a snap-over cover member 46. The upstanding side walls 44 and 45 constitute opposed portions of a circle which is concentrically disposed within the circular base portion 43. Opposed ends of the side walls 44, 45 terminate in respective aligned recesses 47, 48 which extend substantially to base portion 43 from diametrically opposed locations of the circle formed by the side walls. Each recess 47, 48 includes an upper neck portion which is relatively narrow and which terminates at its bottom in a generally circular portion having its opposite end approximately tangential with base portion 43. The neck portion of recesses 47 and 48 is narrower than the diameter of the catheter tube 50 which is to be secured in place by the stabilizer 40. The bottom circular portion of the recesses 47, 48, on the other hand, have substantially the same diameter as the catheter tube 50 so as to permit the catheter tube 50 to be slidable longitudinally within the recesses 47, 48. In this regard, the catheter tube may be inserted from above through the neck portions of recesses 47 and 48, by flexing the two (2) side walls 44 and 45 away from one another and forcing the catheter tube into the circular portions of the recesses. Alternatively, the catheter tube may be slid longitudinally in place through the two (2) circular portions of the recesses 47 and 48. It should be noted, however, that for some applications it may be desirable that the diameter of the circular portions of recesses 47 and 48 be slightly smaller than the outside diameter of catheter tube 50 so as to firmly engage the catheter tube in place when the tube is properly inserted into the stabilizer.

The snap-over cover 46 is in the form of a strap secured to the outer surface of side wall 45 at a location substantially 90° displaced from each of recesses 47 and 48. The strap 46 includes a relatively thin portion 51 near its proximal end which serves as a hinge to provide

4,397,647

7          8

the cover 46 to be folded over the space above the two (2) side walls 44 and 45 in the manner illustrated in FIGS. 7, 8 and 9. A through hole 52 is defined in the strap or cover 46 in a position to mate with a projecting latch 53 formed integrally with the top edge of side wall 44 at a location spaced 90° from each of recesses 47 and 48. The latch member 53 projects radially outward somewhat from side wall 44 and is configured to permit the latching hole 52 of the strap 46 to be stretched over projection 53 so that the projection extends through the hole and latches the cover in place. The latched condition is illustrated in FIGS. 7 and 8. The top side of strap 46 includes a raised member 54 disposed on the side of latching hole 52 remote from hing 51. Member 54 includes a top surface which is oblique relative to the top surface of strap 46 so as to slope downward toward hole 52. When the cover is in its closed position, the underside of projection 53 rests on the sloped surface of projection 54. This engagement between the underside of projection 53 and the sloped surface of projection 54 facilitates opening of the cover when the distal end of strap 46 is pulled upwardly from the position illustrated in FIGS. 7 and 8. Specifically, when the distal end of strap 46 is pulled upwardly, the underside of projection 53 slides along the slope surface of projection 54 while the opposite end of the hole 52 engages the presented surface of projection 53 which is likewise sloped. The annular boundary of hole 52 thus slides along the sloped projection 53 while the underside of the projection 53 slides along the surface of projection 54 to facilitate removal of the projection from the hole.

The underside of strap 46 is provided with a gripping projection 55 which is positioned lengthwise along strap 46 so as to project downwardly between side walls 44 and 45 when the strap is latched closed. The gripping projection extends sufficiently far down into the space between the side walls 44 and 45 to engage and slightly crimp the catheter tube 50 (as best illustrated in FIG. 9), forcing the catheter tube slightly downward into the central opening 49 at the center of the annular base portion 43. More specifically, the side walls 44 and 45 have their inner surfaces disposed to extend vertically upward from the periphery of the central opening 49 in the base portion 43. This circular space below the bottom of recesses 47 and 48 permits the projection 55 to force the catheter tube 50 below the bottom of recesses 47 and 48 so that a transverse gripping effect is achieved.

The distal end of the strap may be provided with raised ridges 56 on one or both sides thereof to facilitate gripping of the strap for purposes of latching and unlatching.

It should once again be emphasized that the base portion 43, side walls 44, 45, strap 46, projection 55 and projection 53 are formed integrally as one (1) piece of rubber or other elastomeric material. The stabilizer 40 is therefore simply and inexpensively manufactured by conventional molding processes.

In the preferred embodiment, the projection 55 takes the form of an oval in transverse cross-section with decreasing dimensions so that the tube engaging surface is of smaller area than the area of intersection with strap 46. This smaller contact area permits greater pressure to be exerted on the catheter tube 50.

As noted above, latching projection 53 has sloped sides to facilitate latching and unlatching by forcing the hole 52 resiliently along the sloped sides.

Although the embodiments described herein relate primarily to use with urethral catheters, it should be evident to one of ordinary skill in the art that the same concept can be utilized to stabilize hyperalimentation, nasalgastric tubes, nephrostomy tubes, cystostomy tubes, chest drainage tubes, etc. Moreover, the same concept described herein relates to intravenous catheter stabilization in the manner described in my aforementioned U.S. patent application Ser. No. 5,032. The different between stabilizing indwelling catheter tubes and intravenous catheter tubes relates to the fact that the stabilization of the intravenous catheter tube makes use of the varied configuration of a catheter hub so that a particular locating means is utilized for longitudinally positioning the catheter hub in the stabilizer. For the indwelling catheter, the tube has no hub but is merely a flexible tubing which can be positioned anywhere along its length within the stabilization device. In that context, the claimed tube is held longitudinally in place by means of the off-set ribs 21, 28 and their longitudinally aligned recesses which slightly crimp the tube.

The instant invention is not to be limited to the embodiment of the invention as herein described, for various modifications can be made by a person skilled in the art without detracting from the true spirit and scope of the invention as defined in the appended claims.

What is claimed is:

1. A stabilizing fitting for securing a catheter to a patient's skin comprising a laminar base member having an upper surface and a lower surface, pressure-sensitive adhesive means on at least a part of said lower surface of said base member, a catheter tube-retaining cradle secured to said upper surface of said base member, said cradle having a forward end, a rearward end, and resilient substantially parallel side walls, said side walls being spaced to receive a catheter tube placed longitudinally in said cradle, a tab grip extending beyond the periphery of said base member, a snap-over cover hinged to the upper edge of one of said side walls and including means for positively contacting said catheter tube and urging the catheter tube toward said lower surface, and latching engagement means on the other of said side walls for holding the cover in place in a flexibly removable engagement over a tube disposed in said cradle.

2. A stabilizing fitting for securing a catheter to a patient's skin comprising a laminar base member having an upper surface and a lower surface, pressure-sensitive adhesive means on at least a part of said lower surface of said base member, a catheter tube-retaining cradle secured to said upper surface of said base member, said cradle having a forward end, a rearward end, and resilient substantially parallel side walls, said side walls being spaced to receive a catheter tube placed longitudinally in said cradle, a tab grip extending beyond the periphery of said base member, a snap-over cover hinged to the upper edge of one of said side walls, and latching engagement means on the other of said side walls for holding the cover in place in a flexibly removable engagement over a tube disposed in said cradle; and further including at least one upstanding rib member in said cradle disposed parallel to said forward end, said upstanding rib member being arcuately recessed to support a catheter tube therein;

a further rib member secured to said cover and depending downwardly toward said cradle, said further rib member being upwardly recessed to receive a catheter tube;

4,397,647

9

wherein said upstanding rib member and said further rib member are longitudinally spaced from one another such that, with said cover closed, the recesses in said rib members engage a catheter tube in said cradle at different locations.

3. The stabilizer fitting according to claim 2, wherein the recesses in said rib members are configured to crimp a catheter tube in said cradle when said cover is closed to thereby positively prevent longitudinal movement of such catheter tube.

4. The stabilizer fitting according to claims 1 or 3, wherein said cradle is divided into two longitudinally aligned sections spaced by transversely aligned first and second notches defined in respective side walls of said cradle, said snap-over cover being coextensive with the first of said cradle sections, said stabilizer fitting further comprising a second snap-over cover hinged to the upper edge of said other of said side walls and latching means secured on said one of said side walls for providing a resilient engagement holding said further cover in place over said catheter hub fitting, whereby said covers are arranged to hinge in opposite directions over a catheter tube disposed in said cradle.

5. A stabilizing fitting for securing a catheter to a patient's skin comprising a laminar base member having an upper surface and a lower surface, pressure-sensitive adhesive means on at least a part of said lower surface of said base member, a catheter tube-retaining cradle secured to said upper surface of said base member, said cradle having a forward end, a rearward end, and resilient substantially parallel side walls, said side walls being spaced to receive a catheter tube placed longitudinally in said cradle, a tab grip extending beyond the periphery of said base member, a snap-over cover hinged to the upper edge of one of said side walls, and latching engagement means on the other of said side walls for holding the cover in place in a flexibly removable engagement over a tube disposed in said cradle; and

further comprising means for positively engaging a catheter tube, said means comprising:

an arcuate recess defined in said forward end of said cradle;

at least one upstanding rib member disposed in said cradle longitudinally spaced and parallel to said forward end, said rib member having an arcuate recess defined therein in longitudinal alignment with the recess in said forward end;

a further rib member depending from said other in longitudinally spaced relationship to said forward end and said first-mentioned rib member, said further rib member having an arcuate recess which is aligned with the arcuate recesses of said forward end and said first-mentioned rib member when said cover is closed, said arcuate recesses and said rib member being sized to slightly bend a catheter tube disposed longitudinally between the recesses.

6. The stabilizing fitting according to claim 5, wherein said cover includes a longitudinally extending inward projection and said latching engagement means includes a plurality of longitudinally extending spaced ribs on said other side wall arranged to be resiliently engaged by said projection.

7. A stabilizing fitting for securing a catheter to a patient's skin comprising a laminar base member having an upper surface and a lower surface, pressure-sensitive adhesive means on at least a part of said lower surface of said base member, a catheter tube-retaining cradle se-

10

cured to said upper surface of said base member, said cradle having a forward end, a rearward end, and resilient substantially parallel side walls, said side walls being spaced to receive a catheter tube placed longitudinally in said cradle, a tab grip extending beyond the periphery of said base member, a snap-over cover hinged to the upper edge of said side walls, and latching engagement means on the other of said side walls for holding the cover in place in a flexibly removable engagement over a tube disposed in said cradle; wherein said cradle and said cover comprise an integral injection-molded unit.

8. A stabilizing fitting for a flexible catheter tube comprising:

a flexible base member having a pressure-sensitive adhesive-coated underside, said base member being sufficiently flexible to conform to the contours of a patient's skin;

a cradle member secured to said base member, said cradle member having first and second longitudinally aligned sections for receiving respective longitudinal portions of said catheter tube, said cradle member having first and second side walls;

a first cover member coextensive with said first longitudinal section of said cradle, and hinged to said first side wall;

first latching means for securing said first cover member to said second side wall of said first cradle section;

a second member hinged to said second side wall; and second latching means for resiliently engaging said second member to said first side wall.

9. The stabilizer fitting according to claim 8, further comprising means for positively gripping said catheter tube between said cradle and said first and second cover members.

10. The stabilizer fitting according to claim 9, further characterized by means of a notch defined in said first and second side walls between said first and second longitudinal sections of said cradle to permit bending of said cradle at said notch.

11. A stabilizing fitting for securing a catheter to a patient's skin comprising a laminar base member having an upper surface and a lower surface, pressure-sensitive adhesive means on at least a part of said lower surface of said base member, a catheter tube-retaining cradle secured to said upper surface of said base member, said cradle having a forward end, a rearward end, and resilient substantially parallel side walls, said side walls being spaced to receive a catheter tube placed longitudinally in said cradle, a tab grip extending beyond the periphery of said base member, a snap-over cover hinged to the upper edge of one of said side walls, and latching engagement means on the other of said side walls for holding the cover in place in a flexibly removable engagement over a tube disposed in said cradle, wherein the cover includes a longitudinally extending inward projection and said latching engagement means includes a plurality of longitudinally-extending spaced ribs on said other side wall arranged to be resiliently engaged by said projection.

12. A stabilizing fitting for securing a catheter to a patient's skin comprising a base having an upper surface and a lower surface, pressure-sensitive adhesive means secured to at least a part of said lower surface of said base, a catheter tube-retaining cradle secured to said upper surface of said base member, said cradle having a forward end, a rearward end, and resilient side walls,

4,397,647

**11**

means for receiving a catheter tube placed longitudinally in said cradle between said side walls, a snap-over cover hinged to one of said side walls to move between opened and closed positions and including means for positively contacting said catheter tube in said closed position to urge the catheter tube toward said base, and latching engagement means on the other of said side walls for holding the cover in place in a flexibly removable engagement over a catheter tube disposed in said cradle, wherein said cover includes a latching through hole and wherein said latching engagement means comprises a latching projection secured to said other side walls, said through hole being positioned to align with and resiliently fit over said latching projection when said cover is in said closed position.

13. A stabilizing fitting for securing a catheter to a patient's skin comprising a base having an upper surface and a lower surface, pressure-sensitive adhesive means secured to at least a part of said lower surface of said base, a catheter tube-retaining cradle secured to said upper surface of said base member, said cradle having a forward end, a rearward end, and resilient side walls, means for receiving a catheter tube placed longitudinally in said cradle between said side walls, a snap-over cover hinged to one of said side walls to move between opened and closed positions and including means for positively contacting said catheter tube in said closed position to urge the catheter tube toward said base, latching engagement means on the other of said side walls for holding the cover in place in a flexibly removable engagement over a catheter tube disposed in said cradle;

and further including:

at least one upstanding rib member in said cradle disposed parallel to said forward end, said upstanding rib member being arcuately recessed to support a catheter tube therein;

a further rib member secured to said cover and depending downwardly toward said cradle, said further rib member being upwardly recessed to receive a catheter tube;

wherein said upstanding rib member and said further rib member are longitudinally spaced from one another such that, when the cover is closed, the recesses in said rib members engage a catheter tube in said cradle at different longitudinal locations; and

wherein the recesses in said rib members are configured to crimp a catheter tube in said cradle when said cover is closed to thereby positively prevent longitudinal movement of said catheter tube.

14. A stabilizing fitting for securing a catheter to a patient's skin comprising a base having an upper surface and a lower surface, pressure-sensitive adhesive means

**12**

secured to at least a part of said lower surface of said base, a catheter tube-retaining cradle secured to said upper surface of said base member, said cradle having a forward end, a rearward end, and resilient side walls, means for receiving a catheter tube placed longitudinally in said cradle between said side walls, a snap-over cover hinged to one of said side walls to move between opened and closed positions and including means for positively contacting said catheter tube in said closed position to urge the catheter tube toward said base, and latching engagement means on the other of said side walls for holding the cover in place in a flexibly removable engagement over a catheter tube disposed in said cradle;

wherein said base is an annular member having a generally circular hole at its center, wherein said side walls are arcuate upstanding walls disposed about the periphery of said circular hole, and wherein said means for receiving comprises a pair of diametrically opposed recesses defined between facing ends of said arcuate side walls.

15. The stabilizing fitting according to claim 14, wherein said recesses each have a top neck portion which is narrower than the diameter of said catheter tube and a bottom circular portion having a diameter substantially equal to that of said catheter tube.

16. The stabilizer fitting according to claim 15, wherein said cover includes a latching through hole and wherein said latching engagement means comprises a latching projection secured to said other side wall, said through hole being positioned to align with and resiliently fit over said latching projection when said cover is in said closed position.

17. The stabilizer fitting according to claim 12, wherein said cover, said base, said side walls, and said latching projection are part of an integrally-formed elastomeric structure.

18. The stabilizer fitting according to claim 12, wherein said cover is a strap-like member having a top side and a bottom side, and wherein said strap-like member includes a sloped surface portion positioned adjacent said through hole to contact said latching projection when said through hole is fitted over said latching projection, said sloped surface providing a camming action when the latched cover is lifted so as to facilitate disengagement of said latching projection and said through hole.

19. The stabilizer fitting according to claim 18, wherein said positively contacting means comprises a latching projection from said bottom side of said strap-like member, and latching projection having a perimeter at its distal end which is smaller than its perimeter at its proximal end.

* * * * *

# Exhibit D

**Executive Summary: Information Disclosure Statement Notice of Proposed Rulemaking (IDS NPR)**
**71 Fed. Reg. 38808 (July 10, 2006); XX *Off. Gaz. Pat. Office* YY (August 1, 2006)**

**Objectives of the IDS NPR**:
    A) Improve the quality of the examination process by:
        1) Getting IDSs to the examiner before initial examination,
        2) Reducing citations to the most pertinent, and
        3) Where large documents, foreign language documents or a large number of documents are submitted, imposing additional disclosure requirements that will assist and expedite an examiner's consideration of the IDS; and
    B) Address practitioners' concerns by providing them with an alternative to filing an IDS when they receive unsolicited documents from a third party.

**Item I.  Four time periods, and the proposed requirements for filing an IDS within each of the periods.**
        Note: **Definitions of the proposed additional disclosure requirements ("explanation," "non-cumulative description" and "patentability justification") are given in Item II below.**
    **1st period**: <u>ends</u> the later of three months after filing, or prior to mailing of the 1st Office action on the merits.
        **General rule:** IDSs may be filed during this time period without triggering any additional disclosure requirements.
        **When additional disclosure requirement is triggered**: An "<u>explanation</u>" would be required for:
            1.  Any large (over 25 pages) document (excluding sequence & computer listings);
            2.  Any non-English language document; <u>and</u>
            3.  ALL documents in each IDS when the cumulative number of documents filed in the 1st period exceeds 20.
        **Exception from the "explanation" requirement**: All documents cited by a foreign patent office in a counterpart foreign application would be <u>exempt</u> from the "explanation" requirement if a search report (ISR) is also filed.
    **2nd period**: <u>starts</u> after 1st period; <u>ends</u> with mailing of a Notice of Allowability or Notice of Allowance, or a NIRC.
        **General rule:** IDSs may be filed but an "<u>explanation</u>" and a "<u>non-cumulative description</u>" would be required for all IDS documents.
        **Exception to general rule**:  All documents cited by a foreign patent office in a counterpart foreign application would be <u>exempt</u> from the "explanation" and "non-cumulative description" requirements if: 1) a search report (ISR), and 2) a certification that each document in the IDS is being filed within three months of the date it was first cited by any foreign patent office in a counterpart foreign application, are also filed.
    **3rd period**: <u>starts</u> after 2nd period; <u>ends</u> with payment of the issue fee.
        **Rule:** IDSs may be filed if accompanied by:
            1.  A certification that each document in the IDS is being filed within three months of the date it: (a) was first cited by any foreign patent office in a counterpart foreign application, or (b) first became known to the applicant, <u>and</u>
            2.  One of the "<u>patentability justifications</u>," including an amendment, if necessary.
    **4th period**: <u>starts</u> after payment of the issue fee or mailing of NIRC; <u>ends</u> when there is no longer sufficient time for the IDS to be considered by the examiner prior to issuance of the patent or Reexamination Certificate.
        **Rule:** IDSs may be filed if accompanied by:
            1.  A certification that each document in the IDS is being filed within three months of the date it: (a) was first cited by a foreign patent office in a counterpart foreign application, or (b) first became known to the applicant,
            2.  A petition to withdraw the application from issue, <u>and</u>
            3.  An unequivocal statement that one or more claims are "unpatentable" in view of the cited information, an amendment to such "unpatentable" claims, and a "patentability justification".
    **Note:**  For each of the time periods, if the proposed requirements for the time period are not met when the IDS is filed, the examiner is not required to consider the IDS.

**Item II.  Definitions of the "Explanation," "Non-Cumulative Description," and "Patentability Justification" additional disclosure requirements in IDSs:**

**Executive Summary: Information Disclosure Statement Notice of Proposed Rulemaking (continued)**

(A)    An "**explanation**" of a document would include, for each reason for which the document is being submitted:

    1. An identification of:

        (i) The specific feature(s), showing(s), or teaching(s) that caused a document to be cited, and

        (ii) a portion(s) of the document where the specific feature(s), showing(s), or teaching(s) may be found (e.g., by page and line number); and

    2. A correlation of the specific feature(s), showing(s), or teaching(s) to corresponding specific claim language, or to a specific portion(s) of the supporting specification, if the document is cited for that purpose.

(B)    A "**non-cumulative description**" (only needed after a first Office action) would require: a description of how each document is not merely cumulative of any other document, e.g., a description of a specific feature, showing, or teaching in each cited document that is not found in any other citation in any (prior or current) IDS, or any information cited by the examiner.

(C)    A "**patentability justification**" (only needed after allowance) would require either:

    1. An "explanation," a "non-cumulative description," and reasons why the independent claims are patentable over the information in the IDS being submitted, considered together, and in view of any information already of record; or

    2. An "explanation," a "non-cumulative description," and reasons why an amendment causes claims, admitted to be unpatentable over the information submitted in an IDS, to now be patentable over such information when considered together, and in view of any information already of record.

Requirements for meaningful submissions and updating:

    1. The "explanations" and "non-cumulative descriptions" must be **meaningfully different** for each document. Pro forma explanations and non-cumulative descriptions will not be accepted. If the "non-cumulative descriptions" are not meaningfully different for different documents, the examiner may decline to consider the rest of the documents in the IDS. In such an instance, the examiner should initial each considered document, and place a line through the non-considered documents.

