## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VENETEC INTERNATIONAL, INC.  )
)
           Plaintiff,  )
)
      v.  )
)
           )  Case No.: 07-CV-0057 ***
NEXUS MEDICAL, LLC  )
)
           Defendant.  )
)
_____ )

## DECLARATION OF SCOTT R. BROWN IN SUPPORT OF NEXUS MEDICAL, LLC'S REPLY TO VENETEC INTERNATIONAL, INC.'S OPPOSITION TO NEXUS MEDICAL, LLC'S MOTION TO CLARIFY OR AMEND THE STIPULATED PROTECTIVE ORDER

I, Scott R. Brown, declare:

1.     I am a member in good standing of the bar of the state of Missouri and am a partner in the law firm of Hovey Williams LLP, responsible for representation of Nexus Medical, LLC ("Nexus") in this matter. I have personal knowledge of the statements made herein.

2.     This Declaration accompanies Nexus Medical, LLC's Reply to Venetec International, Inc.'s Opposition to Nexus Medical's Motion to Clarify or Amend the Stipulated Protective Order.

3.     Nexus's Litigation Counsel ceased continuing preparation of the Request for Reexamination of the '979 Patent upon receipt of Venetec International, Inc.'s July 9, 2007, letter and has not performed any work on the Request for Reexamination since then.

4.     Attached hereto as Exhibit A is a copy of *Commissariat a L'Energie Atomique v. Dell Computer Corp., et al.*, No. Civ.A. 03-484-KAJ, 2004 WL 1196965 (D. Del. May 25, 2004).

5.    Attached hereto as Exhibit B is a copy of *Interactive Coupon Mktg. Group, Inc. v. H.O.T! Coupons, LLC*, No. 98 C 7408, 1999 WL 618969 (N.D. Ill. Aug. 9, 1999).

6.    Attached hereto as Exhibit C is a copy of *Grayzel v. St. Jude Medical, Inc.*, 162 Fed. App. 954 (Fed. Cir. 2005).

7.    Attached hereto as Exhibit D is a copy of *MercExchange LLC v. eBay, Inc.*, 467 F. Supp. 2d 608 (E.D. Va. 2006).

8.    Attached hereto as Exhibit E is a copy of *EEOC v. Hora, Inc.*, No. 05-5393, 2007 WL 1875834 (3rd Cir. June 29, 2007).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:  August 17, 2007

Scott R. Brown

# Exhibit A

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1196965 (D.Del.)

(Cite as: Not Reported in F.Supp.2d)

**H**
Commissariat A L'Energie v. Dell Computer Corp.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
DELL COMPUTER CORPORATION; Samsung
Electronics Co., Ltd.; Samsung Electronics America,
Inc.; Samsung Electronics Canada, Inc.; Samsung
International, Inc.; Sun Microsystems, Inc.; and
Viewsonic Corporation, Defendants.
No. Civ.A. 03-484-KAJ.

May 25, 2004.

Richard D. Kirk, Morris, James, Hitchens &
Williams, Wilmington, DE, for Plaintiff and Counter-
Defendant.
William J. Marsden, Jr., Fish & Richardson, P.C.,
Wilmington, DE, for Defendants.
Richard L. Horwitz, Potter Anderson & Corroon,
LLP, Wilmington, DE, for Defendants and Counter-
Claimant.

*MEMORANDUM ORDER*
JORDAN, J.
**\*1** This is a patent infringement case. Jurisdiction is
proper under 28 U.S.C. § 1331. Presently before me
is a Motion for Expedited Entry of Protective Order
filed, on April 13, 2004, by plaintiff Commissariat à
L'Énergie Atomique (" CEA" ). (Docket Item [" D.I."
] 172; the " Motion" .) For the reasons that follow,
CEA's Motion will be denied.

CEA alleges that Defendants [FN1] are infringing its
U.S. Patent No. 4,701,028 (issued October 20, 1987)
(" the '028 patent" ) and U.S. Patent No. 4,889,412
(issued December 26, 1989) (" the '412 patent" ),
both of which claim certain liquid crystal display ("
LCD" ) technology. (See D.I. 1.) CEA filed a motion
for a preliminary injunction against Samsung on
October 28, 2003 (D.I.58, 59) and, on March 3, 2004,
I granted CEA's request for limited expedited
discovery in connection with that motion (D.I.138).
Samsung provided some responsive information to
CEA's expedited discovery requests, and both sides
want some form of protective order in place to

protect confidential information, but CEA and the
Defendants have reached an impasse in their
negotiations over the scope of the protective order
that should be entered.[FN2] (See D.I. 173 at 1; D.I. 199
at 2.)

> FN1. On May 13, 2004, I issued a
> Memorandum Order granting in part and
> denying in part CEA's Motions to
> Consolidate this case with several others.
> (D.I.209.) Any reference herein to the "
> Defendants" means the module
> manufacturers against whom this action is
> now proceeding, namely, Samsung
> Electronics (" Samsung" ), Fujitsu Display
> Technologies Corporation (" Fujitsu" ), and
> Tottori Sanyo Electric Co., Ltd. (" Tottori
> Sanyo" ). (Id. at 8.) The Defendants have
> each submitted formal or letter briefing in
> response to CEA's Motion. (See D.I. 182,
> 183, 196, 198, 199.)

> FN2. The Defendants, recognizing that these
> protective order issues will impact them
> equally as this case moves forward, share a
> common position in response to CEA's
> proposed protective order. (See D.I. 182 at 1
> n. 2; D.I. 183; D.I. 196.)

The parties disagree over whether three of the
attorneys who are on CEA's trial team and also
prosecute patents for CEA-namely, Song Jung,
Rebecca Rudich, and Yonggyu Kim (collectively
referred to as " CEA's patent prosecution attorneys"
)-should have access to discovery designated as "
highly confidential." (D.I. 173 at 1; D.I. 198 at 3;
D.I. 199 at 2.) CEA argues that Mr. Jung, CEA's lead
attorney in this case, and his colleagues, Ms. Rudich
and Mr. Kim, need access to all discovery in order to
continue to represent CEA effectively.[FN3] (D.I. 173 at
2, 12.) The Defendants are seeking entry of a
protective order that bars CEA's patent attorneys
from accessing the Defendants' highly confidential
information. (D.I. 199 at 9-10.) The Defendants argue
that giving CEA's patent prosecution attorneys access
creates an unacceptable risk of inadvertent disclosure
or misuse of their highly confidential research,
technical, and proprietary information, especially
since Mr. Jung and his colleagues prosecute patents
for LG.Philips LCD Co., Ltd. (" LG.Philips" ), one of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1196965 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

the Defendants' major competitors. (D.I. 198 at 4; D.I. 199 at 3.) CEA responds that, just because their patent prosecution attorneys render legal advice with respect to patent prosecution, does not necessarily mean that they are involved in competitive decision making and thus warrant denying them access to highly confidential information. (D.I. 203 at 1.) The Defendants say, in the alternative, that if the patent prosecution attorneys are given access to confidential information, they should be barred from prosecuting patents in the LCD field for a minimum of one year. (D.I. 198 at 3; D.I. 199 at 21.) CEA asserts that any restriction on those attorneys' patent prosecution should be more narrow, and, specifically, " should be limited to the VA-mode birefringence compensation technology at issue or, at most, VA-mode LCD technology generally." (*Id.* at 1-2.)

> FN3. CEA also argues that it need not identify its non-testifying experts and consultants who may have access to confidential information prior to the end of this case. (D.I. 173 at 3.) I heard argument from CEA and the Defendants on this point during an April 21, 2004 teleconference, and ruled that, if CEA wanted to show " confidential and what's asserted to be highly sensitive information" to non-testifying experts and consultants, CEA had to " tell [the Defendants] who they are before ... divulg[ing] it." (D.I. 197 at 16:5-11.)

\*2 <u>Federal Rule of Civil Procedure 26(c)</u> provides that, " for good cause shown, ... the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way...." <u>Fed.R.Civ.P. 26(c)(7) (2004)</u>. This court has routinely recognized the importance of protecting technical information, particularly in patent cases. *See Motorola, Inc. v. Interdigital Tech. Corp.,* 1994 U.S. Dist. LEXIS 20714 at \*6 (D.Del. Dec. 19, 1994) (" In a patent case, maintaining the integrity of the protective order is an especially serious concern." ); <u>*Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.,* 682 F.Supp. 20, 22 (D.Del.1988)</u> (" Courts dress technical information with a heavy cloak of judicial protection because of the threat of serious economic injury to the discloser of scientific information." ). Access to confidential information "

should be denied or granted on the basis of each individual counsel's actual activity and relationship with the party represented...." <u>*U.S. Steel Corp. v. U.S.,* 730 F.2d 1465, 1469 (Fed.Cir.1984)</u>. " The critical inquiry is whether the attorney in question is in a position that creates a high risk of inadvertent disclosure" of highly confidential information. *Motorola,* 1994 U.S. Dist. LEXIS 20714 at \*10.

I think it is appropriate to deny CEA's patent prosecution attorneys access to the Defendants' highly confidential information or, if they are permitted to have access to such information, to prevent them from prosecuting patents in the field of LCD technology for one year after the conclusion of this litigation, including appeals. Central to my determination is the Defendants' assertion, unrebutted by CEA, that CEA's patent prosecution attorneys-and Mr. Jung, in particular-prosecute patents in the field of LCD technology for LG.Philips, one of the Defendants' major competitors. (D.I. 198 at 3; D.I. 199 at 4.) I disagree with CEA's assertion that those attorneys' activities do not rise to the level of " competitive decision making" that is necessary to restrict their access to highly confidential information. (D.I. 173 at 2 (citing <u>*U.S. Steel,* 730 F.2d at 1468</u>).) Prosecuting patent applications " involves decisions of scope and emphasis" that implicate competitive decision making, as claims may be drafted to " read on new products and new directions where [a party] project[s] sales to be most critical." *Motorola,* 1994 U.S. Dist. LEXIS 20714 at \*11. In this case, as in *Motorola,* " [t]here can be no question" that CEA attorneys who receive highly confidential information and then later prosecute patents in the field of LCD technology " will have to distill and compartmentalize the confidential knowledge they have gained." 1994 U.S. Dist. LEXIS 20714 at \*12. This creates a high risk of inadvertent disclosure of the Defendants' highly confidential information. *See Motorola,* 1994 U.S. Dist. LEXIS 20714 at \*13. CEA's patent prosecution attorneys are currently prosecuting patent applications related to the subject matter of the patents-in-suit. (*See* D.I. 198, Ex. A (<u>U.S. Patent Application No. 10/437,982</u> entitled " Liquid Crystal Display Device With Wide Viewing Angle," listing Mr. Jung as the corresponding attorney).) Those CEA patent prosecution attorneys who, if given access, \*3 were to view [the Defendants'] voluminous confidential information and then later prosecute the patents would have to constantly challenge the origin of every idea, every spark of genius. This would be a

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 1196965 (D.Del.)

(Cite as: Not Reported in F.Supp.2d)

sisyphean task, for as soon as one idea would be stamped " untainted" , another would come to mind. The level of introspection that would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical the ... attorneys may be.

*Motorola,* 1994 U.S. Dist. LEXIS at *14-*15. In sum, I am persuaded that CEA's patent prosecution attorneys should not have unfettered access to the Defendants' highly confidential information. There is a substantial risk of inadvertent disclosure of such information, given that CEA's patent attorneys are prosecuting and will continue to prosecute patents in the field of LCD technology, including patents for the Defendants' competitors.

As previously noted, CEA argues that there are many different categories of LCD technology,[FN4] and that, because the subject matter of the patents-in-suit pertains to the field of VA-mode birefringence compensation, any restriction on its patent prosecution attorneys' prosecution activities should be limited to that narrow area. (D.I. 203 at 2.) However, I will not pick and choose which categories of LCD technology are fair game for CEA's patent prosecution attorneys and those which are not. If CEA's patent prosecution attorneys have access to the Defendant's highly confidential information, they will be barred from prosecuting patents " relating to the broad subject matter of the patents in suit," that is, LCD technology, for one year after the conclusion of this lawsuit, including all appeals.[FN5] *See Motorola,* 1994 U.S. Dist. LEXIS 20714 at *8-*9.

> FN4. *E.g.,* vertical alignment (" VA" ), in plane switching, twisted nematic, and ferroelectric liquid crystal LCD technologies.

> FN5. CEA also argues that it will be unduly prejudiced in prosecuting this case if its patent prosecution attorneys are not allowed access to the Defendants' highly confidential information. (D.I. 173 at 12-13.) While this is " a factor to be balanced against [the Defendants'] need to protect [their] confidential information ... it is just one factor." *Motorola,* 1994 U.S. Dist. LEXIS 20714 at *16. As the Defendants point out, CEA fails to explain why Mr. Jung cannot continue to direct this litigation without access to the Defendants' highly confidential information, or why the many other

attorneys on CEA's litigation team are incapable of handling this case as it moves forward. (D.I. 198 at 11.)

If CEA wants Mr. Jung, Ms. Rudich, and Mr. Kim to continue in their current roles as litigation counsel, and to have access to the Defendants' highly confidential information, then either these three individuals, who also prosecute patents in the field of LCD technology, must be barred from having access to the Defendants' highly confidential information, or they must be prohibited from prosecuting patents in the field of LCD technology for one year following the conclusion of this litigation, including all appeals. This, I think, strikes the proper balance between " the goals of full disclosure of relevant information and reasonable protection against economic injury" that are implicated in patent infringement cases generally, and certainly in this one. *Safe Flight,* 682 F.Supp. at 23.

For these reasons, I will adopt the Defendant's proposed section 4.1(a) of the draft Stipulated Protective Order submitted as Exhibit D to Docket Item 174.[FN6] The parties are ORDERED to submit a Stipulated Protective Order containing this language to the court within five days of the date of this Memorandum Order.

> FN6. This language provides, in relevant part, that " attorneys shall not be provided access to HIGHLY SENSITIVE CONFIDENTIAL information if such attorneys ... currently participate in, direct or supervise any patent prosecution activity involving (i) LCD technology or (ii) technology directed to increasing the wide-angle viewing of LCD products (collectively, " the Subject Matter" ). During the pendency of this litigation and for one year after the full and final conclusion of this litigation, including all appeals, those attorneys ... who are provided access to HIGHLY SENSITIVE CONFIDENTIAL materials covered by this order will not participate in, direct or supervise any patent prosecution activity ... involving the Subject Matter...." (D.I. 174, Ex. D at 5.) This provision gives CEA the option of deciding whether to give their patent prosecution attorneys access to the Defendants' highly confidential information, while also giving effect to the restrictions described herein, if

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 1196965 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

     CEA does decide to continue using their
patent prosecution attorneys as litigation
counsel in this case.

D.Del.,2004.
Commissariat A L'Energie v. Dell Computer Corp.
Not Reported in F.Supp.2d, 2004 WL 1196965
(D.Del.)

END OF DOCUMENT

# Exhibit B

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 1999 WL 618969 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

▷
Interactive Coupon Marketing Group, Inc. v. H.O.T.!
Coupons, LLC.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
INTERACTIVE COUPON MARKETING GROUP,
INC. d/b/a Coolsavings, Plaintiff,
v.
H.O.T! COUPONS, LLC., Defendant.
No. 98 C 7408.

Aug. 9, 1999.

*MEMORANDUM OPINION AND ORDER*
GOTTSCHALL, J.
**\*1** Plaintiff, Interactive Coupon Marketing Group,
Inc. (" Coolsavings" ) has filed a motion to
reconsider this court's Memorandum Opinion and
Order of June 7, 1999 (the " Opinion" ), which barred
plaintiff's attorneys who are engaged in patent
prosecution work from reviewing H.O.T. Coupons'
confidential information produced in the course of
this litigation. For the reasons stated below, plaintiff's
motion to reconsider is denied and its motion for
clarification is granted.

*BACKGROUND*

In the Opinion, the court set forth the factual scenario
which underlies this litigation. Briefly, Coolsavings
sues its competitor H.O.T. Coupons for patent
infringement. H.O.T. Coupons moved to disqualify
plaintiff's counsel because the firm acted as both trial
counsel and patent prosecution counsel for
Coolsavings and might be called as witnesses at trial.
In the Opinion, that motion was denied and it is not
challenged here. However, the court barred plaintiff's
patent prosecution counsel from reviewing any of
H.O.T. Coupons' confidential information.
Coolsavings seeks review of that portion of the
Opinion.