    2. If amendments affecting the scope of the claims are later filed, updated "explanations", or a statement that no updating is needed, will be required.

**Item III.** **Applicant may consent to the filing of a protest by a third party for unsolicited documents received from the 3rd party:** The protest rule is proposed to be revised to set forth that an applicant may consent to the filing of a protest by a third party as to any unsolicited documents that applicant has received from the third party (e.g., resulting from litigation in a related application/patent). Thus, instead of applicant filing the documents in their application via an IDS (along with any required additional disclosure requirements), applicants could, instead, consent to the 3rd party filing a protest, and thereby shift the burden of explaining the relevance of the documents, if any, back to the third party, who would have to comply with the protest rule submission requirements.

**Item IV.** **Changes would apply to Reexamination Proceedings:** Similar changes are being proposed for IDS submissions during *ex parte* and *inter partes* reexamination proceedings.

**Item V.** **Safe harbor created for any party complying with the additional disclosure requirements:** A new paragraph is proposed to be added to the duty to disclose rule (Rule 56) to create a safe harbor for parties submitting additional disclosure statements to comply with IDS requirements if they have acted in good faith, such as by making reasonable inquiry, and they have a reasonable basis for the statements they have made.

2

**Executive Summary: Information Disclosure Statement Notice of Proposed Rulemaking (continued)**

**Item VI.  Fee requirements to be deleted**:  All fee requirements for IDS submissions are proposed to be deleted.

**Item VII.  Period of time for third party submissions to be expanded**: The permitted period for third party submissions of information is proposed to be extended (from two months after pre-grant publication of the application) to six months after pre-grant publication of the application, or mailing of a notice of allowance, whichever occurs first.

**Item VIII.  Certain amendments would be permitted after allowance to decrease the need to file an RCE or a continuation**:  After allowance of the application, amendments to the following items would be permitted: bibliographic data, a reference to a joint research agreement, addition of a benefit or priority claim, changing the order of inventors, and correction of inventorship.  Such formality amendments would also be permitted after payment of the issue fee if they are submitted in sufficient time to permit the patent to be printed with the amended information.

**Item IX.  Duty to review (§10.18(b))**:  Each item of information being contemplated for inclusion in an IDS must be reviewed before submission of the IDS to the Office to assure that the information selected for submission will not:

   (1) Cause unnecessary delay or needlessly increase the cost of examination, or
   (2) Result in the obscuring of material information.

**Item X.  Other related documents**: For additional information the following related documents may be consulted (available via the "More Information" hyperlink associated with the Notice's title at the following USPTO webpage: http://www.uspto.gov/web/offices/pac/dapp/ogsheet.html):
  (1) Slide set - IDS NPR,
  (2) Charts of:  "The Four Time Periods for Submitting an IDS and Their Corresponding Requirements,"
  (3) Application Prosecution Timeline, and
  (4) Detailed Summary - IDS NPR.

**Item XI.  Contact Information**: The following persons may be contacted as to any questions regarding the IDS NPR:

  Hiram Bernstein
  Office of Patent Legal Administration
  (571) 272-7707

  Brian Hanlon
  Office of Patent Legal Administration
  (571) 272-5047

  Robert J. Spar
  Director
  Office of Patent Legal Administration
  (571) 272-7700

3

# Exhibit E

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Inter Partes* Reexamination Filing Data - March 31, 2007

1.  Total requests filed since start of *inter partes* reexam on 11/29/99 ................................ 249[1]

2.  Number of filings by discipline

    a.  Chemical Operation      63    25%
    b.  Electrical Operation      90    36%
    c.  Mechanical Operation      96    39%

3.  Annual Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 2000 | 0 | 2002 | 4 | 2004 | 27 | 2006 | 70 |
| 2001 | 1 | 2003 | 21 | 2005 | 59 | 2007 | 67 |

4.  Number known to be in litigation.................................................124..................50%

5.  Decisions on requests ................................................................................ 203

    a.  No. granted ............................................................................... 194 ................. 96%

        (1) By examiner      194
        (2) By Director (on petition)      0

    b.  No. not granted ............................................................................. 9 ................... 4%

        (1) By examiner      7
        (2) Reexam vacated      2

6.  Overall reexamination pendency  (Filing date to certificate issue date)

    a.  Average pendency      27.9 (mos.)
    b.  Median pendency      29.7 (mos.)

7.  Total inter partes reexamination certificates issued (1999 - present) ....................R.......... 7

    a.  Certificates with all claims confirmed      1      14%
    b.  Certificates with all claims canceled      6      86%
    c.  Certificates with claims changes      0      0%

---

[1]Of the requests received through March 31, 2007, 1 request was vacated per 37 CFR 1.913; and 14 requests have not yet been accorded a filing date and preprocessing of 1 request was terminated, for failure to comply with the requirements of 37 CFR 1.915. See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

# Exhibit F

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786
**(Cite as: Not Reported in F.Supp.)**

Page 1

▷
Robert H. Harris Co., Inc. v. Metal Mfg. Co., Inc.
E.D.Ark.,1991.

United States District Court, E.D. Arkansas,
Jonesboro Division.
ROBERT H. HARRIS COMPANY, INC., Plaintiff,
v.
METAL MANUFACTURING CO., INC.,
Defendant.
**Civ. No. J-C-90-179.**

June 21, 1991.

J. Frank Lady, Jr., Lady & Houston, P.A.,
Jonesboro, Ark., for plaintiff.
Glenn Lovett, Jr., Snellgrove, Laser, Langley &
Lovett, Jonesboro, Ark., for defendant.

*ORDER*
GEORGE HOWARD, Jr., District Judge.
**\*1** Plaintiff brings this action alleging that
defendant manufactures and sells a product which
infringes plaintiff's patent. Defendant has filed a
motion to dismiss for lack of personal jurisdiction
and for improper venue. In the alternative,
defendant asks that the Court transfer this action
pursuant to 28 U.S.C. § 1404(a). Defendant has
also filed a motion for stay pending re-examination.

*Motion to Dismiss or to Transfer*

To determine whether the Court can exercise
personal jurisdiction over defendant, the Court must
find that jurisdiction is proper under the Arkansas
long-arm statute and that the exercise of personal
jurisdiction is consistent with due process.
*Mountaire Feeds, Inc. v. Agro Impex, S.A.,* 677
F.2d 651, 653 (8th Cir.1982).

The Arkansas long-arm statute provides that a court
may exercise personal jurisdiction over a

non-resident for a cause of action arising from the
defendant's transacting any business in this state.
A.C.A. § 16-4-101(C)(1)(a). The Arkansas
Supreme Court has held that the term "transacting
business" is more inclusive than the previous
statutory provision of "doing business" and that the
legislative intent is to expand jurisdiction to the
limits permitted by the due process clause of the
United States Constitution. *Dudley v. Dittmer,* 795
F.2d 669, 672 (8th Cir.1986).

Defendant states that its contacts with the state are
too "attenuated" to comport with due process.
Defendant also asserts that the Court cannot
exercise personal jurisdiction over it unless plaintiff
demonstrates that defendant has shipped the
allegedly infringing product into Arkansas.

The Court disagrees. Defendant has purposefully
availed itself of the privilege of conducting business
in Arkansas. *See Burger King Corp. v. Rudzewicz,*
105 S.Ct. 2174 (1985). Defendant has derived
significant revenues from the sale of its products in
Arkansas. It solicits business in Arkansas
(including the sale of the allegedly infringing
product) through the mailing of catalogs, magazine
advertisements, and telephone contacts. The
documentation provided by plaintiff demonstrates
sufficient "minimum contacts" between the
non-resident defendant and the forum state so that
the exercise of personal jurisdiction over defendant
is consistent with traditional notions of fair play and
substantial justice. *International Shoe Co. v.
Washington,* 326 U.S. 310 (1945).

Defendant also argues that venue is inappropriate in
this district. Defendant relies on the language of
the patent venue statute, 28 U.S.C. § 1400(b) which
provides that an action for patent infringement may
be brought in the judicial district where the
defendant resides, or where defendant has
committed acts of infringements and has a regular
and established place of business.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786
**(Cite as: Not Reported in F.Supp.)**

The question of the meaning of the patent venue statute in light of the recent changes to the general venue statute, 28 U.S.C. § 1391(c) was addressed in a recent decision. *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574 (Fed.Cir.1990). The court held that the definition of "reside" in § 1391(c) applies to § 1400(b).

**\*2** By order dated December 12, 1990, the Court stayed a decision on the motion to dismiss because of improper venue pending action by the United States Supreme Court on the petition for certiorari filed in *VE Holding Corp.* Certiorari in that case has recently been denied. 111 S.Ct. 1315 (1991).

As the Court noted in its December 12th order, the holding in *VE Holding Corp.* is dispositive of the venue issue. As defendant is subject to personal jurisdiction in this district, venue is proper here.

Defendant contends, in the alternative, that the Court should transfer the case to the Middle District of Florida.

Under 28 U.S.C. § 1404(a), a court may transfer an action to any district where it might have been brought "[f]or the convenience of the parties and witnesses, [and] in the interest of justice." The plaintiff's choice of forum is usually entitled to great weight and should not be disturbed unless the balance of the various factors is clearly in favor of the defendants. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947). However, "[t]his choice is deserving of less weight when none of the operative facts of the action occur in the forum selected by the plaintiff." *National Mortgage Network, Inc. v. Home Equity Centers, Inc.,* 683 F.Supp. 116, 119 (E.D.Pa.1988). In determining whether to exercise its discretion to transfer an action, the Court may consider a number of factors, including the convenience of the parties and the witnesses, the availability of judicial process to compel the attendance of unwilling witnesses, the governing law, ease of access to sources of proof such as the location of records and documents, the place where the events at issue occurred, and the place where the case could be tried more expeditiously and inexpensively. *Darchuk v. Kellwood Co.,* 47 FEP Cases 1259 (E.D.Ark.1988); *Kolko v. Holiday*

*Inns, Inc.,* 672 F.Supp. 713 (S.D.N.Y.1987).

The Court has weighed the factors and is persuaded that the balance of convenience or burden to defendants in this instance does not outweigh plaintiff's choice of forum. Both plaintiff and defendant will be somewhat burdened by having to obtain witnesses and documents from Florida. Plaintiff, however, contends that it is not financially able to prosecute its action in Florida.

In sum, the Court finds that defendant has not met its burden of demonstrating that transfer is warranted under 28 U.S.C. § 1404(a).

*Motion for Stay Pending Re-Examination*

Defendant has filed a reexamination request with the United States Patent and Trademark Office (PTO) on June 7, 1991. The reexamination process is a relatively new procedure codified at 35 U.S.C. §§ 301-307. When a petition for reexamination is filed, the PTO must decide within three months whether there is a substantial question of patentability. 35 U.S.C. § 303(a). If a substantial question of patentability is found, the patent will be reexamined, and the patent owner will be given a reasonable period to respond. 35 U.S.C. § 304. *See Freeman v. Minnesota Mining & Mfg. Co.,* 661 F.Supp. 886 (D.Del.1987).

**\*3** Only items of prior art are to be considered in the reexamination proceeding. "Typically, the cited prior art patents or printed publications upon which such a request is based are ones which were not considered by the patent examiner during the processing of the patent application which results in the patent-in-suit. Once a reexamination request is granted, a Patent Examiner who is familiar with the technology involved with the patent conducts the reexamination and is obligated to do so 'with special dispatch.' 37 C.F.R. § 1.550(a)." *Ingro v. Tyco Industries, Inc.,* 227 U.S.P.Q. 69, 70 (N.D.Ill.1985).

In this instance, defendant states that a recently discovered manual raises new questions of patentability with respect to plaintiff's patent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3

Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786
**(Cite as: Not Reported in F.Supp.)**

Defendant therefore has requested that Claims 1-8 of the Harris patent be reexamined.

Whether the action should be stayed pending the outcome of a reexamination proceedings before the PTO resides in the discretion of the court. The legislative history surrounding the establishment of the reexamination proceeding evinces congressional approval of district courts liberally granting stays.

The bill does not provide for a stay of court proceedings. It is believed by the committee that stay provisions are unnecessary in that such power already resides with the Court to prevent costly pre-trial maneuvering which attempts to circumvent the reexamination procedure. It is anticipated that these measures provide a useful and necessary alternative for challengers and for patent owners to test the validity of the United States patents in an efficient and relatively inexpensive manner.

H.R.Rep. No. 1307 Part I, 96th Cong., 2d Sess. 4, *reprinted* in 1980 U.S.Code Cong. & Ad. News 6460, 6463.

A number of courts have recognized the advantages of staying a pending infringement action until completion of a reexamination request. In *Emhart Industries, Inc. v. Sankyo Keiki Mfg.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987), the court enumerated the following advantages in granting a stay which would shift to the PTO the validity of a patent claim:

1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.

2. Many discovery problems relating to prior art can be alleviated by the PTO examination.

3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.

4. The outcome of the examination may encourage a settlement without the further use of the Court.

5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and

length of the litigation.

6. Issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination.

7. The cost will likely be reduced both for the parties and the Court.

Similarly, in *Loffland Brothers Co. v. Mid-Western Energy Corp.,* 225 U.S.P.Q. 886, 887 (W.D.Okla.1985), the court noted that "[t]he reexamination procedure has the potential to eliminate trial on the issue of patent infringement, should all of the patent's claims be cancelled. It is equally possible for all of the claims in plaintiff's patent to be upheld ... In any event, the expert view of the Patent Office examiner will certainly benefit this Court."

**\*4** Plaintiff objects to a stay. It argues that defendant seeks a stay solely to prolong the litigation and increase plaintiff's costs. In particular, plaintiff argues that it continues to be prejudiced by the existence of defendant in the marketplace. Plaintiff argues that the prejudice of the delay would outweigh any benefit which might result from the reexamination procedure.

The Court has weighed the costs and benefits of granting a stay. This action has been pending less than a year. Although it is set for trial next month, the Court is not persuaded that this a case which has "run an overly protracted course." *See Toro Company v. L.R. Nelson Corp.,* 223 U.S.P.Q. 636, 638 (C.D.Ill.1984). The parties appear not to have engaged in expensive discovery or extensive pretrial preparation. Furthermore, plaintiff has sued for damages and has an adequate legal remedy. *See Ingro, supra.*

The Court is not persuaded that defendant has abused the reexamination process in an attempt to delay trial proceedings. The Court notes that the decision on whether defendant's request for reexamination is granted will be forthcoming; should it be denied, the case can immediately be replaced on the trial calendar.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 4

Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786
**(Cite as: Not Reported in F.Supp.)**

Should the reexamination request be granted, some delay will result. The Court, however, is not of the opinion that the delay will be significant and finds that the benefits of the reexamination procedure far outweigh the prejudice to plaintiff resulting from the delay.

Thus, the Court grants defendant's motion for stay of proceedings pending resolution of its request for reexamination by the PTO. Defendant is directed to notify the Court as soon as the PTO acts on the request. The case will be removed from the July 29th trial calendar.

Accordingly, the motion to quash or dismiss for lack of jurisdiction or improper venue, or in the alternative, to transfer venue is denied. The motion for stay of proceedings or to continue is granted.

E.D.Ark.,1991.
Robert H. Harris Co., Inc. v. Metal Mfg. Co., Inc.
Not Reported in F.Supp., 1991 WL 217666 (E.D.Ark.), 19 U.S.P.Q.2d 1786

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit G

Westlaw.

Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1991 WL 133586 (C.D.Cal.), 18 U.S.P.Q.2d 1496
**(Cite as: Not Reported in F.Supp.)**

c
Brown v. Shimano American Corp.
C.D.Cal.,1991.

United States District Court, C.D. California.
Lawrence G. BROWN, Plaintiff,
v.
SHIMANO AMERICAN CORPORATION and
Shimano Industrial Company, Ltd., Defendants.
**No. CV 88-6565 WJR (BX).**

Jan. 29, 1991.

A.L. Black, Robins, Kaplan, Miller & Ciresi,
Minneapolis, Minn., A. James Anderson, Robins,
Kaplan, Miller & Ciresi, Atlanta, Ga., for plaintiff.
Mark S. Shipow, Whitman & Ransom, Los
Angeles, Ca., for defendants.

ORDER GRANTING DEFENDANTS' MOTION
FOR STAY PENDING REEXAMINATION
REA, District Judge.
*1 The Court has reviewed and considered the
moving and opposing papers, the record of the case,
the arguments of counsel, the applicable authorities
and good cause appearing therefore:

IT IS HEREBY ORDERED that the defendants'
motion for a stay of the litigation pending the U.S.
Patent and Trademark Office's (PTO) consideration
of defendants' request for reexamination is
GRANTED.

In support of this order, the Court finds as follows:

It is completely within the discretion of the Court to
stay the proceedings pending reexamination.
*Emhart Industries, Inc. v. Sankyo Seiki Mfg. Co.,* 3
U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987). The Court
is temporarily staying the proceedings until the PTO
rules on defendants' request to reexamine the patent.
If the PTO denies the request, then the Court will
lift the stay and immediately reschedule the trial. If

the PTO grants defendants' request, the Court will
then stay the proceedings pending the outcome of
the reexamination.

The Court finds that the benefits of granting
defendants' motion to stay outweighs the burdens of
delay caused by the reexamination. The
reexamination procedure could provide a valuable
service to the Court. If the Court had felt
comfortable in granting defendants' motion for
summary judgment based on anticipation or
obviousness, then there would have been no need
for a reexamination. *See The Toro Company v.
L.R. Nelson Corp.,* 223 U.S.P.Q. 636, 638
(C.D.Ill.1984). The Court denied the motion for
summary judgment because the Court wanted more
information regarding the scope of the '550 patent
and the prior art references. As noted in *Emhart
Industries, Inc. v. Sankyo Seiki Mfg. Co.,* 3
U.S.P.Q.2d 1889, 1890 & 1892 n. 3 (N.D.Ill.1987),
reexamination by the PTO when issues relevant to
prior art are involved is especially helpful given the
PTO's expertise. The PTO is in a better position
than the Court to evaluate the validity of the '550
patent in view of the prior art references.

The Court finds that defendants have not abused the
reexamination process in an attempt to delay trial
proceedings. *See, e.g., The Toro Company v. L.R.
Nelson Corp.,* 223 U.S.P.Q. 636, 638 (C.D.Ill.1984)
; *Freeman v. Minnesota Mining & Mfg. Co.,* 661
F.Supp. 886, 888 (Del.1987); *Enprotech Corp. v.
AutoTech Corp.,* 15 U.S.P.Q.2d 1319 (N.D.Ill.1990)
. While the Court recognizes that the
reexamination could cause significant delay in the
proceedings, the complexity of the case and the fact
that Mr. Brown can be fully compensated should he
prevail at the reexamination and trial support
staying this action.

C.D.Cal.,1991.
Brown v. Shimano American Corp.
Not Reported in F.Supp., 1991 WL 133586
(C.D.Cal.), 18 U.S.P.Q.2d 1496

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 2

Not Reported in F.Supp., 1991 WL 133586 (C.D.Cal.), 18 U.S.P.Q.2d 1496
**(Cite as: Not Reported in F.Supp.)**


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit H

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21640372 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Alloc, Inc. v. Unilin Decor N.V.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ALLOC, INC., a Delaware corporation, et al.,
Plaintiffs,
v.
UNILIN DECOR N.V., a Belgian company, et al.,
Defendants.
**No. Civ.A. 03-253-GMS.**

July 11, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.

### I. INTRODUCTION

**\*1** On March 5, 2003, Alloc, Inc. ("Alloc"), Berry Finance N.V. ("Berry"), and Valinge Aluminum AB, ("Valinge") (collectively "the plaintiffs") filed a complaint against Unilin Decor, N.V. ("Unilin") and Quick-Step Flooring, Inc. ("Quick-Step") (collectively "the defendants") alleging infringement of U.S. Patent No. 6,516,579 ("the '579 patent"). The '579 patent is the latest in a series of continuation patents that include U.S. Patent Nos. 5,706,621 ("the '621 patent"), 5,860,267 ("the '267 patent"), 6,023,907 ("the '907 patent"), and 6,182,410 ("the '410 patent").

The '621 patent is currently undergoing reexamination in the United States Patent and Trademark Office ("PTO"). Additionally, the Federal Circuit is considering infringement issues with regard to the '267, '907, and '410 patents after the International Trade Commission ("ITC") rendered a non-infringement decision in favor of Unilin and against the plaintiffs.

Presently before the court is the defendant's motion to stay litigation of the '579 patent pending the

completion of both the '621 reexamination proceedings and the Federal Circuit's decision on the '267, '907, and '410 patents. After consideration of each of the factors involved, and for the reasons detailed below, the court will grant the motion to stay.

### II. BACKGROUND

The parties involved in the present action have attempted to resolve their patent infringement issues in many different forums, both in the United States and in Europe. Specifically, in July 2000, Pergo Inc. ("Pergo"), Unilin's licensee, brought a declaratory action in the District of Columbia with regard to the '267, '907, and '621 patents in response to the plaintiffs' threats of infringement litigation. Pergo additionally filed a request for reexamination of the '621 patent in the PTO. This reexamination is currently ongoing. The plaintiffs subsequently filed a complaint in the Eastern District of Wisconsin asserting that Pergo and Unilin infringed the '267 and '907 patents. In response, Unilin filed its own declaratory judgment action in the District of Columbia, alleging that its product did not infringe the '267, '907, and '621 patents.