In the Opinion, the court relied on the declaration of
Coolsavings' president, Hillel Levin, in assessing the
extent of plaintiff's counsel's involvement in
Coolsavings' affairs. In his declaration, Levin
emphasized the critical role that the law firm Niro,

Scavone, Haller & Niro (" Niro Scavone" ) plays as
Coolsavings' counsel. Specifically he made the
following statements:
" Niro, Scavone, Haller & Niro is currently
responsible for maintaining all of Coolsavings'
intellectual property and has done so since almost the
inception of the company...." Decl. Hillel Levin
(April 30, 1999) (" Levin Decl. I" ), at ¶ 3.
Niro Scavone " has become intimately familiar with
Coolsavings' technology and business operations.
Also, counsel has become involved with various
licensing and litigation matters." *Id.* at ¶ 4.
Niro Scavone " know[s] our personnel, they reviewed
our documents, and participated in several high level
management     meetings     regarding     intellectual
property. This history uniquely qualifies Niro,
Scavone, Haller & Niro to represent Coolsavings in
litigation matters involving its '648 patent." *Id.* at ¶
5.

In Coolsavings' motion to reconsider, it submitted a
second declaration by Hillel Levin that presumably is
intended to paint a different picture of Niro Scavone's
role in Coolsavings' affairs. Levin explained that the
firm's representation was limited to legal advice
relating to intellectual property matters and stated
that the firm has no involvement in business
planning. Levin testified:
Niro Scavone " has become intimately familiar with
CoolSavings' technology and business operations, but
only in connection with its representation of
CoolSavings on intellectual property matters, such as
litigation, licensing and patent prosecution." Decl.
Hillel Levin (June 21, 1999) (" Levin Decl. II" ), at ¶
4.
**\*2** Niro Scavone " do[es] not act as CoolSavings' '
business advisors' or participate in CoolSavings' '
competitive business decisions.' Moreover, the Niro
Scavone law firm does not participate in decisions
about CoolSavings' pricing or design." *Id.* at ¶ 5.
" While CoolSavings' personnel have met with
attorneys at the Niro Scavone law firm, such
meetings have been limited to discussions about
CoolSavings' intellectual property, not general
business planning or strategizing meetings." *Id.* at ¶
6.
" No one at the Niro Scavone law firm is a member
of the CoolSavings' Board of Directors. To my
knowledge, no one at the Niro firm is related to
anyone at CoolSavings." *Id.* at ¶ 8.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 618969 (N.D.Ill.)

(Cite as: Not Reported in F.Supp.2d)

## DISCUSSION

The issue to be decided is whether plaintiff's patent prosecution counsel at Niro Scavone should be denied access to H.O.T. Coupons' confidential information. " In evaluating whether ... counsel should have access, a court should balance the risk of inadvertent disclosure of trade secrets to competitors against the risk of impairing the process of litigation by denying access." *Thomas & Betts Corp. v. Panduit Corp.*, No. 93 C 4017, 1997 WL 603880,[*]12 (N.D.Ill. Sep. 23, 1997) (*citing Brown Bag Software v. Symantec*, 960 F.2d 1465, 1470 (9th Cir.1992). A key factor in assessing the risk of inadvertent disclosure of trade secrets is whether counsel is engaged in competitive decisionmaking. *Brown Bag Software*, 960 F.2d at 1470. Involvement in competitive decisionmaking refers to counsel's actual " advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *United States Steel Corp. v. United States*, 730 F.2d 1465, 1468, n. 3 (Fed.Cir.1984)).

H.O.T. Coupons argues that it is not necessary to find that Niro Scavone was involved in Coolsavings' business affairs because the firm's involvement in patent prosecution is enough to find that it was engaged in competitive decisionmaking. For this proposition, H.O .T. Coupons relies on two district court decisions that denied access to outside patent counsel engaged in patent prosecution work because the nature of patent prosecution work constituted involvement in competitive decisionmaking. *See Mikohn Gaming Corp. v. Acres Gaming Inc.*, 50 U.S.P.Q.2d 1783 (D.Nev.1998); *Motorola, Inc. v. Interdigital Tech. Corp.*, 1994 U.S. Dist. LEXIS 20714 (D.Del.1994). In *Mikohn*, the plaintiff sought to deny outside defense counsel access to plaintiff's confidential technical information during the course of the patent infringement action. Defense counsel testified that his only association with the defendant was as its outside patent counsel, providing counseling and legal advice in the field of intellectual property. *Mikohn*, 50 U.S.P.Q.2d at 1784. He denied that he participated in marketing, product development, design, or pricing. *Id.* Although the court credited the attorney's statements, the court still denied access because the law firm was prosecuting patent applications directly related to the patents-in-suit. *Id.* at 1785. The court concluded that the advice

rendered by the firm was " intensely competitive." *Id.* The court also noted that the defendant had invested in the attorney's technical training and concluded that it " cannot be doubted that as patent prosecution counsel [the attorney] works very closely with and advises [defendant] on matters relating to product design." *Id.* at 1786. The court found that the risk of inadvertent disclosure outweighed the burden that the defendant would experience if the firm was denied access, particularly since the defendant had already retained additional outside counsel to litigate the action. *Id.*

*3 In *Motorola*, defendant's attorneys were involved in patent prosecution and trial work for the defendant. The court held that involvement in patent prosecution constituted involvement in competitive decisionmaking and/or scientific research and created a high risk of inadvertent disclosure. The court stated that, like activities that define the scope and emphasis of a client's research and development efforts, " [t]he process of prosecuting patent applications also involves decisions of scope and emphasis...." *Motorola, supra*, at [*]11. Further, the court concluded that the attorneys " who were to view Motorola's voluminous confidential information and then later prosecute the patents would have to constantly challenge the origin of every idea, every spark of genius. This would be a sisyphean task, for as soon as one idea would be stamped ' untainted' , another would come to mind. The level of introspection that would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical the ... attorneys may be." *Id.* at [*]14-15. Accordingly, the court denied access to the attorneys because they prosecuted patents.

The court is not persuaded that it is appropriate to disqualify patent prosecution counsel from an active role in its client's litigation as a matter of course. However, in the case at bar, the Niro Scavone firm has represented and is likely to represent Coolsavings in the prosecution of numerous related patents, and it appears that the firm is deeply involved in representing the client in multiple, related infringement cases in the context of a fluid, developing technology. The court needs to ask whether the firm's prosecution activities are likely to be shaped by confidential information about competitors' technology obtained through the discovery process. The concern is whether the firm's involvement in developing a patent prosecution strategy will be informed by such information to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 1999 WL 618969 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

competitors' detriment.

Coolsavings' submissions have not been helpful to the court. In his first declaration, Mr. Levin, in an obvious attempt to persuade the court that disqualification of the Niro Scavone firm would have a catastrophic impact on Coolsavings, suggested that the Niro Scavone firm was deeply involved in Coolsavings' business decisionmaking in the area of intellectual property; that is how the court interpreted his declaration, although with the wisdom of hindsight the declaration appears rather vague in spots. Then, in his second declaration, Mr. Levin attempts to persuade the court that the Niro Scavone firm is not involved in business decisions. This declaration, however, is even more vague than the first one and really says nothing. This court cannot make much sense of a statement like, " [T]he Niro Scavone law firm has become intimately familiar with CoolSavings' technology and business operations, but only in connection with its representation of CoolSavings on intellectual property matters...." In this court's view, competitive decisionmaking is not limited to decisionmaking about pricing and design but can extend to the manner in which patent applications are shaped and prosecuted. *See U.S. Steel,* 730 F.2d at 1468, n. 3 (Involvement in competitive decisionmaking refers to counsel's actual " advice and participation in *any or all of the client's decisions* (pricing, product design, etc.) *made in light of similar or corresponding information about a competitor."* ) (emphasis added). Levin's vague declaration does not provide a basis for reconsideration. Courts confronted with such vague statements have no choice but to assume disabling involvement. *See Carpenter Tech. Corp. v. Armco, Inc.,* 132 F.R.D. 24 (E.D.Penn.1990) (denying access to in-house attorney because his vague testimony that he had " no *direct* responsibility or authority over competitive decisions" led the court to assume that he had at least some involvement) (emphasis added).

**\*4** Coolsavings has attempted to walk a fine line, using careful wording to try to persuade the court first of Niro Scavone's central involvement with Coolsavings' activities and then of its peripheral status. It has been too shrewd for its own good, convincing the court of nothing other than that the concerns raised by H.O.T. Coupons have not been answered. Accordingly, the motion to reconsider is denied. The court's order of June 7, 1999 is, however, clarified as follows: all of plaintiff's attorneys who are privy to confidential information obtained from defendant in discovery shall not participate in the prosecution of any patent application for plaintiff relating to the subject matter of the patents in suit during the pendency of this case and for one year after the conclusion of this litigation, including appeals.

N.D.Ill.,1999.
Interactive Coupon Marketing Group, Inc. v. H.O.T.! Coupons, LLC.
Not Reported in F.Supp.2d, 1999 WL 618969 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

Westlaw.

162 Fed.Appx. 954                                                                                                  Page 1

162 Fed.Appx. 954, 2005 WL 3529007 (C.A.Fed.)

**(Cite as: 162 Fed.Appx. 954)**


**H**
Grayzel v. St. Jude Medical, Inc.
C.A.Fed.,2005.
This case was not selected for publication in the
Federal Reporter.NOTE: Pursuant to Fed.Cir.R. 47.6,
this order is not citable as precedent. It is public
record.Please use FIND to look at the applicable
circuit court rule before citing this opinion. Federal
Circuit Rule 47.6. (FIND CTAF Rule 47.6.)
United States Court of Appeals,Federal Circuit.
Joseph GRAYZEL, Plaintiff-Appellant,
v.
ST. JUDE MEDICAL, INC., St. Jude Medical, Daig
Division, Inc., and St. Jude Medical S.C., Inc.,
Defendants-Appellees.
No. 05-1126.

Dec. 23, 2005.

**Background:** Owner of patent for bevel-tipped
introduction-dilation catheter sued competitor for
infringement. Competitor counterclaimed for
invalidity. The United States District Court for the
District of New Jersey, Jose L. Linares, J., 345
F.Supp.2d 466, held patent invalid, and owner
appealed.

**Holdings:** The Court of Appeals, Michel, Chief
Judge, held that:

(1) patent was invalid as anticipated, and

(2) barring plaintiff from participating in
reexamination proceeding was not abuse of
discretion.


Affirmed.
West Headnotes
**[1] Patents 291 ☞101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(2) k. Construction in General.
Most Cited Cases
" Sheath," called for in patent for vascular
introduction-dilation catheter, was any tubular
member of any size that could be used for accessing
vascular system through skin and through which
other devices and elements could be passed.

**[2] Patents 291 ☞101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(2) k. Construction in General.
Most Cited Cases
Requirement, in patent for vascular introduction-
dilation catheter, that sheath be " flexible," meant
that it had to be flexible enough for use in vascular
system as conduit for introducing catheter and other
devices.

**[3] Patents 291 ☞101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(2) k. Construction in General.
Most Cited Cases
Requirement, in patent for vascular introduction-
dilation catheter, that sheath be " uniformly" thin-
walled, meant that its wall thickness had to be "
always the same" or " unvarying."

**[4] Patents 291 ☞70**

291 Patents
    291II Patentability
        291II(D) Anticipation
            291k67 Prior Description in Printed
Publication
                291k70 k. Operation and Effect. Most
Cited Cases
Patent claim for flexible, bevel-tipped introduction-
dilation catheter was invalid as anticipated by prior
art journal article that either expressly or inherently
taught every element of claim. 35 U.S.C.A. § 102(b).

**[5] Patents 291 ☞324.2**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k324 Appeal
                291k324.2 k. Decisions Reviewable.

162 Fed.Appx. 954
162 Fed.Appx. 954, 2005 WL 3529007 (C.A.Fed.)
(Cite as: 162 Fed.Appx. 954)

**Most Cited Cases**
Court of Appeals had jurisdiction over appeal from interlocutory order enjoining patent infringement plaintiff from participating in Patent and Trademark Office's ex parte reexamination proceedings, even though plaintiff's appeal from final judgment for defendant did not mention order; appeal impliedly incorporated all interlocutory orders, plaintiff had raised issue in its opening appellate brief, and defendant had had opportunity to respond. F.R.A.P.Rule 3(c), 28 U.S.C.App.(1994 Ed.)

**[6] Patents 291 ⚎140**

291 Patents
    291VII Reissues
        291k140 k. Application for Reissue and Proceedings Thereon. Most Cited Cases
Finding that patent infringement plaintiff, subject to protective order limiting his use of defendant's confidential information to purposes connected with litigation, was barred from participating in Patent and Trademark Office reexamination proceeding was not abuse of discretion.

**Patents 291 ⚎328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
4,850,960. Invalid.

***955** Before MICHEL, Chief Judge, SCHALL and GAJARSA, Circuit Judges.
MICHEL, Chief Judge.
****1** Dr. Joseph Grayzel (" Grayzel" ) appeals the United States District Court for the District of New Jersey's grant of summary judgment of invalidity of claims 13, 14, and 16 of U.S. Patent No. 4,850,960 (" the '960 patent" ) in favor of St. Jude Medical, Inc., St. Jude Medical S.C., Inc., and St. Jude Medical, Daig Division, Inc. (collectively, " St. Jude" ). Grayzel v. St. Jude Med., Inc., 345 F.Supp.2d 466 (2004) (" Summary Judgment Decision" ). Grayzel also appeals the district court's grant of an injunction to enforce a protective order entered into by the parties during the course of discovery. Because we agree with the district court's construction of the " sheath," " flexible," and " uniformly-thin" claim limitations and its finding that the prior art anticipates

each and every limitation of claim 13 of the '960 patent, we ***956** affirm the summary judgment of invalidity. We further hold that the district court's grant of an injunction enforcing the protective order is moot as to claims 13, 14, and 16 and affirm as to claims 1-12, 15, and 17-26.

## I. BACKGROUND

### A. The Asserted Patent

In 1953, Dr. Sven Seldinger developed a new percutaneous technique for introducing a catheter into a patient's blood vessel. See Sven Seldinger, " Catheter Replacement of the Needle in Percutaneous Arteriography: A New Technique," Acta Radiologica 39: 368-76 (1953). His technique, which became known as the " Seldinger technique," involved: (1) inserting a hollow needle through the skin; (2) puncturing the blood vessel with the needle; (3) inserting a guidewire through the bore of the needle into the vessel; (4) removing the needle, leaving the guidewire in the vessel; (5) advancing a catheter over the guidewire into the vessel; and (6) removing the guidewire, leaving the catheter in the vessel through which a cardiologist may insert diagnostic and therapeutic devices. Prior to the " Seldinger technique," a doctor cut an incision in the skin and artery and then inserted the desired catheter.

In 1965, Drs. Donald Desilets and Richard Hoffman improved the Seldinger technique. See Donald T. Desilets & Richard Hoffman, " A New Method of Percutaneous Catheterization," Radiology 85: 147-48 (1965). They introduced a thin-walled, flexible sheath on top of the catheter and inserted that unit into the vessel as described above. The catheter was, however, removed along with the guidewire, leaving only the sheath in the vessel to act as a channel through which multiple devices could be inserted and removed without having to pass each new device over a reinserted guidewire. This technique became known as the " modified Seldinger technique." Notably, because both the catheter and the sheath contained blunt or flat tips, considerable force was needed to insert the sheath-covered catheter into the vessel. That force often caused tearing and trauma at the puncture site.

In July of 1987, Grayzel filed a patent application claiming an improvement to the modified Seldinger technique. Specifically, he disclosed using a beveled tip at the end of the sheath, as shown in the figure

162 Fed.Appx. 954

162 Fed.Appx. 954, 2005 WL 3529007 (C.A.Fed.)

(Cite as: 162 Fed.Appx. 954)

Page 3

below, to reduce the force needed to insert the sheath-covered catheter and to avoid traumatizing the



**2 '960 patent, fig. 9. The beveled tip is indicated by the number 15 with the leading point shown as number 4 and rearmost point shown as number 3. The catheter is designated number 6 with the distal portion shown as number 5 and cylindrical section leading to the beveled tip shown as number 9.

This application issued as the '960 patent in July of 1989. Independent claim 13 recites:
13. [1] A sheath of a size for use in the vascular system for assisting in the insertion of other devices in blood vessels through the wall of the blood vessel, said sheath comprising:
[2] a flexible catheter for use in the vascular system;
[3] said sheath having a flexible uniformly thin walled cylindrical shell body portion having a bore therethrough and a distal end and a *957 proximal end, said bore constructed to coact with and be supported by said flexible catheter extending within the bore;
[4] a bevelled tip portion formed on the distal end of said sheath, said bevelled tip formed at an acute angle with respect to the longitudinal axis of said tubular portion, to facilitate entry into an existing puncture in the wall of a blood vessel.

'960 patent, col. 11, ll. 61-68 (emphases added) (underlined text shows disputed limitations; bracketed numbers reflect district court's designation of claim limitations).