In December 2000, the plaintiffs initiated a proceeding in the ITC asserting that Unilin infringed the '267, '907, and '410 patents. Upon the filing of the ITC action, all of the district court actions between the two parties concerning the alleged infringement of the '267, '907, and '410 patents were stayed pursuant to 28 U.S.C. § 1659. In November 2001, an ITC Administrative Law Judge ("ALJ") issued a decision finding that Unilin did not infringe the '267, '907, or '410 patents. The ITC affirmed the ALJ's decision in April 2002. The plaintiffs then appealed to the Federal Circuit, which heard oral argument on that case in March 2003. No decision has yet issued.

In the present case, the '579 patent is the only patent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2

Not Reported in F.Supp.2d, 2003 WL 21640372 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

in dispute. However, as the court noted above, it is the latest of the continuation patents that stem from the original '621 patent. The '579 patent has never been reviewed by the PTO, the ITC, or any other court.

### III. DISCUSSION

**\*2** The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985) . This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) (noting that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted); *see also Emhart Indus. v. Sankyo Seiki Mfg.,* 3 U.S.P.Q .2d 1889, 1890 (N.D.Ill.1987) (recognizing that, "in passing legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion. "); *Gould v. Control Laser Corp.,* 705 F .2d 1340, 1342 (Fed.Cir.1983) (citing legislative history of reexamination statute).

In determining whether a stay is appropriate, courts are directed to consider the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3 Comm Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

In opposition to the defendants' motion to stay, the plaintiffs first argue that, since the '579 patent itself is not at issue in the reexamination proceedings, or in the Federal Circuit appeal, there is no need to stay the case before this court. *See* D.I. 21 at 7. The court must disagree because the plaintiffs cannot credibly argue that the patents are not alike in subject matter, as well as in many of their claims. This is so because, in general, "a continuing application is one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application." *Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 555 (Fed.Cir.1994). Thus, a continuation application "claims the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed." *Id.* Indeed, the plaintiffs themselves admit that the patents in question do have some terms in common. *See* D.I. 21 at 10. Therefore, even though the '579 patent does not contain precisely the same claims of the other patents that are under review or reexamination, there is a sufficient correlation among all of the patents for the court to conclude that a stay is appropriate.

Additionally, with regard to the issue of efficiency, it is beyond dispute that the court would benefit from a narrowing of the numerous complex issues relating to claims, which, if clearly defined, would streamline discovery and subsequent litigation. To this end, the reexamination of the '621 patent will greatly serve the purpose of defining the issues in this case. For example, the court will gain the benefit of the PTO's particular expertise in evaluating the prior art. *See Pegasus Development Corp. v. DirecTV, Inc.,* 2003 WL 21105073, \*2 (D.Del. May 14, 2003) (citations omitted). Likewise, the court will also benefit from the reexamination process in that (1) many discovery issues relating to prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; and (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court. *Id.* (citations omitted). Such a refinement of the issues will benefit both parties by reducing litigation costs. *See id.* This approach will also best conserve the court's scarce resources. *See id.* Similar benefits will likewise flow from the Federal Circuit's analysis of the '267, '907, and '410 patents.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 3

Not Reported in F.Supp.2d, 2003 WL 21640372 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*3** The plaintiffs alternatively contend that the motion is premature because the two proceedings that have a potential impact on this case may be decided well before this case reaches the claim interpretation stage. *See* D.I. 21 at 5. However, if the decisions of the PTO and Federal Circuit are imminent, as the plaintiffs suggest, a stay at this time would not unduly burden their case as the stay would then be of short duration.

Finally, the court notes that discovery in this case has not yet begun, nor has a discovery schedule been entered at this time. Likewise, the court has not yet set a trial date. Therefore, the stay will be entered before any party incurs substantial litigation-related expenses.

IV. CONCLUSION

In light of the above considerations, the court concludes that a stay at this point in the case would not unduly prejudice the plaintiffs or create for them a clear tactical disadvantage. Indeed, a stay will allow the issues before the court to be further simplified and defined to the benefit of the parties, as well as the court.

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. The Defendants' Motion to Stay Pending the Reexamination by the U.S. Patent and Trademark Office and Ruling by the United States Court of Appeals for the Federal Circuit (D.I.15) is GRANTED.
2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '621 patent and any decision that results from the Federal Circuit's consideration of the '267, '907, and '410 patents within thirty (30) days of the date of each decision.
3. The Plaintiffs' Motion to Strike Portions of the Answer and Complaint (D.I.11) is DISMISSED, without prejudice, and with leave to re-file should it become necessary following the stay.

D.Del.,2003.
Alloc, Inc. v. Unilin Decor N.V.

Not Reported in F.Supp.2d, 2003 WL 21640372 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit I

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Pegasus Development Corp. v. Directv, Inc.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PEGASUS DEVELOPMENT CORPORATION
and Personalized Media Communications, L.L.C.,
Plaintiffs
v.
DIRECTV, INC., Hughes Electronics Corporation,
Thompson Consumer Electronics, Inc., and Philips
Electronics North America Corporation, Defendants.
**No. Civ.A. 00-1020-GMS.**

May 14, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.
*1 AND RELATED COUNTERCLAIMS

I. INTRODUCTION

On December 4, 2000, Pegasus Development
Corporation ("Pegasus") and Personalized Media
Communications, L.L.C. ("PMC") filed a complaint
against several defendants, alleging infringement of
six patents, including U.S. Patent Nos. 4,965,825 ("
the '825 patent") and 5,335,277 ("the '277 patent").
Since that time, the original scheduling order has
been revised several times. Currently, fact discovery
is scheduled to close on August 22, 2003, and a trial
is scheduled for February of 2004.

On February 4, 2003 and March 14, 2003,
respectively, the defendant Thomson Consumer
Electronics, Inc. ("Thomson") filed with the Patent
and Trademark Office ("PTO") a request for *ex
parte* reexaminations of the '825 and '277 patents.
The request for reexamination of the '825 patent
was granted on April 10, 2003.[FN1] Presently
before the court is a joint motion by the defendants
to stay the litigation pending the completion of the

patent reexaminations (D.I.459). After careful
consideration of the parties' submissions, and for
the reasons detailed below, the court will grant the
motion.

> FN1. The court is not yet aware of a
> decision by the PTO regarding
> reexamination of the '277 patent.

II. DISCUSSION

The decision to stay a case is firmly within the
discretion of the court. *Cost Bros., Inc. v. Travelers
Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985). This
authority applies equally to patent cases in which a
reexamination by the PTO has been requested.
*Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27
(Fed.Cir.1988) ("Courts have inherent power to
manage their dockets and stay proceedings,
including the authority to order a stay pending
conclusion of a PTO reexamination.") (internal
citation omitted); *see also Emhart Indus. v. Sankyo
Seiki Mfg.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987)
("[I]n passing the legislation establishing the
reexamination proceeding, Congress stated its
approval of district courts liberally granting stays
within their discretion."); *Gould v. Control Laser
Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.1983) (citing
legislative history of reexamination statute). In
determining whether a stay is appropriate, the court
is guided by the following factors: "(1) whether a
stay would unduly prejudice or present a clear
tactical disadvantage to the non-moving party; (2)
whether a stay will simplify the issues in question
and trial of the case; and (3) whether discovery is
complete and whether a trial date has been set."
*Xerox Corp v. 3 Comm Corp.,* 69 F.Supp.2d 404,
406 (W.D.N.Y.1999) (citing cases); *cf. United
Sweetner USA, Inc. v. Nutrasweet Co.,* 766 F.Supp.
212, 217 (D.Del.1991) (stating a similar test).

In this case, there are two plaintiffs, four
defendants, and several counter claimants, as well

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

as six patents comprising dozens of claims. In addition, the written submissions in this case have been particularly voluminous; the briefing on claim construction alone, for example, constitutes 576 pages. *See* Report and Recommendation of Special Master Regarding Claim Construction at 2 (citing " copious briefing"). In these ways, the present suit is quite complex, although, perhaps, not extraordinarily so. The greater context of this suit is extraordinary, however: the plaintiffs have filed more than 300 related patent applications based upon an original patent application filed in 1981 and supplemented in 1987. Together, these applications contain an estimated 10,000 claims. Furthermore, as observed by the Special Master appointed in this case, the 1987 application alone constitutes over 300 columns of patent text and "is, by any measure, an extremely complex document." *Id.* at 2. These related applications may become relevant to the present case in respect to several issues including claim construction, enablement, adequacy of written description, indefiniteness, and inequitable conduct. *See id.* at 21. Thus, in this case, more than many, the court would benefit from a narrowing of the issues.

**\*2** The reexamination process will serve this purpose. For example, the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency. *See Braintree Laboratories, Inc. v. Nephron-Tech, Inc.,* 1997 WL 94237, at \*9 (D.Kan.1997); *Hamilton Indus., Inc. v. Midwest Folding Products Mfg.,* 1990 WL 37642, at \*1-2 (N.D.Ill.1990). Other potential efficiencies resulting from the reexamination process are numerous: (1) many discovery problems relating to the prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial, reducing the complexity and length of the litigation; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court; and (5) if the patent is declared invalid, the suit likely will be dismissed as to that patent. *Id.* These efficiencies will result in a reduced cost of litigation for the parties and more effective utilization of the limited

resources of the court. *Id.*

Thus, a stay may result in a simplification or reduction of issues for the court's consideration, or it may dispense with the litigation entirely. These are considerable economies indeed, particularly in this case. Given the involved prosecution history of the various patents-in-suit and hundreds of related patents, the number of claim terms at issue, the inordinate amount of prior art references, and the PTO's conclusion that all of the challenged claims warrant reexamination, the court finds particular merit in permitting an additional layer of review by the PTO before expending further judicial resources. *See Digital Magnetic Systems, Inc. v. Ainsley,* 213 U.S.P.Q. 290, 290 (W.D.Okla.1982) (" Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts."); *Softview Computer Products Corp. v. Haworth, Inc.,* 2000 WL 1134471, at \*3 (S.D.N.Y.2000) ("[T]he grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims."). Furthermore, the court notes that discovery is not complete, and the trial, although scheduled, is some nine months in the future. In light of all these factors, and considering that the reexamination process will proceed "with special dispatch," 35 U.S.C. 305, the court concludes that a stay is the most compelling alternative.

The court recognizes that a stay will cause further delay in a case that has suffered several delays already, as well as considerable distress to the plaintiffs. The court is sensitive to the plaintiffs' right to have their day in court. Nonetheless, for the reasons already mentioned, the court is convinced that a stay is appropriate in this particular case. In addition, the court reminds the plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard now to complain of the rights afforded others by that same statutory framework. Thomson is legally entitled to invoke the reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that. Moreover, the court notes that if, after reexamination, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiffs' patents are again upheld, the plaintiffs' rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 961 (Fed.Cir.1986) (holding that upon reissue, the burden of proving invalidity is 'made heavier') (quoting *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985)). In this light, and given the particular circumstances of this case, the court cannot find that the prejudice to the plaintiffs is undue.

**\*3** Objecting to a stay, the plaintiffs also have complained of dilatory conduct by the defendants, who, in turn, have accused the plaintiffs of "burying" the PTO in claims and prior art references. *See, e.g.,* Mem. of Plaintiffs in Opp. to Defs.' Joint Motion to Stay (D.I.488) at 5-22 (detailing ways in which the defendants allegedly "have repeatedly acted to complicate and delay the resolution of this litigation"); Defs.' Joint Brief in Support of Motion to Stay (D.I.460) at 4 ("Many of the Harvey patents had vast numbers of cited prior art references of record, effectively burying the most relevant ones.") and 7 ("[I]t appears that PMC sought to 'overwhelm' the PTO and the Courts.").

As a brief response to the accusation of dilatory conduct, the court notes that Thomson's request for reexamination of the '825 patent comprised 2,610 pages; its request regarding the '277 patent totaled 4,736 pages. It is presumed that such an effort requires an enormous expenditure of time and other resources; thus, the timing of Thomson's reexamination requests does not, necessarily, reflect undue delay. Furthermore, as noted above, Thomson was legally entitled to invoke the reexamination procedure when it did. As to the defendants' repeated complaint that the plaintiffs overwhelmed the PTO with prior art references during prosecution of the patents-in-suit, the implications of such alleged conduct will be explored at another time in the litigation, if necessary. At this stage in the process, the court is satisfied that the PTO has found "substantial new questions of patentability" raised by each of the cited references, and has determined that all of the challenged claims of the '825 patent necessitate a reexamination. *See* PTO's Decision Granting Reexamination, Supp. Appendix to Defs.' Joint Brief in Support of Motion to Stay (D.I.467) at 138. Although the court regrets a further delay in the present case, it is confident that the advantages of a stay outweigh the costs.

### III. CONCLUSION

Because the PTO's reexamination of one or more of the patents-in-suit may materially affect the issues in this case, the court will grant the defendants' motion to stay. The case is stayed pending a disposition of the PTO's reexamination of patent '825, and will be stayed pending reexamination of the '277 patent, if applicable. All pending motions will be denied without prejudice; the parties may refile them following the stay and upon the entry of a new scheduling order, if applicable.

Thus, for the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Stay Pending Reexamination by the U .S. Patent and Trademark Office (D.I.459) is GRANTED. The proceedings are stayed from the date of this order until further notice.
2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '825 patent, and any other decision of the PTO regarding reexamination of any of the other patents-in-suit.
**\*4** 3. The plaintiffs' Motion for Leave to Assert Claim 15 of U.S. Patent 4,965,825 (D.I.399) is DENIED without prejudice.
4. Thomson's Motion to Dismiss or in the Alternative for Summary Judgment (D.I.376) is DENIED without prejudice.
5. Phillips' Motion to Dismiss for Lack of Standing (D.I.396) is DENIED without prejudice.

D.Del.,2003.
Pegasus Development Corp. v. Directv, Inc.
Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit J

Westlaw.

Slip Copy

Slip Copy, 2006 WL 2375035 (D.Del.)
(Cite as: Slip Copy)

**c**
Abbott Diabetes Care, Inc. v. DexCom, Inc.
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ABBOTT DIABETES CARE, INC., Plaintiff,
v.
DEXCOM, INC., Defendants.
**C.A. No. 05-590 GMS.**

Aug. 16, 2006.

Mary B. Graham, James Walter Parrett, Jr., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, James F. Hurst, Stephanie S. McCallum, Pro Hac Vice, for Plaintiff.
John W. Shaw, Melanie K. Sharp, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Brian M. Kramer, David C. Doyle, M. Andrew Woodmansee, Morgan S. Adessa, Pro Hac Vice, for Defendants.

***MEMORANDUM***
GREGORY M. SLEET, District Judge.

**I. INTRODUCTION**

**\*1** On August 11, 2005, Abbott Diabetes Care, Inc. ( "Abbott") brought this declaratory judgment (Count I) and patent infringement (Count II) action against DexCom, Inc. ("DexCom"). Presently before the court are the following motions: (1) DexCom's Motion to Dismiss Abbott's Complaint (D.I.5); (2) DexCom's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I.61); and (3) DexCom's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I.25). For the reasons that follow, the court will grant in part and deny in part DexCom's motion to dismiss. The court will grant the motion to dismiss Abbott's declaratory judgment count and will deny the motion to dismiss the infringement count. Additionally, the court will

grant DexCom's motion to strike the "amended complaint," deny the renewed motion to dismiss the complaint as moot, and grant the motion to stay pending reexamination of Abbott's patents.

**II. BACKGROUND**

Abbott owns U.S. Patent Nos. 6,175,752 (the " 752 patent"), 6,284,478 (the " 478 patent"), 6,329,161 (the " 161 patent"), and 6,565,509 (the " 509 patent") (collectively, the "patents-in-suit"). The patents-in-suit are directed to methods, systems, and devices for continuously monitoring glucose levels in humans. (Compl.¶ 7.) The patented technology at issue offers an alternative monitoring system for diabetics, who currently monitor their glucose levels by pricking their fingers to draw blood several times a day. (D.I. 32, at 3; see 752 patent, Col. 1, ll. 21-26; 509 patent Col. 1, ll. 21-26.) According to the background of the invention sections of the 752 and 509 patents, the pricking technique does not permit the continuous monitoring of glucose, is painful and inconvenient, and results in inconsistencies in monitoring among individuals with diabetes. (See 752 patent, Col. 1, ll. 26-38; 509 patent, Col. 1. ll. 26-38.) Therefore, the technology described in the patents-in-suit was invented to address the need for a small and comfortable device that could continuously monitor glucose levels for days at a time, while permitting a patient to engage in normal activities. ( 752 patent, Col. 2, ll. 1-4; 509 patent, Col 2., ll. 5-8.) Each of the patents-in-suit relate to an aspect of the continuous glucose monitor, which involves implanting a glucose sensor in a patient and monitoring signals over the life of the sensor.[FN1] (D.I. 32, at 3.) The monitoring device provides patients with feedback regarding their glucose levels, and may even include an alarm to warn patients of dangerous glucose levels. (*Id.* at 3-4.)

    FN1. The 752 and 509 patents relate to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

glucose monitoring devices and their methods of use, while the 478 and 161 patents relate to subcutaneous glucose sensors.

Abbott alleges that DexCom intends to market its STS TM Continuous Glucose Monitoring System, which will infringe one or more claims of the patents-in-suit. The complaint states that DexCom filed a premarket approval application with the Food and Drug Administration (the "FDA") in March 2005, seeking approval to sell its product. (Compl.¶ 12.) The complaint further states that DexCom expects FDA approval by the second quarter of 2006.[FN2] (*Id.* ¶ 15.) In Count I, Abbott seeks declaratory relief in the form of a judicial declaration that DexCom's product will infringe one or more claims of each of the patents-in-suit. (*Id.* ¶ 25.)

FN2. As previously mentioned, Abbott filed its complaint on August 11, 2005. The FDA subsequently approved DexCom's glucose monitoring product, in March 2006.

**\*2** Further, Abbott alleges that, prior to filing its premarket approval application with the FDA, DexCom attended two "trade shows" where it publicized and displayed its glucose monitoring product. (Compl.¶ 16.) The complaint alleges that the products DexCom displayed at the trade shows were manufactured for the purpose of showcasing rather than for gathering information for submission to the FDA. (*Id.* ¶ 17.) Abbott alleges that DexCom's manufacture and display of its product constitutes an act of patent infringement. (*Id.* ¶ 28.)

On August 31, 2005, DexCom filed a motion to dismiss Abbott's complaint for lack of subject matter jurisdiction and failure to state a claim. Additionally, on February 22, 2006, DexCom filed a motion to stay the litigation pending reexamination of the patents-in-suit. On June 27, 2006, Abbott filed an amended complaint, which alleges further infringing acts on the part of DexCom and adds several patents to the suit. On July 12, 2006, DexCom filed a motion to strike the "

amended complaint" and renewed motion to dismiss.

## III. DISCUSSION

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Dexcom first contends that the court should dismiss Abbott's declaratory judgment claim because there is currently no "accused device" to compare against the claims of the patents-in-suit and, therefore, Abbott's claim is premature. In other words, DexCom contends the court lacks subject matter jurisdiction over Count I of Abbott's Complaint.

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure contests the jurisdiction of the Court to address the merits of a plaintiff's complaint. Such a challenge may present either a facial or a factual contest to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would be insufficient to establish the Court's jurisdiction. *Gould Elecs. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). The present motion presents a facial challenge to the complaint because the jurisdictional facts are not in dispute. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiff's favor. *See id.* Additionally, the court must test the existence of jurisdiction as of the time the complaint was filed. *Lang v. Pacific Marine and Supply Co.,* 895 F.2d 761, 764 (Fed.Cir.1990).

The Declaratory Judgment Act (the "Act") provides that "[i]n a case of actual controversy ... [a court of competent jurisdiction] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Thus, before a court may exercise jurisdiction over a declaratory judgment action, the Act requires an " actual controversy between the parties ." *Medimmune, Inc. v. Centocor, Inc.,* 409 F.3d 1376,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

1378-79 (Fed.Cir.2005) (citing *Teva Pharms. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1331 (Fed.Cir.2005)). "If the controversy requirement is met by a sufficient allegation of immediacy and reality ... a patentee [is able] to seek a declaration of infringement against a future infringer ... [just as] a future infringer is able to maintain a declaratory judgment action of noninfringement under the same circumstances." *Telectronics Pacing Sys., Inc v. Ventritrex, Inc.,* 982 F.2d 1520, 1526 (Fed.Cir.1992) (citing *Lang,* 895 F.2d at 764).

**\*3** However, a district court does not have jurisdiction to hear the action when there is no actual controversy. *Spectronics Corp. v. H .B. Fuller Co.,* 940 F.2d 631, 634 (Fed.Cir.1991), *cert. denied,* 112 S.Ct. 658 (1991). Moreover, "even assuming [the existence of] an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary." *Telectronics,* 982 F.2d at 1526 (citations omitted).

Two elements must be present in order to meet the controversy requirement in a declaratory judgment action brought by a patentee against an alleged future infringer: (1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under 35 U.S.C. § 271(a), or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming. *Lang,* 895 F.2d at 764. In addition, the declaratory judgment plaintiff bears the burden of proving the existence of facts underlying its allegations of the existence of an actual controversy. *Jervis B. Webb Co. v. S. Sys., Inc.,* 742 F.2d 1388, 1399 (Fed.Cir.1984).