**B. The Prior Art**

Two years before Grayzel filed his application, Dr. S. Murthy Tadavarthy and others published an article describing a percutaneous technique for introducing a filter into the inferior vena cava to snare blood clots ("Tadavarthy Article"). See S. Murthy Tadavarthy, "Kimray-Greenfield Inferior vena cava Filter: Percutaneous Introduction," Radiology 151: 525-26 (May 1984). The article disclosed a blood vessel dilation system having four parts: (1) a guidewire; (2) an 8 French dilator; (3) a 24 French dilator; and (4) a 24 French Teflon tube that fits over the 24 French

insertion site. See '960 patent, col. 2, ll. 43-58.

dilator. [FN1] The article explained that after the two dilators and tube are inserted percutaneously into a patient's inferior vena cava by way of the guidewire, the dilators are removed, leaving the tube in position. It further explained that a Kimray-Greenfield filter may be placed into a patient's inferior vena cava through the tube to catch loose blood clots.

> FN1. The term "French" is a measurement for the diameter of tubular instruments and is equal to 0.013 inches. See McGraw Hill Dictionary of Scientific & Technical Terms 646 (3d ed.1984).

**C. The District Court Decision**

In August of 2001, Grayzel filed a patent infringement action against St. Jude, alleging that St. Jude's Angio-Seal vascular closure device infringes independent claim 13 and dependent claims 14 and 16 of the '960 patent. [FN2]

> FN2. Claim 14 is drawn to the invention of claim 13 wherein "visible indicia are provided along the length of the sheath to indicate the position of the tip of the beveled end." '960 patent, col. 12, ll. 8-10. Claim 16 is drawn to the invention of claim 1, 2, 3, or 13 wherein visible indicia are provided on the body portion of the catheter to indicate the orientation of the bevel. Id., col. 12, ll. 16-18.

During the course of discovery, St. Jude identified numerous prior art references that were not disclosed during the prosecution of the '960 patent. Grayzel in turn filed a request for an ex parte reexamination with the U.S. Patent and Trademark Office ("PTO") for claims 13, 14, and 16, and moved to stay the district court action pending reexamination. The PTO granted Grayzel's request for reexamination not just for claims 13, 14, and 16 as requested, but also for claims 1-12, 15, and 17-26. The district court denied Grayzel's motion to stay the litigation.

**3 In response, St. Jude filed a motion for an injunction to enforce the protective order entered by the district court at the start of the litigation to bar both Grayzel and his litigation counsel from participating in the ex parte reexamination. That protective order identified two classes of information: (1) " Confidential Information;" and (2) " Attorneys' Eyes Only Information." Under the terms of the order, Grayzel had access to the Confidential Information, but not the Attorneys' Eyes Only Information. His use of Confidential Information was, however, restricted such that he could not use it " for any purpose other than in connection with [the] litigation." **958 The protective order also contained a so-called " prosecution bar" provision, which prohibited any person " who ha[d] come into the possession of Attorney's [sic] Eyes Only Information" from " any involvement in the prosecution of" the '960 patent. That same provision likewise specifically stated: " Joseph Grayzel understands the terms of this Protective Order limiting the use of CONFIDENTIAL INFORMATION and ATTORNEY'S [sic] EYES ONLY INFORMATION only for purposes in connection with this litigation and that no patent application can be filed or prosecuted at any time based on CONFIDENTIAL INFORMATION or ATTORNEY'S [sic] EYES ONLY INFORMATION produced by St. Jude or Daig in this litigation." The district court referred the injunction motion to a magistrate judge for resolution.

Following briefing and a two-day hearing, the magistrate judge recommended barring Grayzel and his counsel from participating in the ex parte reexamination. The magistrate judge reasoned that the " entire tenor of the protective order was to protect information within the four corners of this litigation and not to allow discovery that is confidential to be used for outside purposes." The district court adopted the magistrate judge's recommendation and granted St. Jude's motion for an injunction to enforce the protective order. *Grayzel v. St. Jude Med., Inc.*, No. 01-CV-3737 (D.N.J. Dec. 4, 2003).

In March of 2003, St. Jude filed a motion for summary judgment of invalidity due to anticipation under 35 U.S.C. § 102 and obviousness under 35 U.S.C. § 103. The district court issued its claim construction and granted summary judgment in favor of St. Jude in October of 2004. It held that claim 13

of the '960 patent was anticipated by the Tadavarthy Article as well as two other prior art references. *Summary Judgment Decision, 345 F.Supp.2d at 476-78.* The district court also held that claims 14 and 16 were obvious in light of other prior art references. *Id.* at 479-81.

With particular regard to anticipation of claim 13 by the Tadavarthy Article, the district court first found that the sheath pictured in the article's diagram is clearly a " tubular member ... used for accessing the vascular system through the skin and through which other devices ... can be passed," and it is obviously " thin-walled" and " flexible enough for use in the vascular system." As the very title of the article demonstrates, this sheath is being inserted percutaneously into the vena cava. A device, specifically a so-called " Greenfield filter," is passed through the sheath following removal of the introducing catheters.

**4 *Id.* at 478. It consequently concluded that the Tadavarthy Article teaches limitations [1] and [3] of claim 13. Next, the district court found that " the article shows an introducing catheter that visibly bends and is inserted into the vena cava, thus rendering it, by definition, flexible enough for use in the vascular system." *Id.* at 478. As such, it concluded that the Tadavarthy Article also teaches limitation [2] of claim 13. Finally, the district court found that the Tadavarthy Article " clearly reveals a sheath with a ' sloped edge' that would facilitate vein entry," thereby disclosing limitation [4] of claim 13. *Id.*

Grayzel timely appeals the district court's claim construction, its grant of summary judgment on anticipation grounds as to claim 13, and its grant of an injunction enforcing the protective order.[FN3] *959 We have jurisdiction to consider the appeal pursuant to 28 U.S.C. § 1295(a)(1).

> FN3. Grayzel does not challenge the district court's invalidity ruling on obviousness grounds as to claims 14 and 16. He merely asserts those claims are not invalid because they depend from claim 13. The district court did not, however, hold claims 14 and 16 anticipated. Consequently, we shall not address Grayzel's argument regarding claims 14 and 16.

## II. DISCUSSION

### A. Claim Construction

Because claim construction is purely a matter of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71 (Fed.Cir.1995) (en banc), we review the district court's claim construction de novo. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). In interpreting claims, a court's primary focus should be on the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification, and, if in evidence, the prosecution history. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-17 (Fed.Cir.2005) (en banc).

Grayzel argues that the district court misconstrued the " sheath," " flexible," and " uniformly" limitations found in claim 13 of the '960 patent.[FN4] We consider each of his arguments in turn.

> FN4. Grayzel also argued that the district court misconstrued the limitation " visible indicia are provided along the length of the sheath to indicate the position of the tip of the beveled end" of claim 14 to mean " visible indicia extending from the beveled tip portion to indicate the catheter's position in the vein." *Summary Judgment Decision,* 345 F.Supp.2d at 476. The district court's construction of this limitation does not impact the resolution of this appeal since Grayzel does not properly raise any challenge with respect to claim 14. We thus need not address Grayzel's argument.

### 1. Sheath

[1] The district court framed the dispute surrounding the " sheath" limitation as " whether the sheath described has a particular size range," ultimately concluding that it did not. *Summary Judgment Decision,* 345 F.Supp.2d at 472-73. It thus construed the term to mean " any tubular member of any size that can be used for accessing the vascular system through the skin and through which other devices and elements can be passed." *Id.* Grayzel asserts that the district court erroneously relied on a dictionary definition to trump both the intrinsic and extrinsic record in rendering its construction. He contends that the correct construction for the " sheath" limitation, based upon the intrinsic record, is " a SDH sheath for use in the SDH technique." For support, he relies on

the " Summary and Objects of the Invention" section, which he argues describes the introducing catheter and sheath as an assembly used in the SDH technique at least sixteen times. He also relies on the prosecution history, in particular a statement Grayzel made in response to an office action disclosing that " [b]asically, the present invention sets forth an introducing catheter and/or sheath having a beveled end."

**5** We disagree with Grayzel. The '960 patent uses the term " sheath" in the ordinary sense of the word. First, as the district court noted, claim 13 recites that the " sheath" is " of a size for use in the vascular system for assisting in the insertion of other devices in blood vessels through the wall of the blood vessel." Second, as St. Jude points out, the specification expressly defines the term " sheath" as " [a] thin-walled outer tubular member" through which an operational catheter is inserted into the blood vessel. '960 patent, col. 1, ll. 58-59, 67-68. While that definition is disclosed in the " Background of the Invention" section of the specification in the context of describing the prior art, Grayzel does not depart from it when describing his invention. For example, the specification states in the context of describing *960 figures 12, 13, and 14: " Once the sheath is in place, with entry to the lumen of the blood vessel properly dilated and the opening is secured, the introducing catheter 506 and the guide wire 514 can be removed leaving the sheath in place to allow for entry of the various devices that will then be placed into the blood vessel." '960 patent, col. 10, ll. 17-22. Third, logically, it is unlikely that Grayzel would have defined the term " sheath" distinct from the prior art because his invention did not radically depart from the modified Seldinger technique. Rather his invention involved an improvement over the prior art sheath at an angle to facilitate entry through the puncture site.

Given that the term " SDH sheath" does not appear anywhere in the '960 patent or its prosecution history, we suspect that Grayzel likely coined the term for purposes of this appeal. Indeed, the statements in the specification and prosecution history relied upon by Grayzel do not actually support his proffered construction. Instead, we read those statements to be consistent with an ordinary definition for the term as accorded by the district court. Additionally, we note that before the district court Grayzel argued only in favor of limiting the definition of " sheath" to a

particular size range, numerical limits which the district court correctly found are not present in the intrinsic record. Grayzel did not advocate below that the term " sheath" means " SDH sheath." Accordingly, we agree with the district court's construction of the term " sheath" to mean " any tubular member of any size that can be used for accessing the vascular system through the skin and through which other devices and elements can be passed."

### 2. Flexible

[2] The district court construed the term " flexible" to mean " flexible enough for use in the vascular system as a conduit for an introducing catheter and other devices." *Summary Judgment Decision,* 345 F.Supp.2d at 475. Grayzel argues that such a construction " reverses the relationship between the SDH sheath and the introducing catheter in the SDH apparatus." The sheath, he contends, does not act as a conduit for the introducing catheter. Rather, Grayzel asserts that the introducing catheter enters the puncture site carrying the sheath and that the sheath would " bend, fray, or buckle" if unsupported by an introducing catheter. Grayzel relies on the language of claim 13, which recites that the sheath " coacts with" and is " supported by" the introducing catheter, to support his contention. Hence, he advocates that the correct construction for the term " flexible" is " sufficiently flexible such that the sheath must be carried into the vessel wall puncture by the introducing catheter" and " would bend, fray, or buckle if it were introduced into the puncture site without the benefit of being carried in by the introducing catheter."

**6 Grayzel's proposed construction is not consistent with the intrinsic record. The specification makes clear that the sheath may be supported by the catheter, but that it is not required to be. The specification states in the " Summary and Objects of the Invention" section: " After insertion of the catheter, the sheath can be inserted by sliding it over the catheter *if the sheath is not already on the body of the catheter."* '960 patent, col. 5, ll. 34-36 (emphasis added). Contrary to Grayzel's argument, this disclosure suggests that the introducing catheter may be inserted first followed by the sheath. Once inside the vessel, the sheath will be slid onto the introducing catheter so that the two are positioned in the vessel as a single unit. The specification does not caution that the sheath may " bend, fray, or buckle" if introduced

without the support of the introducing catheter. Nor does it disclose that *961 special care is necessary when handling an independent sheath. Alternatively, this disclosure suggests the way that St. Jude apparently contemplates for inserting the introducing catheter and sheath under the '960 patent, specifically, that the sheath may be placed over the introducing catheter at the outset and the two are inserted and positioned into the vessel as a single unit.

Significantly, either approach is consistent with the language of claim 13, which merely states that the bore of the sheath will " coact with" and " be supported by the said flexible catheter." This language does not proscribe that such coaction and support exist before the sheath is inserted into the vessel. Grayzel plainly misapprehends this language in arguing otherwise. Hence, because the specification teaches two approaches for inserting the sheath into a vessel, one where the sheath is independent of an introducing catheter, we conclude that the district court correctly construed the " flexible" limitation simply as " flexible enough for use in the vascular system as a conduit for an introducing catheter and other devices."

### 3. Uniformly

[3] The district court construed the term " uniformly" as " always the same" or " unvarying." *Summary Judgment Decision,* 345 F.Supp.2d at 475. Grayzel challenges this construction, arguing that the correct construction is " without fluctuation or variation; consistent." Grayzel is splitting hairs in arguing that the district court should have selected the definition " without fluctuation or variation; consistent" instead of the definition " always the same; unvarying" for the term " uniformly." The district court's definition is synonymous with Grayzel's proposed definition. *See* The Oxford Thesaurus 561 (Am. ed. 1992) (" consistent" and " unvaryingly" listed as synonyms for the adjective " uniform" ). Moreover, either definition conveys that the walls of the sheath are thin for the entire length of the sheath. As such, we conclude that the district court did not err in construing the " flexible" limitation to mean " always the same" or " unvaryingly."

### B. Anticipation

**7 We review the grant of summary judgment de novo, reapplying the same standard as the district

court. *Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.,* 367 F.3d 1381, 1384 (Fed.Cir.2004). Summary judgment is appropriate when there are no genuine issues of material fact or when the non-movant cannot prevail on the evidence submitted when viewed in a light most favorable to it. *Id.* " When ruling on a motion for summary judgment, all of the non-movant's evidence is to be credited, and all justifiable inferences are to be drawn in the non-movant's favor." *Id.* (quoting *Caterpillar Inc. v. Deere & Co.,* 224 F.3d 1374, 1379 (Fed.Cir.2000)). A claim is anticipated under § 102 " if each and every limitation is found either expressly or inherently in a single prior art reference." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.,* 246 F.3d 1368, 1374 (Fed.Cir.2001).

Grayzel argues that the district court erred in holding that the Tadavarthy Article anticipates claim 13 of the '960 patent because it fails to disclose a " catheter" and a " sheath" as set forth in claim 13. As to the former, he contends that the neither the 8 French dilator nor the 24 French dilator discussed in the Tadavarthy Article serve as a " catheter" because they do not function to " introduce" diagnostic tools into a patient's vessel by expanding the puncture site. Instead, the 8 French dilator, he claims, serves a " diagnostic" purpose because it allows an inferior cavogram to be taken by a diagnostic catheter once that catheter is positioned in the inferior vena cava. Similarly, he maintains **962 that the 24 French dilator also serves a " diagnostic" purpose because it expands the inferior vena cava to allow deliver of the Kimray-Greenfield filter. Grayzel also asserts that the Tadavarthy Article teaches that the 24 French dilator is made of a stiff material and thus not flexible. He points out that claim 13, by contrast, requires the " catheter" to be " flexible."

Turning to the " sheath" limitation, Grayzel argues that the Tadavarthy Article does not disclose a " sheath" as required by claim 13 because the 24 French Teflon tube discussed in that reference is both too large and too rigid. For support, Grayzel relies on the testimony of his expert, Dr. David Eckmann, who explained in his declaration that " SDH sheaths" are normally much smaller than 24 French, and that he compared the representative flexibility of the claimed " SDH sheath" with that of the 24 French Teflon tube and found that the latter was 30 times more rigid. Grayzel also relies on three articles published by Dr. Wilfrido Castaneda-Zuniga wherein Dr. Castaneda referred to the Teflon tube used in

conjunction with dilators as being " stiff." Additionally, Grayzel asserts that Tadavarthy Article does not disclose that the 24 French Teflon tube is " uniformly thin-walled" as required by claim 13. He contends that the district court merely speculated that this limitation was found in the Tadavarthy Article, stating that the " [24 French Teflon tube] is obviously thin-walled," *Summary Judgment Decision,* 345 F.Supp.2d at 478, without conducting a proper anticipation analysis for that claim limitation.

**\*8** St. Jude responds by asserting that the district court correctly found that the Tadavarthy Article discloses at least one " catheter" and a " sheath." St. Jude contends that either the 8 French dilator or the 24 French dilator qualifies as a " catheter" because they both expand the puncture site, even though they may also serve other purposes. It also contends that the 24 French Teflon tube is a " sheath" as claimed in claim 13. The size of the tube, St. Jude argues, is of no import because it is not a specific claim limitation. Moreover, St. Jude advocates that the 24 French Teflon tube is necessarily flexible because it is inserted percutaneously into the vascular system via either the jugular vein in the neck or the femoral vein in the leg and navigated to the inferior vena cava without causing any internal damage. Finally, St. Jude maintains the Tadavarthy Article plainly illustrates that the " sheath" is " uniformly thin-walled." As such, it argues that the district court correctly found that the Tadavarthy Article anticipates each and every limitation of claim 13 of the '960 patent.