Applying the above-discussed elements to the present case, it is clear to the court from the record before it that Abbott's complaint did not present an actual controversy under the Act at the time it was filed. That is, Abbott has not demonstrated that DexCom produced or has prepared to produce a product that would be subject to an infringement charge under 35 U.S.C. § 271. At the time Abbott

filed its complaint, the FDA had not approved DexCom's product and Abbott could not predict when, or if, the FDA would approve the product. Indeed, Abbott states as much in its complaint, alleging that "DexCom ... *expects* FDA approval for marketing by the second quarter of 2006...." (Compl.¶ 15) (emphasis added).[FN3] Additionally, Abbott did not, and could not, allege with any certainty that "the device when approved would be the same device that began clinical trials[,]" as " product changes during testing are contemplated by statute, 21 U.S.C. § 360j(g)(2)(C)(iii) (1988)." *Telectronics,* 982 F.2d at 1527. Most important, Abbott did not allege nor does it now contend that DexCom has distributed sales literature, prepared to solicit orders, or engaged in any sales or marketing activity with regard to its glucose monitoring product. *See Lang,* 895 F.2d at 765; *Benitec Australia Ltd. v. Nucleonics, Inc.,* Civil Action No. 04-0174 JJF, 2005 U.S. Dist. LEXIS 22008, at \*9 (D.Del. Sept. 29, 2005); *Interdigital Tech. Corp. v. OKI Am., Inc.,* 845 F.Supp. 276, 284 (E.D.Pa.1994) ("Activity directed towards advertising or marketing the accused device is particularly important to a finding of a justiciable controversy.") Therefore, the court concludes that no controversy of sufficient immediacy and reality existed, at the time Abbott filed its complaint, to support declaratory judgment jurisdiction in the present case. As such, the court will dismiss Count I of Abbott's complaint.

> FN3. The court agrees with the argument Abbott makes in its answering brief, namely that FDA approval is not the standard by which it should evaluate whether an actual controversy existed at the time the complaint was filed. However, the court finds that the absence of FDA approval is evidence that the dispute between the parties is neither real nor immediate.

### B. Motion to Strike Abbott's "Amended Complaint"

**\*4** DexCom next argues that the court should strike the "Amended Complaint" because Abbott failed to

Slip Copy                                                                                            Page 4

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

seek leave of court to file what correctly should be termed a "supplemental pleading." Conversely, Abbott asserts that it properly amended its complaint under Federal Rule of Civil Procedure 15(a) to allege additional acts of infringement that occurred prior to and after it filed the initial complaint. The court is unpersuaded by Abbott's argument and will, therefore, strike its "Amended Complaint."

As Abbott points out in its briefing, "[a]n amended pleading generally is a modification to incorporate events that were unknown but occurred *prior* to the filing of the original pleading." (D .I. 66, at 7) (emphasis added) (citing 3 James Wm. Moore et al., Moore's Federal Practice § 15.02 (3d ed.1999)). On the other hand, "a supplemental pleading refers to additions to include transactions or occurrences that take place after the filing of the original pleading." (D.I. 66, at 7.) By Abbott's own words, it amended its complaint "to allege additional acts of infringement that occurred prior to and *after* " its initial complaint. (*Id* .) Because Abbott's "Amended Complaint" contains allegations regarding events that occurred after August 11, 2005-the filing date of the original complaint-it is governed by Federal Rule of Civil Procedure 15(d). Pursuant to Rule 15(d), "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Fed.R.Civ.P. 15(d); *see GAF Bldg. Materials Corp. v. Elk Corp. of Dallas,* 90 F.3d 479, 483 (Fed.Cir.1996) (holding that district court did not abuse its discretion when " adhering to the motion requirement of Rule 15"); *Bronson v. Horn,* Civil Action No. 02-663, 2006 U.S. Dist. LEXIS 38791, at *5 (W.D. Pa. June 12, 2006) (dismissing supplemental complaint because it was not filed pursuant to a motion). Accordingly, because Abbott did not file a motion to supplement its complaint in the present case, the court will strike it from the docket for failure to comply with Rule 15(d).

**C. Motion to Dismiss for Failure to State a Claim**

Finally, with respect to dismissal, DexCom contends that Count II of Abbott's complaint fails to state a claim for which relief can be granted. According to DexCom, its display of glucose monitoring products at two scientific conferences is exempt under 35 U.S.C. § 271(e)(1).[FN4] Therefore, DexCom argues that Abbott has failed to state a claim for patent infringement.

> FN4. Section 271(e)(1) states, in pertinent part:
> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.
> 35 U.S.C. 271(e)(1).

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, in deciding a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery,* 117 F .3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer. " *Colburn v. Upper Darby Twp.,* 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss ." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir.1997). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Thus, in order to prevail, a moving party must show "beyond doubt that the plaintiff can prove no set of facts in support of his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

claim [that] would entitle him to relief." *Conley,* 355 U.S. at 45-46.

**\*5** After having reviewed Abbott's complaint, the parties' submissions and relevant case law, the court concludes that DexCom cannot show that "beyond doubt" there exists "no set of facts" in support of Abbott's patent infringement claim. The language of section 271(e)(1) exempts potentially infringing activities "if performed solely for uses reasonably related to the development of information for FDA approval." *Telectronics,* 982 F.2d at 1523. Here, Abbott's complaint alleges that "[u]pon information and belief, the [DexCom] products displayed at the [two] trade shows were manufactured for the purpose of showcasing at the trade shows rather than for the purpose of gathering information." (Compl.¶ 17.) Abbott's complaint, therefore, alleges that DexCom's manufacture and display of products at scientific conferences or trade shows falls outside the safe harbor of section 271(e)(1). Based upon this allegation, and viewing the complaint in the light most favorable to Abbott, the court is unwilling to conclude at this juncture that no relief could be granted under any set of facts that Abbott could prove consistent with its patent infringement allegations.[FN5] Therefore, the court will deny DexCom's motion to dismiss Count II of the complaint.

> FN5. DexCom contends that the facts of the present case are on "all fours" with the facts of *Telectronics.* The court, however, finds that DexCom's reliance is misplaced because, in *Telectronics,* the Federal Circuit reviewed a district court's grant of summary judgment for the defendant, while here the court must decide a motion to dismiss. As DexCom well knows, the standard for granting a motion to dismiss is markedly different from the summary judgment standard. When deciding a Rule 56 motion, the court reviews "the pleadings, *depositions, answers to interrogatories,* and *admissions on file,* together with [any] affidavits," to determine whether "there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added). In contrast, when deciding a motion to dismiss, the scope of the court's review is limited to the complaint. *See Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002) ("As a general rule, the court may only consider the pleading that is attacked by an FRCP 12(b)(6) motion in determining its sufficiency.") Therefore, *Telectronics* is distinguishable in that the court made its determination after reviewing a more complete record than that which the court is permitted to review here. That is not to say that DexCom could not successfully attack Abbott's claim at a later stage of these proceedings. For example if, through discovery, DexCom adduces facts indicating that its conduct at the scientific conferences or trade shows falls within the section 271(e)(1) safe harbor, the court will likely entertain a motion for summary judgment at the appropriate time.

### D. Motion to Stay

DexCom has also filed a motion to stay the litigation pending reexamination of the patents-in-suit by the Patent and Trademark Office (the "PTO"). The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985). This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) (noting that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). In determining whether a stay is appropriate, the court's discretion is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

*Com Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

In opposing DexCom's motion, Abbott maintains that a stay would prevent it from seeking a preliminary injunction and enforcing its patent rights, thereby unduly prejudicing it and presenting it with a clear tactical disadvantage in the marketplace. The court is not persuaded. First, Abbott's argument is premised on its filing of a motion for preliminary injunction. Abbott, however, did not, and has not, filed any such motion, even though the FDA has recently approved DexCom's glucose monitoring product for marketing. Because Abbott has not filed a motion for preliminary injunction, its arguments relating to the court's rendering of an opinion on such a motion are moot. As such, the only other argument Abbott asserts with respect to undue prejudice is that it will be unable to enforce its patents while in reexamination. Abbott's position, however, assumes that the PTO will leave all of the more than 200 claims of the four patents-in-suit unaltered after reexamination. *See Applera Corp. v. Thermo Electron Corp.,* No. C.A. 04-1230 GMS, (D.Del. Dec. 28, 2005) (04-1230 D.I. 81 ¶ 6). Further, while Abbott may suffer some prejudice from a stay, the court is not persuaded that a stay would *unduly* prejudice Abbott, or present any clear tactical disadvantage. Accordingly, the first factor militates in favor of granting the requested stay.

**\*6** With respect to the second factor, Abbott argues that a stay will not simplify the issues, but prolong the litigation. According to Abbott, the only way to avoid prolonging the litigation would be if the reexamination resulted in the PTO invalidating all of the asserted claims of all of the patents-in-suit. The court cannot agree. Contrary to Abbott's position, the court finds that granting the stay will simplify the issues and focus the litigation. For example, if the PTO determines that some or all of the claims of the of the four patents undergoing reexamination are invalid, then many of the issues in the litigation will become moot. Additionally, it is beyond dispute that the court, as well as the

parties, would benefit from a narrowing of the variety of complex issues relating to the numerous claims at issue, which, if clearly defined, would streamline the discovery process and the remainder of the litigation. A stay, therefore, will conserve the resources of the parties and the court, thereby promoting efficiency. Moreover, the court would not run the risk of inconsistent rulings or issuing advisory opinions. *See Gioello Enters. Ltd. v. Mattel, Inc.,* No. C.A. 99-375 GMS, 2001 WL 125340, at *1 (D.Del. Jan. 29, 2001). The second factor, therefore, weighs in favor of granting the motion to stay.

Finally, the court finds that the third factor it must consider in its determination, i.e. whether discovery is complete and whether a trial date has been set, weighs in favor of granting the motion. In the present case, fact discovery is not scheduled to close until January 31, 2007 and, although already set, the trial is not scheduled to begin until October 9, 2007. [FN6] Thus, given its findings with respect to the first two factors, the court concludes that the balance of harms weighs in favor of granting a stay of this action. Accordingly, the court will grant DexCom's motion to stay.

FN6. See Amended Scheduling Order, D.I. 71 ¶¶ 2, 8.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss Abbott's Complaint (D.I.5) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Count I of Abbott's complaint and DENIED with respect to Count II of Abbott's complaint.

2. The court shall dismiss Count I of Abbott's complaint without prejudice.

3. The plaintiff's Motion For Limited Jurisdictional Discovery and for a Corresponding Extension of the Briefing Schedule on DexCom's Motion to Dismiss

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 7

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

(D.I.9) is DENIED as moot.

4. The defendant's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I.61) is GRANTED in part and DENIED in part. The motion to strike the "amended complaint" is GRANTED and the renewed motion to dismiss is DENIED as moot.

5. The plaintiff's Amended Complaint (D.I.55) shall be stricken from the court's docket.

6. The defendant's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I.25) is GRANTED.

D.Del.,2006.
Abbott Diabetes Care, Inc. v. DexCom, Inc.
Slip Copy, 2006 WL 2375035 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit K

US006213979B1

(12) **United States Patent**
Bierman

(10) Patent No.: **US 6,213,979 B1**
(45) Date of Patent: *Apr. 10, 2001

(54) **MEDICAL LINE ANCHORING SYSTEM**

(75) Inventor: **Steven F. Bierman**, Del Mar, CA (US)

(73) Assignee: **Venetec International, Inc.**, San Diego, CA (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/865,231**

(22) Filed: **May 29, 1997**

(51) Int. Cl.[7] ...................................................... **A61M 5/00**

(52) U.S. Cl. ............................ **604/174**; 604/177; 604/180; 128/DIG. 26

(58) **Field of Search** ...................................... 604/174, 177, 604/180; 128/DIG. 26

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D. 364,922 | 12/1995 | Bierman . |
| D. 375,355 | 11/1996 | Bierman . |
| 2,525,398 * | 10/1950 | Collins . |
| 2,533,961 * | 12/1950 | Rouseau et al. . |
| 2,707,953 * | 5/1955 | Ryan . |
| 3,059,645 * | 10/1962 | Hasbrouck et al. . |
| 3,064,648 * | 11/1962 | Bujan . |
| 3,167,072 * | 1/1965 | Stone et al. . |
| 3,482,569 * | 12/1969 | Raffaelli . |
| 3,529,597 * | 9/1970 | Fuzak . |
| 3,602,227 * | 8/1971 | Andrew . |
| 3,630,195 * | 12/1971 | Santomieri . |
| 3,677,250 * | 7/1972 | Thomas . |
| 3,766,915 * | 10/1973 | Rychlik . |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2341297 | 8/1973 | (DE) . |
| 0247590 A2 | 12/1987 | (EP) . |
| 356683 | 7/1989 | (EP) . |
| 2063679 | 6/1981 | (GB) . |
| 2086466 | 5/1982 | (GB) . |
| WO 80/01458 | 7/1980 | (WO) . |
| WO 85/02774 | 7/1985 | (WO) . |
| WO 91/16939 | 11/1991 | (WO) . |
| WO 92/19309 | 11/1992 | (WO) . |
| WO 96/10435 | 4/1996 | (WO) . |

OTHER PUBLICATIONS

Multiple–Lumen Central Venous Cathecrization Product with ARROW+gard™ Antiseptic Surface (Arrow International brochure) (4/94).

Photographs (4) of Catheter Clamp and Rigid Fastener sold by Arrow International, Inc.

*Primary Examiner*—John D. Yasuo
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

An anchoring system includes a simply-structured device which permits a portion of a catheter tube or similar medical article to be easily anchored to a patient, desirably without the use of tape or needles and suturing. A unitary retainer desirably includes a base connected to a cover by way of a flexible hinge. The retainer is attached to a flexible anchor pad including an adhesive bottom surface, which can be attached to the patient's skin. A catheter is secured to a fitting, which in turn mounts to the retainer. Mounting the fitting to the retainer can be accomplished by inserting posts of the retainer through holes of the fitting, or by mounting the fitting within a channel defined by mounting structures integral to the retainer. The cover is then positioned over the base, by bending the flexible hinge, and latched to the base. Several embodiments of the latching mechanism are disclosed. In one form, the latching mechanism includes one or more posts on the base which can be releasably locked into corresponding slotted holes in the cover.

**74 Claims, 6 Drawing Sheets**



## US 6,213,979 B1
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,834,380 | | 9/1974 | Boyd . |
| 3,847,370 | * | 11/1974 | Engelsher . |
| 3,856,020 | * | 12/1974 | Kovac . |
| 3,900,026 | * | 8/1975 | Wagner . |
| 3,906,946 | * | 9/1975 | Nordstrom . |
| 3,942,228 | * | 3/1976 | Buckman et al. . |
| 3,973,565 | * | 8/1976 | Steer . |
| 4,020,835 | * | 5/1977 | Nostrom et al. . |
| 4,057,066 | * | 11/1977 | Taylor . |
| 4,059,105 | * | 11/1977 | Cutruzzula et al. . |
| 4,082,094 | * | 4/1978 | Dailey . |
| 4,114,618 | * | 9/1978 | Vargas . |
| 4,129,128 | * | 12/1978 | McFarlane . |
| 4,133,307 | * | 1/1979 | Ness . |
| 4,142,527 | * | 3/1979 | Garcia . |
| 4,161,177 | * | 7/1979 | Fuchs . |
| 4,193,174 | | 3/1980 | Stephens . |
| 4,224,937 | * | 9/1980 | Gordon . |
| 4,248,229 | * | 2/1981 | Miller . |
| 4,250,880 | * | 2/1981 | Gordon . |
| 4,316,461 | * | 2/1982 | Marais et al. . |
| 4,324,236 | * | 4/1982 | Gordon et al. . |
| 4,326,519 | * | 4/1982 | D'Alo et al. . |
| 4,362,156 | * | 12/1982 | Feller, Jr. et al. . |
| 4,392,853 | * | 7/1983 | Muto . |
| 4,397,647 | | 8/1983 | Gordon . |
| 4,449,975 | * | 5/1984 | Perry . |
| 4,453,933 | * | 6/1984 | Speaker . |
| 4,474,559 | * | 10/1984 | Steiger . |
| 4,480,639 | * | 11/1984 | Peterson et al. . |
| 4,516,968 | * | 5/1985 | Marshall et al. . |
| 4,563,177 | * | 1/1986 | Kamen . |
| 4,633,863 | * | 1/1987 | Filips et al. . |
| 4,650,473 | * | 3/1987 | Bartholomew et al. . |
| 4,660,555 | * | 4/1987 | Payton . |
| 4,711,636 | * | 12/1987 | Bierman . |
| 4,742,824 | * | 5/1988 | Payton et al. . |
| 4,808,162 | * | 2/1989 | Oliver . |
| 4,823,789 | * | 4/1989 | Besiang, III . |
| 4,826,486 | * | 5/1989 | Palsrok et al. . |
| 4,852,844 | * | 8/1989 | Villaveces . |
| 4,857,058 | * | 8/1989 | Payton . |
| 4,863,432 | * | 9/1989 | Kvalo . |
| 4,880,412 | * | 11/1989 | Weiss . |
| 4,896,465 | | 1/1990 | Rhodes et al. . |
| 4,897,082 | * | 1/1990 | Erskine . |
| 4,898,587 | * | 2/1990 | Mera . |
| 4,919,654 | * | 4/1990 | Kalt . |
| 4,932,943 | * | 6/1990 | Nowak . |
| 4,955,864 | * | 9/1990 | Hajduch . |
| 4,976,700 | * | 12/1990 | Tollini . |

| | | | |
|---|---|---|---|
| 4,997,421 | * | 3/1991 | Palsrok et al. . |
| 5,000,741 | * | 3/1991 | Kalt . |
| 5,037,397 | * | 8/1991 | Kalt et al. . |
| 5,073,170 | * | 12/1991 | Schneider . |
| 5,084,026 | * | 1/1992 | Shapiro . |
| 5,098,399 | * | 3/1992 | Tollini . |
| 5,147,322 | * | 9/1992 | Bowen et al. . |
| 5,156,641 | | 10/1992 | White . |
| 5,192,273 | | 3/1993 | Bierman et al. . |
| 5,192,274 | | 3/1993 | Bierman . |
| 5,195,981 | | 3/1993 | Johnson . |
| 5,266,401 | | 11/1993 | Tollini . |
| 5,267,967 | | 12/1993 | Schneider . |
| 5,282,463 | | 2/1994 | Hammersley . |
| 5,292,312 | | 3/1994 | Delk et al. . |
| 5,304,146 | | 4/1994 | Johnson et al. . |
| 5,306,243 | | 4/1994 | Bonaldo . |
| 5,314,411 | | 5/1994 | Bierman . |
| 5,322,514 | | 6/1994 | Steube et al. . |
| 5,330,438 | | 7/1994 | Gollobin et al. . |
| 5,338,308 | | 8/1994 | Wilk . |
| 5,342,317 | | 8/1994 | Claywell . |
| 5,344,406 | | 9/1994 | Spooner . |
| 5,344,414 | | 9/1994 | Lopez et al. . |
| 5,346,479 | | 9/1994 | Schneider . |
| 5,352,211 | | 10/1994 | Merskelly . |
| 5,354,282 | | 10/1994 | Bierman . |
| 5,354,283 | | 10/1994 | Bark et al. . |
| 5,380,293 | | 1/1995 | Grant . |
| 5,380,294 | | 1/1995 | Persson . |
| 5,380,301 | | 1/1995 | Prichard et al. . |
| 5,382,239 | | 1/1995 | Orr et al. . |
| 5,382,240 | | 1/1995 | Lam . |
| 5,395,344 | | 3/1995 | Beisang, III et al. . |
| 5,403,285 | | 4/1995 | Roberts . |
| 5,413,562 | | 5/1995 | Swauger . |
| 5,443,460 | | 8/1995 | Milusek . |
| 5,449,349 | | 9/1995 | Sallee et al. . |
| 5,456,671 | | 10/1995 | Bierman . |
| 5,468,228 | | 11/1995 | Gebert . |
| 5,468,230 | | 11/1995 | Corn . |
| 5,468,231 | | 11/1995 | Newman et al. . |
| 5,470,321 | | 11/1995 | Forster et al. . |
| 5,484,420 | | 1/1996 | Russo . |
| 5,496,282 | | 3/1996 | Militzer et al. . |
| 5,496,283 | | 3/1996 | Alexander . |
| 5,499,976 | | 3/1996 | Dalton . |
| 5,520,656 | | 5/1996 | Byrd . |
| 5,522,803 | | 6/1996 | Teissen-Simony . |
| 5,527,293 | | 6/1996 | Zamierowski . |
| B1 5,147,322 | * | 1/1996 | Bowen et al. . |

* cited by examiner





*FIG. 3*



*FIG. 2*









US 6,213,979 B1

1

# MEDICAL LINE ANCHORING SYSTEM

## Background of the Invention

### 1. Field of the Invention

The present invention relates to anchoring systems for anchoring medical lines to patients.