[4] We agree with St. Jude that the Tadavarthy Article anticipates claim 13. First, as the district court correctly found, the 24 French dilator disclosed in the Tadavarthy Article operates as a " catheter" as set forth in claim 13. The 24 French dilator is inserted into either the jugular or femoral vein via a guidewire and carries the 24 French Teflon tube with it to the inferior vena cava, exactly like the claimed " catheter." That the 24 French dilator simultaneously expands the jugular or femoral vein and inferior vena cava to allow the Kimray-Greenfield filter to enter is immaterial. The language of claim 13 does not limit the function of the claimed " catheter" to only introducing a " sheath." In fact, claim 13 does not prescribe any specific function for the " catheter." Moreover, as pointed out by St. Jude, neither the specification nor the prosecution history of the '960 patent limits the function of the " catheter." If anything, the specification actually appears to

recognize that the introducing catheter offers more than one function: " A further object of the present invention is to provide an introducing catheter**963** which separates the *entry function* of the catheter from the *dilation function* of the catheter." '960 patent, col. 3, ll. 34-36 (emphases added).

Second, although the Tadavarthy Article does not explicitly address whether the 24 French dilator is flexible, it does so implicitly by virtue of the fact that the 24 French dilator is inserted via either the jugular or femoral vein and delivered to the inferior vena cava, some internal distance away from the puncture site. If the 24 French dilator was rigid, then it would be difficult to maneuver it through the vascular system around internal organs to position it in the inferior vena cava. Indeed, the Tadavarthy Article specifically recognizes the difficulty in accessing the inferior vena cava stating that it is preferable to reach it via the transjugular approach through the neck rather than by the transfemoral approach through the leg. Accordingly, we conclude that the Tadavarthy Article discloses a " catheter" as claimed in claim 13.

**\*9** Third, the district court correctly found that the 24 French Teflon tube disclosed in the Tadavarthy Article operates as the claimed " sheath." The Tadavarthy Article teaches that the 24 French Teflon tube is placed over the 24 French dilator and inserted into the inferior vena cava, precisely as the claimed " sheath" is positioned over the claimed " catheter" and inserted into a blood vessel. Grayzel's argument that the 24 French Teflon tube is too large to qualify as the claimed " sheath" is unavailing. Claim 13 does not place any numerical restriction on the size of the claimed " sheath," and it stands to reason, as St. Jude acknowledges, that sheath size varies with blood vessel size. Grayzel's argument that the 24 French Teflon tube is too rigid to qualify as the claimed " sheath" is equally unavailing. As discussed above, the 24 French Teflon tube implicitly must be " flexible" for the same reason that the claimed " sheath" is flexible. That is, the 24 French Teflon tube travels atop the 24 French dilator through either the jugular or femoral vein to be positioned in the inferior vena cava. If the 24 French dilator was rigid as asserted by Grayzel, it is unlikely that it could be routed through the vascular system around various internal organs. Moreover, Figure 2 in the Tadavarthy Article shows the 24 French Teflon tube in a bent position upon removal from the jugular vein after insertion of the Kimray-Greenfield filter.

Furthermore, Grayzel's reliance on the three Castaneda articles is misplaced. The " stiff" sheaths discussed in those articles were inserted via the ureter into a kidney to remove kidney stones; they were not inserted into a blood vessel like the sheath employed in the '960 patent. This functional difference explains why those sheaths were of a more rigid nature than the claimed " sheath." Indeed, one of the articles explains that the stiffness was needed to prevent the dilator from buckling at the renal capsule, which was a common problem in renal dilation systems. Grayzel thus takes Dr. Castaneda's statements about the sheath out of context in asserting that they apply to the claimed " sheath."

Fourth, while Grayzel is correct that the Tadavarthy Article does not explicitly state that the 24 French Teflon tube is " uniformly thin-walled," it inherently must be because the size is set at 24 French. The diameter therefore must be " unvarying" or " always the same" for the entire length of the tube. Moreover, the dilator over which the Teflon tube fits is 24 French in diameter. If the Teflon tube were of varying diameter along the length or of a diameter that increased or decreased, respectively, from the beveled tip to the far end, then the tube either potentially would not fit atop the dilator and/or **\*964** would not remain in position through the insertion process. Hence, like the district court, we conclude that the Tadavarthy Article implicitly discloses a " uniformly thin-walled sheath" as claimed in claim 13.

**\*\*10** In sum, because the Tadavarthy Article discloses each and every limitation of claim 13 of the '960 patent, we hold that it anticipates claim 13 and thereby renders it invalid under § 102. As such, we need not decide whether the district court correctly found that the remaining two references also anticipate claim 13.

## C. Injunction to Enforce the Protective Order

Grayzel argues that the district court erred in barring him from participating in the ex parte reexamination of the '960 patent based upon the " prosecution bar" provision of the protective order.FN5 That provision, he contends, does not apply to him for three specific reasons. First, Grayzel asserts both that it applies only to recipients of Attorneys' Eyes Only Information and that he is not such a recipient. Second, he asserts that it applies only to applications

either corresponding to the '960 patent or related to the subject matter of the '960 patent, but not to the '960 patent itself. Third, he asserts that the " prosecution bar" provision does not name a reexamination as a prohibited proceeding.

FN5. Grayzel does not challenge the district court's order as to his litigation counsel.

In response, St. Jude asserts that we need not review Grayzel's challenge to the district court's order issuing an injunction to enforce the protective order because Grayzel only appealed the final judgment granting St. Jude's motion for summary judgment based on invalidity. Moreover, the district court's order, St. Jude argues, is not an interlocutory decision with substantial connection to the summary judgment of invalidity such that it merged into that judgment. Rather, it claims that the district court granted the injunction to protect its confidential information; such protection is in no way related to the validity of the '960 patent. Even if Grayzel had properly appealed the district court's ruling, St. Jude contends that Paragraphs 15 and 19 of the protective order expressly prevent Grayzel from using protected information, except in the litigation itself. Accordingly, it maintains that the district court did not abuse its discretion in enforcing the protective order against Grayzel.

Grayzel's challenge to the district court's issuance of an injunction enforcing the protective order is not simple and involves dividing the claims subject to reexamination into two groups, namely, (1) claims 13, 14, and 16, which were subject to the St. Jude litigation, and (2) claims 1-12, 15, and 17-26, which were not. As to the former group, we need not reach the merits of Grayzel's appeal in view of Manual of Patent Examining Procedure § 2286. That section requires the PTO to terminate a reexamination proceeding where the Federal Circuit has issued a final decision holding that the claims subject to reexamination are invalid. Specifically, " [u]pon the issuance of a final holding of invalidity or unenforceability, the claims held invalid or unenforceable will be withdrawn from consideration in the reexamination. The reexamination will continue as to any remaining claims." U.S. Pat. & Trademark Off., Manual of Patent Examining Procedure § 2286 (8th ed.2001, rev. May 2004). Here, Grayzel sought, and the PTO granted, reexamination of claims 13, 14, and 16 of the '960 patent. We hold that claim 13 is invalid under § 102

herein, and Grayzel failed to appeal the district court's ruling that claims 14 and 16 are invalid under § 103, thus waiving his rights to do so in the future. Accordingly, we conclude that there can be no substantial new question of patentability as to claims 13, 14, and 16 and that Grayzel's challenge is moot as to those claims.

**11 With respect to the latter group, claims 1-2, 15, and 17-26 were not implicated in the St. Jude litigation. Nor were they listed in Grayzel's request for reexamination. The PTO, nevertheless, included them in its reexamination grant and has proceeded to consider the patentability of these claims in light of the prior art references disclosed by Grayzel during the reexamination proceeding. We are, as a result, in the position of having to decide the merits of Grayzel's challenge to the issuance of an injunction enforcing the protective order. In doing so, we apply the law of the regional circuit since the nature of his challenge does not involve a patent issue. *See Phonometrics, Inc. v. Hospitality Franchise Sys.*, 203 F.3d 790, 793 (Fed.Cir.2000).

[5] Federal Rule of Appellate Procedure 3(c) provides, in pertinent part, that a notice of appeal " must designate the judgment, order or part thereof appealed from...." Fed. R.App. P. 3(c). If a party does not satisfy the requirements of this rule, then an appellate court does not acquire jurisdiction over the undesignated judgment or order. *United States v. Rivera Constr. Co.*, 863 F.2d 293, 298 (3d Cir.1988). Here, Grayzel stated in his notice of appeal that he appeals " from the final judgment entered in this action on November 8, 2004 granting defendant's motion for summary judgment based on invalidity of claims 13, 14 and 16 of U.S. Patent No. 4,850,960 and dismissing the case." Plainly, he did not mention the district court's interlocutory order. Consequently on first blush, it appears that the St. Jude may be correct that we lack appellate jurisdiction.

Nevertheless, the Third Circuit has opted to liberally construe notices of appeal. *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 858 (3d Cir.1990). It has, in fact, held that it may properly exercise appellate jurisdiction over orders not specified in the notice of appeal if " ' there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issues.' " *Lusardi v. Xerox Corp.*, 975 F.2d 964, 972 (3d Cir.1992) (quoting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 954, 2005 WL 3529007 (C.A.Fed.)

**(Cite as: 162 Fed.Appx. 954)**

*Williams v. Guzzardi,* 875 F.2d 46, 49 (3d Cir.1989)). Here, we conclude that these three requirements are met. First, Grayzel procedurally could not appeal the district court's interlocutory order until the district court entered final judgment in favor of St. Jude. The Third Circuit has explained that an appeal from a final judgment incorporates all prior non-final orders and rulings, since only a final judgment or order is appealable. *Drinkwater,* 904 F.2d at 858 (citing *Elfman Motors, Inc. v. Chrysler Corp.,* 567 F.2d 1252, 1254 (3d Cir.1977)). To conclude otherwise in this case would prevent Grayzel from ever challenging the district court's interlocutory ruling, and we do not think such an outcome comports with the Third Circuit's jurisprudence regarding Rule 3(c). Because of this, we conclude that the requisite connection exists. Second, Grayzel has clearly manifested his intent to appeal the district court's interlocutory order. He specifically raised this issue in clear terms in both his opening and reply briefs. Third, St. Jude would not be prejudiced if we decide this issue since it had the opportunity to fully respond to Grayzel's challenge and has done so. Accordingly, contrary to St. Jude's contention, we hold that we have jurisdiction to review the district court's interlocutory order granting an injunction to enforce the protective order.

**\*966 \*\*12** [6] The Third Circuit reviews the grant of injunctive relief under the abuse of discretion standard. *United States v. Bell,* 414 F.3d 474, 478 (3d Cir.2005). In the disputed protective order, Paragraph 15 works together with Paragraph 19, the so-called " prosecution bar" provision, to restrict the use of all Confidential and Attorneys' Eyes Only Information involved in the litigation. Read together, those provisions expressly prohibit persons who come into possession of any such information from disclosing it outside of the litigation, regardless of the use. Paragraph 19, in fact, specifically discusses Grayzel's use of the two kinds of protected information, stating " Joseph Grayzel understands the terms of this Protective Order limiting the use of CONFIDENTIAL INFORMATION and ATTORNEYS' EYES ONLY INFORMATION only for purposes in connection with this litigation...." On this basis, we have no choice but to conclude that Grayzel, who had access to Confidential Information, although not Attorneys' Eyes Only Information, falls squarely into the prohibitions set forth in Paragraphs 15 and 19. Thus, he is plainly precluded from using any of the Confidential Information he acquired through this litigation in any proceeding outside of the litigation, such as the ongoing reexamination proceeding.

Grayzel's arguments regarding the scope of Paragraph 19 are unpersuasive. In asserting that he is unaffected by the prohibition on the use of ATTORNEYS' EYES ONLY INFORMATION found in Paragraph 19, Grayzel mistakenly ignores Paragraph 15. Moreover, that Paragraph 19 only mentions applications corresponding to the '960 patent or related subject matter and does not specifically list a reexamination proceeding is of no consequence in the face of the express prohibition found in Paragraph 15. Far from producing " Draconian results," as asserted by Grayzel, the district court's order granting an injunction to enforce the protective order does nothing more than effect the parties' intent, just as the magistrate judge essentially acknowledged in his recommendation. To allow Grayzel to escape the very provisions he agreed to before learning of potentially invalidating prior art during discovery and filing a request for reexamination would, we fear, render the protective order under which discovery proceeded in this case meaningless. We, therefore, conclude that the district court did not abuse its discretion in granting the injunction to enforce the protective order, and we affirm that grant.

### III. CONCLUSION

For the foregoing reasons, we affirm the summary judgment of invalidity of claim 13 under § 102, hold that the district court's issuance of an injunction enforcing the protective order is moot as to claims 13, 14, and 16, and affirm the district court's order granting an injunction to enforce the protective order as to claims 1-12, 15, and 17-26.

C.A.Fed.,2005.
Grayzel v. St. Jude Medical, Inc.
162 Fed.Appx. 954, 2005 WL 3529007 (C.A.Fed.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit D

Westlaw.

467 F.Supp.2d 608

467 F.Supp.2d 608

**(Cite as: 467 F.Supp.2d 608)**

Page 1

**H**
Mercexchange, L.L.C. v. eBay, Inc.
E.D.Va.,2006.

United States District Court,E.D. Virginia,
Norfolk Division.
MERCEXCHANGE, L.L.C., Plaintiff,
v.
eBAY, INC. and Half.com, INC., Defendants.
**No. CIV.A. 2:01CV736.**

Dec. 18, 2006.

**Background:** Holder of patent for method of
conducting on-line sales sued auction website
operators, alleging infringement. Following remand,
188 Fed.Appx. 993, operator brought non-dispositive
evidentiary motions.

**Holdings:** The District Court, Friedman, J., held that:

(1) court would not strike exhibits submitted in
support of renewed motion for permanent injunction;

(2) court would not strike witness' declaration;

(3) court would grant leave for operator to submit
motion to enforce protective order; and

(4) court would modify protective order.

Motions granted in part and denied in part.
West Headnotes
**[1] Patents 291 ☞317**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k317 k. Permanent Injunction. Most
Cited Cases
In infringement action brought by holder of patent for
method of conducting on-line sales against auction
website operators, district court would not strike
exhibits submitted in support of holder's renewed
motion for permanent injunction; such evidence was
not improper in absence of formal motion to reopen
record, majority of exhibits did not appear to be
attempts to improperly backfill record, and

information relating to holder's business relationships
was not duplicative or untimely.

**[2] Federal Civil Procedure 170A ☞2016**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(C) Reception of Evidence
         170Ak2016 k. Reopening Case for Further
Evidence. Most Cited Cases
District court may, in its discretion, reopen
evidentiary record in limited manner with respect to
targeted issue, so long as parties are presented equal
and fair opportunity to investigate facts and challenge
opposing party's evidence through traditional
adversarial means.

**[3] Patents 291 ☞314(1)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
            291k314(1) k. In General. Most Cited
Cases
In infringement action brought by holder of patent for
method of conducting on-line sales against auction
website operators, district court would not strike
witness' declaration filed as exhibit to holder's
response in opposition to operator's motion to stay
proceedings, since such evidence was not improper in
absence of formal motion to reopen record, and may
have been germane to fraud allegation.

**[4] Patents 291 ☞292.4**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k292 Discovery
            291k292.4 k. Other Matters. Most Cited
Cases
In infringement action brought by holder of patent for
method of conducting on-line sales against auction
website operators, district court would grant leave for
operator to submit motion to enforce protective order;
operator's allegations with respect to protective order
were at least tangentially related to two primary
motions presently before court, since operator alleged
improper participation in Patent and Trademark

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 608

Page 2

467 F.Supp.2d 608

(Cite as: 467 F.Supp.2d 608)

Office (PTO) reexamination proceedings.

[5] Patents 291 ☞292.4

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k292 Discovery
                291k292.4 k. Other Matters. Most Cited
Cases
In infringement action brought by holder of patent for
method of conducting on-line sales against auction
website operators, district court would modify
operator's protective order to require that any expert
with prior access to operator's proprietary
information would not participate in Patent and
Trademark Office (PTO) reexamination of any
patents at issue in instant litigation; although holder
had not technically violated order, such experts
should not have been participating in reexamination.