### 2. Description of Related Art

It is very common in the treatment of patients to utilize intravenous (IV) catheters to introduce fluids and medications directly into the bloodstream. In many cases, and particularly with respect to cardiac therapy, the IV catheter is introduced into a central or larger vein located close to the patient's heart. A typical catheter utilized in connection with a central vein is referred to as a "central venous catheter" ("CVC"). A venous catheter peripherally inserted into the central circulation through a vein in the arm is commonly referred to as a "peripherally inserted central catheter" ("PICC").

In these cases, long-term IV infusion typically requires that the catheter remain in place for many days. In order to secure such an IV catheter in position at the insertion site, the catheter often is provided with an integrated or a movable flexible clamp with winged extensions which are sutured to the patient's skin. In other applications, the flexible clamp is covered by a rigid box clamp, which receives the catheter/clamp combination in a friction-fit manner. The rigid box clamp and the flexible clamp have lateral, aligned holes in them, which allow the combination to be sutured to the patient's skin. Although this technique securely attaches the central venous catheter to the patient, it obviously is painful and uncomfortable for the patient. This prior retention procedure is also time consuming and inconvenient, poses the risk of needle-stick to the health care provider, and risks suture-site infection to the patient. In addition, suture material tends to exhibit poor gripping on medical tubes and can cut through the winged extension of the flexible clamp.

## SUMMARY OF THE INVENTION

A need therefore exists for a simply-structured anchoring system that affixes a medical line in a fixed position, but releases the medical line for dressing changes or other servicing.

On aspect of the present invention thus involves an anchoring system for securing a medical line to the body of a patient. The system comprises a retainer including a base that defines a receiving area for receiving a portion of the medical line. A cover is permanently coupled to the base. The cover is movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open. A latching mechanism operates between the base and the cover to releasably latch the cover to the base with the cover in the closed position. Interacting structure is located generally beneath the cover with the cover in the closed position. The interacting structure is adapted to limit movement of the medical line through to the retainer when the catheter is placed within the receiving area.

Another aspect of the present invention involves an anchoring system for securing a medical line to the body of a patient. The system includes a fitting adapted to engage with the medical line and having at least one opening. A retainer comprises a base including a platform and at least one post extending from the platform and arranged to

2

interact with the hole of the fitting. A cover is movably coupled to the base so as to be moved between an open position and a closed position. A latching mechanism operates between the cover and the base to releasably latch the cover to the base in the closed position.

In accordance with an additional aspect of the present invention, an anchoring system for securing a medical line to the body of a patient is provided. The anchoring system comprises an adaptor having an adaptor body with a longitudinal axis defined between first and second ends. A first connector is located at the first end of the adaptor for connection to a first medical line, and a second connector is located at the second end for connection to a second medical line. A retainer includes a base and a cover permanently coupled to the base. The cover is movable between an open position and a closed position. A latching mechanism releasably latches the cover to the base in the closed position. And a channel ia arranged to lie between the base and the cover in the closed position. The channel is shaped to retain the adaptor between the cover and the base with the cover in the closed position to inhibit movement of the adapter in a direction generally parallel to the adapter's longitudinal axis. An adhesive layer is attached to the retainer and is adapted to adhesively secure the retainer to the body of a patient.

A preferred method of anchoring a medical line to a patient involves providing a retainer including a base having a plurality of posts, and a cover attached to the base by a flexible leash. The provided cover also includes a corresponding plurality of openings with each opening comprising a slot. The retainer is coupled to an adhesive layer. The anchoring system is positioned on the body of the patient, and the adhesive layer is attached to the body of the patient. A medical device is arranged between the posts of the base. The cover is positioned over the base to bring the openings of the cover in proximity with the posts of the base. The cover is shifted relative to the base to engage the posts with the slots of the openings.

Further aspects, features, and advantages of the present invention will become apparent from the detailed description of the preferred embodiments that follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above-mentioned and other features of the invention will now be described with reference to the drawings of several preferred embodiments of the present anchoring system. The illustrated embodiments of the anchoring system are intended to illustrate, but not to limit the invention. The drawings contain the following figures:

FIG. 1A is a perspective view of an anchoring system in accordance with a preferred embodiment of the present invention and illustrates a retainer of the anchoring system in an open position together with an exemplary catheter wing clamp fitting (the components of which are illustrated as exploded above the retainer);

FIG. 1B is a bottom plan view of a cover of the retainer of FIG. 1A;

FIG. 2 is a perspective view of the anchoring system of FIG. 1A with the cover of the retainer shown in a partially closed position;

FIG. 3 is a cross-sectional view of the anchoring system of FIG. 2, with the retainer shown in a completely closed position and the catheter wing clamp fitting assembled and anchored therein;

FIG. 4A is a perspective view of a retainer in accordance with another preferred embodiment of the present invention, shown in an open position;

US 6,213,979 B1

3

FIG. 4B is a bottom plan view of a cover portion of the retainer of FIG. 4A;

FIG. 5 is a perspective view of the retainer of FIG. 4A, shown in a partially closed position;

FIG. 6 is a perspective view of a retainer in accordance with another preferred embodiment of the present invention, shown in an open position;

FIG. 7 is a perspective view of the retainer of FIG. 6, shown in a closed position;

FIG. 8 is a cross-sectional view of the retainer of FIG. 7, taken along the line 8—8;

FIG. 9 is a cross-sectional view of the retainer according to FIG. 8, but with a tang shown in a release position;

FIG. 10A is a prospective view of an anchoring system in accordance with an additional preferred embodiment of the present invention and illustrates a retainer of the anchoring system in an open position and together with an exemplary catheter adaptor;

FIG. 10B is a bottom plan view of a cover portion of the retainer of FIG. 10A;

FIG. 11 is a prospective view of the retainer of FIG. 10A, shown in a partially closed position with the cover interacting with the catheter adapter; and

FIG. 12 is a cross-sectional view of the retainer according to FIG. 11, shown in a completely closed position, with the catheter adaptor anchored therein.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

The present embodiments of the medical line anchoring system are disclosed in the context of an exemplary central line catheter. The principles of the present invention, however, are not limited to PICCs or CVCs. Instead, it will be understood by one of skill in this art, in light of the present disclosure, that the anchoring systems and retainers disclosed herein also can be successfully utilized in connection with other types of medical lines, including tubes for fluid communication and electrical wires. For example, but without limitation, the retainers disclosed herein can retain CVCs, PICCs, Foley catheters, and hemodialysis catheters, surgical drainage tubes, feeding tubes, chest tubes, nasogastric tubes, scopes, as well as with electrical wires or cables connected to external or implanted electronic devices or sensors. One skilled in the art may also find additional applications for the devices and systems disclosed herein. Thus, the illustration and description of the anchoring system 8 in connection with a catheter is mainly exemplary of one possible application of the system.

Each of the embodiments described herein employ the same basic concepts characteristic of the improved anchoring system, namely releasable attachment of a medical line to a patient. The anchoring systems also all include interacting structure that operates between a retainer of the anchoring system and a fitting which in some applications is releasably attached to the medical line and in other applications is integrally formed with the medical line. The interacting structure between the retainer and the fitting generally inhibits relative movement between the medical line and the anchoring system in at least one degree of freedom.

To assist in the description of the components of the anchoring systems and retainers disclosed herein, the following coordinate terms are used. A longitudinal axis is generally parallel to a section of the medical line to be retained by the anchoring system, generally in the plane of

4

a retainer base (discussed below). A lateral axis is generally perpendicular to the longitudinal axis within the plane of the base. A transverse axis extends transverse to both the longitudinal and lateral axes. A number of the figures illustrate this coordinate system to the side of the anchoring system. In addition, as used herein, the "longitudinal direction" refers to a direction substantially parallel to the longitudinal axis. "The lateral direction" refers to a direction substantially parallel to the lateral axis. And, "the transverse direction" refer to a direction substantially parallel to the transverse axis. These coordinates are used to describe structures and movement of the anchoring system of each embodiment. A detailed description of each embodiment, and its associated method of use, now follows.

FIGS. 1 to 3 illustrate an anchoring system 8 constructed in accordance with a preferred embodiment of the present invention. The system 8 includes a retainer 10 which is configured to retain a catheter, either directly or by way of a fitting 11. In the illustrated embodiment, the fitting 11 comprises a catheter box clamp 12 and a soft wing clamp 13 for use with a central line catheter 15.

The retainer 10 includes a base 14. The base 14 of the retainer 10 is attached to an anchor pad 16, which forms a part of the anchoring system 8. The base 14 desirably is secured to the anchor pad 16 by a solvent bond adhesive, such as cyanoacrylate or other bonding material. One such adhesive is available commercially as Part No. 4693 from the Minnesota Mining and Manufacturing Company (3M).

The anchor pad 16 comprises a flexible structural layer for securing the retainer 10 to a patient's skin. The pad desirably comprises a laminate structure with an upper cushioning foam layer (e.g., closed-cell polyethylene foam), and a bottom adhesive layer. The adhesive desirably is a medical-grade adhesive and can be either diaphoretic or nondiaphoretic, depending upon the particular application. Such foam with an adhesive layer is available commercially from New Dimensions in Medicine of Columbus, Ohio. Although not illustrated, it will be understood that the retainer and/or anchor pad can include suture holes in addition to the adhesive layer to further secure the anchor pad to the patient's skin.

An upper surface of the foam layer is roughened by corona-treating the foam with a low electric charge. The roughened or porous upper surface of the anchor pad 16 improves the quality of the adhesive joint formed by the cyanoacrylate (or by another type of adhesive or bonding material) between the base 14 to the anchor pad 16. In the alternative, the flexible anchor pad 16 can comprise a medical-grade adhesive bottom layer, an inner cellulose foam layer and an upper paper or other woven or nonwoven cloth layer.

A removable paper or plastic backing 17 desirably covers the bottom adhesive surface before use. The backing 17 preferably resists tearing and is divided into a plurality of pieces to ease attachment of the pad to a patient's skin. Desirably, the backing 17 is split along a center line 18 of the flexible anchor pad 16 in order to expose only half of the adhesive bottom surface at one time. The backing 17 also advantageously extends beyond at least one edge of the anchor pad 16, as illustrated, to facilitate removal of the backing 17 from the adhesive layer.

In the illustrated embodiment, the anchor pad 16 also desirably includes a pair of opposing concave sections that narrows the center of the anchor pad proximate to the base 14. As a result, the peripheral ends of the anchor pad 16 have more contact area to provide greater stability and adhesion

US 6,213,979 B1

5

to a patient's skin, while allowing the retainer 10, which is located at center section of the anchor pad 16, to be placed adjacent to an insertion site of the catheter 15.

Although the anchor pad 16 has not been shown in the other drawings that illustrates this embodiment, nor in some of the drawings illustrating the other embodiments, it will be understood that a similar flexible anchor pad is included to secure the retainer to the patent's skin with each embodiment.

The base 14 and the catheter 15 desirably include interacting structure to couple the catheter 15 to the base 14. As will be clear from the disclosure below, the interacting structure mounts the medical line either directly or by way of a fitting (e.g., the box clamp 12 and soft wing clamp 13) to the base 14. In the latter case, a portion of the interacting structure desirable is formed on the fitting and another portion of the interacting structure is formed on the retainer. The term "mount," when used with reference to the relation between the catheter or fitting and the retainer, does not necessarily imply that the catheter 15 or fitting 11 are immobilized or fixed. Rather, this term is meant to describe the condition in which the interacting structure inhibits movement of the catheter 15 relative to the retainer 10 in at least one degree of freedom (e.g., rotational, lateral, longitudinal or transverse). In the illustrated embodiment, as well as in those later described, the interacting structure inhibits movement of the catheter 15 at least in the longitudinal direction.

In the illustrated embodiment, a portion of the interacting structure on the base 14 comprises at least one post 20 which extends upwardly from a relatively rigid platform 21. The base 14 desirably includes a pair of posts 20. The base can also include additional posts to suit a specific application. For example, where the retainer is designed to secure a relatively large fitting, the base can include four posts arranged at the corners of a rectangle, for greater stability. And, three posts can be used to firmly anchor a Y-site fitting.

Each post 20 includes a shank or shaft 25, attached to and extending upwardly from the platform 21. The posts 20 can have a variety of lengths and a variety of distances between them, depending upon the particular application and the particular fitting 11 with which they are to interact to mount the catheter 11. For anchoring catheters and medical tubing, each post 20 desirably has a length of about 4 mm to 20 mm, and more particularly a length of about 6 mm; however, longer or shorter lengths also are possible. The posts 20 are laterally spaced at least wide enough to accommodate the medical line to be anchored, and in the illustrated embodiments, the posts 20 are spaced to accommodate the fitting 11 which secures the medical line. Desirably, the posts 20 are spaced apart by a distance between 5 mm and 40 mm, and more particularly by a distance equal to about 15 mm. The shaft 25 of each post 20 has a diameter sufficient to perform its structural function, as described in more detail below, and depends upon the material chosen for the base 14 and shafts 25. The illustrated posts 20 comprise a polymer plastic material, with a diameter between 0.5 mm and 3 mm and particularly about 1.7 mm.

At least one protrusion extends radially from the shaft. In the illustrated embodiment, the protrusion comprises an enlarged tip or head 26 at the end distal from the platform 21. As seen in FIG. 1, at least a portion of the head 26 of each post 20 is larger than the diameter of the shaft 25, desirably having a maximum diameter of 1.1 to 1.5 times the diameter of the shaft 25. In the illustrated embodiment, the head 26 has a generally hemispherical shape with a smooth surface

6

and a maximum diameter at an overhanging lower surface or underside 30. It will be understood, however, that the head 26 can take a variety of other shapes, such as for example, solid or hollow conicals, arrowheads, barbs, spheres, mushroom heads, and other types of radially projecting structures. A relatively blunt end of the head 26 is preferred to avoid snagging on materials such as a health care provider's latex gloves or sheets on the patient's bed.

A cover 22 is flexibly coupled to the base 14 by way of a flexible coupling. In the illustrated embodiment, the coupling comprises a flexible leash 24. The leash 24 can take any number of forms to mechanically connect the base 14 to the cover 22 while permitting movement of the cover 22 relative to the base 14 so as to enable engagement or disengagement of these parts, as described below. In the illustrated embodiment, the leash 24 comprises a band of flexible material. The leash 24 desirably is integrally molded with the base 14 and the cover 22. The illustrated leash 24 has a longitudinal width of about 0.5 mm to 5 mm, desirably about 1 mm, and a similar depth or transverse dimension. The length of the leash 24 depends in part upon the height of the post 20. Desirably, the leash 24 is longer than the height of the post 20, to allow some leeway in engaging or disengaging the base 14 with the cover 22, as will be understood by one of skill in the art in light of the disclosure herein. While the leash 24 desirably is generally oblong in cross-section, as illustrated, and fixes an orientation of the cover 22 relative to the base 14, it will be understood that the leash can also have a string-like (e.g., rounded) configuration and allow rotation about the lateral axis.

The cover 22 comprises an elongate member which can be formed of the same polymer or plastic material as the base 14, and desirably is integrally molded with the base 14. The cover 22 desirably has a shape that is generally coextensive with the platform 21 of the base 14. The cover 22 can be smaller; however, the cover should have a length in the lateral direction at least large enough to extend over the space between the posts 20 and a width in the longitudinal direction that is wider than the posts 20. The width of the cover 22 desirably is sufficient to stabilize a section of the catheter 15 within the retainer 10. In particular, the width of the cover 22 desirably generally matches the longitudinal length of the fitting 11. The corners of the cover are also desirably rounded to avoid snagging on materials such as the latex gloves worn by the health care provider, bed sheets, etc. In the illustrated embodiment, the cover 22 generally has an elliptical shape for this purpose.

As shown in FIG. 2, the illustrated cover 22 also desirably includes a textured portion 48, such as that formed by longitudinal ridges 50 in the cover surface at an end of cover 22 opposite of the leach 24. It will be understood that any well known form of texturing such as, for example, a roughened surface can be used in place of ridges. The textured portion 48 improves the health care provider's grip on the cover 22.

The base 14 and cover 22 are further releasably connected by a latching mechanism. The latching mechanism permits the cover 22 to be engage with the base 14 in a closed position, as illustrated in FIG. 3. The cover 22 also can be disengaged from the base 14 and moved to an open position, as shown in FIG. 1A.

The latching mechanism includes interengaging structures formed on the base 14 and on the cover 22. In the illustrated embodiment, the portion of the latching mechanism on the base 14 is formed by at least one of the posts 20 with it enlarged head 26. Desirably, the latching mechanism

US 6,213,979 B1

7

involves the posts 20 that lie on opposite sides of the catheter 15 when the catheter 15 is properly positioned on the retainer 10.

A cover portion of the latching mechanism includes at least one opening 32 formed in the cover 22, and desirably includes the same number of openings 32 as there are posts 20 on the base 14. The illustrated cover 22 thus includes two openings 32 with corresponding points of the openings 32 being spaced by approximately the same distance as the two posts 20 on the base 14, desirably by between about 5 mm and 40 mm, and particularly about 15 mm. Each opening 32 is arranged in the cover 22 to cooperate with the corresponding post 20. It will be understood that, in other arrangements of the latching mechanism are possible where the posts are on the cover, the openings are formed in the base, as described in more detail below.

Each opening 32 shown in FIGS. 1–3 is defined by a central hole 34 with at least one slot 36 extending to one side, desirably laterally adjacent to and intersecting with the central hole 34 at a narrow waist opening 37. The central hole 34 is sized and shaped to accommodate the largest diameter of the post head 26. The illustrated slot 36 extends in the lateral direction from the central hole 34 with the lateral axis of the slot 36 being substantially collinear with a center line of the cover 22 extending in the lateral direction. It will be understood that the slots 36 on the cover 22 can extend from the central hole 34 in any direction, though both slots 36 desirably extend in the same general direction. In other arrangements, more than one slot can extend from each central hole.

The width of the illustrated slot 36 in the longitudinal direction is smaller than the central hole 34 and is smaller than the largest diameter of the head 26. The slot width desirably ranges from slightly smaller to slightly larger than the diameter of the shaft 25.

The interengagement between the posts 20 and the openings 32 on the cover 22 thus form the latching mechanism that releasably secures the cover 22 to the base 14. When the post shaft 25 is positioned in the slot 36, the cover 22 can not be lifted from the retainer base 14 in the transverse direction, as described in more detail below.

As best seen from the plan view of FIG. 1B, the cover 22 desirably includes a post retention mechanism to inhibit unintentional retraction of a post 20 from the slot 36. In the embodiment of FIGS. 2–3, the retention mechanism includes a lip 38 of cover material that forms a depression 40 (FIG. 3) that is sized slightly smaller than the lower surface 30 of the post head 26. The retention mechanism of the illustrated slotted hole 36 further comprises the waist opening 37 (FIG. 1B), which has a slightly smaller diameter than the shaft 25. The longitudinal dimension of the slot 36 widens to slightly larger than the diameter of the shaft 25 between the lip 38 of the cover 22. While not illustrated, the retention mechanism can also be formed by arranging the slots at a slight deviation from parallel to one another to increase the friction between the cover 22 and the posts 20.

The retainer 10 also desirably includes a locator device to locate the cover 22 at a desired distance from the platform 21. In the illustrated embodiment, each post 20 includes an annular ring 28 positioned between the platform 21 and the head 26 for this purpose; however, other types of protuberances (e.g., small bumps or ribs) can also serve this purpose. The annular ring 28 is spaced below the head 26 along the shaft 25 by a distance sufficient to accommodate the thickness of the cover 22 when latched together. The ring 28

8

desirably is located between about 1 mm and 4 mm below the lower surface 30 of the head 26. Like the head 26, the annular ring 28 is larger in diameter than the shaft 25, desirably 1.1 to 2.0 times the diameter of the shaft 25. Most desirably, the ring 28 is slightly larger than the maximum diameter of the head 26.

As mentioned above, the base 14, leash 24 and cover 22 desirably are integrally formed to make a unitary retainer 10. This can be accomplished in any of a variety of ways well known to one of skill in the art. For instance, the entire retainer can be injection molded, in order to reduce fabrication costs. Additionally, features such as the leash 24 are desirably flexible. Suitable plastics which account for these considerations include polypropylene, polyethylene, and the like. Desirably, the illustrated retainer 10 comprises injection molded polyethylene or polypropylene.

The anchoring system 8 can also include the fitting 11 for mounting a medical line (e.g., catheter) to the retainer 10. In the exemplary application illustrated in FIGS. 1–3, the fitting 11 takes the form of the box clamp 12 and the soft wing clamp 13. Mounting of the fitting 11 (or catheter directly) to the retainer 10 is achieved by way of the interacting structures, a portion of which comprises surfaces or structures of the retainer 10 and another portion of which comprises surfaces or structures of the fitting 11 (or catheter, if directly coupled).

The box clamp 12, best seen from the view of FIG. 1, is a relatively small, rigid wing-shaped device having a configuration similar to that of conventional box clamps in common usage today in suturing attachment systems. The box clamp 12 includes a central elongate body 60 having a longitudinal groove 62 formed on the underside and a box-shaped upper surface 64. The longitudinal groove 62 is generally U-shaped and is sized to receive the body of a catheter and/or associated fluid line, and more desirably is sized to receive the wing clamp 13. At least one end, and preferably at both ends of the longitudinal groove 62, the body 60 of the box clamp 12 narrows the opening of the longitudinal groove 62. That is, the longitudinal groove 62 at either end extends through an arc which is greater than 180° about an axis of the longitudinal groove 62. The groove also can have a uniform cross section along its length so that the wall of the entire groove extends through an arc greater than 180°. The box clamp 12 desirably is formed of a relatively rigid material, such as polycarbonate.