*609 Jennifer Ann Albert, Hunton & Williams,
Emerson Vincent Briggs, III, Hunton & Williams,
Washington, DC, Brian Mark Buroker, Hunton &
Williams, Washington, DC, Thomas J. Cawley,
Hunton & Williams, McLean, VA, Kenneth Reed
Mayo, Reed Mayo Law Firm PC, Virginia Beach,
VA, Scott L. Robertson, Hunton & Williams,
Washington, DC, Thomas Jefferson Scott, Jr.,
Hunton & Williams LLP, Washington, DC, Gregory
N. Stillman, Hunton & Williams, Norfolk, VA, Seth
Paul Waxman, Wilmer Cutler Pickering Hale & Dorr
LLP, Washington, DC, David Michael Young,
Hunton & Williams, McLean, VA, for
Mercexchange, L.L.C., Plaintiff.
Matthew James Brigham, Cooley Godward LLP,
Palo Alto, CA, for Half.com , Inc., eBay, Inc.,
Defendants.
Charles Patrick Ebertin, Cooley Godward LLP, Palo
Alto, CA, for eBay, Inc., Defendant.
Michael Christopher Hendershot, Cooley Godward
LLP, Palo Alto, CA, for Half.com , Inc., eBay, Inc.,
Defendants.
Jeffrey Scott Karr, Cooley Godward LLP, Palo Alto,
CA, for Half.com , Inc., eBay, Inc., Defendants.
Robert William McFarland, McGuireWoods LLP,
Norfolk, VA, for Half.com , Inc., eBay, Inc.,
Returnbuy, Inc., Defendants.
Jeffrey Graham Randall, Cooley Godward LLP, Palo
Alto, CA, for Half.com , Inc., eBay, Inc., Defendants.
Kermit Arthur Rosenberg, Jr., Tighe Patton
ArmstrongTeasdale PLLC, Washington, DC, for
Returnbuy, Inc., Defendant.

Allan Madis Soobert, Skadden Arps Slate Meagher &
Flom LLP, Washington, DC, for Half.com, Inc.,
eBay, Inc., Defendants.
Steven R. Zahn, McGuireWoods LLP, Norfolk, VA,
for Half.com, Inc., Defendant.

### ORDER AND OPINION

FRIEDMAN, District Judge.
On November 17, 2006, the court conducted a
hearing to address four motions filed by eBay, Inc.
and Half.com, Inc. (collectively " eBay" ): (1) "
Motion to Strike New & Irrelevant Evidence" ; (2) "
Motion Strike Nahan Declaration" ; (3) " Motion for
Leave to Submit Motion to Enforce the Court's
Protective Order" ; and (4) " Motion to Enforce
Court's Protective Order." For the reasons set out
herein, the court DENIES both eBay's motion to
strike new evidence and motion to strike the Nahan
declaration; however, such ruling requires that both
eBay and MercExchange be afforded the opportunity
to perform limited discovery in order to update the
record to the present time. Additionally, the court
GRANTS eBay's motion for leave to submit the
protective order motion and GRANTS in part, and
DENIES in part, the substantive protective order
motion.

### I. Factual and Procedural Background

In an effort to avoid repeating a detailed depiction of
the facts and procedural posture of the instant
litigation, the limited background pertinent to the
instant motions is as follows: subsequent to the grant
of summary judgment in favor of eBay based on a
finding of invalidity on the asserted claims of the '051
patent and a jury verdict awarding damages to
MercExchange*610 based on eBay's infringement of
the '265 patent, on August 6, 2003, this court entered
an order and opinion denying MercExchange's
motion for an injunction.[FN1] Mercexchange, L.L.C. v.
eBay, Inc., 275 F.Supp.2d 695 (E.D.Va.2003). On
appeal, the Federal Circuit vacated this court's grant
of summary judgment on the '051 patent and reversed
the denial of MercExchange's motion for a permanent
injunction. Mercexchange, L.L.C. v. eBay, Inc., 401
F.3d 1323 (Fed.Cir.2005). The Supreme Court
granted certiorari to address the proper standard for
entry of a permanent injunction and ultimately
vacated the Federal Circuit's injunction ruling,
defining the traditional four-part equitable test as the
proper standard for the injunction calculus in patent
cases. eBay Inc. v. MercExchange, L.L.C., --- U.S. ---

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 608

467 F.Supp.2d 608

**(Cite as: 467 F.Supp.2d 608)**

_-, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)._

> FN1. In short, the '051 patent covers auction style transactions where prospective buyers bid on an item whereas the '265 patent covers fixed price transactions such as eBay's " buy-it-now" sales option where the seller sets a fixed purchase price.

This matter has now been remanded to this court for consideration of MercExchange's renewed motion for a permanent injunction, as well as for an eventual trial on the '051 patent. The two primary motions presently under consideration by the court are: (1) MercExchange's renewed motion for a permanent injunction; and (2) eBay's motion to stay the proceedings in light of the Patent and Trademark Office (PTO) reexamination of the '265 and '051 patents. The four motions that are addressed in this order are secondary motions that are relevant to this court's consideration of the motion for an injunction and motion to stay. Because the court previously denied MercExchange's motion for an injunction in an order dated August 6, 2003, the court's references to " new" evidence or " recent" developments refer to occurrences subsequent to this court's August 6, 2003, ruling, whereas references to " backfilled" evidence refer to facts that existed as of August 6, 2003, yet were not made part of the record.

## II. eBay's Motion to Strike New and Irrelevant Evidence

eBay's motion to strike was filed in response to numerous exhibits, including expert declarations, filed by MercExchange in support of its renewed motion for a permanent injunction.[FN2] Although eBay conceded at the hearing on this matter that injunctive relief's prospective nature requires the court to consider *present circumstances* in determining whether or not to grant an injunction, eBay contends that MercExchange has improperly submitted numerous exhibits seeking to backfill the record and re-litigate issues already decided by this court. Furthermore, eBay challenges the fact that two of the expert declarations submitted as exhibits to MercExchange's motion were submitted by previously undisclosed experts. As to the portions of MercExchange's exhibits that relate to recent factual developments, consisting primarily of MercExchange's business relationship with uBid, Inc. (uBid), eBay contends that such evidence is duplicative and irrelevant.

> FN2. It should be noted from the outset that eBay has also filed voluminous exhibits in support of its motion to stay.

In contrast, MercExchange contends that it is not trying to backfill the record, but rather, the portions of the exhibits discussing prior events are merely included to present a factual background that is relevant to this court's decision as to whether or not to enter an injunction. With respect to the previously undisclosed experts, MercExchange argues that the *611 legal standard applicable to the court's injunction decision has been called into question by eBay and that such declarations were submitted to clarify the irreparable harm that MercExchange will suffer in case the court concludes that a presumption of irreparable harm no longer exists. Finally, as to uBid, MercExchange argues that such evidence is both relevant and significantly different from evidence previously advanced, and thus, is not duplicative.

Although the parties disagree on virtually every factual and legal issue relevant to the instant matter, they agree that the decision as to whether to " reopen the record" on remand lies squarely within this court's discretion. *See United States v. Com. of Va.,* 88 F.R.D. 656, 662 (E.D.Va.1980) (recognizing that it is " well-established that, in the absence of error affecting the introduction of evidence at trial, the decision whether to reopen the evidence at a later stage of the proceedings rests with the trial judge" ). Although the court's exercise of such discretion is dependant upon a careful case-by-case analysis, the type of relief sought on remand unquestionably has a significant impact on the court's decision as prospective equitable relief, such as an injunction or a stay of the proceedings, necessitates that the court consider the facts as they exist at the time of remand and not as they existed several years in the past. *See Lyons Partnership, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 799 (4th Cir.2001) ( " A prospective injunction is entered only on the basis of *current,* ongoing conduct that threatens *future* harm." ) (emphasis added). The current facts are so vital to the court's decision when such form of relief is sought as the court is not only charged with determining the equitable relief appropriate on the date of the court's order, but is also expected to fashion relief that appears appropriate for extension into the future; such task can hardly be faithfully completed in reliance on a record that is nearly three and half years

467 F.Supp.2d 608

467 F.Supp.2d 608

**(Cite as: 467 F.Supp.2d 608)**

Page 4

old and established prior to a significant factual development. *See Continental Airlines, Inc. v. United Airlines, Inc.,* 277 F.3d 499, 503 (4th Cir.2002) (remanding for reconsideration of an injunction involving airport security screening equipment and recognizing that, " on remand, the district court and the parties will undoubtedly have to deal with [the ramifications of September 11th] in considering any prospective relief" ); *see also Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 819 (4th Cir.1991) ( " [W]e reverse the grant of the injunction herein and remand the case for further proceedings consistent with the rulings herein, without prejudice to the right of the plaintiff to premise its motion on new or changed circumstances." ); *Huminski v. Corsones,* 396 F.3d 53, 94 (2d Cir.2005) ( " Upon remand, the district court should consider whether, under present circumstances, permanent injunctive relief is required and, of course, the terms of any such injunction." ).

[1] Based on the prospective nature of the relief sought, as well as the significant time lapse subsequent to this court's denial of MercExchange's original motion for an injunction, as set forth in greater detail below, the court denies eBay's motion to strike the exhibits submitted in support of MercExchange's renewed motion for an injunction. First, such evidence is not improper in the absence of a formal motion; second, the majority of such exhibits do not appear to be an attempt to improperly backfill the record and to the extent that such exhibits are in conflict with the court's prior factual findings they will be disregarded; and third, information relating to MercExchange's business relationship with uBid is not duplicative nor untimely. Because the court is willing to *612 accept submissions by both parties that update the court on factual developments occurring after 2003, the court will permit limited discovery in order to afford the parties the traditional protections of the adversarial system.

**A. MercExchange's failure to file a written motion to reopen the record does not require that MercExchange's exhibits be stricken.**

eBay's motion to strike first seeks to have MercExchange's exhibits stricken on procedural grounds, arguing that new evidence is not properly before the court both because MercExchange failed to file a formal motion to reopen the record and because the opinions of both superior courts failed to suggest that the record be reopened on remand. First,

from a legal standpoint, eBay fails to cite any caselaw directly on point suggesting that such new evidence must be stricken in absence of formal motion by MercExchange. Additionally, eBay's allegation that MercExchange failed to file such motion is hypocritical in light of the fact that eBay also failed to file a motion to reopen the record prior to submitting recent PTO reports and other factual exhibits in support of its motion to stay. Second, from a practical standpoint and as conceded by eBay, common sense dictates that a dispute over prospective relief requires consideration of the facts as they exist at the time of the hearing, not as they existed over three years ago, and this court does not require a superior court to instruct it to apply such common sense requirement. Furthermore, although MercExchange did not file a formal motion seeking to reopen the record, it is clear from the transcript of a telephone status conference conducted by this court on July 28, 2006, that MercExchange announced its intent to introduce additional evidence reflecting factual developments occurring subsequent to trial. The following exchange occurred during such call:
*Mr. Stillman (MercExchange):*
In terms of scheduling, obviously time is of the essence with respect to our request for injunctive relief. But nonetheless, we would like the opportunity to supplement the record, the evidentiary record, on that request to bring it current, to make the Court aware of what MercExchange has been about in the three plus years since the jury entered its verdict, and to get some guidance from you about scheduling and how we would go about doing that.
*The Court:*
All right. Mr. Randall.
*Mr. Randall (eBay):*
Your Honor, our view is that based on the re-exam proceedings-and the re-exam was initially granted in June of 2004, so it's been going on for two years. There have been two significant rejections of all claims.... So we are asking that the Court first consider our motion to stay.

(July 28, 2006 Conf. Call p. 6). The excerpt cited above not only establishes that the court and *both* parties understood that MercExchange would be submitting exhibits reflecting recent factual developments in conjunction with its renewed motion for an injunction, but also highlights the fact that eBay's motion to stay relies almost exclusively upon recent factual developments, that is, the PTO reexamination proceedings. As a result, the court, in its discretion, concludes that reopening the record for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 608

467 F.Supp.2d 608

(Cite as: 467 F.Supp.2d 608)

Page 5

the limited purpose of admitting evidence relevant to the parties' motion for an injunction and motion to stay and targeted at the period subsequent to August 6, 2003, is proper notwithstanding the fact that a formal motion was not filed by MercExchange.

**\*613 B. The court will disregard the portions of exhibits attempting to introduce facts predating August 6, 2003, that were not previously made part of the record and those portions attempting to recast the prior record in a manner inconsistent with this court's findings of fact.**

As stated above, the court's decision to reopen the record for the limited purpose of permitting the parties to update the court on factual developments occurring subsequent to this court's August 2003 order does not permit the parties to backfill the record by presenting evidence that was previously available yet not advanced either at trial or in support of MercExchange's initial motion for an injunction.[FN3] Likewise, the court's decision to reopen the record does not permit the parties to recast the prior record in a manner inconsistent with the findings of fact associated with the court's denial of MercExchange's original motion for an injunction. Notably, significant portions of the declarations challenged by eBay advance facts and opinions aimed at proving that MercExchange intended to commercialize its inventions from their infancy even though this court's prior findings suggest otherwise. Furthermore, any impropriety contained in such declarations is compounded by the fact that eBay has not had the opportunity to depose the individuals in relation to their newly submitted declarations.[FN4]

> FN3. As discussed below in Part III, the one exception to the August 6, 2003, cutoff date is that the court, in its discretion, will permit the parties to investigate the fraud alleged by MercExchange with respect to eBay's meeting with Kenneth Nahan and the introduction of the Newman video. The court permits such inquiry even though the pertinent facts predate the court imposed cutoff date because eBay produced the Newman video shortly before trial and after the close of discovery; thus, MercExchange may not have previously been permitted sufficient time to fully investigate such matter.

> FN4. As previously mentioned, two of the

expert declarations were submitted by experts not previously identified by MercExchange.

For example, MercExchange has submitted a recent declaration of Thomas Woolston, MercExchange's president, that purports to document MercExchange's history from its founding until the present. Although the court is willing to consider the portions of such report that document factual developments occurring subsequent to August 6, 2003, the portions of the declaration advancing Mr. Woolston's portrayal of events prior to such time should have been submitted, if at all, either at trial or in support of MercExchange's original motion for an injunction. Similarly, although the recently submitted expert declaration of Larry Evans, who testified at trial on behalf of MercExchange, permissibly cites trial testimony, it repeatedly offers the opinion that "[f]rom the outset, Mr. Woolston sought to commercialize his patents" (Evans Decl. ¶ 32); such conclusion appears to vary from, and may even be in contravention of, this court's prior finding that "the evidence of the plaintiff's willingness to license its patents, its lack of commercial activity in practicing the patents, and its comments to the media as to its intent with respect to enforcement of its patent rights, are sufficient to rebut the presumption that it will suffer irreparable harm if an injunction does not issue." *Mercexchange,* 275 F.Supp.2d at 712.[FN5] Although**\*614** the Supreme Court concluded that neither this court nor the Federal Circuit "correctly applied the traditional four-factor framework that governs the award of injunctive relief," *eBay Inc.,* 126 S.Ct. at 1840, remand permits MercExchange the opportunity to argue that applying the "correct" legal framework to the previous record, as supplemented by interim factual developments, an injunction is warranted; it does not provide the opportunity to recast the prior record. To clarify, the undisturbed record led this court to conclude that prior to 2003, MercExchange exhibited a "willingness to license its patents" a "lack of commercial activity in practicing the patents" and that its "numerous comments to the media before, during, and after this trial indicat[e] that it did not seek to enjoin eBay but rather sought appropriate damages for the infringement." *Mercexchange,* 275 F.Supp.2d at 712. Although MercExchange has every right to argue that such factual findings, applied to the proper legal test, warrant an injunction, or, that such factual findings when considered in light of recent developments, both factual and legal, warrant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 608

467 F.Supp.2d 608

(Cite as: 467 F.Supp.2d 608)

Page 6

an injunction, it will not be presented the opportunity to challenge such factual findings. Thus, MercExchange may argue that this court was legally incorrect in concluding that a willingness to license or lack of commercial activity suggest that an injunction is not warranted; however, it may not attempt to argue that it was never willing to license or that it never had a lack of commercial activity practicing the patents.

> FN5. Set forth below is a more complete quote from this court's August 6, 2003, order and opinion discussing MercExchange's lack of commercial activity. The order stated:
> The defendants next argue that there was evidence adduced at trial proving that the plaintiff is willing to license or sell its patents. On this point, the defendants are correct. Substantial evidence was adduced at trial showing that the plaintiff does not practice its inventions and exists merely to license its patented technology to others. Indeed, the plaintiff has made numerous comments to the media before, during, and after this trial indicating that it did not seek to enjoin eBay but rather sought appropriate damages for the infringement. The Federal Circuit has observed that " the lack of commercial activity by the patentee is a significant factor in the calculus" of whether the patentee will suffer irreparable harm absent an injunction. *High Tech Medical Instrumentation, Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1556 (Fed.Cir.1995). In the case at bar, the evidence of the plaintiff's willingness to license its patents, its lack of commercial activity in practicing the patents, and its comments to the media as to its intent with respect to enforcement of its patent rights, are sufficient to rebut the presumption that it will suffer irreparable harm if an injunction does not issue. Moreover, the plaintiff never moved this court for a preliminary injunction. If it believed that it was suffering irreparable harm by the defendants' continued infringement of its patents, such a motion would have been appropriate. This fact, while certainly not dispositive of the issue, lends additional weight in support of the defendants' arguments that the plaintiff will not be irreparably harmed absent an injunction.