A pair of lateral wings 66 extend roughly perpendicularly from the body 60 of the box clamp 12, each including a hole 67 therethrough. Each hole 67 is sized and shaped to receive the head 26 and the collar 28 of one of the posts 20.

The soft wing clamp 13 has a configuration similar to that of the box clamp 12, including a central elongate body 70 defining an inner cavity 72 and an outer surface 74. The inner cavity 72 is sized to surround a portion of a catheter. The wing clamp 13 is constructed from a soft, pliable or flexible material such as, for example, latex or the like. The central elongate body 70 includes a longitudinal slit 75 along its underside. The slit 75 can be expanded due to the pliable nature of the wing clamp 13. Thus, the wing clamp 13 is capable of being placed on and surrounding and longitudinally contacting in a frictional manner a portion of the catheter. This frictional contact between the soft wing claim 13 and the catheter generally prevents relative movement between these articles.

Lateral wings 76 extend roughly perpendicularly from the body 70 of the soft wing clamp 13, each including a through-hole 77. Each hole 77 is sized and shaped to receive

US 6,213,979 B1

9                                                                          10

the head 26 of one of the posts 20. As the material surrounding the wing hole 67 is pliable in the illustrated embodiment, the hole 67 can be smaller than the corresponding box clamp hole 67 and even smaller than the post head 26, yet still be stretched to receive the post head 26; the through-hole 77, however, desirably is larger than the post head 26 and generally equal in size to the corresponding hole 67 in the box clamp 12.

The illustrated box clamp 12 and soft wing clamp 13 are commercially available from Arrow® for use with its CVC. Other clamps with suture wing extensions are currently in commercial use with Quinton® Hemodialysis catheters, Cook® PICC's, Baxter® CVCs and B. Braun CVCs. The skilled artisan will find application for the present invention with any of these and many other clamp configurations. As will be clear from a discussion of the embodiment of FIGS. 10–12, the fitting 11 (box clamp/soft wing clamp combination) can also be replaced with an inter-line connector or adaptor, such as those used to connect the catheter to a supply, delivery or drainage line.

FIG. 3 illustrates the interengagement of the components of the anchoring system 8, in accordance with the present embodiment. The box clamp 12 and soft wing claim 13 are shown engaged with the posts 20 and retained between the base 14 and cover 22 of the retainer 10.

As noted, the groove 62 of the box clamp 12 is configured to receive the soft wing clamp 13. In particular, the groove 62 is sized and shaped to receive the outer surface 74 of the elongate body 74 on the soft wing clamp 13. The wings 66 of the box clamp 12 have approximately the same size and shape as the wings 76 of the soft wing clamp 13. When the wings 66, 76 are aligned, the box clamp holes 67 are correspondingly aligned with the soft wing clamp holes 77.

Together, the box clamp 12 and the soft wing clamp 13 form the fitting 11 for mounting in the retainer 10. In the illustrated embodiment, the retainer 10 has been sized for retention of the conventional box clamp 12 and soft wing clamp 13. Accordingly, the holes 67, 77 of the fitting 11 are spaced by approximately the same distance as the posts 20 on the retainer base 14. The box-like upper surface 64 of the box clamp 12 is sized and shaped to fit between the posts 20. Accordingly, a lateral dimension of the elongate body 60 is smaller than the spacing between the posts 20 (i.e., the elongate body 60 is located between and spaced from holes 67 on the box clamp wings 66), while the height of the fitting 11 (formed by the height of the box clamp 12 plus the thickness of the soft wing clamp wings 76) is smaller than the height of the posts. Desirably, the height of the fitting is smaller than the height of the shaft 25 up to the underside 30 of the post head.

The interaction between the posts 20 and the openings 67, 77 of the fitting 11 mount the fitting 11 on the base 14. Accordingly, this interacting structure between the retainer 10 and the fitting 11 inhibits movement of the catheter 15 relative to the retainer 11 in at least the longitudinal and lateral directions. It is understood that the posts need not to extend entire through the holes for this purpose, though.

As noted above, the spacing between the posts 20 on the base 14 also dictates the spacing between the openings 32 in the cover 22. Desirably, the slots 36 each extend from the same side, and desirably laterally, from the central holes 34. Thus, the spacing between the central holes 34 is approximately equal to the spacing between the slots 36, which is in turn approximately equal to the spacing between the posts 20 on the base.

As also noted above, the leash 24 flexibly connects the platform 21 of the base 14 to the cover 22. Desirably, the

leash 24 connects lateral ends of the base 14 and cover 22, so as not to interfere with the mounting of the fitting 11 and catheter along the longitudinal axis. The leash 24 is long enough to permit a desired parallel spacing of the base 14 from the cover 22 when the retainer is in a closed position, as illustrated.

In operation, a catheter (or other medical tube or wire) is inserted into the patient, and the fitting 11 is secured to the catheter. The fitting 11 is then retained within the retainer 10, and the retainer 10 is then secured to the patient. These steps are described in more detail below. While this sequence is advantageous, it will be understood that, in other arrangements, the fitting can be secured to a catheter before or after securing the fitting to the retainer, depending upon the form of the fitting. Similarly, and especially for reapplication of a catheter to the retainer 10, the catheter and fitting 11 can be mounted to the retainer 10 after the retainer 10 has already been secured to the patient.

In the illustrated embodiment, desirably after catheter insertion, the wing clamp 13 is stretched open at the slit 75 and fit over the catheter, as in standard practice. The groove 62 of the box clamp 12 is fitted over the elongate body 70 of the soft wing clamp 13, providing a tight "snap fit." Some flexibility in the wing clamp body 70 facilitates this fitting. The relatively more rigid box clamp body 60, however, exerts relatively more inward pressure on the catheter than the relatively more flexible wing clamp 13, such that a better frictional grip holds the catheter within the fitting 11. It will be understood by one of skill in this art, however, that the fitting 11 of the present embodiment can comprise the soft wing clamp 13 alone.

As shown in FIG. 2, the catheter and fitting 11 are then removably mounted to the retainer 10. In the illustrated embodiment, the holes 77, 67 are fitted over the posts 20 of the retainer base 14. Desirably, each slightly smaller wing clamp hole 77 stretches to accommodate the larger diameter head 26 and ring 28 of the post 20. Each box clamp hole 67, on the other hand, desirably is large enough to receive the head 26 and ring 28 without interference. The fitting 11 is thereby fitted onto the base 14 with the posts 20 extending through the fitting holes 67, 77 and the bottom surface of the soft wing clamp 13 resting on the platform 21.

As illustrated in FIGS. 2 and 3, the cover 22 is latched to the base 14, with the fitting 11 interposed between the cover and the base. FIG. 2 shows the cover 22 in a partially closed position, with the flexible leash 24 bent to position the cover 22 over the base 14. The openings 32 of the cover 22 are aligned with the posts 20 of the base 14 and the cover 22 is then moved toward the base such that the head 26 of each post passes through the central hole 34 of one of the openings 32. The size and spacing of the openings 32 and the posts 22 should result in an easy engagement so that only a light downward force is necessary, thereby avoiding pain or discomfort to the patient. In this position, the portion of the cover 22 between the holes 34 can firmly contact a portion of the fitting 11 in some applications.

The rings 28 can also support, at least in part, the cover 22, or at least limit the travel of the cover 22 over the posts 20 so as to properly position the cover 22 on the posts 22 generally beneath the flared heads 26. Once the heads 26 of the posts 20 have cleared the central holes 34 in the cover 22, the cover 22 contacts the ring 28.

The cover 22 is then slid laterally (to the right, in the views of FIGS. 2 and 3) so that the shaft 25 of each post 20 slides past the narrow waist opening 37 into the corresponding slot 36. The cover material at the waist 37 and/or the

US 6,213,979 B1

11

shaft 25 slightly compresses as the cover 22 is shifted under force provided by the health care provider. Desirably, the retainer is arranged such that, when the posts 20 are engaged with the slots 36, the cover 22 is centered with respect to the base.

The resulting engagement, shown in FIG. 3, serves to retain the fitting 11 securely in place within the retainer 10. As the waist openings 37 are desirably slightly more narrow than the post shafts 25, the slots 36 provide a friction or snap fit engagement with the posts 20. The slots 36 are longitudinally more narrow than the post heads 26, such that the cover 22 cannot be transversely lifted away from the base 14 in this position. Surfaces of the post 20 abut against surfaces of the cover 22 formed by the lip 38 and walls 46 of the opening 32. The posts 20 of the base 14 and the slotted holes 67, 77 of the cover 22 thereby form a latching structure. The latching structure allows the posts 20 to be easily inserted into the openings 32 in one position but inhibits unintentional retraction of the posts 20 from the openings 32 in a second position.

Additionally, the underside 30 of the post head 26 seats against the cover 22 with the periphery of the head 26 at the edge of the depression 40, as shown. A slight deformation of the head 26 and/or edge of the depression 40 creates increased interference between the cover 22 and the post heads 26 which aids in maintaining the cover 22 in place, relative to the posts 20.

It will be understood that, in other arrangements, the openings can instead be formed in the base, rather than the cover, and the posts formed on the cover. In such a case, each opening would comprise a partial central hole in the base, below which a hollow space is formed for receiving the heads of downward extending posts of the cover. The space would also accommodate the lateral movement of the cover (and consequent lateral movement of the posts) in order to provide engagement between the shaft of each post and a narrow slot extending from the opening. In this manner, the head of one of the posts would be captured within the hollow space below each slot. The post could not be pulled out of the hollow space because the rear side of the post head would contact the portions of the base which define the slot. Such a latching mechanism is disclosed in copending application Ser. No. 08/587,092, entitled "Catheter Anchoring System", filed on Jan. 15, 1996, in the name of Steven F. Bierman and assigned to the assignee hereof, which stands allowed as of the filing date of this application and which is hereby incorporated by reference.

In initial application, the illustrated retainer 10, with the fitting 11 and the catheter retained in it as described above, is secured to the patient by way of the self-adhesive anchor pad 16. The health care provider selects a skin site on which the retainer 10 will be attached. For use with CVCs and PICCs, the retainer 10 desirably is applied to the skin of the patient in the vicinity of the catheter insertion site. The health care provider then cleanses and prepares the anticipated dressing site according to well known methods, usually swabbing with alcohol and allowing the site to dry thoroughly. The health care provider peels away half of the backing layer 17 from the adhesive surface of the anchor pad 16, properly locates the pad 16 on the patient, and presses the exposed adhesive against the patient's skin to secure the anchor pad 16 to the patient. The second half of the backing layer 17 is then removed, and the second half of the anchor pad 17 adhered to the patient's skin. The anchor pad 16 should be mounted on the patient so that catheter overlies the retainer 10 along the retainer's longitudinal axis.

When removal of the catheter becomes necessary, the cover 22 simply is slid horizontally in the opposite direction,

12

desirably with force sufficient to compress cover material at the waists 37, so that the heads 26 of the posts 20 are once again aligned with the central holes 34. The cover 22 can then be easily lifted transversely from the base 14. With the retainer 10 thus unlatched, the fitting 11 can also be removed. The catheter secured by the fitting 11 can then be changed or cleaned and replaced in the retainer 10, without requiring a new retainer.

It should be noted that a deliberate effort is generally required to disengage the post shafts 25 from the slots 36, due to the retention mechanism formed by the retainer neck 37 and/or depression 40. The retainer 10 thus releasably mounts a catheter (or other medical line) and can be reused without requiring reattachment to the patient, while at the same time inhibiting accidental release of the catheter.

Significantly, the removed cover 22 remains leashed to the retainer base 14, which remains attached to the patient. Thus, the health care provider need not take care to place the cover 22 in a safe hygienic place, nor keep track of its whereabouts. The cover 22 can simply hang from the base 14 by the leash 24, where it is easily found and relatched to the base 14 when a new catheter is engaged. Furthermore, each time the cover is relatched, the cover 22 is automatically correctly oriented, such that the health care provider need not take care to ensure that the depression 40 is facing the correct direction, nor to ensure that the slots 36 are on the correct side.

Of course, if the medical treatment is completed and there is no need to reuse the retainer 10, the health care provider can release the cover from the base in the manner described above. The medical article then can be lifted from the base. To remove the anchor pad 16, the health care provider lifts an edge of the pad 16 and gently strokes the undersurface with an alcohol swab while slowly but continuously lifting the edge. The anchor pad 16 can be peeled from the patient's skin in this manner. The health care provider then cleanses and prepares skin using well known hospital or agency protocols.

A retainer 10a in accordance with another embodiment of the invention is illustrated in FIGS. 4A to 5, with FIG. 4A showing a completely open position of the retainer 10a and FIG. 5 showing the partially closed position, similar to FIGS. 1–2 above. Though not illustrated, this retainer 10a also desirably includes a flexible anchor pad, as illustrated in FIG. 1, for adhesive attachment to the body of a patient. Only the cover 22a of this embodiment differs from the above-described embodiment. Accordingly, the above description applies equally to the embodiment of FIGS. 4–5, unless otherwise indicated. In addition, like reference numerals are used to indicate like features of the two embodiments, with the letter "a" added as a suffix to refer to features of the present embodiment.

The cover 22a of this retention mechanism 14a includes a pair of openings 32a. In contrast to the embodiment discussed above, each opening 32a comprises a single slot 80 extending from a longitudinal outer edge 82 of the cover 22a to a terminus 84. The pair of slots 80 can extend from either of the two outer edges 82, but both slots 80 desirably extend from the same edge.

The slots 80 advantageously extend obliquely from the outer edge 82 of the cover 22a to the slot terminus 84, such that one side of each slot 80 defines an obtuse angle α (FIG. 4B) with the outer edge 82 from which the slot extends, as shown in FIG. 4B. The termini 84 of the slots 80 desirably are centered on or close to a lateral line that bisects the cover 22a into longitudinal halves. Thus, the length of each slot 80

US 6,213,979 B1

13

depends upon the obtuse angle cc between the outer edge 82 and the slot 80. The angle cc should be small enough and the slot 80 short enough that the structural integrity of the cover 22a is not compromised. While illustrated as parallel, the slots 80 can also be arranged at a slight angle to one another. The width of each slot 80 desirably is slightly larger than the diameter of the post shaft 25a, and smaller than the largest dimension of the post head 26a.

As best seen from the plan view of FIG. 4B, the opening 32a desirably includes a retention mechanism, such as to inhibit retraction of the post 20a from the slot 80. As visible from the views of FIGS. 4B and 5, each slot 80 is partially defined at the terminus 84 by a lip 38a of cover material, forming a depression 40a in the cover 22a, similar to the lip 38 and depression 40 shown in FIGS. 1–3. The depression 40a is sized slightly smaller than the lower surface 30a of the post head 26a.

In the illustrated embodiment, the retention mechanism further comprises one or more protuberances 86 extending at certain positions from interior walls of the slot 80. As illustrated, the protuberances 86 desirably are positioned within the slot 80 just outside the depression 40a. At the protuberances 86, the slot 36a most desirably has a slightly smaller diameter than the shaft 25a, while widening to slightly larger than the shaft 25a at the lip 38a. These protuberances 86 define the waist 37a of the opening 32a for the present embodiment.

FIG. 5 illustrates the retainer 10a in a partially closed position. The flexible leash 24a has been bent to swing the cover 22a counterclockwise (in the view of FIG. 5), bringing the openings 32a in proximity to the posts 20a. The cover 22a continues in a downward arc from the position of FIG. 5 and is shifted slightly out of alignment with the base 14a until the edge openings of the openings 32a at the longitudinal edge 82 are adjacent to the section of the posts 20a between the head 26a and the ring 28a.

While not illustrated in FIGS. 4A to 5, a catheter fitting can first be mounted to the retainer 10a prior to latching. For example, the fitting 11a illustrated in FIGS. 1–3 can be first secured to the retainer. For such a case, the posts 20a serve as a portion of an interacting structure and the holes 67a, 77a of the fitting 11a serve as another portion of the interacting structure. The interacting structure thus mounts the fitting to the retainer to inhibit at least one degree of movement of the fitting relative to the retainer. Alternatively, a portion of the interacting structure can directly mount a catheter, without the intermediate fitting.

The shaft 25a of each post 20a (between the head 26a and the ring 28a) can be easily inserted into the edge opening of the openings 32a at the outer edge 82. The cover 22a is then shifted obliquely such that the shafts 25a slide along the slots 80. The shafts 25a and/or the protuberances 86 are compressed or the protuberances are deflected as the shafts 25a slide past the protuberances 86. After the shafts 25a have passed the protuberances 86, the shafts and/or the protuberances can regain their original shape such that the shafts snap into the position adjacent to the protuberances 86 and engage with the terminus 84 of the slots 80. When the head 26a is seated at the edge of the depression 40a, the surfaces of the cover 22a formed by the lip 38a and the protuberances 86 of the slot 80 abut against the shaft 25a of the post 20a. The cover 22a is thus latched in a closed position.

In order to remove the cover 22a from the base 14a, the sliding motion of the cover 22a over the posts 20a is simply reversed until the post shafts 25a exit the openings 32a at the

14

outer edge 82 of the cover 22a. Note that some deliberate force is generally required to overcome the retention mechanism. Namely, the cover 22a is slightly depressed to disengage the underside of the head 26a from the edge of the depression 40a, and the cover 22a is slid with sufficient force to deflect or compress the protuberances 86. Any fitting secured therein can then be disengaged from the opened retainer 10a.

Where the slots are arranged at a slight angle to one another, the friction fit of the posts within the slots will improve, relative to an exactly parallel arrangement. It will be understood that, in other arrangements, a similar slot can extend perpendicularly from the longitudinal edge. Alternatively, slots of each opening can extend from opposite longitudinal edges of the cover. In the latter arrangement, the cover would be aligned longitudinally between the posts and the cover twisted to a lateral alignment, such that the posts each engage the slots on each side. As will be understood by one of skill in this art, such slots would desirably extend along the circumference of a circle centered between the termini.

In either of the above illustrated embodiments, or in inverted arrangements with the posts on the cover, the posts serve both as an interacting structure (for mounting a medical line or fitting) and as a part of the latching structure (for latching the cover to the base). It will be understood, however, from the description of the following two embodiments, that the posts can serve only as part of the latching structure, or only as part of the interacting structure. It will further be understood by one of ordinary skill in this art that the posts can be absent altogether in other arrangements.

FIGS. 6–9 illustrate a retainer 10b in accordance with another embodiment of the present invention. The retainer 10b is shown in an open position in FIG. 6 and in a fully closed and latched position in FIG. 7. Other components of the anchoring system 8b (e.g., anchor pad, catheter adapter) can be the same as described above with respect to FIGS. 1–3. Accordingly, the above description applies equally to the embodiment of FIGS. 6–9, unless otherwise indicated. In addition, like reference numerals are used to indicate like features among the embodiments, with the letter "b" added as a suffix to refer to features of the present embodiment.

The base 14b includes a pair of posts 20b; however, the base can include more or less posts depending upon the application of the anchoring system. Each post 20b has a relatively smooth, continuous surface up to a tip 90 which need not protrude radially from the post 20b, unlike the head 26, 26a of the previously described embodiments. The tip 90 of the post 20b can be a flat surface or can taper into a hemispherical shape (as shown), a conical shape or other well known shapes. In the illustrated embodiment, the posts 20b each consist only of a simple shaft tapered hemispherically at the tip 90. The posts 20b otherwise desirably have the same diameter, spacing, and height of the posts 20, 20a of the previous embodiments. The posts 20b are illustrated as connected to a platform 21b of the base 14a, although it will be appreciated by those skilled in the art, in light of the above disclosure, that the posts could be connected to the cover 22b.

The flexible hinge 24b of this embodiment comprises a relatively rigid support arm 92 that is integrally joined to the platform 21b at a base end 94. As shown in FIG. 6, the support arm 92 extends upwardly from the base end 94 to join with the cover 22b at a thin bridge 96 of cover material. The bridge 96 is formed along a common exterior surface 98

15

(see FIG. 7) of the cover 22b and the support arm 92. The bridge 96 is defined along the apex of a notch 100 in the material that forms the cover 22b and support arm 92. The notch 100 can be thought of as the structure formed by a bevelled edge sloping away from an interior surface 102 of the cover 22b, conjoined at the bridge 96 with a bevelled edge sloping away from an inside surface 104 of the support arm 92. The hinge 24b flexibly connecting the base 14b to the cover 22b thus comprises the support arm 92, the bridge 96, and the surfaces forming the notch 100. In other arrangements, however, the hinge of an embodiment resembling that of FIGS. 6–9 can comprise a structure similar to a conventional hinge pin-bracket arrangement.

Desirably, the support arm 92, which terminates at an upper end at the bridge 96, has the same height as the posts 20b. It will be understood, however, that the support arm 92 can be higher than the posts 20b in other arrangements.