*Mercexchange,* 275 F.Supp.2d at 712 (footnote omitted).

In order to preserve the admissible portions of MercExchange's submissions, as well as avoid the delay associated with ordering that MercExchange's experts rewrite their reports without the portions that attempt to recast facts predating August 6, 2003, the court will simply disregard any opinion or argument seeking to re-litigate the court's prior factual findings. [FN6] The court in no way suggests that it will not entertain counsels' arguments as to how the previous record, established through trial and this court's prior injunction ruling, as well as any interim factual updates, should be applied to the correct legal framework; rather, the court will simply not reconsider its past factual findings*615 regarding the time period prior to August 6, 2003. As a result, counsel for both parties are invited to refer to the prior record, as well as recent factual developments, and argue that such facts, when applied to the proper legal standard, warrant an injunction; however, the court will give no weight to arguments, opinions, or exhibits that attempt to add to, modify, or recast the court's prior factual findings. [FN7]

> FN6. The court suggests that both parties re-familiarize themselves with this court's August 6, 2003, order prior to the hearing on the motion for an injunction and motion for a stay as the factual findings of the court dealing with the time period prior to August of 2003 remain undisturbed.

> FN7. Although the court does not condone the submission of declarations from previously undisclosed experts, the court recognizes MercExchange's justification for such submissions, namely, that the legal standard for issuing an injunction was in flux throughout the appeal of this matter and appears to remain uncertain today in that the Supreme Court did not expressly address whether the presumption of irreparable harm upon a showing of validity and infringement survives the Supreme Court's decision; however, the court does not believe that an expert primer on irreparable harm suffered by small companies whose patents are infringed offers any significant support for MercExchange's position. First, the Supreme Court cautioned the lower courts about avoiding categorical rules, and the expert

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 608

(Cite as: 467 F.Supp.2d 608)

declaration offered by Lori Pressman, one of the experts not previously disclosed, presents virtually no information with respect to MercExchange nor relevant post trial developments, but rather, presents an opinion painted with a very broad brush suggesting that small companies holding patents will always be irreparably harmed absent the right to exclude. Similarly, portions of the other expert reports, such as the Evans declaration, make similar generalizations concluding: " An individual inventor or small company that lacks the financial resources to take on the big guy in high-stakes patent litigation should not be forced to grant compulsory licenses" (Merc. Injunct. Memo Ex.17 ¶ 103). Again, the court will not strike such declarations in light of the fact that MercExchange will be given the opportunity to conduct limited discovery, including depositions of some of such experts if it chooses; however, the court will afford little weight to exhibits espousing categorical rules or seeking to highlight the woes of the small patent holder while ignoring this court's prior findings.

### C. References to uBid are not duplicative nor untimely.

As can be inferred from the discussion above, the court rejects eBay's contention that references to MercExchange's business relationship with uBid, a factual development occurring subsequent to August 6, 2003, are duplicative or untimely. First, such references are not untimely as MercExchange did not have a business relationship with uBid when the initial motion for an injunction was filed, and thus, evidence regarding uBid is not backfill of the record, but rather, is precisely the type of evidence updating the court on recent developments that is vital to the court's injunction calculus. *See Lyons,* 243 F.3d at 799 (" A prospective injunction is entered only on the basis of *current,* ongoing conduct that threatens *future* harm." ) (emphasis added). Second, although eBay effectively demonstrates that the non-exclusive license entered into between uBid and MercExchange is not particularly lucrative and appears similar to Mercexchange's past non-exclusive licenses, the declaration of Timothy Takesue, the Merchandising Executive Vice President of uBid, highlights the fact that the terms of such contract are not very favorable to MercExchange primarily because eBay is

infringing on MercExchange's '265 patent and that an exclusive license [FN8] or *616 merger has been contemplated but has not come to fruition due to eBay's infringement. The sworn claims that eBay's infringement on the '265 patent is directly hindering MercExchange's business opportunities distinguishes uBid from most of MercExchange's past licensing partners, as the trial record establishes that some of MercExchange's past difficulties commercializing its patents were not a result of eBay's infringement. Furthermore, sworn testimony from a uBid executive establishing that a merger between MercExchange and an internet auction website that *directly competes* with eBay was contemplated, yet foreclosed as a result of eBay's infringement distinguishes the business relationship with uBid from past licensing agreements. Thus, uBid is not unique based on the terms of the current non-exclusive license, but rather, the potential for an exclusive license or merger and the apparent value of such relationship to both uBid and MercExchange if an injunction prevented eBay from offering " buy-it-now" sales on its website while uBid, a direct competitor, was able to offer such option on its website.[FN9] As a result, the court will not strike MercExchange's submissions advancing evidence with respect to uBid; however, as previously mentioned, the court will reopen the record in a limited manner in order to permit eBay to perform depositions and further investigate the MercExchange/uBid business relationship.

> FN8. eBay argues that the terms of several of MercExchange's prior licenses would preclude MercExchange from granting an exclusive license to uBid. Such argument, even if correct, ignores the reality that uBid appears to place virtually the entire value of an exclusive license to the '265 patent on the ability to utilize such patent while preventing eBay from doing so. Thus, even if technically MercExchange could not grant uBid an exclusive license to the '265 patent covering every field of use, a nearly exclusive license that prevents MercExchange from granting further licenses to uBid's competitors, especially to eBay, ultimately appears to have the same effect and value as what MercExchange and uBid refer to as an " exclusive license."

> FN9. The recurring issue underlying nearly every dispute presently before the court is whether or not eBay has designed around

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 608                                                                    Page 8
467 F.Supp.2d 608
(Cite as: 467 F.Supp.2d 608)

the '265 patent; if it has, then an exclusive license is of virtually no value to uBid, nor is an injunction of much value to MercExchange. Although eBay has offhandedly referred to its purported design around both in court and in its briefs, eBay appears to have failed to advance any evidence nor even make the express, yet uncorroborated, claim that it has in fact designed around the '265 patent.

### D. Although the court will permit additional discovery, such discovery is limited in scope and time.

Although the court recognizes the necessity of updating the record with recent factual developments, the court will not permit the parties to backfill or recast facts in a manner inconsistent with this court's prior findings. However, even though portions of the challenged declarations plainly ignore this court's prior factual findings and at times advance opinions that appear more appropriate for counsel to argue, the court declines to strike such reports because the court recognizes, first, that its prior factual findings were limited, and second, that the expert reports generally do not attempt to backfill the record by adding new facts, but rather, merely cite trial testimony in an attempt to highlight MercExchange's version of pre-2003 events. Thus, rather than striking such reports, the court will simply disregard and give no weight to any portions of such reports that the court deems to be inconsistent with its prior factual findings.

In light of the court's decision not to strike such reports, nor strike references to uBid, the court must permit some form of discovery to ensure that the parties have a fair opportunity to investigate and challenge evidence advanced by the opposing party.FN10 As discussed at the hearing *617 on this matter, eBay relies on _Lussier v. Runyon_, 50 F.3d 1103 (1st Cir.1995) for the proposition that " once the record is closed, a district court, absent waiver or consent, ordinarily may not receive additional factual information of a kind not susceptible to judicial notice _unless it fully reopens the record_ and animates the panoply of evidentiary rules and procedural safeguards customarily available to litigants." _Id._ at 1105-06 (emphasis added). Adding some context to such quote, in _Lussier_ the district court was " [d]issatisfied with the trial evidence" regarding the plaintiff's future disability benefits, so the court, in an effort to accurately calculate plaintiff's damages,

ordered the parties to file a status report concerning certain disability payments that plaintiff would receive in the future. _Id._ at 1113. Plaintiff, " though objecting vigorously to the directive," submitted some evidence relating to his interim disability payments, whereas the defendant offered no information. _Id._ Subsequently, the court, apparently exasperated with defendant's failure to submit requested information, used the plaintiff's forced submission to calculate the present value of plaintiff's future disability benefits, reduced plaintiff's damages based on such calculation, and " paid lip service" to the fact that it had " reopened the record." _Id._ at 1113, 1115 n. 16. On appeal, the First Circuit concluded that although the district court claimed to have reopened the record, its actions failed to approach the proper method of reopening the record as the court, " over the plaintiff's objection, engaged in a unilateral pursuit of additional evidence without affording the parties the standard prophylaxis that generally obtains at trial ... [including] the right to object to evidence, the right to question its source, relevance, and reliability, the right to cross-examine its proponent, and the right to impeach or contradict it." _Id._ at 1115 n. 16.

> FN10. Although MercExchange firmly opposes reopening discovery as doing so delays resolution of its motion for an injunction, it was MercExchange that submitted numerous expert reports, some nearly forty pages in length with hundreds of pages of exhibits, and a declaration in support of a new allegation that eBay committed a fraud on this court. The court's decision to consider such materials necessitates that eBay be permitted the opportunity to investigate them.

[2] Although this court's views are in alignment with the First Circuit's, the court does not agree with eBay's broad categorization of the _Lussier_ opinion standing for the proposition that if the record is reopened, it must be reopened without limitation. Rather, _Lussier_ espouses the proposition that a court, no matter what its motivations, may not undertake the unilateral pursuit of extra-record evidence nor under any circumstances consider evidence advanced by one party concerning disputed material facts that the opposing party is not presented an opportunity to challenge. _Id._ at 1113; _see also Black v. TIC Investment Corp._, 900 F.2d 112, 116 (7th Cir.1990) (" Where new evidence is presented in a reply to a

467 F.Supp.2d 608

467 F.Supp.2d 608

(Cite as: 467 F.Supp.2d 608)

motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond." ). Such requirement is a " fundamental principle of our jurisprudence" as " [o]urs is a system that seeks the discovery of truth by means of a managed adversarial relationship between the parties, [and][i]f we were to allow judges to bypass this system, even in the interest of furthering efficiency or promoting judicial economy, we would subvert this ultimate purpose." *Lussier,* 50 F.3d at 1113-14. Thus, a district court may, in its discretion, " reopen the record" in a limited manner with respect to a targeted issue, so long as the parties are presented an equal and fair opportunity to investigate the facts and challenge the opposing party's evidence through traditional adversarial means. *See, e.g., Black,* 900 F.2d at 116 (remanding and explaining that a late filed affidavit could either be considered or disregarded by the district court; however, if accepted, the court must afford the opposing party **\*618** the opportunity to respond); *Chamberlain v. Denny's, Inc.,* 206 F.R.D. 418, 419-20 (D.Md.2002) (permitting the plaintiffs to file an affidavit from an individual improperly omitted from a prior discovery request because " the evidence to be presented by the witness [tardily identified] was particularly significant and dealt with a key issue in the case" ; however, because such individual " had not been previously identified as a witness in the case, the Court granted defendant the right to depose him and ascertain pertinent facts relating to his observations ..." ).

Here, the court's denial of eBay's motion to strike MercExchange's exhibits necessitates that, in order to preserve the adversarial system, the court reopen the record and permit the parties additional time to perform limited discovery into the new evidence submitted to the court. As requested by eBay at the hearing on this matter, the parties are permitted to perform additional depositions as well as serve document requests; however, all discovery requests must be confined to the investigation into events occurring subsequent to this court's denial of MercExchange's initial motion for an injunction. Furthermore, because the court's decision to reopen the record is not made without consideration of MercExchange's interest in a speedy resolution of its motion for an injunction and the extensive discovery previously conducted, the court will limit each party to five depositions, lasting no longer than six hours each, and all depositions must be concluded by March 2, 2007. Additionally, all document requests

must be served no later than January 12, 2007, and objections or responses are due no later than February 2, 2006. In the event that discovery disputes arise, the parties must contact Magistrate Judge James Bradberry no later than February 6, 2007, to determine an expedited discovery dispute procedure. Such limited time-frame should be more than sufficient to afford the parties, which each have extensive legal teams spanning multiple law firms, adequate time to investigate the pertinent issues, yet at the same time will allow for a hearing on the motion for an injunction and motion to stay to be conducted in the near future. Following the conclusion of discovery, the parties will be permitted until March 16, 2007, to file a supplemental brief, not to exceed twenty pages, in support of its motion and in opposition of the opposing party's motion.[FN11] The court anticipates that such briefs will focus primarily on the updated discovery and the impact of such discovery on the pending motions.

> FN11. The court is cognizant of MercExchange's desire for the speedy resolution of its motion and the court begrudgingly permits the parties until March 2, 2007, to complete additional discovery, which, along with two weeks for supplemental briefing, delays resolution of this matter until at least March 16, 2007. The court originally intended to permit the parties a significantly shorter period to conduct discovery; however, due to the close proximity of the issuance of this order to the December holiday season, realistically, the court recognizes that neither the lawyers nor the deponents would be able to comply with such a schedule without modification.

The court's decision to limit discovery is permitted by Federal Rule of Civil Procedure 26(b)(2) which states: " By order, the court may alter the limits in these rules on the number of depositions and interrogatories or the length of depositions under Rule 30. By order or local rule, the court may also limit the number of requests [for admission]." Fed.R.Civ.P. 26(b)(2). Thus, pursuant to such rule and in recognition of the already well-developed record, there will be no interrogatories and no requests for admission during the limited discovery period; however, as discussed above, the **\*619** court will permit both eBay and MercExchange to perform five depositions and to serve document requests

467 F.Supp.2d 608                                                                                    Page 10
467 F.Supp.2d 608
(Cite as: 467 F.Supp.2d 608)

relevant to the time period beginning August 6, 2003. The propriety of the court's limits on discovery is further bolstered by the fact that eBay stated at oral argument that it was not seeking never-ending discovery, but intended on submitting document requests, as well as performing a limited number of depositions including corporate depositions of uBid, MercExchange, and possibly Altitude Capital.[FN12] Although MercExchange has not requested the right to conduct depositions or serve document requests, the court will permit each party the same discovery rights. To reiterate, the permissible discovery must relate to developments subsequent to August 6, 2003, that are relevant to MercExchange's motion for an injunction and eBay's motion to stay the proceedings.

> FN12. The court sees minimal relevance in exploring the details of Altitude Capital's alleged capitalization of MercExchange because even if MercExchange recently received a multi-million dollar influx from such source, considering the totality of the circumstances and the damages at stake in this litigation, such fact appears to have little impact on the determination of whether or not an injunction should issue. However, the court will permit the parties to choose how to allocate their five permitted depositions, so long as the depositions seek to obtain information relating to events occurring subsequent to this court's August 6, 2003, order.

### III. eBay's Motion to Strike the Nahan Declaration

eBay's challenge to the sworn declaration submitted by Kenneth Nahan prompted a separate motion to strike because such declaration was not filed in support of MercExchange's injunction motion, but rather, was filed as an exhibit to MercExchange's response in opposition to eBay's motion to stay the proceedings. MercExchange submits the Nahan declaration in support of its claim that, at trial, eBay perpetrated a fraud on the court and, therefore, is not deserving of a favorable ruling in equity. The fraud alleged by MercExchange involves eBay's failure to disclose that it had a meeting with Mr. Nahan prior to trial at which eBay was allegedly informed that the Newman video, an exhibit introduced by eBay at trial, was confidential. eBay contends that such claim is false, irrelevant, and untimely; furthermore, eBay denies all allegations of fraud.

eBay attempts to suppress the Nahan declaration based on arguments similar to those discussed in the previous section of this order, specifically, both that MercExchange did not file a motion seeking to reopen the record and that MercExchange previously had the opportunity to file such declaration or call Mr. Nahan as a witness and its failure to do so makes the declaration untimely. Additionally, eBay highlights the fact that, at trial, MercExchange challenged the admissibility of the Newman video and objected to statements suggesting that such video was public, making submission of the Nahan declaration duplicative and unwarranted. MercExchange counters by pointing out that although the facts regarding eBay's meeting with Mr. Nahan may have previously been in existence, eBay did not produce the Newman video until *after* the close of discovery and eBay never informed MercExchange or the court of its meeting with Mr. Nahan. MercExchange contends that is it disingenuous for eBay to have concealed the confidential nature of the video, as well as its meeting with Mr. Nahan, and then fault MercExchange for failing to uncover such intentional concealment.