The thickness of the bridge 96 depends upon the material chosen, and is thick enough to provide the desired strength to connect the support arm 92 to the cover 22b, but thin enough to provide flexibility for opening and closing the retainer 10b. Desirably, the retainer 10b is integrally injection molded of a resilient polymer material, such as polypropylene or polyethylene. For such materials, the bridge 96 has a thickness between about 0.5 mm and 2.5 mm, and desirably about 1.5 mm.

The flexibility of the hinge 24b also depends in part upon the angle formed by surfaces of the notch 100 when the retainer 10b is in the open position shown in FIG. 6. Desirably, the notch 100 defines an angle of at least about 90°, and particularly about 115°. Such an arrangement allows the cover 22b to lie parallel to the platform 21b when the retainer 10b is in the closed position shown in FIG. 7. It will be understood, however, that in other arrangements the closed cover need not lie parallel to the platform 14b (and may take a curvilinear path as described below).

As seen in FIG. 7A, the latching mechanism 110b of the illustrated retainer 10b comprising a fastening pin 112 and a latch having a receptacle 114. The receptacle 114 is configured to receive the fastening pin 112. As shown in FIGS. 6–9, the illustrated fastening pin 112 is integrally connected to the cover 22b and the receptacle 114 is integrally connected to the base 14b. It will be understood, however, that the pin can instead be positioned on the base, while the receptacle is positioned on the cover.

The fastening pin 112 includes a bar 116 extending from the cover 22b (or the base 14b, depending on the position of the element). At the end distal from the connection to the cover 22b, the bar 116 connects to an expanded portion or barb 118 which tapers to a terminus 120 of the pin 112. Like the post head 26, 26a of the previous embodiments, the barb 118 of the fastening pin 112 can be formed in any of a variety of shapes such as an arrowhead (as shown), hemispherical, conical or flexible ribs extending outward from the bar 116. Desirably, the terminus 120 of the fastening pin 112 is relatively blunt and smooth to prevent it from puncturing the gloves of a health care provider or catching on other materials. The barb 118 also desirably includes a sloping or curved surface 121 leading from the terminus 120 to the maximum diameter of the barb 118. At least one shoulder is formed behind the barb 118. In the illustrated embodiment, shoulders are defined on either side of the bar 116.

The receptacle 114 of the latch 110b comprises a pair of opposing tangs 122 that extend to a stem 124 connected to the base 14b (or cover 22b, depending on the position of this element of the latch). Each tang 122 extends outwardly to a

16

lug 126 that can be depressed by finger pressure. Desirably, each tang 122 includes an inner bevelled surface 127. These bevelled surfaces define an aperture 128 therebetween which tapers from a wider dimension at the top to a narrower dimension at the bottom, where it communicates with a slot 130 located between the opposing stems 124. Each tang defines a downward facing shoulder that cooperates with one of the shoulders of the fastening pin barb 118, as described below.

In operation, a fitting, such as the fitting 11 of FIGS. 1–3, can be first engaged with the posts 20b while the retainer 10b is open (see FIG. 6). Accordingly, the posts 20b of the illustrated embodiment form a portion of the interacting structure for inhibiting movement of a medical line fitting relative to the retainer 10b.

The cover 22b can then swing to a closed position as shown in FIG. 7. The relatively thin strip of material forming the bridge 96 allows the hinge 24b to bend when finger pressure is exerted on the cover 22b to lower it. The angle of the notch 100 further allows the cover 22 to be closed without compressing material between the interior surface 102 of the cover and the inner surface of the support arm 92. While the rigid support arm 92 and the thin bridge 96 permit only rotational and not lateral movement of the cover 22b relative to the base 14b, such lateral movement is not necessary for the illustrated latching mechanism.

The fastening pin 112 can be inserted into the receptacle 114 by positioning the pin 112 into the aperture 128 and pressing on the cover 22b. The sloped surfaces 121 of the fastening pin 112 slide over the bevelled inner surfaces 127 of the tangs 122. The interaction of these sloped and bevelled surfaces tends to distend the tangs 122 slightly, thereby allowing the barb 118 to enter the slot 130. The tangs 122 then snap back into their original position and engage with the barb 118 of the pin 112 with the corresponding shoulders abutting, thereby releasably securing the cover 22b to the base 14b. FIG. 8 illustrates the closed latch 110b.

When the latch 110b is closed, as shown in FIG. 7, the inner surface 102 of the cover 22b sits atop the tip 90 of the posts 20b, since the posts of the illustrated retainer 10b have the same height as the support arm 92. It will be understood that, in arrangements where the posts are attached to the cover, the tips would abut the base when the cover is in the closed position and latched. Where such contact takes place, a fitting secured between the cover 22b and the base 14b could not slip off the posts 20b when the retainer 10b is closed and latched. Furthermore, the posts 20b provide added support for the cover 22b in the closed position to prevent overextension of the hinge 24b.

To release the cover 22b from the base 14b, the health care provider can press down on the lugs 126, thereby gaining access to the fitting and/or catheter secured therein. When a lug 126 is depressed, the attached stem 124 bends outward slightly, causing the tang 122 to moved outwardly and the slot 128 to expand, as shown in FIG. 9. To provide friction between the health care provider's finger and the top of the lug 124, ridges or other types of roughened surface can be included.

When only a single lug 124 is depressed, however, the attached tang 122 is elevated until it contacts the surface of the element (e.g., the cover) to which the fastening pin 112 is connected. This degree of elevation of a single tang 122 does not expand the aperture 128 sufficiently to release the barb 118 of the fastening pin 112. In contrast, when both lugs 124 are depressed (not shown), the aperture 128 is sufficiently widened to allow the fastening pin 112 to be readily

US 6,213,979 B1

17

extracted from the receptacle 114. This design prevents inadvertent release of the fastening pin 112 (e.g., when a lug is bumped), but permits easy opening of the retainer 10b when a health care provider seeks to move the catheter or other fitting held within the retainer 10b.

FIGS. 10–12 illustrate an anchoring system 8c in accordance with another embodiment of the present invention. Like the anchoring systems described above, the illustrated embodiment includes a retainer 10c, a fitting or adaptor 11c and an anchor pad 16c. The anchor pad 16c desirably is similar to the anchor pad 16 described with respect to FIG. 1. The retainer 10c and the fitting 11c differ somewhat from the above-described embodiments, though certain features are the same. Accordingly, the above description applies equally to the embodiment of FIGS. 10–12, unless otherwise indicated. In addition, like reference numerals are used for like features among the embodiments, with the letter "c" added as a suffix to refer to features of the present embodiment.

The illustrated posts 20c do not include a locator ring of material below the head 26c. The illustrated base 14c, including dimensions of the posts 20c, is otherwise identical to the base 14 described with respect to FIGS. 1–3. Unlike the openings 32, 32a of the previous embodiments, the illustrated opening 32c is shown without a lip or depression in the slot 36c. It will be understood, however, that the slot can also include a depression over which the post head would seat without departing from the principles of the present embodiment.

Like the previous embodiments, the present embodiment includes interengaging structure to mount the medical line to the retainer 10c. In the illustrated embodiment, the interacting structure comprises a channel defined by a mounting structure 140. The channel is sized and shaped to mount a medical line, such as a catheter, either directly or indirectly by way of a fitting. Desirably, the channel defined by the mounting structure 140 is configured to mate with and mount the adaptor 11c which, in turn, engages with the medical line. In the illustrated embodiment, the mounting structure 140 is integrally formed with the cover 22c, such as by injection molding. It will be understood, however, that the mounting structure 140 can equally well be formed as part of the base 14c without materially affecting the function of the retainer 10c.

The illustrated mounting structure 140 comprises two substantially rectangular box-like extensions 141 that extends from the cover 22c between the two openings 32c. The extensions 141 are spaced by a distance sufficient to receive the adaptor 11c and include inner faces 142 configured to mate with surfaces of the adaptor 11c. The inner faces 142 are more particularly shaped to inhibit at least one degree of freedom, desirably to inhibit longitudinal movement of the adaptor 11c when the adaptor is mounted within the channel (see FIG. 11). The illustrated inner faces 142 are convex in shape. The channel defined between the extensions 141, thus, has a minimal width at a central point and widens toward either longitudinal end. In other arrangements, the skilled artisan will recognize that a maximum channel width at a central point will inhibit longitudinal movement of a different fitting. Where, as illustrated, the mounting structure 140 is integral with the cover 22c, the extensions 141 desirably are spaced closely enough to provide a snug or slight interference fit for the adaptor 11c within the channel.

The mounting structure 140 (and the channel defined by it) has a height less than or equal to the height of the post

18

shafts 25c of the base 14c. In the illustrated embodiment, the structure 140 is equal to the height of the shafts 25c, less the thickness of the cover 22c. An outer surface 144 (FIG. 10) of each of the illustrated extensions 141 is accordingly configured to mate with the platform 21c of the base 14c, and is flat in this case.

The cover 22c is illustrated with a slight hourglass shape, such as to provide a slight indentation 146 along an edge 148 of the cover 22c. Desirably, the indentation 146 comprises transverse ridges 150. This shape facilitates an interengagement between the fitting 11c and the mounting structure 140 to inhibit movement of the adaptor 11c at least in the longitudinal direction, as described below.

The fitting 11c of the present embodiment is an in-line adaptor 11c. This adaptor 11c comprises an elongate structure defining a fluid pathway, and means for connecting the adaptor to lines at either end. The illustrated adaptor 11c comprises a medical connector such as those commonly used to connect a supply line to a catheter.

Desirably, the adaptor 11c is of a type similar to that disclosed with respect to FIGS. 11 and 12 of U.S. Pat. No. 5,306,243 ("the '243 patent"), the disclosure of which is hereby incorporated herein by reference. The adaptor 11c includes a male connector 160 for connection to a catheter and a female connector 162 for connection to a medical supply or delivery tube (e.g., leading to an IV drip or a suction pump). The illustrated male connector 160 includes a Luer-type fitting 164 with internal threads and a tapered nose extending outwardly, with an internal passageway for fluid communication with a catheter.

The female connector 162 comprises external threads 166 and a membrane 168 for sealing the internal passageway. The membrane 168 can comprise a closed septum, through which a sharp needle is inserted to provide communication between the supply or delivery tube and the internal passageway. The membrane 168 can also comprise a pre-slit membrane, through which a blunt needle provides communication between the supply or delivery tube and the internal passageway. Desirably, however, the female connector 162 of the adaptor 11c comprises an internal needle integral with the internal passageway, as disclosed in the '243 patent. The membrane 168 comprises a resilient, self-sealing material which is outwardly biased.

An adaptor body 170, between the male connector 160 and the female connector 162, comprises mounting surfaces 172 which form a portion of the interacting structure of the anchoring system 8c. The illustrated mounting surfaces 172 comprise opposed concave surfaces, desirably including ridges (not shown) to facilitate finger gripping during connection of the adaptor 11c to catheters or other medical tubes. In this manner, the adaptor body 170 has a minimal width at a central point and widens toward both the female connector 162 and the male connector 160. In particular, the widest points of the illustrated adaptor 11c are wider than the most narrow portion of the channel between the extensions 141 of the retainer 10c.

The mounting surfaces 172 are joined by a top surface 174 and a bottom surface (not shown). The top and bottom surfaces desirably are flat to mate with the illustrated cover 22c and platform 21c of the retainer 10c, such that these surfaces also form a portion of the interacting structure.

In operation, the adaptor 11c can first be connected to medical tubes. For example, a catheter can be fitted with a female connector with external threading, similar to the female connector 162 of the adaptor 11c. Such a connector can be quickly and easily threaded into the male connector

US 6,213,979 B1

19

160 of the adaptor without any external needles, thus reducing the likelihood of needle sticks to the health care provider. While the female connector is threaded into the Luer-type fitting of the male connector 160, the nose of the male connector 160 forces the membrane 168 backwards over the internal needle, thus providing fluid communication between the catheter and the internal passage of the adaptor 11c. Similarly, a medical delivery/supply line can be fitted with a male connector similar to the male connector 160 of the adaptor 11c. Such a connector would then connect with the female connector 162 of the adaptor 11c, thereby completing fluid communication through the adaptor 11c between the delivery/supply line and the catheter.

The adaptor 11c then mounts within the channel defined by the mounting structure 140 of the retainer 10c. In the illustrated embodiment, wherein the mounting structure 140 is formed integrally with the cover 22c, the inner faces 142 of the extensions 141 desirably snugly receive and grip the mounting surfaces 172 of the adaptor 11c.

It will be understood by one of skill in the art, however, that the fit need not be tight enough to inhibit transverse movement of the fitting or adaptor, particularly where the mounting structure is integral to the base, rather than integral to the cover. Desirably, however, the interaction between the mounting structure inner faces 142 and the adaptor mounting surfaces 172 is such as to inhibit significant longitudinal movement (e.g., more than 1–2 mm) of the adaptor 11c. In the illustrated embodiment, the minimal width of the channel is more narrow than the widest portions on either end of the adaptor body 170.

With the adaptor 11c thus mounted to the retainer 10c, the retainer 10c is then be closed and latched, as described with respect to the previous embodiments. Where, as illustrated, the mounting structure 140 is located on the cover 22c, if the mounting structure 140 is not configured for firm engagement, the health care provider can hold the adaptor 11c within the channel until the retainer 10c is latched. FIG. 11 illustrates the retainer 10c in a partially closed condition.

FIG. 12 illustrates the retainer 10c latched closed with the adaptor 11c retained therein. As will be understood by one of skill in the art, the cover 22c and the base 14c interposed the adaptor 11c between them, preventing transverse movement of the adaptor 11c relative to the retainer 14c. The channel defined by the mounting structure 140 inhibits lateral or longitudinal movement of the adaptor 11c relative to the retainer 14c by the cooperating shape of the channel and the adaptor 11c (which form the interengaging structure in this embodiment). Accordingly, the adaptor 11c is sufficiently restrained to secure a catheter extending therefrom to the patient. If the catheter had not been secured to the adaptor prior to engagement of the adaptor to the retainer, the catheter can be secured after engagement.

The skilled artisan will appreciate that the retainers disclosed herein demonstrate versatility in securing a great variety of medical articles to a patient. Retainers similar to those of FIGS. 1–9 can be utilized to secure any device which is provided with holes spaced apart to engage with the posts. The cover is secured to the base to interpose the device between them. Many medical devices are already provided with suture holes which can be fitted over the retainer posts disclosed herein. Other devices can be modified to include such holes. Other arrangements to secure a medical article to the posts, either between the posts or adjacent to a single post, will be readily apparent to those skilled in the art in light of the disclosure herein.

Medical devices can be also be provided with surfaces similar to the mounting surfaces 172 of the illustrated

20

adaptor 11c, for mounting within the integral channel of the retainer 10c illustrated in FIGS. 10–12. Y-joint adapters, for example, can be adapted to mount within the channel of the retainer 10c shown in FIGS. 10–12.

Alternatively, one of skill in the art will readily appreciate that the disclosed retainers can be modified, without departing from the spirit of the invention, to mount and retain existing medical devices. For example, the integral mounting structure illustrated in FIGS. 10–12 can be adapted to clamp existing Y-joint adapters, or to directly mount a catheter or other medical line without the need for an intermediate fitting. In addition, the channel can have a semi-tubular shape and include at least one lateral slot that receives a radially extending member of the adaptor (e.g., an annular collar). Desirably, any such modified mounting structure would inhibit longitudinal and lateral movement of the device or medical line. Transverse movement is inhibited by closure of the retainer with the device or line sandwiched between the base and the cover.

Furthermore, the skilled artisan will recognize the interchangeability of various features from different embodiments. For example, the integral mounting structure 140 of FIGS. 10–12 can be adapted for mounting an adaptor in any of FIGS. 6–9, thus requiring no posts. Similarly, the various posts, slotted holes, hinges, anchor pads and fittings disclosed herein, as well as other known equivalents for each such feature, can be mixed and matched by one of ordinary skill in this art to construct anchoring systems in accordance with principles of the present invention.

Although not illustrated, each of the illustrated retainers can be adapted for use in an anchoring system which includes a safety loop. An anchor pad larger than the pad 16 illustrated in FIG. 1 can mount both a retainer, in accordance with one of the preferred embodiments, and a separate tube clip. The medical line mounted by the retainer can also be secured less tightly to the tube clip, with an adequate amount of slack in the line between the retainer and the clip. The clip and the resultant slack are desirably located between the retainer and the catheter insertion site, for example.

If movement by the patient causes a sudden pull upon catheter, the catheter slips within the tube clip and the slack length or "safety loop" of the tube is pulled through the clip. Friction between the clip and the sliding tube absorbs some of the force and some of the force causes a slight pull on the adhesive pad, functioning as a warning to the patient to cease the undesirable movement.

Similarly, the retainer itself can be arranged to only slightly inhibit longitudinal movement of a catheter, such as to allow some amount of slip in response to large forces. For example, the fitting of FIGS. 1–3 can comprise a soft wing clamp without the box clamp. In any of these arrangements, a jerk upon the medical line can be largely absorbed by allowing some slip, without either disconnecting the line from the fitting or painfully pulling the anchor pad from the patient's skin.

Using a retainer in accordance with the above disclosure, no painful, invasive or time-consuming sutures or other extensive procedures involving medical sharps (e.g., suture needles) are necessary to anchor an elongate medical article to a patient's skin. In addition, the flexible anchor pad absorbs much of the force incurred in the installation or removal of the retainer and the medical device, thereby providing greater comfort for the patient.

As common to each of the above-described retainers and anchoring systems, the present invention provides a sterile,

US 6,213,979 B1

21

tight-gripping, needle-free way to anchor medical articles to a patient. The retainers thus eliminate accidental needle sticks, suture wound site infections and scarring because sutures are not required. In addition, the retainers can be used with any of a wide variety of catheters, tubes, wires, and other medical articles to provide universal securement using one style of retainer. Also, patient comfort is enhanced and application time is decreased with the use of the present retainer.

The releasable engagement of the cover and the base allow the same retainer to be used more than once on the same patient at the application location. That is, a first medical device can be mounted in the retainer. When the function of the first medical device is accomplished, the retainer can be unlatched, the first device removed, and a second medical device can be retained in the same retainer. Furthermore, the leash or hinge connecting the cover to the base ensures that the cover will not be lost or misplaced during a catheter change. The health care provider wastes no time in searching for a cover, nor in orienting the cover prior to latching.

Although this invention has been described in terms of certain preferred embodiments and suggested possible modifications thereto, other embodiments and modifications apparent to those of ordinary skill in the art are also within the scope of this invention. Accordingly, the scope of the invention is intended to be defined only by the claims which follow.

What is claimed is:

1. An anchoring system for securing a medical line to the body of a patient, comprising a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line, a cover permanently coupled to the base, the cover being movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, a latching mechanism operating between the base and the cover to releasably latch the cover to the base with the cover in the closed position, and interacting structure which is adapted to engage the medical line in a non-occlusive manner and to limit longitudinal movement of the medical line through the retainer when the medical line is placed within the receiving area, the interacting structure being located at least partially beneath the cover with the cover in the closed position.

2. The anchoring system of claim 1, wherein the cover is coupled to the base by a flexible hinge.

3. The anchoring system of claim 2, wherein the flexible hinge comprises an elongate leash extending between and permanently connected to the cover and the base.

4. The anchoring system of claim 2, wherein the flexible hinge comprises a rigid support arm fixed to the base and a flexible bridge extending between the support arm and the cover.

5. The anchoring system of claim 2, wherein the base, cover and hinge are integrally formed.

6. The anchoring system of claim 1, wherein the latching mechanism comprises barb member and a latch having a receptacle that releasably receives the barb member.

7. The anchoring system of claim 6, wherein said barb member comprises a shank and a barbed end, and said latch includes at least one tang that projects into the receptacle and cooperates with the barbed end to inhibit unintentional retraction of the barb member from the receptacle.

8. The anchoring system as in claim 7, wherein said tang is formed as a flexible stem.

9. The anchoring system of claim 1, wherein the latching mechanism comprises at least one post extending between

22

the base and the cover and at least one opening sized to receive a portion of the post with the cover in the closed position, and the post includes at least one radial extension.

10. The anchoring system of claim 9, wherein the opening comprises a central hole with a more narrow slot extending from the central hole.

11. The anchoring system of claim 9, wherein the opening comprises a slot extending into either the base or the cover from a respective edge.

12. The anchoring system of claim 9, additionally comprising a keeper mechanism operating between the post and the opening to inhibit movement of the post within the opening with the cover in the closed position.

13. The anchoring system of claim 9, wherein the post extends from the base and the opening is formed in the cover.

14. The anchoring system of claim 13, wherein post comprises a shaft and the radial extension comprises a flared head atop the shaft, the flared head engaging with a cover surface in the closed position.

15. The anchoring system of claim 14 additionally comprising a locator extending radially from the post and spaced along the post from the flared head.

16. The anchoring system of claim 14, wherein the cover comprises a keeper mechanism operating between the post and the cover to inhibit unintentional disengagement of the post from the opening.

17. The anchoring system of claim 16, wherein the keeper mechanism comprises a narrowing waist at a juncture between a slot and a remaining portion of the opening.

18. The anchoring system of claim 16, wherein the keeper mechanism comprises a lip forming a depression within the cover surface and next to a portion of the opening, the depression having a dimension slightly more narrow than the flared head.

19. The anchoring system of claim 1 additionally comprising a fitting adapted to attach to the medical line, and the interacting structure being formed between the fitting and the retainer.