Along with the claims duplicative to the motion to strike the injunction exhibits, eBay also seeks to have portions of the Nahan declaration stricken for containing *620 inadmissible hearsay.[FN13] Furthermore, eBay contends that the Nahan declaration should be stricken because MercExchange failed to provide evidence corroborating Mr. Nahan's confidentiality claims. [FN14] In response to the hearsay claim, MercExchange argues that all statements made by eBay's counsel are not hearsay under Rule 801(d) of the Federal Rules of Evidence as they represent statements by a party opponent. With respect to the lack of corroboration, MercExchange contends that because it was eBay's burden at trial to prove that the Newman video was public, neither MercExchange or Mr. Nahan need to provide corroboration to establish the confidentiality of the video.

> FN13. Numerous paragraphs of the Nahan declaration include references to what Mr. Nahan was told by counsel for both MercExchange and eBay. Additionally, two paragraphs contain information apparently relayed from eBay's counsel, to Mrs. Nahan, to Mr. Nahan.

467 F.Supp.2d 608

467 F.Supp.2d 608

(Cite as: 467 F.Supp.2d 608)

Page 11

FN14. MercExchange has provided what purports to be a control log and several sample *unsigned* confidentiality agreements in an attempt to corroborate Mr. Nahan's claims that the Newman video was maintained as confidential. eBay challenges the authenticity, relevancy and admissibility of such exhibits.

[3] As discussed in detail in Part III above, the court will not strike any of MercExchange's exhibits, including the Nahan declaration, based on the lack of a formal motion to reopen the record. As to the timing of the Nahan declaration, eBay's failure to produce the Newman video until *after the close of discovery* supports MercExchange's claim that it never had the opportunity to fully investigate the facts surrounding the video. That being said, the Nahan declaration, submitted by MercExchange in opposition to eBay's motion to stay, appears to be rather far afield from the primary issues before the court, and although certainly relevant to the court's equity calculus, the court recognizes not only that the declaration includes hearsay, but that Mr. Nahan has minimal corroboration for his position and that MercExchange has submitted conflicting affidavits.[FN15] Considering which party carries the burden, although MercExchange is correct that *at trial* the burden is on eBay to prove that the video was in the public domain, thus potentially invalidating MercExchange's patents, at this stage in the proceedings it is MercExchange that is attempting to prove that eBay committed a fraud on the court, and therefore, it is MercExchange that carries the burden to establish not only that the video was in fact confidential, but that eBay *knew* it was confidential and represented otherwise to the court.

FN15. eBay submits affidavits from Douglas Graham and Karen Bacon, past officers of Honicorp Inc. (Honicorp), Mr. Nahan's company. Such affidavits are offered in support of eBay's claims that the Newman video was not confidential and that eBay's counsel was informed *prior to trial* that the Newman video was not confidential.

Based on the considerations discussed above, the court denies eBay's motion to strike the Nahan declaration as although MercExchange's allegation of fraud may be somewhat tangential to the primary issues before the court, it is true that if eBay has

perpetrated a fraud on the court it is undeserving of a ruling in equity. The court does, however, recognize both that several statements within the Nahan declaration appear to be inadmissible hearsay and that MercExchange's evidence attempting to corroborate Mr. Nahan's statements is not compelling. Likewise, although the past Honicorp officers' affidavits, advanced by eBay, characterize the video as non-confidential, such affidavits suffer from a similar infirmity as the Nahan affidavit as portions are plainly hearsay. Therefore, as with the portions of the expert reports that the court deems improper, the court will give no weight to *621 hearsay statements contained in any affidavit before the court and will give the weight the court deems appropriate to the portions of the declarations that are properly before the court.

In anticipation of the court's denial of eBay's motion to strike the Nahan declaration, eBay has requested both in its memoranda and at oral argument that, in that alternative, it be afforded the opportunity to depose Mr. Nahan as well as file declarations in opposition of the Nahan declaration. However, as previously noted, eBay has in fact already filed two declarations in opposition of the Nahan declaration, and therefore, eBay's request to submit additional declarations is denied.[FN16] As for eBay's request to depose Mr. Nahan, the previous section of this order indicated that the court is permitting both parties the opportunity to perform five additional depositions and if eBay chooses to use one of its five depositions on Mr. Nahan, it may do so. Likewise, MercExchange is permitted to allocate two of its depositions to the two Honicorp officers that offered declarations in opposition of the Nahan declaration if it chooses to do so. The court clarifies that the issue regarding the Newman video is the *only issue* pre-dating the court's August 6, 2003, denial of MercExchange's injunction motion that the parties are permitted to investigate during discovery, and that such investigation is being permitted only as a result of eBay's tardy submission of the Newman video after the close of trial discovery.

FN16. Such declarations are attached as exhibits 18 and 20 to eBay's reply brief in support of its motion to stay. Exhibit 18 is a sworn statement offered by Douglas Graham, the president of Honicorp from 1991-1993 and it suggests both that the Newman video was not confidential and that Graham told eBay it was not confidential in

March, 2003 (eBay Reply to Mo. to Stay Ex.
18).

### IV. eBay's Motion for Leave to Submit a Motion to Enforce the Protective Order

[4] Unlike eBay's motions to strike, which are
directly related to the motion for an injunction and
motion to stay, eBay's motion to enforce the court's
protective order is somewhat discrete; thus, eBay
properly filed a request to file such motion rather
than simply filing it. Furthermore, although eBay was
correct to request permission to file a motion to
enforce the protective order, eBay's allegations with
respect to the protective order are at least tangentially
related to the two primary motions before the court
because eBay alleges improper participation in the
PTO reexamination proceedings; such proceedings
are plainly pertinent to both the motion to stay and
motion for an injunction. Additionally, if the court
were to deny eBay leave to file such motion the court
would potentially be permitting violations of the
protective order to go unchecked. Finally, the parties
have already fully briefed the motion to enforce the
protective order, and thus, even though this court
previously instructed the parties not to file additional
motions, at this stage there is little justification for
the court not to reach the merits of the fully briefed
motion. Therefore, eBay's motion for leave to submit
its motion to enforce the protective order is granted.

### V. eBay's Motion to Enforce the Protective Order

On March 8, 2002, this court entered a stipulated
protective order submitted by the parties; although
the court did not draft such order, its final provision
states that the court may modify the protective order
" at any time upon a showing of good cause" (March
8, 2002 Order ¶ 21). eBay's instant motion to enforce
the protective *622 order was prompted by the fact
that experts originally engaged by MercExchange to
testify at the trial on this matter have made
submissions to the PTO on behalf of MercExchange
in support of the validity of the '265 and '051 patents.
Such experts, prior to being permitted to view eBay's
confidential business information, signed sworn
statements indicating that they read and understood
the terms of the protective order, agreed to be bound
by the conditions of such order, and would not use or
disclose any confidential information except for
purposes explicitly allowed by the order. eBay
contends that the protective order bars such experts
from having any involvement in the PTO

reexamination of the patents at issue in the instant
litigation, whereas MercExchange contends that the
paragraph of the protective order directed at outside
experts does not bar such involvement. eBay's motion
seeks relief in three forms: first, eBay requests that
this court order MercExchange's experts, Drs.
Weaver, Palmer, and Frieder, to cease all
participation in patent prosecution activities on behalf
of MercExchange; second, that MercExchange be
ordered to withdraw all declarations submitted to the
PTO by such experts and all new or amended claims
supported by such declarations; and third, that
MercExchange maintain a log, for in camera
inspection, of all documents relating to
communications with, or analysis by, its experts
regarding patent prosecution efforts.

[5] After carefully considering the merits of eBay's
motion, the court determines that MercExchange has
not violated the terms of the protective order, and
thus, it is not proper for this court to order
MercExchange to withdraw any expert declarations
or related claims.[FN17] However, the court also
concludes that the spirit of the protective order
suggests that experts who accessed eBay's
confidential information should not be participating
in the PTO reexamination of the very patents that
constituted the core of the litigation such experts
were involved. As a result, the court determines that
there is " good cause" to modify the protective order
to require that, from this point forward, any expert
with prior access to eBay's proprietary information
shall no longer participate in the PTO reexamination
of any of the patents at issue in the instant
litigation.[FN18] The court reaches such determination
in spite of the fact that there has been no showing that
confidential information has been misused because
the addition of fifty-two claims to one of the patents
constituting the core of the instant litigation creates
the very real potential for the unintentional misuse of
confidential information.

> FN17. For brevity's sake, the court avoids an
> extensive discourse into the textual analysis
> of the protective order and deems it
> sufficient to explain that although eBay is
> correct that the protective order states that
> under " no circumstances shall any person
> who accesses [confidential] material"
> participate in patent prosecution activities,
> MercExchange's position that the protective
> order's structure limits the application of
> such broad language to law firms and their

467 F.Supp.2d 608

467 F.Supp.2d 608

**(Cite as: 467 F.Supp.2d 608)**

employees is more persuasive than eBay's contention that it covers all individuals, including experts. (March 8, 2002 Order ¶ 4).

FN18. MercExchange argues that much of the information previously marked as confidential became public at trial, thereby losing its confidential status. The court recognizes, however, that because summary judgment was granted on the '051 patent, vast amounts of proprietary information were not publicly displayed at trial. Likewise, even though the '265 patent was litigated in open court, a significant amount of eBay's confidential information subject to review by MercExchange's experts was not revealed at trial. Therefore, any expert viewing any of eBay's information that remains confidential must cease involvement in the PTO reexamination.

*623 The court's decision to prohibit MercExchange's trial experts from future involvement in the PTO reexamination is based on several factors balanced by the court including: (1) the apparent minimal burden on MercExchange to retain alternative experts who did not personally examine eBay's confidential information if future reports or consulting is necessary; [FN19] (2) the reality that the ex parte nature of the PTO reexamination process prevents eBay from effectively monitoring disclosures made by experts that viewed confidential information coupled with the fact that it is not within the province of this court to provide monitoring or oversight of submissions to the PTO; and (3) as several cases cited by eBay effectively demonstrate, it is oftentimes impossible for an individual, even with the noblest of intentions, to delineate between ideas that they may advance as a result of their own creation, and those influenced by past exposure to confidential information. The high risk of inadvertent disclosure of confidential information due to the difficulty in mentally segregating the origin of ideas,[FN20] as well as the inability of both eBay and this court to police experts' communications with the PTO, is precisely why the court believes that an *absolute bar* from participation in the reexamination of the very patents at the heart of the instant litigation is necessary.[FN21]

FN19. *See, e.g., U.S. Steel Corp. v. United States,* 730 F.2d 1465, 1468 (Fed.Cir.1984)

(recognizing that forcing the plaintiffs to rely on newly retained counsel " would create an extreme and unnecessary hardship" ); *Motorola, Inc. v. Interdigital Tech. Corp.,* No. 93-488-LON, 1994 U.S. Dist. LEXIS 20714, at *15 (D.Del. Dec. 19, 1994) (unpublished) ( " Courts have also considered the hardship to the client if counsel is disqualified or restricted in some manner." ).

FN20. In *U.S. Steel Corp.,* the Federal Circuit explained: " Inadvertence, like the thief-in-the-night, is no respecter of its victims. Inadvertent or accidental disclosure may or may not be predictable. To the extent that it may be predicted, and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision." 730 F.2d at 1468.

FN21. Although MercExchange cites several cases in support of its contention that broad language in a protective order prohibiting involvement in patent prosecution for similar patents or in a similar field for a set number of years is disfavored, two significant factual distinctions exist between such cases and the instant matter. *See, e.g., Trading Technologies Intern., Inc. v. eSpeed, Inc.,* No. 04 C 5312, 2004 WL 2534389, at *1 (N.D.Ill. Sept. 24, 2004) (unpublished) (refusing to bar the plaintiff's attorney who is " primarily a litigator" from being involved in prosecuting patents on plaintiff's behalf for a specified number of years because: (1) such attorney is generally only " incidentally involved in patent applications" and " acts as an advocate, not as a drafter of specifications and claims" ; and (2) the court had no reason to doubt that such attorney would " conscientiously keep in mind and act to uphold his professional obligations" ); *AFP Advanced Food Products LLC v. Snyder's of Hanover Mfg.,* No. Civ.A. 05-3006, 2006 WL 47374, at *2 (E.D.Pa. Jan. 6, 2006) (unpublished) (" Barring AFP's attorneys from prosecuting similar patents for two years following this suit, without some tangible reason or good cause other than the general threat of inadvertent misuse of discovered materials,

467 F.Supp.2d 608                                                                    Page 14

467 F.Supp.2d 608

(Cite as: 467 F.Supp.2d 608)

is the exact type of overly broad and generalized fear rejected in [various past federal cases]." ). The two primary differences between the instant dispute and such cases are, first, that the cited cases involve barring *lawyers* from involvement in patent prosecution, not *experts,* and not only must a court presume a heightened level of ethical conduct on the part of lawyers as compared to experts, but also, requiring a party to replace counsel they have a longstanding relationship with creates a much greater burden than requiring a party to hire different experts. *See Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.,* 682 F.Supp. 20, 23 (D.Del.1988) (" [C]ounsel who are admitted to the Bar of this Court are officers of the Court and are bound by the Code of Professional Responsibility." ). Second, the patent prosecution activities that eBay seeks to bar in the instant motion do not involve " similar patents" or future patents in a " similar field," but rather, involve the reexamination and addition of claims to the *very patents* constituting the core of the instant litigation.

**\*624** Although, as previously mentioned, it does not appear that MercExchange's experts have improperly relied upon eBay's proprietary information, the post-trial addition of fifty-two claims to the '051 patent creates a very real and expressly identifiable potential for misuse of confidential information as MercExchange attempts to redefine the scope of such patent and defend the validity of both the '051 patent and the '265 patent after preliminary PTO findings suggest that such patents may be invalid. In *In re Papst Licensing, GmbH, Patent Litigation,* No. MDL 1278, 2000 WL 554219 (E.D.La. May 4, 2000) (unpublished), the court concluded:

[I]t is clear that the advice and participation of the Papst parties' counsel in preparation and prosecution of patent applications related to the patents in suit is an intensely competitive decisionmaking activity and would be informed by access to the Non-Papst parties confidential information. *Counsel's ability to file new claims in existing and pending patents based on the confidential information discovered during the course of this litigation poses an unacceptable opportunity for inadvertent disclosure and misuse.* Although the Court is confident that counsel for the Papst parties maintains the highest ethical and

professional standards, the risk of inadvertent disclosure and misuse and the difficulty of distinguishing the source of the Papst parties' basis for filing new claims are great.

*Id.* at *\*4* (emphasis added).[FN22] Similarly, in *Mikohn Gaming Corp. v. Acres Gaming Inc.,* 50 U.S.P.Q.2d 1783 (D.Nev.1998), the law firm representing the defendant in district court was also prosecuting patent applications on behalf of defendant that were " part of the very core of th[e] suit," and the court found that were such firm given access to plaintiff's proprietary technology it " would be in the ' untenable position' of having to either refuse his client legal advice on competitive design matters or violate the protective order's prohibition against revealing [plaintiff's] technical information." *Id.* at 1785-86, 1998 WL 1059557. The court noted that " [n]o matter how much good faith [such lawyers] might exercise, it is unrealistic to expect that ... knowledge of [plaintiff's] secret technology would not or could not influence the nature of his advice to [defendant]" ; therefore, the court concluded that the defendant's patent prosecution firm could not view the plaintiff's confidential information.[FN23] **\*625***Id.* at 1786, 1998 WL 1059557. Finally, in *Motorola, Inc. v. Interdigital Tech. Corp.,* No. 93-488-LON, 1994 WL 16189689, 1994 U.S. Dist. LEXIS 20714 (D.Del. Dec. 19, 1994) (unpublished), the district court noted that because the defendant's attorneys were currently prosecuting patent applications related to the *very patents* at issue in the lawsuit, if such attorneys were permitted to view plaintiff's " voluminous confidential information" than they " would have to constantly challenge the origin of every idea, every spark of genius." *Id.* at 1994 WL 16189689, *\*5,* 1994 U.S. Dist. LEXIS 20714, *\*14-15.* The court characterized such segregation of ideas as a " sisyphean task, for as soon as one idea would be stamped ' untainted,' another would come to mind," and the " level of introspection that would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical the [defendant's] attorneys may be." *Id.* at 1994 WL 16189689, *\*5,* 1994 U.S. Dist. LEXIS 20714, *\*15.* As a result, the court barred the defendant's lawyers and employees that viewed plaintiff's confidential information from participating in patent prosecution. *Id.* at 1994 WL 16189689, *\*6,* 1994 U.S. Dist. LEXIS 20714, *\*17-18.*

FN22. Notably, the quote from *In re Papst Licensing* talks only of counsel's " ability to

467 F.Supp.2d 608
467 F.Supp.2d 608
(Cite as: 467 F.Supp.2d 608)

file new claims" as part of the reexamination process, whereas here, new claims were in fact filed.