20. The anchoring system of claim 19, wherein the fitting comprises a rigid box clamp engaged with a wing clamp, and the interacting structure comprises at least one hole that extends through corresponding wings of the box clamp and the wing clamp.

21. The anchoring system of claim 19, wherein the fitting comprises an adaptor including an adaptor body, a first connector at a distal end for connection to a first medical line, and a second connector at a proximal end for connection to a second medical line.

22. The anchoring system of claim 21, wherein the interacting structure comprises a channel formed on the retainer and arranged to lie between the base and the cover with the cover in the closed position, the channel being configured to receive a portion of this adapter.

23. The anchoring system of claim 22, wherein the channel has a shape that generally corresponds to the shape of the portion of the fitting to be received.

24. The anchoring system of claim 19, wherein the interacting structure comprises at least one post extending at least partially between the cover and the base with the cover in the closed position.

25. The anchoring system of claim 23, wherein the post is integrally formed with the base.

26. The anchoring system of claim 23, wherein the latching mechanism comprises the post and at least one opening sized to receive at least a portion of the post with the cover in the closed position, and the post includes at least one radial extension.

US 6,213,979 B1

23

27. The anchoring system of claim 26, wherein the post comprises a shaft, and the radial extension comprises a flared head atop the shaft.

28. The anchoring system of claim 27 additionally comprising a locator ring defining the maximum radial dimension of the post, and the fitting comprises a hole that is larger than the locator ring.

29. The anchoring system of claim 1, wherein at least a portion of the latching mechanism is integrated with the interacting structure.

30. The anchoring system of claim 29, wherein the latching mechanism comprises a post shank supporting a projection that extends in a direction radial to an axis of the post shank, and the post shank is arranged to form at least a portion of the interacting structure.

31. The anchoring system of claim 1 additionally comprising an adhesive layer coupled to the retainer and adapted to adhesively secure the retainer to the body of a patient.

32. The anchoring system of claim 31 additionally comprising a flexible anchor pad interposed between the retainer and the adhesive layer.

33. The anchoring system of claim 32, wherein the base of the retainer is bonded to the adhesive pad.

34. An anchoring system for securing a medical line to the body of a patient, said anchoring system comprising a fitting adapted to engage with the medical line, the fitting having at least one hole, and a retainer releasably receiving the fitting and comprising a base having a platform and at least one post extending from the platform and arranged to interact with the hole of the fitting, a cover movably coupled to the base so as to be moved between an open position and a closed position, and a latching mechanism operating between the cover and the base to releasably latch the cover to the base in the closed position.

35. The anchoring system of claim 34, wherein the fitting includes a plurality of holes and the base includes a plurality of posts.

36. The anchoring system as in claim 34, wherein the latching mechanism is formed at least between the post and a hole on the retainer.

37. The anchoring system of claim 36, wherein the hole is formed on the cover and includes a central aperture and a slot, the aperture being sized and shaped to receive the protrusion of the post, and the slot extending from the central aperture.

38. The anchoring system of claim 36, wherein the hole is formed on the cover and includes an edge hole at an edge of the cover and a slot extending into the cover from the edge hole.

39. The anchoring system of claim 36, wherein each hole further comprises a retention mechanism to inhibit movement of the post through the hole.

40. The anchoring system of claim 36, wherein the post includes a radial protrusion.

41. An anchoring system for securing a medical line to the body of a patient, comprising:

an adaptor having an adaptor body with a longitudinal axis defined between first and second ends, a first connector at the first end for connection to a first medical line, and a second connector at the second end for connection to a second medical line;

a retainer attachable to the adaptor, including a base, a cover permanently coupled to the base, the cover movable between an open position and a closed position, a latching mechanism for releasably latching the cover to the base in the closed position, and a channel arranged to lie between the base and the cover

24

in the closed position, the channel shaped to retain the adaptor between the cover and the base with the cover in the closed position to inhibit movement of the adapter in a direction generally parallel to the adapter's longitudinal axis; and

an adhesive layer attached to the retainer and adapted to adhesively secure the retainer to the body of a patient.

42. The anchor system of claim 41, wherein the latching mechanism comprises a plurality of posts extending from the base and a corresponding plurality of openings in the cover.

43. The anchor system of claim 41, wherein the channel is defined by opposed inner faces of a pair of extensions positioned between the base and the cover with the cover in the closed position.

44. The anchor system of claim 43, wherein the extensions extend from the cover.

45. The anchor system of claim 43, wherein the inner faces are each convex.

46. The anchoring system of claim 41, wherein the cover is permanently attached to the base.

47. The anchoring system of claim 46, wherein a flexible leash couples the cover to the base.

48. The anchoring system of claim 46, wherein a flexible hinge couples the cover to the base, and the flexible hinge comprises a rigid support area fixed to the base and a flexible bridge that extends between the support arm and the cover.

49. An anchoring system for securing a medical line to the body of a patient, comprising a retainer, the retainer including a base that defines a receiving area for receiving a portion of the medical line and a cover coupled to the base, means for releasably latching the cover to the base, and means for limiting longitudinal movement of the medical line relative to the retainer, said movement limiting means located at least partially beneath the cover when the cover is latched to the base.

50. An anchoring system as in claim 49 additionally comprising an flexible anchor pad having an adhesive layer on one side, and the retainer is attached to the flexible anchor pad on an opposite side.

51. An anchoring system as in claim 49, wherein the retainer comprises a movable clamp.

52. An anchoring system as in claim 49, wherein the retainer comprises an in-line adapter.

53. An anchoring system as in claim 49, wherein the cover is permanently linked to the base.

54. An anchoring system as in claim 53, wherein the cover and the base are integrally formed such that the retainer has a unitary construction.

55. The anchoring system of claim 1, wherein the cover is smaller than the base.

56. The anchoring system of claim 1, wherein the interacting structure is a pair of posts arranged on the base.

57. The anchoring system of claim 56, wherein the cover has length in a lateral direction sufficient to extend between the pair of posts arranged on the base.

58. The anchoring system of claim 1, wherein the cover has width in a longitudinal direction that is wider than a width of a post formed on the base.

59. The anchoring system of claim 58, wherein the cover has a width sufficient to stabilize a section of the medical line located within the retainer.

60. The anchoring system of claim 41, wherein the cover is permanently coupled to the base.

61. The anchoring system of claim 41, additionally comprising an adhesive layer coupled to the retainer and adapted to adhesively secure the retainer to the body of a patient.

US 6,213,979 B1

25

**62**. The anchoring system of claim **61**, additionally comprising a flexible anchor pad interposed between the anchor pad and the adhesive layer.

**63**. The anchoring system of claim **61**, wherein the base of the retainer is bonded to the adhesive pad.

**64**. An anchoring system for securing a fitting, having at least one opening, on a medical line to a body of a patient, the anchoring system comprising a base having a platform and at least one post extending from the platform and arranged to interact with the opening of the fitting, a cover movably coupled to the base so as to be moved between an open position and a closed position, and a latching mechanism operating between the cover and the base to releasably latch the cover to the base in the closed position, the post being disposed at least partially beneath the cover with the cover in the closed position.

**65**. The anchoring system of claim **64**, wherein the cover is coupled to the base by a flexible hinge.

**66**. The anchoring system of claim **65**, wherein the flexible hinge comprises an elongate leash extending between and permanently connected to the cover and the base.

**67**. The anchoring system of claim **65**, wherein the flexible hinge comprises a rigid support arm fixed to the base and a flexible bridge extending between the support arm and the cover.

26

**68**. The anchoring system of claim **65**, wherein the base, cover and hinge are integrally formed.

**69**. The anchoring system of claim **64**, wherein the latching mechanism comprises a barb member and a latch having a receptacle that releasably receives the barb member.

**70**. The anchoring system of claim **69**, wherein said barb member comprises a shank and a barbed end, and said latch includes at least one tang that projects into the receptacle and cooperates with the barbed end to inhibit unintentional retraction of the barb member from the receptacle.

**71**. The anchoring system as in claim **70**, wherein said tang is formed as a flexible stem.

**72**. The anchoring system of claim **64** additionally comprising an adhesive layer coupled to the base and adapted to adhesively secure the base to the body of a patient.

**73**. The anchoring system of claim **72** additionally comprising a flexible anchor pad interposed between the base and the adhesive layer.

**74**. The anchoring system of claim **73**, wherein the base is bonded to the adhesive pad.

*    *    *    *    *

# Exhibit L

VINTL.26FCPD1CC                                                                                    PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant | : | Steven F. Bierman |
| Appl. No. | : | 11/204,586 |
| Filed | : | August 16, 2005 |
| For | : | MEDICAL LINE ANCHORING SYSTEM |
| Examiner | : | Manuel A. Mendez |
| Group Art Unit | : | 3763 |

### SUPPLEMENTAL AMENDMENT AND RESPONSE

MAIL STOP AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450


Dear Sir:

Further to the Response filed on November 21, 2006, please enter the following amendments and consider the following remarks in connection with the above-captioned application. Changes to the pending claims have been identified with underlining to indicate insertions and by strikethrough to indicate deletions.

**Amendments** to the claims begin on page 2 of this paper.

**Remarks** begin on page 7 of this paper.

Appl. No.           :       11/204,586
Filed               :       August 16, 2005

## AMENDMENTS TO THE CLAIMS

**Please amend Claims 1, 2, 9, 12, 23, 25, and 26 as follows:**

**Please add new Claims 28 through 34 as follows.**

1.    **(Currently Amended)** An anchoring system for securing a medical line to the body of a patient, <u>the medical line including a fitting,</u> the system comprising:

~~a fitting on a medical line, the fitting having at least one hole; and~~

a retainer including a base that defines a receiving area for receiving a portion of the fitting <u>of the medical line,</u> a cover ~~permanently~~ coupled to the base, the cover being movable between a closed position, in which at least a portion of the cover extends over at least a portion of the receiving area, and an open position, in which the receiving area is at least partially open, a coupling ~~mechanism~~ operating between the base and the cover to ~~releasable~~ <u>releasably</u> connect a portion of the cover to the base with the cover in the closed position, and interacting structure which is adapted to engage <u>at least a portion of</u> the fitting and to ~~limit~~ <u>inhibit</u> longitudinal movement of the fitting through the retainer when the fitting is placed within the receiving area, the interacting structure being located at least partially beneath the cover with the cover in the closed position.

2.    **(Currently Amended)** The anchoring system of claim 1, wherein the fitting comprises a wing clamp and a rigid box clamp engaged with the wing clamp, and ~~the~~ at least one hole extends through corresponding wings of the box clamp and the wing clamp.

3.    **(Original)** The anchoring system of claim 2, wherein a first portion of the at least one hole in the wing of the rigid box clamp is greater in size than a second portion of the at least hole in the corresponding wing of the wing clamp.

4.    **(Original)** The anchoring system of claim 2, wherein the rigid box clamp includes an elongated body having a longitudinal groove sized to receive the wing clamp, and wherein the wing clamp includes an elongated body defining an inner cavity sized to surround the medical line in a frictional manner.

5.    **(Original)** The anchoring system of claim 1, wherein the fitting comprises a rigid clamp having a longitudinal groove sized to receive the medical line.

6.    **(Original)** The anchoring system of claim 1, wherein the cover is smaller than the base.

Appl. No.           :       11/204,586
Filed               :       August 16, 2005

7.      (**Original**) The anchoring system of claim 1, wherein the cover has a width sufficient to stabilize a section of the fitting located within the retainer.

8.      (**Original**) The anchoring system of claim 1, wherein the interacting structure comprises at least one post extending at least partially between the cover and the base with the cover in the closed position.

9.      (**Currently Amended**) The anchoring system of claim 1, wherein the interacting structure comprises at least one post disposed on the base and configured to extend into ~~the~~ at least one hole of the fitting.

10.     (**Original**) The anchoring system of claim 9, wherein the post comprises a shaft and a radial extension, the shaft engaging with the fitting and the radial extension engaging with a cover surface with the cover in the closed position.

11.     (**Original**) The anchoring system of claim 9, wherein the cover has width in a longitudinal direction that is wider than a width of the at least one post.

12.     (**Currently Amended**) The anchoring system of claim 9, wherein the coupling ~~mechanism~~ comprises the at least one post and at least one opening sized to receive at least a portion of the post with the cover in the closed position.

13.     (**Original**) The anchoring system of claim 1, wherein the interacting structure includes at least two posts disposed on the base.

14.     (**Original**) The anchoring system of claim 13, wherein the cover has length in a lateral direction sufficient to extend at least between the posts.

15.     (**Original**) The anchoring system of claim 1 additionally comprising an adhesive layer coupled to the retainer and adapted to adhesively secure the retainer to the body of a patient.

16.     (**Original**) The anchoring system of claim 15 additionally comprising a flexible anchor pad interposed between the retainer and the adhesive layer.

17.     (**Original**) An anchoring system for securing a medical line to the body of a patient, said anchoring system comprising a fitting on a medical line, the fitting having at least one hole, and a retainer being configured to receive at least a portion of the fitting and comprising a base and at least one post extending from the base and arranged to interact with the hole of the fitting, a cover movably coupled to the base so as to be moved between an open position and a closed position, and a latching mechanism operating between the cover and the base to releasably latch the cover to the base in the closed position.

Appl. No.            :        11/204,586
Filed                :        August 16, 2005

18.    (**Original**) The anchoring system of claim 17, wherein the fitting includes a plurality of holes and the base includes a plurality of posts.

19.    (**Original**) The anchoring system of claim 17, wherein the latching mechanism comprises the at least one post and at least one opening sized to receive at least a portion of the post with the cover in the closed position.

20.    (**Original**) The anchoring system of claim 19, wherein the at least one opening is formed on the cover and includes a central aperture and a slot, the aperture being sized and shaped to receive the at least one post, and the slot extending from the central aperture.

21.    (**Original**) The anchoring system of claim 19, wherein the at least one opening is formed on the cover and aligns generally with the at least hole in the fitting, the cover and the fitting each receiving at least a portion of the at least one post when the cover is in the closed position.

22.    (**Original**) The anchoring system of claim 19, wherein the fitting comprises a rigid box clamp engaged with a wing clamp, and the at least one hole extends through corresponding wings of the box clamp and the wing clamp.

23.    (**Currently Amended**) An anchoring system for securing a medical line to the body of a patient, comprising:

an adaptor having an adaptor body with a longitudinal axis defined between first and second ends, a first connector at the first end for connection to a first medical line, and a second connector at the second end for connection to a second medical line; and

a retainer attachable to the adaptor, including a base, a cover ~~permanently~~ coupled to the base, the cover movable between an open position and a closed position, a coupling ~~mechanism~~ for releasably connecting a portion of the cover to the base in the closed position, and a receiving space ~~channel~~ arranged to lie between the base and the cover in the closed position, the receiving space ~~channel~~ shaped to retain the adaptor between the cover and the base with the cover in the closed position to inhibit movement of the adapter in a direction generally parallel to the longitudinal axis of the adaptor.

24.    (**Original**) The anchor system of claim 23, further comprising an adhesive layer attached to the retainer and adapted to adhesively secure the retainer to the body of a patient.

Appl. No.              :         11/204,586
Filed                  :         August 16, 2005

25.    (**Currently Amended**) The anchor system of claim 23, wherein the coupling ~~mechanism~~ comprises a plurality of posts extending from the base and a corresponding plurality of openings in the cover.

26.    (**Currently Amended**) The anchor system of claim 23, wherein the <u>receiving space</u> ~~channel~~ is defined by opposed inner faces of a pair of extensions positioned between the base and the cover with the cover in the closed position.

27.    (**Original**) The anchoring system of claim 23, wherein the first medical line is a catheter and the second medical line is a medical tube.

28.    (**New**) An anchoring system for securing a medical line to the body of a patient, the system comprising:

a fitting on a medical line, the fitting having a pair of wings; and

a retainer including a base that defines a receiving area for receiving a portion of the fitting, a cover, and first and second pairs of posts, the cover being movable between a closed position in which at least a portion of the cover extends over at least a portion of the receiving area and an open position in which the receiving area is at least partially open, the first and second pairs of posts extending between the base and the cover at least when the cover is in the closed position, at least two of the posts of the first and second pairs of posts being disposed on the receiving area and spaced apart so as to receive at least a portion of one of the wings there between, and at least two other posts of the first and second pairs of posts being disposed on the receiving area and spaced apart so as to receive at least a portion of the other one of the wings there between, at least a portion of each of the first and second pairs of posts being located at least partially beneath the cover when the cover is in the closed position.

29.    (**New**) An anchoring system according to Claim 28, wherein the first and second pairs of posts are arranged at the corners of a rectangle.

30.    (**New**) An anchoring system according to Claim 28, wherein the first and second pairs of posts extend in an upward direction from the base.

31.    (**New**) An anchoring system for securing a medical article to the body of a patient, the medical article having an irregularly shaped fitting, the anchoring system comprising:

an anchor pad having an upper surface and a lower surface; and

a retainer comprising,

Appl. No.          :          11/204,586
Filed              :          August 16, 2005

a base being coupled to the anchor pad;

a plurality of walls extending generally perpendicular to the base and being arranged relative to each other so as to receive between at least portion of the walls the irregularly shaped fitting of the medical article; and

a cover movable coupled to the base so as to move between a first position and a second position, the cover lying above at least part of the base when in the first position.

32.      (**New**) An anchoring system according to Claim 31, wherein the cover is coupled to the base by a flexible coupling.

33.      (**New**) An anchoring system according to Claim 31 further comprising at least one post arranged between the base and the cover when the cover is in the first position, wherein the post extends generally upward from the base.

34.      (**New**) An anchoring system according to Claim 33, wherein the cover includes a receptacle for receiving at least a portion of the post when the cover is in the first position.

Appl. No.          :          11/204,586
Filed              :          August 16, 2005

## REMARKS

Claims 1-27 were rejected under the judicially created doctrine of obviousness type double patenting. Applicant had responded to the double patenting rejection in the Response filed by Applicant on November 21, 2006. Upon further reflection and by this paper, Applicant is now adding new Claims 28-34 to present claims of differing scope. Thus, Claims 1-34 are pending in the application and are presented for reconsideration and further examination in view of the amendments and the following remarks. Applicant respectfully requests examination of new Claims 28 through 34.

## Obviousness Type Double Patenting Rejection

Claims 1-27 were rejected under the judicially created doctrine of obviousness type double patenting as being unpatentable over Claims 1-74 of U.S. Patent No. 6,213,979. To further distinguish the subject matter claimed in the two cases, the Applicant has further amended the claims as recited above. Applicant previously submitted a Terminal Disclaimer in compliance with 37 C.F.R. § 1.321(c) on August 16, 2005 at the time the patent application was filed. Applicant had included a courtesy copy of the filed Terminal Disclaimer with the Response filed by Applicant on November 21, 2006. Applicant respectfully submits that the filed Terminal Disclaimer overcome the obviousness type double patenting rejection. Thus, allowance of Claims 1-27 is respectfully requested.

## New Claims 28 through 34

New independent Claims 28 and 31 have been added to present claims of differing scope. Claim 28 recites several limitations that are also found in allowed independent Claim 1, *inter alia*, "a fitting," a "retainer including a base that defines a receiving area," and "a cover." Claim 28 further recites "first and second pairs of posts." Allowed Claim 8, which depends from Claim 1, recites a post limitation. Applicant respectfully submits that the applied prior art fails to disclose at least the recited structure.

New independent Claim 31 recites, *inter alia*, "an anchor pad" and a "retainer." Claim 31 further recites that the retainer comprises "a base," "a plurality of walls extending generally perpendicular to the base and being arranged relative to each other so as to receive between at

-7-

Appl. No.          :          11/204,586
Filed                :          August 16, 2005

least portion of the walls the irregularly shaped fitting of the medical article," and "a cover" "lying above at least part of the base when in the first position." The anchor pad limitation is also recited in allowed dependent Claim 16. Applicant respectfully submits that the applied prior art fails to disclose at least the recited structure. Consideration and allowance of new independent Claims 28 and 31 are respectfully requested.

Applicant respectfully submits that new dependent Claims 29-30 and 32-34, which depend from independent Claims 28 and 31, are allowable over the applied prior art for at least the reasons stated above in connection with the respective independent claim.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the rejection set forth in the outstanding Office Action is inapplicable to the present claims. Accordingly, early issuance of a Notice of Allowance is most earnestly solicited.

Any remarks in support of patentability of one claim should not be imputed to any other claim, even if similar terminology is used. Additionally, any remarks referring to only a portion of a claim should not be understood to base patentability on solely that portion; rather, patentability must rest on each claim taken as a whole.

The undersigned has made a good faith effort to respond to all of the noted rejections and to place the claims in condition for immediate allowance. Nevertheless, if any undeveloped issues remain of if an issue requires clarification, the Examiner is respectfully requested to call Applicant's attorney in order to resolve any such issue promptly.

Appl. No.        :   **11/204,586**
Filed            :   **August 16, 2005**

Please charge any additional fees, including any fees for additional extension of time, or credit overpayment to Deposit Account No. 11-1410.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: _____1/3/07_____        By: _____

James F. Herkenhoff
Registration No. 51,241
Attorney of Record
Customer No. 20,995
(619) 235-8550

3184452