FN23. This court is aware of the District of Maryland's recent decision in *MedImmune, Inc. v. Centocor, Inc.*, 271 F.Supp.2d 762 (D.Md.2003), which permitted patent prosecution counsel to view the opposing party's confidential information during the course of discovery. However, the facts of *MedImmune* are inapposite from both *Mikohn* and the instant facts, and were expressly recognized as such in the *MedImmune* opinion, which explained that, unlike *Mikohn*, there was no showing that " patent counsel was *currently* prosecuting patents on *the exact same subject matter of* the litigation." *Id.* at 775 n. 14 (emphasis added). Furthermore, the instant matter is readily distinguishable from *Interactive Coupon Marketing Group, Inc. v. H.O.T.! Coupons, LLC.*, No. 98 C 7408, 1999 WL 618969 (N.D.Ill. Aug. 9, 1999) (unpublished) which barred patent prosecution counsel from viewing confidential information because counsel " has represented and *is likely to represent* [the plaintiff] in the prosecution of numerous *related* patents, and ... is deeply involved in representing the client in multiple, related infringement cases in the context of a fluid, developing technology." *Id.* at *3 (emphasis added). Unlike *Interactive Coupon,* here, it is not past or potential future patent prosecution, nor merely " related" patents at issue, but rather, here, the court seeks to prevent experts that accessed eBay's confidential information from participating in the reexamination of the very patents constituting the core of the litigation.

Unlike *Papst, Mikohn,* and *Motorola,* here, the issue is not whether attorneys actively participating in patent prosecution may view confidential information; [FN24] rather, the issue is whether experts that previously participated in litigation as trial experts and accessed confidential information during the course of such engagement may later participate in the reexamination of the very patents they were retained to opine on. Although this court recognizes the difference between an expert's involvement and

an attorney's involvement, including the differences in the ability to influence strategic decisionmaking, the court notes that segregating patent prosecution and patent litigation to two separate law firms would lose its intended purpose if consultants that qualify as experts in the field of claimed inventions were permitted to view an opposing party's confidential information, work closely alongside litigation counsel, and then subsequent to trial, crossover and work alongside patent prosecution counsel during the reexamination of the very same patents. Furthermore, here, the impropriety of such crossover is multiplied by the fact that MercExchange has added fifty-two claims to one of the patents at the core of the litigation. Although the court does not dispute MercExchange's legitimate desire to continue reexamination with aid from experts familiar with the facts of this case and the patents at issue, if, as MercExchange contends, its experts' involvement in the reexamination is truly limited to disputes about the scope of prior art and other matters plainly distinct from eBay's confidential information, than MercExchange will suffer little prejudice in being required to rely on alternative experts that have not accessed eBay's confidential information.

FN24. MercExchange has properly segregated trial representation and patent prosecution to two separate law firms.

In summary, although MercExchange's construction of the previously entered protective order appears correct, the court at this time modifies such order to prohibit MercExchange's outside experts and independent consultants that viewed eBay's confidential information from any further involvement in the PTO reexamination of **626** patents subject to the instant litigation. Such remedy is " broad enough to protect [eBay's] confidential information, yet seeks to minimize the hardship to [MercExchange]" as the court's prohibition applies only to the patents at issue in the instant lawsuit. *Motorola,* 1994 WL 16189689, at *6, 1994 U.S. Dist. LEXIS 20714, at *18. Although modifying the protective order based on good cause, the court denies eBay's request that any past submissions, or claims founded on such submissions, be ordered withdrawn from the PTO as the court is mindful of its responsibility not to disrupt the PTO's administrative proceeding, MercExchange's and eBay's interest in a timely resolution of both the instant litigation and the PTO reexamination, and the fact that MercExchange's experts' submissions were not in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 608

467 F.Supp.2d 608

(Cite as: 467 F.Supp.2d 608)

violation of the protective order as written. Furthermore, as suggested by the above findings, the court denies eBay's request that MercExchange maintain a log for in camera review of all expert submissions to the PTO, as past submissions were not improper, and future submissions will not occur in light of this court's ruling.

## VI. Conclusion

Based on the prospective nature of the relief sought in MercExchange's motion for an injunction and eBay's motion for a stay of the proceedings, as well as the fact that both parties rely heavily on factual developments occurring subsequent to this court's denial of MercExchange's original motion for an injunction, the court deems it necessary to reopen the record and permit the parties to investigate recent factual developments through the adversarial process. Although the court recognizes that permitting the parties to perform additional depositions and submit document requests will delay the resolution of the pending motions, an apparent detriment to MercExchange, the court notes that it was MercExchange that chose to submit numerous expert declarations and other exhibits in support of its injunction motion, and MercExchange simply cannot have the benefit of the court considering such submissions without the associated detriment of eBay being permitted time to investigate them.

Although the court's decision to reopen the record is properly limited to developments occurring after August 6, 2003, the date this court denied MercExchange's initial motion for an injunction, the court will permit inquiry into eBay's production of the Newman video in light of its pre-trial meeting with Kenneth Nahan. Although the facts regarding such matter predate August 6, 2003, the court recognizes that eBay produced the Newman video after the close of trial discovery and that MercExchange never had the opportunity to fully investigate such matter.

The court grants eBay's motion to file its motion to enforce the protective order; however, after considering the substantive motion, the court determines that MercExchange's experts have not in fact violated the protective order as written. However, after considering the briefs and oral arguments, the procedural posture of both this case and the PTO reexamination proceedings, and the intended goals of the protective order, the court

agrees with eBay that trial experts and consultants that viewed eBay's confidential information should not be permitted to participate in the PTO reexamination proceedings of the very same patents at the heart of the litigation. As a result, the court, for good cause shown, modifies the protective order to require that, from this point forward, any non-party expert or outside consultant that viewed eBay's confidential information cease participation in the PTO reexamination of the patents at issue in the instant litigation.

*627 In summary, both of eBay's motions seeking to strike newly submitted evidence are **DENIED**. As a result of such denial, the court **PERMITS** both parties until March 2, 2007, to perform additional discovery into eBay's knowledge and representations regarding the Newman video as well as all relevant factual developments occurring subsequent to August 6, 2003. As previously discussed, in recognition of the already well-developed record, there will be no interrogatories or requests for admission; however, both parties are permitted to conduct five depositions, each lasting no longer than six hours. Additionally, document requests may be served by both parties no later than January 12, 2007, and objections or responses to such requests are due no later than February 2, 2007. Finally, each party is afforded until March 16, 2007, to submit a single supplemental brief in support of its motion and in opposition of the opposing party's motion; such brief is limited to 20 pages in length.

The court **GRANTS** eBay's motion for leave to submit the protective order motion and **GRANTS** in part, and **DENIES** in part, the substantive protective order motion. Specifically, the court **GRANTS** the portion of the motion requesting that experts that viewed eBay's confidential information be prohibited from further involvement in the PTO reexamination of the patents at issue in this litigation and **DENIES** the remainder of such motion.

The Clerk is **REQUESTED** to mail copies of this Order to counsel of record.

**IT IS SO ORDERED.**

E.D.Va.,2006.
Mercexchange, L.L.C. v. eBay, Inc.
467 F.Supp.2d 608

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2007 WL 1875834 (C.A.3 (Pa.))

(Cite as: Slip Copy)

**H**
E.E.O.C. v. Hora, Inc.
C.A.3 (Pa.),2007.
Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,Third Circuit.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; Manessta Beverly, Plaintiff/Intervenor in District Court
v.
HORA, INC. d/b/a Days Inn; Marshall Management, Inc. Jana R. Barnett, Appellant pursuant to F.R.A.P. 12(a).
No. 05-5393.

Argued May 21, 2007.
Filed June 29, 2007.

Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C. No. 03-cv-01429), District Judge: The Honorable Gene E.K. Pratter.

Andrew N. Howe, Hartman, Hartman, Howe & Allerton, Reading, PA, for Equal Employment Opportunity Commission; Manessta Beverly/Hora Inc.
Daniel P. O'Meara, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Howard K. Kurman, Offit Kurman, Owing Mills, MD, for Marshall Mgmt. Inc.
Thomas S. Neuberger, Stephen J. Neuberger, The Neuberger Firm, Wilmington, DE, for Jana R. Barnett.

Before BARRY, CHAGARES and TASHIMA [FN*], Circuit Judges.

> FN* Honorable A. Wallace Tashima, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

OPINION OF THE COURT
TASHIMA, Circuit Judge.

*1 Jana R. Barnett, Esq., appeals an order of the district court finding her violation of the Pennsylvania Rules of Professional Conduct (" PRPC" or " Rules" ) and therefore disqualifying her from representing Manessta Beverly in a lawsuit against Beverly's former employer, HORA, Inc., d/b/a Days Inn, and Marshall Management (together " Defendants" ), the management company for Days Inn. The Equal Employment Opportunity Commission (" EEOC" ) filed suit against Defendants, alleging that Beverly's supervisor, Nelson Garcia, created a sexually-hostile working environment by harassing Beverly and other female employees, and that Defendants retaliated against Beverly by firing her when she complained about Garcia's conduct. The district court disqualified Barnett from representing Beverly in the EEOC action, based on Barnett's allegedly improper contact with another HORA employee, Debbie Richardson.[FN1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

> FN1. We assume without deciding that Richardson was neither a client of Barnett nor consulted Barnett for the purpose of deciding whether to then become a client of hers.

**I.**

In reviewing an attorney disqualification issue, this court first exercises " plenary review to determine whether the district court's disqualification was arbitrary-' the product of a failure to balance proper considerations of judicial administration against the right to counsel.' " United States v. Stewart, 185 F.3d 112, 120 (3d Cir.1999) (quoting United States v. Voigt, 89 F.3d 1050, 1074 (3d Cir.1996)). If we conclude that the district court's decision was not arbitrary, we then determine whether the district court abused its discretion in disqualifying the attorney. Id.

**II.**

The district court relied primarily on Rule 4.2 of the PRPC in deciding to disqualify Barnett.[FN2] Rule 4.2 provides:

> FN2. We write only for the parties and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 2

Slip Copy, 2007 WL 1875834 (C.A.3 (Pa.))

**(Cite as: Slip Copy)**

therefore do not state the facts separately.

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

PRPC 4.2. " The rationale behind Rule 4.2 is ' to prevent ... a represented party ... [from] be[ing] taken advantage of by adverse counsel; the presence of the party's attorney theoretically neutralizes the contact.' " *Inorganic Coatings, Inc. v. Falberg*, 926 F.Supp. 517, 519 (E.D.Pa.1995) (quoting *Univ. Patents, Inc. v. Kligman*, 737 F.Supp. 325, 327 (E.D.Pa.1990)) (alterations in original); *see also Carter-Herman v. City of Phila .*, 897 F.Supp. 899, 901 (E.D.Pa.1995) (" The purpose of Rule 4.2 is to prevent lawyers from taking advantage of uncounselled lay persons and to preserve the efficacy and sanctity of the lawyer-client relationship." ). The explanatory comment provides that,

[i]n the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

**\*2** *Id.,* cmt. 7. Rule 4.2, therefore, would have prohibited communication between Barnett and Richardson if Richardson were an employee who regularly consulted with Defendants' lawyer regarding the matter, or if she had authority to obligate Defendants with respect to the matter, or if her acts in connection with the harassment claim could be imputed to Defendants for liability purposes.

We conclude that Richardson's role at Days Inn did not bring her within the scope of Rule 4.2. " The underlying policy and Official Comment to the Rule [4.2] make clear that it was intended to forbid *ex parte* communications with all institutional employees whose acts or omissions could bind or impute liability to the organization or whose statements could be used as admissions against the organization, presumably pursuant to Federal Rule of Evidence 801(d)(2)(D)." *Univ. Patents,* 737 F.Supp. at 328; *see also McCarthy v. Se. Pa. Transp. Auth.,*

772 A.2d 987, 993 (Pa.Super.Ct.2001) (" The key information needed by the trial court to determine if an employee qualifies for protection from ex parte communication with opposing counsel is what status that employee has within the employee's organization, i.e., whether, by virtue of the employee's status, a statement made by this employee could impute liability to the company." ). There is no evidence in the record to support the conclusion that Richardson regularly consulted with Defendants' lawyer regarding the matter or that her acts or omissions could obligate or impute liability to Defendants with respect to the matter.

Richardson's role as an administrative assistant is different from that of the employees in cases in which Rule 4.2 has been found to apply. For example, in *Weeks v. Indep. Sch. Dist. No. 1-89,* 230 F.3d 1201 (10th Cir.2000), counsel for the plaintiff, a former bus driver for a school district, engaged in ex parte communications, on matters relevant to the case, with an operations supervisor for the school district and with the plaintiff's immediate supervisor. Both employees had managerial authority over issues in the underlying litigation and could have made statements that would bind the school district and therefore came within the scope of Rule 4.2 of the Oklahoma Rules of Professional Conduct.[FN3] *Id.* at 1210-11; *see also Carter-Herman,* 897 F.Supp. at 903 (examining " the written job descriptions of the various ranks of the Philadelphia Police Department for the purpose of determining who has managerial responsibility" ); *McCarthy,* 772 A.2d at 993-94 (concluding that the trial court erred in removing counsel where " the trial court did not make a finding of fact or even state on the record that the witnesses were employees whose statements may constitute admissions for the purposes of [Rule 4.2]" ). Defendants, in fact, did not rely on Rule 4.2 in their motion to disqualify Barnett because they conceded that Richardson had no managerial authority in the company.[FN4]

> FN3. Oklahoma Rule 4.2 is essentially the same as Pennsylvania's.

> FN4. The EEOC also took the position that Rule 4.2 did not apply in these circumstances.

**\*3** Moreover, even if Richardson were covered by Rule 4.2, the district court did not indicate how Defendants were prejudiced by Barnett's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1875834 (C.A.3 (Pa.))

**(Cite as: Slip Copy)**

communications with Richardson. *See Univ. Patents,* 737 F.Supp. at 329 (stating that, " [i]n determining the proper sanction or remedy [in the case of a Rule 4.2 violation], the court must consider the client's right to be represented by the counsel of his choice, as well as the opposing party's right to prepare and try its case without prejudice," and concluding that there was " not sufficient evidence ... to conclude that plaintiff has been so severely prejudiced that the draconian measure of disqualification of counsel" was warranted) (internal quotations omitted). Defendants conceded at the hearing on the motion to disqualify Barnett that all of the information that Barnett received from Richardson was disclosed during discovery. Because Defendants accordingly were not prejudiced by Barnett's communications with Richardson, the draconian measure of disqualification was not warranted.

The district court's reliance on Rule 4.4, which prohibits a lawyer from using methods of obtaining evidence that violate the legal rights of a third person, similarly suffers from a lack of evidence of prejudice to Defendants. To repeat, all of the evidence that Barnett received from Richardson was produced during discovery, and there is no indication that Defendants were prejudiced by Barnett's receipt of the evidence. Moreover, Barnett specifically stated in her verified statement that she did not rely on information she had received from Richardson regarding a conversation between Defendants and their counsel, because Barnett knew that the information was privileged. There is no evidence to the contrary. Nor is there evidence to support the district court's conclusion that Barnett encouraged Richardson to disclose to her all the information she learned through her employment.[FN5]

> FN5. For substantially the same reasons, we conclude that Barnett's conduct also did not violate Rule 8.4.

The district court also relied on Rule 3.7, which forbids a lawyer from " act [ing] as advocate at a trial in which the lawyer is likely to be a necessary witness." PRPC 3.7(a). The district court reasoned that Barnett's testimony might be necessary to Defendants' theory of the case that the information provided to the EEOC resulted from Barnett's " fueling" a personal vendetta by a disgruntled Richardson, who was angry with management and did not get along with her supervisor. If this was Defendants' defense-that they did nothing wrong, and

that the EEOC claim was nothing more than a personal vendetta by Richardson-it is possible that Barnett would be a necessary witness. However, it is highly unlikely that this would be their defense, in light of the fact that Beverly and several other women named numerous specific incidents of sexual harassment by Garcia and of management doing nothing in response. Moreover, Rule 3.7 provides an exception if the disqualification of the lawyer would work substantial hardship on the client, an issue that the court barely discussed. Because of the highly speculative nature of the theory that Barnett manipulated Richardson into acting, and the hardship to Beverly of disqualifying her attorney, Rule 3.7 does not provide a sufficient basis on which to disqualify Barnett.

*4 For the foregoing reasons, we conclude that the district court abused its discretion in imposing the severe sanction of disqualification.[FN6]

> FN6. Because we reverse on the grounds set forth above, we need not reach Barnett's argument that Rule 4.2 is unconstitutionally vague.

C.A.3 (Pa.),2007.

E.E.O.C. v. Hora, Inc.

Slip Copy, 2007 WL 1875834 (C.A.3 (Pa.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.